IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF TEXAS

JUSTIN RIDDLE, ) Plaintiff, )

16422 Patrick Ave, Omaha, NE 68116

1:25CV00073 DII

v. ) X CORP aka TWITTER, INC. ) Defendant. )

856 FM1209 building 2, Bastrop, TX 78602

Registered Agent : C T CORPORATION SYSTEM**

701 S CARSON ST STE 200, Carson City, NV, 89701, USA

COMPLAINT AND DEMAND FOR JURY TRIAL

I. INTRODUCTION

1. This action arises from Defendant X Corp's (formerly known as Twitter, Inc., hereinafter "X Corp") fraudulent, negligent, and unlawful conduct in systematically violating Plaintiff's intellectual property rights while simultaneously engaging in deceptive billing practices. X Corp's actions demonstrate not only direct harm to Plaintiff but also reveal a disturbing pattern of corporate misconduct enabled by the broad immunities currently afforded to social media platforms.

2. Beginning in November 2023, X Corp enabled and actively facilitated widespread copyright infringement of Plaintiff's registered photograph, allowing dozens of accounts to misuse Plaintiff's intellectual property despite receiving multiple DMCA-compliant takedown notices. The scale of infringement is staggering, with conservative estimates indicating well over 500 separate instances of unauthorized use, each constituting an individual violation of Plaintiff's exclusive rights under copyright law.

3. Compounding these violations, X Corp engaged in fraudulent billing practices by continuing to charge Plaintiff for premium services while simultaneously suspending his account and preventing access to the paid features. When Plaintiff attempted to cancel these unauthorized charges, X Corp's own suspension policies prevented him from accessing the cancellation mechanism, creating a predatory cycle of billing for services that X Corp knew it was not providing.

4. Beyond the specific harms suffered by Plaintiff, this case presents a critical opportunity to address the broader systemic issues of platform accountability and corporate responsibility in the digital age. The outcome has the potential to establish precedent regarding the limits of platform immunity and the enforcement of individual rights in the social media context.

5. The systematic abuse enabled by platform immunity creates profound psychological harm that extends far beyond immediate financial damages. When social media platforms selectively enforce policies and allow coordinated harassment while suppressing legitimate speech, they create conditions that can severely impact mental health and social functioning.

6. Consider the psychological impact of experiencing:

   - Coordinated impersonation, where malicious actors are allowed to steal one's identity, image, and personal story to spread false narratives

   - Systematic suppression, where legitimate attempts to correct false information are hidden from view

   - Institutional gaslighting, where platforms acknowledge harassment but refuse to address clear copyright violations

   - Financial exploitation through continued billing while denying service access

   - Deliberate obstruction of legal remedies through account suspension

7. These actions create a perfect storm of psychological distress by:

   - Forcing victims to watch their identity be misused without recourse

   - Creating doubt about one's own perceptions when institutions ignore clear evidence

   - Generating feelings of powerlessness when legal rights are systematically denied

   - Causing social isolation through coordinated suppression of legitimate speech

- Inflicting emotional trauma through unchecked harassment

8. The damage is compounded by institutional coordination, where:

- Platforms protect harassers while punishing victims

- Support systems acknowledge abuse but refuse to act

- Legal remedies are deliberately obstructed

- Evidence of misconduct is systematically hidden

- Legitimate complaints trigger retaliation

9. This creates particularly severe harm because:

- Victims cannot escape the abuse while maintaining social connections

- Their efforts to seek help are systematically thwarted

- They are forced to watch their identity be misused

- Their attempts to correct false narratives are suppressed

- They face retaliation for seeking legal remedies

10. The broader societal impact includes:

- Erosion of trust in institutions

- Suppression of legitimate public discourse

- Creation of artificial narratives through selective enforcement

- Protection of coordinated harassment campaigns

- Deliberate obstruction of legal accountability

11. These harms are not accidental but result from deliberate policy choices:

   - Platforms prioritize engagement over user safety

   - Support systems are designed to obstruct rather than assist

   - Legal compliance mechanisms are intentionally ineffective

   - Harassment is protected while legitimate speech is suppressed

   - Accountability systems are deliberately dysfunctional


12. The psychological impact is particularly severe because:

   - Victims can see the abuse but cannot stop it

   - Their evidence is clear but systematically ignored

   - Legal rights exist but are deliberately obstructed

   - Truth becomes visible but remains unspeakable

   - Justice systems acknowledge harm but refuse remedy


13. This systematic institutional failure creates lasting trauma by:

   - Destroying faith in justice systems

   - Creating learned helplessness

   - Inflicting cognitive dissonance

   - Generating social isolation

   - Causing deep psychological harm

14. The damages extend beyond immediate financial harm to include:

- Long-term psychological trauma

- Loss of social connections

- Professional reputation damage

- Erosion of trust in institutions

- Ongoing emotional distress


15. This comprehensive pattern of abuse demonstrates why platform immunity must be balanced against:

- Individual rights protection

- Mental health preservation

- Social discourse integrity

- Institutional accountability

- Justice system function


16. The current system enables coordinated psychological abuse while providing no meaningful remedy, creating conditions that can lead to severe mental health consequences and societal harm. This case presents an opportunity to establish precedent for platform accountability and protect individuals from systematic institutional abuse.


## II. JURISDICTION AND VENUE

17. This Court has diversity jurisdiction under 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000 and the parties are citizens of different states. The potential statutory damages for copyright infringement alone exceed $75,000,000, based on the number of documented infringements and the maximum statutory penalty of $150,000 per willful infringement.

18. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including X Corp's decisions regarding content moderation, policy enforcement, and billing practices, which were made at its headquarters which is located in Bastrop, TX.

III. PARTIES

19. Plaintiff Justin Riddle ("Plaintiff") is an individual residing at 16422 Patrick Ave, Omaha, NE 68116. Plaintiff is a citizen of Nebraska and can be reached at 402-813-2156 for matters relating to this litigation.

20. Defendant X Corp, formerly known as Twitter, Inc., is a Delaware corporation with its principal place of business at 856 FM1209 building 2, Bastrop, TX 78602. X Corp operates one of the world's largest social media platforms and possesses

sophisticated technological systems for content moderation, user identification, and policy enforcement.

IV. FACTUAL ALLEGATIONS

A. Copyright Registration and Initial Infringement

21. Plaintiff is the owner of a valid registered copyright in a formal personal photograph depicting himself and his wife ("the Photograph"). The copyright registration obtained is a personal photograph of the Plaintiff and his wife, not an arbitrary work of art that could be confused by a department of trained individuals on DMCA regulations. The registration is documented in and by the US Copyright Office.

 

22. Starting in December 2023, a coordinated network of accounts on X Corp's platform began systematically misusing the Photograph. This was not isolated

activity but rather a widespread campaign involving dozens of accounts and hundreds, potentially thousands of infringing posts. These accounts would often block the plaintiff while using his image and even, in some cases, impersonating him by using his full name, images and personal background, such as his win in the Nebraska Supreme Court, additionally, claiming that Plaintiff's account was the imposter.



## B. DMCA Compliance and X Corp's Failures

23. Between December 2023 and May 2024, Plaintiff submitted four separate DMCA-compliant takedown notices to X Corp. Each notice:

    a) Was submitted through X Corp's designated legal DMCA process

    b) Required Plaintiff to visit a separate website with multiple explicit warnings about legal liability for false reporting

    c) Included all legally required elements under 17 U.S.C. § 512

    d) Specifically identified the infringing content and accounts

    e) Was submitted under penalty of perjury

f) Was screen recorded to prevent X-Corp from pretending that it wasn't received or that Plaintiff had incorrectly submitted the request. Here is one such example: https://youtu.be/5MN8Ix_XRYw?t=1677

24. These notices demonstrate Plaintiff's diligent compliance with legal requirements and X Corp's repeated failures to act. Despite having:

   a) Sophisticated content monitoring systems

   b) Access to user identification data

   c) Device IDs

   d) IP addresses

   e) MAC addresses

   f) Email verification records

   g) Phone number verification data

X Corp failed to take any meaningful action to address the infringement.

25. Additionally, Plaintiff was required to send proof of identification so that they could verify who he was, and even with that information provided, they refused to remove the infringing posts or accounts. This takes it from the realm of subjectivity or automation to deliberate and willful choices to allow for continued harassment while making Plaintiff jump through hoops following a variety of procedures that

never ended with resolution. **Notably, every email and submission came with a clear warning of legal repercussions and liability if Plaintiff were to misrepresent or file a false claim.** This drives home the serious nature and advanced effort by X Corp to properly review using the legal department.



26. At no point did any of these steps taken by the Plaintiff resolve the copyright infringement. As Plaintiff continued to request action, he was ultimately suspended due to mass reporting by the accounts that were impersonating him.



It appears that curse words were sufficient to suspend the Plaintiff, while rampant harassment, impersonation and threats of violence from the infringing accounts, was allowed with blessing. Some responses screenshot below.



**Panel 1:**

Case# 0351375367: DMCA - Copyright owner [ref:!00DA00K0A8.!5004w02rioLv:ref]

TS  Twitter Support    11/30/2023
To You

Hello,

Thanks for bringing this to our attention. However, it seems that you are trying to report an impersonation or harassment issue, not one relating to copyright. Please file a new report using the appropriate form:

https://support.twitter.com/forms/.

Thanks,

Twitter

image

**Panel 2:**

We have an update for you 0351666199 [ref:!00DA00K0A8.!5004w02rjwMO:ref]

TS  Twitter Support    12/1/2023

Hello,

Thank you for contacting us. After a review, we've determined that the content you reported does not appear to infringe copyright.

In some cases, we find there might be some confusion about what constitutes a copyright violation on Twitter. If a report doesn't involve the unauthorized publication of copyrighted works, then it's unlikely that there's a copyright issue.

We also see some confusion between copyright and trademark. For questions about trademarks, please read our Trademark Policy available in our Help Center.

If you need to report a trademark infringement or a violation of the Twitter Rules or Terms of Service, please use the appropriate form. Please note that whenever you file a report about a specific Tweet, we need you to include a direct link to the Tweet.

We appreciate your report.

Thanks,

Twitter

image

**Panel 3:**

We have an update for you 0352099481 [ref:!00DA00K0A8.!500Vp0Tpnl:ref]

TS  Twitter Support    12/7/2023

Hello,

Thank you for contacting us. After a review, we've determined that the content you reported does not appear to infringe copyright.

In some cases, we find there might be some confusion about what constitutes a copyright violation on Twitter. If a report doesn't involve the unauthorized publication of copyrighted works, then it's unlikely that there's a copyright issue.

We also see some confusion between copyright and trademark. For questions about trademarks, please read our Trademark Policy available in our Help Center.

If you need to report a trademark infringement or a violation of the Twitter Rules or Terms of Service, please use the appropriate form. Please note that whenever you file a report about a specific Tweet, we need you to include a direct link to the Tweet.

We appreciate your report.

Thanks,

Twitter

image

↰ ⌄  Reply

27. Impersonation, harassment, and many other swarm attempts used by bad actors on social media are not generally governed by actual law, unless they cross the threshold into certain threats or national security issues. These account administrators from X would have clearly seen:

   - Admission from the offending accounts that they were impersonating Plaintiff and his family

   - Multiple posts from the imposters claiming to be Riddle, while simultaneously trying to inflame strangers to become violent against Plaintiff

   - Open calls to entice additional bad actors to threaten, harass and impersonate Plaintiff

   - Plaintiff's information proving he was the subject of the image as well as the legal copyright owner

   - Even Plaintiff's family, including his son in law were targeted and impersonated, which Twitter was made fully aware and did not correct when reported by the Plaintiff

   - Repeated Doxing and threats of violence in the "Real World" were constant. For example, **@daviddunn177 has over 21,000 followers and in three consecutive posts on 12-13-2024, amassed over 70,000 views. Just Three posts.** There were over a dozen accounts involved in the constant harassment, impersonation and threats of violence, and as you can see, as of December 10th of 2023, this account

remains active and unhindered by X-Corp, despite this abusive and policy violating

behavior.



28. To see the volume of attempts to correct this, one can simply look at how many

emails there were regarding this issue without resolution. Because of the volume,

the image showing the email responses is barely readable, but each dot is a

separate response from the defendant. Additionally, Plaintiff has hundreds of

screenshots and hours of video of the offending accounts. Notably, Plaintiff provided

his driver's license and X admitted that "harassment and impersonation" were

involved. This is a clear admission that they knew the offenders were violating X

user agreement but chose to allow it to continue, suggesting an ineffective option. It

also indicates that they have a culture of ignoring serious violations of individuals

rights, and giving useless options for resolution. As shown below, they acknowledged impersonation and harassment but did not correct it, instead requiring an additional report, which was then denied despite the earlier admission.



## C. Account Suppression and Fraudulent Billing

29. While allowing the copyright infringement to continue, X Corp simultaneously:

    a) Suspended Plaintiff's premium account features

b) Suppressed the visibility of Plaintiff's content

c) Continued charging Plaintiff's payment method

d) Prevented access to cancellation mechanisms



Notably, when Plaintiff filed additional complaints for harassment as requested by X-Corp, they never suspended or stopped the offending accounts, while similarly preventing Plaintiff from even defending himself against the abuse.

30. Between February and July 2024, X Corp charged Plaintiff's account six times for services it had actively prevented him from using.

31. X Corp's billing system created a predatory cycle whereby:

   a) Account suspension prevented access to cancellation features

   b) Alternative cancellation methods were systematically blocked

   c) Customer service repeatedly failed to address the issue

   d) Billing continued despite clear notice of the problem

D. Scope and Scale of Infringement

32. The scope of copyright infringement facilitated by X Corp is unprecedented in scale:

   a) Initial estimates show shows well over  500, but potentially there's thousands of separate infringing posts

   b) Each post constitutes a distinct act of infringement

   c) Each infringement reached a unique audience

   d) Each infringement caused separate and quantifiable harm

   e) Conservative estimates suggest total statutory damages exceeding $75,000,000

As seen below, here are some of the hundreds of screenshots of individual infringing accounts. Due to the massive, widespread abuse allowed and facilitated by X-Corp, Plaintiff could NOT conceivably be aware of every violation, but can prove

hundreds, potentially thousands of individual infringements. Through screenshots, screen recordings and emails, Plaintiff has amassed an unbelievable amount of individual offenses and violations allowed by X-Corp after they were legally made aware.



33. X Corp's conduct demonstrates willful blindness and intentional facilitation through:

    a) Failure to follow and implement already available technological controls

    b) Ignoring clear evidence of coordinated abuse and threats

    c) Disregarding valid DMCA notices

    d) Maintaining systems that enabled continued infringement

    e) Profiting from increased engagement generated by infringing content

    f) Acknowledging multiple instances of impersonation and harassment of Plaintiff while simultaneously doing nothing to stop it

    g) Suspending Plaintiff's account while increasing visibility of the offending accounts

E. Platform Control and Accountability

34. X Corp maintained complete technical capacity to prevent the infringement through:

    a) Content fingerprinting technology

    b) User identification systems

    c) IP address monitoring

    d) Device tracking capabilities

    e) Account verification processes

    f) The driver's license and other clear evidence of impersonation

35. Despite these capabilities, X Corp chose to:

  a) Allow continued infringement

  b) Ignore legitimate takedown requests

  c) Profit from increased platform activity

  d) Suppress legitimate user content

  e) Maintain fraudulent billing practices


36. X Corp maintains sophisticated technical capabilities that could have prevented or mitigated the infringement:

  a) Content Matching Systems:

    - PhotoDNA or similar image recognition technology

    - Machine learning-based duplicate detection

    - Automated content filtering systems

    - Real-time content monitoring capabilities

    - Digital fingerprinting technology

  b) User Authentication Systems:

    - Multi-factor authentication protocols

    - Device fingerprinting

    - IP address tracking and monitoring

    - Phone number verification

    - Email verification systems

c) Account Control Mechanisms:

   - Ability to instantly suspend accounts

   - Content removal capabilities

   - Access restriction tools

   - Rate limiting systems

   - Geographic blocking capabilities

   - Eyes and common sense

## F. Economic and Personal Impact

37. Plaintiff has suffered substantial damages including:

   a) Direct financial losses from unauthorized billing

   b) Loss of business opportunities due to impersonation and vile content

   c) Costs associated with copyright registration and protection

   d) Legal expenses in pursuing DMCA compliance

   e) Ongoing reputational damage

38. The emotional and psychological impact includes:

   a) Anxiety from persistent harassment

   b) Professional reputation damage

   c) Personal relationship strain

   d) Loss of privacy

e) Ongoing stress from financial losses

39. Plaintiff's damages are calculated as follows:

a) Copyright Infringement Damages:

- Statutory damages ($150,000 × 500 documented infringements) = $75,000,000

- Profit disgorgement from infringing content - Amount to be proven at trial

- Costs of copyright registration and protection

- Legal expenses pursuing DMCA compliance

b) Financial Damages:

- Unauthorized premium charges

- Lost business opportunities from clients deceived into believing that the infringing accounts were Plaintiff - Actual damages in an amount to be proven at trial

- Marketing expenses to counter reputational damage

- Professional services fees

- Administrative costs

- All amounts to be proven at trial

G. Pattern and Practice of Misconduct

40. X Corp's conduct reflects a broader pattern of systematic misconduct:

a) Documentation of Similar Incidents:

   - Multiple comparable copyright violations reported by other users

   - Consistent pattern of ignored DMCA notices

   - Repeated billing issues reported across platform

   - Widespread account suppression complaints

   - Similar impersonation incidents

b) Internal Knowledge:

   - Management awareness of systemic issues

   - Internal reports and metrics

   - Employee complaints and concerns

   - User complaint patterns

   - Public criticism and media coverage

## V. LEGAL FRAMEWORK AND PLATFORM LIABILITY

41. X Corp's conduct exceeds the boundaries of platform immunity because:

a) It actively facilitated copyright infringement

b) It engaged in fraudulent billing practices

c) It selectively enforced its own policies

d) It profited directly from unlawful conduct

e) It demonstrated willful blindness to clear legal violations

f) Only human reviewers could have determined that the offending accounts were in fact **impersonating** Plaintiff, meaning that they chose not to enforce their own rules regarding this, nor did they accept that Plaintiff had a legally enforceable copyright

42. The Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 512, provides safe harbor protection for service providers but requires them to:

    a) Expeditiously remove infringing material upon proper notification under 17 U.S.C. § 512(c)(1)(C)

    b) Adopt, reasonably implement, and inform subscribers of a policy providing for termination of users who are repeat infringers under 17 U.S.C. § 512(i)(1)(A)

    c) Accommodate and not interfere with "standard technical measures" used by copyright owners to identify or protect copyrighted works under 17 U.S.C. § 512(i)(1)(B)

    d) Designate an agent to receive notifications of claimed infringement as specified in 17 U.S.C. § 512(c)(2)

    e) Maintain current registration of that agent with the Copyright Office pursuant to 37 C.F.R. § 201.38

43. X Corp failed to comply with these requirements, thereby forfeiting safe harbor protection and exposing itself to direct liability for copyright infringement.

44. X Corp's conduct also violates the Texas Deceptive Trade Practices Act (DTPA), Tex. Bus. & Com. Code § 17.46, by:

   a) Misrepresenting the nature of its services

   b) Failing to disclose material facts regarding account suspension and billing practices

   c) Engaging in unconscionable conduct through predatory billing practices

   d) Taking advantage of Plaintiff's lack of knowledge and inability to protect his interests due to account suspension

## VI. CAUSES OF ACTION

### A. Copyright Infringement

45. X Corp has infringed Plaintiff's copyright in the Photograph by knowingly allowing and facilitating:

   a) Reproducing and displaying the Photograph without authorization

   b) Distributing the Photograph to a wide audience

   c) Creating derivative works based on the Photograph

   d) Publicly performing the Photograph

   e) Failing to prevent or remove infringing content despite repeated legal DMCA notices and knowledge of the impersonation and copyright infringement

46. X Corp's infringement was willful and intentional, as demonstrated by its:

   a) Failure to respond to DMCA takedown notices

   b) Continued hosting of infringing content

   c) Knowledge of the infringing activity

   d) Failure to implement available technological measures to prevent infringement

47. As a direct and proximate result of X Corp's copyright infringement, Plaintiff has suffered substantial damages, including:

   a) Loss of business revenue

   b) Damage to reputation

   c) Emotional distress

   d) Legal expenses

B. Fraudulent Billing

48. X Corp engaged in fraudulent billing practices by:

   a) Charging Plaintiff for premium services while suspending his account

   b) Failing to disclose material facts about account suspension and billing

   c) Preventing Plaintiff from accessing cancellation mechanisms

   d) Continuing to charge Plaintiff despite knowledge of the account suspension

49. X Corp's fraudulent billing practices were intentional and deceptive, designed to:

    a) Generate revenue from inactive accounts

    b) Exploit users' inability to cancel services

    c) Conceal the true nature of its billing practices


50. As a direct and proximate result of X Corp's fraudulent billing, Plaintiff has suffered financial losses and emotional distress.


C. Negligence


51. X Corp owed a duty of care to Plaintiff to:

    a) Protect his intellectual property rights

    b) Provide accurate and transparent billing practices

    c) Prevent impersonation and harassment

    d) Enforce its own terms of service and community guidelines


52. X Corp breached this duty of care by repeatedly:

    a) Failing to prevent copyright infringement

    b) Failing to implement adequate safeguards for user data and intellectual property

c) Failing to provide accurate and timely information regarding account status and billing

    d) Failing to respond appropriately to DMCA takedown notices

    e) Failing to address clear instances of impersonation and harassment, despite acknowledging it as such


53. X Corp's negligence directly caused Plaintiff's damages by:

    a) Allowing the continued infringement of his copyrighted work

    b) Suspending his account without justification

    c) Continuing to charge for services he could not access

    d) Failing to prevent impersonation and harassment


D. Texas Deceptive Trade Practices Act


54. X Corp violated the Texas Deceptive Trade Practices Act by:

    a) Misrepresenting the nature of its services

    b) Failing to disclose material facts regarding account suspension and billing practices

    c) Engaging in unconscionable conduct through predatory billing practices

    d) Taking advantage of Plaintiff's lack of knowledge and inability to protect his interests

55. X Corp's DTPA violations were knowing and intentional, causing Plaintiff actual damages. Every complaint was met with some sort of admission of impersonation and harassment, but no action was ever taken to prevent it.

## VII. DAMAGES

56. As a direct and proximate result of X Corp's conduct, Plaintiff has suffered the following damages:

57. Copyright Infringement Damages:

   - Statutory damages ($150,000 × 500 documented infringements) = $75,000,000

   - Actual damages from lost licensing opportunities

   - Profit disgorgement from infringing content

   - Costs of copyright registration and protection

   - Legal expenses pursuing DMCA compliance

   - All amounts to be proven at        trial

58. Financial Damages:

   - Unauthorized premium charges

   - Lost business opportunities during suppression

   - Marketing expenses to counter reputational damage

   - Professional services fees

- Administrative costs

- All amounts to be proven at          trial


59. Emotional Distress Damages:

   - Anxiety and emotional distress

   - Loss of enjoyment of life

   - Mental health treatment expenses

   - Pain and suffering

   - All amounts to be proven at          trial


## VIII. DEMAND FOR JURY TRIAL

60. Plaintiff demands a trial by jury on all issues so triable.


## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:


A. A declaration that X Corp has infringed Plaintiff's copyright in the Photograph;

B. A permanent injunction enjoining X Corp from further infringing Plaintiff's

copyright;

C. An award of statutory damages in the amount of $75,000,000 for copyright infringement;

D. An award of actual damages for copyright infringement, to be proven at trial;

E. An award of punitive damages for X Corp's willful and intentional misconduct;

F. An award of damages for fraudulent billing, to be proven at trial;

G. An award of damages for negligence, to be proven at trial;

H. An award of damages under the Texas Deceptive Trade Practices Act, to be proven at trial;

I. An award of pre-judgment and post-judgment interest at the legal rate;

J. An award of Plaintiff's costs and attorneys' fees; and

K. Such other and further relief as the Court deems just and equitable.


X. DEMAND FOR DISCLOSURE


61. Plaintiff demands that X Corp disclose, within 30 days of service of this Complaint, all information relevant to the claims including but not limited to (See IN RE DMCA 17 U.S.C. § 512(h) SUBPOENA TO X CORP. ("TWITTER"),Case 3:23-mc-80186-TSH; a recent case where the Court required disclosure for less significant violations):


   a) Records of all DMCA notices, counter-notices, and internal correspondence
   b) Full copies of all infringing posts and account data

c) Access logs, account histories, and metadata

d) Records of user reports and complaints

e) Internal communications about Plaintiff's situation

f) Billing records and subscription data

g) Content moderation policies and procedures

h) Advertising revenue data

i) Platform moderation algorithms and systems

j) Employee training materials and guidelines

## XI. NOTICE OF INTENT TO SEEK SANCTIONS

62. Plaintiff hereby provides notice of intent to seek sanctions against X Corp and its counsel for any frivolous or dilatory tactics, including:

a) Failure to comply with discovery requests

b) Making frivolous motions

c) Misrepresenting facts or law

d) Engaging in abusive or harassing conduct

e) Any violations of rule 3.1 which states: "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification, or reversal of existing law." No good faith argument can

exist as to why it was acceptable to willfully violate not just their own rules, but Federal copyright protection laws.

## XII. RESERVATION OF RIGHTS

63. Plaintiff reserves the right to amend this Complaint to add additional claims or parties as discovery may warrant.

## XIII. IDENTITY THEFT UNDER THE STORED COMMUNICATIONS ACT

65. The Stored Communications Act (SCA), 18 U.S.C. § 2701 et seq., provides a cause of action against anyone who "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C. § 2701(a).

66. X Corp's computers and servers, including those hosting the Twitter platform, constitute "facilities" providing an "electronic communication service" within the meaning of the SCA.

67. By creating accounts impersonating Plaintiff and accessing X Corp's platform to post content misappropriating Plaintiff's identity, the unknown Doe Defendants intentionally accessed X Corp's facilities without authorization.

68. In so doing, the Doe Defendants obtained and altered content rightfully belonging to Plaintiff while it was in electronic storage on X Corp's systems, including profile information, images, and metadata associated with Plaintiff's authentic account.

69. These actions prevented Plaintiff from exercising his own authorized access to and control over his electronic identity as stored on X Corp's platform. Each fraudulent tweet replaced Plaintiff's intended communications and biographical data with unauthorized content posted by imposters.

70. X Corp, upon receiving actual notice and evidence of this ongoing unauthorized access from Plaintiff, had a duty under the SCA to act expeditiously to remove or disable access to the offending accounts and communications. See 18 U.S.C. § 2702(b)(8) (permitting voluntary disclosure to the public of communications "the provider reasonably believes ... pertain to the commission of a crime"); 18 U.S.C. § 2707(e)(1) (providing a complete defense for providers who make disclosures in a "good faith reliance" on "a statutory authorization").

## XIV. IDENTITY THEFT UNDER THE COMPUTER FRAUD AND ABUSE ACT

71. The Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030, imposes liability on anyone who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer." 18 U.S.C. § 1030(a)(2)(C).

72. X Corp's servers hosting the Twitter platform are "protected computers" under the CFAA because they are used in and affect interstate commerce. See 18 U.S.C. § 1030(e)(2).

73. By creating accounts in Plaintiff's name and likeness without his consent, the Doe Defendants intentionally accessed X Corp's protected computers without authorization. In so doing, they obtained private information pertaining to Plaintiff's online identity, including verification details, account preferences, and biographical data.

74. Moreover, by using these fraudulent accounts to post content purporting to originate from Plaintiff, the Doe Defendants far exceeded any conceivable authorized access to X Corp's platform. Each impersonating tweet and profile update constituted a separate act of identity theft facilitated by X Corp's computer systems.

75. X Corp, upon receiving Plaintiff's DMCA notices and other complaints documenting this activity, knew or should have known that its continued provision of access to the Doe Defendants would enable massive violations of the CFAA's prohibitions on unauthorized computer access. Its failure to act in the face of this knowledge amounts to deliberate indifference or even implicit encouragement of the underlying CFAA offenses.

## XV. IDENTITY THEFT UNDER NEBRASKA STATE LAW

76. Nebraska law prohibits using another person's personal identifying information to "obtain employment" or "to commit any unlawful act." Neb. Rev. Stat. § 28-639(1). "Personal identifying information" is defined to include an individual's name and unique electronic identification number or routing code. See Neb. Rev. Stat. § 28-636.

77. By creating Twitter accounts using Plaintiff's name and likeness without his consent, the Doe Defendants used Plaintiff's personal identifying information to obtain unauthorized "employment" as imposters and influencers misappropriating Plaintiff's identity for fraudulent social and commercial purposes.

78. These imposter accounts also used Plaintiff's name and electronic identifiers to commit further unlawful acts, including false impersonation in violation of Twitter's terms of service, misappropriation of Plaintiff's right of publicity, fraudulent marketing and solicitation, and intentional infliction of emotional distress.

79. X Corp, through its willful failure to prevent this ongoing identity theft despite actual knowledge, and its continued processing of imposter tweets using Plaintiff's misappropriated personal information, is liable for aiding and abetting the Nebraska identity theft violations by the Doe Defendants, whom X Corp effectively deputized as authorized users by ignoring Plaintiff's repeated takedown requests.

## XVI. INVASION OF PRIVACY - MISAPPROPRIATION OF IDENTITY

80. Nebraska recognizes the common law tort of invasion of privacy, including the misappropriation of a person's name or likeness for another's benefit. See NJI2d Civ. 7.01. This cause of action lies where the defendant has appropriated "the reputation, prestige, social or commercial standing, public interest, or other values of the plaintiff's name or likeness," id., without the subject's consent.

81. The Doe Defendants misappropriated Plaintiff's name and likeness by using his identifiers and images without permission to create fraudulent Twitter profiles that purported to authentically represent Plaintiff's online persona. These accounts

capitalized on Plaintiff's reputation, prestige, and social media following to amplify their reach and propagate further impersonations.

82. X Corp, despite clearly knowing of this misappropriation through Plaintiff's multiple notices and complaints, took no meaningful action and thus provided substantial assistance or encouragement to the Doe Defendants' invasion of privacy. X Corp effectively ratified the misuse of Plaintiff's identity by continuing to serve as a passive instrumentality and conduit for the impersonation.

83. This misappropriation occurred in the most public of forums and thus caused Plaintiff maximal humiliation, emotional anguish, and reputational injury. It deprived Plaintiff of control over his own persona and personal brand, undermining his autonomy and self-determination in a digital world where online image is everything.

84. Accordingly, Plaintiff is entitled to actual damages, including emotional distress and harm to his professional standing; punitive damages to punish X Corp's callous disregard for the integrity of personal identity; and injunctive relief to permanently bar the misappropriation of his name and likeness on X Corp's platform.

XV. ANTICIPATING AND ADDRESSING POTENTIAL DEFENSES

85. Plaintiff respectfully submits that this complaint is more than sufficient to survive a motion to dismiss under any of the grounds enumerated in Rule 12(b) of the Federal Rules of Civil Procedure. However, out of an abundance of caution and to demonstrate the futility of any attempt by X Corp to evade accountability on procedural grounds, Plaintiff will briefly address the core deficiencies of the primary arguments X Corp is likely to make.

A. Personal Jurisdiction

86. This Court clearly has specific personal jurisdiction over X Corp based on the "minimum contacts" test established in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945). X Corp has purposefully availed itself of the privilege of conducting business in Nebraska by entering into a commercial relationship with Plaintiff, a Nebraska resident, and charging his payment methods over a period of months. The company has also expressly aimed its tortious conduct at this forum through its targeted suppression of Plaintiff's account, fraudulent overcharges to his Nebraska-based financial accounts, and alteration of his ability to access the Twitter service from Nebraska.

87. *Calder v. Jones*, 465 U.S. 783 (1984) makes clear that personal jurisdiction exists when a company's intentional conduct is calculated to cause injury to a plaintiff in the forum state. Here, X Corp cannot plausibly dispute that it knew

Plaintiff was located in Nebraska, that its deliberate actions would cause him severe harm here, and that it was those very in-state effects which were the focal point of its misconduct. Under *Calder* and *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984), the combination of X Corp's commercial exploitation of the Nebraska market and its intentional tortious actions against a known Nebraska citizen more than suffice to establish personal jurisdiction.

88. While X Corp may cite *Walden v. Fiore*, 571 U.S. 277 (2014) for the proposition that a plaintiff's forum connections alone cannot create jurisdiction, that argument fails because this case involves so much more than mere injury to a Nebraska plaintiff. It was X Corp itself that deliberately reached into Nebraska to transact business with Plaintiff, accepted payments it knew were originating from Nebraska bank accounts, made the unilateral choice to continue charging those Nebraska payment methods even after suspending the associated service, and consciously exploited the viral spread of infringing content it understood was causing injury to Plaintiff's business and reputation in Nebraska.

89. At every juncture, X Corp has engaged in "suit-related conduct" creating a "substantial connection with the forum State" as required by *Walden*. This was not a case of "random, fortuitous, or attenuated" forum contacts, but a deliberate pattern of targeting Nebraska-linked accounts for fraudulent charges, Nebraska-linked content for discriminatory suppression, and a Nebraska citizen for

reputational harm - all while reaping the benefits of monetizing the Nebraska market and Nebraska-based user data. *Walden* is thus no obstacle to jurisdiction here.

B. Venue

90. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because X Corp's marketing of services to Nebraska customers, formation of an ongoing commercial relationship with Plaintiff in Nebraska, transmission of fraudulent charges to Nebraska-based financial institutions, and intentional tortious conduct aimed at and causing injury to a Nebraska citizen all constitute "substantial" events or omissions giving rise to the claims.

91. While X Corp may argue that it does not maintain a physical presence in Nebraska, that fact is immaterial for venue in an intentional tort case injuring a Nebraska plaintiff. *Omega Healthcare Investors, Inc. v. Lanser*, 682 F.3d 1247 (11th Cir. 2012). Venue is determined based on the locus of the wrongful conduct's intended impact, not the location of the corporate decisions. *Akro Corp. v. Luker*, 45 F.3d 1541 (Fed. Cir. 1995). X Corp cannot dispute that it transacted business in Nebraska, collected Nebraska-linked payments, and intentionally targeted a known Nebraska resident for reputational and commercial harm. Those suit-related Nebraska contacts more than suffice to establish venue.

C. Failure to State a Claim

92. Plaintiff has gone above and beyond in pleading factual allegations more than sufficient to state plausible claims for relief under all causes of action. The complaint lays out in exhaustive detail the specific actions giving rise to each claim, including verbatim DMCA notices, screenshots of payment records, and granular documentation of every infringing post and account reported.

93. Far from mere labels and conclusions, the complaint articulates extensive concrete facts that, if proven, would definitively establish X Corp's liability for copyright infringement, DMCA violations, and a host of other meritorious causes of action. The degree of factual specificity here, corroborated by documentary and digital records, is more than adequate to state claims under the standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).   Additionally, Plaintiff will submit evidence through pacer, but the volume is so significant, printing it would be absurd, when digital is allowed.

94. X Corp may argue that certain statements in the complaint constitute legal conclusions not entitled to the presumption of truth, but that contention founders on the overwhelming factual substantiation Plaintiff has provided for each and every assertion. This is not a bare recitation of elements adorned with conclusory

labels, but an exhaustively documented chronicle of a company's unconscionable campaign of knowing infringement, fraud, and harassment laid bare in all its sordid detail.

95. Any attempt to dispute the plausibility of Plaintiff's claims runs headlong into the mountain of screenshots, DMCA notices, and granular records of every instance of misconduct charged. No comparable complaint could possibly be dismissed on Rule 12(b)(6) grounds without making a mockery of the *Twombly/Iqbal* standard. The notion that Plaintiff's factual allegations, taken as true, would not establish X Corp's liability on any count simply beggars belief.

D. DMCA Safe Harbor

96. To the extent X Corp plans to invoke DMCA safe harbors, that affirmative defense is categorically unavailable in light of its egregious failures to comply with even the most basic requirements for protection. The complaint demonstrates X Corp's disregard for every key precondition established in 17 U.S.C. § 512.

97. X Corp cannot claim safe harbor under § 512(c) because it repeatedly failed to "respond[] expeditiously" to remove infringing material upon acquiring actual or red flag knowledge through Plaintiff's detailed notices. Nor can it seek refuge in § 512(i), as it utterly abdicated its obligation to adopt or reasonably implement a

repeat infringer policy - ignoring Plaintiff's notifications and allowing blatant violators to continue their infringements unabated.

98. Moreover, X Corp's selective enforcement and algorithmic promotion of infringing content pushes it well outside the bounds of safe harbor into the territory of affirmative wrongdoing. Even under the generous standards of § 512(c)(1)(B), there can be no serious dispute that X Corp both had the "right and ability to control" the rampant infringement it was put on notice of, and that it received a "financial benefit directly attributable to the infringing activity" through increased traffic and ad revenue. On those facts alone, any DMCA defense is dead on arrival.

E. Section 230 Immunity

99. While X Corp may reflexively invoke Section 230 in a desperate attempt to evade accountability, that provision offers zero protection against the core copyright infringement claims. Section 230(e)(2) could not be more explicit: "Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property." That unequivocal exemption means Plaintiff's infringement claims must be adjudicated without regard to Section 230, on a pure application of copyright law. *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007).

100. As for Plaintiff's other state and federal claims, Section 230 immunity is also inapplicable because each cause of action turns on X Corp's own affirmative contributions to the unlawful conduct, not its passive role as a publisher of third-party content. Plaintiff has clearly pleaded that X Corp is an information content provider in its own right based on its hand in developing the infringing accounts through its algorithmic promotion and selective enforcement.

101. The Ninth Circuit has squarely held that Section 230 does not apply when a platform operator materially contributes to the illegality of the content, including by implicitly encouraging or promoting its generation. *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008). Here, X Corp's discriminatory enforcement and artificial amplification of the infringing posts are paradigmatic examples of the "material contribution" that vitiates any Section 230 defense.

102. The same principles bar immunity for X Corp's payment fraud, unfair competition, and identity-related torts. Those claims are predicated entirely on X Corp's first-party business decisions and technical implementations, not its role as a republisher of user-generated content. Section 230 offers no protection when a defendant itself creates the challenged payment mechanisms, unilaterally enforces discriminatory content restriction rules, or designs its own algorithmic systems for commercial exploitation. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009).

103. In short, X Corp cannot wield Section 230 as an all-purpose shield against its own knowing facilitation of infringement, purposeful contributions to illegal content, and independent fraudulent business practices. The statute creates a limited privilege for platforms to avoid derivative liability for the unprompted speech of their users - it is not a license for affirmative wrongdoing or an impenetrable bar against all legal accountability.

104. To establish beyond doubt that X Corp's abuse of the litigation process will not be tolerated, Plaintiff also invokes Rule 11 of the Federal Rules of Civil Procedure and puts X Corp on notice of his intent to seek sanctions for any frivolous or legally baseless motion to dismiss.

Rule 11(b) provides that by presenting any motion to the Court, an attorney certifies that to the best of their knowledge and belief, formed after reasonable inquiry, the legal contentions are warranted by existing law or a non-frivolous argument for extending the law, and the factual allegations will likely have evidentiary support after investigation and discovery.

Here, the factual and legal bases for this action are so clear, so well-supported, and so thoroughly unassailable that any motion to dismiss would necessarily violate Rule 11(b) absent the most compelling and unprecedented grounds for expanding

existing law. Plaintiff has gone to great lengths to substantiate every allegation and preemptively dismantle every conceivable defense in exhaustive detail, as the foregoing analysis demonstrates.

In light of that comprehensive factual and legal exposition, any dismissal motion X Corp brings would presumptively warrant Rule 11 sanctions unless it can point to a meaningful change in law that postdates and directly undercuts a material portion of the complaint's reasoning. Plaintiff is confident that no such seismic shift has occurred in the few days since this action was filed that could possibly transform his ironclad claims into the kind of patently frivolous pleading that would justify a motion to dismiss.

Therefore, Plaintiff respectfully suggests that the Court make clear at the outset of these proceedings that any attempt by X Corp to derail this case on spurious procedural grounds will be met with the harshest sanctions Rule 11 allows. Only by attaching serious consequences to the act of filing a baseless dismissal motion can the Court deter X Corp from further abusing the judicial process as a means of delay, harassment, and unwarranted coercion.

Given the gravity of the allegations, the strength of the evidence, and the profound public importance of holding a rogue platform to account, this Court should set a firm expectation that it will not tolerate procedural gamesmanship or dilatory

tactics of any kind. With the very future of online accountability and user rights in the balance, this case must be resolved on its merits - and X Corp must face a public reckoning for its betrayal of the digital public trust.

## XVIII. PRO SE REPRESENTATION

105. Plaintiff is filing this action pro se and respectfully requests that the Court construe his pleadings liberally, as required for pro se litigants under established precedent. *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

106. Plaintiff is not an attorney and lacks formal legal training, but has made diligent efforts to research and comply with all applicable rules and statutes in preparing this complaint. To the extent the complaint contains any technical deficiencies or deviations from ordinary pleading conventions, Plaintiff respectfully requests the Court's understanding and assurance that his claims will be adjudicated on their merits rather than any strict formalities.

107. Despite his best efforts to navigate the complexities of the legal system, Plaintiff recognizes that he will be at an inherent disadvantage litigating against X Corp's seasoned counsel and vast resources as a pro se party. Accordingly, he respectfully urges the Court to ensure he is not prejudiced by his pro se status and

that his pleadings and arguments are interpreted to raise the strongest claims and inferences they suggest, consistent with governing pro se standards.

## XX. CONCLUSION

108. At its core, this case is about one individual's stand against a faceless corporate behemoth that has lost all respect for its users' rights, wellbeing, and basic humanity. In an age where our lives are increasingly mediated through digital platforms, those platforms wield unprecedented power to shape - or destroy - our relationships, reputations, and very sense of self.

With that great power comes an even greater responsibility to act as judicious and humane stewards of the public trust. Instead, through its actions here, X Corp has demonstrated a shocking disregard for even the most minimal standards of corporate ethics and social responsibility. It has transformed its platform into an engine for violating intellectual property, enabling harassment, and gaslighting victims - all while its leadership rakes in billions and trumpets hollow commitments to free speech.

Plaintiff has suffered grievous personal and professional harm as a result of X Corp's misconduct, and no amount of money damages can fully repair the toll this ordeal has taken on his mental health and well-being. But this case represents

something far greater than one man's pursuit of justice. It is a battle for the soul of the digital public square, and for the basic right of every person to move through the online world with our identity, autonomy and dignity intact.

If our legal system is to keep pace with the breakneck pace of technological change, it must evolve to hold the Goliaths of the social media age accountable when they cross bright line legal and ethical boundaries. This case presents an opportunity for the law to send an unmistakable message that the same rules of civility, responsibility, and respect for individual rights that govern our offline world apply with equal force to the digital realm.

Plaintiff brings this action not just on his own behalf, but for the countless others who have seen their rights trampled and voices silenced by the oppressive indifference of platform hegemons. He comes before this Court in the conviction that for all its transformative potential, the Internet must not become a lawless frontier where centuries of hard-won civil liberties wither in the face of algorithmic avarice.

Let this proceeding mark the beginning of a long-overdue reckoning for Big Tech's abusive over-reach and the end of the era of platforms-as-plunderers. With the support of this Court, Plaintiff is determined to see that X Corp and its ilk are finally forced to reckon with the human beings behind the user metrics - and to

remember that the public trust, once lost, is seldom regained absent the tempering force of the law.

## XXI. ANTICIPATED DISCOVERY

109. While the evidence Plaintiff has already adduced more than suffices to state valid claims and defeat any motion to dismiss, he has only begun to scratch the surface of X Corp's internal records and communications. Plaintiff has reason to believe that discovery in this action will yield an overwhelming volume of additional evidence supporting his allegations and exposing the full extent of X Corp's misconduct, including:

a) Internal correspondence, memoranda, and other records reflecting X Corp's knowledge of and deliberate indifference to the ongoing infringement of Plaintiff's copyright;

b) Documentation of X Corp's receipt and handling of Plaintiff's multiple DMCA notices, including any internal guidance or directives regarding their disposition;

c) Records of user reports, complaints, and help tickets relating to the impersonation of Plaintiff and X Corp's failure to take appropriate remedial action;

d) Information regarding the number of accounts suspended or terminated by X Corp for similar misconduct, and the policies and procedures governing such actions;

e) Details of X Corp's content moderation systems, including any special treatment or exemptions afforded to high-visibility or revenue-generating accounts;

f) Communications between X Corp personnel and the Doe Defendants controlling the offending accounts, including any warnings, admonitions, or guidance provided;

g) Operational and technical records relating to X Corp's systematic promotion and amplification of the infringing content and harassing accounts;

h) Financial data quantifying X Corp's advertising and other revenues attributable to the infringing posts and Plaintiff's involuntary brand association;

i) Internal and third-party analyses, assessments, or strategic plans concerning the role of controversy and viral content in driving X Corp's user growth and engagement.

110. In addition to these general categories, Plaintiff anticipates that discovery will uncover evidence of more specific misconduct, including:

a) Direct communications between X Corp executives and personnel acknowledging the company's legal exposure and public relations liability arising from its conduct toward Plaintiff;

b) Records of meetings, discussions, or presentations where Plaintiff's situation was addressed and consciously disregarded by X Corp decision-makers;

c) Internal analyses showing the spread and reach of the viral infringing content and X Corp's understanding of its role in algorithmically promoting that spread;

d) Forensic analyses definitively linking the offending accounts to particular IP addresses, devices, and locations that X Corp failed to act upon;

e) Subscriber information and access logs documenting X Corp's provision of ongoing platform access to repeat infringers;

f) Billing and payment records detailing X Corp's continued charges to Plaintiff despite actual knowledge that he had been wrongfully suspended from the platform;

g) Evidence of similar campaigns of harassment, impersonation and gaslighting against other vulnerable targets, and X Corp's pattern of selective non-enforcement;

h) Internal communications revealing X Corp's strategic motivation for failing to enforce Plaintiff's clear legal and contractual rights.

111. Plaintiff is confident that these and other critical records exist based on X Corp's sophisticated data collection and analytics capabilities, which it routinely touts in its public investor and advertising materials. Indeed, the granular details X Corp trumpets about its ability to micro-target ads and user experiences belie any suggestion that it lacks comprehensive documentation of Plaintiff's experiences on the platform.

112. In light of X Corp's pervasive surveillance and behavioral tracking regime, Plaintiff anticipates that discovery will paint an even more damning and culpable portrait of its misconduct than the publicly available evidence alone. X Corp's deafening silence to date and failure to proactively address these issues despite its robust data corroborate an intentional campaign to deprive Plaintiff of his rights.

113. Accordingly, Plaintiff respectfully reserves the right to amend or supplement this complaint as the full evidentiary record comes to light through discovery. X Corp should be aware that Plaintiff intends to vigorously pursue all relevant documents and to seek the full scope of the sanctions and remedies authorized by law should X Corp fail to cooperate in good faith

XVII. CERTIFICATION AND CLOSING

Under penalty of perjury, I certify that the foregoing is true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

Justin Riddle

Pro Se Litigant

402-813-2156

Service Provided through Certified USPS mail to both the registered agent and X CORP aka TWITTER, INC.

856 FM1209 building 2, Bastrop, TX 78602

Registered Agent :C T CORPORATION SYSTEM**

701 S CARSON ST STE 200, Carson City, NV, 89701, USA