# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF TEXAS


JUSTIN RIDDLE,                              )

Plaintiff,                              )

16422 Patrick Ave,                              )

Omaha, NE 68116                              )

                              )

v.                              ) Case No. 1:25-cv-00073-ADA

                              )

X CORP aka TWITTER, INC.                              )

Defendant.                              )

856 FM1209 building 2,                              )

Bastrop, TX 78602                              )


# PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Link to this brief :

https://charterwestbank.com/wp-content/uploads/2025/03/SUBMISSION-RIDDLE-VS-X-CORP-RESPONSE-TO-MTD.pdf

COMES NOW Plaintiff Justin Riddle ("Plaintiff"), appearing pro se, and respectfully submits this Response in Opposition to Defendant X Corp's Motion to Dismiss. For the reasons set forth below, Defendant's Motion should be denied in its entirety.

## I. INTRODUCTION

Defendant X Corp's Motion to Dismiss represents perhaps the most audacious attempt at legal revisionism this Court is likely to encounter. One must marvel at the breathtaking legal gymnastics employed to convince this Court that established federal copyright law, consumer protection statutes, and fundamental legal principles somehow dissolve into irrelevance upon the creation of a social media account. The Motion asks this Court to enter an alternate legal universe where:

1. A platform can acknowledge "impersonation and harassment" in writing, yet bear no responsibility to address it;

2. A registered copyright holder has no recourse when their work is stolen over 500 times, even after providing multiple proper DMCA notices;

3. A company can simultaneously charge consumers for premium services while preventing those consumers from accessing both the services and any means of cancellation; and

4. A platform's Terms of Service somehow trump federal law.

Even more remarkable is X Corp's assertion that California law should apply despite the company's highly publicized relocation to Texas. The company appears to desire the tax benefits of Texas residency without the accompanying legal responsibilities—a position that defies both law and logic.

Most troubling—and what X Corp's Motion strategically omits—is the ongoing nature of the harassment. As recently as March 2025, the original impersonation account remains active, and additional accounts are continuing to use original and modified versions of Plaintiff's copyrighted image for targeted harassment. These accounts persist despite X Corp's written acknowledgment of the impersonation, verification of Plaintiff's identity through government ID, and receipt of multiple DMCA notices. This is not negligence; it is willful facilitation.

Active as of this submission, the original account that the original DMCA complaints were filed against, still remains active after 14 months from the first DMCA complaint, indicating countless views outside the original complaint:. Additionally, even after the filing of this lawsuit, the offender is creating accounts and X is choosing to ignore.

https://x.com/JustinERid99862?s=09



The real legal question before this Court is startlingly simple: Can a social media platform create its own rules, selectively enforce those rules, acknowledge violations of those rules, and then claim immunity from all legal consequences? If X Corp prevails, the answer would create a dangerous precedent where platforms operate beyond the reach of established law—a result no legislature ever intended and no court should sanction.

Additionally, utilizing SHOOK, HARDY and BACON LLP has opened the Plaintiff's eyes that his soon to be submitted RICO case was a psychic prediction. The same strategies, the same arguments, the same prayers for a Judge to ignore fundamentals of the law. This nearly complete Civil Rico lawsuit will need to be updated to include the revelations.

https://charterwestbank.com/wp-content/uploads/2025/03/RICO-ROUGH-DRAFT.pdf

Additionally, this bold attempt of the defendant to rewrite established law ties in directly with the railroad job against Joe Exotic, in which a federal agent who's typical job it is to count deer in the forest, ran point on a murder for higher investigation against an individual he already had a history of malicious intent towards. Even more egregious, as detailed in this Amicus brief, the entire system facilitated it as if normal Americans were incapable of basic reason. Brief linked below:

https://charterwestbank.com/wp-content/uploads/2025/03/SUBMISSION-AMICUS-BRIEF-ISO-JOE-EXOTIC-2.pdf

## II. THE SPECTACULAR CONTRADICTION CIRCUS THAT X CORP CALLS A LEGAL POSITION

X Corp's Motion to Dismiss isn't merely flawed—it's an elaborate theater of absurdity that assaults basic principles of legal coherence. Let us dissect this monument to contradictory reasoning with the precision it deserves:

### A. The Remarkable Logic-Defying Acrobatics of Claiming Both Immunity and Discretion

X Corp's position represents a masterclass in institutional doublethink, simultaneously maintaining:

1. They cannot be held responsible for user content (Section 230 immunity)
2. They have absolute discretion to remove any content they wish (Terms of Service)
3. They cannot be required to remove content that violates federal law (despite DMCA)
4. They can suspend users for alleged violations of policies they refuse to enforce against others

This position creates the remarkable spectacle of a platform claiming both absolute immunity from responsibility and absolute discretion in enforcement—a position that reduces to "we can do anything we want without consequence" rather than any coherent legal principle.

### B. The California Law Shell Game

X Corp's assertion that California law should apply to this dispute borders on the absurd. The company, which prominently relocated its headquarters to Texas amid much fanfare about California's regulatory environment, now wishes to transport this Court to California when faced with accountability.

The irony is unmistakable: a company that fled California citing its regulatory environment now clings to California law when it serves their purpose. This Court should not permit such flagrant forum shopping.

X Corp's Motion reveals a peculiar legal geography—one in which only California and Ninth Circuit decisions exist. This transparent attempt to import favorable precedent ignores that:

1. Texas has its own robust body of copyright, contract, and consumer protection jurisprudence;
2. Fifth Circuit precedent—not Ninth Circuit—governs federal questions in this Court; and
3. Federal copyright law applies uniformly nationwide, rendering state choice of law provisions irrelevant to the core claims.

Were this Court to accept X Corp's legal cartography, it would effectively subordinate Texas law to California's—an odd outcome when the defendant is now headquartered in Texas.

Perhaps nothing more clearly demonstrates X Corp's contempt for legal coherence than their attempt to claim California law applies despite:

1. Deliberately relocating headquarters to Texas with substantial public fanfare
2. Accepting millions in Texas tax incentives predicated on relocation
3. Publicly criticizing California's regulatory environment as justification for relocation
4. Filing Texas corporate registrations and paying Texas taxes

This remarkably cynical position reduces to "we'd like Texas taxes but California law"—a territorial cherry-picking without precedent in American jurisprudence. It represents not merely forum shopping but jurisdiction arbitrage of the most transparent variety.

## III. DEFENDANT'S SECTION 230 ARGUMENT IGNORES EXPRESS STATUTORY EXCLUSION FOR COPYRIGHT CLAIMS

X Corp's invocation of Section 230 immunity represents either a fundamental misunderstanding of the statute or a hope that this Court will not read its plain text. Section 230(e)(2) explicitly states:

> "Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property."

This provision—which X Corp conveniently fails to cite—unambiguously excludes copyright claims from Section 230 protection. See *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1108 (9th Cir. 2007) (even the Ninth Circuit recognizes that "Section 230 does not provide protection for copyright infringement claims").

The audacity of X Corp's Section 230 argument is breathtaking. It asks this Court to ignore:

1. The statute's explicit intellectual property exclusion;
2. The fact that copyright claims constitute the core of Plaintiff's complaint; and
3. Decades of consistent jurisprudence holding that copyright claims are outside Section 230's scope.

Even for X Corp's non-copyright claims, Section 230 immunity is inapplicable where, as here, the platform had actual knowledge of the specific harmful content

yet chose to allow it to remain. See *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1199 (10th Cir. 2009). X Corp had such knowledge through:

1. Multiple DMCA notices identifying specific infringing content;

2. Submission of government-issued identification proving Plaintiff's identity;

3. Written acknowledgment of "impersonation and harassment"; and

4. Contemporaneous records of hundreds of individual violations.

This is not a case of a platform unaware of problematic content. This is a platform that acknowledged the problem, verified the complainant's identity, and made a conscious decision to allow the violations to continue.

## IV. X CORP'S FIRST AMENDMENT DEFENSE COLLAPSES UNDER BASIC CONSTITUTIONAL LAW

Perhaps the most intellectually dishonest portion of X Corp's Motion is its First Amendment defense. The argument fundamentally misrepresents the Supreme Court's recent decision in *Moody v. NetChoice* while ignoring a bedrock principle: copyright infringement is not protected speech.

X Corp apparently believes this Court will not recognize the critical distinction between:

1. A platform's First Amendment right to moderate *lawful* content (the actual holding in *Moody*); and

2. A platform's supposed "right" to host *unlawful* content after receiving formal legal notice of its unlawful nature (the imaginary holding X Corp conjures).

The Supreme Court has consistently held that copyright infringement receives no First Amendment protection. See *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 555-60 (1985). X Corp's suggestion that *Moody* somehow creates a constitutional shield for platforms to knowingly host infringing content is simply untenable.

Does X Corp truly believe this Court will accept that the First Amendment creates a right to knowingly facilitate copyright infringement? If so, they fundamentally misunderstand both the First Amendment and this Court.

## V. X CORP'S ANALYSIS OF COPYRIGHT CLAIMS DELIBERATELY IGNORES CRUCIAL FACTS

X Corp's treatment of Plaintiff's copyright claims is a masterclass in selective factual presentation. The Motion attempts to recast this case as a routine copyright

dispute when the evidence demonstrates an extraordinary pattern of deliberate indifference.

X Corp characterizes this case as if it involved isolated instances of third-party infringement. This conveniently ignores:

1. Over 500 documented instances of copyright infringement;

2. Multiple formal DMCA notices submitted through X Corp's own legal process;

3. X Corp's written acknowledgment of "impersonation and harassment";

4. Plaintiff's submission of government identification proving his identity; and

5. The continued hosting of infringing content after all these notifications.

This is not a case about a platform unaware of infringement. It is about a platform that received proper notification, acknowledged the problem, verified the complainant's identity, and then chose to do nothing—hundreds of times over.

X Corp's reliance on the "volitional conduct" requirement from *BWP Media* reflects either a profound misunderstanding of copyright law or a deliberate attempt to mislead the Court. While initial hosting of third-party content may lack the necessary volitional element, courts consistently hold that refusing to remove content after specific notification satisfies this requirement. See *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 625 (4th Cir. 2001) (holding that "if [a

platform] is given sufficient information to identify infringing activity, it can be liable for copyright infringement if it refuses to remove the material from its system").

The volitional element is present when a platform:

1. Receives specific notice of infringing content;

2. Has the technological capability to remove it; and

3. Makes a conscious decision not to do so.

Plaintiff's complaint meticulously documents each of these elements. X Corp received four separate DMCA notices, acknowledged the "impersonation and harassment," and possessed sophisticated content monitoring capabilities—yet chose to allow the infringement to continue while simultaneously suspending Plaintiff's account.

X Corp also conveniently fails to address its clear disqualification from DMCA safe harbor protection under 17 U.S.C. § 512. To qualify for safe harbor, a service provider must:

1. "Expeditiously" remove infringing content upon notification;

2. Adopt and reasonably implement a policy for terminating repeat infringers; and

3. Not have actual knowledge of infringement.

X Corp failed all three requirements:

1. It did not remove content despite multiple notifications;

2. It allowed repeat infringers to continue their activities; and

3. It had actual knowledge through Plaintiff's DMCA notices and its own acknowledgment of the issue.

Indeed, far from terminating repeat infringers as the DMCA requires, X Corp's actions demonstrate a pattern of protecting infringers while punishing victims. The irony of X Corp's position is remarkable: it seeks protection under a statute whose requirements it flagrantly violated.

## VI. THE ABSURD PARADOX OF X CORP'S SELECTIVE RULE ENFORCEMENT

Perhaps most revealing is the bizarre paradox created by X Corp's approach to its own platform rules. X Corp maintains:

1. Its Terms of Service grant it absolute discretion to suspend accounts;

2. Its Content Policies prohibit impersonation and harassment;

3. It has sophisticated content moderation capabilities;

4. It explicitly acknowledged the "impersonation and harassment" of Plaintiff;

5. Yet it chose not to enforce its own rules against the documented violations.

This creates an absurd situation where X Corp claims both:

1. The absolute right to enforce its rules when it suspends accounts it wishes to suspend; and

2. The absolute right not to enforce those same rules when doing so would protect a user it appears not to favor.

The paradox reveals the truth: X Corp's rules are not rules at all, but rather pretexts for selective enforcement against disfavored users while allowing favored users to violate with impunity. This selective enforcement creates an illusion of neutral platform rules while enabling targeted harassment.

As the screenshots provided with this response demonstrate, the harassment continues to this day. An account titled "Justin's Undescended Testicle (parody)" (@anti_rizzler) remains active with the sole purpose of harassing Plaintiff, using a modified version of the copyrighted photograph. Despite being reported, despite X Corp's acknowledgment of the harassment, despite being a clear violation of X Corp's own Content Policies, this account remains active.

The conclusion is inescapable: X Corp does not actually enforce its Content Policies in good faith. It enforces them selectively, against some users but not others, creating a facade of rules while actually exercising unfettered discretion to protect harassers it favors while punishing victims it does not.

## VII. X CORP'S ATTEMPT TO DISMISS BILLING CLAIMS DEFIES BOTH FACT AND LAW

Perhaps the most troubling aspect of X Corp's Motion is its attempt to normalize predatory billing practices that would be condemned in any other industry.

X Corp's Motion conveniently omits the critical fact that Plaintiff was:

1. Charged for premium services;
2. Suspended from accessing those services;
3. Prevented from accessing cancellation mechanisms due to suspension; and
4. Continued to be charged despite X Corp's knowledge of this situation.

In any other context, billing a consumer for services while simultaneously preventing access to those services and to cancellation mechanisms would be

recognized as a textbook unfair business practice. X Corp asks this Court to believe that standard contract principles somehow permit this predatory cycle.

X Corp's suggestion that its Terms of Service permit charging users for services they cannot access represents a remarkable misunderstanding of basic contract principles. Contract provisions that are unconscionable, that create illusory promises, or that allow one party to act in bad faith are unenforceable in every American jurisdiction—including California. See *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal.4th 83, 114 (2000).

A contract provision purporting to allow a company to:

1. Charge for services it does not provide;

2. Block access to cancellation mechanisms; and

3. Continue charging despite knowledge of the situation

would be deemed unconscionable and unenforceable in any court—regardless of choice of law provisions.

## VIII. X CORP'S CITED CASES ARE FUNDAMENTALLY DISTINGUISHABLE

X Corp's Motion relies on a carefully curated selection of cases that bear little resemblance to the extraordinary facts documented in Plaintiff's complaint.

*BWP Media USA, Inc. v. T & S Software Assocs., Inc.* involved no DMCA notices, no platform acknowledgment, no identity verification, and no ongoing infringement—all critical factors here.

*Cross v. Facebook* did not involve copyright claims, DMCA notices, acknowledgment of violations, or identity verification. Its analysis of non-copyright issues is irrelevant to the core claims here.

*Damner v. Facebook* involved standard application of terms of service to typical use cases—not the predatory catch-22 where a suspended user is charged for services they cannot access and prevented from cancelling.

The cumulative effect of X Corp's selective case citation is to create a fictional legal landscape bearing no resemblance to established jurisprudence. One can only speculate why X Corp chose not to cite cases addressing situations where platforms:

1. Acknowledged wrongdoing yet failed to act;

2. Received proper DMCA notices yet continued hosting infringing content; or

3. Charged users for services they simultaneously blocked.

Perhaps such cases would not support the outcome X Corp seeks.

## IX. THE ONGOING NATURE OF THE HARASSMENT UNDERMINES X CORP'S ENTIRE DEFENSE

As the screenshots submitted with this response demonstrate, the harassment continues unabated to this day. An account titled "Justin's Undescended Testicle (parody)" (@anti_rizzler) remains active, using a modified version of Plaintiff's copyrighted image to harass him. This account: https://x.com/anti_rizzler?s=09



1. Was created after X Corp received multiple DMCA notices;

2. Uses a barely-modified version of the same copyrighted photograph;

3. Exists solely to harass Plaintiff;

4. Clearly violates X Corp's own Content Policies against harassment; and

5. Remains active despite all of the above.

This ongoing harassment exposes the fiction at the heart of X Corp's defense. If X Corp truly believed it was legally required to remove infringing content, or if it actually enforced its Content Policies in good faith, this account would not exist. Its continued presence demonstrates that X Corp's claims about Terms of Service enforcement, content moderation capabilities, and legal compliance are merely pretexts for selective enforcement.

Even now, accounts impersonating Plaintiff using modified versions of his copyrighted photograph remain active on X Corp's platform, including:

1. Accounts created after X Corp received multiple DMCA notices

2. Accounts that exist solely to harass Plaintiff

3. Accounts that clearly violate X Corp's own Content Policies against harassment

4. Accounts using barely-modified versions of the same copyrighted photograph

These accounts don't merely contradict X Corp's legal arguments—they actively demonstrate the hollowness of their claim to enforce platform policies in good faith.

The continued operation of these accounts while Plaintiff's account was suspended creates an undeniable record of selective enforcement that:

1. Protects harassment while punishing the harassed
2. Ignores copyright violations while enforcing against legitimate speech
3. Demonstrates a pattern of institutional protection for coordinated harassment

This selective enforcement pattern transforms X Corp from a neutral platform into an active facilitator of targeted harassment—directly contradicting their claims of immunity.

## X. X CORP'S MOTION REVEALS A TROUBLING VIEW OF PLATFORM ACCOUNTABILITY

Beyond its legal deficiencies, X Corp's Motion reveals a troubling perspective on platform accountability. It suggests that:

1. A platform can acknowledge wrongdoing yet have no obligation to address it;

2. A user who follows every legal procedure still has no recourse for hundreds of violations;

3. A company can charge for services it doesn't provide while preventing cancellation; and

4. The platform's own rules are meaningful only when invoked against disfavored users.

This perspective is not merely legally incorrect—it is fundamentally at odds with basic principles of corporate responsibility and consumer protection. It suggests that social media platforms exist in a separate legal universe where ordinary rules of business conduct do not apply.

The implications are stark: if X Corp prevails, no user of any social media platform would have meaningful protection for their intellectual property, identity, or financial interests. Platforms could acknowledge violations, continue allowing them, charge users affected by those violations, and face no legal consequences.

This Court should reject not only X Corp's specific arguments but the broader proposition that platforms exist beyond the reach of established law.

# XI. X CORP'S SHIFTING TERMS OF SERVICE: A CALCULATED LEGAL STRATEGY REVEALED

X Corp's Motion to Dismiss relies heavily on their Terms of Service as a shield against liability, yet fails to address a critical reality: their Terms constitute not a consistent legal framework but a constantly shifting instrument strategically manipulated to evade accountability. The timing and substance of their latest Terms update—released shortly after receiving Plaintiff's complaint—reveals this strategy in stark relief.

## A. The Suspicious Timing of X Corp's Terms Update

The updated X Purchaser Terms of Service, scheduled to take effect on March 15, 2025, emerged suspiciously soon after X Corp received this lawsuit. This timing cannot be dismissed as coincidental, particularly when examining the specific modifications made:

1. **Removal of Notice Requirements**: The requirement for X Corp to provide advance notice of material revisions has been eliminated—conveniently erasing a contractual obligation they failed to honor with Plaintiff.

2. **Governing Law Restructuring**: The "Governing Law" section has been completely overhauled to include jurisdiction-specific provisions for users in

different regions—a direct response to the jurisdictional vulnerabilities exposed in this litigation.

3. **Arbitration Language Removal**: References to "binding arbitration" for United States users have been strategically excised—precisely when faced with a lawsuit that challenges their ability to enforce such provisions.

4. **Dispute Resolution Barriers**: A new "Initial Dispute Resolution" section creates procedural hurdles that did not exist when Plaintiff's claims arose—effectively attempting to retroactively impose additional barriers to legal remedy.

5. **Address and Location Changes**: The corporate address for X Corp has been removed entirely, while office location information has been changed—creating deliberate ambiguity about jurisdiction at the exact moment jurisdictional questions arise in litigation.

6. **Acceptance Language Modification**: The phrase "or accessing" has been removed from the acceptance clause—a subtle but significant change that narrows the scope of when users are deemed to have accepted terms.

7. **Content Liability Restructuring**: Multiple sections have been reorganized to further insulate X Corp from liability for user content—modifications directly responsive to the claims in Plaintiff's complaint.

## B. The Terms of Service Shell Game

X Corp's Motion to Dismiss engages in a remarkable legal sleight-of-hand, selectively citing different versions of their Terms depending on which iteration better serves their immediate argument. This creates a bewildering shell game where:

1. They cite pre-relocation California choice-of-law provisions while simultaneously claiming Texas tax benefits and headquarter status;

2. They reference Terms restrictions from versions that did not exist when the violations occurred;

3. They selectively enforce provisions against Plaintiff while ignoring those same provisions when applied to harassing accounts;

4. They attempt to retroactively apply contractual limitations specifically added to address the vulnerabilities exposed by this litigation.

This approach transforms their Terms of Service from a legitimate legal agreement into an ever-shifting foundation designed specifically to evade accountability. When one version doesn't support their position, they simply reference a different version—creating a Schrödinger's contract that exists in whatever state most benefits X Corp at that moment.

## C. The Self-Serving Contradictions in X Corp's Terms Arguments

X Corp's reliance on their Terms of Service creates remarkable contradictions that reveal the true nature of their approach:

1. **Territorial Contradiction**: X Corp fled California citing its regulatory environment, yet now clings to California law when it serves their purpose—a position reducing to "we want Texas taxes but California law."

2. **Enforcement Contradiction**: Their Terms grant absolute discretion to suspend accounts for rule violations, yet they claim no obligation to enforce those same rules against documented impersonation and harassment.

3. **Contract Contradiction**: They cite contractual provisions to excuse charging for services they block access to—effectively claiming the right to receive payment for services they deliberately withhold.

4. **Notice Contradiction**: They claim Plaintiff had notice of limitations and cancellation procedures while simultaneously acknowledging he was prevented from accessing those same procedures.

5. **Liability Contradiction**: They claim both absolute immunity from responsibility for user content and absolute discretion in content moderation—reducing to "we can do anything we want without consequence."

The March 2025 Terms update represents not a good-faith contract revision but a transparent attempt to retroactively shield X Corp from liability for conduct that occurred under previous Terms versions. Most tellingly, the changes systematically address the exact vulnerabilities exposed by Plaintiff's complaint—particularly regarding dispute resolution, governing law, and platform accountability.

## D. The Illusion of Contract Consistency

X Corp's Motion asks this Court to treat their Terms as if they represent a consistent, stable agreement rather than the constantly mutating document they truly are. Consider:

1. The Terms effective in November 2023 (when the infringement began) differ materially from those effective in February 2024 (when Plaintiff's account was suspended);

2. Those February 2024 Terms differ from the Terms cited in X Corp's Motion to Dismiss;

3. And all previous versions differ substantially from the March 2025 Terms scheduled to take effect shortly after this litigation commenced.

Which version applies to which aspect of this dispute? X Corp's answer appears to be "whichever version most effectively shields us from liability at any given moment"—a position no court should countenance.

## E. The Texas-California Paradox

Perhaps most revealing is X Corp's attempt to claim California law applies despite:

1. Their highly publicized relocation to Texas in 2023;

2. The estimated $6.25 million in Texas tax incentives they received for that relocation;

3. Their public statements criticizing California's regulatory environment;

4. Their Texas corporate registrations, property holdings, and tax arrangements;

5. Their own updated March 2025 Terms, which alter the governing law provisions.

This remarkable position reduces to "Texas benefits but California laws"—a territorial cherry-picking without precedent or principle that reveals the fundamentally opportunistic nature of X Corp's legal approach.

## F. Terms Updates as Admissions of Vulnerability

The timing and substance of X Corp's March 2025 Terms update constitute what amounts to an admission that their previous Terms were legally insufficient to shield them from the misconduct alleged. Rather than addressing that misconduct, X Corp simply rewrites the rules after the fact.

Most significantly, these revised Terms—regardless of which version X Corp selectively cites—cannot overcome the statutory protections afforded by copyright law. Section 230(e)(2) explicitly excludes intellectual property claims from

immunity, and no contractual provision can erase X Corp's statutory obligation to respond to valid DMCA notices.

The Court should recognize X Corp's Terms of Service strategy for what it is: not a legitimate legal defense but a calculated attempt to retroactively insulate themselves from liability through contractual revision. This approach effectively asks the Court to allow X Corp to change the rules of the game after it has been played—a position fundamentally at odds with basic principles of contract law and corporate accountability.

## XII. CONCLUSION: THE EMPEROR'S DIGITAL CLOTHES

X Corp asks this Court to accept legal arguments of such spectacular inconsistency that they amount to a corporate declaration of "the rules don't apply to us." They simultaneously claim:

1. They're immune from responsibility for content (Section 230)

2. Except intellectual property is excluded from that immunity (Section 230(e)(2))

3. But they should be immune from intellectual property claims anyway (contrary to explicit statute)

4. They have a First Amendment right to make editorial decisions (Moody)

5. Including decisions to facilitate copyright infringement (contrary to established precedent)

6. They're a Texas corporation for tax purposes

7. But California law should apply to this case

8. Their Terms of Service allow them to charge for services they block access to

9. Their Content Policies prohibit harassment and impersonation

10. But they have no obligation to enforce those policies in any consistent manner

This collection of contradictions doesn't represent legal argumentation but an attempt to establish that platforms exist in a parallel legal universe where conventional legal principles—and even statutory text—simply don't apply.

For the Court to accept these arguments would require it to ignore explicit statutory language, contradict established precedent, validate selective enforcement of platform rules, legitimize predatory billing practices, and ultimately establish that multi-billion dollar platforms operate beyond the reach of law rather than within it.

This Court should reject not only X Corp's specific arguments but the broader proposition that platforms exist beyond the reach of established law.

X Corp's Motion to Dismiss represents an attempt to distort both fact and law to avoid accountability for conduct that would be condemned in any other industry. It

relies on mischaracterized precedent, ignores statutory language, omits critical facts, and advances legal theories that collapse under minimal scrutiny.

For the foregoing reasons, Defendant's Motion to Dismiss should be denied in its entirety.

Respectfully submitted,

Justin Riddle

Pro Se Litigant

16422 Patrick Ave

Omaha, NE 68116

402-813-2156

Date: March 6, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2025, I caused the foregoing Response in Opposition to Defendant's Motion to Dismiss to be served The Texas Electronic Filing System/ PACER, upon:

Norma N. Bennett

Michella Gibbs

SHOOK, HARDY & BACON, LLP

600 Travis, Suite 3400

Houston, Texas 77002


Kenneth M. Trujillo-Jamison

WILLENKEN LLP

707 Wilshire Blvd., Suite 4100

Los Angeles, CA 90017


Attorneys for Defendant X Corp.


Justin Riddle