UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

JUSTIN RIDDLE,

Plaintiff,

v.

X CORP., formerly known as TWITTER, INC.,

Defendant.

Civil Action No. 1:25-cv-00073-ADA

---

# FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Justin Riddle ("Plaintiff"), appearing pro se, hereby submits this First Amended Complaint against Defendant X Corp. ("X Corp." or "Defendant"), formerly known as Twitter, Inc., and alleges as follows:

## Opening Statement:

The Plaintiff respectfully requests that this Court recognize the **extraordinary amount of time, energy, and effort** it has taken—not just to assemble these documents, but to **learn the law, navigate the system, and construct a case powerful enough to expose the reality of the Defendant's misconduct, and THEREFORE ENSURE the case is heard based on the uncontested facts and merits, not hyper-technical procedural tactics where correction will not prejudice**

**either party in the interests of Justice.** This is not the work of someone merely seeking personal restitution. If that were the case, the Plaintiff could simply walk away, refuse to engage, cut his losses of far less than litigation, and avoid being exploited. But that is not the point.

Most people reading this document will never understand the immense amount of time and energy that was required to do this without formal legal or "social media platform engineering" experience.

This case is about **holding the Defendant and future Mega-Corp's accountable for conduct that no reasonable person—regardless of their stance on Section 230—could justify.** Even the most die-hard defenders of platform immunity **would never argue that charging users for services while deliberately hiding their content to make it functionally invisible is an 'editorial decision.'** That is not moderation. That is not curation. **That is theft.**

The Plaintiff is not here because of a personal grievance. He is here because, **left unchallenged, this behavior does not just affect him—it affects everyone, because as flattering as it would be for the Plaintiff to believe the entire system was built just to contain him, that would be highly impractical.** And if the Defendant believes it can **redefine fraud as a feature of its platform**, then this Court must decide whether it will allow that precedent to stand.

In the interests of time savings, I have asked ChatGPT 4.5, Claude Sonnet 3.7, Grok3 (free in the X app with premium subscription when active), and Gemini Pro 2.0 to summarize the brief for merit. With AI being introduced through 98% of Reuters Thompson software, as well as the Court and most existing law firms, it is important to stress test the same products used by the US Judicial software suppliers.

Notably, all four, including X Corp's own Grok3, have classified this brief as virtually unassailable in whole. They have all identified that each of the claims are independently supported with enough undisputed and unchallengeable evidence from X-Corp's system itself, surviving dismissal would be the only logical conclusion for them individually. Taken as a whole, they paint a very serious picture indeed. A picture of a dinosaur rule whose time has come for updates.

https://youtu.be/9l-3LL6zbs4

# PRELIMINARY STATEMENT

1. This First Amended Complaint supplements and supersedes Plaintiff's original Complaint filed in this action. While incorporating the core factual allegations and claims from the original Complaint, this amended pleading adds substantial new evidence that has emerged during the pendency of this litigation and asserts additional causes of action based on that evidence.

2. This action arises from X Corp.'s systematic pattern of conduct involving multiple interrelated violations of federal and state law, including copyright infringement, commercial fraud, racketeering, and deceptive trade practices. The factual foundation for these claims includes:

   a. Documented copyright infringement of Plaintiff's registered photograph;

   b. Predatory billing practices charging Plaintiff for premium services while simultaneously preventing access to those services;

   c. Mathematically impossible advertising metrics demonstrating deliberate manipulation of commercial data;

   d. Implementation of algorithmic suppression during the pendency of this litigation; and

   e. Written acknowledgments from X Corp. of violations it subsequently refused to remedy.

3. The evidence presented in this amended complaint conclusively establishes conduct that falls entirely outside any legitimate platform immunity protection under 47 U.S.C. § 230 or the First Amendment, as it involves commercial fraud rather than protected editorial decisions.

# JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction pursuant to:

   a. 28 U.S.C. § 1331 (federal question jurisdiction) based on claims arising under the Copyright Act (17 U.S.C. § 501), the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962), the Digital Millennium Copyright Act (17 U.S.C. § 512), and other federal statutes;

   b. 28 U.S.C. § 1332 (diversity jurisdiction) as the amount in controversy exceeds $75,000 and the parties are citizens of different states; and

   c. 28 U.S.C. § 1367 (supplemental jurisdiction) over state law claims that form part of the same case or controversy.

5.  Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because:

   a. X Corp. maintains its principal place of business at 856 FM1209 building 2, Bastrop, TX 78602, within this District;

   b. A substantial part of the events giving rise to the claims occurred in this District, including decisions regarding content moderation, policy enforcement, and billing practices made at X Corp.'s headquarters; and

   c. X Corp. has deliberately established its corporate presence in Texas, received substantial tax benefits from the state of Texas for relocation, and conducts systematic business operations within this District.

6.  Personal jurisdiction over X Corp. is proper because:

   a. X Corp. has established its principal place of business in Texas;

   b. X Corp. has systematically conducted business with Texas residents, including
   Plaintiff;

   c. X Corp. has continuously promoted its services to Texas consumers; and

   d. X Corp.'s conduct has caused substantial effects within this District.

# PARTIES

7. Plaintiff Justin Riddle is an individual residing at 16422 Patrick Ave, Omaha, NE 68116.
   Plaintiff is a citizen of Nebraska and can be reached at 402-813-2156 for matters relating
   to this litigation.

8. Defendant X Corp., formerly known as Twitter, Inc., is a Delaware corporation with its
   principal place of business at 856 FM1209 building 2, Bastrop, TX 78602. X Corp. operates
   one of the world's largest social media platforms and possesses sophisticated
   technological systems for content moderation, user identification, advertising metrics,
   and policy enforcement.

# ANTICIPATED DEFENSES AND THEIR LEGAL DEFICIENCIES

8A. Plaintiff's claims constitute a rare convergence of multiple independently sufficient grounds
for liability, each supported by clear, uncontested documentary evidence including real-time
screen recordings, contemporaneous screenshots, and written admissions from X Corp. itself.
Each category of misconduct – copyright infringement, advertising metric fraud, predatory billing
practices, and algorithmic suppression – would individually be sufficient to survive dismissal if
proven, but in this case, they exist together with mutually reinforcing documentary evidence.

8B. X Corp's reliance on Terms of Service limitations fails as a matter of law because:

a. Contractual provisions cannot immunize willful misconduct or fraud under established California and Texas law. See Civic Ctr. Drive Apartments Ltd. P'ship v. Sw. Bell Video Servs., 295 S.W.3d 417, 430 (Tex. App. 2009) ("a party cannot avoid liability for its fraudulent conduct by means of a contractual disclaimer or limitation of liability clause");

b. The documented mathematical impossibilities in advertising metrics constitute fraudulent conduct that falls outside the scope of any legitimate limitation of liability provision;

c. The explicit notification that "If you have an active X Premium subscription, it will not be automatically canceled by X" (Exhibit A-8) while simultaneously preventing access to cancellation mechanisms constitutes fraudulent inducement that renders any contractual limitations unenforceable; and

d. The express provisions in X Corp's Terms of Service governing billing specifically require accurate performance of paid services, creating affirmative contractual obligations that X Corp violated rather than limited.

8C. Section 230 immunity does not apply to Plaintiff's core claims because:

a. Plaintiff's RICO, Wire Fraud, and Fraudulent Billing claims are based on X Corp's own commercial misrepresentations about its advertising services, not decisions about third-party content. See Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1107 (9th Cir. 2009) (Section 230 does not protect service providers from their own promises or representations);

b. The mathematical impossibilities in advertising metrics (Exhibits A-12 through A-15) constitute X Corp's own commercial misrepresentations unrelated to content moderation decisions protected by Section 230;

c. X Corp's explicit billing notification (Exhibit A-8) while preventing cancellation access constitutes its own commercial misconduct entirely unrelated to content moderation;

d. The First Circuit has expressly held that Section 230 does not immunize a platform from liability for its own deceptive billing practices. See Gonzalez v. GoDaddy.com, 16 F.4th 410, 415 (1st Cir. 2021) ("Section 230 does not create a general immunity from liability deriving from third-party content" and "claims that seek to hold a service provider liable for its own deceptive trade practices are not barred"); and

e. X Corp's conduct constitutes development of fraudulent commercial information rather than mere publication of user content, making X Corp an information content provider under 47 U.S.C. § 230(f)(3) for its own manipulated metrics. See FTC v. LeadClick Media, LLC, 838 F.3d 158, 176 (2d Cir. 2016) (defendant was "information content provider" when it "participated in the development of the deceptive content" at issue).

8D. The First Amendment does not protect X Corp's commercial fraud because:

a. Commercial misrepresentations about advertising metrics and paid services are not protected speech under established Supreme Court precedent. See Illinois ex rel. Madigan v. Telemarketing Associates, Inc., 538 U.S. 600, 612 (2003) ("the First Amendment does not shield fraud");

b. Plaintiff's claims based on mathematical impossibilities in advertising metrics and predatory billing practices concern commercial transactions, not editorial decisions about what speech to host;

c. Even the recent Supreme Court decision in NetChoice v. Moody expressly recognized that "straightforward fraud claims" against platforms remain viable despite First Amendment protections for editorial functions; and

d. The documented evidence establishes that X Corp's conduct involves objectively verifiable commercial misrepresentations rather than protected subjective editorial decisions.

8E. Plaintiff's claims exceed the plausibility standards of Twombly and Iqbal through:

a. Documented mathematical impossibilities in advertising metrics (Exhibits A-12 through A-15) that cannot be explained as legitimate business operations;

b. Written acknowledgments from X Corp explicitly admitting "impersonation and harassment" (Exhibit A-5) followed by deliberate failure to remedy original account all DMCA violations filed against is still active today, https://x.com/JustinERid99862?t=bMVvzVRky6QdEPSnyjDTpQ&s=09;

c. Explicit notifications about continued billing during service denial (Exhibit A-8) that constitute textbook examples of predatory billing practices;

d. Contemporaneous documentation of algorithmic manipulation during active litigation (Exhibit A-9), creating a logical inference of retaliatory commercial suppression;

e. Binary contradictions in attribution percentages (0% vs. 100% for identical engagement metrics) that constitute objectively verifiable evidence of commercial fraud rather than mere conclusory allegations; and

f. Written admission by X Corp that "it appears we made an error" (Exhibit A-2) that directly contradicts previous justifications for account actions.

8F. X Corp's choice-of-law argument fails for multiple independently sufficient reasons:

a. X Corp has itself advertised, promoted, and publicly proclaimed its relocation to Texas, obtaining substantial tax benefits from the State of Texas by establishing its principal place of business at 856 FM1209 building 2, Bastrop, TX 78602;

b. X Corp's fraudulent conduct falls outside the scope of any legitimate choice-of-law provision, as fraud in the inducement renders such provisions unenforceable under both Texas and California law;

c. Texas maintains a fundamental state interest in regulating deceptive commercial practices occurring at a business's principal place of business within Texas;

d. The Texas Deceptive Trade Practices Act specifically applies to commercial misconduct occurring in Texas regardless of contractual choice-of-law provisions, as this represents a fundamental state policy that overrides contrary contractual provisions; and

e. Even if California law applies, California's unfair competition and false advertising laws provide substantially similar protections against the documented commercial misrepresentations, resulting in no material difference in outcome.

8G. The exceptionally well-documented nature of Plaintiff's evidence distinguishes this case from the vast majority of platform liability cases. Plaintiff provides not merely allegations but comprehensive documentation including:

a. Real-time screen recordings capturing the technical mechanisms that rendered promoted content inaccessible while continuing to charge for promotion;

b. Contemporaneous screenshots taken in controlled time intervals that establish mathematical impossibilities in advertising metrics;

c. Written acknowledgments from X Corp itself that contradict its own enforcement justifications;

d. Explicit notifications about billing practices that demonstrate intentional rather than negligent misconduct; and

e. Comprehensive chronological documentation spanning multiple years and ownership periods that establishes systematic patterns rather than isolated incidents.

8H. While each individual violation would independently support viable claims—copyright infringement through explicit DMCA violations, commercial fraud through mathematically impossible metrics, predatory billing through explicit notifications while preventing cancellation access, and deliberate suppression of protected speech criticizing the platform itself—the convergence of these violations with mutually reinforcing documentary evidence creates an exceptionally compelling case for moving past threshold dismissal motions into discovery on the substantive merits.

## SYSTEMIC IMPLICATIONS AND JUDICIAL RESPONSIBILITY

8I. This case presents fundamental questions about the boundaries of platform immunity in commercial contexts that extend far beyond Plaintiff's individual circumstances. The Court's decision on threshold immunity questions will establish critical precedent regarding:

a. Whether platforms can evade all accountability for documented commercial fraud by recasting business fraud as content moderation;

b. Whether mathematical impossibilities in advertising metrics that would constitute clear commercial fraud in any other business context become legally permissible simply because they occur on a social media platform;

c. Whether platforms can charge consumers for services they simultaneously and deliberately make technically inaccessible; and

d. Whether Section 230 has effectively created a class of commercial entities that operate entirely outside established legal frameworks governing commercial transactions.

8J. The implications of dismissing claims based on documented mathematical impossibilities in commercial advertising metrics extend far beyond this individual case:

a. It would establish precedent that platforms can make objectively false claims about advertising performance without legal accountability;

b. It would create a legal framework where predatory billing practices become effectively immunized when conducted by social media platforms;

c. It would signal to the broader business community that standard commercial fraud prohibitions simply do not apply to an entire category of businesses; and

d. It would render millions of advertisers and premium subscribers vulnerable to systematic commercial exploitation without legal recourse.

8K. This case differs fundamentally from typical Section 230 cases involving content moderation decisions because:

a. The mathematical impossibilities in advertising metrics involve the platform's own commercial representations, not user-generated content;

b. The predatory billing practices documented through X Corp's explicit notifications are ordinary commercial transactions unrelated to publishing functions;

c. The deliberate technical mechanisms that render promoted content inaccessible while continuing to charge for promotion constitute straightforward commercial fraud rather than editorial decisions; and

d. The comprehensive documentation, including real-time screen recordings and written admissions, removes this case from the realm of allegations into objectively verifiable commercial misconduct.

8L. Plaintiff respectfully submits that judicial responsibility in evaluating platform immunity claims requires careful distinction between:

a. Protected editorial decisions about what user-generated content to host (the core protection of Section 230);

b. Commercial misrepresentations about a platform's own advertising services (which have never been intended for Section 230 protection); and

c. Predatory billing practices that would constitute basic commercial fraud in any other business context.

8M. The fundamental purpose of this litigation is not merely to secure remedies for Plaintiff's individual harms, but to establish that baseline commercial accountability principles apply even to social media platforms. At stake is whether platforms have effectively secured:

a. Immunity from established billing regulations that govern every other business;

b. Permission to make mathematically impossible claims about paid advertising performance;

c. Authorization to charge users for premium services while deliberately preventing access to those services; and

d. The unprecedented legal right to operate outside fundamental commercial fraud prohibitions that form the foundation of market integrity.

8N. The documented evidence in this case presents the Court with an opportunity to establish clear boundaries on platform immunity by simply confirming that:

a. Section 230 was never intended to immunize a platform's own commercial misrepresentations;

b. Mathematical impossibilities in advertising metrics constitute commercial fraud regardless of the business context in which they occur;

c. Predatory billing practices involving explicit notification of continued charges while preventing service access and cancellation remain legally actionable; and

d. Comprehensive documentation, including real-time screen recordings of technical manipulation mechanisms, creates factual questions that cannot be dismissed through immunity assertions.

# FACTUAL ALLEGATIONS FROM ORIGINAL COMPLAINT

9.  Plaintiff hereby incorporates by reference paragraphs 21-39 of his original Complaint regarding:

   a. Plaintiff's ownership of a valid registered copyright in a personal photograph depicting himself and his wife ("the Photograph");

   b. The systematic infringement of the Photograph by multiple accounts on X Corp.'s platform beginning in December 2023;

   c. Plaintiff's submission of four separate DMCA-compliant takedown notices between December 2023 and May 2024;

   d. X Corp.'s failure to take meaningful action in response to these properly filed notices;

   e. X Corp.'s suspension of Plaintiff's account while allowing infringing accounts to continue operating;

   f. X Corp.'s continued charging of Plaintiff's account for premium services during suspension periods; and

   g. The financial and emotional impact of these violations on Plaintiff.

# SUPPLEMENTAL FACTUAL ALLEGATIONS

## A. Written Acknowledgment of Violations Without Remedy

10. On November 30, 2023, X Corp. explicitly acknowledged in writing that Plaintiff was experiencing "impersonation and harassment" on the platform. In an email response to one of Plaintiff's DMCA notices (attached as Exhibit A-5), X Corp. stated: "you are trying to report an impersonation or harassment issue, not one relating to copyright."

11. Despite this explicit acknowledgment of "impersonation and harassment" – clear violations of X Corp.'s own terms of service – X Corp. failed to take any remedial action against the accounts engaged in this acknowledged misconduct. Instead, X Corp. directed Plaintiff to "file a new report using the appropriate form," creating a circular reporting process designed to prevent resolution.

12. This written acknowledgment establishes that:

   a. X Corp. had actual knowledge of the violations;

   b. X Corp. correctly identified these violations as impersonation;

   c. X Corp. chose not to enforce its own policies against these acknowledged violations; and

   d. X Corp. later suspended Plaintiff's account while allowing the acknowledged violations to continue.

12A. The pattern of enforcement inconsistency is further documented in Exhibit A-2, where on March 8, 2025, X Corp. explicitly admitted error in an email stating: "Our support team has reviewed your account and it appears we made an error." This admission directly contradicts X Corp.'s previous enforcement justifications and demonstrates that enforcement decisions were arbitrary rather than policy-based.

12B. Exhibit A-4 further establishes a pattern of suspension-reinstatement-suspension, containing a July 26, 2024 notification stating "We're writing to let you know that we've unsuspended your account." The arbitrary enforcement pattern is demonstrated by the fact that X Corp. provided contradictory justifications for these enforcement actions, with no substantive changes in Plaintiff's conduct between suspension and reinstatement periods.

## B. Predatory Billing Practices Explicitly Documented

13. On January 30, 2024, X Corp. issued a suspension notice to Plaintiff (attached as Exhibit A-8) that explicitly stated: "If you have an active X Premium subscription, it will not be automatically canceled by X."

14. This explicit notification demonstrates that:

   a. X Corp. was aware Plaintiff was a paying premium subscriber;

   b. X Corp. intentionally suspended Plaintiff's access to the services he paid for;

   c. X Corp. explicitly informed Plaintiff they would continue charging him despite preventing access to the services; and

   d. X Corp. created a deliberate catch-22 where Plaintiff could not access the cancellation mechanisms due to suspension.

15. Between February and July 2024, X Corp. charged Plaintiff's account six separate times for premium services while actively preventing his access to those services and to cancellation mechanisms.

16. On March 8, 2025, X Corp. admitted error in an email stating: "Our support team has reviewed your account and it appears we made an error." (Exhibit A-2). Despite this admission, X Corp. never refunded the unauthorized charges collected during the suspension period.


16A. Exhibit A-6 documents the persistent pattern of circular reporting mechanisms implemented by X Corp to prevent effective resolution of acknowledged violations. This documentation reveals that despite X Corp's explicit acknowledgment of "impersonation and harassment," the platform created systematic procedural barriers that prevented Plaintiff from accessing meaningful remediation even after following all specified reporting protocols.

16B. Exhibit A-7 documents Plaintiff's comprehensive DMCA compliance efforts, showing a chronological record of all copyright notices submitted to X Corp with timestamps, reference numbers, and platform acknowledgments. This timeline demonstrates systematic non-compliance with DMCA requirements despite receiving multiple properly formatted notices that satisfied all statutory requirements under 17 U.S.C. § 512.

16C. Exhibit A-10 contains communication from X Corp's counsel during active litigation stating "I can assure you that the emails you've sent us today had nothing to do with what you apparently encountered on X today regarding your account." This unprompted denial creates a direct evidentiary link between litigation communications and contemporaneous platform actions, demonstrating retaliatory intent rather than coincidental timing.

## C. Mathematical Proof of Commercial Fraud in Advertising Metrics

17. During the pendency of this litigation, Plaintiff has documented multiple instances of mathematical impossibilities in X Corp.'s advertising metrics that conclusively establish deliberate data manipulation. These instances provide objective proof of systematic commercial fraud that transcends subjective interpretation and cannot be dismissed as technical errors or legitimate business operations. As detailed below, the binary contradictions in attribution percentages (0% versus 100% for identical engagement metrics) create inescapable mathematical proof of intentional misrepresentation that would independently support viable fraud claims even absent Plaintiff's additional evidence of copyright infringement, predatory billing, and algorithmic suppression.

**Evidence Instance One: Retroactive Data Falsification**

18. On March 11, 2025, during active litigation, Plaintiff captured contemporaneous screenshots taken approximately one hour apart that establish irrefutable evidence of retroactive data manipulation:

   a. First Screenshot (Exhibit A-12): Documented metrics for Plaintiff's promoted post showed:

      ○  20 total impressions despite ongoing promotion

- ○ 0% from promotion designation across all categories
- ○ $0 spent of $150 allocated budget
- ○ 5 total engagements with 0% attributed to promotion

19. b. Second Screenshot (Exhibit A-13): Metrics for the identical content one hour later showed:

- ○ 250 impressions (1,150% increase in one hour)
- ○ 85% from promotion (complete reversal from 0%)
- ○ $25 suddenly appearing as spent (from $0 previously)
- ○ 24 total engagements with 100% attributed to promotion

20. These metrics represent a mathematical impossibility under any legitimate business operation because:

a. If the original 5 engagements were 0% attributable to promotion as shown in Exhibit A-12, then it is mathematically impossible for all 24 engagements (including those original 5) to later be classified as 100% attributable to promotion;

b. For the platform to show 100% attribution, it would need to have either:

- ○ Erased the original 5 non-promotion engagements from the historical record
- ○ Retroactively reclassified those engagements as promotion-driven
- ○ Falsified attribution data across the entire measurement system

**Evidence Instance Two: Systematic Pattern Repeated**

20. On March 12, 2025, Plaintiff documented an identical pattern of metric manipulation on a separate promoted post, establishing that this represents systematic business practice rather than isolated technical error:

a. First Chronological Screenshot (Exhibit A-14): Metrics showed:

- ○ 35 total impressions with only 3% from promotion
- ○ $0 spent of $150 allocated budget

- ○ 4 total engagements with 0% attributed to promotion
- ○ 2 likes with 0% attributed to promotion
- ○ Status indicator showing "Your promotion is running"

21. b. Second Chronological Screenshot (Exhibit A-15): Metrics for the identical post showed dramatically contradictory data:

- ○ 564 total impressions (1,511% increase) with 84% from promotion
- ○ $60 suddenly appearing as spent (from $0 previously)
- ○ 52 total engagements with 100% attributed to promotion
- ○ 14 likes with 100% attributed to promotion
- ○ Status indicator still showing "Your promotion is running"

22. This second instance creates multiple additional mathematical impossibilities:

a. The platform initially showed 2 likes with 0% attributed to promotion, then later showed 14 likes with 100% attributed to promotion. This creates an inescapable binary contradiction:

- ○ Either the original 2 non-promotional likes never existed (data deletion)
- ○ Or those 2 likes were retroactively reclassified as promotional (data falsification)

23. b. The presentation of contradictory attribution percentages (0% vs. 100%) definitively eliminates any potential defense that metrics simply "reset" when promotion begins.


## D. Algorithmic Manipulation During Active Litigation

22. During the pendency of this litigation, X Corp. implemented undisclosed algorithmic limitations on Plaintiff's account that directly interfered with his ability to develop evidence and communicate about this case:

a. On March 8, 2025, coincident with litigation communications, X Corp. suddenly restored Plaintiff's account after approximately three years of suspension;

b. Immediately following restoration, Plaintiff received explicit platform notifications

stating: "We've added a temporary label to your account which may impact its reach" (Exhibit A-9);

  c. When attempting to promote content discussing X Corp.'s motion to dismiss arguments, Plaintiff received notifications stating: "We couldn't create your promotion with this post as it doesn't meet our advertising guidelines" (Exhibit A-9);

  d. Within hours, Plaintiff received contradictory messages, first stating "Your promotion is up and running!" followed immediately by "We couldn't create your promotion with this post" (Exhibit A-9).

23.  This documented pattern of algorithmic manipulation during active litigation establishes:

  a. The existence of undisclosed "temporary labels" that "impact reach";

  b. Selective application of vague "advertising guidelines" to prevent paid promotion of content discussing this litigation;

  c. Real-time implementation of these mechanisms specifically during the pendency of this case; and

  d. Contradictory system messaging that demonstrates active technical intervention rather than legitimate automated processes.

## E. The Digital Vanishing Act: Promoted Posts Rendered Inaccessible While Charging

24.  Beyond metric manipulation, Plaintiff has documented an even more egregious form of advertising fraud through comprehensive real-time screen recordings: promoted posts that were rendered completely inaccessible through normal platform navigation while X Corp. continued charging for their promotion. These screen recordings, unlike static screenshots, capture the dynamic technical mechanisms that deliberately prevented

access to content while simultaneously charging for its promotion, providing conclusive proof of intentional rather than accidental technical limitations.

Evidence of X-Corp hiding even my own ability to view the post I paid for happening still today, March 13th, 2025 in a 3 minute screen recording:

https://youtu.be/XzK7W_k3Tys

The 60 second version below:

https://youtube.com/shorts/VJ0ZsuMmIPs

Link to post that is currently invisible from the web browser:

https://x.com/ProSeSelfHelp/status/1900017865056551298?s=19:

a. Both promoted posts (the same posts with manipulated metrics) were:

- Visible within the mobile application interface
- Completely inaccessible through the web interface
- Unable to be located through normal navigation paths
- Impossible to reach by clicking through to the post and scrolling up
- Appearing to have a navigation indicator showing they should be accessible but with the navigation functionality disabled

25. b. When attempting to access these posts through the web interface, users experienced the following technical barriers:

- Clicking on the post's permalink directed users to responses only
- Attempting to navigate to the original post redirected back to responses
- The navigation indicator suggesting the post exists remained visible
- The post appeared to exist in the system (as evidenced by metric reporting) but was programmatically rendered inaccessible

26. This evidence establishes an even more fundamental fraud than metric manipulation:

a. X Corp. charged for promoting content it simultaneously made inaccessible;

b. X Corp. reported "views" on content that could not be viewed through standard web navigation; and

c. X Corp. generated metrics for engagement with content it deliberately hidden.

## F. Pattern of Systematic Misconduct Spanning Ownership Periods

26. The documented misconduct spans different ownership periods and continues to the present day, demonstrating a systematic pattern embedded in X Corp.'s business operations rather than isolated incidents. This comprehensive chronological documentation creates an evidentiary foundation that would independently support viable claims in each discrete time period, but together establishes a pattern of systematic commercial misconduct that transcends individual enforcement decisions:

a. August 25, 2022 (Pre-Musk Period): Twitter permanently suspended Plaintiff's account allegedly for "multiple or repeat violations" while simultaneously failing to enforce those same rules against documented impersonation accounts (Exhibit A-1);

b. December 20, 2022 (Pre-Musk Period): Twitter claimed the suspension would "not be restored" allegedly for "hateful conduct" despite lacking evidence of such conduct (Exhibit A-3);

c. November 30, 2023 (Post-Musk Period): X Corp. explicitly acknowledged "impersonation and harassment" in response to Plaintiff's DMCA notices, yet redirected Plaintiff through circular reporting processes (Exhibit A-5);

d. January 30, 2024 (Post-Musk Period): X Corp. suspended Plaintiff's account "due to a user report" while explicitly informing him that "If you have an active X Premium subscription, it will not be automatically canceled by X" (Exhibit A-8);

e. February-July 2024 (Post-Musk Period): X Corp. charged Plaintiff's account six separate times for premium services it had actively prevented him from accessing;

f. March 8, 2025 (Post-Musk Period): X Corp. admitted "we made an error" in suspending Plaintiff's account, contradicting previous representations about policy violations (Exhibit A-2);

g. March 11-12, 2025 (Post-Musk Period, During Active Litigation): X Corp. manipulated advertising metrics, showing mathematically impossible contradictions and rendering promoted content inaccessible while continuing to charge for promotion (Exhibits A-12, A-13, A-14, A-15). The difference in impressions in 3 days with $150 spent for the first promotion versus $300 spent for subsequent promotions reveals drastic algorithmic manipulation: approximately 31,000 impressions for the first $150 compared to merely 1,800 impressions for the subsequent $300.

h. Evidence of X-Corp hiding even Plaintiff's ability to view his own paid promoted content continues through present day, March 13, 2025, as documented in a 3-minute comprehensive screen recording: https://youtu.be/XzK7W_k3Tys, with a condensed 60-second version available at: https://youtube.com/shorts/VJ0ZsuMmIPs. These real-time recordings capture the technical mechanisms that simultaneously charge for promotion while rendering the promoted content technically inaccessible.

# CAUSES OF ACTION

## COUNT I: COPYRIGHT INFRINGEMENT

### (17 U.S.C. § 501)

27. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

28. Plaintiff is the owner of a valid registered copyright in the Photograph.

29. X Corp. has infringed Plaintiff's copyright by knowingly:

   a. Allowing and facilitating the reproduction and distribution of the Photograph without authorization after receiving multiple DMCA-compliant takedown notices;

   b. Continuing to display the Photograph after receiving actual knowledge of its infringing nature;

   c. Failing to implement available technological measures to prevent continued infringement despite acknowledging the "impersonation and harassment" issue; and

   d. Explicitly acknowledging the infringement in writing while taking no action to remedy it.

30. X Corp.'s infringement was willful and intentional, as demonstrated by:

   a. Its failure to respond to multiple DMCA takedown notices;

   b. Its explicit acknowledgment of "impersonation and harassment" while taking no remedial action;

   c. Its continued hosting of infringing content despite actual knowledge; and

   d. Its pattern of suspending Plaintiff's account while allowing infringing accounts to continue operating.

31. As a direct and proximate result of X Corp.'s copyright infringement, Plaintiff has suffered substantial damages, including:

   a. Loss of control over his copyrighted work;

   b. Damage to his professional reputation;

c. Economic losses from unauthorized use; and

d. Costs associated with attempting to enforce his rights.

## COUNT II: VIOLATION OF THE DIGITAL MILLENNIUM COPYRIGHT ACT

## (17 U.S.C. § 512)

32. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

33. Under the Digital Millennium Copyright Act (DMCA), service providers must expeditiously remove or disable access to infringing material upon receiving proper notification under 17 U.S.C. § 512(c)(1)(C).

34. Between December 2023 and May 2024, Plaintiff submitted four separate DMCA-compliant takedown notices to X Corp. Each notice:

   a. Was submitted through X Corp.'s designated DMCA process;

   b. Included all legally required elements under 17 U.S.C. § 512;

   c. Specifically identified the infringing content and accounts; and

   d. Was submitted under penalty of perjury.

35. X Corp. failed to "expeditiously remove or disable access to" the infringing material after receiving these notifications, as required by 17 U.S.C. § 512(c)(1)(C).

36. X Corp. further failed to adopt and reasonably implement a policy providing for the termination of repeat infringers, as required by 17 U.S.C. § 512(i)(1)(A), as evidenced by its continued tolerance of infringing accounts despite multiple notifications.

37. X Corp.'s failures disqualify it from safe harbor protection under the DMCA and render it liable for copyright infringement.

## COUNT III: WIRE FRAUD

### (18 U.S.C. § 1343)

38. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

39. X Corp. has engaged in multiple acts of wire fraud in violation of 18 U.S.C. § 1343, which prohibits "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" using interstate wire communications.

40. X Corp.'s fraudulent scheme involved:

a. Charging Plaintiff for premium services while simultaneously preventing his access to those services;

b. Explicitly informing Plaintiff that "If you have an active X Premium subscription, it will not be automatically canceled by X" while preventing access to cancellation mechanisms;

c. Presenting mathematically impossible advertising metrics to misrepresent the performance of paid promotional services; and

d. Rendering promoted content inaccessible while continuing to charge for its promotion.

41. X Corp. executed this scheme using interstate wire communications, including:

a. Electronic billing communications for premium services during suspension periods;

b. Electronic communications containing mathematically impossible advertising metrics;

c. Electronic notifications stating "We've added a temporary label to your account which may impact its reach" after accepting payment for promotional services; and

d. Contradictory electronic communications regarding promotion status.

42. X Corp. acted with specific intent to defraud, as evidenced by:

a. The explicit notification about continued billing during suspension periods;

b. The systematic pattern of metric manipulation across multiple posts;

c. The mathematically impossible transitions in attribution percentages; and

d. The rendering of promoted content inaccessible while continuing to charge.

43. As a direct result of X Corp.'s wire fraud, Plaintiff has suffered financial damages including:

a. Unauthorized charges for premium services during suspension periods;

b. Payments for promotional services that delivered fraudulent metrics; and

c. Charges for promoting content that X Corp. deliberately made inaccessible.

# COUNT IV: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)

## (18 U.S.C. § 1962(c))

44. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

45. X Corp. constitutes an "enterprise" under 18 U.S.C. § 1961(4), defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

46. The X Corp. enterprise operates through coordinated action across multiple departments:

   a. Content Moderation Department: Selectively enforces platform rules, protecting impersonation accounts while suspending victims who report violations;

   b. Technical Systems Department: Designs and maintains the algorithmic systems that manipulate visibility, engagement metrics, and advertising performance data;

   c. Advertising Department: Operates the promotional systems that generate fraudulent performance metrics;

   d. Billing Department: Maintains the payment processing systems that continue charging suspended users while preventing access to cancellation mechanisms; and

   e. Legal Department: Processes DMCA notices and other legal complaints, creating circular reporting processes that acknowledge violations without remedying them.

47. X Corp. has engaged in a "pattern of racketeering activity" under 18 U.S.C. § 1961(5), consisting of multiple related acts of wire fraud spanning years and continuing through the present, including:

   a. Electronic communications containing mathematically impossible advertising metrics (Exhibits A-12, A-13, A-14, A-15);

   b. Electronic billing for premium services during suspension periods;

   c. The January 30, 2024 electronic notification that "If you have an active X Premium

subscription, it will not be automatically canceled by X" while preventing access to cancellation mechanisms (Exhibit A-8); and

  d. Electronic notifications implementing "temporary labels" to suppress content during active litigation (Exhibit A-9).

48. Each of these predicate acts involves a use of interstate wire communications containing fraudulent statements for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. § 1343.

49. This pattern demonstrates both closed-ended continuity (spanning from August 2022 to March 2025) and open-ended continuity (continuing during active litigation), as required under H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989).

50. X Corp.'s pattern of racketeering activity directly caused Plaintiff's injuries, including:

  a. Financial losses from fraudulent billing practices;

  b. Economic losses from manipulated advertising metrics;

  c. Lost business opportunities from algorithmic suppression; and

  d. Damage to professional reputation from facilitated impersonation.

51. As a result of X Corp.'s violations of 18 U.S.C. § 1962(c), Plaintiff is entitled to treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).


## COUNT V: FRAUDULENT BILLING

52. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

53. X Corp. engaged in fraudulent billing practices by:

    a. Charging Plaintiff for premium services while suspending his account;

    b. Explicitly notifying Plaintiff that "If you have an active X Premium subscription, it will not be automatically canceled by X" while preventing access to cancellation mechanisms;

    c. Continuing to charge Plaintiff despite knowledge of the account suspension; and

    d. Charging for promotional services while simultaneously implementing "temporary labels" that "impact reach."

54. X Corp. made material misrepresentations and omissions regarding:

    a. The nature of its billing practices during account suspension;

    b. The ability to access cancellation mechanisms during suspension;

    c. The delivery of paid promotional services; and

    d. The implementation of "temporary labels" affecting the performance of paid promotions.

55. X Corp. knew these representations were false when made, as evidenced by:

    a. Its explicit notification about continued billing during suspension periods;

    b. Its implementation of technical barriers preventing access to cancellation mechanisms; and

    c. Its presentation of mathematically impossible advertising metrics.

56. X Corp. intended Plaintiff to rely on these misrepresentations to extract continued payment for services it was not providing.

57. As a direct and proximate result of X Corp.'s fraudulent billing, Plaintiff has suffered financial losses and emotional distress.

## COUNT VI: NEGLIGENCE

58. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

59. X Corp. owed a duty of care to Plaintiff to:

   a. Protect his intellectual property rights;

   b. Provide accurate and transparent billing practices;

   c. Prevent impersonation and harassment;

   d. Deliver the paid services it promised; and

   e. Present accurate advertising metrics for paid promotional services.

60. X Corp. breached this duty of care by:

   a. Failing to prevent copyright infringement despite multiple notifications;

   b. Charging for premium services while preventing access to those services;

   c. Presenting mathematically impossible advertising metrics;

   d. Rendering promoted content inaccessible while continuing to charge; and

e. Implementing "temporary labels" affecting paid promotional performance without disclosure.

61. X Corp.'s breaches were not mere oversights but reflected a systematic pattern of misconduct, as evidenced by:

    a. The explicit acknowledgment of "impersonation and harassment" without remedial action;

    b. The explicit notification about continued billing during suspension periods;

    c. The mathematically impossible transitions in attribution percentages; and

    d. The implementation of "temporary labels" during active litigation.

62. As a direct and proximate result of X Corp.'s negligence, Plaintiff has suffered damages including:

    a. Financial losses from unauthorized billing;

    b. Economic losses from manipulated advertising metrics;

    c. Professional reputation damage from unchecked impersonation; and

    d. Emotional distress from the systematic pattern of abusive conduct.

## COUNT VII: TEXAS DECEPTIVE TRADE PRACTICES ACT

### (Tex. Bus. & Com. Code § 17.46)

63. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

64. X Corp. has violated the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code § 17.46, which prohibits "false, misleading, or deceptive acts or practices."

65. X Corp.'s violations include:

   a. Representing that goods or services have characteristics, uses, benefits, or quantities which they do not have by charging for promotional services that actually suppress rather than promote content;

   b. Representing that an agreement confers or involves rights, remedies, or obligations which it does not by claiming to provide premium services while actively preventing access to those services; and

   c. Failing to disclose information concerning goods or services which was known at the time of the transaction by concealing the existence of "temporary labels" that "impact reach" while accepting payment for promotional services.

66. X Corp.'s DTPA violations occurred within Texas, where X Corp. maintains its principal place of business and makes decisions regarding content moderation, policy enforcement, and billing practices.

67. X Corp.'s violations were knowing and intentional, as evidenced by:

   a. Its explicit notification about continued billing during suspension periods;

   b. Its presentation of mathematically impossible advertising metrics; and

   c. Its implementation of "temporary labels" affecting paid promotional performance without disclosure.

68. As a direct and proximate result of X Corp.'s DTPA violations, Plaintiff has suffered damages including:

    a. Financial losses from unauthorized billing;

    b. Economic losses from manipulated advertising metrics; and

    c. Lost business opportunities from undisclosed algorithmic suppression.

## COUNT VIII: BREACH OF CONTRACT AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

69. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

70. Plaintiff entered into a contract with X Corp. by subscribing to its premium services and paying for promotional services.

71. X Corp. breached this contract by:

    a. Charging for premium services while preventing access to those services;

    b. Accepting payment for promotional services while implementing "temporary labels" that "impact reach" without disclosure;

    c. Rendering promoted content inaccessible while continuing to charge for its promotion; and

    d. Presenting mathematically impossible advertising metrics for paid promotional services.

72. X Corp. also breached the implied covenant of good faith and fair dealing by:

    a. Creating deliberate procedural loops to prevent resolution of legitimate complaints;

    b. Acknowledging violations in writing yet refusing to address them;

    c. Retaliating against a user seeking to enforce legitimate legal rights through algorithmic suppression; and

    d. Implementing algorithmic limitations during active litigation.

73. These breaches are not subject to contractual limitation of liability provisions because they involve:

    a. Willful misconduct rather than mere negligence;

    b. Fraud rather than good-faith error;

    c. Conduct so egregious as to be unconscionable; and

    d. Intentional commercial misrepresentation rather than content moderation decisions.

74. As a direct and proximate result of X Corp.'s breaches, Plaintiff has suffered damages including:

    a. Financial losses from services paid for but not received;

    b. Economic losses from manipulated advertising metrics; and

    c. Lost business opportunities from undisclosed algorithmic suppression.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment in Plaintiff's favor on all counts;

B. Award statutory damages for copyright infringement under 17 U.S.C. § 504(c), calculated at $150,000 per willful infringement for each of the documented instances (over 500) of infringement using Plaintiff's copyrighted photograph;

C. Award treble damages under RICO (18 U.S.C. § 1964(c)) for the pattern of racketeering activity documented herein, including wire fraud through fraudulent advertising metrics and predatory billing practices;

D. Award actual damages for all financial losses suffered as a result of X Corp.'s fraudulent conduct, including:

- All charges for premium services during suspension periods
- All payments for promotional services that were subject to algorithmic suppression or fraudulent metrics
- Lost business opportunities resulting from account suspension and suppression
- Costs associated with monitoring and documenting the ongoing violations;

E. Award punitive damages for the willful and malicious nature of X Corp.'s systemic suppression, including implementation of algorithmic limitations during active litigation;

F. Grant injunctive relief requiring X Corp. to:

- Cease its fraudulent advertising practices by implementing verifiable third-party auditing of advertising metrics;
- Remove all "temporary labels" that "impact reach" and disclose all past instances of such labeling;
- Implement transparent advertising metrics that accurately report promotional outcomes;
- Terminate accounts engaged in impersonation after receipt of proper notification;
- Cease charging users for services they are prevented from accessing;
- Remove technical barriers that render promoted content inaccessible;
- Implement comprehensive reforms to DMCA compliance practices, including mandatory response timelines;
- Establish transparent account action appeals processes with defined resolution timelines;
- Cease the practice of continued billing during account suspension periods;

- Implement technical and operational safeguards to prevent algorithmic retaliation against users who criticize platform practices; and
- Provide restitution to all affected users who were charged for premium or promotional services during periods when they were prevented from accessing those services;

G. Award attorneys' fees and costs as provided under RICO (18 U.S.C. § 1964(c)), the Copyright Act (17 U.S.C. § 505), and the Texas Deceptive Trade Practices Act;

H. Appoint a neutral technical expert or special master with expertise in:

- Digital advertising metrics and attribution modeling
- Content distribution and accessibility systems
- Data integrity and contradiction analysis
- Commercial platform analytics systems

To independently evaluate:

- The mathematical impossibilities in attribution percentages
- The technical mechanisms preventing content access while charging for promotion
- The statistical probability of consistent attribution inversions across multiple instances
- Whether the documented contradictions can be explained through legitimate technical error;

I. Order expedited discovery regarding:

- X Corp.'s advertising metric calculation and reporting systems
- The criteria and implementation process for "temporary labels"
- All internal communications regarding Plaintiff's account
- The decision-making process for account suspensions and restorations
- The application of advertising guidelines that prevented promotion
- The technical mechanisms that rendered promoted content inaccessible
- The mathematical algorithms governing attribution percentage calculations
- The internal controls for detecting and correcting metric contradictions;

J. Award attorneys' fees and costs as provided under RICO (18 U.S.C. § 1964(c)), the Copyright Act (17 U.S.C. § 505), and the Texas Deceptive Trade Practices Act;

J. Award pre-judgment and post-judgment interest at the maximum rate allowed by law; and

K. Grant such other and further relief as this Court deems just and equitable.

# CONCLUSION

75. This litigation presents a critical inflection point for platform accountability. The outcome will conclusively establish one of two fundamental realities: either platforms remain subject to basic commercial accountability principles despite their special status under Section 230, or platforms have effectively secured unprecedented immunity from commercial fraud prohibitions that apply to every other business entity in the United States.

76. The factual record documented here through comprehensive real-time recordings, contemporaneous screenshots, written admissions, and mathematically impossible metrics presents the clearest possible case for judicial intervention. If these documented commercial practices remain immune from legal accountability:

a. It would effectively establish that social media platforms operate entirely outside the commercial legal framework that governs every other business;

b. It would signal to millions of advertisers and premium subscribers that they have no legal recourse against even the most blatant forms of commercial fraud when conducted by platforms;

c. It would render Section 230 an unprecedented grant of commercial immunity never intended by Congress and inconsistent with fundamental principles of commercial accountability; and

d. It would create a legally untenable framework where mathematical impossibilities in commercial representations become legally permissible solely based on the business category of the entity making those impossible claims.

77. The binary choice presented by this case is straightforward: either the documented commercial practices require meaningful judicial scrutiny and potential remediation, or they represent the legally-sanctioned commercial reality that millions of advertisers and subscribers must accept without recourse. There is no middle ground between these alternatives, as mathematical impossibilities in commercial metrics either constitute actionable misrepresentations or they do not.

78. The objective mathematical impossibilities documented here cannot be dismissed as mere technical errors or legitimate business operations for several fundamental reasons:

a. The attribution percentage inversion from 0% to 100% for identical engagement events violates core principles of non-contradiction in mathematical systems;

b. The binary state shifts in engagement attribution across multiple instances eliminate statistical probability of random error;

c. The cross-platform access asymmetry (content simultaneously accessible on mobile but inaccessible on web) demonstrates deliberate technical implementation rather than system failure; and

d. The temporal correlation between these mathematical impossibilities and active litigation proceedings cannot be reasonably attributed to coincidence given the statistical improbability of such correlation.

79. Industry-standard attribution measurement principles in digital advertising provide objective technical context against which X Corp's contradictory metrics must be evaluated. These established technical standards make clear that the documented metric manipulations represent fundamental violations of core attribution consistency requirements rather than legitimate technical variations.

80. The documented comparative access patterns - showing identical content simultaneously accessible on mobile but inaccessible through web interface - establish that content visibility limitations were the result of deliberate technical implementation rather than

random error or legitimate functionality constraints.

81. The comprehensive chronological documentation of premium service charges correlated with account status notifications creates an unambiguous temporal relationship between explicit suspension notifications and continued billing for services X Corp knew it was not providing.

82. Plaintiff respectfully submits that the comprehensive documentation presented here compels the conclusion that platform immunity under Section 230 was never intended to, and does not, extend to systematic commercial misrepresentations about a platform's own services. The alternative conclusion—that platforms alone among all business entities may engage in documented commercial fraud without legal accountability—would represent an unprecedented and unjustifiable expansion of immunity principles far beyond their intended scope.

# DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

_____

Justin Riddle Pro Se Litigant 16422 Patrick Ave Omaha, NE 68116 402-813-2156 Date: March 13, 2025

I certify under penalty of perjury that every single word contained in this document is true to the best of my knowledge and service was performed through Electronic Filing Notice to opposing counsel.