UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

JUSTIN RIDDLE,

 Plaintiff,

v.

X CORP. (Formerly Twitter, Inc.),

 Defendant.

Civil Action No. 1:25-CV-0073

_____

# PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## INTRODUCTION: A TRILLION-DOLLAR ASSAULT ON THE RULE OF LAW

This case presents the Court with nothing short of a constitutional crisis disguised as a routine motion to dismiss. The question at its core strikes at the very foundation of our legal system: Can a trillion-dollar corporation simply opt out of federal law through the magic of a clickwrap agreement that virtually no one reads?

What X Corp proposes is not just wrong as a matter of contract interpretation; it represents an unprecedented corporate power grab that would effectively place technology platforms above Congress, federal statutes, and the Constitution itself. It is legal nihilism dressed in corporate legalese—a world where laws exist only at the pleasure of private power.

X Corp's Motion to Dismiss suggests, with breathtaking audacity, that its Terms of Service—a document that users "accept" by clicking through (and which X Corp can unilaterally change at any moment)—creates a magical force field of immunity that renders them untouchable by even the most fundamental principles of fraud law, consumer protection statutes, and copyright regulation. One shudders to imagine their next update—perhaps claiming immunity from criminal statutes or announcing their liberation from the law of gravity itself.

This position isn't merely wrong—it's wrong in a way that requires either willful intellectual dishonesty or a staggering detachment from constitutional reality. It represents nothing less than a corporate declaration of sovereignty—an attempt to establish a parallel legal universe where trillion-dollar platforms operate as independent nation-states, bound only by rules they write themselves and can modify at will, answerable to no electorate, no legislature, and no court.

Note. One in ten people that reach out routinely ask about my local filings not in pacer. For perspective, this was filed today in Nebraska :

https://charterwestbank.com/wp-content/uploads/2025/04/SUBMISSION-SUPPLEMENTAL-FILIN G-THE-FIVE-MILLION-DOLLAR-COVER-UP-AND-THE-DEATH-OF-ACCOUNTABILITY.pdf

# FACTUAL BACKGROUND: MATHEMATICAL IMPOSSIBILITY AS SMOKING GUN

Through painstaking documentation and timestamp-verified evidence, Plaintiff has assembled a case so mathematically irrefutable that it transforms this proceeding from a he-said/she-said dispute into a mathematical proof of corporate fraud. We aren't asking the Court to weigh competing narratives—we're asking it to acknowledge that 2+2 cannot equal 5, no matter how many billions of dollars stand behind the equation.

The Complaint meticulously catalogues X Corp's fraudulent scheme to inflate advertising metrics, mislead advertisers, and conceal the deception. Far from "conclusory" or "lacking particularity" as X Corp baselessly asserts, these allegations are supported by a wealth of specific evidence exhaustively documented in detailed exhibits. Consider the documented anomalies that would make a first-grade arithmetic teacher blush. Note that prior to the promotion, there were impressions, engagements and likes:





- On April 1, 2023, at 9:23 AM, Plaintiff's advertisement showed 9,965 impressions. Just 50 minutes later, at 10:13 AM, it recorded only 9,892 impressions—73 fewer. One need not be a mathematician to understand that cumulative counts cannot decrease over time, any more than you can un-ring a bell or un-see a billboard.

- At 9:23 AM, Plaintiff's advertisement showed 276 engagements and 79 "detail expands." 50 minutes later, at 10:13 AM, engagements had decreased to 269 (7 fewer), and "detail expands" had inexplicably decreased to 78 (1 fewer). Anyone with the cognitive capacity of a houseplant can recognize this is mathematically impossible.

- During this same period, Plaintiff's advertisement showed 143 "profile visits" with zero new followers—a conversion rate that is statistically impossible in any legitimate social

environment. For reference, industry standards for verified accounts in specialized legal niches typically yield follower acquisition costs between $1.50-$4.00 per follower. The infinite cost-per-follower documented here represents an impossibility in any legitimate advertising system.

These are not isolated glitches or occasional reporting lags, but a consistent pattern of logically impossible "negative" engagement. The inescapable reality, laid bare by X Corp's own data, is that its metrics are fundamentally and intentionally fraudulent. Once a user has viewed an advertisement or interacted with it in a quantifiable way, that event is irrevocably logged. The number of impressions or engagements cannot go backwards any more than yesterday's newspaper can erase itself from existence. It is not physically possible. The only explanations are fraud or such reckless disregard for the integrity of the data that it amounts to fraud.

Crucially, Plaintiff relied on these inflated metrics in making additional advertising purchases on X Corp's platform. This is the very essence of fraud—a misrepresentation of fact, advanced with knowledge of its falsity, to induce detrimental reliance by another. X Corp's claim that no reasonable business would rely on its metrics is not just factually baseless but legally irrelevant. Fraud is never excused by caveat emptor, nor can a fraudster escape liability because its falsehoods are "too good to be true."

Making matters worse, when Plaintiff confronted X Corp about these discrepancies, X Corp not only refused to investigate or rectify the issues, but summarily terminated Plaintiff's account and barred access to critical data necessary to further document the fraud. This cover-up attempt, straight out of the playbook of the guiltiest of wrongdoers, speaks volumes about the depth of X Corp's culpability and consciousness of guilt.

# THE "SANDBOX" ENVIRONMENT: PAYING FOR PHANTOM SERVICES

The evidence irrefutably indicates that Plaintiff's account was placed in what technical experts would call a "sandbox" environment—a sophisticated bifurcated system where:

- Content appears to be distributed (generating impression counts controlled internally by X Corp)
- Some engagement metrics are simulated (again controlled internally)
- Externally verifiable outcomes (follows, likes, comments) are systematically prevented

This creates the perfect fraud: X Corp charges for services while implementing technical barriers that prevent those services from ever being delivered. It's the digital equivalent of selling tickets to a movie theater with no screen, then claiming your Terms of Service permit you to define "movie showing" as "sitting in a dark room imagining a film."

The technical evidence reveals a deliberate system architecture that separates metrics into two categories:

| Metric Type | Examples | Manipulation Pattern | User Verification Capability |
| --- | --- | --- | --- |
| Externally Verifiable | Followers, Reposts, Likes, Website Clicks | Limited/No Manipulation | User can independently count/verify |
| Non-Verifiable | Impressions, Profile Visits, Detail Expands, Engagements | Extensive Synthetic Generation | User cannot independently verify |

This bifurcated system allows X Corp to generate synthetic engagement metrics for values that users cannot independently verify, while preventing conversion to metrics that would be externally visible. The statistical anomalies are so glaring they border on comical:

- 143 profile visits resulted in zero new followers—a conversion rate of 0% that is statistically impossible for verified accounts with specialized content

- When spending over $34 in advertising, Plaintiff's content generated an infinite cost-per-follower, dramatically exceeding industry benchmarks of $1.50-$4.00 for similar content categories

- Attribution percentages shifted from accurately attributing 50% of engagement to organic reach to falsely attributing 100% to paid promotion—revealing deliberate retroactive data falsification

Even with poorly performing content, some minimum percentage of users who expand details or visit profiles will follow, like, or comment. Zero conversion across all externally verifiable metrics with hundreds of reported engagements creates a statistical pattern that simply cannot exist without deliberate technical intervention.

Most damning of all, X Corp has now erased Plaintiff's historical metrics during active litigation—a clear act of evidence spoliation that demonstrates consciousness of guilt and an attempt to prevent the comparative analysis that would expose their manipulation system.



# A PATTERN OF SYSTEMATIC MANIPULATION

Additional technical evidence reveals this is not merely accidental or coincidental behavior, but a comprehensive, systematically implemented fraud framework:

1. **Synthetic Engagement Theater**: X Corp's system generates inflated non-verifiable metrics (impressions, engagements) while presenting them as actual measurements, when they are in fact fabricated values

2. **Conversion Barrier Implementation**: The platform implements technical barriers that block transition from synthetic metrics to verifiable metrics (followers, responses)

3. **Attribution Manipulation**: As the fraud continues, the system retroactively reassigns engagement sources, shifting from accurately attributing some engagement to organic reach to falsely attributing 100% to paid promotion

4. **Evidence Management System**: The platform implements sophisticated evidence management techniques, including real-time metric modification and systematic erasure of historical data during litigation

5. **Selective Application Framework**: Comparative testing across accounts with different characteristics shows this manipulation is selectively applied rather than a platform-wide limitation—definitively proving targeted application

The most compelling evidence that this represents deliberate technical implementation rather than accidental behavior is the statistically clean engagement-to-click ratios alongside completely broken conversion-to-follow ratios. This pattern of consistency in certain metric relationships while others show complete suppression demonstrates deliberate technical management rather than natural algorithmic variation.

Controlled testing across clean, unflagged accounts confirms these patterns, as standard advertising accounts with similar content but different viewpoints demonstrated:

- Consistent upward-only metric progression
- Natural conversion patterns from profile visits to follows (3-7% range)
- Proportional scaling between spending and performance metrics
- No instances of decreasing metrics regardless of observation frequency

This comparative framework provides definitive evidence that the behaviors documented represent targeted, deliberate application rather than platform-wide technical limitations or standard algorithmic behavior.

# THE HIERARCHY OF LEGAL AUTHORITY: CONSTITUTIONAL LAW 101

Our legal system operates on a clear hierarchy of authority so fundamental that it's typically grasped by middle school civics students:

1. Constitutional provisions establish supreme law
2. Federal statutes implement constitutional principles
3. State laws operate within federal parameters
4. Private contracts exist within the boundaries established by statutory law
5. Terms of Service are merely a subset of private contracts (and among the weakest forms at that)

X Corp's position inverts this hierarchy in a way so legally preposterous that it would make even the most sycophantic corporate lawyer blush with embarrassment. Their argument effectively places their Terms of Service—a document that users "accept" with the same level of informed consent as someone walking past a pickpocket—above laws enacted through the democratic process after debate, committee hearings, floor votes, presidential signature, and judicial review.

Let's be absolutely clear about what X Corp is claiming: that a document they wrote, which they can change unilaterally at any time, which virtually no one reads, which cannot be negotiated, which is presented on a take-it-or-leave-it basis, and which is accepted with a thoughtless click, somehow trumps the entire apparatus of constitutional democracy. One wonders what other foundational principles they believe their magical Terms of Service might override. Perhaps the

prohibition against cruel and unusual punishment? The right to due process? The laws of thermodynamics? The mind reels at the breathtaking arrogance.

# THE DMCA: FEDERAL LAW X CORP PRETENDS DOESN'T EXIST

The Digital Millennium Copyright Act (DMCA) establishes specific statutory requirements that even the least attentive legal mind could grasp:

1. Service providers must designate an agent to receive copyright notifications
2. Upon receiving valid notifications, providers must "expeditiously" remove infringing content
3. The statute provides a safe harbor only when these requirements are met
4. Congress explicitly made these protections non-waivable through private agreements

Plaintiff submitted at least four separate DMCA-compliant takedown notices for the same copyrighted photograph. X Corp acknowledged receipt of these notifications, then promptly... did nothing. They instead mischaracterized the notices as "harassment" complaints, as if the statutory framework of the DMCA were a suggestion rather than federal law.

X Corp's position that its Terms of Service somehow override these statutory requirements isn't just legally incorrect—it's incorrect in a way that should embarrass anyone with even a passing familiarity with how laws work. It's akin to arguing that a handwritten note saying "I don't have to stop at red lights" exempts one from traffic laws.

# TERMS OF SERVICE: THE EMPTY SHELL OF CORPORATE IMMUNITY

X Corp's Terms of Service defense crumbles under the most basic scrutiny:

1. Contracts cannot immunize parties from liability for willful misconduct or fraud
2. Provisions that violate public policy are unenforceable
3. Contracts cannot waive statutory rights when Congress has made such rights unwaivable

4.  Adhesion contracts receive heightened scrutiny, particularly when they contain unconscionable terms

These principles are so foundational to contract law that one wonders if X Corp's legal team somehow missed the day these concepts were covered in law school. Perhaps they were too busy drafting Terms of Service claiming immunity from the law of gravity.

The "consent" upon which X Corp relies is equally vacuous:

1.  Terms of Service agreements are rarely read, with studies showing less than 1% of users actually read these documents
2.  The agreements are presented on a take-it-or-leave-it basis with no meaningful opportunity to negotiate
3.  Critical terms are often buried in lengthy documents using complex legal language
4.  Updates to terms are frequently pushed through with minimal notice

This type of "consent" has about as much legitimacy as a pickpocket claiming you "consented" to having your wallet taken because you didn't explicitly object while walking down a crowded street.

Most damning of all, X Corp's own Terms of Service do not permit the very conduct they engaged in. Nowhere in their Terms do they authorize:

1.  Ignoring valid copyright claims
2.  Billing for services with no intent to deliver
3.  Manipulating metrics to show mathematically impossible results
4.  Destroying evidence during litigation

They are simultaneously claiming that their Terms of Service shield them from liability while violating those same Terms. This internal contradiction exposes the hollowness of their entire defense. If X Corp truly believed its Terms of Service were legally binding, it would feel obligated to comply with them itself. Instead, it treats them as a one-way shield—binding on users but optional for the company.

# PROCEDURAL GAMESMANSHIP: THE LAST REFUGE OF THE LEGALLY BANKRUPT

Unable to defend their position on the merits, X Corp resorts to procedural gamesmanship so transparent it borders on contempt for judicial intelligence:

1. They mischaracterize the procedural posture, suggesting Plaintiff failed to object to their motion to dismiss, when in fact:

   - The Plaintiff filed an amended complaint, which by operation of law supersedes the original complaint
   - When an amended complaint is filed, any pending motion to dismiss the original complaint automatically becomes moot
   - No objection was necessary because the amended complaint rendered the motion legally null

2. They create a circular trap designed to prevent Plaintiff's substantive allegations from ever being heard:

   - Judge denied Plaintiff's motion to amend (Document 4) based on venue language
   - Plaintiff filed amended complaint (Document 22) as matter of right under FRCP 15(a)(1)
   - X Corp now argues judge's denial of Document 4 somehow invalidates Document 22 despite: a. Document 22 containing no venue arguments b. Judge granting X Corp extensions to respond to Document 22 c. X Corp filing a motion to dismiss Document 22

This creates a circular trap:

- If Document 22 is invalidated, case reverts to original complaint
- X Corp's motion to dismiss original complaint proceeds
- Plaintiff loses right to amend despite never having properly exercised it
- Plaintiff's evidence of metric manipulation never receives substantive review

3. Most damning of all, X Corp has destroyed critical evidence during active litigation:

- ○ Plaintiff's screenshot evidence shows all historical metrics for previous paid promotions have been erased
- ○ This erasure occurred during pending litigation where these metrics constitute material evidence
- ○ The erased data specifically contained the comparative baselines that would further confirm the pattern of manipulation
- ○ Under Federal Rule of Civil Procedure 37(e), destruction of electronically stored information during litigation can trigger serious sanctions

This destruction of evidence during litigation doesn't just suggest consciousness of guilt—it screams it from the rooftops with a megaphone. It represents a deliberate attempt to prevent Plaintiff from conducting the comparative analysis that would further expose X Corp's manipulation system. This is not an accidental data purge or routine system maintenance—it is targeted evidence spoliation of precisely the data that would most clearly demonstrate the manipulation pattern.

The timing of this evidence destruction is particularly suspect—occurring after Plaintiff documented the initial metric anomalies but before discovery could compel X Corp to provide a complete accounting of the manipulation system. This represents a calculated attempt to eliminate the very evidence that would definitively prove Plaintiff's case.

The pattern is unmistakable: X Corp wants this case dismissed on procedural grounds because it knows it cannot win on the merits. The mathematical impossibility of its metrics is not something that can be explained away through clever legal argumentation. It is an objective, irrefutable fact that can only be avoided by preventing the Court from ever reaching the substance of Plaintiff's claims.

# THE DANGEROUS CONSTITUTIONAL IMPLICATIONS

If X Corp's position were accepted, it would effectively create a system where:

1. Technology platforms could operate outside established legal frameworks
2. Constitutional and statutory rights would exist at the discretion of private corporations
3. Foundational legal protections would be reduced to "opt-in" privileges

4. Accountability would exist solely at the convenience of those with the technical capacity to violate rights

This represents not merely a misreading of contract law but a fundamental threat to constitutional governance and the rule of law. It would establish a precedent that powerful technology platforms are effectively above the law, bound only by rules they write themselves and can change at their convenience.

The "Technical-Legal Accountability Gap" exploits the growing disconnect between technological capabilities and legal accountability mechanisms:

1. X Corp maintains complete technical control over all evidence systems
2. The disparity between near-instantaneous technical changes and deliberately paced judicial timelines creates structural advantages
3. The asymmetry in technical knowledge and access creates fundamental procedural inequities

This gap represents a critical vulnerability in our legal system that X Corp's position would convert from a challenge to be addressed into a permanent accountability shield.

The legal implications extend far beyond this individual case. If X Corp's position were accepted, it would effectively establish that:

1. Corporations can charge consumers for services they have no intention of providing
2. They can fabricate performance metrics that are mathematically impossible
3. They can destroy evidence during litigation
4. They can ignore explicit statutory requirements
5. They can shield all of this misconduct behind Terms of Service that they themselves don't follow

This would render not just consumer protection frameworks but the entire concept of commercial regulation effectively optional for those with sufficient technical sophistication and market power.

# THE CHILD EXPLOITATION ARGUMENT: THE DEFINITIVE REFUTATION

To illustrate the absurdity of X Corp's position, let us consider a parallel scenario: If a user reported child exploitation content on the platform and X Corp acknowledged receipt of the report but took no action, would they seriously argue that their Terms of Service shield them from liability under federal child protection statutes?

Of course not. The very suggestion is morally repugnant and legally absurd. Yet this is precisely analogous to their position regarding copyright law and fraudulent advertising metrics. X Corp cannot coherently argue that their Terms of Service override federal child protection laws but somehow do override federal copyright protections and fraud statutes.

This simple thought experiment exposes the intellectual bankruptcy at the core of X Corp's position. Either Terms of Service can override federal statutory requirements or they cannot. If they cannot override child protection laws (which any sane person would agree they cannot), then they equally cannot override copyright law, fraud statutes, or consumer protection frameworks.

X Corp's selective invocation of Terms of Service immunity—claiming it applies to some federal laws but implicitly acknowledging it doesn't apply to others—reveals the fundamental incoherence of their entire legal position.

# CONCLUSION: A CONSTITUTIONAL MOMENT DISGUISED AS A ROUTINE MOTION

What stands before this Court is not merely a routine motion to dismiss but a constitutional inflection point that will resonate far beyond this courtroom. X Corp's position represents nothing less than corporate nullification—a doctrine more dangerous than its historical predecessor because it comes not with the crude transparency of state defiance but cloaked in the bland, anodyne language of "Terms of Service" and "User Agreements."

To dismiss this Complaint now would be to ratify a legal theory so radical that it would effectively privatize law itself. It would establish that the wealthiest corporations can simply draft themselves immunity from the legal system that binds ordinary citizens and smaller businesses. It would, in effect, create a legal apartheid where the rules that govern society apply differently—or not at all—to the tech aristocracy.

Let us speak plainly about what the evidence shows:

1. X Corp has implemented a sophisticated technical architecture designed to generate synthetic engagement metrics rather than measure actual user activity
2. The decreasing metrics provide mathematical proof that these are not measurements of actual events but fabricated values that can be arbitrarily manipulated
3. X Corp charges advertisers for services it has no intention of delivering, implementing technical barriers that prevent the very outcomes advertisers pay to achieve
4. When confronted with evidence of this fraud, X Corp destroyed evidence during active litigation
5. X Corp now claims its Terms of Service shield it from liability—even though nothing in those Terms authorizes fraud, evidence destruction, or copyright violations

This is not merely corporate misconduct; it is a direct assault on the rule of law itself. X Corp's position effectively asserts that corporations can opt out of legal accountability through clickwrap agreements that no one reads and that can be unilaterally changed at any time. This position would render not just consumer protection laws but the entire framework of commercial regulation optional for those powerful enough to implement Terms of Service.

The implications extend far beyond this case. If Terms of Service can override federal statutes, what remains of consumer protection? If clickwrap agreements trump laws passed by Congress, what remains of democratic governance? If mathematically impossible advertising metrics can be defended as legitimate, what remains of basic commercial honesty?

This Court now stands at a crossroads of legal history. One path leads toward a system where law derives its authority from democratic processes and applies equally to all. The other leads toward a neo-feudal arrangement where corporate giants establish private legal regimes, accountable to no one, binding on everyone unlucky enough to need their services.

The battle lines are starkly drawn: on one side, a lone plaintiff armed with nothing but mathematical truth, timestamp-verified evidence, and the text of federal statutes; on the other, a trillion-dollar corporation with armies of attorneys deploying procedural tactics to avoid confronting the inescapable reality of their own fraudulent conduct.

This Motion is not merely wrong; it is dangerous. It should be rejected not just for its legal deficiencies—which are legion—but for the existential threat it poses to constitutional governance itself. By allowing this case to proceed to discovery, this Court will affirm that in America, it is still the law that governs corporations, not corporations that govern the law.

Only those committed to the most cynically tortured interpretation of constitutional democracy—or those with a direct financial interest in establishing corporate immunity—could possibly suggest otherwise. The choice before this Court isn't merely legal; it's whether the experiment in self-governance that began in 1776 will continue, or whether it will be quietly supplanted by the private governance of corporate terms and conditions.

Respectfully submitted,

JUSTIN RIDDLE Plaintiff, pro se

Dated: April 4, 2025

I certify under penalty of perjury that every single word contained in this document is true to the best of my knowledge and service was performed through Electronic Filing Notice.