# APPELLANT'S EMERGENCY MOTION CHALLENGING VOID ORDER, JURISDICTIONAL USURPATION, AND SYSTEMATIC OBSTRUCTION OF TRANSPARENCY

## IN THE NEBRASKA COURT OF APPEALS

**JUSTIN RIDDLE,**
 Appellant,

v.

**OMAHA PUBLIC SCHOOLS,**
 Appellee.

**Case No. A-25-0032 from case CI 24-7996**

---

# INTRODUCTION

Image above, impossibility #1.          Image above, impossibility #2

**This Court now confronts not merely procedural error but an unprecedented assault on the very foundations of judicial process that renders the entire appellate system meaningless. When a District Court judge who previously declared he had "no jurisdiction" suddenly reasserts jurisdiction to modify his own ruling while the case is pending before this Court—without a mandate, without an opinion, and in direct contradiction to basic logical principles—we have entered territory where rules have become mere suggestions and judicial authority has collapsed into raw power.**

**The pattern before this Court reveals not isolated mistakes but a system operating completely outside established legal boundaries:**

1. **Omaha Public Schools has expended approximately $5 million fighting disclosure of basic public records to a single parent—a sum so extraordinary it defies innocent explanation and raises profound questions about where these public funds are actually flowing and what could possibly be worth concealing at such extraordinary cost.**

2. **The District Court issued a logically impossible dismissal on contradictory grounds, then—while the case was on appeal—took back jurisdiction it claimed never to have had in order to declare it has no jurisdiction, creating a circular impossibility that defies basic logic.**

3. **This Court has apparently communicated with the District Court outside proper channels, while failing to issue any opinion addressing Appellant's arguments.**

4. **Appellant is being charged appeal costs despite receiving no appellate review whatsoever.**

**This is not justice. It represents the complete abandonment of legal principles in favor of predetermined outcomes at any cost. The actions taken here are not merely wrong—they are logically impossible yet occurring nonetheless, revealing a system where power has completely displaced principle.**

**The Court must act decisively not merely to correct error but to prevent the complete collapse of judicial legitimacy. If a judge can simultaneously claim to lack jurisdiction yet exercise jurisdiction to declare he lacks jurisdiction—and face no consequences—the rule of law becomes meaningless.**

## STATEMENT OF JURISDICTIONAL CRISIS

**On April 4, 2025, Judge Duane C. Dougherty of the Douglas County District Court issued an "Order Pursuant to Mandate" claiming that this Court dismissed Appellant's appeal "for lack of jurisdiction pursuant to Neb. Ct. R. App. P. §2-107(A)(1)." This order purports**

**to modify Judge Dougherty's previous contradictory ruling that dismissed Appellant's case both for "lack of jurisdiction" and for "failure to state a claim."**

**This order represents an egregious jurisdictional violation for the following reasons:**

1. **This Court has issued no formal opinion, published or unpublished, addressing Appellant's appeal.**

2. **This Court has issued no mandate returning jurisdiction to the District Court.**

3. **Judge Dougherty lacks any jurisdiction whatsoever to issue orders in this case while it remains pending before this Court.**

4. **The original contradictory dismissal remains unaddressed by this Court.**

5. **Despite the absence of any formal appellate review, Appellant is being charged appeal costs.**

# LEGAL ARGUMENT

## I. THE DISTRICT COURT'S ORDER IS VOID FOR ABSOLUTE LACK OF JURISDICTION

**The most fundamental principle of appellate procedure is that once an appeal is filed, the trial court is completely divested of jurisdiction. This is not a technical formality—it is the essential safeguard that prevents exactly what has occurred here: a lower court modifying its own errors while those errors are under appellate review.**

**Nebraska law is unequivocal: "When a notice of appeal is filed, the trial court loses jurisdiction over any matters within the scope of the appeal." State v. Melton, 308 Neb. 159, 953 N.W.2d 246 (2021). The Nebraska Supreme Court has repeatedly emphasized that "during the pendency of an appeal, a trial court has no jurisdiction to hear a case involving the same matter as that on appeal." Spady v. Spady, 284 Neb. 885, 824 N.W.2d 366 (2012).**

**Despite these clear jurisdictional boundaries, Judge Dougherty has taken the unprecedented step of modifying his own ruling while it is pending before this Court. This action is not merely erroneous—it is a nullity. As the Nebraska Supreme Court held in In re Interest of Jedidiah P., 267 Neb. 258, 673 N.W.2d 553 (2004), "Any order attempting to exercise jurisdiction after the appeal has been perfected is void for lack of jurisdiction."**

**If this Court permits a district judge to reach into a case on appeal and "fix" his own contradictory ruling, it will create a devastating precedent that effectively nullifies the entire purpose of appellate review.**

## II. THE DISTRICT COURT'S ACTIONS CREATE AN IRRESOLVABLE LOGICAL PARADOX THAT EXPOSES THE ARBITRARY NATURE OF THESE PROCEEDINGS

**The District Court's recent actions have created an irresolvable logical paradox that completely shatters any pretense of rules-based adjudication:**

1. **The Jurisdictional Paradox: Judge Dougherty initially ruled he lacked jurisdiction over this case. Now, he has somehow "reasserted" this allegedly non-existent jurisdiction for the sole purpose of declaring—again—that he has no jurisdiction. This defies the most basic logical principles: he cannot simultaneously lack jurisdiction to hear the case yet possess jurisdiction to issue a new order declaring he lacks jurisdiction. It is the judicial equivalent of declaring "I have no authority to speak on this matter, and I hereby use my authority to declare I have no authority."**

2. **The Badge Outside Jurisdiction Paradox: This situation resembles an officer claiming his badge has no power in another jurisdiction, yet simultaneously using that powerless badge to exercise authority in that jurisdiction. If Judge Dougherty's badge (his jurisdiction) means nothing in this case as he claims, then by what authority does he now exercise power over it?**

3. **The Circular Impossibility: If Judge Dougherty truly believed he lacked jurisdiction originally, then he necessarily lacks jurisdiction to issue this new order. He cannot logically "reassert" jurisdiction he claims never to have had in order to declare he has no jurisdiction. This circular impossibility exposes the fundamentally arbitrary nature of these proceedings.**

**Yet the most troubling aspect is that while these actions are logically impossible, they are nonetheless occurring in reality. Rules of jurisdiction and logic that should constrain judicial action have been replaced by raw exercises of power and predetermined outcomes. Judge Dougherty is simultaneously claiming his badge has no power here while using that same badge to exercise power—and expecting this Court to accept this logical impossibility without question.**

**Either Judge Dougherty knowingly issued a contradictory ruling initially, in which case his subsequent attempt to silently "fix" it represents deliberate manipulation of procedure to prevent merit review; OR he was genuinely confused about basic jurisdictional principles, in which case he would require a complete rehearing with new**

arguments—not simply reading the same materials again and selecting a different outcome.

All possibilities reveal fatal deficiencies in the proceedings below. Rather than addressing this error through proper appellate channels, Judge Dougherty has now attempted to retroactively "fix" his contradiction without rehearing arguments, without briefing, and while simultaneously claiming both to have and not have jurisdiction—a logical impossibility that is nonetheless being treated as a valid judicial act.

## III. THIS COURT'S SILENT ACQUIESCENCE THREATENS THE LEGITIMACY OF APPELLATE REVIEW

What has occurred here goes beyond procedural error—it represents an unprecedented assault on the very concept of appellate authority, made all the more disturbing by this Court's apparent silent acquiescence. For weeks, this appeal has sat without action while procedural irregularities multiplied, culminating in Judge Dougherty's usurpation of appellate jurisdiction. This pattern suggests not confusion but coordination—a predetermined outcome being implemented through increasingly irregular means.

The implications of this Court's inaction are profound and legacy-defining:

1. It signals that appellate review is merely theatrical when powerful institutions face scrutiny. For weeks, this Court has held Appellant's appeal without issuing any opinion, only to apparently communicate privately with Judge Dougherty while keeping Appellant in the dark.

2. It renders this Court functionally irrelevant. If trial judges can simply pull back cases and modify their rulings during appeals with this Court's tacit approval, what purpose does this Court serve beyond providing procedural cover for predetermined outcomes?

3. It establishes that citizens challenging government institutions face a coordinated wall of resistance rather than independent judicial review. The pattern suggests not separate courts applying law independently, but a unified system working collectively to prevent accountability.

4. It indicates that this Court has chosen institutional self-protection over the administration of justice. By allowing Judge Dougherty to issue this logically impossible order rather than addressing his contradictory ruling directly, this Court appears to be participating in concealing judicial error rather than correcting it.

Due process requires, at minimum, that judicial decisions be accompanied by reasoning. Neb. Rev. Stat. § 24-1107 specifically requires that appellate decisions "shall be stated in

writing." Yet here, Appellant faces the Kafka-esque situation of having his appeal apparently dismissed without any written opinion or formal order whatsoever. The pattern suggests this Court recognized the impossibility of defending either ground in Judge Dougherty's contradictory dismissal, and rather than issue a reversible written opinion, chose to allow him to "fix" his error through an unprecedented jurisdictional violation.

This creates an impenetrable procedural maze:

1. Appellant cannot challenge this Court's jurisdictional determination because no reasoning has been provided.

2. Appellant cannot address the District Court's modified ruling because that court lacks jurisdiction to issue it.

3. Appellant is being charged appeal costs despite receiving no appellate review whatsoever.

The unprecedented nature of what has occurred here forces this Court to confront its own role in this breakdown of judicial process. The Nebraska Supreme Court has recognized that "The right to appeal would be meaningless if the court could refuse to hear properly presented appeals without explanation." State v. Decker, 261 Neb. 382, 622 N.W.2d 903 (2001). This principle is embedded in Nebraska's constitutional guarantee of access to the courts, which "includes the right to meaningful appellate review." Steinacher v. Stearns, 302 Neb. 674, 924 N.W.2d 688 (2019).

This Court now faces a watershed moment that will define its legacy: it must either reassert basic principles of transparent, rules-based adjudication, or acknowledge through its actions that Nebraska's judicial system has abandoned even the pretense of independent review when government institutions face scrutiny.

## IV. THE EXTRAORDINARY FINANCIAL EXPENDITURES DEFY INNOCENT EXPLANATION

The procedural irregularities in this case cannot be viewed in isolation from the staggering financial resources deployed to prevent disclosure of basic public records to a single parent. Omaha Public Schools has now spent approximately $5 million fighting Appellant's public records requests—a sum equivalent to the entire cost of O.J. Simpson's "Trial of the Century," which involved months of televised proceedings, teams of renowned attorneys, hundreds of witnesses, and complex DNA evidence.

The breathtaking disproportion between expenditure and actual legal work performed defies any rational explanation:

1. **While the O.J. Simpson trial involved nine months of daily court proceedings, Appellant has managed to get before a judge for a total of approximately 50 minutes over two years.**

2. **During these brief hearings, OPS counsel typically speaks for less than 5-7 minutes total, offering minimal substantive arguments beyond procedural objections—yet OPS has somehow spent $5 million on this representation.**

3. **This extraordinary expenditure equates to approximately $100,000 per minute of actual court time, or over $1.6 million per hour—a rate that cannot be reconciled with any legitimate legal representation.**

4. **While spending $5 million in taxpayer funds to fight disclosure, OPS simultaneously charged Appellant $1,600 for completely blacked-out documents—over 100 pages of entirely redacted material that could have contained anything or nothing at all.**

5. **OPS claimed these complete redactions were necessary because proper review would exceed the statutorily allowed 8 hours, yet has subsequently devoted thousands of attorney hours fighting disclosure.**

6. **This creates the absurd situation where the public is both:**

    - **Charged exorbitant fees to receive unusable blacked-out pages under the pretense that proper review is too costly; AND**
    - **Forced to fund millions in legal expenses to prevent proper disclosure of those same records.**

**To provide concrete perspective on the extraordinary nature of this expenditure:**

1. **At standard Nebraska legal rates, $5 million represents approximately 12,500-16,000 attorney hours—equivalent to 6-8 full-time attorneys working exclusively on this case for two years.**

2. **This sum could fund the annual salaries of approximately 100 Nebraska teachers.**

3. **The O.J. Simpson murder trial, widely considered one of the most expensive criminal prosecutions in American history, cost approximately $5-6 million and involved:**

    - **Nine months of televised trial proceedings**
    - **World-renowned attorneys including Robert Shapiro, Johnnie Cochran, F. Lee Bailey, and Alan Dershowitz**
    - **Extensive DNA analysis and expert testimony**
    - **Hundreds of witnesses and thousands of exhibits**

- ○ **National media coverage requiring substantial security**
4. **Yet OPS has spent a comparable sum fighting disclosure of basic public records to a single parent—records that by law should be readily available to citizens at minimal cost.**

**This expenditure is so disproportionate to the nature of the underlying requests that it defies any innocent explanation. It raises alarming questions that this Court cannot ignore:**

1. **What information could possibly justify spending $5 million in taxpayer funds to prevent its disclosure while simultaneously charging citizens $1,600 for completely blacked-out pages? The scale and hypocrisy suggest the records contain information of extraordinary significance that OPS believes would cause substantial damage if released.**

2. **WHERE IS THE MONEY ACTUALLY GOING? The sheer magnitude of these expenditures raises serious questions of impropriety:**

    - ○ **Is this money being funneled to connected law firms with ties to officials involved in these proceedings?**
    - ○ **Are these funds being used to influence judicial or governmental outcomes through indirect channels?**
    - ○ **Are portions of these legal fees being redirected to judicial campaigns, bar association activities, or other venues where they might influence the proceedings?**
    - ○ **How can $5 million possibly be spent legitimately on preventing disclosure of basic public records?**

3. **WHO AUTHORIZED THIS EXTRAORDINARY EXPENDITURE of public resources, and what oversight was applied? School budgets typically require approval through public processes—was this massive legal expenditure ever subjected to proper public scrutiny?**

4. **Given the coordinated procedural irregularities documented in this case, has any portion of these funds been directed to entities or individuals connected to the judiciary or other officials involved in these proceedings?**

**The Nebraska Supreme Court has recognized that public officials have a duty to be "guardians of the public trust." State ex rel. O'Connor v. Tusa, 130 Neb. 528, 265 N.W. 524 (1936). The extraordinary expenditure of $5 million fighting basic transparency—coupled with the unprecedented procedural irregularities—suggests a systematic breach of this trust that demands this Court's most searching scrutiny.**

## V. THE SYSTEMATIC PATTERN REVEALS A COORDINATED CAMPAIGN TO DENY ACCESS TO JUSTICE

**The procedural history before this Court reveals not isolated errors but a methodical campaign to prevent Appellant from exercising basic legal rights through increasingly outrageous procedural barriers:**

1. **FABRICATION OF NON-EXISTENT LEGAL REQUIREMENTS: Throughout these proceedings, OPS and the courts have systematically invented non-existent legal hurdles specifically designed to prevent Appellant from accessing public records:**

    - **Requiring Appellant to pursue mandamus as a prerequisite to filing suit, despite Nebraska law clearly establishing that mandamus is an optional alternative remedy, not a mandatory precondition to exercising statutory rights;**

    - **When Appellant did pursue mandamus as demanded, the Nebraska Supreme Court refused to hear it—creating a perfect Catch-22 where Appellant is told he must obtain mandamus to proceed yet denied access to mandamus proceedings;**

    - **Imposing procedural requirements that exist nowhere in Nebraska law, such as requiring multiple pre-litigation administrative procedures before a citizen can enforce statutory rights to public records.**

2. **SYSTEMATIC PROCEDURAL MANIPULATION: At every stage, procedural rules have been weaponized to extract maximum delay, expense, and frustration:**

    - **Allowing OPS to file last-minute motions to dismiss literally as parties were entering the courtroom;**

    - **Dismissing Appellant's complaints over trivial formatting issues like font choices or paragraph spacing, rather than allowing routine amendments;**

    - **Deliberately waiting until Appellant completed extensive filings before dismissing on grounds that could have been raised immediately;**

    - **Making blatantly false statements during hearings, such as claiming Appellant cannot object, stating void ab initio principles don't apply, and falsely attributing scheduling to the defense when Appellant scheduled the hearing.**

3. **REPEATED VIOLATIONS OF NEBRASKA SUPREME COURT PRECEDENT:** The District Court has repeatedly violated clear Nebraska Supreme Court precedent:

   - **Issuing a contradictory dismissal on both jurisdictional and merits grounds, despite the Nebraska Supreme Court's clear holding in Nebraska Dept. of Rev. v. Nichols, 252 Neb. 760 (1997) that these grounds are mutually exclusive;**

   - **Attempting to modify its own ruling during a pending appeal, despite the Nebraska Supreme Court's unequivocal holding in In re Interest of Jedidiah P., 267 Neb. 258 (2004) that "Any order attempting to exercise jurisdiction after the appeal has been perfected is void for lack of jurisdiction";**

   - **Creating unprecedented procedural requirements for public records requests that directly contradict the Nebraska Supreme Court's directive in State ex rel. Veskrna v. Steel, 296 Neb. 581 (2017) that "The public records statutes should be liberally construed to promote disclosure."**

4. **COORDINATED OBSTRUCTION ACROSS MULTIPLE INSTITUTIONS:** The pattern reveals coordination across multiple government entities to prevent transparency:

   - **OPS has spent approximately $5 million fighting basic public records requests;**

   - **The OPS School Board has repeatedly approved these extraordinary legal expenditures through deceptive "consent agenda" votes that conceal the nature and purpose of the payments from public scrutiny—effectively voting to protect themselves with public funds despite clear conflicts of interest;**

   - **The School Board recently approved an additional $239,000 in legal fees immediately after being publicly informed that such self-dealing approval violates their ethical obligations—demonstrating open contempt for basic governance principles;**

   - **These extraordinary legal expenditures continue despite OPS already maintaining three full-time in-house attorneys who should be handling routine public records matters;**

   - **OPS's deliberate use of private outside counsel rather than their in-house attorneys appears strategically calculated to shield their legal representatives from the heightened ethical obligations and potential professional consequences that government attorneys would face for knowingly making false representations to courts—effectively outsourcing**

   the ethical liability for the systematic deception documented throughout these proceedings;

   ○ **The Attorney General's office has systematically denied citizen public records appeals for three straight years across 185 published decisions;**

   ○ **The District Court issued legally impossible rulings creating procedural dead ends;**

   ○ **This Court has apparently communicated with the District Court outside proper channels while failing to issue any opinion addressing the clear legal errors.**

**This is not good-faith legal disagreement—it is the systematic weaponization of procedure to prevent a citizen from exercising basic statutory rights. When multiple government entities coordinate to create impossible procedural barriers that directly contradict Supreme Court precedent, it reveals a system that has abandoned even the pretense of rule-based adjudication in favor of predetermined outcomes.**

## VI. THE FUNDAMENTAL CONSTITUTIONAL CRISIS THIS CASE REPRESENTS

**While presented as a "mere" public records dispute, this case has evolved into something far more significant: a systematic assault on the most basic constitutional guarantees of due process, equal protection, and access to justice. The extraordinary measures deployed against Appellant reveal not isolated procedural irregularities but a constitutional crisis that strikes at the heart of what it means to live in a society governed by law rather than arbitrary power:**

1. **SYSTEMATIC DENIAL OF MEANINGFUL ACCESS TO COURTS: The procedural labyrinth created in this case—where jurisdictional grounds are contradictory, appeals vanish without opinions, and judges retroactively modify their own rulings—effectively transforms constitutional guarantees of access to courts into empty promises.**

2. **DEPLOYMENT OF STATE POWER TO INTIMIDATE: Throughout this process, Appellant has faced not merely legal obstacles but the full intimidating force of state power, including:**

   ○ **Law enforcement officers deployed to intimidate;**
   ○ **Capitol security personnel directed to remove Appellant from public proceedings;**

- ○ **Systematic refusal by officials to acknowledge or address legitimate concerns raised in public forums;**
- ○ **Judicial rulings so fundamentally flawed they cannot be reconciled with good-faith application of law.**

3. **SYSTEMATIC EROSION OF CONSTITUTIONAL SAFEGUARDS: The actions documented here represent the same fundamental breakdown in constitutional protections that has historically enabled grave miscarriages of justice:**

   - ○ **The same mechanisms used here to prevent access to public records are indistinguishable from those used to prevent review of wrongful convictions;**
   - ○ **The same willingness to disregard clear legal principles enables corrupt prosecutors and judges to exclude exculpatory evidence while admitting inflammatory conjecture;**
   - ○ **The same institutional coordination demonstrated here enables systematic civil rights violations across contexts.**

4. **DEVASTATING PERSONAL TOLL ON CITIZENS SEEKING ACCOUNTABILITY: The human cost of this systematic obstruction extends far beyond monetary damages:**

   - ○ **Years of Appellant's life consumed fighting a system deliberately designed to exhaust and demoralize;**
   - ○ **The psychological toll of confronting institutions that openly flout the law while presenting a facade of legitimacy;**
   - ○ **The profound disillusionment that comes with recognizing that systems purportedly designed to protect citizens have been weaponized against them;**
   - ○ **The isolation of fighting alone against coordinated institutions when attorneys fear professional destruction for challenging this system.**

5. **POTENTIAL CRIMINAL IMPLICATIONS OF COORDINATED OBSTRUCTION: The pattern documented here raises serious questions about potential criminal violations:**

   - ○ **Coordinated actions across multiple institutions to prevent disclosure potentially constitute conspiracy to violate civil rights under color of law;**
   - ○ **The deliberate misuse of public funds to conceal information potentially violates multiple statutes governing public corruption;**
   - ○ **The systematic deception of courts through knowingly false representations potentially constitutes fraud upon the court.**

**The extraordinary question now before this Court is whether Nebraska still maintains even the pretense of constitutional governance. If a judge can simultaneously claim to lack jurisdiction while exercising jurisdiction; if appeals can vanish without opinions; if $5 million in public funds can be deployed to prevent disclosure; if law enforcement can**

be used to intimidate those seeking transparency; then what remains of our constitutional guarantees?

At what threshold does the systematic denial of constitutional rights register as unacceptable in a functional democratic society? This case forces this Court to confront whether Nebraska's judiciary still operates as a guardian of constitutional rights or has devolved into an administrative mechanism for protecting powerful institutions from accountability.

The precedent set by this Court's handling of this motion will affect every Nebraska citizen who ever seeks transparency from government, challenges improper official action, or attempts to hold powerful institutions accountable. If this level of coordinated obstruction is permitted to stand, it signals to every citizen that Nebraska's constitutional guarantees exist only on paper, not in practice.

## VII. THE FUNDAMENTAL CONSTITUTIONAL CRISIS THIS CASE REPRESENTS

While presented as a "mere" public records dispute, this case has evolved into something far more significant: a systematic assault on the most basic constitutional guarantees of due process, equal protection, and access to justice. The extraordinary measures deployed against Appellant reveal not isolated procedural irregularities but a constitutional crisis that strikes at the heart of what it means to live in a society governed by law rather than arbitrary power:

1. **SYSTEMATIC DENIAL OF MEANINGFUL ACCESS TO COURTS:** The procedural labyrinth created in this case—where jurisdictional grounds are contradictory, appeals vanish without opinions, and judges retroactively modify their own rulings—effectively transforms constitutional guarantees of access to courts into empty promises.

2. **DEPLOYMENT OF STATE POWER TO INTIMIDATE:** Throughout this process, Appellant has faced not merely legal obstacles but the full intimidating force of state power, including:

   - **Law enforcement officers deployed to intimidate;**
   - **Capitol security personnel directed to remove Appellant from public proceedings;**
   - **Systematic refusal by officials to acknowledge or address legitimate concerns raised in public forums;**
   - **Judicial rulings so fundamentally flawed they cannot be reconciled with good-faith application of law.**

3. **SYSTEMATIC EROSION OF CONSTITUTIONAL SAFEGUARDS:** The actions documented here represent the same fundamental breakdown in constitutional

**protections that has historically enabled grave miscarriages of justice:**

- **The same mechanisms used here to prevent access to public records are indistinguishable from those used to prevent review of wrongful convictions;**
- **The same willingness to disregard clear legal principles enables corrupt prosecutors and judges to exclude exculpatory evidence while admitting inflammatory conjecture;**
- **The same institutional coordination demonstrated here enables systematic civil rights violations across contexts.**

4. **DEVASTATING PERSONAL TOLL ON CITIZENS SEEKING ACCOUNTABILITY: The human cost of this systematic obstruction extends far beyond monetary damages:**

    - **Years of Appellant's life consumed fighting a system deliberately designed to exhaust and demoralize;**
    - **The psychological toll of confronting institutions that openly flout the law while presenting a facade of legitimacy;**
    - **The profound disillusionment that comes with recognizing that systems purportedly designed to protect citizens have been weaponized against them;**
    - **The isolation of fighting alone against coordinated institutions when attorneys fear professional destruction for challenging this system.**

5. **POTENTIAL CRIMINAL IMPLICATIONS OF COORDINATED OBSTRUCTION: The pattern documented here raises serious questions about potential criminal violations:**

    - **Coordinated actions across multiple institutions to prevent disclosure potentially constitute conspiracy to violate civil rights under color of law;**
    - **The deliberate misuse of public funds to conceal information potentially violates multiple statutes governing public corruption;**
    - **The systematic deception of courts through knowingly false representations potentially constitutes fraud upon the court.**

**The extraordinary question now before this Court is whether Nebraska still maintains even the pretense of constitutional governance. If a judge can simultaneously claim to lack jurisdiction while exercising jurisdiction; if appeals can vanish without opinions; if $5 million in public funds can be deployed to prevent disclosure; if law enforcement can be used to intimidate those seeking transparency; then what remains of our constitutional guarantees?**

**At what threshold does the systematic denial of constitutional rights register as unacceptable in a functional democratic society? This case forces this Court to confront whether Nebraska's judiciary still operates as a guardian of constitutional rights or has devolved into an administrative mechanism for protecting powerful institutions from accountability.**

**The precedent set by this Court's handling of this motion will affect every Nebraska citizen who ever seeks transparency from government, challenges improper official action, or attempts to hold powerful institutions accountable. If this level of coordinated obstruction is permitted to stand, it signals to every citizen that Nebraska's constitutional guarantees exist only on paper, not in practice.**

   7. **PERVASIVE GASLIGHTING BY COURT OFFICIALS: Throughout this process, Appellant has faced systematic gaslighting by court personnel designed to create self-doubt and confusion:**

      - **Court clerks, staff, and officials routinely deflect basic procedural questions with "I can't give legal advice" responses—even when Appellant merely seeks clarification on proper procedures or filing requirements;**

      - **This deflection creates a Catch-22 where Appellant cannot obtain basic procedural information from court officials yet is held to perfect procedural compliance;**

      - **When Appellant points out procedural irregularities or contradictions in court rulings, officials routinely suggest Appellant must be misunderstanding basic legal concepts;**

      - **Court personnel have consistently implied that any procedural confusion stems from Appellant's pro se status rather than acknowledging the extraordinary procedural irregularities documented in court records.**

**This systematic gaslighting serves a clear purpose: to make Appellant doubt his own understanding of clearly documented procedural violations and to create the false impression that he, rather than the courts, is operating outside normal procedures. When combined with the fact that attorneys consistently state these same procedures are "impossible" when described to them, it creates a system specifically designed to exhaust, confuse, and demoralize citizens seeking accountability.**

   8. **THE FUNDAMENTAL MORAL BANKRUPTCY OF INDIVIDUAL CHOICES: At its core, this case is not about abstract "systems" but about individual human beings who have made specific choices to participate in coordinated obstruction:**

      - **Each judge, attorney, school board member, and official involved has made a conscious personal decision to place institutional protection above basic constitutional rights;**

      - **These are not abstract entities but individual people who have somehow convinced themselves they have greater rights to determine truth than a**

**citizen seeking basic transparency;**

- **The extraordinary coordination documented here required dozens of individual moral failures—specific moments when people with names and faces chose to participate in systematic obstruction rather than fulfill their ethical and constitutional obligations;**

- **The staggering statistical improbability that every single individual across multiple institutions would independently make identical ethically compromised decisions reveals not random failure but coordinated choice.**

**This case forces this Court to confront a fundamental question: How does a democratic society function when those entrusted with protecting rights collectively decide those rights don't matter? The individuals occupying these positions were not hired or appointed to coordinate in denying constitutional rights—yet that is precisely what the evidence shows they have done. This is not a case of "the system failing" in some abstract sense, but of specific people failing to fulfill the most basic moral and constitutional obligations of their positions.**

9. **DELIBERATE WEAPONIZATION OF TIME: Throughout these proceedings, OPS and related officials have systematically weaponized time to maximize burden on Appellant while minimizing their own efforts:**

    - **While spending $5 million on legal representation (equivalent to 6-8 full-time attorneys), OPS routinely waits until the literal final hour of the final day permitted by statute to respond to any filing—creating artificial months of delay between simple procedural steps;**

    - **Court officials and OPS frequently exceed statutory deadlines without consequences, while Appellant faces immediate dismissal for even minor procedural imperfections;**

    - **This pattern creates the absurd situation where a governmental entity with millions in legal resources and multiple full-time attorneys consistently needs the maximum time permitted by law (or longer) to complete basic filings, while a single pro se litigant is held to immediate and perfect compliance;**

    - **The deliberate manipulation of timing reveals not resource constraints but strategic obstruction designed to exhaust Appellant through artificial delay.**

**This systematic abuse of procedural timing undermines the entire purpose of statutory deadlines and procedural rules. When an entity spending $5 million on legal**

representation consistently requires the maximum time permitted for every response while a single pro se litigant is expected to navigate complex procedures immediately and perfectly, it exposes the fundamental inequity this Court has permitted to flourish.

## VI. REMEDIES REQUESTED

Appellant respectfully requests this Court to:

1. DECLARE Judge Dougherty's April 4, 2025 "Order Pursuant to Mandate" VOID for absolute lack of jurisdiction.

2. ISSUE a formal opinion addressing Appellant's appeal, including the District Court's legally impossible dismissal on contradictory grounds.

3. REVERSE the District Court's dismissal and remand with instructions to proceed immediately to the merits of Appellant's public records claims.

4. VACATE any assessment of appeal costs against Appellant.

5. ASSIGN a different District Court judge on remand to ensure impartial proceedings.

6. ORDER Omaha Public Schools to provide a full accounting, under oath, of all legal expenses related to Appellant's public records requests, including detailed billing records showing the distribution of the approximately $5 million expended.

7. ESTABLISH a special master to oversee expedited production of the requested public records.

8. REFER this matter to appropriate authorities for investigation of potential misuse of public funds.

## CONCLUSION

Let us speak plainly: No one involved in these proceedings is confused about what is happening. This Court is not confused. Judge Dougherty is not confused. Omaha Public Schools is not confused. What we are witnessing is not error but design—a desperate effort to prevent disclosure of information so damaging that procedural rules, jurisdictional boundaries, logical consistency, fiscal responsibility, and judicial integrity have all been sacrificed to maintain the wall of obstruction.

Appellant's years-long journey through Nebraska's courts—including a prior victory in the Nebraska Supreme Court against a financial institution that altered documents and

**still faced systematic procedural obstruction at every level—has revealed a disturbing truth: the system's response is determined not by law but by the identity of the parties. When powerful institutions face scrutiny, normal rules of procedure are replaced by increasingly outrageous barriers deliberately designed to exhaust, bankrupt, and demoralize citizens seeking accountability.**

**The actions documented in this motion are so extraordinary that they create a no-lose situation for Appellant and a no-win situation for this Court. Either:**

1. **This Court acknowledges the unprecedented jurisdictional violations, logical impossibilities, and procedural manipulations documented here and takes decisive action to restore proper judicial process; OR**

2. **This Court permits these unprecedented actions to stand, thereby conclusively proving Appellant's core contention: that Nebraska's judicial system has abandoned even the pretense of rule-based adjudication when powerful institutions face scrutiny.**

**That is the inescapable legacy-defining choice now before this Court. Simply allowing these extraordinary actions to continue does not make them disappear—it permanently documents that Nebraska's judicial system is willing to operate completely outside established rules when convenient. A self-proclaimed powerless judge has exercised power he claimed not to have, to reaffirm he has no power, while a case was pending before this Court—and this Court has remained silent.**

**What has OPS spent $5 million to conceal? The extraordinary nature of these proceedings suggests information of profound significance. No rational institution spends resources equivalent to the "Trial of the Century" fighting disclosure of routine public records unless what those records contain would cause substantial damage if revealed.**

**The $5 million question now before this Court is breathtakingly simple: Does Nebraska have a functional, rules-based legal system, or does it have a system where judges can simultaneously claim to lack jurisdiction while exercising jurisdiction; where trial courts can pull cases back from appellate courts at will; where appeals can be dismissed without opinions; where school boards can vote themselves millions in legal protection using public funds; and where $5 million in taxpayer money can be spent preventing a parent from accessing basic public records?**

**The choice this Court makes in response to this motion will permanently establish which answer is correct. If these actions are permitted to stand, no further evidence will be needed to prove Appellant's contention that the system has been corrupted beyond recognition. If these actions are corrected, perhaps a functioning system of justice can still be salvaged. Either way, Appellant's core claims have already been vindicated by the**

**extraordinary lengths to which Nebraska's institutions have gone to prevent meaningful review.**

**Respectfully submitted, April 9, 2025**

---

**Justin Riddle Appellant, Pro Se**

**402-813-2156**

**[Justinriddle1@gmail.com](mailto:Justinriddle1@gmail.com)**

**I certify under penalty of perjury that every single word contained in this document is true to the best of my knowledge and service was performed To Steve Davidson at Baird Holm via email.**

**A also included this in my pacer filing against X-Corp, to show the world precisely what Nebraska is doing. Despite the fact that every single agency, Judge, elected official, media representative, etc, has failed miserably at being honest, but succeeded flawlessly at abusing their position, the world will not be blind forever.**