COMPLAINT FOR DECLARATORY JUDGMENT SECTION

Plaintiff, Justin Riddle , representing himself pro se, top level complaint Complaint for
Declaratory Judgment against the Defendant, states and alleges as follows: INTRODUCTION

1. This action seeks declaratory relief under the Nebraska Uniform Declaratory Judgments
   Act, Neb. Rev. Stat. § 25-21,149 et seq., to resolve a series of fundamental legal questions
   that have one answer when examining Nebraska's published laws and statutes, but
   mysteriously have the exact opposite answer when applied to Plaintiff's cases - and
   apparently only Plaintiff's cases.

2. Unable to obtain clear procedural answers from any Nebraska court, administrative
   agency, or clerk's office despite years of litigation, Plaintiff now seeks definitive judicial
   clarification on the following questions that should have simple yes-or-no answers: a. Can
   a judge dismiss a case for both "lack of jurisdiction" AND "failure to state a claim"
   simultaneously? (First-year law students know the answer is NO, yet it happened in
   Plaintiff's case) b. Is a judge required to rule on a properly filed motion to recuse before
   proceeding with other matters? (The law says YES, yet Judge Dougherty completely
   ignored Plaintiff's recusal motion) c. Can two separate appeals of the same case proceed
   simultaneously with different appellate panels? (Obviously NO, yet the Court of Appeals
   claimed Plaintiff's brief was a "second appeal") d. Is "void ab initio" a real legal concept in
   Nebraska, and does it mean the action never legally occurred? (Every jurisdiction says
   YES, yet Judge Dougherty said "I don't care

about that") e. Can a party file a motion to dismiss less than 48 hours before a hearing and have
the court consider only that motion? (The rules require 5-7 days notice, yet Stratman accepted
one filed the evening before, and Dougherty accepted one filed less than 48 hours prior) f. Are the
options in Neb. Rev. Stat. § 84-712.03 mandatory prerequisites or optional alternatives? (The
statute says "may elect to," yet courts require both) g. Can a clerk reject a timely-filed appeal brief
as a "second appeal" when the court has already acknowledged the brief's due date? (Common
sense says NO, yet Plaintiff has the order proving this happened) h. Does the Attorney General
have any obligation to correct demonstrably false published statements about a citizen? (Basic
fairness says YES, yet the AG admitted the falsehoods but refused correction) i. Can state offices
deploy security to remove citizens asking procedural questions? (The First Amendment says NO,
yet this repeatedly happens to Plaintiff) j. Can the bar launch unauthorized practice of law
investigations based on nonexistent complaints as retaliation for winning in court? (Due process
says NO, yet this happened immediately after Plaintiff prevailed against Judge Stratman) 3. To be
absolutely clear: Plaintiff is not seeking special treatment or exemption from valid procedural
requirements. As the ONLY person in recorded legal history - not just in Nebraska but globally -
to successfully acquire and retain a major financial institution's domain name through litigation
(www.charterwestbank.com), defeating Charter West Bank in the Nebraska Supreme Court after
losing at every lower level - state court, federal court, Nebraska Court of Appeals, and the 8th
Circuit - Plaintiff has proven he can navigate the most complex litigation imaginable. This

unprecedented victory - achieved without precedent or roadmap in front of 150 Creighton Law School students - makes the suggestion that he cannot properly request simple public records containing his own name patently absurd. He is simply asking whether the rules that apply to every other litigant in Nebraska also apply to him, or whether there exists some hidden exception that transforms clear statutory language and established legal principles into their opposites whenever Justin Riddle enters a courtroom seeking basic transparency. 4. What follows is a detailed accounting of how Nebraska's courts and agencies have created a parallel universe of procedure that exists only for Plaintiff - a Kafkaesque maze where optional becomes mandatory, "or" becomes "and," simultaneous impossibilities become requirements, asking for clarification results in security being called, and winning in court triggers retaliatory investigations. Plaintiff, who has been diagnosed with

Attention-Deficit/Hyperactivity Disorder (ADHD), finds himself neurologically incapable of accepting these logical contradictions without resolution, yet every attempt to obtain clarity has resulted in escalating retaliation rather than answers. For a forensic analysis of the situation, see the following pdf:

https://charterwestbank.com/wp-content/uploads/2025/04/Working-Rico-draft-.pdf

4a. To remove any doubt about the veracity of these allegations, Plaintiff has maintained meticulous documentation of every interaction with Nebraska's courts, administrative agencies, and officials. This includes over 30 recorded phone calls and 30 recorded in-person visits to various government offices spanning from 2021 to present. Representative transcripts of these recordings are available upon request and demonstrate that officials consistently: (a) refuse to answer basic procedural questions; (b) deploy security to prevent questioning rather than providing answers; (c) contradict their own published procedures; and (d) retaliate against Plaintiff for seeking clarification. Every statement in this complaint is supported by audio, video, or documentary evidence that Plaintiff is prepared to present to the Court. Due to space constraints and practical limitations, this complaint presents only a small subset of the total documented incidents—perhaps 25-30% of the full evidentiary record Plaintiff has amassed over years of systematic obstruction.

4b. It is critical to note that Plaintiff did not initiate the complaints to the Attorney General regarding the OPS board meeting incident. Those complaints were filed by other community members who witnessed the events, and Plaintiff and his mother were unaware of the AG's investigation until Plaintiff accidentally discovered the AG's report online in approximately May 2024, over two years after it was written. This discovery of previously unknown false official statements about Plaintiff from a government agency he never contacted is what prompted Plaintiff's subsequent public records requests, which began in May/June 2024. PARTIES 5. Plaintiff Justin Riddle is a citizen and resident of Douglas County, Nebraska. Plaintiff has been diagnosed with ADHD, a recognized disability under the Americans with Disabilities Act. 6. Defendant State of Nebraska is named pursuant to the Declaratory Judgments Act as the party whose laws and procedures are at issue in this action. JURISDICTION AND VENUE 7. This Court

has jurisdiction over this matter pursuant to Neb. Rev. Stat. § 25-21,149, which authorizes courts of record within their respective jurisdictions to declare rights, status, and other legal relations. 8. Venue is proper in Douglas County pursuant to Neb. Rev. Stat. § 25-403.01, as Plaintiff resides in Douglas County. REQUEST FOR EXPEDITED PROCEEDINGS 9. This action arises directly from Nebraska's Public Records Statutes, Neb. Rev. Stat. § 84-712 et seq. 10. As such, this matter is subject to expedited review under Neb. Rev. Stat. § 84-712.03, which mandates: "In any action brought under this subsection, the court shall order an in camera review of the public records in question to determine the matter. The hearing shall be held within fifteen calendar days after the filing of the petition, unless the court has good cause for extending such time." 11. While this is a declaratory judgment action regarding procedural requirements rather than a direct mandamus action for records production, the matter directly impacts Plaintiff's ability to enforce his public records rights. Plaintiff has been procedurally stalled since September 2024 without any substantive hearing on the merits of his public

records claims. 12. Given that this procedural question represents the sole barrier to adjudication of Plaintiff's underlying public records dispute, and given the legislative directive for expedited review of public records matters, this Court should immediately schedule this matter for hearing and decision within fifteen calendar days as contemplated by the statute.

12a. For clarity, the following timeline illustrates the key events in this procedural saga:

a. August 2, 2021: Initial Board Meeting Incident - Plaintiff and his mother, Cheryl Adamson (a 36-year teacher at OPS), attended an OPS Board meeting. As documented in the Holman v. Riddle transcript (CI21-8450), Ms. Adamson was initially allowed to speak after declining to give her address, but was then cut off when she attempted to play an audio recording. Plaintiff was subsequently denied the right to speak for not providing his address, showing disparate treatment in the application of rules.

b. August 2021: Community members (not Plaintiff or his mother) filed complaints with the Nebraska Attorney General's Office regarding the OPS meeting incident, naming Plaintiff and his mother as alleged victims.

c. December 2021: OPS counsel David Kramer responded to AG inquiry with false narrative, claiming Ms. Adamson was removed "for that reason alone" (not giving address), directly contradicting the meeting transcript.

d. January 6, 2022: Attorney General's Office issued opinion containing demonstrably false statements about Plaintiff but deliberately kept this opinion off their public website for two years.

e. May 2024: Plaintiff accidentally discovered the January 6, 2022 AG report online, learning for the first time about the AG investigation and its false conclusions.

f. May/June 2024: After discovering the AG's false statements, Plaintiff submitted public records requests to OPS for communications containing his name.

g. June 2024: OPS provided over 140 pages of completely blacked-out documents in response to Plaintiff's public records requests while charging $1,600.

h. August 12, 2024: Plaintiff filed initial lawsuit against OPS for public records violations (CI 24-6273).

i. October 1, 2024: Judge Stratman hearing. OPS filed last-minute motion to dismiss (the evening before the hearing). Judge refused to allow evidence and dismissed without addressing merits, claiming Plaintiff needed mandamus and AG review first.

j. October 2, 2024: The Supreme Court Department of Unauthorized Practice of Law sent a threatening but vague letter accusing Plaintiff of unauthorized practice of law immediately after Judge Stratman's dismissal, demonstrating coordinated retaliation.

k. October 2024: Plaintiff attempted to obtain mandamus from Nebraska Supreme Court, which denied the application without explanation while retaining Plaintiff's $100 filing fee.

l. December 2024: Plaintiff filed second lawsuit; case initially assigned to Judge Vaughn, who recused himself due to having family connections with OPS.

m. December 2024: Case reassigned to Judge Dougherty, who had previously granted restraining order against Plaintiff in 2021 in Holman v. Riddle.

n. December 11, 2024: Judge Dougherty dismissed case for both "lack of jurisdiction" AND "failure to state a claim" without addressing Plaintiff's motion for recusal.

o. January 15, 2025: Plaintiff filed Notice of Appeal and Statement of Intent (explicitly stating "FULL BRIEF TO FOLLOW"); Court of Appeals accepted and provided due date of February 26 for appeal brief.

p. January 21, 2025: Plaintiff submitted appeal brief, which Court clerk later rejected as a "second appeal" requiring additional fees despite being the brief for the already-accepted appeal.

q. May 1, 2025: When attempting to inquire about procedural contradictions at Douglas County District Court Clerk's Office, Plaintiff was confronted by 12-15 security officers and threatened with arrest.

r. May 8, 2025: Meeting with Crystal at Douglas County clerk's office where staff acknowledged the appeal brief issue but could not explain the logical contradiction of how one case could have two simultaneous appeals.

s. May 15, 2025: Call with Deputy Court Administrator Anne Borer, who refused to answer whether judges must address recusal motions before ruling on other matters, then hung up when pressed.

COMPLAINT FOR DECLARATORY JUDGMENT SECTION 2: Core Legal Issues (¶¶ 13-45) FACTUAL ALLEGATIONS The Statutory Framework vs. The Parallel Universe of Applied Practice 13. Nebraska's Public Records Statutes, specifically Neb. Rev. Stat. § 84-712.03, states: "Any person denied any rights granted by sections 84-712 to 84-712.03 may elect to: (1) File for speedy relief by a writ of mandamus in the district court within whose jurisdiction the state, county, or political subdivision officer who has custody of the public record can be served; or (2) petition the Attorney General to review the matter to determine whether a record may be withheld from public inspection or whether the public body that is custodian of such record has otherwise failed to comply with such sections..." 14. In plain English that would be comprehensible to any person with basic reading skills, this statute provides these options as alternatives ("may elect to"), not as requirements. The statute reads like a menu offering two optional appetizers, not a prix fixe meal requiring both courses before getting to the main event. Even more fundamentally, nothing in this statute or any other Nebraska law requires either option to be pursued before filing a lawsuit - just as no citizen is required to get permission from the Better Business Bureau or any other government agency before suing their neighbor, their employer, or their government. 15. Remarkably, however, Plaintiff has discovered himself in what appears to be an alternate legal dimension where the clear word "or" in the statute has been mysteriously transformed into "and, in that specific order, with both being required despite being mutually exclusive," and where optional procedures designed to help citizens avoid litigation costs have been transformed into mandatory toll booths that must be passed

before accessing the courthouse doors. 16. The absurdity of this interpretation becomes clear when one considers that these options exist specifically for citizens who prefer to avoid the costs and complexities of litigation. They are shortcuts, not requirements. Yet Nebraska courts have transformed these cost-saving alternatives into additional expenses that must be incurred before the actual litigation can even begin - like requiring someone to buy both a bicycle and a skateboard before being allowed to walk to work. The Curious Case of Contradictory Requirements 17. In Plaintiff's attempts to enforce his rights under the Public Records Statutes against Omaha Public Schools, multiple Nebraska courts have informed him - with apparent seriousness - that he must first obtain both: a. A review and determination from the Nebraska Attorney General's Office; and b. A writ of mandamus before he may proceed with a civil action to enforce his public records rights. 18. Let's be perfectly clear about how absurd this is: These courts are claiming that before Plaintiff can file a lawsuit - something every Nebraska citizen can do for literally any other grievance without asking permission - he must first complete TWO separate procedures that the statute explicitly describes as OPTIONAL alternatives designed to AVOID litigation. 19. These purported requirements not only directly contradict the plain language of Neb. Rev. Stat. § 84-712.03, which provides these as alternative options a citizen "may elect" to pursue, but appear to exist in a unique legal universe applicable solely to Plaintiff's litigation. It's as if courts decided that before suing your neighbor for playing loud music, you

must first file a complaint with the neighborhood association AND get a written opinion from the city noise ordinance department AND perform an interpretive dance for the mayor's office - despite no law requiring any of these things. 20. For perspective: If one were to apply this same logic to other areas of law, citizens would need to obtain a ruling from the Better Business Bureau AND file a separate court action for declaratory judgment before being allowed to sue a business for breach of contract. Such requirements would be recognized as absurd in any other context because they ARE absurd - citizens have a fundamental right to access the courts without completing obstacle courses of optional procedures that were designed as alternatives to litigation, not prerequisites for it. Round One of the Impossible Game: The Attorney General Review 21. Dutifully playing by these apparently special rules created just for him, Plaintiff petitioned the Nebraska Attorney General's Office for review regarding public records disputes with

Omaha Public Schools. 22. The Attorney General's Office issued an opinion letter containing statements about Plaintiff that were demonstrably false - not matters of interpretation, but objectively incorrect factual assertions that Plaintiff could and did disprove with video evidence. Most notably, in a display of Orwellian doublethink that would make George Orwell himself weep, the Attorney General's opinion stated on the SAME PAGE that: (a) at the top, Plaintiff's mother "declined to give her address and was allowed to continue and spoke for approximately 1 minute," and (b) at the bottom, that she was stopped not because of her speech but because "she wouldn't give her address." This internal contradiction - she both was and wasn't allowed to continue after declining to give her address - represents the quality of analysis applied throughout. Even a first-year law student would fail their logic exam for such blatant self-contradiction, yet this passes for legal analysis when the state wants to deny transparency. 23. The Attorney General's review was conducted despite - or perhaps because of - the fact that the original school board incident remains publicly available on YouTube, where other citizens (not just Plaintiff and his mother) complained about OPS's conduct. The Attorney General reviewed this video evidence, received false statements from OPS, and knowingly published false conclusions. 24. When presented with this evidence proving the letter contained false information, representatives of the Attorney General's Office made the remarkable admission that yes, the information was incorrect, but they had "no statutory obligation" to correct false information in their published opinions. 25. Let that sink in: A state agency acknowledged publishing false information about a citizen but claimed they have no duty to correct it, even while courts allegedly require citizens to obtain review from this very agency before accessing the courts. 26. When Plaintiff persisted in seeking correction of these acknowledged falsehoods, the Attorney General's Office responded in the manner seemingly reserved for citizens seeking basic accountability: by calling security and issuing a trespass warning. 27. The Attorney General's uncorrected false statements have subsequently been cited by opposing parties in Plaintiff's public records litigation - precisely the prejudicial outcome one would expect from being forced to obtain a review that contains acknowledged falsehoods that the agency refuses to correct. Round Two of the Impossible Game: The Mandamus Mystery 28. Having completed the first purportedly required step (albeit with the AG publishing admittedly false information),

*Plaintiff proceeded between the Stratman and Dougherty hearings to attempt the second supposedly mandatory prerequisite: filing a petition for*

writ of mandamus with the Nebraska Supreme Court. 29. Plaintiff paid the required filing fee for this mandamus action (approximately $100) to the Nebraska Supreme Court Clerk's Office - real money transferred to the state for a service to be rendered. 30. The Supreme Court subsequently denied Plaintiff's "application to docket an original action" without explanation, but retained Plaintiff's filing fee - a transaction that in any other context might be described as "taking money without providing the service paid for." 31. When Plaintiff inquired about the reason for denial and how to correct any deficiencies - a reasonable question from someone who has just paid for a service not received - the clerk stated: "they didn't give us any information that's all the information they give us" and "no further information can be provided because the court doesn't provide us with any other information." 32. Upon information and belief, the Nebraska Supreme Court has a "longstanding policy" of not entertaining mandamus actions when the Attorney General has already reviewed the matter. This creates the judicial equivalent of a cruel practical joke, where: a. Courts require both Attorney General review and mandamus; but b. The Supreme Court refuses to docket mandamus actions if the Attorney General has already reviewed the matter; while c. The Attorney General refuses to correct false information in its review; and d. No one bothers to explain this circular trap to the citizen trying to navigate it. 33. Plaintiff has thus attempted in good faith to satisfy both purported requirements, but has been prevented from doing so by the very institutions imposing these requirements - a situation akin to a teacher failing a student for not turning in homework while simultaneously refusing to accept the homework when offered. The Impossible Barrier: A Masterclass in Kafkaesque Procedure 34. Through these contradictory requirements and refusals, Nebraska state institutions have created a procedural labyrinth with no exit: a. Courts require Attorney General review and mandamus before proceeding with public records litigation; b. The Attorney General conducts reviews but refuses to correct false information; c. The Supreme Court refuses to docket mandamus actions after Attorney General review; d. Neither institution provides clear guidance on how to navigate this contradictory framework; e. Filing fees are retained even when applications are summarily rejected. 35. This is the bureaucratic equivalent of requiring someone to be standing and sitting simultaneously - a physical impossibility presented as a reasonable prerequisite.

36. Plaintiff has made good faith efforts to comply with all stated requirements, only to be denied access to courts through a system of circular prerequisites that cannot be simultaneously satisfied.

37. The procedural requirements imposed on Plaintiff resemble a Kafkaesque scenario designed to prevent access rather than facilitate it. Consider if the same logic were applied to other governmental functions: Imagine a DMV that required citizens to present a driver's license before receiving a driver's license application, or a passport office that required international travel before issuing a passport. The absurdity of such circular requirements would be immediately apparent to anyone. Yet this is precisely the logical loop Plaintiff has been placed in - required to complete a mandamus action to file a lawsuit, but unable to complete the mandamus because the AG already reviewed the

matter, while the AG review contains uncorrectable false information. The Curious Absence of Such Requirements for Everyone Else

38. What makes this situation even more remarkable is that the dual prerequisites of Attorney General review and mandamus action purportedly required before filing a public records lawsuit are not requirements for any other type of civil litigation in Nebraska.

39. For example, a citizen wishing to sue: a. A neighbor for nuisance; b. An entity for breach of contract; c. A person for negligence; d. A business for consumer protection violations; or e. Any other civil claim is not required to obtain prior approval, review, or separate judicial action before filing a lawsuit on the merits. No other litigation in Nebraska appears to require citizens to complete two mutually exclusive prerequisites before accessing the courts.

40. Upon information and belief, other citizens filing public records lawsuits have not been subject to these dual prerequisites. Plaintiff appears to have been granted the special privilege of being the only Nebraska citizen required to solve an impossible procedural puzzle before accessing the courts.

41. To illustrate the absurdity of imposing these unique barriers on Plaintiff while allowing virtually any other case to proceed: Nebraska courts have entertained lawsuits against God himself. In Chambers v. God, former State Senator Ernie Chambers sued the Almighty, and when the court dismissed for inability to serve process, Chambers noted that an omniscient God already had notice. The courts took this case seriously enough to issue written rulings.

42. Even more remarkably, the Nebraska Court of Appeals has adjudicated cases where the defendants were inanimate objects. In one case, the named defendants were literally five slot machines - not their owners, not the casino, but the actual machines themselves. These slot machines received more procedural consideration than Plaintiff

has received in attempting to obtain simple public records bearing his own name. 43. Consider the profound irony: Five slot machines can have their day in court, God can be sued (with the only barrier being service of process), but a citizen seeking records about how government officials discussed him - documents with his own name on them - must navigate an impossible maze of contradictory prerequisites that don't exist in statute and can't be satisfied in reality. 44. Plaintiff's original public records requests were straightforward: any communications between school board members, the Attorney General, or law enforcement that contained his name. This is perhaps the most basic form of government transparency - a citizen's right to know what his government is saying about him. Yet OPS and Nebraska's courts have created more procedural barriers to accessing these records than existed for Senator Chambers to literally sue the Creator of the Universe. 45. The transparent purpose of the options in Neb. Rev. Stat. § 84-712.03 is to provide citizens with alternative, potentially less costly avenues to resolve public records disputes without full litigation, not to create additional barriers to judicial review of public records denials. These were meant to be shortcuts, not roadblocks. By transforming these options designed to help citizens into mandatory prerequisites that are themselves impossible to satisfy, the system has inverted the legislative intent of the Public Records Statutes from promoting transparency to obstructing it - turning a door into a wall while still labeling it a door.

COMPLAINT FOR DECLARATORY JUDGMENT SECTION 3: Judicial History and Personal Impact (¶¶ 46-84) Impact of Logical Impossibilities on Plaintiff's Disability 46. Plaintiff has been diagnosed with Attention-Deficit/Hyperactivity Disorder (ADHD), a recognized disability under the Americans with Disabilities Act. A characteristic of Plaintiff's ADHD is the neurological inability to process and accept logically impossible situations without resolution. 47. To illustrate the impact of these procedural contradictions on Plaintiff's disability: For a person with Plaintiff's form of ADHD, being told they must satisfy two requirements while

simultaneously being prevented from satisfying both is akin to being instructed to exit a room through a doorway while being told the doorway doesn't exist. A neurotypical person might simply accept this contradiction and move on; Plaintiff's disability makes this neurologically impossible. 48. The procedural labyrinth Plaintiff has encountered is comparable to arriving at a government office with a sign reading "All Visitors Must Check In at Front Desk" only to find a second sign at the desk stating "Front Desk No Longer Accepts Check-Ins" with no further instructions. While some might shrug at this obvious contradiction, Plaintiff's ADHD creates a neurological imperative to resolve such logical inconsistencies before proceeding. 49. When Plaintiff has sought clarity from officials about these contradictory requirements, the responses have been equivalent to a restaurant server telling a patron "You must order food before we will serve you water" but then informing the same patron "We don't serve food here" while surrounding tables receive full meals. The rational impossibility of such situations creates genuine neurological distress for someone with Plaintiff's disability. 50. The courts have effectively created the following impossible directive for Plaintiff: "You must complete Steps A and B before proceeding to Step C. However, completing Step A makes it impossible to complete Step B, and we will not tell you how to resolve this contradiction." For Plaintiff, this is not merely frustrating; it creates a genuine neurological barrier due to his disability. 51. Plaintiff has attempted to explain his disability-related need for procedural clarity to multiple officials, specifically noting that contradictory instructions create a unique barrier for his neurological condition. Rather than providing the simple logical consistency that would constitute a reasonable accommodation, officials have responded by: a. Terminating conversations when logical contradictions are pointed out; b. Calling security when Plaintiff persists in seeking resolution of these contradictions; c. Providing circular explanations that only reinforce the logical impossibility; d. Suggesting Plaintiff simply accept logically impossible directives without question. 52. To be perfectly clear: Plaintiff is not seeking special treatment or exemption from valid procedural requirements. He is simply requesting the basic logical consistency that his disability requires - either that he (1) not be required to satisfy logically impossible prerequisites, or (2) be given a clear explanation of how to simultaneously satisfy contradictory requirements. This constitutes the very definition of a reasonable accommodation under the ADA. Prior Judicial Failures and Request for Unbiased Adjudication

Judge Stratman's Due Process Violations 53. On October 1, 2024, Judge Shelly R. Stratman of the District Court of Douglas County demonstrated a remarkable pattern of procedural violations and logical contradictions: a. Acceptance of last-minute filing: Judge Stratman allowed OPS to file a motion to dismiss the evening before the scheduled hearing - less than 24 hours notice - in

violation of Nebraska's requirement for 5-7 days notice on dispositive motions. b. Refusal to examine evidence while demanding procedure: When Plaintiff attempted to offer Exhibit 5 to directly refute the defendant's false claims, Judge Stratman refused to consider it, stating "there are no exhibits in the record right now" while simultaneously claiming to have read the complaint and made determinations based on its contents. c. Circular reasoning on verification: Judge Stratman insisted Plaintiff needed a "verified petition or motion with supporting affidavits" without ever identifying what specific element was missing from the already-filed complaint. When Plaintiff explicitly offered to swear under oath in open court, stating "I can swear under oath right now it's all true," Judge Stratman rejected this offer while continuing to cite lack of verification as grounds for dismissal. d. Personal attacks and procedural hypocrisy: After refusing Plaintiff's offer to verify his claims under oath in court, Judge Stratman declared Plaintiff "the most disrespectful person that I have dealt with in a while" for pointing out the logical inconsistencies in her rulings. This occurred after she claimed to value procedure while refusing a simple procedural remedy (verification in open court) that would have cured any alleged defect. Judge Dougherty's Procedural Improprieties 54. On December 11, 2024, Judge Duane C. Dougherty of the District Court of Douglas County exhibited similar failures: a. Acceptance of untimely filing: Judge Dougherty allowed OPS to file a motion to dismiss less than 48 hours before the scheduled hearing, again violating the 5-7 day notice requirement for dispositive motions. b. Simultaneous contradictory dismissals: Judge Dougherty dismissed Plaintiff's case based on both "lack of jurisdiction" AND "failure to state a claim" - a legal impossibility that would require the Court to simultaneously have and not have the power to review the case. c. Denial of basic procedural rights: Judge Dougherty explicitly told Plaintiff "No objections" when opposing counsel began speaking, denying Plaintiff the fundamental right to object to procedural improprieties. d. Improper hijacking of scheduled hearing: Judge Dougherty allowed opposing counsel to hijack an emergency hearing scheduled for Plaintiff's motions by considering a motion to dismiss filed only two days prior, in direct violation of Nebraska's notice requirements. e. Selective application of service rules: While allowing opposing counsel to proceed with an untimely filing, Judge Dougherty criticized Plaintiff for allegedly not serving his properly-scheduled motions, demonstrating a clear double standard. f. Dismissal of jurisdictional defects: When Plaintiff correctly pointed out that the removal to federal court was void ab initio due to lack of service, Judge Dougherty simply stated "I don't care about that" and refused to address this fundamental jurisdictional defect. g. Premature dismissal of due process arguments: Judge Dougherty refused to hear Plaintiff's substantive responses to procedural objections, effectively

conducting a one-sided hearing where only the defendant's arguments received consideration. The Pattern of Escalating Obstruction: From School Board to Supreme Court 55. The procedural impossibilities documented in this complaint did not arise in a vacuum. They represent the culmination of a systematic effort to prevent Plaintiff from obtaining judicial review of clear constitutional violations: a. The Original Violation: Omaha Public Schools silenced Plaintiff and his mother at a public school board meeting, violating their First Amendment rights. The incident remains on YouTube to this day, where other citizens (not just Plaintiff and his mother) complained about OPS's treatment. When they attempted to exercise their statutory right to

public records documenting this incident, OPS escalated by involving law enforcement and obtained a restraining order against Plaintiff. b. The Attorney General's Cover-Up: When Plaintiff sought the supposedly optional Attorney General review, the AG's office published demonstrably false statements about the incident - statements directly contradicted by video evidence they reviewed. They acknowledged these falsehoods but claimed "no statutory obligation" to correct them. They kept their false opinion hidden from their website for two years to prevent discovery until after the correction deadline had passed. c. The Courts Join the Obstruction: Rather than address these clear violations, every level of Nebraska's court system has participated in creating increasingly absurd procedural barriers: Trial courts invented non-existent prerequisites; Judges issued logically impossible rulings (simultaneous lack of jurisdiction AND failure to state a claim); The Court of Appeals invented a "second appeal" fiction to avoid reviewing the trial court's errors; Each procedural trick was timed to prevent correction within statutory deadlines. d. The Bar's Retaliation: Immediately after Plaintiff prevailed against Judge Stratman's procedural manipulations, the Nebraska bar launched an unauthorized practice of law investigation. When Plaintiff requested the complaint through FOIA, they refused based on "investigative security." Mark Weber couldn't even explain what the complaint alleged during their phone call, admitting they had no real evidence but proceeding anyway with the clear intention of harassment. 56. The depth of this institutional commitment to preventing review is best illustrated by specific examples: a. The Unserved Removal Trick: OPS attempted to remove the case to federal court without properly serving Plaintiff, hoping for a default dismissal he would never discover. When Plaintiff caught this maneuver and obtained remand, he correctly noted that OPS's failure to serve made the removal void ab initio and put them outside the 30-day window to file a motion to dismiss. Judge Dougherty's response: "I don't care about that." b. The Video Evidence: The Attorney General's false statements could be definitively disproven by 3-4 minutes of video footage - the same footage that prompted complaints from other attendees about OPS's treatment of Plaintiff and his mother. The AG's office, which spoke only to OPS and never to Plaintiff or his mother, either failed to review this readily available evidence or deliberately ignored it. c. The Hidden Opinion:

The Attorney General's office strategically kept their opinion off their public website for two years, only revealing it during litigation to ensure Plaintiff couldn't request correction within the two-year review period. 57. What began as a school district violating constitutional rights has metastasized into a multi-institutional effort to prevent any court from examining those violations on the merits. Every single procedural defense raised has either: ● Created requirements that don't exist in law; ● Applied contradictory standards that violate basic logic; ● Invented new procedures unknown to Nebraska jurisprudence; ● Been strategically timed to prevent correction; ● Resulted in retaliatory action when Plaintiff exposed the contradictions. 58. This pattern reveals a simple truth: Nebraska's institutions are so committed to protecting each other from accountability that they will sacrifice legal logic, procedural integrity, and constitutional principles rather than allow a citizen to have his day in court on the merits of clear violations. The Appeals Court's "Second Appeal" Fiction 59. The absurdity reached new heights when Plaintiff attempted to appeal Judge Dougherty's contradictory dismissal to the Nebraska Court of Appeals: a. Acceptance and docketing: The Court of Appeals initially accepted Plaintiff's

Notice of Intent to Appeal, assigned it to the docket, and accepted the filing fee - all standard procedures for processing an appeal. b. Clear statutory timeline: Nebraska law provides that the final appeal brief is due 30 days from the request of the Bill of Exceptions. Plaintiff submitted his appeal brief just one week after filing his Notice of Intent to Appeal, well within all applicable deadlines. c. The "second appeal" invention: Despite Plaintiff's Notice of Intent to Appeal clearly stating that the appeal brief would follow separately (standard practice), and despite the appeal brief being clearly labeled as such, the clerk's office rejected the brief, claiming it was somehow a "second appeal" requiring an additional filing fee. d. Logical impossibility admitted: When Plaintiff directly asked the clerk whether, had he paid this fictitious "second appeal" fee, they would have created two separate appeal panels with six different judges reviewing the same case simultaneously

- an arrangement that would violate fundamental principles of judicial economy and create obvious potential for conflicting rulings - the clerk had no answer because no such procedure exists or could exist. e. Strategic timing of rejection: The court's rejection of the appeal brief as a "second appeal" was conveniently timed to ensure that by the time Plaintiff discovered this fictional procedural barrier, any attempt to correct it would be beyond applicable deadlines, effectively forcing him to start from scratch.
60. This "second appeal" fiction represents perhaps the most brazen example of creating non-existent procedural barriers. There is no provision in Nebraska law for simultaneous appeals of the same matter, no procedure for convening two separate appellate panels

for one case, and no rational basis for treating a standard appeal brief as a new action requiring additional fees. Yet this absurd interpretation was used to prevent Plaintiff's appeal from being heard on the merits. 61. To date, Plaintiff has appeared before numerous judges in both state and federal courts regarding these public records matters, and not a single judge has been willing to apply basic logical consistency to the procedural requirements or address the merits of the underlying dispute. Even the appellate court, designed as a check on trial court errors, chose to invent a procedurally impossible "second appeal" rather than review the logical contradictions in the trial court's rulings.

61a. The Court of Appeals' "second appeal" fiction is part of a broader pattern of procedural manipulation that dates back to the Holman v. Riddle protection order case (CI21-8450). The transcript from that September 16, 2021 hearing, now part of the official record, provides critical context that demonstrates the systematic mistreatment Plaintiff has faced:

a. Selective Rule Enforcement: Dr. Holman testified under oath that she cut off Ms. Adamson's microphone because "she was showing a video and audio of an individual...no identifiable information can be shared during public comment" (p.23), not for refusing to give her address. When asked directly, "Prior to the meeting, did you properly announce the rules regarding the address aspect of the law?" Dr. Holman claimed she had, but when asked, "Specifically?" she retreated to the vaguer "I gave the rules of the meeting" (p.23). Plaintiff testified that two other

speakers immediately before him did not provide addresses yet were allowed to speak, demonstrating selective enforcement.

b. Political Speech Mischaracterized as Threats: The emails at issue in the protection order were sent to all board members, not just Dr. Holman, and concerned public education policy. The phrase "termination and leprosy" that Dr. Holman characterized as threatening was clearly political speech about removing her from office through legal means and her inability to regain public trust. Plaintiff explained during cross-examination: "Termination was an easier way of saying the inability to regain public trust ever again" (p.25). This clear political speech was mischaracterized as harassment.

c. Irrelevant Prejudicial Material: During cross-examination, Dr. Holman's counsel was permitted to introduce highly prejudicial and completely irrelevant references to Kyle Rittenhouse (p.41-43), asking "And on one of those tweet lines it was, '#KyleRittenhouse Supporters. Please do me a favor and retweet this. Not this, but the tweet I'm retweeting.'" This was a transparent attempt to associate Plaintiff with a controversial figure in the news at that time, despite the complete irrelevance to the protection order proceedings.

d. Double Standard in Evidence: The court allowed Dr. Holman to interpret Plaintiff's emails and social media posts in the most negative light possible without any supporting evidence, while subjecting Plaintiff's explanations to intense scrutiny and skepticism. For instance, when Plaintiff attempted to explain the context of his communications, Judge Dougherty repeatedly instructed him to limit himself to questions only and not provide context (p.26).

e. Predetermined Outcome: Most tellingly, at the conclusion of the hearing, Judge Dougherty stated "I'll let the Petitioner leave the courtroom. And then in a few minutes, then you will be allowed to leave" (p.46-47) - a standard practice for cases where protection orders are granted. This procedural decision was made before the judge had supposedly deliberated on the evidence, indicating a predetermined outcome.

61b. This consistent pattern of procedural manipulation - from the 2021 protection order hearing to the current appeal - demonstrates that the barriers Plaintiff has faced are not isolated incidents but part of a systematic effort to prevent meaningful review of government misconduct. When the same procedural irregularities appear across different cases, different courts, and different years, they cannot be dismissed as coincidental. Pattern of Judicial Avoidance 62. The pattern is unmistakable: When faced with the logical impossibility of the procedural requirements imposed on Plaintiff, judges have consistently: a. Created new, undefined procedural barriers ("verified petition" without specifying what verification was missing); b. Refused to examine evidence that would resolve the contradictions; c. Applied different procedural standards to Plaintiff than to institutional defendants; d. Dismissed cases using logically incompatible grounds rather than address the substantive issues; e. Attacked Plaintiff personally when he points out logical inconsistencies. 63. Most tellingly, both Judge Stratman and Judge Dougherty treated last-minute motions to dismiss as if they were written by God himself,

accepting every defense assertion without scrutiny while refusing to hear any of Plaintiff's substantive responses. This creates an absurd dynamic where judges - who have the power to control evidence, determine relevance, and guide proceedings - suddenly claim helplessness when faced with obvious defense obfuscation. 64. The situation is analogous to having Tiger Woods as your personal golf coach, but every time you explain you need to work on putting, he insists you can't practice putting until you can drive the ball 450 yards with a five wood - and even then claims uncertainty about his ability to teach putting. Judges who routinely make complex evidentiary rulings suddenly become incapable of recognizing that a public records request is exactly what it appears to be.

COMPLAINT FOR DECLARATORY JUDGMENT SECTION 4: Escalating Security Responses and Neurological Impact (¶¶ 65-77) The Escalating Security Theater: From One Officer to SWAT-Level Response 65. The pattern of institutional retaliation has reached comedic proportions in its escalation. What began as simple security escorts has evolved into what can only be described as performance art: a. Charter West Bank (2018): Called one police officer when Plaintiff tried to fix loan issue the day after discovering the checkbox error. Officer politely asked them to leave. No incident report. b. OPS Board Meeting (2024): Security escorted Plaintiff and his mother out for speaking at public comment. Next day, Department of Health and Wellness police called Plaintiff. School Resource Officer called later. Eventually obtained restraining order. Still no violence alleged. c. Lincoln Capitol: Security called immediately upon arrival. No actual trespass documentation. Pattern continues. d. Douglas County Courthouse (Multiple Visits): Escalation reaches absurd levels: ○ First visit: 12-15 officers ○ Second visit: 12-15 officers ○ Most recent visit: 12-15 officers arrive within 30 seconds of Plaintiff sitting down ○ Commander declares "if this guy comes back he's going to jail" while escorting Plaintiff out ○ Officer orders Plaintiff to "keep walking" while Plaintiff is already walking ○ Officers tell Plaintiff when to get on and off elevators, as if he's incapable of operating elevators independently e. The Remarkable Contradiction: Despite SWAT-level response with 12-15 officers, NO INCIDENT REPORTS FILED. Body cam footage exists but is denied due to "investigative security" - for incidents that officially never happened. 66. The absurdity reaches peak levels when considering that Plaintiff has NEVER been: ● Violent or threatening ● Actually trespassed with documentation ● Told he's wrong about his claims ● Given any substantive response beyond "you don't like the answers" Yet the security response escalates each time, as if Plaintiff's questions about procedural requirements constitute an increasing threat level requiring additional officers. At this rate, Plaintiff's next courthouse visit will require the National Guard, a SWAT team, and perhaps air support - all to prevent him from asking why optional procedures became mandatory. 67. Most tellingly, when Plaintiff requested body cam footage and incident reports from these encounters, he was told: ● No incident reports exist (despite 12-15 officers responding) ● Body cam footage cannot be provided due to "investigative security"

● The investigation that doesn't exist because no reports were filed still somehow prevents disclosure This represents the perfect microcosm of Nebraska's approach to transparency: deny everything, claim security exemptions for non-existent investigations, and deploy increasingly absurd levels of force to prevent citizens from pointing out the contradictions. The Courthouse

Call: A Masterclass in Institutional Evasion and Manipulation 67a. The pattern of institutional evasion, deliberate psychological manipulation, and weaponized incompetence is perfectly illustrated by Plaintiff's recorded telephone conversation with the Deputy Court Administrator on May 15, 2025 - a contemporaneous example that occurred simultaneously with the drafting of this complaint. 67b. This call, which Plaintiff has preserved in its entirety, reveals the systematic tactics deployed at every level of Nebraska's judicial system: a. Deliberate Psychological Manipulation: When Plaintiff asked the simple procedural question of whether judges must address recusal motions before ruling on other matters, the Deputy Administrator deployed escalating psychological tactics: - Initially pretending not to understand the question - Claiming she "doesn't Google" when Plaintiff offered to help her find the rule - Repeatedly stating "I don't understand" as a deflection tactic - Attempting to make Plaintiff doubt himself with "you don't understand" statements - Emphasizing her title as "Deputy Administrator" while simultaneously disclaiming any knowledge of basic court procedures b. Power Play Theater: The Deputy Administrator's emphasis on being the "deputy administrator" while simultaneously claiming no knowledge of basic court procedures exemplifies institutional theater - claiming authority when it serves to dismiss questions but disclaiming knowledge when accountability is required. c. Weaponized Incompetence: The pattern of "I don't know that answer" followed by "you need an attorney" represents classic weaponized incompetence - pretending ignorance as a strategy rather than an actual lack of knowledge. This is particularly evident when the Deputy Administrator could immediately identify and locate case documents in the system but claimed complete ignorance of procedural requirements. d. The Trap Inversion: When Plaintiff pointed out contradictions in her responses, the Deputy Administrator actually claimed the conversation itself was "absurd" - a gaslighting technique where reasonable expectations become framed as unreasonable demands. e. False Dichotomy Creation: The Deputy Administrator repeatedly characterized basic procedural questions as "legal advice" - creating a false choice between "legal advice" (which they won't give) and nothing at all, when procedural guidance is clearly neither legal advice nor nothing.

f. Complete ADA Dismissal: Most tellingly, when Plaintiff explicitly identified his ADHD disability and explained that contradictory procedure creates a neurological barrier for him, the Deputy Administrator completely dismissed this accommodation need, reverting immediately to "you need an attorney" - demonstrating the system's complete inability to even comprehend neurological accommodation requirements. 67c. The call ended with the Deputy Administrator hanging up - precisely the phone equivalent of calling security rather than addressing logical contradictions, confirming the pattern extends through every form of interaction with the court system. 67d. This contemporaneous evidence is particularly valuable as it demonstrates these are not isolated incidents but ongoing institutional patterns that continue to the present day. The Deputy Administrator's complete inability to answer whether judges must address recusal motions - perhaps the most basic procedural question imaginable - while simultaneously being able to immediately locate and reference specific case documents demonstrates this is willful evasion rather than genuine ignorance. The ADHD Neurological Response & Impact 68. To fully understand the situation, it's crucial to consider what it's like for Plaintiff – someone who takes 25,000 steps daily even when confined to his living room due to his need to pace constantly,

someone who is excitable by design. Plaintiff must exert extraordinary effort to sit quietly and avoid sudden movements just to get a basic question asked in these official settings. Yet even this deliberate self-restraint proves futile. 69. The system effectively takes someone who is deliberately trying his best to hold back psychologically – suppressing the normal tendencies that accompany his ADHD just to navigate the basic functions of government – and then introduces armed security officers that dramatically heighten the tension of the situation. Officials then express outrage when Plaintiff's voice becomes louder than it was initially, though never reaching the level of shouting. 70. There exists a profound difference between speaking in a loud or commanding voice versus actually shouting at someone, even quietly. An excited voice responding to an increasingly tense situation created by security presence is fundamentally different from aggressive communication, yet officials deliberately conflate these distinctions to justify escalating security responses. 71. If the state's implied assertion about Plaintiff is true – that he alone among Nebraska citizens possesses the legal acumen to identify procedural contradictions that evade hundreds of trained professionals – this would constitute a remarkable compliment rather than grounds for security escorts. In essence, officials are suggesting that Plaintiff possesses a legal mind so exceptional that he has identified what countless judges, clerks, and attorneys have missed. Such extraordinary analytical capability might better qualify him for a judicial appointment than security removal. 72. The pattern of refusing to acknowledge admitted errors while escalating security responses rather than addressing factual inconsistencies mirrors troubling historical precedents in the justice system. Consider the case of Carlos DeLuna, where an unwillingness by the state to reverse course despite overwhelming evidence of innocence resulted in an execution. Officials knew they had the wrong person but maintained their position because of institutional commitment to earlier decisions. The parallel is clear: when institutions commit to a position, even demonstrably false ones, they will deploy increasingly drastic measures to avoid acknowledging error. The Consecutive Chain of Due Process Violations: An Alphabetical Catalog of Absurdity 73. To crystallize the absurdity of Plaintiff's treatment, consider this unbroken chain of procedural violations - not isolated mistakes, but a perfect record where literally everything that could go wrong did go wrong, and every single protection that should exist was violated: a. OPS files motion to dismiss the NIGHT BEFORE the hearing (Stratman) - VIOLATION b. Judge accepts this filing despite 5-7 day rule - VIOLATION c. Judge refuses to look at Plaintiff's evidence (Exhibit 5) - VIOLATION d. OPS removes to federal court WITHOUT SERVING PLAINTIFF - VIOLATION e. Federal court remands as void ab initio - yet Judge doesn't care - VIOLATION f. OPS files another motion to dismiss 48 HOURS before hearing (Dougherty) - VIOLATION g. Judge accepts this filing despite 5-7 day rule - VIOLATION h. Judge tells Plaintiff "No objections" when defense speaks - VIOLATION i. Defense makes false statements about Plaintiff being security threat - VIOLATION j. Judge dismisses for BOTH lack of jurisdiction AND failure to state claim - VIOLATION k. Judge ignores properly filed motion to recuse - VIOLATION l. Plaintiff files appeal, court acknowledges it - NO VIOLATION (yet) m. Clerk rejects appeal brief as "second appeal" despite court order - VIOLATION n. Clerk keeps filing fee while providing no service - VIOLATION o. AG publishes false statements, admits they're false, refuses correction - VIOLATION p. AG hides opinion from website for 2 years to prevent correction request - VIOLATION q. Supreme Court denies

mandamus without explanation after AG review - VIOLATION r. Supreme Court keeps $100 filing fee for service not provided - VIOLATION s. Security called every time Plaintiff asks for clarification - VIOLATION t. Bar launches retaliatory UPL investigation after Stratman hearing - VIOLATION u. Bar refuses FOIA request citing "investigative security" - VIOLATION v. Mark Weber can't explain the UPL complaint but proceeds anyway - VIOLATION w. OPS serves 100+ pages of solid black redactions with no descriptions - VIOLATION x. 12-15 officers deployed for asking procedural questions - VIOLATION y. Commander threatens jail time but files no report - VIOLATION z. Body cam footage denied for "investigative security" on non-existent investigation - VIOLATION aa. Officers tell walking person to "keep walking" - VIOLATION (of common sense) bb. Elevator operation instructions given to competent adult - VIOLATION (of dignity) cc. Zero

incident reports despite SWAT-level responses - VIOLATION dd. Charter West calls police for attempted loan correction - VIOLATION ee. OPS obtains restraining order for attending public meetings - VIOLATION ff. Every AG opinion 2022-2025 (185-0) favors agencies over citizens - VIOLATION (of statistics) gg. Courts require both "optional" prerequisites that cancel each other out - VIOLATION (of logic) hh. Judges claim helplessness against obviously false defense claims - VIOLATION ii. Federal court revokes CM/ECF filing access in retaliation - VIOLATION jj. No written trespass notices despite repeated security incidents - VIOLATION

73a. It must be emphasized that this already lengthy list represents merely a fraction—perhaps less than half—of the total documented incidents Plaintiff has experienced. Due to space constraints, this complaint cannot possibly catalog the full extent of procedural violations, administrative obstruction, and coordinated retaliation Plaintiff has encountered. For every incident explicitly documented here, multiple additional incidents exist with supporting evidence. Plaintiff could easily produce another 30+ pages detailing similarly egregious violations, each supported by recordings, emails, transcripts, or other documentary evidence. This complaint therefore should be understood as illustrative rather than exhaustive, highlighting representative examples of a much larger pattern of systemic dysfunction and deliberate obstruction. 74. This is not cherry-picking or exaggeration - this is EVERY SINGLE PROCEDURAL POINT in the case. The statistical impossibility of this occurring by chance defies calculation. When slot machines can be defendants in Nebraska courts, when God himself can be sued (Chambers v. God), but a citizen cannot obtain simple public records containing his own name without experiencing EVERY POSSIBLE VIOLATION, the system isn't broken - it's operating exactly as designed, just not as advertised. 75. Consider the credentials: Plaintiff accomplished something NO ONE in legal history has ever done - not in Nebraska, not in America, not anywhere. He successfully acquired and retained a functioning bank's domain name (www.charterwestbank.com) through litigation. This isn't like the Nissan case where someone owned a domain before the internet exploded - Plaintiff went out and bought Charter West Bank's exact name with "bank" added, fought them through every court level (losing in state court, federal court, Nebraska Court of Appeals, and the 8th Circuit), and finally won in the Nebraska Supreme Court. He defeated not just the bank but the Department of Banking, Federal Reserve of Kansas City, the Attorney General, and multiple judges who all supported the bank. The bank's failure to check one checkbox on one document - which Plaintiff identified dozens of

times to dozens of people who all covered for the bank - created the circular validation of corruption where each agency cited the others as proof they were right. No other person has EVER done this with an active financial institution. Yet this same person - who achieved the legally impossible - supposedly cannot properly file a simple request for public records containing his own name? 76. The contrast is stark: When fighting a bank over a website, every procedural protection eventually worked (after losing at every level below the Supreme Court). When seeking public records about himself from a school district, every single procedural protection mysteriously fails. This is not incompetence - it is coordinated obstruction. As Plaintiff noted: imagine a lifeguard choosing not to save someone because they went in the deep end without an inner tube. These judges have the tools, knowledge, and duty to ensure fair proceedings, yet they systematically refuse to use them - but only in Plaintiff's cases. 77. The Attorney General's perfect record against citizens is perhaps the most statistically improbable element of this entire pattern. In reviewing all published Attorney General opinions from 2022, 2023, 2024, and 2025 to date - spanning over 185 decisions - not a single one favored a records requester. ZERO. This statistical impossibility reveals a

systematic approach: when citizens request both primary and secondary items, the AG grants only the lesser request. Request payroll records (primary) and lunch schedules (secondary)? Get the lunch schedule. Request lunch schedules (primary) and payroll records (secondary)? Get the payroll records. The game is rigged to ensure citizens never receive what they actually seek.

83a. Plaintiff's approach to ADHD accommodation represents a fundamental paradigm shift in understanding judicial fairness through the lens of disability accommodation that merits detailed examination:

a. Redefining "Access to Justice": While traditional ADA accommodations in courts focus on physical access (wheelchair ramps, elevators) or communication barriers (sign language interpreters, Braille documents), Plaintiff's case expands this to include cognitive/neurological access - the fundamental ability to comprehend and navigate logically consistent procedures. The brain of a person with ADHD, particularly Plaintiff's manifestation, creates a neurological imperative to resolve logical contradictions before proceeding. When presented with mutually exclusive requirements (such as needing both AG review and mandamus when one prevents the other), this creates a uniquely insurmountable barrier that neurotypical individuals might simply accept as bureaucratic frustration.

b. Documented Medical Necessity: Plaintiff has been diagnosed with ADHD by medical professionals for over 24 years, with 12-13 years of consistent treatment by the same physician who can attest to the specific impact of logical inconsistencies on Plaintiff's neurological functioning. This is not a convenience preference but a documented medical necessity that directly impacts Plaintiff's ability to access court services on equal footing with neurotypical individuals.

c. Exposing the "Hidden Curriculum": The legal system operates on unwritten rules where procedural contradictions are expected to be tolerated and navigated without question. For example, when Deputy Administrator Anne Borer stated on May 15, 2025, that she "can't answer" whether judges must address recusal motions before proceeding with cases, she demonstrated the expectation that litigants should somehow intuitively understand when published rules don't apply. This "hidden curriculum" inherently discriminates against neurodivergent individuals whose brains literally cannot process such contradictions.

d. Objective Metrics for Accommodation: By focusing on logical consistency as an accommodation need, Plaintiff has created an objective measure for judicial behavior that's harder to dismiss than subjective accommodations. Either the judge addressed the recusal motion before ruling on the merits (consistent) or did not (inconsistent). Either the Court of Appeals can explain how one case can have two simultaneous appeals (consistent) or it cannot (inconsistent). This provides clear, measurable standards for the requested accommodation.

e. Equal Access, Not Special Treatment: Plaintiff is not requesting special treatment or exemption from valid rules - only that existing rules be applied consistently and logically as written. The ADA does not require creating new advantages for disabled individuals, only removing barriers that prevent equal access. The barrier in this case is procedural inconsistency that neurotypical individuals may find frustrating but that creates a literal neurological roadblock for Plaintiff.

83b. This framework is supported by direct evidence of discrimination in the May 15, 2025 call with Deputy Administrator Anne Borer. When Plaintiff explicitly identified his disability and its impact ("This is my disability... I keep getting jumped by cops as soon as I walk in"), Borer's response was to tell him to "speak with an attorney" rather than provide the procedural clarity that would constitute a reasonable accommodation. This dismissal of explicitly requested accommodation represents precisely the type of failure to accommodate that the ADA was designed to remedy.

83c. The requested accommodation - logical procedural consistency - is inherently reasonable. It requires no expenditure of funds, no modification of facilities, and no specialized equipment. It merely requires that court officials apply their own published rules consistently and provide clear explanations when apparent contradictions arise. If anything, this accommodation would benefit all litigants by improving the transparency and fairness of the judicial system as a whole.

83d. The direct nexus between Plaintiff's disability and the requested accommodation is clearly established through the detailed explanation of how ADHD affects logical processing. As Plaintiff explained to Crystal on May 8, 2025: "I keep pointing out the logical impossibility of what the defense says and the judges just accept it... For somebody with my form of ADHD, being told they must satisfy two requirements while simultaneously being prevented from satisfying both is akin to being instructed to exit a room throughCOMPLAINT FOR DECLARATORY JUDGMENT SECTION 5: Neurological Impact and Progression (¶¶ 78-90) The Neurological Trap: Why Plaintiff Cannot Simply "Move On" 78. To understand why this case must be resolved, the Court

must grasp the psychological torture inherent in what Defendants have created. Most citizens encounter bureaucratic obstruction and abandon their claims after two or three levels of resistance. But for someone with Plaintiff's neurological makeup - the same trait that enabled him to achieve what no one else ever has - walking away is literally impossible. 79. Consider Plaintiff's situation through the lens of someone at an advantage-play slot machine with their last $300. They recognize the patterns, know the older machine's algorithm, see the full coin buckets indicating an imminent payout. Now imagine the machine's buttons are broken - one sticks, another doesn't work, each spin takes two minutes instead of seconds. A neurotypical person might cut their losses and try another machine. But someone who KNOWS the system, who achieved the impossible by understanding patterns others miss, cannot logically abandon what they know is right. 80. This creates a devastating compound effect: a. The Sunk Cost Trap: After months of lies and changing rules, how can Plaintiff ever trust the system enough to file any future lawsuit? If procedures change mid-stream, if judges ignore black-letter law, if clerks invent fictional requirements - the entire concept of "justice system" becomes meaningless. b. The Logical Impossibility: Plaintiff's ADHD creates a neurological imperative to resolve contradictions. When told "you need A and B" but "A prevents B," his brain cannot simply accept this and move on. It's not stubbornness - it's how his neural pathways function. c. The Future Implications: Until these procedural questions are definitively answered, Plaintiff is trapped. How can he ever seek justice on ANY matter if the rules themselves are unknowable and change based on his identity?

81. The cruelest part is the deliberate exploitation of Plaintiff's disability. They've discovered that someone who won't accept illogical answers can be tortured indefinitely by simply providing illogical answers. Each two-week delay, each new excuse, each shifted goalpost isn't just obstruction - it's targeted harassment of someone whose brain cannot process such contradictions.

82. This isn't about public records anymore. It's about whether Nebraska's justice system has any fixed rules at all, or whether it operates on pure whim when certain citizens seek access. For Plaintiff, abandoning this case would mean accepting that the law itself is meaningless - a psychological impossibility for someone whose greatest achievement came from understanding and applying the law when everyone said it couldn't be done.

83. Consider this parallel: If law enforcement was deployed every time a wheelchair user visited the newly remodeled clerk's office and mentioned the counters were six inches too high - if they said "we'll address it," then called security when the person returned a month later to find nothing changed - the discrimination would be obvious. Yet this is precisely what happens when Plaintiff's neurological need for logical consistency is met not with clarification but with armed guards. The Revolutionary ADA Framework: Redefining Access to Justice 83a. Plaintiff's approach to ADHD accommodation represents a fundamental paradigm shift in understanding judicial fairness through the lens of disability accommodation that merits detailed examination:

a. Redefining "Access to Justice": While traditional ADA accommodations in courts focus on physical access (wheelchair ramps, elevators) or communication barriers (sign language

interpreters, Braille documents), Plaintiff's case expands this to include cognitive/neurological access - the fundamental ability to comprehend and navigate logically consistent procedures. The brain of a person with ADHD, particularly Plaintiff's manifestation, creates a neurological imperative to resolve logical contradictions before proceeding. When presented with mutually exclusive requirements (such as needing both AG review and mandamus when one prevents the other), this creates a uniquely insurmountable barrier that neurotypical individuals might simply accept as bureaucratic frustration.

b. Documented Medical Necessity: Plaintiff has been diagnosed with ADHD by medical professionals for over 24 years, with 12-13 years of consistent treatment by the same physician who can attest to the specific impact of logical inconsistencies on Plaintiff's neurological functioning. This is not a convenience preference but a documented medical necessity that directly impacts Plaintiff's ability to access court services on equal footing with neurotypical individuals.

c. Exposing the "Hidden Curriculum": The legal system operates on unwritten rules where procedural contradictions are expected to be tolerated and navigated without question. For example, when Deputy Administrator Anne Borer stated on May 15, 2025, that she "can't answer" whether judges must address recusal motions before proceeding with cases, she demonstrated the expectation that litigants should somehow intuitively understand when published rules don't apply. This "hidden curriculum" inherently discriminates against neurodivergent individuals whose brains literally cannot process such contradictions.

d. Objective Metrics for Accommodation: By focusing on logical consistency as an accommodation need, Plaintiff has created an objective measure for judicial behavior that's harder to dismiss than subjective accommodations. Either the judge addressed the recusal motion before ruling on the merits (consistent) or did not (inconsistent). Either the Court of Appeals can explain how one case can have two simultaneous appeals (consistent) or it cannot (inconsistent). This provides clear, measurable standards for the requested accommodation.

e. Equal Access, Not Special Treatment: Plaintiff is not requesting special treatment or exemption from valid rules - only that existing rules be applied consistently and logically as written. The ADA does not require creating new advantages for disabled individuals, only removing barriers that prevent equal access. The barrier in this case is procedural inconsistency that neurotypical individuals may find frustrating but that creates a literal neurological roadblock for Plaintiff.

83b. This framework is supported by direct evidence of discrimination in the May 15, 2025 call with Deputy Administrator Anne Borer. When Plaintiff explicitly identified his disability and its impact ("This is my disability... I keep getting jumped by cops as soon as I walk in"), Borer's response was to tell him to "speak with an attorney" rather than provide the procedural clarity that would constitute a reasonable accommodation. This dismissal of explicitly requested accommodation represents precisely the type of failure to accommodate that the ADA was designed to remedy.

83c. The requested accommodation - logical procedural consistency - is inherently reasonable. It requires no expenditure of funds, no modification of facilities, and no specialized equipment. It merely requires that court officials apply their own published rules consistently and provide clear explanations when apparent contradictions arise. If anything, this accommodation would benefit all litigants by improving the transparency and fairness of the judicial system as a whole.

83d. The direct nexus between Plaintiff's disability and the requested accommodation is clearly established through the detailed explanation of how ADHD affects logical processing. As Plaintiff explained to Crystal on May 8, 2025: "I keep pointing out the logical impossibility of what the defense says and the judges just accept it... For somebody with my form of ADHD, being told they must satisfy two requirements while simultaneously being prevented from satisfying both is akin to being instructed to exit a room through a doorway while being told the doorway doesn't exist."

83e. This case therefore represents not merely a complaint about procedural irregularities, but a fundamental ADA claim about equal access to justice for neurodivergent individuals. The requested accommodations would allow Plaintiff to navigate the court system with the same access as neurotypical individuals rather than facing the uniquely insurmountable barriers created by logical contradictions and unexplained procedural inconsistencies. this framework - as evidenced by the Deputy Administrator's dismissal of Plaintiff's explicit accommodation request during their May 15th call - demonstrates how novel and potentially disruptive this approach is to institutional power structures that rely on contradiction and obfuscation as control mechanisms. The "Most Frustrating Person" Advantage 83d. Plaintiff acknowledges that he likely is the most frustrating individual Nebraska's judicial system has encountered - but not for the reasons they claim. What makes him uniquely frustrating to the system is precisely what makes this case both possible and necessary: a. Persistent Beyond Expectations: Where most citizens give up after the first "I can't answer that" or "you need an attorney," Plaintiff's ADHD creates a neurological imperative to resolve contradictions that makes him persistently pursue clarity beyond normal tolerance levels. b. Pattern Recognition Abilities: The same ADHD traits that create difficulty with logical contradictions also enable exceptional pattern recognition - allowing Plaintiff to identify systemic manipulation tactics that most citizens miss. c. Comprehensive Documentation: Plaintiff's thorough documentation of every interaction (recordings, transcripts, exhibits) creates accountability that the system is not designed to handle. d. Precedent-Setting Success: Having achieved what no other person in global legal history has accomplished (acquiring and retaining a major financial institution's domain through litigation), Plaintiff brings credibility and demonstrated legal competence that cannot be easily dismissed. e. Neurological Immunity to Gaslighting: Plaintiff's ADHD creates a unique neurological immunity to the gaslighting tactics the system relies upon - he literally cannot "just accept" logical contradictions that neurotypical individuals might reluctantly tolerate. 83e. These traits create a perfect storm for exposing systemic manipulation: Plaintiff is knowledgeable enough to ask the right questions, persistent enough not to be brushed off, articulate enough to highlight contradictions, and equipped with a neurological need for logical consistency that makes typical evasion tactics ineffective.

83f. If the state's implied assertion about Plaintiff is true - that he alone among Nebraska citizens possesses the legal acumen to identify procedural contradictions that evade hundreds of trained professionals including judges, clerks, and attorneys - this would constitute a remarkable compliment rather than grounds for security escorts. The logical conclusion of the state's position is that Plaintiff is the most legally brilliant mind Nebraska has produced - a position that would better justify a judicial appointment than security removal. The Natural Progression: When All Else Fails 84. Having exhausted every procedural trick, every security escalation, and every institutional barrier, Nebraska's system faces a simple reality: nothing has stopped Plaintiff from documenting and exposing these violations. Consider the progression: ● Procedural games failed (Plaintiff navigated them all) ● False AG opinions failed (Plaintiff proved them false) ● Court dismissals failed (Plaintiff kept filing) ● Security intimidation failed (Plaintiff remained calm) ● Bar retaliation failed (Plaintiff documented it) ● 12-15 officer responses failed (Plaintiff filmed it) What remains in the institutional playbook when a citizen refuses to accept lies, documents everything, and achieves what no one else has (defeating a bank at the Supreme Court for their domain name)? 85. History suggests the next escalation follows a predictable pattern. When legal systems exhaust all quasi-legitimate means of silencing critics, darker options emerge. Plaintiff notes this not from paranoia but from pattern recognition - the same skill that allowed him to see through Charter West Bank's deception when every judge and agency said he was wrong. 86. This Court now sits at a crossroads. Either: a. The rule of law means something, and clear answers to simple questions can be provided; or b. The system admits that its rules are merely suggestions, applied arbitrarily based on who's asking. If option (b), then this Court effectively signs Plaintiff's death warrant by judicial decree - acknowledging that when lies, procedures, security theater, and intimidation all fail, only one option remains for silencing those who document institutional corruption. History is littered with examples of what happens to those who effectively expose systemic failures. Plaintiff respectfully suggests the Court choose option (a). The Prediction Challenge: A Test of Institutional Integrity 86a. Plaintiff offers a specific, testable prediction that will further validate the pattern alleged throughout this complaint: If this case somehow overcomes all current procedural barriers and begins moving toward substantive review of the underlying public records denial, Nebraska's judicial system will create an entirely new, never-before-seen procedural barrier that applies uniquely to this case.

86b. This prediction is not based on paranoia but on the clear pattern documented throughout this complaint. Each time Plaintiff navigates past one impossible barrier, a new one emerges - each more creative than the last, each applied only to Plaintiff, each contradicting basic legal principles. 86c. The Court now faces a simple choice that will test its institutional integrity: a. Follow existing law and procedure as written, providing the simple declarations requested; or b. Create yet another special exception that applies only to Plaintiff, thereby proving his core allegation that Nebraska's judicial system operates on a distinct set of rules when Justin Riddle is the plaintiff. 86d. This creates a "heads Plaintiff wins, tails the system loses" scenario: Either Plaintiff receives the straightforward declarations that law requires (fulfilling the court's proper function), or the system creates yet another barrier and thereby proves Plaintiff's allegations about systematic manipulation of procedure to prevent accountability. 86e. The ultimate test of this prediction will be what happens next: Will this Court actually provide straightforward

answers to straightforward questions about procedure? Or will it invent some novel reason - one never before seen in Nebraska jurisprudence - why these simple questions somehow cannot be answered? Request for Assignment to an Unbiased Judge 87. Plaintiff requests this matter be assigned to a judge who: a. Has not previously handled any of Plaintiff's cases; b. Has no collegial relationship or regular interaction with Judges Stratman or Dougherty; c. Is willing to address logical contradictions rather than create new procedural barriers to avoid them; d. Understands that asking questions about procedure doesn't require tactical response teams. 88. Plaintiff's disability-related need for logical consistency in procedural matters constitutes a reasonable accommodation under the ADA. Assigning this case to a judge who has already demonstrated an inability or unwillingness to provide such consistency would constitute a failure to accommodate and would perpetuate the discrimination Plaintiff has experienced. The Assignment Test: A Litmus Test for Systemic Bias 89. The Court's decision on judicial assignment itself becomes a critical piece of evidence in this case. If this matter is assigned to Judge Dougherty, Judge Stratman, or any other judge Plaintiff has previously appeared before, that assignment becomes proof positive of the systemic bias alleged throughout this complaint. 89a. This creates another testable hypothesis: If Nebraska's judicial system operates on neutral principles applied equally to all litigants, this matter will be assigned to a judge with no prior

interaction with Plaintiff. If, however, the system is functioning as Plaintiff alleges - with special rules applied only to him - then the case will somehow find its way back to a judge who has already demonstrated hostility. 89b. The Court thus faces another binary choice: Either assign this matter to a truly neutral judge (demonstrating commitment to fairness and neutrality), or assign it to a previously-involved judge (proving Plaintiff's core allegations about systemic manipulation). There is no third option that maintains both the appearance of neutrality and the practical outcome of control. 90. For Plaintiff's personal safety and for the integrity of the judicial system, this case must be heard by someone untainted by prior institutional bias against him - someone with both the independence and courage to address obvious procedural contradictions regardless of their implications for other judicial officers.

COMPLAINT FOR DECLARATORY JUDGMENT SECTION 6: Legal Arguments and Relief (¶¶ 92-120) 91. The Court is now fully apprised of the extraordinary procedural maze Plaintiff has been forced to navigate - a maze that exists only for him. Every question posed in paragraph 2 of this complaint has been answered one way by Nebraska's courts when applied to Plaintiff, and the opposite way for every other litigant in the state. 92. To summarize the absurdities documented herein: ● Judges dismiss cases for both lack of jurisdiction AND merits simultaneously (only for Plaintiff) ● Required recusal motions are completely ignored without acknowledgment (only for Plaintiff) ● Appeal briefs become "second appeals" requiring additional fees (only for Plaintiff) ● "Void ab initio" doesn't matter (only for Plaintiff) ● 14-hour notice requirements disappear (only for Plaintiff) ● Optional statutory alternatives become dual mandatory prerequisites (only for Plaintiff) ● The Attorney General can publish lies without correction (only about Plaintiff) ● Security removes citizens asking questions (only Plaintiff) ● Federal courts revoke filing access in retaliation (only for Plaintiff) ● The bar launches

retaliatory investigations without real complaints (only against Plaintiff) 93. Plaintiff has provided documentary evidence, including:

● The Court of Appeals order acknowledging his brief was due February 26th, yet claiming the January 21st filing was a "second appeal" ● Video evidence proving the Attorney General's published statements were false ● Transcripts showing judges making contradictory rulings ● Records of security being called for asking procedural questions ● Audio recording of Mark Weber admitting no real UPL complaint exists 94. This is not hyperbole or paranoia - it is the documented reality of Plaintiff's experience in Nebraska's justice system. When slot machines can be defendants in Nebraska courts and God himself can be sued, but a citizen cannot obtain simple public records bearing his own name without navigating impossible procedural requirements, the system has clearly broken down. 95. Plaintiff seeks nothing more than what every other citizen receives: clear, consistent application of published laws and procedures. The questions posed at the beginning of this complaint should have straightforward answers that apply equally to all litigants. If they do not - if there truly is one set of rules for everyone else and another for Justin Riddle - then this Court should declare that reality so Plaintiff can at least know what game he's being forced to play. 96. For Plaintiff, this case represents an existential question: Do laws have meaning, or are they merely suggestions that change based on who's asking? His ADHD makes it neurologically impossible to accept the latter. The same trait that enabled him to see patterns others missed and achieve what no one else ever has - defeating a bank at the Supreme Court after losing at every lower level and becoming the ONLY person in global legal history to acquire and retain a major financial institution's domain name - now traps him in a system that punishes logical thinking. Until these questions are answered, he remains in procedural purgatory - unable to access justice on any matter because the rules themselves are unknowable. 97. This Court has the power to end this Kafkaesque nightmare with simple declarations about what the law actually requires. Plaintiff has waited years for these answers, enduring retaliation and harassment for the crime of expecting consistency. The time has come for Nebraska's justice system to either affirm that its rules apply equally to all, or acknowledge that Justin Riddle exists in a parallel legal universe where words mean their opposites and logic itself is suspended. 98. Make no mistake: This is a historic filing. When future law students study judicial corruption, procedural absurdity, and systematic denial of rights, they will read this document and ask, "How did it get this bad?" The Court now chooses whether this case becomes a cautionary tale of judicial cowardice or a turning point toward actual justice. Either Nebraska has laws that mean something, or it has elaborate theater pretending to be law. There is no middle ground.

99. And to be crystal clear about the stakes: If this Court joins the parade of institutions that have twisted logic to deny Plaintiff's rights, it effectively declares that the only remaining remedy for institutional corruption is whatever desperate measures citizens devise when all legal avenues are exhausted. History teaches us where that path leads. The Court would do well to choose wisely. CAUSE OF ACTION: DECLARATORY JUDGMENT

100.    Plaintiff realleges and incorporates by reference paragraphs 1 through 99 as if fully set forth herein.

101.    Pursuant to the Nebraska Uniform Declaratory Judgments Act, Neb. Rev. Stat. §
25-21,149, this Court has the power to declare rights, status, and other legal relations
whether or not further relief is or could be claimed.

102.    Neb. Rev. Stat. § 25-21,150 specifically provides that any person whose rights, status,
or other legal relations are affected by a statute may have determined any question of
construction or validity arising under the statute and obtain a declaration of rights, status,
or other legal relations thereunder.

103.    A justiciable controversy exists regarding the proper interpretation of Neb. Rev. Stat.
§ 84-712.03 and the procedural requirements for accessing courts to enforce public
records rights. This is not an academic question, but a real barrier to justice that Plaintiff
has encountered while trying in good faith to follow all stated requirements.

104.    This controversy is not academic or theoretical, but has direct, immediate, and
substantial impact on Plaintiff's ability to exercise his statutory rights to public records.

105.    Specifically, the Court's determination of the following questions is necessary to
resolve this controversy: a. Whether Nebraska law requires a citizen to obtain a writ of
mandamus before filing a civil action for public records; b. Whether Nebraska law
requires a citizen to receive a prior review or determination from the Nebraska Attorney
General's Office before filing such an action; c. Whether these requirements are
alternatives that a citizen "may elect" to pursue (as the statute states) rather than
mandatory prerequisites; d. If such requirements do exist despite the statutory language,
what remedies are available to citizens when the institutions responsible for these
prerequisites refuse to process them properly or create contradictory barriers to their
satisfaction? e. Whether the imposition of unique, logically inconsistent procedural
barriers that particularly impact Plaintiff's disability-related needs constitutes
discrimination in access to the courts; f. Whether Nebraska procedural law permits two
simultaneous appeals of the same matter with two different appellate panels, or whether
characterizing a timely-filed appeal brief as a "second appeal" requiring additional fees
constitutes an improper procedural barrier; g. Whether retaliatory bar investigations

launched without real complaints violate due process and First Amendment rights; h. Whether
the systematic pattern of procedural violations documented herein constitutes a denial of equal
protection under the law. 106. Notwithstanding the foregoing, the paradoxical concatenation of
procedurally antecedent prerequisites, when viewed through the prism of quasi-jurisdictional
preclusion doctrines, reveals an epistemological lacuna wherein the putative mandamus
requirement operates as both condition precedent and condition subsequent to the Attorney
General's determinative review, thereby creating a temporal impossibility that violates the
fundamental principles of causality as embodied in the ex ante/ex post dichotomy inherent in
Anglo-American jurisprudence, while simultaneously invoking the doctrine of impossibilium
nulla obligatio est in a manner that renders the entire procedural framework ultra vires ab initio,
particularly when considered in light of the principle that lex non cogit ad impossibilia and the
corollary maxim that actus curiae neminem gravabit, which collectively mandate that courts
cannot impose mutually exclusive obligations that create a logical antinomy resulting in the
nullification of substantive rights through procedural legerdemain, especially where such

requirements constitute a de facto abrogation of the fundamental right of access to courts as guaranteed by both procedural due process and the ancient writ of right, thus transforming what should be permissive statutory alternatives into compulsory Sisyphean prerequisites that violate the very essence of ordered liberty. The Perfect Logical Trap: A Legal Checkmate 106a. Plaintiff's framing of procedural requirements as disability accommodation needs creates a perfect logical trap that leaves the judicial system with no viable escape route: a. Option 1 - Provide Logical Consistency: If the Court acknowledges Plaintiff's accommodation needs and provides the logical consistency required by the ADA, it must necessarily declare that: - Recusal motions must be addressed before merits decisions - Cases cannot be dismissed simultaneously for lack of jurisdiction AND failure to state a claim - The statutory "may elect to" language in Neb. Rev. Stat. § 84-712.03 means options are alternatives, not requirements - Appeal briefs cannot become "second appeals" requiring additional fees - Courts cannot enforce mutually exclusive procedural prerequisites Such declarations would effectively acknowledge that everything done to Plaintiff violated clear procedural rules - exposing the system's previous dishonesty. b. Option 2 - Deny Accommodation: If the Court refuses to provide the logical consistency Plaintiff's ADHD requires, it creates clear ADA violations by: - Knowingly imposing barriers that specifically target Plaintiff's disability - Refusing reasonable accommodations despite well-documented disability needs - Maintaining procedural contradictions that create unique

barriers for neurodivergent individuals - Applying heightened and contradictory standards based on disability status Such denial would transform this procedural maze from merely unfair to actively discriminatory under federal disability law. 106b. Unlike previous procedural maneuvers, this trap cannot be escaped through normal evasion tactics. There is no third option that allows the Court to maintain both the previous pattern of contradictions AND avoid ADA liability. The system must either acknowledge its previous errors or compound them with federally actionable discrimination. 106c. This represents the ultimate checkmate in a system designed to be impenetrable to citizen oversight. By framing logical consistency as a disability accommodation, Plaintiff has created the one scenario where the courts cannot simply create new rules or dismiss the complaint on procedural grounds without digging a deeper legal hole. 106d. Should this Court attempt to find some previously unseen third option - some novel legal theory that has never before existed in Nebraska jurisprudence but conveniently materializes to avoid this binary choice - such creativity would itself validate Plaintiff's core allegation that Nebraska's judicial system operates on distinct rules when he is the plaintiff. 107. This action serves the useful purpose of clarifying and settling the legal relations at issue and will afford relief from uncertainty and controversy. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant, and grant the following relief:

107.    A declaratory judgment that under Nebraska law, specifically Neb. Rev. Stat. § 84-712.03, the options to (1) file for a writ of mandamus or (2) petition the Nebraska Attorney General for review are alternative remedies that a citizen "may elect" to pursue, not mandatory prerequisites that must be satisfied before filing a civil action to enforce

public records rights.

108.     A declaratory judgment that a judge must address a properly filed motion for recusal before proceeding to rule on any other matters in a case, and that failure to do so constitutes a procedural error.

109.     A declaratory judgment that a court cannot simultaneously dismiss a case for both "lack of jurisdiction" and "failure to state a claim" as these are logically incompatible grounds for dismissal - the former indicating the court lacks power to hear the case at all, while the latter constitutes a ruling on the merits that inherently requires jurisdiction.

110.     A declaratory judgment that an appeal brief submitted within the court-ordered deadline for an already-accepted Notice of Intent to Appeal cannot be rejected as a "second appeal" requiring additional fees, as such treatment creates an impossible procedural barrier.

111.     A declaratory judgment acknowledging that requiring simultaneous satisfaction of mutually exclusive procedural prerequisites creates an insurmountable barrier for Plaintiff due to his disability, as his ADHD neurologically prevents him from processing and accepting logical impossibilities without resolution, and that clear, consistent procedural requirements constitute a reasonable accommodation under the Americans with Disabilities Act.

112.     A declaration that Plaintiff has made good faith efforts to satisfy any purported procedural requirements and should be permitted to proceed with his public records action on the merits.

113.     A declaration that public records requests must be treated uniformly regardless of requestor identity, and that charging different fees or providing different levels of access to the same records based solely on who is requesting constitutes a violation of the Nebraska Public Records Law.

114.     An order that this matter be assigned to a judge who has not previously presided over any of Plaintiff's cases and who has no regular collegial interaction with Judges Stratman or Dougherty, as assignment to a previously involved judge would perpetuate the discrimination Plaintiff has experienced and constitute a failure to provide reasonable accommodation under the ADA.

115.     An order that this matter be immediately scheduled for hearing and decision within fifteen calendar days pursuant to Neb. Rev. Stat. § 84-712.03.

116.    Costs of this action as allowed by law.

117.    Such other and further relief as this Court deems just and proper.


Respectfully submitted this _____ day of _____, 2025.

Justin Riddle, Pro Se 402-813-2156 Justinriddle1@gmail.com Respectfully submitted this _____ day of _____, 2025. Justin Riddle, Pro Se 402-813-2156 Justinriddle1@gmail.com

VERIFICATION STATE OF NEBRASKA ) ) ss. COUNTY OF DOUGLAS ) I, Justin Riddle, depose and state that I am the Plaintiff in the above-entitled action, that I have read the foregoing Complaint for Declaratory Judgment and know the contents thereof, and that the statements contained therein are true to the best of my knowledge, information, and belief. Justin Riddle