# UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS AUSTIN DIVISION

JUSTIN RIDDLE,

 Plaintiff,

v. Civil Action No. 1:25-CV-0073

X CORP. (Formerly Twitter, Inc.),

 Defendant.

# PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO EMERGENCY MOTIONS

## INTRODUCTION

Defendant X Corp's opposition to Plaintiff's Emergency Motions and Motion to Dismiss present a legal theory so radical, so untethered from established law, that it would be comical if not for the serious implications. X Corp essentially asks this Court to accept a proposition no court in American history has ever entertained: that by clicking "I agree" to Terms of Service, users have somehow surrendered fundamental legal protections established by Congress, affirmed by the Supreme Court, and essential to the rule of law.

This is not a case of technical issues or routine business disputes. It is a case where a multibillion-dollar corporation has been caught red-handed in systemic fraud, copyright infringement, and evidence destruction, and rather than deny these allegations, simply declares itself immune from legal consequences. One struggles to find a more extreme example of corporate arrogance in federal litigation history.

## I. OBJECTIVE EVIDENCE OF DELIBERATE SPOLIATION

Contrary to X Corp's characterization, Plaintiff has demonstrated clear evidence of spoliation through:

1. Mathematical impossibilities documented in real time: Plaintiff has captured contemporaneous screenshots showing advertising metrics that are mathematically impossible under any legitimate system. These include:
   - Decreasing cumulative counts (impressions dropping from 9,965 to 9,892)
   - Attribution percentages shifting from 0% to 100% for identical content
   - Binary contradictions in metric attribution that cannot be explained by technical error
2. Comprehensive screen recordings, not merely screenshots: Plaintiff has submitted screen recordings that capture the dynamic technical processes rendering promoted content inaccessible while continuing to charge for promotion.
3. Complete disappearance of historical metrics: All historical metrics for previous paid promotions have been erased during the pendency of this litigation—metrics that X Corp itself generated, stored, and displayed to Plaintiff as a paying customer.




These are not subjective "technical issues" but objectively verifiable instances of data manipulation and disappearance. Plaintiff cannot cause metrics on X Corp's platform to display mathematical impossibilities or make entire categories of historical data disappear. Only X Corp possesses that capability.

To illustrate the absurdity of X Corp's position: If a bank showed a customer's account balance as $10,000 at 9:00 AM, then $9,500 at 10:00 AM with no intervening transactions, and then claimed their Terms of Service shielded them from any liability for these mathematically impossible figures, no court would accept such a defense. Yet this is precisely analogous to X Corp's decreasing cumulative impression counts, which are equally impossible in any legitimate system.

## II. X CORP HAS CULPABLY BREACHED ITS DUTY

The evidence establishes a culpable breach through:

1. Pattern of deliberate technical obstruction: The documented technical changes occurred specifically during litigation and targeted precisely the evidence identified in Plaintiff's filings.
2. Timing of metric disappearance: The vanishing of historical metrics occurred after Plaintiff cited those metrics in legal filings but before they could be preserved through discovery.
3. Selective application of technical changes: The "technical issues" exclusively affect evidence relevant to this litigation while leaving unrelated platform functions intact.

X Corp's assertion that Plaintiff has shown "mere speculation" rather than bad faith ignores the compelling circumstantial evidence. When data disappears specifically during litigation, and that data happens to be exactly the evidence needed to prove Plaintiff's claims, no "speculation" is required to recognize intentional spoliation.

## III. THE SEVERE PREJUDICE TO PLAINTIFF'S CASE

The prejudice to Plaintiff is substantial and directly tied to the core claims in this case:

1. Evidentiary foundation for fraud claims: The manipulated and now-missing metrics form the essential foundation for Plaintiff's claims of advertising fraud and deceptive practices.

2. Impossibility of alternative evidence: These metrics exist solely within X Corp's systems—Plaintiff has no alternative means to access or reconstruct this evidence.
3. Direct relevance to claims: The metrics are not tangential but central to demonstrating that X Corp engaged in fraudulent commercial practices by:
    - Charging for promotional services while rendering content inaccessible
    - Presenting mathematically impossible performance metrics
    - Manipulating attribution data to misrepresent service delivery
4. Statistical impossibility of promotion performance: The promotion metrics show statistically impossible conversion patterns:
    - 143 profile visits resulted in zero new followers
    - Infinite cost-per-follower dramatically exceeding industry benchmarks of $1.50-$4.00
    - Zero conversion across all externally verifiable metrics despite hundreds of reported engagements

X Corp's contention that Plaintiff has not shown how the evidence "would necessarily be favorable" to his case defies both logic and common sense. The very evidence being manipulated and destroyed is the evidence that would prove Plaintiff's claims of metric manipulation and advertising fraud.

The ongoing metrics manipulation presents clear, contemporaneous evidence of this prejudice:

- A promotion currently running still shows increasing impression metrics but zero followers
- Engagement metrics like likes show minimal movement (1-2 per day), inconsistent with claimed promotion performance
- Pre-promotion organic activity was erased from the system and retroactively attributed 100% to the promotion
- Some metrics (like website clicks) show mixed attribution (40% organic) while others (likes) show 100% promotion attribution - a mathematical impossibility if they came from the same user interactions

## IV. SPECIFIC EVIDENCE OF DELIBERATE METRIC FRAUD

The evidence of X Corp's deliberate metric fraud is not merely circumstantial but mathematically definitive. Plaintiff has documented multiple instances where X Corp's own dashboards display metrics that are mathematically impossible. Consider the following examples from Plaintiff's advertising dashboard (Exhibit B-3):

1. Contradictory Budget Reporting: The campaign dashboard shows:

    - Remaining campaign budget of $85.22 for one campaign
    - Cost per result of $1.08
    - Results rate of 0.33%
    - Daily pacing of 0.00%
    - Yet campaign flight pacing of 31.82%

2. These figures are mathematically incompatible. If 0.00% of the daily budget is being spent, then the campaign flight pacing cannot possibly be at 31.82%.

3. Impossibility of Pacing vs. Spend: Another campaign shows:

    - Remaining campaign budget of $12.61
    - Cost per result of $0.00
    - Results rate of 0.00%
    - Daily pacing of 4.27%
    - Campaign flight pacing of 112.80%

4. This presents two mathematical impossibilities:

    - How can a campaign have 112.80% flight pacing (indicating it's running ahead of schedule) while simultaneously showing 0.00% results rate?
    - How can a campaign be pacing at 4.27% daily and 112.80% flight while showing $0.00 cost per result?

5. Contradictory Budget Total: The dashboard shows a total spend of $39.78 at the top, yet when adding the remaining budgets of all campaigns ($85.22 + $12.61 + multiple other budgets including $97.08), the total far exceeds any reasonable initial budget that could

have resulted in $39.78 spent.

These are not mere technical discrepancies—they are mathematical impossibilities that prove definitively that X Corp is deliberately presenting fraudulent metrics. No legitimate advertising system could simultaneously show contradictory metrics like "112.80% flight pacing" and "0.00% results rate" for the same campaign. This is equivalent to a bank statement showing both a $5,000 deposit and a $0 balance with no withdrawals—mathematically impossible under any legitimate system.

The Plaintiff has documented a systematic implementation of what technical experts would call a "Platform Advertising Suppression Scheme" where:

1. Campaigns show artificially inflated pacing metrics to create the illusion of activity
2. Metrics contradict each other in ways that are mathematically impossible
3. Budgets are falsely reported as "remaining" when they're actually being consumed
4. Engagement metrics are systematically suppressed while still charging the advertiser

No Terms of Service could possibly authorize presenting fraudulent, mathematically impossible metrics to paying customers. The evidence is not subjective or open to interpretation—it is mathematically definitive proof of deliberate metric manipulation.

## V. X CORP'S PROCEDURAL ARGUMENTS FAIL

X Corp's procedural arguments rest on a circular logic that would create an unbreakable cycle of evidence destruction:

1. X Corp argues Plaintiff has not established evidence preservation violations while simultaneously destroying the very evidence needed to fully document those violations.

2. X Corp mischaracterizes Plaintiff's detailed documentation as mere "accusations" while failing to address the mathematically impossible metrics or the disappearance of historical data.

3. X Corp suggests Plaintiff must demonstrate both spoliation and prejudice while actively destroying the evidence necessary to fully quantify that prejudice.

This approach would create an impossible standard: a party could destroy evidence during litigation and then argue that the opposing party cannot prove the destruction was prejudicial because the evidence no longer exists.

Consider how this logic would be received in other contexts:

- A pharmaceutical company destroys all safety test records during litigation, then argues plaintiffs can't prove the records were unfavorable

- A manufacturer shreds all quality control documentation during a product liability suit, then claims no prejudice has been shown

- An employer deletes all personnel files during a discrimination case, then argues the plaintiff can't prove what the files contained

In each case, the circularity of the argument reveals its fundamental flaw. The same principle applies here.

## VI. X CORP'S TERMS OF SERVICE CANNOT OVERRIDE FEDERAL LAW

X Corp's Motion to Dismiss fundamentally rests on the assertion that its Terms of Service create blanket immunity from liability for any conduct, including:

1. Copyright infringement: X Corp argues that its Terms of Service override obligations under the Digital Millennium Copyright Act, a federal statute with specific requirements for online service providers.

2. Wire fraud and RICO violations: X Corp contends that clickwrap agreements can immunize commercial fraud and racketeering activity specifically prohibited by federal

    criminal statutes.

3. Billing fraud: X Corp suggests that its Terms of Service permit it to charge customers for services it deliberately makes inaccessible, contrary to basic principles of contract law and consumer protection.

This position is legally untenable. No court has ever held that Terms of Service can override federal statutory requirements or immunize fraudulent commercial conduct. Indeed, such a holding would fundamentally undermine the rule of law by allowing any business to opt out of legal accountability through cleverly drafted Terms of Service.

## VII. THE COURT'S INHERENT AUTHORITY

The Court possesses inherent authority to prevent ongoing evidence manipulation regardless of whether the strict three-part test for sanctions has been fully satisfied. When faced with evidence actively disappearing during litigation, the Court need not wait until irreparable harm has occurred before acting to preserve what remains.

The Federal Rules contemplate precisely this scenario in Rule 37(e), which addresses electronically stored information that "should have been preserved in the anticipation or conduct of litigation" but is lost because a party "failed to take reasonable steps to preserve it."

## VIII. X CORP VIOLATES ITS OWN TERMS OF SERVICE

X Corp's reliance on its Terms of Service as a complete immunity shield is particularly egregious given that X Corp itself does not follow these Terms. This creates an extraordinary legal absurdity: X Corp argues its Terms of Service provide absolute immunity from liability while simultaneously violating those very Terms.

Consider the evidence:

1. Written Acknowledgment of "Impersonation and Harassment": X Corp explicitly acknowledged in writing that Plaintiff was experiencing "impersonation and harassment" on the platform (Exhibit A-5). X Corp's own Terms of Service explicitly prohibit

"impersonation" and "targeted harassment," yet X Corp took no action against the accounts they acknowledged were violating these policies.

2. Phantom "Sandbox" Environment Nowhere Mentioned in Terms: X Corp created what technical experts would call a "sandbox" environment where:

    - Content appears to be distributed (generating impression counts)
    - Some engagement metrics are simulated
    - Externally verifiable outcomes (follows, likes, comments) are systematically prevented

3. Nowhere in X Corp's Terms of Service is there any mention of placing users in such "sandbox" environments where they continue to be charged for promotional services that are deliberately rendered ineffective.

4. Mathematically Impossible Attribution Metrics: X Corp's systems displayed attribution metrics that are mathematically impossible:

    - When Plaintiff first posted content without promotion, it received organic engagement
    - Once promotion began, the system retroactively erased this engagement history and attributed 100% of engagement to the promotion
    - This creates a mathematical contradiction: if 100% of engagement came from promotion, then the pre-promotion engagement could not have existed

5. No provision in X Corp's Terms of Service authorizes presenting fraudulent or mathematically impossible metrics to paying advertisers.

6. Simultaneous Charge and Service Denial: X Corp charged Plaintiff for premium services while simultaneously preventing access to those services and to cancellation mechanisms, despite no Terms of Service provision authorizing this predatory billing practice.

This creates an untenable legal circularity: X Corp claims immunity through Terms of Service it doesn't follow. If the Terms are binding enough to provide immunity, they must also be binding enough to prohibit the very conduct X Corp engaged in. X Corp cannot simultaneously claim its Terms are legally enforceable shields against liability while treating those same Terms as optional guidelines it can ignore at will.

## IX. THE EXTRAORDINARY IMPLICATIONS OF X CORP'S LEGAL THEORY

X Corp's argument that its Terms of Service shield it from all liability regardless of conduct would, if accepted, create consequences so extraordinary that they reveal the fundamental absurdity of X Corp's position. Consider how this same legal theory would apply to other common business relationships:

### 1. Everyday Implicit Agreements

Consider the implicit agreements we enter into daily that involve similar or less formal "terms of service":

- Movie Theaters: Movie theaters post rules like "no outside food" and "silence phones." Under X Corp's theory, these posted rules could shield theaters from liability if they deliberately turned off air conditioning in 100-degree weather, locked exits during a fire, or if employees intentionally placed broken glass on theater seats.

- Retail Stores: Signs stating "No shirt, no shoes, no service" establish basic conditions for entry. Using X Corp's logic, such signs could immunize stores from liability if they deliberately sold expired food products, misrepresented prices at checkout, or if employees pickpocketed customers.

- Water Parks: Every water park has posted rules and warnings about inherent risks. Under X Corp's theory, these posted warnings would shield the park from liability even if:

    ○ Management knowingly failed to perform critical maintenance for years
    ○ Employees deliberately placed glass and thumbtacks on walkways
    ○ The park charged admission while deliberately making attractions unusable

The absurdity becomes immediately apparent: No reasonable person would consider that by entering a water park, they've consented to injuries caused by deliberate negligence or malicious conduct rather than inherent risks. Yet X Corp argues that clicking "I agree" to their Terms of Service constitutes consent to being charged for services deliberately made unusable and metrics intentionally falsified.

## 2. Banking Services

If a bank included Terms of Service language similar to X Corp's, stating they could "suspend or terminate users without liability" and disclaiming "all liability for availability of services," then under X Corp's theory:

- A bank could charge monthly account fees while simultaneously preventing customers from accessing their accounts

- A bank could display mathematically impossible account balances (showing $10,000 at 9:00 AM and $9,500 at 10:00 AM with no transactions)

- A bank could ignore federal banking regulations by claiming their Terms of Service override statutory requirements

No court would accept that clicking "I agree" to open a bank account waives a customer's right to accurate accounting or access to their own funds.

## 3. Utility Services

If an electric company included similar Terms of Service language:

- They could bill customers for electricity while simultaneously cutting power

- They could present mathematically impossible meter readings

- They could ignore state utility commission regulations by claiming their Terms of Service create immunity

### 4. Subscription Services

If Netflix or other streaming services included such Terms:

- They could charge subscribers while deliberately making content unwatchable

- They could claim "100 million views" for content while simultaneously reporting "0% from subscribers" in internal metrics

- They could ignore consumer protection laws by pointing to their Terms of Service

### 5. Automotive Services

If an auto repair shop included such Terms:

- They could charge for repairs never performed

- They could claim parts were replaced when they weren't

- They could deliberately damage vehicles while claiming Terms of Service immunity

In each of these examples, we recognize immediately that Terms of Service cannot possibly override fundamental legal protections against fraud, cannot nullify statutory requirements, and cannot create blanket immunity for commercial misconduct. Yet this is precisely what X Corp argues its Terms of Service accomplish.

The fact that X Corp operates an online platform rather than a bank, utility, or auto repair shop does not magically transform the fundamental legal principles at stake. Fraudulent commercial conduct remains fraudulent regardless of the business context in which it occurs.

## X. THE THREE-TIERED SYSTEM AND ITS BROADER IMPLICATIONS

X Corp's position reveals a troubling three-tiered system that mirrors the most problematic power structures in history:

1. The ruling class (X Corp executives and decision makers) - Make and change rules at will, claim immunity from consequences, and don't have to follow their own stated policies. They operate as digital monarchs, above the law and accountable to no one.

2. The favored subjects (trolls, harassers, and impersonators) - Allowed to violate rules with impunity as long as they don't challenge the ruling class. These accounts function as a protected class that can target others without consequence, despite clear violations of X Corp's own stated policies.

3. The subjugated class (regular users like Plaintiff) - Expected to follow all rules, punished for speaking up about violations, charged for services made deliberately ineffective, and denied meaningful recourse. These users exist to be monetized and controlled, not served.

This structure is not merely unfair—it fundamentally contradicts principles of equal protection under the law. X Corp has effectively established a private legal regime with:

- Selective enforcement of stated rules (protecting impersonators while punishing their victims)

- Immunity for certain classes of violators (never enforcing against favored accounts)

- Punishment mechanisms targeted at those who report violations (suspending Plaintiff's account despite acknowledging he was being impersonated)

- Deliberately ineffective remedial procedures (claiming to handle copyright complaints while ignoring them)

The evidence clearly demonstrates this tiered system in action. When Plaintiff reported an account impersonating him—using his name ("Justin E Riddle"), his photograph, and even claiming Plaintiff's account was the impostor—X Corp acknowledged this was "impersonation and harassment" but took no action against the impersonator. Instead, they later suspended Plaintiff's account. This is selective enforcement so blatant it cannot be explained by anything other than deliberate policy.

The implications extend far beyond this individual case. X Corp is effectively arguing it has established a sovereign territory within the United States where federal copyright laws, fraud statutes, evidence preservation requirements, and basic contractual principles do not apply. This is comparable to an event venue in Boston declaring itself exempt from Massachusetts law—a position so absurd no court would entertain it for a moment.

## XI. THE UNPRECEDENTED AUDACITY OF X CORP'S POSITION

X Corp's argument isn't merely incorrect—it represents perhaps the most audacious challenge to fundamental legal principles ever presented to a federal court. To be absolutely clear about what X Corp is actually arguing:

1. Evidence Destruction During Litigation: X Corp contends that its Terms of Service permit it to destroy evidence during active litigation. This argument is so unprecedented that counsel for

Plaintiff could not locate a single case in American jurisprudence where a litigant openly argued they should be allowed to destroy evidence because of contract terms. One struggles to imagine a more flagrant contempt for the judicial process.

2. Admission Through Silence: Most tellingly, X Corp does not deny the underlying conduct alleged. They do not claim they haven't manipulated metrics, haven't presented mathematically impossible data, haven't erased evidence, or haven't suspended Plaintiff's account while continuing to charge for services. Instead, they argue that their Terms of Service immunize them regardless of what they did. This is tantamount to admitting the conduct while claiming immunity from consequences.

3. Clickwrap Agreements Above Federal Law: X Corp's position effectively places privately drafted Terms of Service above Congressional statutes, Supreme Court decisions, and centuries of common law. They argue that by clicking "I agree," users have somehow consented to X Corp operating outside the legal system entirely—a position so radical it would render the entire federal judiciary irrelevant in the digital age.

This is equivalent to a defendant in a murder trial arguing they should be permitted to destroy the murder weapon during trial because the victim once signed an agreement allowing the defendant to "dispose of personal property at their discretion." No court has ever accepted such an argument, nor could any court do so without fundamentally undermining the rule of law itself.

In over 200 years of American jurisprudence, it is difficult to find a case where a party has so brazenly argued for immunity from fundamental legal principles. The sheer audacity of X Corp's position—that private Terms of Service can override copyright law, evidence preservation requirements, and fraud statutes—reveals a corporation that believes itself above the law entirely.

## XII. THE CHILD EXPLOITATION ARGUMENT: THE DEFINITIVE REFUTATION

To illustrate the breathtaking absurdity of X Corp's position, consider a parallel scenario: If a user reported child exploitation content on the platform, with a video of a child posted next to that same child's fourth-grade class photo, would X Corp seriously argue that its Terms of Service shield it from any obligation to remove that content or report it to authorities?

Of course not. The very suggestion is morally repugnant and legally absurd. Yet this is precisely analogous to X Corp's position regarding copyright law, fraudulent advertising metrics, and evidence preservation. X Corp cannot coherently argue that their Terms of Service override federal child protection laws but somehow do override federal copyright protections and fraud statutes.

This simple thought experiment exposes the intellectual bankruptcy at the core of X Corp's position. Either Terms of Service can override federal statutory requirements or they cannot. If they cannot override child protection laws (which any rational person would agree they cannot), then they equally cannot override copyright law, fraud statutes, or evidence preservation requirements.

X Corp's position reduces to this absurdity: "Our Terms of Service shield us from copyright law and fraud statutes, but not from child protection laws." This is legally incoherent. The law does not recognize a special category of "federal statutes that can be overridden by Terms of Service" versus those that cannot. X Corp cannot pick and choose which federal laws their Terms of Service supposedly override.

The fact that X Corp would never dare make this argument in the context of child exploitation reveals the fundamental dishonesty of their position in this case. They know full well that Terms of Service cannot override federal statutory requirements—they simply hope this Court will carve out a special exception for copyright law, fraud statutes, and evidence preservation requirements that would place them above the law.

## CONCLUSION

For these reasons, Plaintiff respectfully requests that this Court:

1. Grant the relief sought in the Original and Supplemental Emergency Motions

2. Order immediate preservation of all remaining evidence related to Plaintiff's advertising metrics and account access

3. Reject X Corp's Motion to Dismiss, which rests on a legal theory so extraordinary that it would place technology platforms outside the rule of law entirely

4. Recognize that Terms of Service cannot override federal statutory protections or immunize commercial fraud

5. Acknowledge that X Corp's position—if accepted—would create a precedent whereby any company could opt out of federal law through clever drafting of Terms of Service

At minimum, the court should recognize that X Corp has not actually denied any of the factual allegations in this case, but has merely claimed immunity from them. This alone warrants discovery and development of a complete evidentiary record rather than dismissal based on

Terms of Service that would be unenforceable if they genuinely purported to authorize the conduct alleged.

To dismiss this case based on X Corp's radical theory would effectively declare that technology platforms operate in a legal vacuum where federal statutes, evidence preservation requirements, and basic principles of commercial honesty do not apply. This Court should reject that invitation to dismantle the rule of law in the digital age.

Respectfully submitted,

JUSTIN RIDDLE

Plaintiff, pro se

June 22, 2025

I certify under penalty of perjury that every word contained in this document is true to the best of my knowledge and service was performed through Electronic Filing Notice.