# EMERGENCY MOTION FOR EXTRAORDINARY JUDICIAL REVIEW

# AND CIVIL RICO ACTION FOR SYSTEMIC DUE PROCESS VIOLATIONS,

# INSTITUTIONAL CORRUPTION, AND PATTERN OF RACKETEERING ACTIVITY

## SELF REPRESENTED PLEA FOR FAIRNESS

Plaintiff is a self-represented litigant, and as such, the Court is obligated to liberally construe his filings to ensure that technical deficiencies do not obstruct meritorious claims. See Haines v. Kerner, 404 U.S. 519, 520 (1972). This is an essential doctrine—one meant to protect those without formal legal training from being disadvantaged by the complexity of judicial proceedings.

However, the application of this principle to the present case creates an interesting paradox.

**The Court must, by law, interpret this pleading with generosity due to Plaintiff's lack of legal training. Yet, this same pleading—crafted without any formal legal education—is demonstrably superior to those regularly filed by licensed attorneys. This presents the judiciary with a dilemma: either dismiss the case and admit to obstructing justice, or engage with a filing that surpasses the standard of those who claim legal expertise. In either scenario, the institutional implications of this case will be profound.**

**It is a fundamental principle of American jurisprudence that courts must interpret the pleadings of self-represented litigants with the utmost leniency and resolve all ambiguities in their favor. This doctrine recognizes that individuals who lack formal legal training should not be penalized for failing to adhere to the rigid technicalities that might entrap a licensed attorney.**

**As a self-represented litigant, Plaintiff acknowledges the Court's obligation to ensure his filings are read with expansive generosity, affording every possible inference in his favor. Indeed, given that Plaintiff has no formal**

legal education, it is imperative that this Court read his pleadings broadly, indulgently, and with an open mind to ensure that no meritorious claim is disregarded simply due to procedural imprecision.

This raises an interesting paradox. If the Court were to apply this principle in its ordinary fashion, it would need to engage in an exercise of extraordinary intellectual charity—liberally construing the arguments of a litigant who, by all conventional wisdom, would be assumed to lack the sophistication necessary to articulate them with clarity.

Yet, in this instance, such an assumption would produce a fascinating, if not absurd, outcome. The reality, which is both unfortunate for Defendants and comically painful for the judiciary, is that this brief is constructed with more legal rigor, evidentiary precision, and procedural integrity than most filings they will ever view in their entire careers.

If Plaintiff were truly the "unsophisticated pro se litigant" that the Court is obligated to accommodate, how then does one explain a pleading that matches the quality of

work produced by the highest-paid attorneys in the state? How does the Court reconcile the mandatory requirement to interpret pro se filings liberally while simultaneously realizing that this very pleading exposes a level of legal acumen that in some ways, rivals its own clerks, its own bar members, and likely, the judge himself?

**Let it be known that:**

**\*\*I CERTIFY UNDER PENALTY OF PERJURY THAT EVERY SINGLE WORD CONTAINED IN THIS DOCUMENT IS TRUE TO THE BEST OF MY KNOWLEDGE.\*\***

## I. INTRODUCTION: THE SOUND OF INSTITUTIONAL PANIC

Never in human history have the unanimous sounds of fists pounding on tables echoed louder off more brittle walls than in Nebraska's courthouses right now. Having exhausted every procedural sleight of hand, every jurisdictional shell game, and every convenient fiction,

the guardians of institutional corruption find themselves confronted with the one thing they cannot defeat: a paper trail of their own creation.

The motion before this Court does not arise from legal complexity requiring sophisticated analysis. Rather, it emerges from a pattern so blatant, so methodical, and so contemptuous of fundamental legal principles that a first-year law student could identify it. Indeed, the defendants have spent eight years and considerable taxpayer resources desperately attempting to prevent precisely this moment – when their coordinated obstruction would be laid bare before a court not yet compromised by their enterprise.

## THE PROCEDURAL LABYRINTH: A SYSTEM DESIGNED TO PREVENT JUSTICE

This Court now confronts not merely a difficult procedural landscape but a deliberately constructed impossibility - a perfect circle of obstruction where each required remedy is systematically foreclosed by design.

## A. The Supreme Catch-22: The Mandamus Paradox

**The absolute centerpiece of this obstructionist architecture is a logically irresolvable trap:**

**1. The District Court Mandamus Requirement: District courts (Judges Stratman and Dougherty) have repeatedly ruled they lack jurisdiction because Plaintiff hasn't properly filed a writ of mandamus with specific verification requirements under Nebraska law.**

**2. The Supreme Court Docketing Barrier: When Plaintiff attempted to comply by filing precisely such a mandamus petition with the Nebraska Supreme Court, they refused to docket it without explanation. When Plaintiff explicitly asked for clarification on why it was rejected or what corrections were needed, court personnel confirmed they were prohibited from providing this information.**

**3. The Perfect Circle of Obstruction: This creates a mathematically perfect system of obstruction:**

   - The District Court says: "We can't hear your case until you get a mandamus"

   - The Supreme Court refuses to docket the mandamus

   - When asked why the mandamus was rejected, the Supreme Court provides no guidance

   - When Plaintiff returns to District Court, they repeat: "We can't hear your case until you get a mandamus"

This is not merely difficult—it is logically impossible. The Plaintiff cannot satisfy a requirement when the very court empowered to provide the required relief refuses to even docket the filing, much less explain its rejection. No amount of legal knowledge, procedural precision, or persistent effort can penetrate this closed system where each institution's actions are designed specifically to foreclose the remedy required by the other.

## B. The Infinite Regress of Procedural Requirements

Beyond this central impossibility lies a cascade of secondary obstructions. Each time Plaintiff satisfies a

procedural requirement, a new one materializes. This pattern reveals not random inconsistency but strategic design:

**1. The Verification Shell Game:** When Plaintiff files a complaint, he's told it lacks proper "verification." When he adds verification language, he's told it's the wrong type. When he adopts the prescribed language, he's told it should have been notarized. When he provides notarization, he's told it should have been in a different format. Each "requirement" is conjured only after the previous one has been satisfied.

**2. The Circular Reference Trap:** When Plaintiff asks specifically what verification standard applies, Judge Stratman cites Nebraska Revised Statute 84-712.03, which refers to 25-2160, which contains no specific verification format. When he asks the clerk's office for clarification, they refuse to specify requirements, creating an impossible standard that exists only in negative space—defined solely by what Plaintiff has not yet tried.

**3. The Jurisdictional Paradox:** Most emblematic of this system's fundamental corruption is Judge Dougherty's

logically impossible order that simultaneously dismisses for "lack of jurisdiction" and "failure to state a claim"—a judicial impossibility explicitly prohibited by the Supreme Court in Steel Co. v. Citizens for Better Environment. This self-contradicting order crystallizes the system's true nature: procedure deployed not as path to justice but as insurmountable barrier.

## C. The Asymmetrical Application of Rules

The procedural obstacles aren't merely difficult—they're selectively enforced to create two parallel systems of justice:

1. Institutional Impunity: OPS files motions less than 24 hours before hearings, fails to properly serve removal notices, makes ex parte communications with judges, and submits documents without proper verification—all without consequence. Each procedural violation is met with judicial accommodation.

**2. Citizen Obstruction: Simultaneously, Plaintiff's filings are microscopically scrutinized for technical deficiencies, with requirements that shift each time they're satisfied. No accommodation is made for pro se status; instead, heightened standards are imposed beyond what any attorney would face.**

**3. Documented Double Standards: The record demonstrates multiple instances where identical procedural issues are treated differently based solely on who commits them. OPS can file a motion on the courthouse steps before a hearing; Plaintiff must follow rules that exist nowhere in statute or precedent.**

**D. The Strategic Deployment of Procedural Complexity**

**What makes this pattern particularly insidious is its strategic deployment at moments of maximum effectiveness:**

**1. Timing Manipulation: Procedural objections materialize only after Plaintiff has invested significant**

resources—filing fees paid, transcripts ordered, evidence compiled. Each dismissal happens at precisely the stage where starting over extracts maximum cost.

**2. Forum Manipulation: When Plaintiff files in state court, OPS improperly removes to federal court without legitimate jurisdiction. When he adapts his case for federal court, judges quickly remand. The case bounces between forums, with each claiming the other is appropriate while neither addresses the substance.**

**3. Escalating Complexity: With each filing cycle, the procedural requirements grow more baroque and less connected to any legitimate purpose. What began as "verification" transforms into an ever-expanding set of technical requirements found nowhere in statute.**

## E. The Mathematical Impossibility of Coincidence

**The statistical probability of these procedural barriers arising randomly approaches zero:**

**1. Consistent Pattern Across Forums: The identical obstruction pattern repeats across multiple judges, courts, and years. The same procedural shell game appears before Judge Stratman, Judge Dougherty, and in the Supreme Court—each deploying verification requirements in exactly the same manner.**

**2. Temporal Consistency: From 2018 (in the CharterWest matter) through 2025 (in the most recent Court of Appeals dismissal), the pattern remains identical—procedural barriers that prevent substantive review while shifting requirements to ensure compliance remains impossible.**

**3. Multi-Institutional Coordination: The synchronization between courts, the Attorney General's Office, and OPS exceeds random alignment. When Plaintiff overcomes one procedural barrier, a new one appears in a different forum, as if the system communicates to ensure continuous obstruction.**

**This is not a system functioning imperfectly—it is a system functioning exactly as designed: to exhaust**

resources, prevent accountability, and ensure that citizens seeking transparency face an unwinnable procedural maze. The core impossibility—requiring a mandamus which the Supreme Court refuses to docket without explanation—reveals the true nature of this enterprise. This is not procedural complexity; it is procedural checkmate designed to ensure no citizen can ever successfully navigate the system to expose institutional misconduct.

This Court now faces a binary choice: it can either acknowledge this systematic procedural manipulation for what it is—a RICO enterprise operating through the machinery of government—or it can become the latest institutional participant in perpetuating the obstruction. There is no middle ground when the very structure of the system has been engineered to make justice mathematically impossible.

This Court now faces a constitutional moment that transcends ordinary judicial review. What follows is not mere allegation but documented proof of a coordinated enterprise spanning multiple institutions, courts, and years – all dedicated to a single objective: preventing a citizen's lawful access to public records through the systematic corruption of every accountability mechanism in Nebraska's government.

The defendants have grown so comfortable in their immunity from oversight that they have become sloppy. They now issue rulings that contain within themselves proof of their own illegitimacy – dismissing cases simultaneously for "lack of jurisdiction" and "failure to state a claim," a logical impossibility that violates centuries of established precedent and the Supreme Court's explicit ruling in *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83 (1998), where Justice Scalia declared the requirement for jurisdictional determinations before merits considerations to be "inflexible and without exception."

How extraordinary it must be for these defendants – attorneys general, judges, law enforcement officials, and respected attorneys – to find their elaborate enterprise of

obstruction undone not by a team of high-powered lawyers or federal investigators, but by a self-represented citizen whose only weapons were persistence and meticulous documentation. Their institutional arrogance led them to believe that the rules of evidence, procedure, and logic itself could be casually discarded when inconvenient, leaving behind the very breadcrumbs that now form an unimpeachable record of their coordination.

This is not a case about technical violations or good-faith legal disagreements. It is a case about whether our system of constitutional governance can still function when every institution designed to ensure accountability has been compromised. It is about whether the rule of law applies equally to powerful interests and ordinary citizens. And most fundamentally, it is about whether truth still matters when confronted with institutional power determined to suppress it.

This case is not about a single dispute or an isolated grievance. It is not even, fundamentally, about the individual plaintiff who brings it, though his story is a microcosm of the larger crisis that has brought us to this fateful pass.

This case is about the wholesale breakdown of republican self-government in the state of Nebraska - a meltdown of the basic norms of transparency, accountability, and institutional integrity that are the sine qua non of a free society. It is about a pervasive culture of impunity and cronyism that has taken root in the highest corridors of power, turning public service into a sordid racket for personal gain.

Most of all, it is about the betrayal of the sacred trust between the government and the governed - the fraying of the social contract that binds citizen to state in a partnership of mutual obligation.

The details would beggar belief were they not so exhaustively documented in the record:

- A bank, CharterWest, that manipulated customer records and leveraged false reporting to shield its malfeasance from scrutiny, while state oversight bodies from the Attorney General to the Banking Department to the Ombudsman turned a blind eye.

Let's be clear, NO HONEST person could be confused about a bank spoiling a document. Critically, no honest person was confused, there was simply no honest person between ALL of Nebraska's consumer protection agencies, the CFPB, the Fed Reserve of KC or any Court.

- A sprawling educational bureaucracy, Omaha Public Schools (OPS), that violated open records laws with impunity and systematically suppressed whistleblowers who dared to challenge its corruption.

Original School Board meeting:

https://youtu.be/vSXHOiOlUWw

- A judiciary so steeped in the same corrosive culture of casual conspiracy that it has abandoned even the pretense of serving as an independent check on official abuse.

**- A State Capitol Police force that physically removed the plaintiff from the capitol building for the "sin" of properly asking the Attorney General's office for resolution.**

**Plaintiff's third time being Kicked out of the Nebraska Attorney General's Office, this time including his mother, the other victim of the Attorney General's Lie (posted below for the world to see how they published two things on the same page that can't both be true).**

**https://youtu.be/4GEKWeUczGA**

**- The offices of the state Ombudsman and Attorney General, who refused to investigate legitimate complaints and actively abetted the suppression of evidence of misconduct. Shown below, one of several letters from the offenders, this one from Attorney General's office telling Plaintiff that he's not allowed to see the same information that Omaha Public Schools was allowed to see.**

**-Agencies like the CFPB, the Federal Reserve Bank of Kansas City, the ACLU, the BBB, FHA DEPARTMENT OF**

EDUCATION and more, staffed with people incapable of reading basic words during the course of standard investigations.

Embarrassing calls from the Federal Reserve of KC where they lie, stumble and even hang up on Plaintiff for the sin of asking for the facts to reflect.

https://youtu.be/nz0ltiNhoco

https://youtu.be/nFlIX2Hx3pY

https://youtu.be/Jf68qdn9t5E

- Even Clerks, Bailiffs, Court Reporters participated in the system of obstruct, abuse, ignore, dismiss.

Conversation with Judge Dougherty's receptionist where she says she can't give me incorrect legal advice that I didn't ask for, while ignoring the question and Judge Dougherty chiming in, apparently also unaware of basic due process and procedures (one of several):

https://youtu.be/gVc8Olf7SQM

https://youtu.be/WQUX0Kg6awg

(It would be prudent in general to advise the Judge's staff against claiming that they can't give legal advice while they proceed to give incorrect legal advice. This happens at every visit.)

- News outlets such as KFAB, WOWT, KETV, THE DAILY RECORD, FLATWATER FREE PRESS, OANN and more, still remain silent in the face of clear evidence.

Scott Vorhees claiming he reached out to multiple OPS school board members, then suddenly, the same guy who routinely talks about the color of the lights on "Rocket Car Wash" while addressing minor issues in school districts in other states, just couldn't see the problem with OPS sending law enforcement after students for merely showing up, not even speaking at a board meeting)

What materializes to anyone capable of looking at the whole picture is a hidden system that logically can only be staffed with CORRUPTION, WEAKNESS and CRIMINAL INTENT, in that order. We are not talking about

unintelligent individuals or short staffed departments, we're talking about people who initially understood my clearly documented situation, but as soon as they connected with an official with something to hide, their interest changed to distancing themselves.

Could major consumer protection agencies, educators, law enforcement, Judges, attorneys and mail clerks all be incapable of understanding what any child (with a dictionary to figure out the big words) can clearly understand? The entire system operates on a wink and a nod while deliberately violating the rights of the citizens.

What emerges is a portrait of a government at war with its own first principles - an insular and unaccountable oligarchy that treats the very notion of public integrity as a punchline. The interlocking abuses chronicled in this complaint, perpetrated by dozens of public employees across every branch of government and level of administration, paint a chilling picture of democracy in decay. They reveal a slow-motion coup against the rule of law itself - a rollback of popular sovereignty so complete as to render the state's constitutional architecture a dead letter.

This case is the story of one citizen's refusal to accept that grim diagnosis as Nebraska's inescapable fate. For nearly a decade, Plaintiff Justin Riddle has waged an indefatigable campaign to uproot the entrenched corruption that has overtaken his government - a lonely crusade for transparency in a wilderness of obfuscation and deceit. Rather than shrink from the powerful interests arrayed against him, Mr. Riddle has compiled a veritable dossier on their collective debasement of the public trust - an omnibus indictment of systemic malfeasance as breathtaking in its breadth as it is meticulous in its evidentiary foundations.

That dossier now serves as the factual backbone of this Complaint - a bill of particulars that names and shames the whole Cornhusker kleptocracy, from the pinnacles of power to the bowels of bureaucracy. By minutely documenting the illicit activities of everyone from the Governor's inner circle to individual records clerks and Assistant AGs, Plaintiff has ripped the veil off an appalling simulacrum of public service. He has delineated, in damning detail after detail, a criminal enterprise so enmeshed in Nebraska's official organs as to render public and private functionally indistinguishable.

The contours of that enterprise are almost too baroque to fathom, but their connective tissue is all too plain: A rootless cynicism that subordinates the general welfare to private whim and sells the state's machinery of enforcement to the highest bidder. Whether abusing the Attorney General's bully pulpit to quash legitimate investigations, or deploying the courts as a retaliatory cudgel against dissident citizens, or turning the Ombudsman's oversight mandate into a farce of legal levitation, the enterprise's disparate parts share a common contempt for the impartial administration of justice. Theirs is a confederation of professional hypocrisies, bound together by a joint commitment to using the letter of the law to shred its spirit.

The result is a staggering tableau of public trust betrayed on an almost incomprehensible scale. To the untrained eye, the offenses documented here might seem too disparate and contradictory to cohere - a random assortment of personal piques and institutional turf battles. But that is precisely the point: The ubiquity of ethical dereliction across so many agencies and individuals, the sheer routinization of impropriety as standard operating procedure, belies any attempt to dismiss it as the work of a few bad apples. What Plaintiff

has exposed is a diseased orchard - a culture of corruption so widespread and deeply rooted as to implicate the very possibility of honest self-government.

That is the sobering reality this case confronts - and the monumental stakes that hang in its balance. For the rot in Nebraska's body politic can no longer be written off as a flesh wound. If the dense web of institutional failure limned in this Complaint is any indication, the cancer of unaccountability has reached Stage IV, metastasizing into every organ of republican government. What is at issue is no longer the misdeeds of this or that bureaucrat, but the very survival of bureaucracy as a tool for effectuating the popular will rather than the reverse.

The question is whether that grim prognosis will be Nebraska's epitaph, or its wake-up call. For as much as this case chronicles a staggering record of systemic dereliction, it also serves as a stirring testament to the power of even one free citizen to serve as a watchman on the walls of his republic. In the face of a kleptocratic phalanx marshaled to thwart his every effort at public scrutiny, Justin Riddle has shown us what a government of the people, by the people, for the people looks like in action. Now it falls to the courts as the last redoubt of

constitutional accountability to put those words back into practice - to demonstrate that our founding ideals are more than a parchment promise or a schoolhouse slogan.

Fortunately, this Plaintiff has left them no choice but to try. For in exhaustively documenting the Defendants' interwoven schemes of official treachery, Mr. Riddle has handed this Court both a rare diagnostic opportunity and a profound moral imperative. After years of painstaking investigation and self-sacrificing struggle, he has surfaced a public malignancy so severe that it can no longer be excused or ignored - and in so doing, has forced the question of whether our bedrock republican values can still be made real. By the same token, he has gifted our judiciary a singular chance to cauterize the wounds of misrule and model what strong constitutional medicine looks like.

Make no mistake: What is at stake here is not just the conduct of a few crooked bureaucrats in America's heartland, but the viability of the rule of law in an era of encroaching executive impunity. The Defendants' transgressions are so flagrant, their contempt for basic democratic safeguards so brazen, that to ratify them

through inaction would be to deal a body blow to a constitutional order already reeling from a crisis of legitimacy. Conversely, to meet their entrenched lawlessness with the full force of the federal Anti-Corruption Acts would be to take a decisive step toward rehabilitating public trust in our battered instruments of self-government. In an age of cascading institutional faiths, it would provide a desperately needed infusion of civic confidence - a tonic to our long national nightmare of elite unaccountability.

So as the Court ponders the grave allegations contained herein, let it be with a keen awareness that the whole country is watching. For the first and perhaps the last time, the nation's eyes are trained on Nebraska as a microcosm of its larger struggle to salvage popular sovereignty from the jaws of a metastasizing Leviathan. The plaintiff's Complaint is thus not just a parochial grievance but a democratic cri de coeur, a flare lofted from the civic frontlines of a republic under siege. How the judiciary responds - whether with bold reaffirmation or timid abdication - will have consequences far beyond the Cornhusker State.

This is the hour of decision, the moment of truth for a legal system poised on a knife's edge between renewal and decline. A patient bleeds out on the operating table of our national destiny, and the scalpel of reform sits idle in the trembling hands of judges more used to wielding it as a prop than brandishing it in earnest. The question is no longer whether major surgery is needed to restore the vital organs of our democracy, but whether the presiding doctors can still locate their nerve and their professional honor.

Justin Riddle has demonstrated, through Herculean effort, that one citizen with a bellyful of fire can still make the comfortable and connected sweat. He has etched, with cool, devastating precision, a diagnostic map of the Nebraska Establishment's every evasion of public scrutiny. In so doing, he has presented the courts with the ultimate Exhibit A to a generation's bill of impeachment against institutional decadence.

Now this Complaint places the scalpel squarely in their hands. Will they find within themselves the wisdom and fortitude to use it for its highest purpose, or will posterity remember this as the moment the guardians of our laws

flinched from the surgeon's oath and let the light of republican self-rule flicker out once and for all?

For over two centuries, this country has served as a shining city on a hill - an imperfect beacon of self-government to a world torn between the Scylla of tyranny and the Charybdis of anarchy. What happens next will determine whether America retains its lonely vigil in the popular imagination, or degenerates into yet another cautionary tale of democratic entropy.

On that score, let no one misapprehend the significance of what unfolds in these pages. The power to write the next chapter in this saga of institutional depravity rests, as it must, with the courts as the last backstop of constitutional faith. But the eyes reading over their shoulder will belong to citizens far beyond the litigants at bar - indeed, to nothing less than the jury pool of history itself.

Like a portent from the past or a postcard from the future, the footnotes to come will bear silent witness to how the United States answers when the roll is called at a hinge moment for self-government. More than any single villain

unmasked or victim redressed, the true legacy of this case will be measured in the message it sends about the sinews of our civic creed.

Can a system this sick still heal itself, or has the hard rain of official misconduct washed away the last dams of public trust? Is there still magic enough in the words "ordered liberty" and "popular sovereignty" to defibrillate the Founders' fading heartbeat, or have we passed the event horizon for a government of laws, not of men?

On these and kindred riddles turns more than the passing fate of good government in Nebraska. They will ripple out from this Complaint to shape the tensile strength of our civic immune system for a generation, with implications for experiments in self-rule far beyond our shores. The time has come to administer the sternest possible stress test of our most sacred constitutional promissory notes - and to discover, in the trying, how much structural integrity remains in the hull of our ship of state.

Justin Riddle has spent the better part of a decade ensuring that this moment might arrive while the pumps are still working and self-correction is still possible. He

has sacrificed more than any healthy polity should ever require of even its most lion-hearted dissenters to force a long overdue reckoning with the oldest question of our republican identity: Quis custodiet ipsos custodes? Who will guard the guardians themselves when every formal check on their power has been deliberately dismantled or captured from within?

Now it falls to the courts to prove whether Juvenal's ancient conundrum remains a cautionary tale or an epitaph for the American experiment. By the grace of a single citizen's unflagging faith in our creaking institutions, they have been granted one last chance to reaffirm first principles at a watershed moment for self-government itself.

Let us pray they are equal to the awesome responsibility. For the sake of Justin Riddle and of the republic for which he stands - as the last line of defense between the arbitrary rule of venal elites and the just consent of the governed.

## II. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action pursuant to:

1. 28 U.S.C. § 1331 (federal question jurisdiction), as this action arises under the Constitution and laws of the United States, including but not limited to:

   a. 18 U.S.C. §§ 1961-1968 (Racketeer Influenced and Corrupt Organizations Act)

   b. 42 U.S.C. § 1983 (Civil Rights Act)

   c. First Amendment to the United States Constitution (right to petition for redress of grievances)

   d. Fifth and Fourteenth Amendments to the United States Constitution (due process and equal protection)

2. 28 U.S.C. § 1343(a)(3) and (4), which grant jurisdiction for civil rights violations and to secure equitable relief under federal civil rights laws.

**3. The Anti-Injunction Act (28 U.S.C. § 2283) does not bar this action despite its involvement with state court proceedings, as this case falls squarely within the recognized exceptions for:**

   **a. Actions expressly authorized by Congress, including RICO enforcement actions (see \*Mitchum v. Foster\*, 407 U.S. 225 (1972), establishing that federal civil rights actions under 42 U.S.C. § 1983 are expressly authorized exceptions)**

   **b. Cases where injunctive relief is necessary to protect or effectuate the judgments of the federal courts**

   **c. Circumstances where state courts are being used to harass citizens and prevent the exercise of federal rights (see \*Dombrowski v. Pfister\*, 380 U.S. 479 (1965))**

**4. The Rooker-Feldman doctrine does not bar jurisdiction, as this action:**

   **a. Does not seek review of final state court judgments but challenges an ongoing pattern of conduct that extends beyond individual cases**

   **b. Addresses a coordinated scheme that has corrupted the judicial process itself, not merely the outcomes of specific cases**

   **c. Falls within the exception for cases involving extrinsic fraud that prevented full and fair litigation (see *In re Sun Valley Foods Co.*, 801 F.2d 186, 189 (6th Cir. 1986))**

   **d. Challenges conduct that is "separate from and independent of the state court judgment" (see *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 167 (3d Cir. 2010))**

**5. Abstention doctrines do not apply, as:**

   **a. Younger abstention is inapplicable where, as here, there is demonstrated bad faith and harassment in state proceedings (see *Younger v. Harris*, 401 U.S. 37, 53 (1971))**

   **b. Pullman abstention is inappropriate where state court remedies have been systematically foreclosed through procedural manipulation (see *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941))**

   **c. Burford abstention does not apply where, as here, the state regulatory system itself has been corrupted (see *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943))**

d. Colorado River abstention is inapplicable given the extraordinary circumstances demonstrating that state proceedings cannot provide adequate protection of federal rights (see *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976))

6. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367, as these claims form part of the same case or controversy as the federal claims.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to these claims occurred within this judicial district, and at least one of defendants reside or maintain their principal place of business within this district.

Venue is also proper pursuant to 18 U.S.C. § 1965, as the RICO enterprise alleged herein operated in some capacity out of Colorado.

## III. PARTIES

### A. Plaintiff

Justin Riddle is a citizen of the United States and a resident of Omaha, Nebraska. He has actively sought public records and transparency from Nebraska governmental entities since 2018, using lawful channels established under the Nebraska Public Records Law (Neb. Rev. Stat. §§ 84-712 to 84-712.09). Despite facing systematic obstruction, coordinated retaliation, and the corruption of every accountability mechanism available to citizens, Plaintiff has meticulously documented each instance of misconduct, creating an unimpeachable record of institutional corruption spanning multiple years and agencies.

Mr. Riddle files this suit as a private citizen and as a representative of the people's interest in honest, transparent, and accountable government. He seeks relief both individual and public in nature, including but not limited to damages, injunctive relief, and a judicial declaration that the Defendants' conduct is violative of state and federal law.

### B. Defendants

The defendants in this action represent a coordinated enterprise spanning multiple governmental and private entities, all operating with the shared purpose of preventing transparency and accountability:

1. **Executive Branch Defendants**:

   a. **Nebraska Attorney General's Office**:

   - MIKE HILGERS, in his individual capacity as Attorney General of Nebraska

   - DOUG PETERSON, in his individual capacity as former Attorney General of Nebraska

   - LAURA NIGRO, in her individual capacity as Assistant Attorney General

   - MITCHELL WURM, in his individual capacity as Assistant Attorney General

   - LESLIE DONLEY, in her individual capacity as Assistant Attorney General and Legal Advisor

- DAVID BYDALEK, in his individual capacity as Chief Deputy Attorney General

b. **Omaha Public Schools**:

- SHAVONNA HOLMAN, in her individual capacity as former President of the OPS Board

- ANNE MACFARLAND, in her individual capacity as Records Keeper for OPS

- CHERYL LOGAN, in her individual capacity as former OPS Superintendent

- MATTHEW RAY, in his individual capacity as OPS Superintendent

- SPENCER HEAD, in his individual capacity as former OPS Board President

- BARRY THOMAS, in his individual capacity as former OPS Director of Equity & Diversity

- UNNAMED OPS BOARD MEMBERS (at least two additional)

- UNNAMED OPS LEGAL COUNSEL

c. **Nebraska Department of Banking and Finance**:

**- MARK QUANDAHL, in his individual capacity as former Director**

**- MIKE MCDANNEL, in his individual capacity as Deputy Director**

**2. \*\*Judicial Branch Defendants\*\*:**

**a. \*\*State Court Judges\*\*:**

**- DUANE DOUGHERTY, in his individual capacity as District Court Judge**

**- SHELLY STRATMAN, in her individual capacity as District Court Judge**

**- VAUGHN, in his individual capacity as State Court Judge**

**b. \*\*Federal Court Judges\*\*:**

**- JOHN GERRARD, in his individual capacity as Federal District Judge**

**- ROBERT ROSSITER, in his individual capacity as Federal District Judge**

**- RICHARD KOPF, in his individual capacity as Federal Judge**

- **RALPH R. ERICKSON, in his individual capacity as Eighth Circuit Judge**

- **LAVENSKI R. SMITH, in his individual capacity as Eighth Circuit Judge**

- **STEVEN M. COLLOTON, in his individual capacity as Eighth Circuit Judge**

- **HORATIO WHEELOCK**

**3. \*\*Law Enforcement Defendants\*\*:**

  **a. \*\*Omaha Police Department\*\*:**

  - **CHARLES OTT, in his individual capacity as Lieutenant and head of OPS School Resource Officers**

  - **STEVE LEE, in his individual capacity as Officer in the Mental Health and Wellness Unit**

  - **UNNAMED POLICE SUPERVISORS**

  **b. \*\*Nebraska State Capitol Police\*\*:**

  - **THREE UNNAMED CAPITOL POLICE OFFICERS who removed Plaintiff from the Capitol building**

4. **Private Attorney Defendants**:

  a. **Baird Holm LLP Attorneys**:

    - STEVE DAVIDSON, in his individual capacity

    - DAVID KRAMER, in his individual capacity

    - JILL ACKERMAN, in her individual capacity

    - CAMERON FINKE, in his individual capacity

  b. **Federal Reserve Bank of Kansas City Attorney**:

    - TODD RUSKAMP of SHOOK, HARDY and BACON LLP, in his individual capacity

    - NORMA BENNET of SHOOK HARDY and BACON LLP, in her individual capacity

    - MICHAELA GIBBS of SHOOK HARDY and BACON LLP, in her individual capacity

    - KENNETH M. TRUJILLO-JAMISON, in his individual capacity

    - JEFFREY NIX, in his individual capacity

    - DEVON RITTER, in his individual capacity

    - D. WELCH, in his individual capacity

 c. **Koley Jessen Attorneys**:

   - PATRICK KIMMEL, in his individual capacity as attorney for WOWT

5. **Oversight Agency Defendants**:

 a. **Nebraska Ombudsman's Office**:

   - JULIE ROGERS, in her individual capacity as Public Counsel

   - UNNAMED OMBUDSMAN'S OFFICE OFFICIALS

 b. **Nebraska Department of Unauthorized Practice of Law**:

   - MARK WEBER, in his individual capacity

6. **Additional Defendants**:

 a. **Municipal Officials**:

   - JEAN STOTHERT, in her individual capacity as Omaha Mayor

 b. **Federal Officials**:

- DON BACON, in his individual capacity as U.S. Congressman

c. **Financial Institutions**:

- CHARTERWEST BANK EXECUTIVES, including GARY WALTERS

d. **Media Representatives**:

- GINA DVORAK, in her individual capacity as WOWT Digital Media Director

- SCOTT VORHEES, in his individual capacity as KFAB reporter

e. **Court Staff**:

- UNNAMED COURT REPORTER who facilitated judicial misconduct

f. **Doe Defendants**:

- JOHN/JANE DOES 1-50, currently unknown defendants who necessarily participated in, accepted, or ignored clear and flagrant violations of the law

Collectively, the Defendants formed and operated a fraudulent enterprise within the meaning of RICO, 18

U.S.C. § 1961(4), engaging in a pattern of racketeering activity designed to silence Mr. Riddle and prevent public exposure of their misdeeds. They exploited their official positions and manipulated the instruments of government power to erect an impenetrable bulwark around their illicit enterprise, violating the basic rights of the Plaintiff and the public at large to know the truth about their government's functioning and to petition their leaders for the redress of grievances.

Each individual Defendant is sued in his or her individual capacity unless otherwise noted. At all relevant times, each Defendant was illegally acting under color of law pursuant to their authority as government officials or as willful participants in joint action with state and federal agents. The misconduct described herein was undertaken with malice, willfulness, and reckless indifference to the rights of others.

### C. Comprehensive List of Defendants and Allegations

**JUDGES**

## 1. **Judge Duane Dougherty (Douglas County District Court)**

* Allowed ex parte communications between Davidson and the court before a hearing

* Relied on a nonexistent Amended Complaint to justify dismissal

* Refused to demand a response from OPS attorneys when accused of fraud

* Took under advisement arguments never made, proving judicial bias

* Made provably false statements in court opinions, including the claim that the defense scheduled a hearing when court records clearly show Plaintiff scheduled it earlier

* Allowed procedural fraud to hijack hearings, favoring OPS's fabricated claims over documented evidence

* Delayed hearings in violation of Nebraska law, preventing timely relief

* Ignored due process violations in Holman v. Riddle, favoring government at every stage

**\* Refused to recuse himself despite clear conflicts of interest**

**\* Betrayed judicial oath by conspiring from bench to protect enterprise from accountability**

**\* Issued biased rulings and manipulated procedures to provide veneer of legal legitimacy**

**\* In 2021, allowed multiple false and prejudicial statements from Baird Holm in OPS case**

**\* Issued protection order based on documented false statements**

**\* Coordinated with co-defendants in administrative actions outside judicial immunity**

**\* Participated in broader RICO enterprise through judicial misconduct**

**\* Predetermined rulings in coordination with co-conspirators**

**\* Used court as "farcical puppet theater" with rigged outcomes**

**\* Created logically impossible rulings by dismissing simultaneously for "lack of jurisdiction" and "failure to**

**state a claim" in violation of Steel Co. v. Citizens for Better Environment**

**2. \*\*Judge Shelly Stratman (Douglas County District Court)\*\***

**\* Permitted fraudulent legal tactics in favor of OPS**

**\* Held Plaintiff to impossible procedural standards while excusing OPS's misconduct**

**\* Refused to consider overwhelming evidence of perjury and procedural violations**

**\* Denied due process by refusing to review evidence of OPS misconduct at October 1, 2024 hearing**

**\* Allowed OPS's last-minute motion to dismiss filed less than 24 hours before a hearing**

**\* Created arbitrary "verification" standards not existing in law to obstruct access to records**

**\* Demonstrated bias in favor of OPS, refusing to uphold statutory rights**

**\* Participated in coordinated effort to suppress transparency**

\* Enabled systematic violations of public trust

\* Tried to intimidate the Plaintiff by claiming he was disrespectful for expecting the truth and laws to matter

3. **Judge John M. Gerrard (Federal Court, Nebraska)**

\* Dismissed cases based on procedural gamesmanship, avoiding merits of claims

\* Blocked legitimate constitutional claims from being heard

\* Participated in systematic suppression of evidence

\* Coordinated with other federal judges to prevent meaningful review

\* Failed to promptly remand case despite obvious lack of jurisdiction

4. **Judge Rossiter (Federal Court, Nebraska)**

\* Allowed jurisdictional defects in OPS's removal to federal court

\* Prevented meaningful review of the case

**\* Rubber-stamped OPS's legal obstruction tactics**

**\* Participated in broader pattern of federal judicial misconduct**

**\* Failed to promptly remand case despite obvious lack of jurisdiction**

**5. \*\*Judge Vaughn (State Court, Nebraska)\*\***

**\* Recused himself due to unspecified connections to OPS**

**\* Delayed Plaintiff's case unnecessarily, contributing to procedural sabotage**

**\* Initial assignment raised concerns about court's neutrality**

**\* Failed to disclose nature of conflicts with OPS**

**\* Participated in coordinated delay tactics**

**6. \*\*Judge Richard Kopf (Eighth Circuit Judge)\*\***

**\* Upheld unconstitutional rulings that ignored due process**

* Showed deference to government agencies over citizen rights

* Refused to acknowledge overwhelming evidence of procedural fraud

* Protected institutional actors from accountability

* Participated in systematic suppression of constitutional claims


7. **Judge Ralph R. Erickson (Eighth Circuit Judge)**

* Part of Eighth Circuit panel issuing baseless summary affirmance in CharterWest

* Actively ignored clear procedural fraud in Nebraska courts

* Refused to engage with substantive legal arguments in prior appeals

* Demonstrated judiciary's complicity in suppressing Plaintiff's case

* Participated in coordinated effort to prevent meaningful appellate review

**8. \*\*Judge Lavenski R. Smith (Eighth Circuit Judge)\*\***

\* Allowed systemic discrimination against pro se litigants to continue unchecked

\* Failed to issue meaningful ruling addressing constitutional issues

\* Helped reinforce pattern of courts protecting institutions over individuals

\* Participated in coordinated suppression of evidence

\* Enabled broader RICO enterprise through judicial inaction

**9. \*\*Judge Steven M. Colloton (Eighth Circuit Judge)\*\***

\* Repeatedly dismissed well-pled claims in summary affirmances

\* Actively participated in judicial misconduct by refusing to address procedural fraud

\* Part of institutional cover-up preventing government entities from facing consequences

\* Coordinated with other circuit judges to prevent meaningful review

**\* Enabled broader pattern of corruption through judicial decisions**

**\* Refused to address Lieutenant Ott's recorded phone call**

**10. \*\*Judge Horatio Wheelock\*\***

**\*\*ATTORNEYS\*\***

**1. \*\*Steve Davidson (Attorney, Baird Holm)\*\***

**\* Submitted ex parte documents to judge before hearings**

**\* Filed fraudulent documents to justify dismissal**

**\* Labeled Plaintiff as "security threat" in court records, committing defamation**

**\* Refused to deny allegations of misconduct when confronted**

**\* Knowingly made false statements in hearings and filings**

**\* Coordinated with state officials to suppress evidence**

**\* Acted as "megaphone of lies" for OPS**

**\* Fabricated baseless security threats to smear Plaintiff**

**\* Coordinated harassment and intimidation tactics**

**\* Made false statements on record in multiple venues**

**\* Engaged in intentional infliction of emotional distress**

**\* Participated in RICO enterprise through pattern of fraud**

**2. \*\*David Kramer (Attorney, Baird Holm)\*\***

**\* Lied to Nebraska Attorney General's Office and courts**

**\* Coordinated with OPS officials to obstruct records requests**

**\* Provided false statements to Nebraska Attorney General's Office**

**\* Actively engaged in legal obfuscation and procedural fraud**

**\* Weaponized legal system to protect OPS and silence whistleblowers**

**\* Leveraged position to participate in records suppression scheme**

**\* Coordinated with conspirators to conceal evidence**

**\* Furthered enterprise's illicit aims through legal tactics**

**\* Participated in broader RICO conspiracy through coordination role**

**3. \*\*Jill Ackerman & Cameron Finke (Baird Holm Attorneys)\*\***

**\* Represented Holman in fraudulent restraining order case**

**\* Knowingly used false statements in legal proceedings**

**\* Participated in broader legal strategy to suppress constitutional rights**

**\* Coordinated with other attorneys to enable fraud**

**\* Engaged in pattern of deceptive legal practices including lying on record**

**\* Made highly prejudicial statements of completely unrelated pending litigation claiming Plaintiff was**

supportive of the "Murderer, Kyle Rittenhouse," who was and remains innocent

## 4. **Patrick Kimmel - Attorney for Koley Jessen representing WOWT**

* Engaged in same pattern of misconduct and ex parte communications

* Filed 11th Hour Motion to Dismiss

* Worked with Judge Stratman to violate Plaintiff's Due process

## 5. **Todd Ruskamp (Attorney, Federal Reserve Bank of Kansas City)**

* Enabled CharterWest Bank's records manipulation through legal cover

* Coordinated with Nebraska Banking Department to prevent investigation

* Participated in procedural obstruction blocking access to federal remedies

**\* Engaged in pattern of legal tactics to prevent accountability**

**\* Leveraged Federal Reserve position to suppress evidence of banking fraud**

## 6. \*\*Jeffrey Nix (Attorney, Federal Reserve Bank of Kansas City)\*\*

**\* Participated in coordinated legal obstruction regarding banking complaints**

**\* Provided false legal justifications for non-investigation of documented fraud**

**\* Used position to influence regulatory bodies against meaningful review**

**\* Engaged in pattern of procedural manipulation to prevent legal remedies**

**\* Coordinated with enterprise participants to ensure systematic protection**

## 7. \*\*Devon Ritter (Attorney, Federal Reserve Bank of Kansas City)\*\*

* Facilitated regulatory capture through procedural obstruction

* Participated in coordinated response strategy across banking institutions

* Engaged in pattern of legal maneuvers to prevent exposure of fraud

* Used procedural technicalities to dismiss legitimate complaints

* Provided legal cover for other enterprise participants


8. **D. Welch (Attorney, Federal Reserve Bank of Kansas City)**

* Participated in systemwide legal obstruction regarding banking oversight

* Engaged in procedural tactics to prevent investigation of documented fraud

* Coordinated with state-level participants to ensure regulatory protection

* Facilitated information-sharing between enterprise participants

**\* Used position to influence banking complaints process against transparency**

**\*\*LAW ENFORCEMENT & GOVERNMENT OFFICIALS\*\***

**1. \*\*Lt. Charles Ott (Head of OPS School Resource Officers)\*\***

**\* Contacted Plaintiff before Holman filed restraining order, proving pre-coordination**

**\* Acknowledged Plaintiff's speech was lawful but engaged in intimidation**

**\* Confirmed OPS contacted law enforcement first, exposing coordinated plan**

**\* Defended OPS's attempt to search student's room without probable cause**

**\* Was prevented from testifying at restraining order hearing**

**\* Called Plaintiff before restraining order filed, showing OPS-OPD coordination**

**\* Refused to testify despite being key law enforcement official**

**\* Participated in coordinated effort to suppress speech**

**\* Enabled broader pattern of civil rights violations**

**2. \*\*Steve Lee (Omaha Police Department, Mental Health and Wellness Unit)\*\***

**\* Contacted Plaintiff before Holman's restraining order filing**

**\* Framed legitimate public concerns as mental health issue**

**\* Part of preemptive law enforcement effort to silence Plaintiff**

**\* Called Plaintiff before restraining order, proving pre-coordination**

**\* Participated in coordinated intimidation campaign**

**\* Enabled broader pattern of civil rights violations**

**\* Attempted to frame legitimate political speech as a mental health issue**

3. **Mike Hilgers (Nebraska Attorney General)**

* Knowingly published false information about public records case

* Refused to correct documented lies, violating public trust

* Allowed office to label Plaintiff "security threat" without evidence

* Failed to uphold transparency laws and enabled OPS misconduct

* Expanded campaign of records suppression and retaliation

* Key participant in ongoing conspiracy against transparency

* Established policies to obstruct public records access

* Shielded political allies from scrutiny

* Turned blind eye to rampant violations

* Presided over regime of secrecy and cronyism

## 4. **Mark Weber (Head of Nebraska Unauthorized Practice of Law Commission)**

* Launched retaliatory investigations against Plaintiff

* Weaponized office to suppress legal claims

* Used false accusations to intimidate Plaintiff

* Initiated unauthorized practice proceedings without notice

* Abused authority as retaliatory measure

* Participated in sham prosecution scheme

* Coordinated with other officials to enable fraud

* Mailed a threat of legal action about a fictitious complaint from a non-existent party

* Used privilege to claim Plaintiff couldn't see the charges, complaint or documents


## 5. **Laura Nigro (Nebraska Attorney General's Office)**

* Participated in delaying tactics and procedural obstruction

* Refused to investigate OPS's fraudulent filings

* Enabled broader pattern of misconduct

* Coordinated with other officials to suppress evidence

## 6. **Mitchell Wurm (Nebraska Attorney General's Office)**

* Issued fraudulent legal opinions to justify suppressing records

* Aided Nebraska's cover-up by misrepresenting laws

* Conspired to concoct spurious legal rationales

* Acted as "loyal foot soldier" for enterprise

* Participated in retaliation campaigns

* Disseminated false legal justifications

## 7. **Leslie Donley (Attorney General's Legal Advisor)**

* Weaponized position to provide false legal cover

* Issued fraudulent opinions to justify denial of records

**\* Acted as critical facilitator of scheme**

**\* Transmitted knowingly false legal interpretations**

**\* Participated in coordinated effort to obstruct access**

**8. \*\*Julie Rogers (Nebraska Ombudsman)\*\***

**\* Failed to intervene despite evidence of AG misconduct**

**\* Allowed OPS and AG's Office to manipulate enforcement**

**\* Blocked legitimate investigations**

**\* Physically barred Plaintiff from office**

**\* Refused to act on fraud complaints**

**\* Abdicated watchdog duty**

**\* Served as guardian of government corruption**

**\* Coordinated with AG's office to dismiss valid complaints**

**\* Enabled enterprise's ongoing violations through inaction**

\* Refused to investigate complaints about the Attorney General's Office despite that being explicitly within her statutory jurisdiction

## 9. **Nebraska State Capitol Police, 3 individuals**

\* Knew the situation because Plaintiff took great care to bring them documentation after being accused of being "disruptive"

\* Removed Plaintiff from the Capitol on 3 separate occasions for the sin of properly asking the AG for resolution

\* Refused to sign a document stating Plaintiff was/was not a "Security Threat" as stated on record and in the motion to dismiss filed by Davidson

\* Physically removed Plaintiff from the state capitol on orders from the Attorney General's office in retaliation for his efforts to expose their corruption

## **OMAHA PUBLIC SCHOOLS**

1. **Shavonna Holman (OPS Board President, at the time)**

* Filed fraudulent protection order against Plaintiff

* Used authority to suppress records and obstruct claims

* Coordinated with law enforcement before filing order

* Worked with OPS attorneys to fabricate legal justifications

* Participated in broader conspiracy to silence dissent

* Enabled systematic violations of public trust


2. **Spencer Head (Former OPS Board President)**

* Personally informed of concerns in 2021 but failed to intervene

* Allowed retaliation efforts to continue unchallenged

* Did nothing to correct procedural abuses

* Knew of violations since 2021 but failed to act

* Had direct conversations about misconduct without intervention

**\* Participated in coordinated suppression strategy**

**3. \*\*Anne MacFarland (OPS Records Keeper)\*\***

**\* Falsified and manipulated public records to obstruct access**

**\* Knowingly delayed responses and withheld documents**

**\* Directly participated in records suppression scheme**

**\* Played integral role in executing enterprise's attacks**

**\* Coordinated with other officials to conceal evidence**

**4. \*\*Cheryl Logan (Former OPS Superintendent)\*\***

**\* Blocked Plaintiff from official accounts to silence dissent**

**\* Helped coordinate overall suppression strategy**

**\* Avoided answering public records requests**

**\* Abruptly resigned without addressing concerns**

**\* Ignored records requests**

**\* Authorized school's involvement in Holman's defense**

**\* Failed to intervene in systematic suppression**

**\* Worked with law enforcement to monitor speech**

**\* Participated in broader conspiracy to prevent transparency**

**5. \*\*Barry Thomas (Former OPS Director of Equity & Diversity)\*\***

**\* Responsible for implementing and hiding curriculum changes**

**\* Subject of unfulfilled public records requests**

**\* Blocked access to key public documents**

**\* Resigned amid controversy without transparency**

**\* Actively worked to implement controversial curriculum**

**\* Engaged in retaliatory suppression of speech**

**\* Coordinated with other officials to prevent disclosure**

## 6. **Matthew Ray (OPS Superintendent)**

* Continued pattern of records suppression

* Maintained retaliatory policies against transparency

* Participated in ongoing conspiracy

* Enabled systematic violations of public trust


## 7. **Unnamed OPS Board Members (At Least Two Additional)**

* Privately discussed suppressing speech & misleading public

* Involved in cutting off microphones & manipulating meetings

* Called Plaintiff "security risk" without evidence

* Voted to indemnify Holman but refused to testify

* Coordinated with attorneys and law enforcement

* Participated in discussions about removing Plaintiff

* Enabled broader retaliation campaign

**\* Systematically violated open meetings laws**

**8. \*\*Unnamed OPS Legal Counsel\*\***

**\* Advised funding Holman's restraining order**

**\* Helped draft false legal arguments about OPS involvement**

**\* Coordinated with law enforcement**

**\* Participated in systematic suppression strategy**

**\*\*ADDITIONAL DEFENDANTS\*\***

**1. \*\*Jean Stothert (Omaha Mayor)\*\***

**\* Failed to intervene in systematic violations**

**\* Enabled broader pattern of corruption**

**\* Participated in coordinated suppression efforts**

## 2. **CharterWest Bank Executives, including Gary Walters**

* Fraudulently altered financial documents

* Falsely claimed past-due child support

* Destroyed loan ability through false records

* Conspired with state officials to cover up fraud

* Initiated broader pattern of retaliation

* Participated in systematic suppression strategy

## 3. **Unnamed Court Reporter**

* Accepted and handled ex parte document

* Facilitated judicial misconduct

* Acted as intermediary for improper communications

* Enabled broader pattern of corruption

## 4. **Unnamed Police Supervisors**

**\* Prevented Lt. Ott from testifying**

**\* Coordinated with OPS to suppress rights**

**\* Instructed officers to monitor speech**

**\* Participated in systematic retaliation**

**\* Enabled broader conspiracy through coordination**

**5. \*\*Unnamed Ombudsman's Office Officials\*\***

**\* Failed to intervene despite evidence**

**\* Intimidated and retaliated against Plaintiff**

**\* Employed shifting rationales for inaction**

**\* Participated in systematic suppression**

**\* Enabled broader pattern of corruption**

**6. \*\*Don Bacon (U.S. Congressman)\*\***

**\* Knows the issues**

\* Claimed they can't help a Citizen that the State is lying about due to "lack of jurisdiction"

\* Refuses to shed light on the situation or get the media involved

## 7. **Gina Dvorak (WOWT Digital Media Director)**

\* Illegally suppressed Plaintiff on WOWT's Facebook

\* Spread false information and made false statements under WOWT's official account

\* Worked within the same system of obstruction as all other Defendants

## 8. **Scott Vorhees (KFAB Reporter)**

\* Reached out to Spencer Head and the OPS School Board based on understanding the concerns

\* After presumably speaking with OPS, silently exited the scene, refusing to cover the story

The facts herein paint a disturbing picture of cronyism, corruption, and conspiracy at the highest levels of Nebraska's government and civic institutions.

## IV. THE ATTORNEY GENERAL'S ROLE IN MEDIA SUPPRESSION

For eight years, no media outlet has shown the slightest curiosity about a case involving:

* Public records fraud

* Judicial corruption

* Retaliation against a citizen exposing systemic abuse

That is statistically impossible unless suppression was deliberate.

### A. The Attorney General's Office Has Been Quietly Controlling the Narrative

At some point, at least one reporter had to have asked about this case. Any journalist investigating legal corruption would have encountered the OPS records suppression scandal and the Nebraska Supreme Court case. Instead of covering it, they stayed silent.

The only logical explanation? The Nebraska Attorney General's Office intervened behind the scenes. This is direct evidence of information control. The AG's Office, rather than allowing the press to investigate, likely issued quiet directives to journalists or their editors, discouraging coverage.

### B. Why This Constitutes a RICO Predicate Act

Influencing or manipulating the media to suppress exposure of criminal activity is obstruction of justice under federal law. Coordinating a cover-up through non-public channels (i.e., influencing media silence) is a form of racketeering activity. The AG's Office does not have the legal authority to control press coverage—meaning any effort to do so is an abuse of power designed to protect a criminal enterprise.

**Conclusion: The Nebraska Attorney General's Office didn't just refuse to investigate corruption—it actively worked behind the scenes to ensure the media would not report on it.**

## V. MEDIA COMPLICITY AND THEIR ROLE IN THE ENTERPRISE

**The media is supposed to serve as a check on government corruption. Instead, in Nebraska, they act as protectors of the system.**

### A. The Business of Silence

**News organizations rely on government relationships for:**

**\* Interviews, scoops, and access to public officials**

**\* Advertising revenue from government agencies and political campaigns**

Covering government corruption puts these relationships at risk. Rather than investigate, they chose to protect their financial and political interests.

### B. The Nebraska Media's Unbroken Record of Suppression

* Not one media outlet has covered the Plaintiff's Nebraska Supreme Court victory, a notable landmark case from a self represented litigant

* Not one journalist has pursued the AG's refusal to enforce public records laws

* Not one publication has inquired on the (upcoming) RICO lawsuit exposing systemic corruption

That isn't oversight. That's complicity.

### C. Why This is a RICO Predicate Act

**\* The media is actively profiting from suppression. By refusing to report on corruption, they maintain their financial relationships with government officials. This transforms their silence into a commodity exchanged for influence and advertising dollars.**

**\* By suppressing critical public information, the media is aiding and abetting fraud. The public has a legal right to know about judicial and government misconduct. News organizations, by deliberately ignoring clear corruption, are participating in a fraudulent scheme that prevents public accountability.**

**Conclusion: The Nebraska media is not failing to report. They are choosing not to report. And that makes them active participants in the conspiracy.**

## VI. SYSTEMATIC FORECLOSURE OF JUSTICE: THE LEGAL INDUSTRY'S ROLE IN PROTECTING CORRUPTION

This section establishes that no attorney can or will challenge the system, proving that legal recourse is an illusion.

### A. The Myth of Legal Representation

* Government agencies, courts, and law enforcement routinely tell citizens to "get an attorney" to resolve legal disputes.

* In reality, no private attorney will take a case against entrenched corruption for two primary reasons:

  * Career Suicide: Any attorney who challenges Nebraska's legal establishment will face blacklisting, professional retaliation, and financial ruin.

  * Firm Restrictions: Large law firms prohibit their attorneys from taking cases that would put them in direct conflict with the courts, the Attorney General's Office, or other government entities.

### B. The Legal Industry's Silent Complicity

**\* The Nebraska State Bar and the judicial system create an environment where attorneys fear challenging the status quo.**

**\* Attorneys who represent government entities enjoy guaranteed paychecks funded by taxpayers, while private attorneys who challenge the system risk everything.**

**\* This creates a legal monopoly where only government-approved cases can proceed, ensuring that corruption is never meaningfully challenged.**

**Conclusion: The legal system is not an avenue for justice—it is a self-regulating monopoly designed to eliminate opposition and ensure power remains concentrated within the government-controlled legal establishment.**

## VII. TAXPAYER-FUNDED SUPPRESSION: HOW PUBLIC MONEY IS WEAPONIZED AGAINST WHISTLEBLOWERS

**This section establishes that the government is using public funds to fight the very people it is supposed to serve.**

### A. Public Resources Are Used to Defend Corruption

* **The Nebraska Attorney General's Office, OPS, the judiciary, and law enforcement all use taxpayer money to cover legal fees, investigations, and suppression tactics against private citizens.**

* **Citizens, on the other hand, must personally finance any attempt to hold these institutions accountable.**

* **Critically, the Defendants routinely wait the statutory maximum time to respond to requests, ask for irrelevant information to extend out requests, deliberately slow walk cases and often simply ignore public requests.**

* **This results in a completely one-sided legal battle, where the government has unlimited resources, while the public is financially exhausted before justice can even be pursued.**

* **This is magnified by the clear fact that in the large majority of situations where the public has enlisted the**

help of the government, that individual has found themselves in a very time-sensitive and disturbing position.

* By deliberately using the system to frustrate, confuse, avoid, and damage individual citizens who are already disillusioned by the system, the defendants have taken their flaunted positions from clearly morally reprehensible to factually criminally liable.

### B. The Public is Funding a Protection Racket

* Public employees are using tax dollars to pay for attorneys who protect their own misconduct.

* Judges, who are taxpayer-funded, are rubber-stamping dismissals that protect the government from being held accountable.

* Government agencies are paying private law firms (e.g., Baird Holm LLP) to obstruct public records access and silence whistleblowers.

* The media, which relies on government sources and advertising, actively participates in suppressing the truth to maintain financial relationships.

**Conclusion: The taxpayers of Nebraska are unknowingly financing a system that is designed to suppress their own rights, protect corrupt officials, and ensure that legal challenges to government misconduct are impossible.**

## VIII. CLOSED-LOOP CORRUPTION: THE SELF-SUSTAINING CYCLE OF POWER & SUPPRESSION

### A. The Circular Nature of Government Suppression

* The government funds its own legal defense against corruption allegations.

* The judiciary rubber-stamps dismissals to protect government entities.

* Law enforcement refuses to investigate clear evidence of fraud and abuse.

* The media ensures that the public never hears about these cases.

\* Private attorneys cannot challenge this system without professional or financial ruin.

Conclusion: This is not just corruption—it is an organized criminal enterprise where every participant benefits from maintaining the status quo.

## IX. THE SYSTEMATIC DESTRUCTION OF STABILITY THROUGH PROCEDURAL ATTRITION

What is often overlooked in discussions of institutional corruption and procedural manipulation is the profound human cost that extends far beyond financial damages. The defendants' actions represent a documented phenomenon in protracted institutional conflict: the weaponization of time, uncertainty, and procedural complexity as tools for defeating even the most determined opponents without ever having to address substantive claims.

### A. The Human Cost of Institutional Manipulation

**The system has been deliberately designed to exploit several leverage points simultaneously:**

**1. \*\*Financial Depletion\*\*: The structured accumulation of costs—filing fees, transcript fees, document production expenses—creates a financial bleeding effect that eventually renders continued pursuit unsustainable. Beyond direct litigation costs, this extends to impact fundamental life decisions and economic security. Filing fees alone have cost the Plaintiff thousands of dollars for proceedings that were predetermined to be dismissed.**

**2. \*\*Cognitive Bandwidth Exhaustion\*\*: The constant need to navigate deliberately complex procedural mazes consumes enormous cognitive resources. The human brain has finite capacity for sustained, high-intensity problem-solving, especially when facing intentionally shifting requirements designed to be unsatisfiable. This creates a situation where even the most diligent citizen cannot maintain the mental energy required to combat systematic obstruction.**

3. **Relationship Infrastructure Erosion**: The isolation that comes from pursuing a complex legal battle that others can't fully comprehend gradually undermines the social support systems that sustain mental health. This creates a secondary effect where the loss of relationships further reduces resilience against the primary stressors. The Plaintiff has experienced the deterioration of personal relationships due to the all-consuming nature of this battle.

4. **Identity and Purpose Distortion**: What begins as a specific grievance seeking specific remedy gradually transforms into a consuming mission that restructures one's entire identity around the conflict. The legal battle becomes not just something you're doing but defines who you are, creating a psychological dependency that defendants can exploit.

### B. The Absence of Temporal Boundaries as Psychological Warfare

A particularly insidious aspect of this approach is the deliberate removal of any temporal boundaries. When facing a defined challenge with clear parameters—even a

difficult one—humans can marshal resources and endurance. But when facing an indefinite challenge with constantly shifting parameters and no clear endpoint, the psychological toll multiplies exponentially.

This is a documented strategy in contexts ranging from interrogation techniques to cult indoctrination: remove all predictability and control over when hardship will end, and even the most resilient individual eventually experiences fundamental psychological distress.

The Defendants have deliberately created an endless procedural maze where each new barrier is followed by another, with no possibility of conclusion. This temporal uncertainty is not incidental but strategic—designed to break the will of those seeking accountability.

### C. Documenting This Dimension for Legal Strategy

This human cost dimension must be explicitly incorporated into the legal strategy for several reasons:

1. **Concrete Damages Quantification**: The emotional toll, relationship disruption, and quality-of-life impairment constitute quantifiable damages that extend beyond direct financial losses. Courts have increasingly recognized these impacts as legitimate damage components, particularly in cases involving institutional misconduct.

2. **Pattern Evidence Reinforcement**: The systematic nature of the procedural obstruction becomes even clearer when viewed through the lens of its human impact. What might otherwise be dismissed as coincidental procedural hurdles appears as the deliberate warfare strategy it truly is when its human consequences are fully documented.

3. **Judicial Empathy Trigger**: Even judges operating within institutional constraints respond to human suffering. Documenting not just the procedural manipulation but its real-world consequences activates ethical and empathic considerations that technical legal arguments alone might not.

4. **Urgency Justification**: The ongoing nature of these harms provides additional justification for emergency intervention. Unlike purely procedural issues that might be remedied later, psychological and relationship damage compounds over time in ways that cannot be fully remediated after the fact.

The human cost inflicted by the Defendants' pattern of institutional abuse represents not just collateral damage but a deliberate strategy of attrition designed to make the price of pursuing justice so high that citizens will abandon their rights rather than face continued torment.

## X. PREEMPTIVELY COUNTERING POTENTIAL DISMISSAL ATTEMPTS

Anticipating the Defendants' defense strategies is critical to ensuring this case receives the substantive review it deserves. What follows are the most likely dismissal arguments they will employ and the countermeasures that preemptively address them.

### A. Jurisdictional Attacks – "This Court Lacks Jurisdiction"

**Their Likely Argument**:

* Sovereign immunity (AG, Judges, Government Officials) → They'll claim the Eleventh Amendment bars your claims against the state actors.

* Rooker-Feldman Doctrine → They'll argue you're improperly challenging a state court decision in federal court.

* Lack of Standing → They'll claim you haven't suffered a direct injury that the court can redress.

**Countermeasures**:

* **42 U.S.C. § 1983 Exception to Sovereign Immunity**:

  * The Supreme Court has ruled that state officials are not immune from suit when sued in their individual capacities for constitutional violations.

**  \* AG, Judges, and other officials acted outside the scope of their lawful authority → This strips them of immunity under Ex parte Young, 209 U.S. 123 (1908).**

**  \* Requested relief (injunctions and damages) applies to individual conduct, not just the office.**

**\* \*\*Rooker-Feldman is irrelevant because\*\*:**

**  \* This is a new case addressing ongoing fraud and obstruction, not a review of a prior ruling.**

**  \* Independent violations (e.g., Davidson's defamation, AG's false statements) happened outside any state court judgment.**

**\* \*\*Standing is airtight because\*\*:**

**  \* Direct injury is clear → You were unlawfully denied records, falsely labeled a security threat, and retaliated against.**

**  \* Injunctive relief is necessary → Future violations are likely, requiring court intervention.**

### B. "Failure to State a Claim" (FRCP 12(b)(6))

**Their Likely Argument**:

* "Plaintiff fails to allege specific conduct that violates a law."

* "There is no pattern of racketeering (RICO)."

* "Public records violations don't create a private cause of action."

**Countermeasures**:

* **RICO Predicate Acts Are Fully Established**:

  * The complaint explicitly identifies mail/wire fraud, obstruction of justice, witness retaliation, and conspiracy.

  * Government fraud cases like Bridge v. Phoenix Bond (2008) confirm public corruption schemes fall under RICO.

* **Civil Rights Violations Are Clear**:

  * Public officials retaliating against a citizen for exposing corruption is a textbook § 1983 violation.

  * Security threat designation without due process = deprivation of liberty interest (Paul v. Davis, 424 U.S. 693).

* **Nebraska Public Records Act Is Actionable**:

  * Denial of access violates state law.

  * Ongoing violations justify injunctive relief.

### C. "Judicial Immunity" (For Judges Named as Defendants)

**Their Likely Argument**:

* Judges have absolute immunity for rulings.

* Dismissing cases is a core judicial function.

**Countermeasures**:

* **Judicial immunity does not apply when**:

  * Acts are administrative, not judicial (e.g., coordination with AG's office to obstruct access to records).

  * Decisions were made in absence of jurisdiction (e.g., misusing procedural dismissals to cover up fraud).

  * Fraud and conspiracy are exceptions (Pierson v. Ray, 386 U.S. 547).

* **Dougherty, Stratman, and other judges engaged in misconduct outside judicial function** → Bias & procedural fraud are actionable.

### D. "No Personal Involvement" (Against Supervisors & Higher Officials)

**Their Likely Argument**:

* The AG (Hilgers) and former AG (Peterson) weren't personally involved.

* They can't be held liable for their employees' actions.

**Countermeasures**:

* **Supervisory Liability Applies When**:

  * They knew about violations and failed to act (Ashcroft v. Iqbal, 556 U.S. 662).

  * They implemented policies that allowed fraud and retaliation to occur.

  * They actively participated in obstruction (e.g., AG's legal opinions and denials).

* **Nebraska AG's Office issued false legal opinions** → Hilgers and Peterson knowingly contributed to the enterprise.

### E. "Statute of Limitations"

**Their Likely Argument**:

* Some of these claims are too old.

* RICO requires recent acts within four years.

**Countermeasures**:

* **The "Continuing Violation Doctrine" applies**:

  * Ongoing suppression of records extends limitations.

  * RICO has no single violation—it's a pattern.

* **Last predicate act occurred recently** → Time clock resets with each new obstructive act.

* **Government concealment tolls the statute** → Fraudulent denial of records prevented timely filing.

### F. "Failure to Exhaust Administrative Remedies"

**Their Likely Argument**:

* Plaintiff should have exhausted Nebraska's administrative review process before suing.

* Ombudsman and AG's Office were still reviewing complaints.

**Countermeasures**:

* **Exhaustion is not required for RICO or § 1983 claims**.

* **The administrative process was corrupted** → Plaintiff exhausted all possible remedies, and the AG/Ombudsman deliberately stalled.

### G. "RICO Doesn't Apply to Government Entities"

**Their Likely Argument**:

* RICO is designed for criminal enterprises, not government agencies.

**Countermeasures**:

* **Government officials acting outside their duties form an enterprise**.

* **The enterprise includes private actors** (e.g., Baird Holm attorneys like Kramer, CharterWest Bank executives).

* **Public corruption cases have been prosecuted under RICO before** (e.g., United States v. Salinas, 522 U.S. 52).

These preemptive counters force the Defendants to confront the substantive merits of the case rather than rely on procedural evasions. By addressing these defenses in advance, this complaint ensures that the Court focuses on the profound constitutional issues at stake rather than technical distractions.

## XI. FACTUAL BACKGROUND: THE INTERCONNECTED CONSPIRACIES

### A. The CharterWest Bank Fraud and the Blueprint for Obstruction (2018)

In 2018, Plaintiff applied for a loan from CharterWest Bank, setting in motion a pattern of institutional obstruction that would become the template for subsequent coordinated action across multiple Nebraska agencies:

1. **The Initial Fraud**: CharterWest Bank deliberately falsified Plaintiff's loan application by checking a box indicating he had child support obligations when he had none. This was not a clerical error or oversight but a deliberate document alteration designed to create a pretextual basis for loan denial.

   a. The document alteration is visually apparent, with the "Yes" box for child support obligations clearly checked after the form was completed.

   b. Plaintiff had explained that his daughter had lived for him for 8 years, and there was already a special exclusion written in the loan, making this alteration unquestionably fraudulent.

   c. This initial fraud established the pattern that would be repeated throughout the later public records disputes: when legitimate channels produce unwanted results, documents are altered and records manipulated.

2. **The Regulatory Capture**: When Plaintiff sought accountability for this documented fraud, he encountered a regulatory system designed to protect institutions rather than enforce the law:

a. The Nebraska Department of Banking and Finance, under Director Mark Quandahl and Deputy Director Mike McDannel, refused to investigate despite being presented with clear photographic evidence of document alteration.

b. Their written responses employed circular reasoning, claiming they found no wrongdoing while simultaneously admitting they conducted no meaningful investigation into the alleged fraud.

c. The Federal Reserve Bank of Kansas City similarly acknowledged receipt of the complaint but took no substantive action. Their attorneys, including Todd Ruskamp, Jeffrey Nix, Devon Ritter, and D. Welch, engaged in procedural obstruction that would later be replicated in the public records disputes.

d. The Consumer Financial Protection Bureau likewise acknowledged the complaint but failed to enforce regulations specifically designed to prevent this type of financial fraud.

3. **The Coordinated Non-Response**: These agencies exhibited the same pattern that would later characterize the public records disputes – coordination without accountability:

a. Emails and correspondence obtained through subsequent records requests showed these agencies communicating extensively with each other and with CharterWest Bank.

b. None of these agencies ever contacted Plaintiff to obtain additional evidence or clarification about his complaint.

c. Despite operating under different statutory mandates and jurisdictions, all reached identical conclusions without conducting meaningful investigations, suggesting coordination rather than independent determinations.

d. When Plaintiff provided additional evidence contradicting their findings, all agencies refused to reconsider, again suggesting predetermined outcomes rather than good-faith regulation.

4. **The Judicial Obstruction**: When Plaintiff sought judicial review, he encountered the same procedural manipulation that would later characterize his public records cases:

a. Courts dismissed his complaints on procedural grounds without addressing the merits, applying

hyper-technical readings of pleading requirements selectively against Plaintiff's filings.

   b. Judges applied impossible standards to Plaintiff's filings while simultaneously allowing opposing counsel substantial procedural leeway, including accepting late filings and overlooking missing elements.

   c. The Eighth Circuit Court of Appeals, including Judges Ralph R. Erickson, Lavenski R. Smith, and Steven M. Colloton, issued summary affirmances without addressing the substantive legal arguments presented, effectively rubber-stamping lower courts' procedural dismissals.

   d. At each level, courts focused exclusively on finding procedural defects rather than addressing the documented fraud at the heart of the case.

5. **The Vindication and Media Silence**: Despite this coordinated obstruction, Plaintiff ultimately prevailed in securing the domain name charterwestbank.com – a modest but telling victory that media entities nevertheless refused to cover:

   a. Local media had ignored his original complaints years earlier, despite clear photographic evidence of document alteration.

   b. When Plaintiff ultimately succeeded, these same media entities maintained their silence, refusing to acknowledge that his allegations had been vindicated.

   c. This pattern of media complicity – ignoring both documented misconduct and subsequent vindication – would repeat throughout the public records disputes.

The CharterWest situation established the template that would be refined and deployed in subsequent confrontations: institutional fraud followed by coordinated regulatory inaction, procedural obstruction by courts, and complete media silence despite compelling evidence of wrongdoing.

### B. The Omaha Public Schools Records Suppression Conspiracy (2021-2025)

In 2021, the same patterns established in the CharterWest Bank case reemerged in an even more sophisticated form when Plaintiff sought public records from Omaha Public Schools:

1. **The Board Meeting Incident**: The catalyst for this phase began with a public meeting where Ms. Adamson (Plaintiff's mother) was improperly silenced:

   a. Video evidence clearly shows Ms. Adamson attempting to speak during the public comment portion of an OPS board meeting when she was removed from the podium for attempting to play an audio recording that contradicted the board's narrative.

   b. Multiple citizens present at the meeting filed complaints with the Attorney General's Office, documenting that speakers with critical views were routinely silenced while supportive speakers were permitted to exceed time limits and violate the same rules used to silence critics.

   c. This silencing of public comment violated both Nebraska's Open Meetings Act and the First Amendment's protection of political speech in public forums.

2. **The Retaliatory Protection Order**: In response to legitimate criticism of this viewpoint discrimination, OPS Board President Shavonna Holman coordinated with attorneys and law enforcement to file a fraudulent protection order against Plaintiff:

**a. Phone records and documented communications prove that this coordination occurred before any allegedly threatening behavior, demonstrating that the protection order was a premeditated strategy to silence criticism rather than a response to legitimate concerns.**

**b. Lieutenant Charles Ott, head of OPS School Resource Officers, contacted Plaintiff in August of 2021 – before the protection order was filed – proving pre-coordination between OPS and law enforcement. This call was legally recorded by Plaintiff, creating irrefutable evidence of the conspiracy.**

**Recorded call below:**

**https://youtu.be/bP_kbT3DSE4**

**c. Officer Steve Lee from the Omaha Police Department's Mental Health and Wellness Unit similarly contacted Plaintiff, attempting to frame legitimate political speech as a mental health issue – a particularly disturbing abuse of authority that stigmatizes both mental health conditions and political dissent.**

**d. Baird Holm attorneys, including Jill Ackerman and Cameron Finke, representing Holman made provably false statements in court proceedings, including deliberately introducing inflammatory and irrelevant**

**comparisons to Kyle Rittenhouse in an attempt to prejudice the court.**

**TRANSCRIPT OF HEARING:
https://charterwestbank.com/wp-content/uploads/2025/02/TOP-Holman-v-Riddle-2-1.pdf**

**3. **The Protection Order Hearing Manipulation**: When the fraudulent protection order reached Judge Dougherty's courtroom, the pattern of judicial complicity became explicit:**

**a. Judge Dougherty prevented Lieutenant Ott from testifying, despite him being a key witness who could have confirmed the pre-coordination between OPS and law enforcement.**

**b. The judge allowed highly prejudicial and irrelevant statements from Baird Holm attorneys while restricting Plaintiff's ability to present relevant evidence that would have exposed the protection order as retaliatory.**

**c. The protection order was granted based on documented false statements, specifically the claim that Plaintiff had engaged in threatening behavior when the evidence showed only constitutionally protected criticism of public officials.**

d. The transcript of this hearing reveals Judge Dougherty's active participation in preventing evidence of the conspiracy from entering the judicial record, rather than serving as a neutral arbiter of fact.

4. **The Public Records Obstruction**: When Plaintiff sought public records regarding these events, the institutional obstruction intensified to unprecedented levels:

a. OPS charged Plaintiff approximately $1,600 for heavily redacted documents they later provided to his mother for free – a clear violation of the Nebraska Public Records Law, which prohibits treating different requesters unequally based on their identity or purpose.

b. The records provided to Plaintiff contained over 100 pages that were entirely redacted—solid black boxes with no text visible—without any explanation of what was redacted or why, as required by Nebraska law.

c. Many of these same documents were later provided to Plaintiff's mother with no redactions whatsoever, proving that the redactions were not legally justified but rather designed to obstruct access to information.

d. OPS repeatedly denied the existence of records that they later produced to others. In multiple instances, they certified to courts that all responsive documents had been provided, only to later "discover" additional responsive documents when faced with evidence of their existence.

e. When Plaintiff attempted to exercise his statutory right to inspect records in person rather than paying for copies, OPS refused to allow this basic right guaranteed by the Nebraska Public Records Law. This refusal persisted even after they had certified to the court that they had already provided all responsive documents.

f. OPS Records Keeper Anne MacFarland played a central role in this obstruction, falsifying and manipulating public records to obstruct access and coordinating with other officials to conceal evidence.

5. **The Oversight Agency Collusion**: When Plaintiff sought assistance from oversight agencies, he encountered the same pattern of coordinated inaction seen in the CharterWest case, but with even more explicit evidence of collusion:

a. The Nebraska Attorney General's Office, under AG Mike Hilgers and previously under AG Doug Peterson,

communicated extensively with OPS and its attorneys but never once contacted Plaintiff or any of the witnesses to the board meeting incident.

b. Records obtained later showed dozens of communications between the AG's office and OPS attorneys, including David Kramer of Baird Holm, while Plaintiff's inquiries were ignored or dismissed without investigation.

c. The AG published a demonstrably false opinion containing internal contradictions about the board meeting incident. The opinion simultaneously claimed that "Ms. Adamson was allowed to continue and spoke for approximately one minute" and also that "Ms. Adamson was not removed due to the content of her speech, but because she refused to provide her address." These statements are logically incompatible—she either continued speaking or was removed—making it impossible for both to be true.

d. When Plaintiff presented evidence of this falsehood and requested correction, the AG refused to correct the public record. This refusal to correct a known falsehood in an official publication represents a particularly

egregious dereliction of duty for the state's chief law enforcement officer.

e. The AG's pattern of behavior extended to their handling of public records requests. They denied all of Plaintiff's requests seeking information about their investigation, not portions based on legitimate sensitivity concerns, but everything. Simultaneously, they selectively published certain denial letters from Plaintiff's case on their website while keeping others unpublished, suggesting deliberate narrative control.

f. Assistant Attorneys General, including Laura Nigro, Mitchell Wurm, and Leslie Donley, actively participated in this obstruction, issuing fraudulent legal opinions to justify suppressing records and refusing to investigate OPS's documented violations despite their statutory obligation to enforce the Public Records Law. Even more alarming is the information accidentally provided to Plaintiff's mother, that shows a cozy relationship with David Kramer and Laura Nigro. It basically reads :

Laura: "Hi David, remember those conversations we had THREE MONTHS AGO? We still haven't notified the victims, and don't plan on it, but we'd like to get this off our desk so that we can harm more citizens!"

David: "You got it toots! I'll find a creative way to avoid this when I get back from the BAR association meeting in Vegas!"

g. The Nebraska Ombudsman's Office, under Public Counsel Julie Rogers, similarly refused to investigate despite clear evidence of misconduct. Rogers went so far as to physically bar Plaintiff from her office and refused to accept complaints about the Attorney General's Office, despite that being explicitly within her statutory jurisdiction.

6. **The Judicial System Participation**: The court system, rather than providing a check on this misconduct, became an active participant in the obstruction with increasingly blatant procedural manipulations:

a. Judge Duane Dougherty allowed ex parte communications between Steve Davidson (Baird Holm attorney) and the court before hearings, a fundamental violation of judicial ethics that undermines the entire concept of adversarial proceedings.

**Transcript of Dougherty hearing (Notably, the Ex-Parte communications were from a previous case which confused everyone except for Plaintiff, leading to a second consecutive hearing filed as CI24-6373.A sloppy mistake that couldn't have been an accident):**

**https://charterwestbank.com/wp-content/uploads/2025/02/ TOP-12-11-24-Riddle-v-OPS.pdf**

**b. Judge Dougherty relied on a nonexistent "Amended Complaint" to justify dismissal in one proceeding, then refused to allow Plaintiff to correct this fictitious deficiency. Court records conclusively prove this document never existed, yet it formed the basis for dismissal.**

**c. In multiple hearings, Judge Dougherty claimed to take "under advisement" arguments that were never made, proving judicial bias and pre-determination of outcomes. Transcripts from these proceedings show decisions being announced on issues that were never raised or argued.**

**d. Judge Dougherty made provably false statements in his opinions, including the claim that the defense scheduled a hearing when court records clearly show**

**Plaintiff scheduled it two days earlier and notified the defense. This falsification of the procedural record is particularly disturbing coming from a sitting judge, in particular when he was present when it was scheduled.**

**e. Judge Shelly Stratman similarly permitted fraudulent legal tactics by OPS, holding Plaintiff to impossible procedural standards while excusing OPS's blatant misconduct. At an October 1, 2024 hearing, she refused to consider overwhelming evidence of perjury and procedural violations by OPS representatives.**

**f. Judge Stratman allowed OPS's last-minute motion to dismiss filed less than 24 hours before a hearing, despite court rules requiring reasonable notice. When Plaintiff objected to this violation of procedural rules, Judge Stratman attempted to intimidate him by claiming he was being "disrespectful" for expecting the law to be followed.**

**Transcript of the Stratman hearing:**

**https://charterwestbank.com/wp-content/uploads/2025/02/ Riddle-v-OPS-Transcript-of-Proceedings.pdf**

g. The courts created novel "verification" requirements not found in Nebraska law, then used these manufactured standards to dismiss Plaintiff's cases without addressing the merits. Each time Plaintiff attempted to comply with these shifting requirements, the courts would invent new procedural barriers.

7. **The Federal Court Extension**: The pattern extended to federal courts, creating a comprehensive barrier to justice spanning both state and federal systems:

a. When Plaintiff filed his case in state court, OPS improperly removed it to federal court without any legitimate basis for jurisdiction. There was no federal question in the case, which centered entirely on Nebraska's Public Records Law, and no diversity of citizenship as all parties were Nebraska residents.

b. Judge John Gerrard and Judge Robert Rossiter of the federal district court failed to promptly remand the case despite the obvious lack of jurisdiction, allowing OPS to delay the proceedings through clearly improper procedural maneuvering.

c. OPS failed to properly serve Plaintiff with notice of removal, violating basic procedural rules. Yet when the case was eventually returned to state court, the state

court ignored OPS's procedural violations while strictly enforcing every technical requirement against Plaintiff.

d. The Eighth Circuit Court of Appeals, when presented with these issues, issued summary affirmances without addressing the substantive legal arguments, effectively rubber-stamping the lower courts' procedural abuses.

8. **The Logically Impossible Dismissal**: The culmination of this judicial manipulation came in Judge Dougherty's December 13, 2024 order, which contains an explicit logical contradiction that cannot exist in a properly functioning judicial system:

a. In this order, Judge Dougherty explicitly ruled: "IT IS THEREFORE ORDERED ADJUDGED AND DECREED that this Court lacks subject matter jurisdiction in this matter and thus the Plaintiff's Complaint and Amended Complaint are hereby dismissed without prejudice."

b. Then, in the very next paragraph, he contradicted this ruling: "IT IS FURTHER ORDERED ADJUDGED AND DECREED that in addition to the fact this Court lacks jurisdiction, this matter is hereby dismissed without

prejudice for failure to state a claim upon which relief can be granted pursuant to Nebraska Court Rules of Pleadings 6-1112(1) and (6)."

c. This creates a logical impossibility that violates the most fundamental principles of civil procedure. As the Supreme Court unequivocally held in Steel Co. v. Citizens for Better Environment, 523 U.S. 83 (1998), if a court lacks subject matter jurisdiction, it has no power whatsoever to render judgment on the merits of a case.

d. Justice Scalia specifically described this requirement as "inflexible and without exception," writing: "The requirement that jurisdiction be established as a threshold matter... is 'inflexible and without exception.'" (quoting Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884)).

e. A dismissal for failure to state a claim is explicitly a merits determination that requires jurisdiction as a prerequisite. By ruling simultaneously that the court lacks jurisdiction and that the complaint fails to state a claim, Judge Dougherty created a self-negating order that is legally incoherent.

f. This contradiction cannot be explained by good-faith error or misunderstanding of law. It represents a deliberate strategy to create multiple dismissal grounds,

giving the appellate court options to select whichever would most effectively prevent review.

9. **The Appeals Court Selective Reading**: When Plaintiff appealed to the Nebraska Court of Appeals, the court demonstrated its complicity in the scheme through its selective reading of Judge Dougherty's contradictory order:

   a. The Court of Appeals dismissed Plaintiff's case claiming lack of jurisdiction because his "amended complaint for mandamus was not properly verified nor supported by affidavits."

   b. In doing so, the court selectively extracted only the jurisdictional ground from Judge Dougherty's contradictory order while ignoring the logically incompatible merits dismissal in the same document.

   c. Despite accepting Plaintiff's filing fees and purportedly reviewing his case, the court failed to identify the fundamental logical contradiction in the district

court's ruling – a contradiction so basic that it violates first principles of civil procedure.

d. This selective reading cannot be explained by oversight or error. It required the appellate court to actively choose between contradictory grounds in the same order, demonstrating coordination rather than independent judicial action.

e. The Court of Appeals further claimed it lacked jurisdiction to review the district court's jurisdictional determination – a position that contradicts the very purpose of appellate review. If appellate courts cannot review jurisdictional determinations, then trial courts could effectively insulate themselves from review by simply declaring "no jurisdiction" in any case they wished to dismiss.

10. **The Eighth Circuit Complicity**: The pattern of obstruction extended to the federal appellate level:

a. When Plaintiff petitioned the Eighth Circuit, providing clear evidence of the contradictory orders and procedural manipulation, the court issued a one-sentence summary affirmance that failed to address any of the substantive issues raised.

**b. The Eighth Circuit deliberately ignored Lieutenant Ott's recorded phone call – direct, uncontested evidence that contradicted the factual basis for their ruling.**

**c. This pattern of summary dismissal without addressing documentary evidence demonstrates that the Eighth Circuit was not functioning as a neutral judicial body but as an active participant in the enterprise of obstruction.**

**11. \*\*The CharterWest Domain Victory and Its Implications\*\*: Plaintiff's unprecedented success in securing the domain name charterwestbank.com provides compelling corroboration of his claims and demonstrates his credibility:**

**a. Plaintiff successfully obtained and retained ownership of charterwestbank.com, an achievement virtually unheard of in modern domain law, where businesses are almost always able to reclaim their domain names.**

**b. This legal victory effectively validates Plaintiff's assertions about CharterWest's fraudulent conduct. Had there been no merit to Plaintiff's claims, CharterWest Bank would have easily reclaimed their domain through standard domain dispute resolution procedures.**

**c. The fact that Plaintiff maintained ownership of the domain – something that hadn't been successfully done against an existing business in over 20 years – strongly suggests legitimate grievances against the bank and validates his broader pattern of allegations.**

**d. This extraordinary legal outcome should have generated significant media interest but was met with complete silence from Nebraska news outlets, further indicating coordinated suppression.**

**e. The domain victory serves as objective, third-party validation of Plaintiff's claims, demonstrating that independent legal proceedings have found merit in his position when not subject to the coordinated obstruction documented throughout this complaint.**

**The OPS records suppression conspiracy represents a refinement and escalation of the tactics first deployed in the CharterWest Bank case. What began as institutional protection of a private bank evolved into systematic corruption of every accountability mechanism in Nebraska's government, all dedicated to preventing a citizen from exercising his statutory right to public information and his constitutional right to petition for redress of grievances.**

## XII. THE SYSTEMATIC FORECLOSURE OF ALL REMEDIES

What makes this case extraordinary is not merely the misconduct of individual actors but the systematic foreclosure of every available remedy. The Plaintiff has been trapped in a Kafkaesque nightmare where each institution that should provide a check on the others instead reinforces their obstruction:

### A. Administrative Remedies Foreclosed

Videos of Plaintiff being removed by Capitol Police for asking the published lie to be corrected:

https://youtu.be/0H69h9ozCnw

https://youtu.be/eVx4HeOJwIY (This one, the Capitol Police actually called Plaintiff and threatened him to stay away)

https://youtu.be/AZ0Cxm7x3Rw

https://youtu.be/nTpESZkTKLo

https://youtu.be/93lq57l2d9M

https://youtu.be/Aj_PF5610H0

1. **The Attorney General's Active Participation in Public Records Violations**:

   a. Despite having explicit statutory authority to enforce the Public Records Law, the AG has never taken enforcement action against a government entity for violations, regardless of how well-documented or egregious.

   b. Analysis of the AG's public records opinions over multiple years reveals a pattern of inconsistent reasoning and selective enforcement that consistently favors government entities over requesters. Legal standards shift from opinion to opinion, with the only consistent element being the outcome—government entities prevail.

   c. The AG published demonstrably false information about the OPS board meeting incident, then refused to correct it when presented with video evidence contradicting their claims. This willful perpetuation of falsehood in official publications represents a fundamental breach of the AG's obligation to uphold the rule of law.

**d. The AG denied all of Plaintiff's public records requests seeking information about their own investigations, creating a catch-22 where the public cannot obtain information about the AG's failure to enforce transparency laws. This self-protecting secrecy renders the AG's oversight function completely illusory.**

**e. The AG issued a disposition letter claiming that OPS had "faithfully" upheld its NPRL obligations despite the mountain of evidence showing otherwise. This false certification represents not just an error of judgment but active complicity in covering up documented violations.**

**f. When Plaintiff attempted to meet with the AG's office to discuss these issues, Capitol Police physically removed him from the building on three separate occasions, at the direction of AG staff. This use of law enforcement to prevent a citizen from petitioning for redress of grievances represents a particularly alarming abuse of power.**

**2. \*\*The Ombudsman's Office Abdication of Oversight Responsibility\*\*:**

**Videos below:**

**https://youtu.be/0MDevTbQ3lw**

**https://youtu.be/JBLJ_b2fTi8**

a. The Ombudsman is statutorily charged with investigating complaints about any state agency, including the Attorney General's Office. Yet when Plaintiff attempted to file complaints about the AG's misconduct, the Ombudsman refused to accept them, inventing non-statutory limitations on its own jurisdiction.

b. Public Counsel Julie Rogers not only refused to investigate documented violations of law but physically barred Plaintiff from her office, an unprecedented action against a citizen seeking to file legitimate complaints.

c. Records obtained later revealed coordination between the Ombudsman's Office and the AG's Office to ensure no meaningful oversight occurred. This collusion between oversight bodies transforms them from checks on power into shields against accountability.

d. The Ombudsman created arbitrary standards for accepting complaints that have no basis in law, then applied these standards selectively to reject Plaintiff's complaints while accepting similar complaints from other citizens.

e. This pattern of conduct violates the Ombudsman's statutory mandate under Neb. Rev. Stat. § 81-8,240 et

seq., which explicitly empowers the office to investigate "administrative acts of administrative agencies," including the Attorney General's Office.

**3. \*\*Other Regulatory and Oversight Bodies' Systemic Failure\*\*:**

   **a. The Department of Banking and Finance refused to investigate CharterWest's documented fraud despite clear photographic evidence, establishing the pattern of regulatory capture that would be replicated across other agencies.**

**See video:**

**https://youtu.be/M0PdhcyvuVE**

   **b. The Federal Reserve Bank of Kansas City and the Consumer Financial Protection Bureau acknowledged complaints but took no meaningful action, demonstrating that the pattern of coordinated inaction extends to federal regulatory bodies.**

   **c. The Nebraska Department of Unauthorized Practice of Law, under Mark Weber, launched retaliatory investigations against Plaintiff based on nonexistent**

complaints from fictional parties, demonstrating that even professional regulatory bodies had been weaponized against citizens seeking accountability.

d. The consistent pattern across these diverse agencies with different statutory mandates suggests coordination rather than coincidence, as the likelihood of every single oversight body independently failing in identical ways approaches statistical impossibility.

### B. Judicial Remedies Foreclosed

1. **The Nebraska State Courts' Systematic Prevention of Judicial Review**:

a. The "verification" requirement cited in the Nebraska Court of Appeals' dismissal represents the culmination of a pattern of inventing procedural hurdles that cannot be overcome. Despite Plaintiff's efforts to comply with each new requirement, the courts continually shift the standards to ensure no case ever reaches substantive review.

b. The courts have applied radically different procedural standards to Plaintiff than to government entities and their attorneys. While Plaintiff's filings are scrutinized for

the slightest technical deficiency, opposing counsel routinely violate clear procedural rules without consequence.

c. In multiple cases, judges have made provably false statements about the procedural history, claiming events occurred that court records show never happened, or denying the occurrence of events clearly documented in the record. These falsifications of the record cannot be explained by honest error—they represent deliberate manipulation of procedural history to justify predetermined outcomes.

d. Judges have allowed opposing counsel to engage in ex parte communications, submit untimely filings, and introduce improper evidence while simultaneously holding Plaintiff to impossible procedural standards. This stark disparity cannot be reconciled with basic principles of due process and equal protection.

e. The courts' handling of Plaintiff's cases reflects not just error but manipulation—procedural rules are not being misinterpreted but weaponized to prevent judicial review of government misconduct.

f. The most egregious example comes from Judge Dougherty's December 13, 2024 order, which simultaneously dismisses for "lack of jurisdiction" and "failure to state a claim" – a logical impossibility that

violates the Supreme Court's explicit holding in Steel Co. v. Citizens for Better Environment that jurisdictional determinations must precede any merits analysis.

g. This logical contradiction cannot be explained by incompetence or oversight—it represents a deliberate strategy to create multiple grounds for dismissal, allowing appellate courts to selectively choose whichever ground would most effectively prevent substantive review.

h. When Plaintiff directly questioned courts about what would constitute proper verification, judges refused to provide guidance, creating an impossible situation where compliance becomes unattainable by design.

2. **The Federal Courts' Failure to Provide Remedy**:

a. When Plaintiff sought relief in federal court, he encountered the same pattern of procedural obstructionism. Cases were dismissed without addressing their merits, often through summary affirmances that provided no substantive analysis.

b. The federal courts allowed OPS to engage in forum manipulation through improper removal to federal court, despite the obvious lack of federal jurisdiction. This

procedural gamesmanship was permitted for the sole purpose of delay and obstruction.

c. Federal judges, including those on the Eighth Circuit Court of Appeals, have repeatedly dismissed well-pled claims through summary affirmances, demonstrating a pattern of federal judicial complicity in preventing meaningful review of local government misconduct.

d. The Eighth Circuit refused to address Lieutenant Ott's recorded phone call, which provided direct evidence contradicting the factual basis for their ruling. This deliberate avoidance of dispositive evidence indicates the court was not functioning as a neutral arbiter but as a participant in the enterprise of obstruction.

e. The federal courts' handling of these cases violates their constitutional role as guarantors of federal rights when state courts fail to provide adequate remedies, as established in cases like Monroe v. Pape, 365 U.S. 167 (1961).

f. This pattern of federal judicial complicity transforms what might otherwise be a state-level breakdown into a comprehensive failure of the entire judicial system, leaving citizens with no forum in which their claims can receive fair and impartial consideration.

## 3. **The Cross-Jurisdictional Pattern of Judicial Obstruction**:

a. The consistency of obstruction tactics across state and federal courts, and across different judges at different levels of the judicial system, suggests coordination rather than coincidence. The statistical probability of multiple independent judges all employing identical patterns of procedural manipulation approaches zero.

b. The specific procedural grounds for dismissal often contradict precedent or create novel requirements never before applied in similar cases. These are not good-faith applications of existing law but ad hoc justifications for predetermined outcomes.

c. When Plaintiff successfully navigates one procedural obstacle, a new one immediately appears—creating an endless maze that can never be completed. This pattern of constantly shifting barriers is the hallmark of a system designed not to adjudicate but to obstruct.

d. The judicial system's treatment of Plaintiff's cases violates fundamental principles of stare decisis and equal application of law. Other similarly situated litigants receive substantively different treatment, demonstrating that these are not neutral applications of established procedure but targeted obstruction.

e. This pattern across both state and federal courts reveals not just individual errors but coordinated obstruction—courts deliberately manipulating procedure to ensure predetermined outcomes rather than applying law to facts. The judiciary has transformed from check on power to its enabler, abandoning its constitutional function in service of institutional protection.

4. **The Logical Impossibility in Judge Dougherty's Order**:

a. Judge Dougherty's December 13, 2024 order represents perhaps the most egregious example of judicial manipulation. By dismissing simultaneously for "lack of jurisdiction" and "failure to state a claim," Judge Dougherty created a logical impossibility that cannot exist in a properly functioning judicial system.

b. This contradiction directly violates the Supreme Court's holding in Steel Co. v. Citizens for Better Environment, 523 U.S. 83 (1998), where Justice Scalia, writing for the majority, explicitly rejected the practice of "hypothetical jurisdiction" where courts bypass jurisdictional questions to reach merits determinations.

c. Justice Scalia described the requirement for jurisdictional determinations before merits

considerations as "inflexible and without exception," writing: "The requirement that jurisdiction be established as a threshold matter... is 'inflexible and without exception.'" (quoting Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884)).

d. By addressing the merits (failure to state a claim) after declaring lack of jurisdiction, Judge Dougherty violated this fundamental principle, creating a ruling that is not merely incorrect but legally incoherent.

e. This contradiction cannot be attributed to oversight or misunderstanding of law—it represents a deliberate strategy to create multiple grounds for dismissal, giving appellate courts options to select whichever would most effectively prevent review.

f. The Court of Appeals' selective extraction of only the jurisdictional ground while ignoring the contradictory merits dismissal in the same document further demonstrates coordination rather than independent judicial action.

### C. Media and Public Exposure Foreclosed

1. **Local Media's Unwillingness to Cover Documented Misconduct**:

   a. Multiple reporters have initially expressed interest in Plaintiff's story only to suddenly drop it after contacting the very officials they should be investigating, suggesting improper influence or coordination.

   b. Scott Vorhees of KFAB initially reached out to Spencer Head and the OPS School Board based on his understanding of the concerns. However, after presumably speaking with OPS officials, he silently exited the scene and refused to cover the story, despite its clear public interest value.

   c. WOWT Digital Media Director Gina Dvorak went even further, illegally suppressing Plaintiff on WOWT's Facebook platform and making false statements under WOWT's official account. When challenged, she provided no explanation for this viewpoint-based censorship.

   d. No media outlet has reported on Plaintiff's victory regarding the CharterWest Bank website domain, despite this being a significant legal development that vindicated his earlier allegations of fraud. The fact that Plaintiff successfully obtained and maintained ownership of charterwestbank.com—an achievement virtually unheard of in modern domain law—should have generated

significant media interest but was met with complete silence.

e. This pattern suggests coordination between media entities and the government officials they should be holding accountable. Multiple reporters have initially expressed interest in the story only to suddenly drop it after contacting the very officials they should be investigating.

f. This media silence represents a failure of the "fourth estate" function that is supposed to provide an additional check on governmental power when official accountability mechanisms fail.

2. **Political Representatives' Refusal to Intervene**:

a. Congressman Don Bacon, when approached about these issues, claimed he couldn't help a citizen being lied about by the state due to "lack of jurisdiction"—an absurd position for a federal representative. He has refused to shed light on the situation or engage with media about these documented abuses.

b. State legislators, when presented with evidence of systematic corruption in the implementation of laws they passed, have similarly refused to exercise their oversight authority or propose legislative remedies.

c. This political abandonment further reinforces the closed system of unaccountability, where even elected representatives refuse to fulfill their constitutional role as a check on executive and judicial overreach.

3. **Private Attorney Reluctance to Challenge the System**:

   a. Despite clear evidence of misconduct, attorneys have declined to represent Plaintiff after initially expressing interest in the case. Many have explicitly stated that they fear professional retaliation if they challenge powerful institutions like OPS or the Attorney General's Office.

   b. This suggests a legal system where challenging powerful institutions carries professional consequences beyond the normal risks of litigation. Attorneys who rely on maintaining good relationships with courts and government agencies cannot afford to represent citizens challenging systemic corruption.

   c. The result is a functional monopoly on legal services that prevents meaningful challenges to government misconduct. Citizens are told to "get an attorney" when seeking redress, while simultaneously the system ensures no attorney can afford to take their case.

d. This exclusion from professional representation further tilts an already uneven playing field, forcing citizens to navigate complex procedural requirements without assistance while institutional defendants enjoy the full resources of government attorneys and private law firms.

4. **The Comprehensive Foreclosure of Public Accountability**:

a. The combination of judicial obstruction, administrative collusion, media silence, and denial of representation creates a perfect storm of unaccountability:

i. Government misconduct cannot be addressed through administrative channels because the oversight agencies are complicit.

ii. It cannot be addressed through the courts because judges manipulate procedural rules to prevent review.

iii. It cannot be addressed through public exposure because media either ignores the story or actively participates in suppressing it.

iv. Professional representation is unavailable because attorneys fear retaliation for challenging the system.

**b. The result is a government that has effectively insulated itself from all forms of accountability, transforming democratic institutions into a self-protecting oligarchy immune from citizen oversight.**

**c. This systematic foreclosure of all remedies is not the result of coincidence or unrelated institutional failures—it represents a coordinated enterprise designed to prevent transparency and accountability at all costs.**

## XIII. THE RICO ENTERPRISE AND ITS PATTERN OF RACKETEERING ACTIVITY

**The consistent pattern of obstruction across multiple institutions and years cannot be explained by coincidence or independent actions. It reveals the existence of a coordinated enterprise operating to prevent transparency and accountability. This enterprise meets all statutory requirements for a RICO claim under 18 U.S.C. §§ 1961-1968.**

### A. Legal Elements of a RICO Claim

To establish a civil RICO claim, a plaintiff must prove: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing injury to the plaintiff's business or property. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985). Each of these elements is clearly satisfied in this case:

1. **Conduct**: Each defendant has participated in the management or operation of the enterprise through a pattern of racketeering activity. See Reves v. Ernst & Young, 507 U.S. 170, 179 (1993) (establishing the "operation or management" test).

   a. The defendants' participation extends beyond passive association, including active coordination, concealment of evidence, falsification of records, obstruction of justice, and witness intimidation.

   b. The level of participation varies from defendants who directed activities (like Attorney General Mike Hilgers, Judge Duane Dougherty, and OPS Board President Shavonna Holman) to those who executed specific aspects of the scheme (like Records Keeper Anne MacFarland and Assistant Attorneys General).

   c. All defendants played some part in "operating or managing" the enterprise, as required by Reves, through

their respective roles in the coordinated obstruction of transparency and accountability.

2. **Enterprise**: The defendants collectively form an "enterprise" within the meaning of 18 U.S.C. § 1961(4), which defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

   a. The Supreme Court has held that a RICO enterprise must have three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. See Boyle v. United States, 556 U.S. 938, 946 (2009).

   b. Purpose: The enterprise has a clear common purpose—preventing transparency and accountability for government misconduct through coordinated obstruction of public records access and manipulation of procedural mechanisms to prevent judicial review.

   c. Relationships: The evidence demonstrates extensive relationships among the defendants, including:

     i. Communications between the Attorney General's Office and OPS attorneys

**ii. Coordination between OPS officials and law enforcement before filing retaliatory actions**

**iii. Ex parte communications between judges and opposing counsel**

**iv. Synchronized procedural maneuvers across state and federal courts**

**v. Consistent patterns of obstruction across nominally independent agencies**

**d. Longevity: The enterprise has operated continuously since at least 2018 (in the CharterWest matter) and intensified its activities from 2021-2025 (in the OPS records matter), easily satisfying the longevity requirement.**

**e. The enterprise's structure extends beyond the formal boundaries of government agencies and private firms, functioning as an "association-in-fact" that coordinates across institutional boundaries to achieve its shared objective.**

**3. \*\*Pattern\*\*: The defendants' conduct constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), which requires at least two acts of racketeering activity within a ten-year period.**

a. The Supreme Court has held that a pattern requires both "relatedness" and "continuity." See H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989).

b. Relatedness: The predicate acts are related by similar methods, participants, and objectives, forming a coherent pattern rather than isolated incidents. Each predicate act serves the common purpose of obstructing transparency and preventing accountability.

c. Continuity: The predicate acts span more than seven years, from 2018 to 2025, demonstrating "closed-ended continuity." See H.J. Inc., 492 U.S. at 241-42 (describing closed-ended continuity as a series of related predicates extending over a substantial period).

d. The pattern also demonstrates "open-ended continuity" as it poses a threat of continued criminal activity. The February 2025 Court of Appeals dismissal demonstrates that the pattern continues unabated to the present day, with no indication that it will cease without external intervention.

4. **Racketeering Activity**: The defendants have committed numerous predicate acts that constitute

"racketeering activity" as defined in 18 U.S.C. § 1961(1), including:

   a. Mail fraud (18 U.S.C. § 1341)

   b. Wire fraud (18 U.S.C. § 1343)

   c. Obstruction of justice (18 U.S.C. § 1503)

   d. Witness retaliation (18 U.S.C. § 1513)

e. These predicate acts are detailed specifically in Section B below.

5. **Injury**: Plaintiff has suffered concrete injury to his business and property as a result of the RICO violations, including:

   a. Direct financial loss through payment of filing fees for proceedings that were predetermined to be dismissed

   b. Direct financial loss through payment of approximately $1,600 for heavily redacted documents that were later provided unredacted to others for free

   c. Direct financial loss through costs associated with transcript preparation and document reproduction

d. Loss of valuable time and resources that could have been devoted to productive business activities

e. The Supreme Court has held that financial losses constitute injury to "business or property" for RICO purposes. See Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979).

### B. The Enterprise's Structure and Operations

The evidence reveals a sophisticated network of public officials, private attorneys, and institutional leaders working in concert to obstruct transparency and silence whistleblowers:

1. **Executive Branch Participants**:

   a. The Nebraska Attorney General's Office serves as the legal shield for the enterprise, refusing to enforce transparency laws, issuing fraudulent legal opinions to justify non-compliance, and coordinating strategy with other participants.

b. OPS officials serve as the frontline obstruction, withholding records, charging excessive fees, providing false certifications to courts, and retaliating against critics through fraudulent legal proceedings.

c. The Nebraska Ombudsman's Office serves as a secondary shield, refusing to investigate complaints about the Attorney General's Office and physically preventing citizens from filing complaints.

d. The Department of Banking and Finance provides regulatory protection for financial institutions engaged in fraudulent practices, refusing to investigate documented fraud and coordinating responses with other agencies.

2. **Judicial Branch Participants**:

a. State court judges, including Duane Dougherty and Shelly Stratman, manipulate procedural rules to prevent judicial review, issue logically contradictory rulings, make provably false statements about procedural history, and apply different standards to different litigants.

b. Federal judges, including John Gerrard, Robert Rossiter, and the Eighth Circuit panel, permit improper forum manipulation, delay remand of cases lacking federal jurisdiction, and issue summary affirmances without addressing documentary evidence.

c. Court staff, including clerks and reporters, facilitate this judicial misconduct by processing improper ex parte communications and selectively applying filing requirements.

3. **Law Enforcement Participants**:

a. Omaha Police Department officers, including Lieutenant Charles Ott and Officer Steve Lee, intimidate citizens seeking accountability, coordinate with institutional defendants before retaliatory legal actions, and attempt to frame legitimate political speech as mental health issues.

b. Capitol Police officers physically remove citizens from public buildings for attempting to file complaints or request information through established channels.

4. **Private Attorney Participants**:

a. Baird Holm attorneys, including Steve Davidson, David Kramer, Jill Ackerman, and Cameron Finke, serve as legal enforcers for the enterprise, drafting fraudulent legal justifications, filing retaliatory lawsuits, engaging in ex parte communications with judges, and making provably false statements in court proceedings.

**b. Attorneys from the Federal Reserve Bank of Kansas City, including Todd Ruskamp, Jeffrey Nix, Devon Ritter, and D. Welch, provide additional legal cover, coordinating responses across institutional boundaries to ensure consistent obstruction.**

**5. \*\*Operational Structure and Methods\*\*:**

**a. The enterprise operates through a sophisticated playbook that is applied consistently across different contexts and years:**

**i. Initial Denial: When public records are requested, they are initially denied, excessively redacted, or provided at exorbitant cost.**

**ii. Administrative Obstruction: When administrative review is sought, oversight agencies coordinate to ensure no meaningful investigation occurs.**

**iii. Procedural Manipulation: When judicial review is sought, courts create procedural barriers that prevent substantive examination of the claims.**

**iv. Retaliation: When citizens persist despite these obstacles, they face retaliatory legal actions, law enforcement intimidation, and false security threat designations.**

**v. Coordinated Narrative Control: Throughout this process, participants coordinate their public responses, statements in legal proceedings, and handling of documentary evidence to present a consistent narrative that obscures their coordination.**

**b. This playbook was first deployed in the CharterWest case and refined in the OPS records dispute, demonstrating both continuity and evolution of the enterprise's methods over time.**

**c. The enterprise's operations extend across institutional boundaries, with information and strategies flowing between nominally independent entities in ways that cannot be explained by legitimate governmental functions.**

### C. Predicate Acts in Detail

**1. **Mail Fraud (18 U.S.C. § 1341)**:**

**a. The Nebraska Attorney General's Office committed mail fraud by sending fraudulent disposition letters claiming that OPS had "faithfully" upheld its NPRL obligations despite documented evidence to the contrary. These letters were sent via U.S. Mail with the specific**

intent to further the fraudulent scheme of preventing transparency and accountability.

b. OPS officials committed mail fraud by sending Plaintiff invoices for approximately $1,600 for heavily redacted documents they later provided unredacted to others for free. These mailings were made with knowledge of their fraudulent nature and with the specific intent to obstruct legitimate access to public records.

c. The Nebraska Department of Unauthorized Practice of Law, through Mark Weber, committed mail fraud by mailing a threat of legal action about a fictitious complaint from a non-existent party. This mailing was made with knowledge of its fraudulent nature and with the specific intent to intimidate Plaintiff into ceasing his legitimate pursuit of accountability.

d. Each of these mailings constitutes a separate predicate act under RICO. See Schmuck v. United States, 489 U.S. 705, 710-11 (1989) (holding that each mailing in furtherance of a fraudulent scheme constitutes a separate violation of the mail fraud statute).

2. **Wire Fraud (18 U.S.C. § 1343)**:

a. AG Mike Hilgers and his predecessor knowingly published false information about the OPS board meeting

incident on the Nebraska Attorney General's website, then refused to correct it when presented with video evidence contradicting their claims. This electronic publication of false information constitutes wire fraud.

b. Assistant AGs Laura Nigro, Mitchell Wurm, and Leslie Donley issued fraudulent legal opinions by email and other electronic means to justify suppressing records and refusing to investigate documented violations. These opinions were transmitted electronically, constituting wire fraud.

c. OPS officials, including Anne MacFarland, transmitted false certifications to courts by electronic filing systems, claiming all responsive records had been provided when they knew additional responsive documents existed. Each of these electronic filings constitutes a separate predicate act.

d. The AG's Office coordinated with OPS and Baird Holm by email to develop a strategy for obstructing public records requests, using interstate electronic communications to further this conspiracy.

e. WOWT Digital Media Director Gina Dvorak used electronic means to suppress Plaintiff on WOWT's Facebook platform and make false statements under WOWT's official account, furthering the enterprise's goal of preventing public exposure of misconduct.

**f. Each of these electronic transmissions constitutes a separate predicate act under RICO. See United States v. Jinian, 725 F.3d 954, 960 (9th Cir. 2013) (holding that each wire transmission in furtherance of a fraudulent scheme constitutes a separate violation of the wire fraud statute).**

**3. \*\*Obstruction of Justice (18 U.S.C. § 1503)\*\*:**

**a. Judge Duane Dougherty obstructed justice by allowing ex parte communications with defense counsel, relying on nonexistent documents to justify dismissal, and making provably false statements in court opinions. These actions were taken with the specific intent to prevent judicial review of government misconduct.**

**b. Judge Shelly Stratman obstructed justice by permitting flagrant procedural violations by OPS attorneys while holding Plaintiff to impossible standards. Her actions were taken with the specific intent to prevent judicial review of government misconduct.**

**c. The AG's refusal to enforce public records laws despite clear violations represents obstruction of justice, as it prevented the lawful execution of statutory transparency requirements with the specific intent to shield government misconduct from public scrutiny.**

**d. Baird Holm attorney Steve Davidson obstructed justice by submitting ex parte documents to judges before hearings, corrupting the judicial process through improper influence of court proceedings.**

**e. OPS Records Keeper Anne MacFarland obstructed justice by falsifying and manipulating public records to obstruct access, directly participating in the pattern of fraud that characterized the enterprise's operations.**

**f. Each of these actions constitutes a separate predicate act under RICO. See United States v. Aguilar, 515 U.S. 593, 599 (1995) (defining obstruction of justice as actions taken with the intent to influence, obstruct, or impede the due administration of justice).**

**4. \*\*Witness Retaliation (18 U.S.C. § 1513)\*\*:**

**a. OPS Board President Shavonna Holman engaged in witness retaliation by filing a fraudulent protection order against Plaintiff based on protected political speech, coordinating with law enforcement before filing. This abuse of the legal process constitutes witness retaliation, as it was specifically designed to punish Plaintiff for his public criticism and testimony.**

**b. Lieutenant Charles Ott contacted Plaintiff before Holman filed her restraining order, proving**

pre-coordination between OPS and law enforcement in developing a retaliation strategy. This call, which attempted to intimidate Plaintiff into ceasing his advocacy, constitutes witness retaliation.

c. Officer Steve Lee from the Mental Health and Wellness Unit similarly contacted Plaintiff in an attempt to frame political speech as a mental health issue, another form of intimidation and retaliation against a witness to government misconduct.

d. Attorney Steve Davidson falsely labeled Plaintiff a "security threat" in court records without any evidence, a defamatory act designed to retaliate against Plaintiff for his role as a witness to government misconduct.

e. Capitol Police officers physically removed Plaintiff from the state capitol on three separate occasions for properly requesting resolution from the Attorney General's Office, violating his constitutional right to petition for redress of grievances and retaliating against him for his role as a witness to government misconduct.

f. Each of these actions constitutes a separate predicate act under RICO. See Deck v. Engineered Laminates, 349 F.3d 1253, 1257 (10th Cir. 2003) (recognizing that witness retaliation claims can constitute RICO predicate acts).

5. **Interstate Commerce and Effect**:

   a. The enterprise operates across state lines and affects interstate commerce in several ways:

   i. The use of electronic communications that traverse state boundaries in furtherance of the fraudulent scheme triggers federal wire fraud statutes.

   ii. The involvement of federal agencies and courts brings this conspiracy within the scope of federal jurisdiction.

   iii. The enterprise's obstruction affects financial transactions and regulatory oversight that cross state lines, particularly in the banking context.

   iv. The use of the internet and interstate telecommunications infrastructure to disseminate false information and coordinate obstructive activities satisfies the interstate commerce requirement.

   b. The Supreme Court has held that RICO should be interpreted broadly to effectuate its remedial purposes. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497-98 (1985) ("RICO is to be read broadly.").

c. The minimal connection to interstate commerce required for RICO jurisdiction is easily satisfied in this case through the extensive use of interstate communication methods and the involvement of federal agencies and courts.

### D. The Pattern Continues Unabated

1. **Continuing Violations Through Present Day**:

   a. The February 24, 2025 dismissal of Plaintiff's most recent case by the Nebraska Court of Appeals demonstrates that the pattern of obstruction continues unabated to the present day.

   b. The Court of Appeals dismissed the case based on an alleged verification deficiency, despite Plaintiff's certification under penalty of perjury.

   c. The court simultaneously denied OPS's motion for summary dismissal as "moot," having already decided to dismiss the case on its own initiative.

   d. This twin dismissal ensured that, once again, the merits of Plaintiff's public records claims would never be addressed, regardless of the procedural posture.

e. The timing of this most recent dismissal is significant, as it demonstrates that the pattern continues despite years of Plaintiff's attempts to navigate the procedural maze created by the courts.

2. **The Consistency Across Years and Contexts**:

a. The same tactics used to obstruct accountability for CharterWest Bank's fraud in 2018 were refined and deployed against Plaintiff's public records requests in 2021-2025.

b. Many of the same individuals and institutions were involved in both contexts, demonstrating the existence of an ongoing criminal enterprise rather than isolated incidents.

c. The pattern has persisted despite Plaintiff's attempts to navigate the procedural maze created by the courts, with new obstacles emerging each time previous ones are overcome.

d. This consistency across different substantive contexts (banking fraud and public records access) and time periods (2018 and 2021-2025) demonstrates both the continuity and relatedness required to establish a pattern under RICO.

3. **RICO Pattern Requirements Satisfied**:

   a. The predicate acts span more than seven years, from 2018 to the present day, easily satisfying the "closed-ended" continuity requirement established in H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 241-42 (1989).

   b. The ongoing nature of the enterprise and its continued operation through the present day also satisfies the "open-ended" continuity requirement, as there is a clear threat of continued criminal activity in the future.

   c. The predicate acts are related by similar methods, participants, and objectives, forming a coherent pattern rather than isolated incidents.

   d. The enterprise has shown remarkable resilience and adaptability, evolving its tactics in response to Plaintiff's efforts while maintaining its core objective of preventing transparency and accountability.

   e. This combination of continuity and relatedness establishes the "pattern" element required for a RICO claim under the Supreme Court's precedents.

4. **Racketeering Activity** (continued):

   d. Witness retaliation (18 U.S.C. § 1513)

   e. These predicate acts are detailed specifically in Section C below.

5. **Injury**: Plaintiff has suffered concrete injury to his business and property as a result of the RICO violations, including:

   a. Direct financial loss through payment of filing fees for proceedings that were predetermined to be dismissed

   b. Direct financial loss through payment of approximately $1,600 for heavily redacted documents that were later provided unredacted to others for free

   c. Direct financial loss through costs associated with transcript preparation and document reproduction

   d. Loss of valuable time and resources that could have been devoted to productive business activities

   e. The Supreme Court has held that financial losses constitute injury to "business or property" for RICO purposes. See Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979).

### B. The Enterprise's Structure and Operations

The evidence reveals a sophisticated network of public officials, private attorneys, and institutional leaders working in concert to obstruct transparency and silence whistleblowers:

1. **Executive Branch Participants**:

   a. The Nebraska Attorney General's Office serves as the legal shield for the enterprise, refusing to enforce transparency laws, issuing fraudulent legal opinions to justify non-compliance, and coordinating strategy with other participants.

   b. OPS officials serve as the frontline obstruction, withholding records, charging excessive fees, providing false certifications to courts, and retaliating against critics through fraudulent legal proceedings.

   c. The Nebraska Ombudsman's Office serves as a secondary shield, refusing to investigate complaints about the Attorney General's Office and physically preventing citizens from filing complaints.

d. The Department of Banking and Finance provides regulatory protection for financial institutions engaged in fraudulent practices, refusing to investigate documented fraud and coordinating responses with other agencies.

## 2. **Judicial Branch Participants**:

a. State court judges, including Duane Dougherty and Shelly Stratman, manipulate procedural rules to prevent judicial review, issue logically contradictory rulings, make provably false statements about procedural history, and apply different standards to different litigants.

b. Federal judges, including John Gerrard, Robert Rossiter, and the Eighth Circuit panel, permit improper forum manipulation, delay remand of cases lacking federal jurisdiction, and issue summary affirmances without addressing documentary evidence.

c. Court staff, including clerks and reporters, facilitate this judicial misconduct by processing improper ex parte communications and selectively applying filing requirements.

## 3. **Law Enforcement Participants**:

**a. Omaha Police Department officers, including Lieutenant Charles Ott and Officer Steve Lee, intimidate citizens seeking accountability, coordinate with institutional defendants before retaliatory legal actions, and attempt to frame legitimate political speech as mental health issues.**

**b. Capitol Police officers physically remove citizens from public buildings for attempting to file complaints or request information through established channels.**

**4. **Private Attorney Participants**:**

**a. Baird Holm attorneys, including Steve Davidson, David Kramer, Jill Ackerman, and Cameron Finke, serve as legal enforcers for the enterprise, drafting fraudulent legal justifications, filing retaliatory lawsuits, engaging in ex parte communications with judges, and making provably false statements in court proceedings.**

**b. Attorneys from the Federal Reserve Bank of Kansas City, including Todd Ruskamp, Jeffrey Nix, Devon Ritter, and D. Welch, provide additional legal cover, coordinating responses across institutional boundaries to ensure consistent obstruction.**

5. **Financial Institution Participants**:

   a. CharterWest Bank executives, including Gary Walters, initiated the pattern of fraud and coordination by falsifying loan documents and then leveraging institutional connections to prevent regulatory accountability.

   b. These executives maintained coordination with regulatory bodies to ensure that complaints were dismissed without investigation, establishing the template for subsequent obstruction.

6. **Operational Structure and Methods**:

   a. The enterprise operates through a sophisticated playbook that is applied consistently across different contexts and years:

      i. Initial Denial: When public records are requested, they are initially denied, excessively redacted, or provided at exorbitant cost.

      ii. Administrative Obstruction: When administrative review is sought, oversight agencies coordinate to ensure no meaningful investigation occurs.

**iii. Procedural Manipulation: When judicial review is sought, courts create procedural barriers that prevent substantive examination of the claims.**

**iv. Retaliation: When citizens persist despite these obstacles, they face retaliatory legal actions, law enforcement intimidation, and false security threat designations.**

**v. Coordinated Narrative Control: Throughout this process, participants coordinate their public responses, statements in legal proceedings, and handling of documentary evidence to present a consistent narrative that obscures their coordination.**

**b. This playbook was first deployed in the CharterWest case and refined in the OPS records dispute, demonstrating both continuity and evolution of the enterprise's methods over time.**

**c. The enterprise's operations extend across institutional boundaries, with information and strategies flowing between nominally independent entities in ways that cannot be explained by legitimate governmental functions.**

### C. Predicate Acts in Detail

1. **Mail Fraud (18 U.S.C. § 1341)**:

   a. The Nebraska Attorney General's Office committed mail fraud by sending fraudulent disposition letters claiming that OPS had "faithfully" upheld its NPRL obligations despite documented evidence to the contrary. These letters were sent via U.S. Mail with the specific intent to further the fraudulent scheme of preventing transparency and accountability.

   b. OPS officials committed mail fraud by sending Plaintiff invoices for approximately $1,600 for heavily redacted documents they later provided unredacted to others for free. These mailings were made with knowledge of their fraudulent nature and with the specific intent to obstruct legitimate access to public records.

   c. The Nebraska Department of Unauthorized Practice of Law, through Mark Weber, committed mail fraud by mailing a threat of legal action about a fictitious complaint from a non-existent party. This mailing was made with knowledge of its fraudulent nature and with the specific intent to intimidate Plaintiff into ceasing his legitimate pursuit of accountability.

   d. Each of these mailings constitutes a separate predicate act under RICO. See Schmuck v. United States,

**489 U.S. 705, 710-11 (1989) (holding that each mailing in furtherance of a fraudulent scheme constitutes a separate violation of the mail fraud statute).**

**2. \*\*Wire Fraud (18 U.S.C. § 1343)\*\*:**

**a. AG Mike Hilgers and his predecessor knowingly published false information about the OPS board meeting incident on the Nebraska Attorney General's website, then refused to correct it when presented with video evidence contradicting their claims. This electronic publication of false information constitutes wire fraud.**

**b. Assistant AGs Laura Nigro, Mitchell Wurm, and Leslie Donley issued fraudulent legal opinions by email and other electronic means to justify suppressing records and refusing to investigate documented violations. These opinions were transmitted electronically, constituting wire fraud.**

**c. OPS officials, including Anne MacFarland, transmitted false certifications to courts by electronic filing systems, claiming all responsive records had been provided when they knew additional responsive documents existed. Each of these electronic filings constitutes a separate predicate act.**

   d. The AG's Office coordinated with OPS and Baird Holm by email to develop a strategy for obstructing public records requests, using interstate electronic communications to further this conspiracy.

   e. WOWT Digital Media Director Gina Dvorak used electronic means to suppress Plaintiff on WOWT's Facebook platform and make false statements under WOWT's official account, furthering the enterprise's goal of preventing public exposure of misconduct.

   f. Each of these electronic transmissions constitutes a separate predicate act under RICO. See United States v. Jinian, 725 F.3d 954, 960 (9th Cir. 2013) (holding that each wire transmission in furtherance of a fraudulent scheme constitutes a separate violation of the wire fraud statute).


3. **Obstruction of Justice (18 U.S.C. § 1503)**:

   a. Judge Duane Dougherty obstructed justice by allowing ex parte communications with defense counsel, relying on nonexistent documents to justify dismissal, and making provably false statements in court opinions. These actions were taken with the specific intent to prevent judicial review of government misconduct.

   b. Judge Shelly Stratman obstructed justice by permitting flagrant procedural violations by OPS

attorneys while holding Plaintiff to impossible standards. Her actions were taken with the specific intent to prevent judicial review of government misconduct.

  c. The AG's refusal to enforce public records laws despite clear violations represents obstruction of justice, as it prevented the lawful execution of statutory transparency requirements with the specific intent to shield government misconduct from public scrutiny.

  d. Baird Holm attorney Steve Davidson obstructed justice by submitting ex parte documents to judges before hearings, corrupting the judicial process through improper influence of court proceedings.

  e. OPS Records Keeper Anne MacFarland obstructed justice by falsifying and manipulating public records to obstruct access, directly participating in the pattern of fraud that characterized the enterprise's operations.

  f. Each of these actions constitutes a separate predicate act under RICO. See United States v. Aguilar, 515 U.S. 593, 599 (1995) (defining obstruction of justice as actions taken with the intent to influence, obstruct, or impede the due administration of justice).

4. **Witness Retaliation (18 U.S.C. § 1513)**:

a. OPS Board President Shavonna Holman engaged in witness retaliation by filing a fraudulent protection order against Plaintiff based on protected political speech, coordinating with law enforcement before filing. This abuse of the legal process constitutes witness retaliation, as it was specifically designed to punish Plaintiff for his public criticism and testimony.

b. Lieutenant Charles Ott contacted Plaintiff before Holman filed her restraining order, proving pre-coordination between OPS and law enforcement in developing a retaliation strategy. This call, which attempted to intimidate Plaintiff into ceasing his advocacy, constitutes witness retaliation.

c. Officer Steve Lee from the Mental Health and Wellness Unit similarly contacted Plaintiff in an attempt to frame political speech as a mental health issue, another form of intimidation and retaliation against a witness to government misconduct.

d. Attorney Steve Davidson falsely labeled Plaintiff a "security threat" in court records without any evidence, a defamatory act designed to retaliate against Plaintiff for his role as a witness to government misconduct.

e. Capitol Police officers physically removed Plaintiff from the state capitol on three separate occasions for properly requesting resolution from the Attorney

General's Office, violating his constitutional right to petition for redress of grievances and retaliating against him for his role as a witness to government misconduct.

   f. Each of these actions constitutes a separate predicate act under RICO. See Deck v. Engineered Laminates, 349 F.3d 1253, 1257 (10th Cir. 2003) (recognizing that witness retaliation claims can constitute RICO predicate acts).

5. **Interstate Commerce and Effect**:

   a. The enterprise operates across state lines and affects interstate commerce in several ways:

   i. The use of electronic communications that traverse state boundaries in furtherance of the fraudulent scheme triggers federal wire fraud statutes.

   ii. The involvement of federal agencies and courts brings this conspiracy within the scope of federal jurisdiction.

   iii. The enterprise's obstruction affects financial transactions and regulatory oversight that cross state lines, particularly in the banking context.

iv. **The use of the internet and interstate telecommunications infrastructure to disseminate false information and coordinate obstructive activities satisfies the interstate commerce requirement.**

b. **The Supreme Court has held that RICO should be interpreted broadly to effectuate its remedial purposes. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497-98 (1985) ("RICO is to be read broadly.").**

c. **The minimal connection to interstate commerce required for RICO jurisdiction is easily satisfied in this case through the extensive use of interstate communication methods and the involvement of federal agencies and courts.**

### D. The Pattern Continues Unabated

1. **Continuing Violations Through Present Day**:

a. **The February 24, 2025 dismissal of Plaintiff's most recent case by the Nebraska Court of Appeals demonstrates that the pattern of obstruction continues unabated to the present day.**

b. The Court of Appeals dismissed the case based on an alleged verification deficiency, despite Plaintiff's certification under penalty of perjury.

c. The court simultaneously denied OPS's motion for summary dismissal as "moot," having already decided to dismiss the case on its own initiative.

d. This twin dismissal ensured that, once again, the merits of Plaintiff's public records claims would never be addressed, regardless of the procedural posture.

e. The timing of this most recent dismissal is significant, as it demonstrates that the pattern continues despite years of Plaintiff's attempts to navigate the procedural maze created by the courts.

2. **The Consistency Across Years and Contexts**:

a. The same tactics used to obstruct accountability for CharterWest Bank's fraud in 2018 were refined and deployed against Plaintiff's public records requests in 2021-2025.

b. Many of the same individuals and institutions were involved in both contexts, demonstrating the existence of an ongoing criminal enterprise rather than isolated incidents.

c. The pattern has persisted despite Plaintiff's attempts to navigate the procedural maze created by the courts, with new obstacles emerging each time previous ones are overcome.

d. This consistency across different substantive contexts (banking fraud and public records access) and time periods (2018 and 2021-2025) demonstrates both the continuity and relatedness required to establish a pattern under RICO.

## 3. **RICO Pattern Requirements Satisfied**:

a. The predicate acts span more than seven years, from 2018 to the present day, easily satisfying the "closed-ended" continuity requirement established in H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 241-42 (1989).

b. The ongoing nature of the enterprise and its continued operation through the present day also satisfies the "open-ended" continuity requirement, as there is a clear threat of continued criminal activity in the future.

c. The predicate acts are related by similar methods, participants, and objectives, forming a coherent pattern rather than isolated incidents.

d. The enterprise has shown remarkable resilience and adaptability, evolving its tactics in response to Plaintiff's efforts while maintaining its core objective of preventing transparency and accountability.

e. This combination of continuity and relatedness establishes the "pattern" element required for a RICO claim under the Supreme Court's precedents.

## XIV. LEGAL ARGUMENT: WHY EXTRAORDINARY INTERVENTION IS REQUIRED

The systematic foreclosure of all ordinary remedies necessitates extraordinary judicial intervention. This is not simply a case of individual errors or differences in legal interpretation—it is evidence of a comprehensive failure of governmental checks and balances that threatens the foundation of our constitutional system.

### A. The Collapse of Separation of Powers Doctrine

1. **The Fundamental Constitutional Crisis**:

a. The Nebraska constitution, like its federal counterpart, relies on the separation of powers to prevent tyranny. The evidence presented demonstrates not merely the failure of individual institutions but the collapse of the separation of powers itself.

b. In a functioning constitutional system, when the executive branch (represented here by OPS, the AG's Office, and other agencies) violates the law, the judicial branch provides a check through independent review.

c. In a functioning system, when the judiciary fails to provide this check, independent oversight bodies like the Ombudsman's Office ensure accountability.

d. In a functioning system, when both administrative and judicial remedies fail, public exposure through media and political pressure creates alternative accountability mechanisms.

2. **The Comprehensive Failure of Checks and Balances**:

a. What the evidence in this case reveals is the comprehensive failure of all these checks and balances:

i. Executive agencies engage in documented misconduct without fear of consequences.

**ii. Judicial institutions not only fail to provide checks on executive overreach but actively participate in shielding executive misconduct from review.**

**iii. Oversight bodies like the Ombudsman's Office coordinate with the very entities they are supposed to monitor, creating a closed system impervious to citizen complaints.**

**iv. Media entities either ignore evidence of corruption or actively participate in suppressing it, eliminating the final check of public exposure.**

**b. This situation represents more than the sum of its parts—it constitutes a fundamental breakdown in the constitutional order:**

**i. When each branch of government not only fails to check the others but actively collaborates to prevent citizen oversight, the entire premise of democratic governance is undermined.**

**ii. The separation of powers doctrine becomes meaningless when the branches unite against citizens seeking transparency and accountability.**

**iii. The system no longer resembles a constitutional republic but a closed oligarchy using the forms of democratic governance to shield itself from accountability.**

3. **Federal Intervention as Constitutional Necessity**:

   a. This Court's authority to intervene is not merely statutory but constitutional—it represents the last opportunity to restore the separation of powers when state institutions have demonstrably failed.

   b. Federal courts have not only the authority but the obligation to intervene when state governmental structures have collapsed to the point where citizens have no meaningful remedies for constitutional violations.

   c. The Supreme Court has recognized that extraordinary remedies are appropriate when ordinary channels have been systematically foreclosed. See United States v. Nixon, 418 U.S. 683 (1974) (holding that extraordinary judicial intervention is warranted when other constitutional mechanisms have failed).

   d. In cases of systematic state failure to protect constitutional rights, federal intervention becomes necessary to preserve the constitutional order itself. See Cooper v. Aaron, 358 U.S. 1 (1958) (affirming federal judicial authority to intervene when state institutions systematically fail to protect constitutional rights).

**e. The evidence presented demonstrates precisely the type of systemic failure that necessitates federal judicial intervention to restore constitutional governance.**

**4. \*\*The Precedential Support for Intervention\*\*:**

**a. In Ex parte Young, 209 U.S. 123 (1908), the Supreme Court established that federal courts may enjoin state officials from enforcing unconstitutional state laws or policies, even when those officials claim sovereign immunity.**

**b. In Monroe v. Pape, 365 U.S. 167 (1961), the Court recognized that federal remedies are necessary when state remedies are inadequate in practice, regardless of their theoretical availability.**

**c. In Mitchum v. Foster, 407 U.S. 225 (1972), the Court held that federal courts may enjoin state court proceedings that are being used to harass citizens and prevent the exercise of their federal rights, explicitly recognizing that the Anti-Injunction Act does not bar federal intervention when state courts themselves become instruments of constitutional violations.**

**d. In Dombrowski v. Pfister, 380 U.S. 479 (1965), the Court recognized that federal injunctive relief is warranted when state procedures are being used to chill**

the exercise of constitutional rights through bad faith harassment.

e. In Gibson v. Berryhill, 411 U.S. 564 (1973), the Court found federal intervention appropriate when state administrative and judicial proceedings were structurally biased, recognizing that systemic bias justifies extraordinary federal remedies.

f. These precedents establish that when state courts systematically fail to provide meaningful remedies, federal intervention is not merely permitted but required to preserve the constitutional order.

### B. The Denial of Fundamental Due Process

1. **The Constitutional Requirements of Due Process**:

a. Due process requires not merely procedural formalities but meaningful access to justice. The Supreme Court has consistently held that procedures that operate as arbitrary barriers to justice violate constitutional principles.

b. In Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982), the Court held that the state cannot create

procedures that arbitrarily deny litigants the opportunity to be heard.

c. In Boddie v. Connecticut, 401 U.S. 371 (1971), the Court recognized that procedures that effectively deny access to the courts violate due process, particularly when those procedures are applied selectively.

d. In M.L.B. v. S.L.J., 519 U.S. 102 (1996), the Court held that excessive or arbitrary fees that create barriers to justice violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

2. **The Coordinated Obstruction as Due Process Violation**:

a. The coordinated obstruction documented here has denied Plaintiff this fundamental right to due process through:

i. The creation of impossible procedural hurdles applied only to Plaintiff, such as the ever-shifting "verification" requirements that change each time Plaintiff attempts to comply.

ii. The refusal to address the substantive merits of any claim regardless of its presentation, ensuring that no

matter how Plaintiff formats his pleadings, they will never receive meaningful review.

    iii. The systematic altering of procedural rules to prevent meaningful review, including accepting untimely filings from opposing counsel while rejecting timely filings from Plaintiff based on hyper-technical readings of the rules.

   b. These arbitrary barriers to justice violate the core principle of due process that "within the limits of practicability, a State must afford to all individuals a meaningful opportunity to be heard." Boddie, 401 U.S. at 379.

   c. The Supreme Court has recognized that seemingly neutral procedures can violate due process when applied in a manner that creates insurmountable barriers to justice. See Little v. Streater, 452 U.S. 1, 16 (1981) (holding that "state procedures for establishing paternity violated the due process guarantee because they effectively denied indigent defendants a meaningful opportunity to be heard").

3. **The Logically Impossible Order as Due Process Violation**:

**a. Judge Dougherty's December 13, 2024 order, which simultaneously dismisses for "lack of jurisdiction" and "failure to state a claim," represents a particularly egregious due process violation.**

**b. By creating a logically impossible standard that no litigant could satisfy, Judge Dougherty has violated the fundamental principle that due process requires "notice and an opportunity to be heard appropriate to the nature of the case." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950).**

**c. The Court of Appeals' selective extraction of only the jurisdictional ground while ignoring the contradictory merits dismissal in the same document further compounds this due process violation, creating a situation where even perfect compliance with procedural requirements cannot secure meaningful review.**

**d. The Supreme Court has held that "the Due Process Clause requires that a judicial proceeding adjudicate the merits of an action where the disposition of a party's claim may bind him." Kremer v. Chemical Const. Corp., 456 U.S. 461, 481 n.22 (1982). The deliberate use of contradictory procedural grounds to avoid merits adjudication violates this core requirement.**

## 4. **Due Process Violations Beyond Procedure**:

a. The due process violations extend beyond procedure to substance:

i. Fundamental fairness requires that courts and administrative agencies apply consistent standards to similar cases. The evidence demonstrates that Plaintiff has been subjected to standards that apply to no other litigant.

ii. Due process requires that judges act as neutral arbiters rather than participants in a scheme to obstruct justice. The documented ex parte communications and provably false statements by judges violate this basic principle.

iii. The coordinated obstruction across multiple institutions creates a situation where Plaintiff is deprived not just of particular procedures but of any meaningful opportunity to be heard—the essence of the due process guarantee.

b. The Supreme Court has recognized that due process has both procedural and substantive components, and that certain government actions may be "so unjustified by any purpose that they run afoul of the Due Process Clause." County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).

   c. The pattern of coordinated obstruction demonstrated here shocks the conscience and lacks any legitimate governmental purpose, thereby violating substantive due process.


### C. The Public Records Law Rendered a Dead Letter


1. **The Statutory Framework and Legislative Intent**:

   a. The Nebraska Public Records Law represents a legislative determination that governmental transparency is essential to democracy:

   i. The law explicitly states that "citizens of this state shall have the full right to know of and have full access to information on the public finances of ... this state and the public bodies and entities created to serve them." Neb. Rev. Stat. § 84-712.01(1).

   ii. It further provides that public records shall be "free for examination by any person," with narrow exceptions that must be specifically justified. Neb. Rev. Stat. § 84-712(1).

**iii. The law establishes specific remedies for citizens denied access, including the right to expedited judicial review and attorney general enforcement.**

**b. The legislative intent behind the Nebraska Public Records Law is clear—to ensure transparency and accountability in government operations by providing citizens with meaningful access to government information.**

**c. The Nebraska Supreme Court has affirmed this purpose, stating that the Public Records Law "is to be liberally construed whenever any public record is in question." State ex rel. Sileven v. Spire, 243 Neb. 451, 457, 500 N.W.2d 179, 183 (1993).**

**2. \*\*The Systematic Nullification of Statutory Rights\*\*:**

**a. The evidence demonstrates that every aspect of this statutory scheme has been subverted:**

**i. OPS has charged excessive fees for heavily redacted documents, provided the same documents to different requesters with different levels of redaction based on viewpoint, and falsely claimed that responsive documents don't exist.**

**ii. The Attorney General has refused to enforce the law despite clear evidence of violations, issued false opinions justifying non-compliance, and denied records requests seeking information about their own enforcement activities.**

**iii. The courts have created procedural barriers to judicial review that exist nowhere in the statute, ensuring that citizens can never obtain the expedited review promised by the law.**

**b. This systematic obstruction has rendered the Public Records Law a dead letter—a statutory right that exists on paper but cannot be exercised in practice due to coordinated institutional resistance.**

**c. The Nebraska Supreme Court has held that "the purpose of statutory interpretation is to determine the legislative intent and give it effect." ML Manager, LLC v. Jensen, 287 Neb. 171, 176, 842 N.W.2d 566, 571 (2014). The coordinated obstruction documented here directly contravenes this legislative intent.**

**3. \*\*The Contradiction with Nebraska's Own Precedents\*\*:**

**a. The courts' manipulation of mandamus requirements directly contradicts Nebraska's own precedents:**

   i. In State ex rel. BH Media Group v. Frakes, 305 Neb. 780, 943 N.W.2d 231 (2020), the Nebraska Supreme Court allowed a public records mandamus action to proceed despite procedural irregularities, stating that "the focus in a mandamus action is whether a duty exists, not on whether the petition was perfectly pled."

   ii. In State ex rel. Veskrna v. Steel, 296 Neb. 581, 894 N.W.2d 788 (2017), the court emphasized that the Public Records Act "is to be liberally construed in favor of disclosure" and that exceptions to disclosure "are to be narrowly construed."

   iii. In State ex rel. Adams Co. Historical Soc. v. Kinyoun, 277 Neb. 749, 765 N.W.2d 212 (2009), the court held that "the burden of showing an exemption from disclosure is on the party claiming the exception."

  b. The courts' handling of Plaintiff's cases represents a dramatic and unexplained departure from these established precedents, suggesting not good-faith legal interpretation but deliberate obstruction.

  c. This selective disregard for binding precedent violates the principle of stare decisis, which the Nebraska Supreme Court has described as "the bedrock of our common-law jurisprudence." State v. Hausmann, 277 Neb. 819, 828, 765 N.W.2d 219, 226 (2009).

**4. \*\*The Constitutional Implications of Statutory Nullification\*\*:**

   **a. When a statutory right as fundamental as access to public information can be so comprehensively nullified, it raises profound questions about whether the rule of law still operates in Nebraska:**

   **i. Legislative enactments become meaningless if executive agencies can ignore them with impunity and courts refuse to enforce them.**

   **ii. The comprehensive subversion of the Public Records Law documented here represents not just violations of particular provisions but the nullification of the entire statutory scheme.**

   **iii. This nullification of statutory law by executive and judicial action represents a constitutional crisis that demands extraordinary judicial intervention.**

   **b. The Supreme Court has recognized that "the duty of the courts is to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." Boyd v. United States, 116 U.S. 616, 635 (1886). The systematic nullification of the Public Records Law represents precisely such a "stealthy encroachment" on citizens' rights to government transparency.**

### D. The Evidence of Deliberate Manipulation Rather Than Good-Faith Error

1. **The "Verification" Requirement as Pretext**:

   a. The most recent dismissal of Plaintiff's case hinges on an alleged failure to properly "verify" his complaint—yet this requirement has been manipulated in ways that expose its pretextual nature:

      i. The verification standard cited by the Court of Appeals, based on State ex rel. Malone v. Baldonado-Bellamy, is selectively enforced against Plaintiff while similar requirements are waived for institutional litigants.

      ii. Plaintiff has consistently certified his filings "under penalty of perjury," the standard federal verification language, which should satisfy any reasonable verification requirement.

      iii. Nebraska law does not prescribe any particular form of verification for mandamus actions. The court has invented increasingly specific requirements that have no basis in statute or consistent precedent.

**b. The selective enforcement of this procedural requirement demonstrates that it is not about ensuring the integrity of the process but about preventing judicial review of government misconduct:**

**i. In numerous other mandamus cases, Nebraska courts have accepted various forms of verification or waived the requirement entirely. Only in Plaintiff's cases has this requirement been elevated to a jurisdictional barrier that cannot be corrected.**

**ii. Each time Plaintiff attempts to comply with the court's stated verification requirements, the requirements change, creating a moving target that can never be hit.**

**iii. The timing of dismissals consistently prevents any examination of the merits of Plaintiff's claims, regardless of the procedural posture or the form of verification provided.**

**2. \*\*The Pattern of Selective Procedural Enforcement\*\*:**

**a. The courts have applied radically different procedural standards to Plaintiff than to government entities and their attorneys:**

**i. OPS's last-minute motion to dismiss filed less than 24 hours before a hearing was allowed despite court**

rules requiring reasonable notice, while Plaintiff's timely motions were rejected for minor technical deficiencies.

    ii. OPS's failure to properly serve Plaintiff with notice of removal to federal court was overlooked, while Plaintiff's alleged service deficiencies were treated as fatal to his case.

    iii. OPS was permitted to submit untimely filings and engage in ex parte communications without consequences, while Plaintiff was held to an impossible standard of procedural perfection.

  b. This disparity cannot be reconciled with basic principles of due process and equal protection, which require that procedural rules be applied equally to all litigants.

  c. The Supreme Court has held that "the Constitution recognizes higher values than speed and efficiency," and that procedural due process requires "the right to be heard before being condemned to suffer grievous loss of any kind." Fuentes v. Shevin, 407 U.S. 67, 90-91 (1972) (internal quotations omitted).

3. **The Logically Impossible Order as Evidence of Deliberate Manipulation**:

a. Judge Dougherty's December 13, 2024 order, which simultaneously dismisses for "lack of jurisdiction" and "failure to state a claim," represents perhaps the most compelling evidence of deliberate manipulation rather than good-faith error.

b. This contradiction cannot be explained by incompetence or oversight—it violates a fundamental principle of civil procedure that first-year law students learn: if a court lacks jurisdiction, it cannot rule on the merits.

c. The Supreme Court's decision in Steel Co. v. Citizens for Better Environment, 523 U.S. 83 (1998), explicitly rejected the practice of "hypothetical jurisdiction" where courts bypass jurisdictional questions to reach merits determinations. Justice Scalia described this requirement as "inflexible and without exception."

d. By addressing the merits (failure to state a claim) after declaring lack of jurisdiction, Judge Dougherty created a ruling that is not merely incorrect but legally incoherent in a way that cannot be explained by good-faith error.

e. The Court of Appeals' selective extraction of only the jurisdictional ground while ignoring the contradictory merits dismissal in the same document further

demonstrates coordination rather than independent judicial action.

4. **The Statistical Impossibility of Coincidence**:

   a. The consistency of obstruction tactics across different institutions, different judges, and different time periods creates a statistical impossibility of coincidence:

   i. Multiple judges independently applying identical patterns of procedural manipulation that consistently prevent substantive review of Plaintiff's claims.

   ii. Multiple agencies independently reaching identical conclusions without investigation, all protecting the same interests in the same way.

   iii. Multiple courts independently making the same procedural "errors" that all happen to prevent Plaintiff's claims from receiving substantive review.

   b. The statistical probability of these patterns occurring independently across so many different institutions and individuals approaches zero, leaving coordination as the only plausible explanation.

   c. Courts have recognized that pattern evidence can establish intent in discrimination cases. See Village of

**Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266 (1977) (noting that a "clear pattern, unexplainable on grounds other than [improper motive]" can establish intent). The same principle applies here—the pattern of procedural manipulation is unexplainable on grounds other than deliberate obstruction.**

### E. The Evidence Compels a Finding of Constitutional Crisis

**1. **The Totality of Evidence and Its Implications** (continued):**

   **a. The totality of evidence presented compels a finding that Nebraska's constitutional system of checks and balances has effectively collapsed:**

   **i. Executive agencies violate the law with impunity, secure in the knowledge that no oversight mechanism will hold them accountable.**

   **ii. Courts manipulate procedural rules to prevent review of executive misconduct, transforming themselves from checks on power into its enablers.**

**iii. Independent oversight bodies coordinate with the very entities they are supposed to monitor, creating a closed system impervious to citizen complaints.**

**iv. Media entities either ignore evidence of corruption or actively participate in suppressing it, eliminating the final check of public exposure.**

**b. This systemic failure represents a constitutional crisis requiring extraordinary judicial intervention:**

**i. When normal channels of accountability have been systematically foreclosed, the federal courts represent the last bulwark against the complete collapse of constitutional governance.**

**ii. The evidence presented in this case is not merely of individual errors or misconduct but of the comprehensive failure of an entire system of constitutional governance.**

**iii. This Court has not only the authority but the duty to intervene when state governmental structures have been so thoroughly corrupted that citizens have no meaningful remedies for constitutional violations.**

**2. **The Implications for Democratic Governance**:**

**a. The systematic dismantling of accountability mechanisms strikes at the heart of democratic governance:**

**i. When citizens cannot access public information about their government, they cannot make informed decisions as voters.**

**ii. When courts refuse to enforce statutory rights, the legislative branch is effectively neutered.**

**iii. When executive agencies can violate the law with impunity, the rule of law itself collapses.**

**iv. When all branches of government coordinate to obstruct citizen oversight, government "of the people, by the people, for the people" ceases to exist in any meaningful sense.**

**b. The Supreme Court has recognized that "the very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 163 (1803). The systematic foreclosure of all remedies documented here directly contradicts this foundational principle.**

**c. When citizens have no meaningful recourse against government misconduct, the social contract itself is undermined. See THE FEDERALIST NO. 51 (James**

Madison) ("If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary.").

## 3. **The Necessity of Federal Intervention**:

a. In cases of systematic state failure to protect constitutional rights, federal intervention becomes necessary to preserve the constitutional order itself:

i. The Reconstruction Amendments and subsequent civil rights legislation explicitly recognized that federal intervention is sometimes necessary when state institutions systematically fail to protect constitutional rights.

ii. In Cooper v. Aaron, 358 U.S. 1 (1958), the Supreme Court affirmed that federal judicial authority must intervene when state institutions systematically fail to protect constitutional rights.

iii. In Mitchum v. Foster, 407 U.S. 225 (1972), the Court recognized that federal courts must have the power to enjoin state proceedings when necessary to protect federal rights from state court abuse.

**b. This case presents precisely the type of systemic failure that necessitates federal intervention—a complete breakdown of state accountability mechanisms that leaves citizens with no meaningful recourse for vindication of their rights.**

**c. When state courts become active participants in the violation of federal rights rather than their protectors, federal intervention is not merely justified but required by the Supremacy Clause and the constitutional structure.**

## XV. CAUSES OF ACTION

### COUNT I - RICO VIOLATIONS (18 U.S.C. § 1962(c))

**(Against All Defendants)**

**The allegations set forth above tell a chilling story of public corruption metastasizing into a criminal enterprise of the first order. By operating this illicit scheme through their various government offices and positions, the Defendants have transformed the very institutions charged with upholding the law into racketeering enterprises violating it.**

Each Defendant pursued a pattern of racketeering activity, freely employing the tools of wire fraud, mail fraud, obstruction of justice, and witness retaliation to perpetrate their unlawful ends and conceal the depths of their conspiracy. With each fraudulent email, each incident of coordinated legal deception, each retaliatory proceeding launched on manufactured grounds, the Defendants engaged in predicate criminal acts under RICO.

The Defendants' crimes were not coincidental, parallel misdeeds, but closely coordinated acts in furtherance of a unitary scheme. Each participant played a critical role, from issuing false legal justifications to destroying records, from initiating sham proceedings to obstructing investigations. This interwoven pattern of concerted unlawful activity affecting interstate commerce renders the Defendants liable for operating a racketeering enterprise under 18 U.S.C. § 1962(c).

### COUNT II - RICO CONSPIRACY (18 U.S.C. § 1962(d))

**(Against All Defendants)**

The Defendants were not content to merely perpetrate racketeering activities—they confederated to do so, entering a mutual pact to violate RICO. Each participant willfully joined the cabal, agreeing to pool their collective authority and resources to achieve through teamwork what they could not accomplish alone: the destruction of transparency in Nebraska government.

In service of their corrupt bargain, each conspirator agreed to commit multiple predicate acts. These were not mere tacit understandings, but explicit plans to break the law, laid bare through numerous communications. With shared purpose, the Defendants lined up to obstruct, to defraud, to cheat the public of their right to an honest government.

The conspiracy's success depended on different players performing different functions—attorneys fabricating legal excuses, commissioners launching retaliatory actions, records custodians denying access. Yet they all moved in concert as part of a cohesive criminal enterprise, and each bears full culpability for their confederates' misdeeds under 18 U.S.C. § 1962(d).

### COUNT III - CIVIL RIGHTS VIOLATIONS (42 U.S.C. § 1983)

**(Against All Defendants)**

**The Defendants did not merely violate the letter of the law—they trampled the most sacred constitutional rights of their fellow citizens. With the power of the state weaponized as an instrument of retaliation, Defendants sought to quash the Plaintiff's freedom of speech, freedom to petition, and freedom to seek truth in government. Due process and equal protection were rendered meaningless by agencies that could obstruct and retaliate at will. Access to the courts was a sham, with even the judiciary conscripted into the Defendants' conspiracy.**

**Though they may have draped themselves in official titles, the Defendants' lawless actions under color of state law served no public end—only the corrupt aims of the enterprise. Retaliating against whistleblowers, manufacturing fraudulent proceedings, hiding public records from the public—these are not legitimate governmental functions, but gross abuses of power. As**

such, the Defendants are liable under 42 U.S.C. § 1983 for their brazen violations of the Plaintiff's constitutional rights.

### COUNT IV - NEBRASKA PUBLIC RECORDS ACT VIOLATIONS

**(Against Peterson, Hilgers, Donley, Kramer, MacFarland)**

The Nebraska Public Records Act is not a mere box to be checked, but the legal embodiment of the public's right to an open government. In flouting these laws, the Attorney General's Office and its accomplices did not simply neglect a legal duty—they betrayed a solemn promise to the people of Nebraska.

The Defendants' violations were not casual oversights, but deliberate, willful acts to conceal their troubled doings. Records requests were met with false denials and fraudulent justifications. Damaging documents were destroyed or hidden, while the gatekeepers of public information schemed to restrict access. Honest requests for government accountability were reframed as acts of defiance, punishable by retaliatory measures. These

practices were not mishaps, but willful violations of the Public Records Act's letter and spirit.

### COUNT V - DEFAMATION

(Against Davidson)

Words have power, and in labeling the Plaintiff a "security threat," Defendant Davidson hurled the weight of his malicious lies straight at the Plaintiff's hard-earned reputation. This charge, presented as a statement of official fact, was pure fabrication from start to finish—an invention of Davidson's spiteful imagination, designed to smear the Plaintiff and shield the enterprise's wrongdoing.

Davidson well knew the falsity of his claims when he broadcast them to the world. Truth was immaterial; what mattered was crippling the Plaintiff's credibility and justifying the Defendants' campaign of harassment under a fraudulent banner of "security." The public now views the Plaintiff as a dangerous individual, though the only threat he poses is to the Defendants' corruption. For this malicious defamation, Davidson must be held to account.

### COUNT VI - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**(Against Davidson)**

**Defendant Davidson's outrageous conduct in falsely branding the Plaintiff a security threat transcended the bounds of decency and constituted an intentional infliction of emotional distress upon the Plaintiff. Davidson's actions were so extreme and beyond the pale of civil conduct as to be utterly intolerable in a civilized society.**

**At the time he made the defamatory statements, Davidson knew or should have known that his false claims would inflict severe emotional distress upon the Plaintiff. Davidson's sole motivation was to harass, intimidate, and retaliate against the Plaintiff for exposing the enterprise's misconduct. The resulting anguish, humiliation, and reputational harm were both foreseeable and intentional consequences of Davidson's malicious actions.**

As a direct and proximate result of Davidson's extreme and outrageous conduct, the Plaintiff suffered severe emotional distress, anguish, loss of personal and professional reputation, and other significant damages. Davidson is liable for the full measure of compensatory and punitive damages flowing from his unconscionable behavior.

## XVI. ANTICIPATORY RESPONSE TO DISMISSAL ARGUMENTS

### A. Jurisdiction and Immunity

The Defendants may seek to cloak themselves in sovereign immunity, but this is no mere dispute over government policy. These officials stepped far outside the legitimate bounds of their authority to perpetrate fraud, and no immunity can shield such ultra vires misconduct. Ex parte Young has long affirmed that state actors may be held to account for unconstitutional abuses, and §1983 codifies the right to bring them to justice. The Plaintiff seeks relief against the Defendants as individuals—as racketeers who only borrowed the state's power to violate the law—not against the state

itself. Immunity cannot mean impunity for public corruption.

Nor can the Defendants hide behind the Rooker-Feldman doctrine. This case is not an invite for the Court to sit in appeal of prior judgments, but to address an ongoing criminal enterprise that continues to inflict fresh injuries. The Plaintiff presents new evidence of new predicate acts—an ever-growing tapestry of fraud that no previous case could have encompassed in its entirety. The Defendants' scheme persists, and with it the grounds for this Court to take action without impinging on past decisions.

The Plaintiff has felt the sting of the Defendants' retaliation too directly to be accused of lacking standing. He was in the cross-hairs of the smear campaign that painted him a security threat on false pretenses. He bore the weight of the sham disciplinary proceedings launched to impede his efforts. And he suffered the loss of access to public records necessary to hold his government accountable. The Plaintiff's injuries are real, they are severe, and they are ongoing—the textbook grounds to seek relief in this Court.

### B. Sufficiency of RICO Claims

The Defendants may bluster that RICO does not reach their actions, but the facts speak for themselves. The participants in this scheme did not act in isolation—they formed a cohesive unit that jointly pursued an agenda of concealment and retaliation, a picture-perfect "enterprise" under RICO. From fraudulent emails to deceptive notices to corrupt court filings, the Defendants engaged in predicate acts with devastating consistency. This pattern of racketeering stretched back years and continues to this day, and has injured the Plaintiff and imperiled the integrity of Nebraska's government. RICO's application could not be more appropriate.

Indeed, the RICO jurisprudence is replete with schemes analogous to this one, in which government officials abused their power for unlawful ends. As the Supreme Court affirmed in Bridge v. Phoenix Bond, public corruption falls squarely within RICO's ambit when officials use their authority to commit fraud. Whether the office abused is an attorney general's chambers or a police precinct or a school administration building, the

**law does not discriminate. Nor does it matter that the Defendants' aim was to conceal information rather than line their own pockets. RICO recognizes that political machines can warp government functions for myriad improper purposes, all of them corrosive to the public trust. The Defendants' corruption of state agencies as repositories for their illicit activities more than suffices to establish a RICO enterprise.**

### C. Judicial Immunity Limitations

**For any other defendant, the shield of immunity would have long since shattered under the weight of such brazen misconduct. Defendant Dougherty cannot escape accountability solely because he wore a judicial robe while conspiring to break the law. His participation was not limited to the adjudication of cases, but bled over into administration, policymaking, and improper coordination with other defendants—acts wholly outside the judicial function that immunity is meant to protect. Any judge who wields his office as a weapon to retaliate against litigants and cover up government misdeeds has no claim to the limited immunity afforded to public servants acting in good faith. If Defendant Dougherty wishes to**

emulate the conduct of his co-conspirators, then he can join them in facing the consequences as well.

Cite Forrester v. White, 484 U.S. 219 (1988)—this proves that judicial immunity does NOT apply when judges engage in administrative or conspiratorial misconduct.

### D. Supervisory Liability

The Defendants at the upper echelons of the Attorney General's Office may seek to evade responsibility for conduct they "merely" enabled, but the law recognizes no such hair-splitting. Defendant Peterson and his successor Defendant Hilgers set policies that directly facilitated the enterprise's misdeeds—not just negligent oversight, but deliberate efforts to shield wrongdoing from public scrutiny. Through their fraudulent legal flunky Defendant Donley and others, they actively participated in deceiving citizens about their rights. And perhaps most damning of all, they did nothing to arrest this runaway corruption despite having the knowledge and power to do so. The Defendants' integral roles in the RICO scheme are undeniable and well-documented, and

neither the loftiness nor fungibility of their titles can spare them from liability.

### E. Timeliness of Claims

The Defendants' racketeering is as alive today as when it first reared its head. Each new fraudulent denial or retaliatory act represents a distinct predicate crime, freshly resetting the limitations clock. And through every deceptive legal memorandum and concealment of public documents, the Defendants actively hid their misdeeds from the Plaintiff until their staggering scope came into focus. Such fraudulent concealment would toll any limitations period until the pattern of racketeering came to light. The Plaintiff has diligently investigated and asserted his claims from the first whiff of impropriety, and the Defendants cannot run out the clock on their own wrongdoing.

### F. Administrative Exhaustion

The Plaintiff's claims sound predominantly in RICO and §1983, for which the courthouse doors are open without any administrative preamble. For causes that could implicate agency processes in theory—such as violations of the Public Records Act—pursuing that path would only cast the Plaintiff into a bureaucratic hall of mirrors. The Defendants have already shown their propensity to manipulate internal proceedings to suppress dissent. The administrative realm is the empire of their co-conspirators who remain in power, poised to abuse procedure just as their deposed brethren did. Where the Ombudsman abets the fraud, where the Attorney General openly strategizes to excuse it, what use would exhausting administrative remedies be except to exhaust the Plaintiff's resources and delay his day in court? The law does not force a plaintiff to submit to a rigged game.

### G. RICO Applicability

The Defendants clothed themselves in the garb of officialdom, but wielded the levers of government for personal, partisan, and decidedly non-governmental ends. It simply defies belief to argue, as the Defendants surely will, that conspiring to hide public records and retaliate against whistleblowers is all in a day's work for a

public servant. These actions are not just ultra vires, but the antithesis of proper government and the embodiment of the self-serving corruption RICO is meant to uproot. If anything, the Defendants' public positions render their betrayal of the law even more egregious.

The Supreme Court dispatched with any distinction between private and public RICO enterprises in United States v. Salinas, emphasizing that the statute extends to any illicit conduct with a nexus to interstate commerce. And even if the majority of the Defendants were nominally state employees, private parties such as Defendants Kramer and MacFarland willingly joined their criminal scheme as well. Their overriding aim was not to formulate policy, but to protect their shared pecuniary and political interests by breaking the law. Government office provided the Defendants a convenient base for their racketeering, but it did not shape their fundamental purpose. Nor can it shield them from the same liability that any other RICO violator would face.

## XVII. REMEDIES REQUESTED: EXTRAORDINARY INTERVENTION JUSTIFIED BY EXTRAORDINARY CIRCUMSTANCES

Given the complete breakdown of ordinary checks and balances, this Court must exercise its extraordinary authority to ensure that justice remains accessible. The unprecedented nature of the coordinated institutional obstruction documented here justifies equally unprecedented remedies.

### A. Declaratory Relief

1. **Declaration of Constitutional Violations**:

   a. A declaration that the Nebraska courts' application of verification requirements in Plaintiff's cases violates due process and equal protection principles:

   i. The shifting and selective application of these requirements creates an arbitrary barrier to justice with no basis in consistent legal principles.

   ii. The requirement as applied functions not as a legitimate procedural safeguard but as a pretext for preventing review of government misconduct.

**iii. This selective enforcement violates both the procedural and substantive aspects of the Due Process Clause.**

**b. A declaration that Judge Dougherty's December 13, 2024 order, which simultaneously dismisses for "lack of jurisdiction" and "failure to state a claim," is legally void as a violation of fundamental due process principles and the Supreme Court's explicit holding in Steel Co. v. Citizens for Better Environment, 523 U.S. 83 (1998).**

**c. A declaration that the Attorney General's refusal to correct demonstrably false information in published opinions constitutes a violation of statutory and constitutional obligations:**

**i. The AG has a statutory duty to enforce the Public Records Law and provide accurate legal guidance to the public.**

**ii. The willful publication and maintenance of false information in official opinions violates this statutory mandate and undermines the constitutional principle of transparent governance.**

**iii. This Court should declare that the AG's current practices violate both statutory and constitutional requirements.**

**d. A declaration that OPS's pattern of records manipulation and viewpoint discrimination violates the Nebraska Public Records Law and the First Amendment:**

**i. The evidence demonstrates a clear pattern of treating different requesters differently based on their viewpoint, in violation of both statutory and constitutional principles.**

**ii. OPS's practices of excessive redaction, false certification, and prohibiting in-person inspection violate specific provisions of the Nebraska Public Records Law.**

**iii. This Court should declare that these practices are unlawful and cannot continue.**

**2. \*\*Declaration of RICO Enterprise\*\*:**

**a. A declaration that the defendants' coordinated pattern of obstruction constitutes a RICO enterprise engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).**

**b. A declaration identifying the specific predicate acts committed by each defendant, including mail fraud, wire fraud, obstruction of justice, and witness retaliation.**

**c. A declaration that the enterprise's activities have caused direct injury to Plaintiff's business and property through enforcement of fraudulent filing fees, excessive document costs, and other quantifiable financial harms.**

**d. A declaration that the enterprise continues to operate through the present day, as evidenced by the February 24, 2025 Court of Appeals dismissal.**

### B. Injunctive Relief

**1. \*\*Public Records Production and Transparency\*\*:**

**a. An injunction requiring OPS to produce all requested public records without excessive redaction or cost:**

**i. OPS should be ordered to provide complete, unredacted copies of all records previously requested by Plaintiff, except where specific statutory exemptions apply.**

**ii. Where exemptions are claimed, OPS should be required to provide a detailed, item-by-item justification for each redaction or withholding.**

iii. OPS should be prohibited from charging excessive fees or treating different requesters differently based on viewpoint.

iv. OPS should be required to allow in-person inspection of public records as provided by the Nebraska Public Records Law.

b. An injunction requiring the Nebraska Attorney General to enforce the Public Records Law impartially and correct false information in published opinions:

i. The AG should be ordered to review and investigate all of Plaintiff's previously submitted complaints about public records violations.

ii. The AG should be required to correct demonstrably false statements in published opinions, particularly regarding the OPS board meeting incident.

iii. The AG should be prohibited from selectively publishing certain records denial letters while withholding others.

iv. The AG should be required to establish clear, objective standards for public records enforcement that apply equally to all requesters regardless of viewpoint.

## 2. **Judicial System Reforms**:

a. An injunction prohibiting the Nebraska courts from applying verification requirements in a discriminatory or arbitrary manner:

    i. The courts should be required to apply consistent standards to all litigants, regardless of their status as individuals or institutions.

    ii. Any verification requirement must be clearly articulated in advance and consistently applied.

    iii. Technical deficiencies in verification should be subject to correction rather than treated as jurisdictional barriers.

    iv. Pro se litigants should be held to the standard established in Haines v. Kerner, 404 U.S. 519 (1972), which requires liberal construction of their pleadings.

b. An injunction requiring adequate procedural protections:

    i. Courts should be required to provide specific, written explanations of any procedural deficiencies, with clear guidance on how to correct them.

ii. Courts should be prohibited from creating novel procedural requirements not found in statute or consistent precedent.

iii. Courts should be required to apply procedural rules equally to all litigants, with written justification for any disparate application.

iv. Ex parte communications between judges and litigants or their counsel should be prohibited, with mandatory disclosure of any inadvertent contact.

3. **RICO Enterprise Dissolution**:

   a. An injunction prohibiting the defendants from continuing to operate the RICO enterprise:

   i. Defendants should be prohibited from coordinating responses to public records requests or related legal proceedings.

   ii. Defendants should be prohibited from retaliating against citizens seeking public records or filing complaints.

   iii. Defendants should be prohibited from using procedural mechanisms to obstruct substantive review of public records disputes.

**iv. Defendants should be prohibited from communicating with each other regarding strategies for obstruction or retaliation.**

**b. An injunction requiring internal safeguards against future RICO violations:**

**i. Each defendant organization should be required to establish written policies prohibiting the types of coordination documented in this case.**

**ii. Each defendant organization should be required to implement training programs on proper handling of public records requests and related legal proceedings.**

**iii. Each defendant organization should be required to establish internal whistleblower protections for employees who report misconduct.**

**iv. Each defendant organization should be required to document all communications regarding public records requests and related legal proceedings, with regular reporting to the monitoring committee described below.**

### C. Appointment of Independent Monitors

1. **Independent Investigation of Coordinated Obstruction**:

   a. This Court should appoint a special master or independent investigator to examine the connections between the various actors and institutions involved in obstructing transparency and accountability.

   b. This investigation should have subpoena power and the authority to review internal communications between agencies, courts, and private entities like Baird Holm.

   c. The investigator should have authority to take sworn testimony from all defendants and other relevant witnesses, with appropriate immunity protections for whistleblowers.

   d. The investigator should issue a public report detailing the extent of coordination and identifying the key participants in the enterprise, with specific findings regarding each predicate act and each defendant's role.

2. **Special Master for Public Records Compliance**:

   a. The appointment of a special master to oversee Nebraska's public records compliance until institutional integrity can be restored:

**i. The special master should have the authority to review records denials, assess the legitimacy of claimed exemptions, and order production where appropriate.**

**ii. All public records requests to OPS and the Attorney General's Office should be subject to review by the special master to ensure consistent and lawful handling.**

**iii. The special master should have authority to hear complaints about public records violations and issue binding determinations.**

**iv. The special master should issue regular public reports on compliance with transparency laws and the progress toward institutional reform.**

**3. \*\*Judicial Monitoring Committee\*\*:**

**a. The establishment of a monitoring committee to ensure judicial integrity in cases involving government transparency:**

**i. This committee should review dismissals based on procedural grounds to ensure they reflect legitimate application of neutral principles rather than pretextual justifications.**

ii. The committee should have the authority to refer cases of judicial misconduct to appropriate authorities, including the Judicial Qualifications Commission.

iii. The committee should have authority to review ex parte communications and procedural irregularities in transparency-related cases.

iv. The committee should issue public reports on patterns of judicial decision-making in transparency cases, highlighting disparities in the treatment of different litigants.

### D. Structural Reforms

1. **Independent Transparency Ombudsman**:

a. The Court should order the creation of an independent transparency ombudsman outside the existing Nebraska governmental structure:

i. This ombudsman should have the authority to investigate complaints about public records violations without interference from the Attorney General's Office or other state agencies.

ii. The ombudsman should have direct access to this Court for enforcement of transparency requirements when state institutions fail to comply.

iii. The ombudsman should have authority to mediate public records disputes and issue advisory opinions on compliance with transparency laws.

iv. The ombudsman should issue public reports on compliance with transparency laws and identify systemic barriers to accountability.

2. **Clear Procedural Standards for Public Records Cases**:

a. The Court should require Nebraska to establish clear, consistent standards for verification in mandamus actions:

i. These standards should be publicly available and consistently applied to all litigants.

ii. Technical deficiencies should be subject to correction rather than treated as jurisdictional barriers.

iii. The standards should be designed to ensure the integrity of the process without creating unnecessary obstacles to judicial review.

iv. These standards should explicitly incorporate the Supreme Court's guidance in Haines v. Kerner regarding liberal construction of pro se pleadings.

b. The Court should require Nebraska to establish expedited procedures for public records cases as contemplated by the Nebraska Public Records Law:

i. These procedures should include strict timelines for judicial review.

ii. They should provide for preliminary injunctive relief when records are improperly withheld.

iii. They should ensure that procedural complexities do not prevent substantive review of public records disputes.

iv. They should include presumptions in favor of disclosure consistent with the purposes of the Nebraska Public Records Law.

3. **Judicial System Safeguards**:

a. The Court should require Nebraska to implement structural safeguards against ex parte communications and procedural manipulation:

**i. Courts should be required to maintain detailed records of all communications between judges and litigants or their attorneys.**

**ii. Procedural rules should be applied consistently to all litigants, with disparities subject to immediate appellate review.**

**iii. Judges should be required to recuse themselves in cases where they have engaged in ex parte communications or demonstrated bias against particular litigants.**

**iv. Courts should be required to provide clear written explanations for all procedural dismissals, with specific guidance on how any deficiencies can be corrected.**

### E. Damages and Costs

**1. \*\*RICO Damages\*\*:**

   **a. Pursuant to 18 U.S.C. § 1964(c), the Court should award Plaintiff treble damages for the financial harm caused by the RICO enterprise's pattern of racketeering activity:**

**i. Direct financial losses from payment of filing fees for proceedings that were predetermined to be dismissed.**

**ii. Direct financial losses from payment of approximately $1,600 for heavily redacted documents that were later provided unredacted to others for free.**

**iii. Direct financial losses through costs associated with transcript preparation and document reproduction.**

**iv. These actual damages, when trebled under RICO, amount to [calculated amount based on documented expenses].**

**2. \*\*Attorney's Fees and Costs\*\*:**

**a. Although Plaintiff has proceeded pro se, the Court should award reasonable fees for the time and resources expended in pursuing these claims:**

**i. The Supreme Court has recognized that pro se litigants may recover fees when justified by exceptional circumstances. See Kay v. Ehrler, 499 U.S. 432, 436 n.7 (1991) (noting that "Congress may have different policy considerations" for allowing fees to pro se litigants in certain cases).**

ii. The extraordinary nature of this case, involving systematic obstruction of justice by multiple government entities and officials, constitutes such exceptional circumstances.

iii. Alternatively, the Court should award Plaintiff his actual costs in pursuing these claims, including filing fees, transcript costs, copying expenses, and other out-of-pocket expenditures.

3. **Punitive Damages**:

a. In addition to RICO's treble damages, the Court should award punitive damages under 42 U.S.C. § 1983 for the defendants' willful violation of Plaintiff's constitutional rights:

i. The Supreme Court has held that punitive damages are available in § 1983 actions "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983).

ii. The evidence demonstrates that defendants' conduct was willful, coordinated, and designed specifically to deprive Plaintiff of his federally protected rights.

**iii. Punitive damages are particularly appropriate given the defendants' abuse of positions of public trust and authority.**

### F. Monitoring and Compliance

**1. \*\*Continuing Jurisdiction\*\*:**

**a. The Court should retain jurisdiction over this case until institutional integrity has been restored:**

**i. The Court should require regular reports from all defendants on their compliance with transparency requirements.**

**ii. The Court should hold regular status conferences to assess progress toward institutional reform.**

**iii. The Court should be prepared to impose escalating sanctions for continued non-compliance, including contempt citations and personal liability for responsible officials.**

**iv. The Court should maintain an open docket for Plaintiff to report any continuing violations or retaliation.**

## 2. **Objective Metrics for Institutional Reform**:

a. The Court should establish objective metrics for determining when Nebraska's institutional integrity has been sufficiently restored:

i. These metrics should include consistent compliance with transparency laws, neutral application of procedural rules, and the absence of retaliation against citizens seeking accountability.

ii. The metrics should be publicly available and regularly assessed by the independent monitors appointed by the Court.

iii. The metrics should include both quantitative measures (such as response times for public records requests) and qualitative assessments (such as the fairness of procedural rulings).

iv. The Court should maintain jurisdiction until these metrics demonstrate sustained improvement over a period of at least two years.

## 3. **Public Transparency and Reporting**:

**a. The Court should require regular public reporting on progress toward institutional reform:**

**i. All defendants should be required to submit quarterly reports detailing their handling of public records requests, including response times, fees charged, and the basis for any denials.**

**ii. The independent monitors should issue semi-annual reports assessing compliance with the Court's orders and identifying areas of continued concern.**

**iii. These reports should be publicly available and subject to comment by interested parties, including Plaintiff and civil society organizations.**

**iv. The Court should hold annual public hearings to assess progress and address ongoing concerns.**

## XVIII. PRAYER FOR RELIEF

**WHEREFORE, Plaintiff respectfully implores this Honorable Court:**

* Declare that the Defendants have wantonly violated federal racketeering laws, trampled cherished constitutional rights, and willfully flouted state public records statutes. Let this Court's pronouncement ring like a bell of justice, proclaiming that no government official, no matter how powerful, is above the law.

* Permanently enjoin the Defendants and their co-conspirators from perpetrating one more second of their illegal scheme. This enterprise of corruption must be razed to the ground, so that no further harm may grow from its poisoned soil. Compel the agencies in question to hew to the Public Records Act, immediately provide access to all wrongfully withheld documents, and cooperate with a full, independent investigation of their misdeeds. Only through such unsparing sunlight can this state hope to disinfect the wounds of official fraud.

* Award damages in an amount sufficient to punish the Defendants' outrageous conduct and deter other officials from emulating their wanton abuses of power. Treble damages under RICO to reflect the severalfold harms the Defendants have inflicted. Punitive damages to condemn the Defendants' callous disregard for the Plaintiff's rights and the public trust. Damages to compensate the

Plaintiff's losses in time, resources, and quality of life from enduring years of the Defendants' persecution. And recovery of all attorney fees and costs incurred in waging this battle for good government. Justice demands no less.

\* Retain continuing jurisdiction to supervise the implementation of remedial measures, and impose any further relief necessary to ensure the eradication of this wrongdoing root and branch. No half-steps or superficial fixes will suffice—Nebraska's government must be scoured of the Defendants' corrupt influence. Institutional reforms, monitoring, and robust accountability measures must become the new watchwords. The road to redemption will be long, but this Court's enduring vigilance can set Nebraska on the right path.

## XIX. CONCLUSION: THE MOMENT OF DECISION FOR CONSTITUTIONAL GOVERNANCE

This Court now faces a choice that transcends ordinary judicial review. The evidence presented is not mere allegation but documented proof of a coordinated enterprise spanning multiple institutions, courts, and

years – all dedicated to preventing a citizen's right to equal justice, through systematic corruption of every accountability mechanism in Nebraska's government

Whether the lowest level employee at a private bank, a simple records clerk at a public school district, the FBI or other law enforcement, or an elected/appointed official, one thing that remains constant: in Nebraska, even citizens will participate in the destruction of their own freedoms.

The question before this Court is not merely whether the Plaintiff has been wronged—though he undoubtedly has—but whether our system of government can still function when every institution designed to ensure accountability has been compromised. Do we still live in

a republic where the rule of law means something, or have we descended into a system where power alone determines outcomes regardless of law, evidence, or constitutional principle?

How extraordinary it must be for these defendants – attorneys general, judges, law enforcement officials, and respected attorneys – to find their elaborate enterprise of obstruction undone not by a team of high-powered lawyers or federal investigators, but by a self-represented citizen armed only with persistence, public records laws, and a meticulous attention to detail. Their institutional arrogance led them to believe that the rules of evidence, procedure, and logic itself could be casually discarded when inconvenient, leaving behind the very breadcrumbs that now form an unimpeachable record of their coordination.

Most damning of all, Judge Dougherty's logically impossible order dismissing simultaneously for "lack of jurisdiction" and "failure to state a claim" – a legal contradiction so fundamental that it violates principles established centuries ago and explicitly affirmed by the Supreme Court in *Steel Co. v. Citizens for Better Environment*. One imagines first-year law students

across the country studying this case in future years, marveling at the audacity of a judge who casually discarded the most basic principles of civil procedure in service of institutional protection.

The defendants have grown so comfortable in their immunity from oversight that they no longer bother to maintain even the pretense of legal coherence. They issue contradictory rulings, falsify procedural history, and coordinate across institutional boundaries with the casual indifference of those who have never faced consequences for their actions.

This case presents a test of whether our constitutional system can still self-correct when faced with systematic corruption. The Founders designed our republic with separated powers precisely because they understood that power corrupts, and that only countervailing power can check that corruption. When every institution designed to provide those checks has been captured, the final responsibility falls to this Court to restore the constitutional order.

In a world where "open government" has become a cynical punchline - a sadistic bait-and-switch promising transparency while slamming the door on scrutiny - one man's indefatigable battle against the machine has given Nebraska a once-in-a-generation chance to prove its treasured public records principles still have teeth. Over eight Kafkaesque years and through a gauntlet of hostile courts, Justin Riddle has meticulously documented a tapestry of official misconduct, dishonesty and contempt for basic accountability so brazen it would make Orwell blush. Yet at every turn, he has found himself lost in a hall of mirrors, his unimpeachable evidence bounced endlessly between one torpid institution and the next - all while those charged with upholding the law contort themselves into rhetorical pretzels to shield the connected from consequence.

This isn't just a glitch in our democratic machinery, but a defining feature - a system so rigged to enable the powerful and evade oversight that it has drifted into a kind of twilight zone, unable to course-correct even when confronted with irrefutable proof of its own unraveling. If sunlight and self-rule must perish from this earth, let their last stand at least find us upright - borne skyward by happy few like our self-appointed Patrick Henry here, raging against the dying of the light. For if we lose

warriors like Justin Riddle to despair and disillusionment, we'll deserve every ounce of the decline that follows.

Let there be no confusion: ANY judge who attempts to dismiss this case without addressing the OVERWHELMING and UNCONTESTED EVIDENCE presented will be confirming their active role in the RICO enterprise. In such an event, the Plaintiff will immediately file an amended complaint naming them as a co-conspirator, ensuring that their misconduct is preserved in the public record and subjected to the scrutiny they have so desperately tried to avoid. The days of hiding behind procedural games are over—if you choose to obstruct justice, you choose to stand trial for it.

Logically speaking, this will end far outside of the Nebraska corruption machine, if there's no one within that can uphold their judicial duty.

The eyes of history are upon this Court. The decision it renders will answer a question that strikes at the heart of our republic: When every institution designed to ensure accountability has failed, does the rule of law still have

**meaning? The evidence is before you. The choice is yours.**

**Respectfully submitted,**

**Justin Riddle**

**Plaintiff, Pro Se**

**16422 Patrick Ave**

**Omaha, NE 68116**

**Justinriddle1@gmail.com**

**Date: February 24, 2025**

## ## CERTIFICATE OF SERVICE

**I hereby certify that on this 24th day of February, 2025, a true and correct copy of the foregoing Emergency Motion for Extraordinary Judicial Review of Systemic Due Process Violations and Institutional Corruption was**

**served via First Class Mail and electronic mail upon the following defendants:**

**[Names and addresses of all defendants]**

**Justin Riddle**

**Plaintiff, Pro Se**

## XXII. THE WEAPONIZATION OF TIME: TEMPORAL OBSTRUCTION AS STRATEGIC ENTERPRISE CONDUCT

The enterprise's methodology extends beyond procedural and informational obstruction to include a sophisticated temporal strategy that systematically manipulates statutory timelines to create another form of mathematical impossibility. This temporal obstruction represents not isolated delays but a coordinated pattern of timeline manipulation that fundamentally undermines the possibility of meaningful accountability.

### A. The Systematic Exploitation of Maximum Statutory Timelines

1. **The Last-Minute Response Pattern**: a. Government entities consistently wait until the absolute final moment allowed by law to respond to requests, even when those responses contain no substantive information. b. This pattern is documented repeatedly across multiple agencies: i. OPS Records Keeper Anne MacFarland consistently provides responses at 4:29pm on the final day of statutory response periods, even when those responses merely direct Plaintiff to search public websites. ii. The Attorney General's Office routinely waits until the final day of statutory periods to issue disposition letters on public records complaints. iii. The Ombudsman similarly exhausts maximum response periods before providing non-substantive replies. iv. Courts regularly wait the maximum time permitted for issuing decisions on motions and filings. c. The consistency of this pattern across different agencies with different workloads and priorities can only

be explained by coordination rather than coincidence. d. This pattern becomes even more revealing when examining the content of these delayed responses - often containing no substantive information that would require extensive preparation time, demonstrating that the delay itself is the purpose rather than an unavoidable consequence of thorough review.

2. **The Compounding Effect of Sequential Procedures**: a. The accountability system requires citizens to complete multiple sequential procedures before obtaining meaningful review: i. Initial records request (statutory maximum: 4 business days) ii. Petition to Attorney General (informal timeline: 4-6 weeks) iii. Mandamus action (no statutory timeline, typically months) iv. Appeal of denied mandamus (statutory maximum: 30 days to file, months for decision) b. Each step in this sequence is individually extended to its maximum statutory limit, creating a cumulative timeline that makes completing the full accountability process practically impossible: i. The total time required to exhaust administrative remedies often exceeds applicable statutes of limitations. ii. The cumulative cost of pursuing each step in sequence becomes prohibitive for individual citizens. iii. The psychological toll of perpetual delay creates strategic attrition designed to exhaust citizens' will to pursue accountability. c. This creates another mathematical impossibility - a system where exhausting administrative remedies as required becomes practically impossible due to the deliberate extension of each component timeline.

## B. The Asymmetric Application of Temporal Requirements

1. **The Double Standard in Deadline Enforcement**: a. While government entities systematically exploit maximum statutory timelines, citizens are held to strict and often impossible deadline requirements: i. Courts reject citizens' filings for minor timing violations while allowing government entities to file motions less than 24 hours before hearings. ii. Agencies require citizens to respond to inquiries within days while taking weeks or months to address citizen complaints. iii. Missing a single deadline in the sequence creates a procedural trap that can terminate the entire accountability process. b. This asymmetry creates a fundamentally unfair playing field where: i. Citizens must meet exact deadlines with perfect compliance. ii. Government entities treat statutory deadlines as mere suggestions. iii. The system creates artificial bottlenecks knowing citizens have limited time and resources. c. The pattern is particularly evident in how courts treat deadline violations - enforcing them strictly against citizens while routinely granting extensions and exceptions to government entities and their attorneys.

2. **The Email Evidence: A Case Study in Temporal Obstruction**: a. A March 19, 2025 email from OPS Records Keeper Anne MacFarland exemplifies this strategy: i. Plaintiff submitted a specific records request on March 13, 2025, seeking "any payments made to Baird Holm including dates, amounts and any accompanying notes." ii. MacFarland waited until 4:29pm on March 19 - the final hour of the statutory response period (4 business days) - to respond. iii. Her response contained no actual records but merely

directed Plaintiff to search through general financial documents on the OPS website. iv. The timing of this non-response (4:29pm on the final day) for what amounted to a simple referral demonstrates deliberate delay rather than legitimate processing time. b. This pattern has been documented repeatedly across dozens of records requests, establishing that these are not isolated incidents but systematic conduct. c. The timing becomes even more revealing when examining responses to follow-up requests, which consistently restart the maximum statutory clock despite addressing the same underlying information.

## C. The Temporal Impossibility

This systematic manipulation of time creates another form of mathematical impossibility within the accountability system:

1. **The Process Completion Paradox**: a. Citizens are told they must exhaust administrative remedies before seeking judicial review. b. Each administrative step is deliberately extended to its maximum statutory limit. c. The cumulative time required exceeds practical human endurance and often applicable statutes of limitations. d. This creates a situation where exhausting administrative remedies becomes mathematically impossible within the timeframes required for meaningful relief.

2. **The Accelerated Response to Litigation Threat**: a. When Plaintiff indicates potential litigation (as in his March 19 follow-up stating "This is due. I'll add it to my next brief if I don't receive it"), responses suddenly appear at the last possible moment. b. This pattern reveals that agencies are capable of more timely responses but deliberately choose delay as a strategic tool. c. The acceleration in response to litigation threats demonstrates that delays are tactical rather than necessary.

3. **The Cumulative Impact of Temporal Manipulation**: a. This weaponization of time creates multiple compounding effects: i. Financial exhaustion through prolonged processes requiring continuous investment of resources ii. Psychological attrition through perpetual uncertainty and delay iii. Procedural traps where citizens miss deadlines due to the overwhelming number of simultaneous processes iv. Legal barriers as statutes of limitations expire during artificially extended administrative processes b. Even when citizens overcome these obstacles, the substantive issues are typically never addressed, and the process begins again with a new round of maximum statutory delays.

This temporal obstruction strategy represents another sophisticated mechanism in the enterprise's arsenal - one that doesn't leave obvious evidence like false statements but effectively prevents accountability through procedural attrition. It's particularly insidious because each individual delay appears legitimate in isolation, but the pattern reveals deliberate coordination to make the overall process impossible to complete.

The weaponization of time complements the information asymmetry and procedural obstruction previously documented, creating a comprehensive system where no matter how determined or resourceful a citizen may be, completing the full accountability process becomes mathematically impossible by design.## XXI. THE WEAPONIZATION OF INFORMATION ASYMMETRY

The enterprise's sophistication extends beyond mere procedural obstruction to include a deliberately engineered information asymmetry that fundamentally undermines due process. This asymmetry represents not a series of isolated decisions but a carefully designed mechanism that appears across multiple agencies and contexts, providing further evidence of coordination rather than coincidence.

## A. The One-Sided Transparency Shield

1. **The Strategic Invocation of Privacy and Confidentiality**: a. Government agencies including the Attorney General's Office, Ombudsman, and regulatory bodies maintain complete transparency with the institutions they're supposedly investigating, while simultaneously invoking "privacy," "confidentiality," and "ongoing investigation" shields against citizen complainants. b. This selective transparency creates a fundamentally unfair process where: i. The accused entity receives the complete complaint and can craft tailored responses ii. The accused entity receives updates and information about the investigation's progress iii. The accused entity effectively gets "multiple bites at the apple" to address concerns iv. Meanwhile, the citizen is kept entirely in the dark, unable to counter false claims or address misrepresentations c. The pattern is too consistent across agencies to be coincidental. Whether dealing with the AG's Office regarding public records violations, the Department of Banking and Finance regarding CharterWest's misconduct, or the Ombudsman regarding accountability failures, the same information asymmetry pattern emerges. d. This one-sided transparency creates a situation where the citizen is functionally prohibited from participating in the very process ostensibly designed to address their complaint.

2. **The Interagency Double Standard**: a. Law enforcement agencies maintain comprehensive information sharing with other government entities when investigating external targets, but create an artificial information blackout when the investigation might implicate those same government entities. b. The FBI, for example, doesn't tell the Nebraska Attorney General "we can't update you on investigations" when the AG refers cases for federal investigation. Yet when Plaintiff approached the FBI regarding potential misconduct by the AG's Office and other state officials, he was told they "don't provide updates on whether they're investigating" and was ultimately placed on a list preventing direct agent contact. c. This selective application of information-sharing protocols creates a protective shield around government entities that doesn't exist for ordinary citizens or businesses. d. The pattern repeats across every level, from the CFPB and Federal Reserve addressing banking complaints to the Department of Education addressing OPS issues – robust information sharing with institutional actors, absolute opacity with

citizens.

## B. The Catch-22 of Disclosure Timing

1. **The Impossible Standard for Citizen Complaints**: a. Agencies create an impossible standard for citizen complaints where: i. If a citizen provides incomplete information initially, the complaint is dismissed based on "insufficient evidence" ii. If a citizen provides comprehensive information initially, agencies cherry-pick what to address and ignore the rest iii. Either way, agencies prevent any meaningful back-and-forth that might lead to actual accountability b. When Plaintiff submitted detailed documentation to the AG's Office regarding OPS's public records violations, the office selectively addressed certain claims while ignoring others, then declared the matter "resolved" without allowing Plaintiff to respond to misrepresentations made by OPS. c. Similarly, when Plaintiff provided comprehensive evidence to the Department of Banking and Finance regarding CharterWest's document alteration, the Department selectively addressed certain claims while ignoring key evidence, then closed the case without allowing Plaintiff to address the bank's misrepresentations. d. This pattern creates a situation where citizens are expected to anticipate and preemptively counter every possible misrepresentation an entity might make – an obviously impossible standard.

2. **The Forever-Closed Investigation**: a. Even when citizens manage to provide comprehensive evidence directly contradicting an entity's claims, agencies invoke the "investigation is complete" shield to prevent any reconsideration. b. The AG's Office, for example, refused to reconsider its findings regarding OPS's public records violations even when presented with documentary evidence directly contradicting OPS's statements. c. The Ombudsman similarly refused to reopen investigations despite clear evidence that entities had provided false information during the initial review. d. This creates a situation where the process is designed to reach a predetermined conclusion regardless of evidence – once an entity's false claims are accepted, no amount of contradictory evidence can reopen the matter.

## C. The Perfect Circle of Informational Obstruction

These mechanisms together create yet another perfect circle of obstruction:

1. Citizens are told to provide complete information upfront
2. Agencies selectively engage with that information
3. Accused entities receive full access to complaints and provide tailored responses
4. Citizens are denied access to those responses and investigation details
5. When citizens attempt to address false claims made by the accused entity, they're told "the investigation is complete"

6. If citizens seek judicial review, they're told to exhaust administrative remedies – returning them to the beginning of this circular process

This information asymmetry serves a critical function in the enterprise's operations, ensuring that:

1. Citizens can never effectively counter false narratives
2. Investigations always have a predetermined outcome favoring institutional actors
3. The pretense of process can be maintained while ensuring no actual accountability
4. Each component of the system can claim it "followed procedure" while actually participating in a rigged process

The consistency of this pattern across different agencies, different time periods, and different substantive contexts provides compelling evidence of coordination rather than coincidence. No legitimate administrative process would systematically deny information to complainants while sharing everything with the entities they're complaining about. This represents not administrative error but deliberate design – a sophisticated mechanism for creating the appearance of investigation while ensuring predetermined outcomes.

Like the mathematical impossibility created by the AG's dual role as both "adversary" and "arbiter," this information asymmetry creates another structural barrier to accountability that cannot be overcome regardless of evidence or merit. It transforms what should be a truth-seeking process into empty theater with predetermined outcomes, further demonstrating the enterprise's sophisticated methodology for preventing meaningful oversight. i. OPS has charged excessive fees for heavily redacted documents, provided the same documents to different requesters with different levels of redaction based on viewpoint, and falsely claimed that responsive documents don't exist. ii. The Attorney General has refused to enforce the law despite clear evidence of violations, issued false opinions justifying non-compliance, and denied records requests seeking information about their own enforcement activities. iii. The courts have created procedural barriers to judicial review that exist nowhere in the statute, ensuring that citizens can never obtain the expedited review promised by the law. b. This systematic obstruction has rendered the Public Records Law a dead letter—a statutory right that exists on paper but cannot be exercised in practice due to coordinated institutional resistance. c. The Nebraska Supreme Court has held that "the purpose of statutory interpretation is to determine the legislative intent and give it effect." ML Manager, LLC v. Jensen, 287 Neb. 171, 176, 842 N.W.2d 566, 571 (2014). The coordinated obstruction documented here directly contravenes this legislative intent.

3. **The Contradiction with Nebraska's Own Precedents**: a. The courts' manipulation of mandamus requirements directly contradicts Nebraska's own precedents: i. In State ex rel. BH Media Group v. Frakes, 305 Neb. 780, 943 N.W.2d 231 (2020), the Nebraska Supreme Court allowed a public records mandamus action to proceed despite procedural irregularities, stating that "the focus in a mandamus action is whether a duty exists, not on whether the petition was perfectly pled." ii. In State ex rel. Veskrna v. Steel, 296 Neb. 581, 894 N.W.2d 788 (2017), the court emphasized that the Public Records

Act "is to be liberally construed in favor of disclosure" and that exceptions to disclosure "are to be narrowly construed." iii. In State ex rel. Adams Co. Historical Soc. v. Kinyoun, 277 Neb. 749, 765 N.W.2d 212 (2009), the court held that "the burden of showing an exemption from disclosure is on the party claiming the exception." b. The courts' handling of Plaintiff's cases represents a dramatic and unexplained departure from these established precedents, suggesting not good-faith legal interpretation but deliberate obstruction. c. This selective disregard for binding precedent violates the principle of stare decisis, which the Nebraska Supreme Court has described as "the bedrock of our common-law jurisprudence." State v. Hausmann, 277 Neb. 819, 828, 765 N.W.2d 219, 226 (2009).

4. **The Constitutional Implications of Statutory Nullification**: a. When a statutory right as fundamental as access to public information can be so comprehensively nullified, it raises profound questions about whether the rule of law still operates in Nebraska: i. Legislative enactments become meaningless if executive agencies can ignore them with impunity and courts refuse to enforce them. ii. The comprehensive subversion of the Public Records Law documented here represents not just violations of particular provisions but the nullification of the entire statutory scheme. iii. This nullification of statutory law by executive and judicial action represents a constitutional crisis that demands extraordinary judicial intervention. b. The Supreme Court has recognized that "the duty of the courts is to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." Boyd v. United States, 116 U.S. 616, 635 (1886). The systematic nullification of the Public Records Law represents precisely such a "stealthy encroachment" on citizens' rights to government transparency.

5. **The Inherent Contradiction in the AG's Dual Role**: a. The AG's Office has explicitly positioned itself as "adversarial" to citizens seeking public records while simultaneously claiming statutory authority to adjudicate disputes over those same records. This creates an irreconcilable conflict of interest that fundamentally corrupts the entire enforcement mechanism: i. The designated enforcer of the law has declared itself an adversary to those seeking enforcement. ii. This contradictory position explains the AG's perfect record of ruling in favor of government entities in public records disputes. iii. This arrangement is not a minor administrative quirk but a structural defect that renders the entire enforcement mechanism meaningless. b. The Supreme Court has recognized that due process requires a neutral decision-maker, not one with an "unconstitutional potential for bias." Schweiker v. McClure, 456 U.S. 188, 196 (1982). The AG's explicit adversarial stance creates precisely such an unconstitutional bias. c. This structural defect in Nebraska's public records enforcement system represents not just a state law violation but a constitutional due process violation that requires federal intervention.

## D. The Evidence of Deliberate Manipulation Rather Than Good-Faith Error

1. **The "Verification" Requirement as Pretext**: a. The most recent dismissal of Plaintiff's case hinges on an alleged failure to properly "verify" his complaint—yet this requirement has been manipulated in ways that expose its pretextual nature: i. The verification standard cited by the Court of Appeals, based on State ex rel. Malone v. Baldonado-Bellamy, is selectively enforced against Plaintiff while similar requirements are waived for institutional litigants. ii. Plaintiff has consistently certified his filings "under penalty of perjury," the standard federal verification language, which should satisfy any reasonable verification requirement. iii. Nebraska law does not prescribe any particular form of verification for mandamus actions. The court has invented increasingly specific requirements that have no basis in statute or consistent precedent. b. The selective enforcement of this procedural requirement demonstrates that it is not about ensuring the integrity of the process but about preventing judicial review of government misconduct: i. In numerous other mandamus cases, Nebraska courts have accepted various forms of verification or waived the requirement entirely. Only in Plaintiff's cases has this requirement been elevated to a jurisdictional barrier that cannot be corrected. ii. Each time Plaintiff attempts to comply with the court's stated verification requirements, the requirements change, creating a moving target that can never be hit. iii. The timing of dismissals consistently prevents any examination of the merits of Plaintiff's claims, regardless of the procedural posture or the form of verification provided.

2. **The Pattern of Selective Procedural Enforcement**: a. The courts have applied radically different procedural standards to Plaintiff than to government entities and their attorneys: i. OPS's last-minute motion to dismiss filed less than 24 hours before a hearing was allowed despite court rules requiring reasonable notice, while Plaintiff's timely motions were rejected for minor technical deficiencies. ii. OPS's failure to properly serve Plaintiff with notice of removal to federal court was overlooked, while Plaintiff's alleged service deficiencies were treated as fatal to his case. iii. OPS was permitted to submit untimely filings and engage in ex parte communications without consequences, while Plaintiff was held to an impossible standard of procedural perfection. b. This disparity cannot be reconciled with basic principles of due process and equal protection, which require that procedural rules be applied equally to all litigants. c. The Supreme Court has held that "the Constitution recognizes higher values than speed and efficiency," and that procedural due process requires "the right to be heard before being condemned to suffer grievous loss of any kind." Fuentes v. Shevin, 407 U.S. 67, 90-91 (1972) (internal quotations omitted).

3. **The Logically Impossible Order as Evidence of Deliberate Manipulation**: a. Judge Dougherty's December 13, 2024 order, which simultaneously dismisses for "lack of jurisdiction" and "failure to state a claim," represents perhaps the most compelling evidence of deliberate manipulation rather than good-faith error. b. This contradiction cannot be explained by incompetence or oversight—it violates a fundamental principle of civil procedure that first-year law students learn: if a court lacks jurisdiction, it cannot rule on the merits. c. The Supreme Court's decision in Steel Co. v. Citizens for Better Environment, 523 U.S. 83 (1998), explicitly rejected the practice of "hypothetical

jurisdiction" where courts bypass jurisdictional questions to reach merits determinations. Justice Scalia described this requirement as "inflexible and without exception." d. By addressing the merits (failure to state a claim) after declaring lack of jurisdiction, Judge Dougherty created a ruling that is not merely incorrect but legally incoherent in a way that cannot be explained by good-faith error. e. The Court of Appeals' selective extraction of only the jurisdictional ground while ignoring the contradictory merits dismissal in the same document further demonstrates coordination rather than independent judicial action.

4. **The Statistical Impossibility of Coincidence**: a. The consistency of obstruction tactics across different institutions, different judges, and different time periods creates a statistical impossibility of coincidence: i. Multiple judges independently applying identical patterns of procedural manipulation that consistently prevent substantive review of Plaintiff's claims. ii. Multiple agencies independently reaching identical conclusions without investigation, all protecting the same interests in the same way. iii. Multiple courts independently making the same procedural "errors" that all happen to prevent Plaintiff's claims from receiving substantive review. b. The statistical probability of these patterns occurring independently across so many different institutions and individuals approaches zero, leaving coordination as the only plausible explanation. c. Courts have recognized that pattern evidence can establish intent in discrimination cases. See Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266 (1977) (noting that a "clear pattern, unexplainable on grounds other than [improper motive]" can establish intent). The same principle applies here—the pattern of procedural manipulation is unexplainable on grounds other than deliberate obstruction.

## E. The Evidence Compels a Finding of Constitutional Crisis

1. **The Totality of Evidence and Its Implications**: a. The totality of evidence presented compels a finding that Nebraska's constitutional system of checks and balances has effectively collapsed: i. Executive agencies violate the law with impunity, secure in the knowledge that no oversight mechanism will hold them accountable. ii. Courts manipulate procedural rules to prevent review of executive misconduct, transforming themselves from checks on power into its enablers. iii. Independent oversight bodies coordinate with the very entities they are supposed to monitor, creating a closed system impervious to citizen complaints. iv. Media entities either ignore evidence of corruption or actively participate in suppressing it, eliminating the final check of public exposure. b. This systemic failure represents a constitutional crisis requiring extraordinary judicial intervention: i. When normal channels of accountability have been systematically foreclosed, the federal courts represent the last bulwark against the complete collapse of constitutional governance. ii. The evidence presented in this case is not merely of individual errors or misconduct but of the comprehensive failure of an entire system of constitutional governance. iii. This Court has not only the authority but the duty to intervene when state governmental structures have been so thoroughly corrupted that

citizens have no meaningful remedies for constitutional violations.

2. **The Implications for Democratic Governance**: a. The systematic dismantling of accountability mechanisms strikes at the heart of democratic governance: i. When citizens cannot access public information about their government, they cannot make informed decisions as voters. ii. When courts refuse to enforce statutory rights, the legislative branch is effectively neutered. iii. When executive agencies can violate the law with impunity, the rule of law itself collapses. iv. When all branches of government coordinate to obstruct citizen oversight, government "of the people, by the people, for the people" ceases to exist in any meaningful sense. b. The Supreme Court has recognized that "the very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 163 (1803). The systematic foreclosure of all remedies documented here directly contradicts this foundational principle. c. When citizens have no meaningful recourse against government misconduct, the social contract itself is undermined. See THE FEDERALIST NO. 51 (James Madison) ("If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary.").

3. **The Necessity of Federal Intervention**: a. In cases of systematic state failure to protect constitutional rights, federal intervention becomes necessary to preserve the constitutional order itself: i. The Reconstruction Amendments and subsequent civil rights legislation explicitly recognized that federal intervention is sometimes necessary when state institutions systematically fail to protect constitutional rights. ii. In Cooper v. Aaron, 358 U.S. 1 (1958), the Supreme Court affirmed that federal judicial authority must intervene when state institutions systematically fail to protect constitutional rights. iii. In Mitchum v. Foster, 407 U.S. 225 (1972), the Court recognized that federal courts must have the power to enjoin state proceedings when necessary to protect federal rights from state court abuse. b. This case presents precisely the type of systemic failure that necessitates federal intervention—a complete breakdown of state accountability mechanisms that leaves citizens with no meaningful recourse for vindication of their rights. c. When state courts become active participants in the violation of federal rights rather than their protectors, federal intervention is not merely justified but required by the Supremacy Clause and the constitutional structure.

# XV. CAUSES OF ACTION

## COUNT I - RICO VIOLATIONS (18 U.S.C. § 1962(c))

(Against All Defendants)

The allegations set forth above tell a chilling story of public corruption metastasizing into a criminal enterprise of the first order. By operating this illicit scheme through their various

government offices and positions, the Defendants have transformed the very institutions charged with upholding the law into racketeering enterprises violating it.

Each Defendant pursued a pattern of racketeering activity, freely employing the tools of wire fraud, mail fraud, obstruction of justice, and witness retaliation to perpetrate their unlawful ends and conceal the depths of their conspiracy. With each fraudulent email, each incident of coordinated legal deception, each retaliatory proceeding launched on manufactured grounds, the Defendants engaged in predicate criminal acts under RICO.

The Defendants' crimes were not coincidental, parallel misdeeds, but closely coordinated acts in furtherance of a unitary scheme. Each participant played a critical role, from issuing false legal justifications to destroying records, from initiating sham proceedings to obstructing investigations. This interwoven pattern of concerted unlawful activity affecting interstate commerce renders the Defendants liable for operating a racketeering enterprise under 18 U.S.C. § 1962(c).

## COUNT II - RICO CONSPIRACY (18 U.S.C. § 1962(d))

(Against All Defendants)

The Defendants were not content to merely perpetrate racketeering activities—they confederated to do so, entering a mutual pact to violate RICO. Each participant willfully joined the cabal, agreeing to pool their collective authority and resources to achieve through teamwork what they could not accomplish alone: the destruction of transparency in Nebraska government.

In service of their corrupt bargain, each conspirator agreed to commit multiple predicate acts. These were not mere tacit understandings, but explicit plans to break the law, laid bare through numerous communications. With shared purpose, the Defendants lined up to obstruct, to defraud, to cheat the public of their right to an honest government.

The conspiracy's success depended on different players performing different functions—attorneys fabricating legal excuses, commissioners launching retaliatory actions, records custodians denying access. Yet they all moved in concert as part of a cohesive criminal enterprise, and each bears full culpability for their confederates' misdeeds under 18 U.S.C. § 1962(d).

## COUNT III - CIVIL RIGHTS VIOLATIONS (42 U.S.C. § 1983)

(Against All Defendants)

The Defendants did not merely violate the letter of the law—they trampled the most sacred constitutional rights of their fellow citizens. With the power of the state weaponized as an instrument of retaliation, Defendants sought to quash the Plaintiff's freedom of speech, freedom to petition, and freedom to seek truth in government. Due process and equal protection were

rendered meaningless by agencies that could obstruct and retaliate at will. Access to the courts was a sham, with even the judiciary conscripted into the Defendants' conspiracy.

Though they may have draped themselves in official titles, the Defendants' lawless actions under color of state law served no public end—only the corrupt aims of the enterprise. Retaliating against whistleblowers, manufacturing fraudulent proceedings, hiding public records from the public—these are not legitimate governmental functions, but gross abuses of power. As such, the Defendants are liable under 42 U.S.C. § 1983 for their brazen violations of the Plaintiff's constitutional rights.

## COUNT IV - NEBRASKA PUBLIC RECORDS ACT VIOLATIONS

(Against Peterson, Hilgers, Donley, Kramer, MacFarland)

The Nebraska Public Records Act is not a mere box to be checked, but the legal embodiment of the public's right to an open government. In flouting these laws, the Attorney General's Office and its accomplices did not simply neglect a legal duty—they betrayed a solemn promise to the people of Nebraska.

The Defendants' violations were not casual oversights, but deliberate, willful acts to conceal their troubled doings. Records requests were met with false denials and fraudulent justifications. Damaging documents were destroyed or hidden, while the gatekeepers of public information schemed to restrict access. Honest requests for government accountability were reframed as acts of defiance, punishable by retaliatory measures. These practices were not mishaps, but willful violations of the Public Records Act's letter and spirit.

## COUNT V - DEFAMATION

(Against Davidson)

Words have power, and in labeling the Plaintiff a "security threat," Defendant Davidson hurled the weight of his malicious lies straight at the Plaintiff's hard-earned reputation. This charge, presented as a statement of official fact, was pure fabrication from start to finish—an invention of Davidson's spiteful imagination, designed to smear the Plaintiff and shield the enterprise's wrongdoing.

Davidson well knew the falsity of his claims when he broadcast them to the world. Truth was immaterial; what mattered was crippling the Plaintiff's credibility and justifying the Defendants' campaign of harassment under a fraudulent banner of "security." The public now views the Plaintiff as a dangerous individual, though the only threat he poses is to the Defendants' corruption. For this malicious defamation, Davidson must be held to account.

## COUNT VI - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(Against Davidson)

Defendant Davidson's outrageous conduct in falsely branding the Plaintiff a security threat transcended the bounds of decency and constituted an intentional infliction of emotional distress upon the Plaintiff. Davidson's actions were so extreme and beyond the pale of civil conduct as to be utterly intolerable in a civilized society.

At the time he made the defamatory statements, Davidson knew or should have known that his false claims would inflict severe emotional distress upon the Plaintiff. Davidson's sole motivation was to harass, intimidate, and retaliate against the Plaintiff for exposing the enterprise's misconduct. The resulting anguish, humiliation, and reputational harm were both foreseeable and intentional consequences of Davidson's malicious actions.

As a direct and proximate result of Davidson's extreme and outrageous conduct, the Plaintiff suffered severe emotional distress, anguish, loss of personal and professional reputation, and other significant damages. Davidson is liable for the full measure of compensatory and punitive damages flowing from his unconscionable behavior.

# XVI. ANTICIPATORY RESPONSE TO POTENTIAL DISMISSAL ARGUMENTS

## A. Jurisdiction and Immunity

The Defendants may seek to cloak themselves in sovereign immunity, but this is no mere dispute over government policy. These officials stepped far outside the legitimate bounds of their authority to perpetrate fraud, and no immunity can shield such ultra vires misconduct. Ex parte Young has long affirmed that state actors may be held to account for unconstitutional abuses, and §1983 codifies the right to bring them to justice. The Plaintiff seeks relief against the Defendants as individuals—as racketeers who only borrowed the state's power to violate the law—not against the state itself. Immunity cannot mean impunity for public corruption.

Nor can the Defendants hide behind the Rooker-Feldman doctrine. This case is not an invite for the Court to sit in appeal of prior judgments, but to address an ongoing criminal enterprise that continues to inflict fresh injuries. The Plaintiff presents new evidence of new predicate acts—an ever-growing tapestry of fraud that no previous case could have encompassed in its entirety. The Defendants' scheme persists, and with it the grounds for this Court to take action without impinging on past decisions.

The Plaintiff has felt the sting of the Defendants' retaliation too directly to be accused of lacking standing. He was in the cross-hairs of the smear campaign that painted him a security threat on false pretenses. He bore the weight of the sham disciplinary proceedings launched to impede his efforts. And he suffered the loss of access to public records necessary to hold his government accountable. The Plaintiff's injuries are real, they are severe, and they are ongoing—the textbook grounds to seek relief in this Court.

## B. Sufficiency of RICO Claims

The Defendants may bluster that RICO does not reach their actions, but the facts speak for themselves. The participants in this scheme did not act in isolation—they formed a cohesive unit that jointly pursued an agenda of concealment and retaliation, a picture-perfect "enterprise" under RICO. From fraudulent emails to deceptive notices to corrupt court filings, the Defendants engaged in predicate acts with devastating consistency. This pattern of racketeering stretched back years and continues to this day, and has injured the Plaintiff and imperiled the integrity of Nebraska's government. RICO's application could not be more appropriate.

Indeed, the RICO jurisprudence is replete with schemes analogous to this one, in which government officials abused their power for unlawful ends. As the Supreme Court affirmed in Bridge v. Phoenix Bond, public corruption schemes fall squarely within RICO's ambit when officials use their authority to commit fraud. Whether the office abused is an attorney general's chambers or a police precinct or a school administration building, the law does not discriminate. Nor does it matter that the Defendants' aim was to conceal information rather than line their own pockets. RICO recognizes that political machines can warp government functions for myriad improper purposes, all of them corrosive to the public trust. The Defendants' corruption of state agencies as repositories for their illicit activities more than suffices to establish a RICO enterprise.

## C. Judicial Immunity Limitations

For any other defendant, the shield of immunity would have long since shattered under the weight of such brazen misconduct. Defendant Dougherty cannot escape accountability solely because he wore a judicial robe while conspiring to break the law. His participation was not limited to the adjudication of cases, but bled over into administration, policymaking, and improper coordination with other defendants—acts wholly outside the judicial function that immunity is meant to protect. Any judge who wields his office as a weapon to retaliate against litigants and cover up government misdeeds has no claim to the limited immunity afforded to public servants acting in good faith. If Defendant Dougherty wishes to emulate the conduct of his co-conspirators, then he can join them in facing the consequences as well.

The Supreme Court has clearly established that judicial immunity does NOT apply when judges engage in administrative or conspiratorial misconduct. See Forrester v. White, 484 U.S. 219 (1988). This precedent proves that judicial immunity is limited to judicial acts performed within the court's jurisdiction—not to administrative actions, and certainly not to participation in criminal conspiracies.

## D. Supervisory Liability

The Defendants at the upper echelons of the Attorney General's Office may seek to evade responsibility for conduct they "merely" enabled, but the law recognizes no such hair-splitting. Defendant Peterson and his successor Defendant Hilgers set policies that directly facilitated the enterprise's misdeeds—not just negligent oversight, but deliberate efforts to shield wrongdoing

from public scrutiny. Through their fraudulent legal flunky Defendant Donley and others, they actively participated in deceiving citizens about their rights. And perhaps most damning of all, they did nothing to arrest this runaway corruption despite having the knowledge and power to do so. The Defendants' integral roles in the RICO scheme are undeniable and well-documented, and neither the loftiness nor fungibility of their titles can spare them from liability.

## E. Timeliness of Claims

The Defendants' racketeering is as alive today as when it first reared its head. Each new fraudulent denial or retaliatory act represents a distinct predicate crime, freshly resetting the limitations clock. And through every deceptive legal memorandum and concealment of public documents, the Defendants actively hid their misdeeds from the Plaintiff until their staggering scope came into focus. Such fraudulent concealment would toll any limitations period until the pattern of racketeering came to light. The Plaintiff has diligently investigated and asserted his claims from the first whiff of impropriety, and the Defendants cannot run out the clock on their own wrongdoing.

## F. Administrative Exhaustion

The Plaintiff's claims sound predominantly in RICO and §1983, for which the courthouse doors are open without any administrative preamble. For causes that could implicate agency processes in theory—such as violations of the Public Records Act—pursuing that path would only cast the Plaintiff into a bureaucratic hall of mirrors. The Defendants have already shown their propensity to manipulate internal proceedings to suppress dissent. The administrative realm is the empire of their co-conspirators who remain in power, poised to abuse procedure just as their deposed brethren did. Where the Ombudsman abets the fraud, where the Attorney General openly strategizes to excuse it, what use would exhausting administrative remedies be except to exhaust the Plaintiff's resources and delay his day in court?

Furthermore, the AG's Office has explicitly declared itself "adversarial" to citizens seeking public records while simultaneously claiming to be the arbiter of disputes over those records. This inherent and acknowledged conflict of interest renders administrative remedies not merely inadequate but a sham. The law does not force a plaintiff to submit to a rigged game.

## G. RICO Applicability

The Defendants clothed themselves in the garb of officialdom, but wielded the levers of government for personal, partisan, and decidedly non-governmental ends. It simply defies belief to argue, as the Defendants surely will, that conspiring to hide public records and retaliate against whistleblowers is all in a day's work for a public servant. These actions are not just ultra vires, but the antithesis of proper government and the embodiment of the self-serving corruption RICO is meant to uproot. If anything, the Defendants' public positions render their betrayal of the law even more egregious.

The Supreme Court dispatched with any distinction between private and public RICO enterprises in United States v. Salinas, emphasizing that the statute extends to any illicit conduct with a nexus to interstate commerce. And even if the majority of the Defendants were nominally state employees, private parties such as Defendants Kramer and MacFarland willingly joined their criminal scheme as well. Their overriding aim was not to formulate policy, but to protect their shared pecuniary and political interests by breaking the law. Government office provided the Defendants a convenient base for their racketeering, but it did not shape their fundamental purpose. Nor can it shield them from the same liability that any other RICO violator would face.

# XVII. REMEDIES REQUESTED: EXTRAORDINARY INTERVENTION JUSTIFIED BY EXTRAORDINARY CIRCUMSTANCES

Given the complete breakdown of ordinary checks and balances, this Court must exercise its extraordinary authority to ensure that justice remains accessible. The unprecedented nature of the coordinated institutional obstruction documented here justifies equally unprecedented remedies.

## A. Declaratory Relief

1. **Declaration of Constitutional Violations**: a. A declaration that the Nebraska courts' application of verification requirements in Plaintiff's cases violates due process and equal protection principles: i. The shifting and selective application of these requirements creates an arbitrary barrier to justice with no basis in consistent legal principles. ii. The requirement as applied functions not as a legitimate procedural safeguard but as a pretext for preventing review of government misconduct. iii. This selective enforcement violates both the procedural and substantive aspects of the Due Process Clause. b. A declaration that Judge Dougherty's December 13, 2024 order, which simultaneously dismisses for "lack of jurisdiction" and "failure to state a claim," is legally void as a violation of fundamental due process principles and the Supreme Court's explicit holding in Steel Co. v. Citizens for Better Environment, 523 U.S. 83 (1998). c. A declaration that the Attorney General's refusal to correct demonstrably false information in published opinions constitutes a violation of statutory and constitutional obligations: i. The AG has a statutory duty to enforce the Public Records Law and provide accurate legal guidance to the public. ii. The willful publication and maintenance of false information in official opinions violates this statutory mandate and undermines the constitutional principle of transparent governance. iii. This Court should declare that the AG's current practices violate both statutory and constitutional requirements. d. A declaration that OPS's pattern of records manipulation and viewpoint discrimination violates the Nebraska Public Records Law and the First Amendment: i. The evidence demonstrates a clear pattern of treating different requesters differently based on their viewpoint, in violation of both statutory and constitutional principles. ii. OPS's practices of excessive redaction,

false certification, and prohibiting in-person inspection violate specific provisions of the Nebraska Public Records Law. iii. This Court should declare that these practices are unlawful and cannot continue. e. A declaration that the Attorney General's inherent conflict of interest in public records enforcement violates due process: i. The AG's explicit positioning as "adversarial" to citizens while claiming to adjudicate their disputes creates a structural bias that violates fundamental due process. ii. This inherent conflict renders the entire public records enforcement mechanism constitutionally defective. iii. The Court should declare that this arrangement violates the Due Process Clause of the Fourteenth Amendment.

2. **Declaration of RICO Enterprise**: a. A declaration that the defendants' coordinated pattern of obstruction constitutes a RICO enterprise engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). b. A declaration identifying the specific predicate acts committed by each defendant, including mail fraud, wire fraud, obstruction of justice, and witness retaliation. c. A declaration that the enterprise's activities have caused direct injury to Plaintiff's business and property through enforcement of fraudulent filing fees, excessive document costs, and other quantifiable financial harms. d. A declaration that the enterprise continues to operate through the present day, as evidenced by the February 24, 2025 Court of Appeals dismissal.

## B. Injunctive Relief

1. **Public Records Production and Transparency**: a. An injunction requiring OPS to produce all requested public records without excessive redaction or cost: i. OPS should be ordered to provide complete, unredacted copies of all records previously requested by Plaintiff, except where specific statutory exemptions apply. ii. Where exemptions are claimed, OPS should be required to provide a detailed, item-by-item justification for each redaction or withholding. iii. OPS should be prohibited from charging excessive fees or treating different requesters differently based on viewpoint. iv. OPS should be required to allow in-person inspection of public records as provided by the Nebraska Public Records Law. b. An injunction requiring the Nebraska Attorney General to enforce the Public Records Law impartially and correct false information in published opinions: i. The AG should be ordered to review and investigate all of Plaintiff's previously submitted complaints about public records violations. ii. The AG should be required to correct demonstrably false statements in published opinions, particularly regarding the OPS board meeting incident. iii. The AG should be prohibited from selectively publishing certain records denial letters while withholding others. iv. The AG should be required to establish clear, objective standards for public records enforcement that apply equally to all requesters regardless of viewpoint. v. The AG should be required to recuse itself from adjudicating public records disputes as long as it maintains its "adversarial" position toward citizens seeking records.

2. **Judicial System Reforms**: a. An injunction prohibiting the Nebraska courts from applying verification requirements in a discriminatory or arbitrary manner: i. The courts should be required to apply consistent standards to all litigants, regardless of their status as individuals or institutions. ii. Any verification requirement must be clearly articulated in advance and consistently applied. iii. Technical deficiencies in verification should be subject to correction rather than treated as jurisdictional barriers. iv. Pro se litigants should be held to the standard established in Haines v. Kerner, 404 U.S. 519 (1972), which requires liberal construction of their pleadings. b. An injunction requiring adequate procedural protections: i. Courts should be required to provide specific, written explanations of any procedural deficiencies, with clear guidance on how to correct them. ii. Courts should be prohibited from creating novel procedural requirements not found in statute or consistent precedent. iii. Courts should be required to apply procedural rules equally to all litigants, with written justification for any disparate application. iv. Ex parte communications between judges and litigants or their counsel should be prohibited, with mandatory disclosure of any inadvertent contact.

3. **RICO Enterprise Dissolution**: a. An injunction prohibiting the defendants from continuing to operate the RICO enterprise: i. Defendants should be prohibited from coordinating responses to public records requests or related legal proceedings. ii. Defendants should be prohibited from retaliating against citizens seeking public records or filing complaints. iii. Defendants should be prohibited from using procedural mechanisms to obstruct substantive review of public records disputes. iv. Defendants should be prohibited from communicating with each other regarding strategies for obstruction or retaliation. b. An injunction requiring internal safeguards against future RICO violations: i. Each defendant organization should be required to establish written policies prohibiting the types of coordination documented in this case. ii. Each defendant organization should be required to implement training programs on proper handling of public records requests and related legal proceedings. iii. Each defendant organization should be required to establish internal whistleblower protections for employees who report misconduct. iv. Each defendant organization should be required to document all communications regarding public records requests and related legal proceedings, with regular reporting to the monitoring committee described below.

## C. Appointment of Independent Monitors

1. **Independent Investigation of Coordinated Obstruction**: a. This Court should appoint a special master or independent investigator to examine the connections between the various actors and institutions involved in obstructing transparency and accountability. b. This investigation should have subpoena power and the authority to review internal communications between agencies, courts, and private entities like Baird Holm. c. The investigator should have authority to take sworn testimony from all defendants and other relevant witnesses, with appropriate immunity protections for whistleblowers. d. The investigator should issue a public report detailing the extent of coordination and

identifying the key participants in the enterprise, with specific findings regarding each predicate act and each defendant's role.

2. **Special Master for Public Records Compliance**: a. The appointment of a special master to oversee Nebraska's public records compliance until institutional integrity can be restored: i. The special master should have the authority to review records denials, assess the legitimacy of claimed exemptions, and order production where appropriate. ii. All public records requests to OPS and the Attorney General's Office should be subject to review by the special master to ensure consistent and lawful handling. iii. The special master should have authority to hear complaints about public records violations and issue binding determinations. iv. The special master should issue regular public reports on compliance with transparency laws and the progress toward institutional reform.

3. **Judicial Monitoring Committee**: a. The establishment of a monitoring committee to ensure judicial integrity in cases involving government transparency: i. This committee should review dismissals based on procedural grounds to ensure they reflect legitimate application of neutral principles rather than pretextual justifications. ii. The committee should have the authority to refer cases of judicial misconduct to appropriate authorities, including the Judicial Qualifications Commission. iii. The committee should have authority to review ex parte communications and procedural irregularities in transparency-related cases. iv. The committee should issue public reports on patterns of judicial decision-making in transparency cases, highlighting disparities in the treatment of different litigants.

## D. Structural Reforms

1. **Independent Transparency Ombudsman**: a. The Court should order the creation of an independent transparency ombudsman outside the existing Nebraska governmental structure: i. This ombudsman should have the authority to investigate complaints about public records violations without interference from the Attorney General's Office or other state agencies. ii. The ombudsman should have direct access to this Court for enforcement of transparency requirements when state institutions fail to comply. iii. The ombudsman should have authority to mediate public records disputes and issue advisory opinions on compliance with transparency laws. iv. The ombudsman should issue public reports on compliance with transparency laws and identify systemic barriers to accountability.

2. **Clear Procedural Standards for Public Records Cases**: a. The Court should require Nebraska to establish clear, consistent standards for verification in mandamus actions: i. These standards should be publicly available and consistently applied to all litigants. ii. Technical deficiencies should be subject to correction rather than treated as jurisdictional barriers. iii. The standards should be designed to ensure the integrity of the process without creating unnecessary obstacles to judicial review. iv. These standards should

explicitly incorporate the Supreme Court's guidance in Haines v. Kerner regarding liberal construction of pro se pleadings. b. The Court should require Nebraska to establish expedited procedures for public records cases as contemplated by the Nebraska Public Records Law: i. These procedures should include strict timelines for judicial review. ii. They should provide for preliminary injunctive relief when records are improperly withheld. iii. They should ensure that procedural complexities do not prevent substantive review of public records disputes. iv. They should include presumptions in favor of disclosure consistent with the purposes of the Nebraska Public Records Law.

3. **Resolution of the Attorney General's Conflict of Interest**: a. The Court should require structural changes to eliminate the inherent conflict of interest in the AG's dual role: i. The AG's Office should be required to establish an independent public records review unit with a firewall from attorneys representing state agencies. ii. Alternatively, public records enforcement authority should be transferred to a neutral entity without an inherent conflict. iii. The AG should be prohibited from claiming to be both "adversarial" to citizens and the arbiter of their public records disputes. iv. Clear structural separations should be established between the AG's advocacy and enforcement functions.

4. **Judicial System Safeguards**: a. The Court should require Nebraska to implement structural safeguards against ex parte communications and procedural manipulation: i. Courts should be required to maintain detailed records of all communications between judges and litigants or their attorneys. ii. Procedural rules should be applied consistently to all litigants, with disparities subject to immediate appellate review. iii. Judges should be required to recuse themselves in cases where they have engaged in ex parte communications or demonstrated bias against particular litigants. iv. Courts should be required to provide clear written explanations for all procedural dismissals, with specific guidance on how any deficiencies can be corrected.

## E. Damages and Costs

1. **RICO Damages**: a. Pursuant to 18 U.S.C. § 1964(c), the Court should award Plaintiff treble damages for the financial harm caused by the RICO enterprise's pattern of racketeering activity: i. Direct financial losses from payment of filing fees for proceedings that were predetermined to be dismissed. ii. Direct financial losses from payment of approximately $1,600 for heavily redacted documents that were later provided unredacted to others for free. iii. Direct financial losses through costs associated with transcript preparation and document reproduction. iv. These actual damages, when trebled under RICO, amount to a substantial sum based on documented expenses.

2. **Attorney's Fees and Costs**: a. Although Plaintiff has proceeded pro se, the Court should award reasonable fees for the time and resources expended in pursuing these claims: i. The Supreme Court has recognized that pro se litigants may recover fees when justified by exceptional circumstances. See Kay v. Ehrler, 499 U.S. 432, 436 n.7 (1991)

(noting that "Congress may have different policy considerations" for allowing fees to pro se litigants in certain cases). ii. The extraordinary nature of this case, involving systematic obstruction of justice by multiple government entities and officials, constitutes such exceptional circumstances. iii. Alternatively, the Court should award Plaintiff his actual costs in pursuing these claims, including filing fees, transcript costs, copying expenses, and other out-of-pocket expenditures.

3. **Punitive Damages**: a. In addition to RICO's treble damages, the Court should award punitive damages under 42 U.S.C. § 1983 for the defendants' willful violation of Plaintiff's constitutional rights: i. The Supreme Court has held that punitive damages are available in § 1983 actions "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983). ii. The evidence demonstrates that defendants' conduct was willful, coordinated, and designed specifically to deprive Plaintiff of his federally protected rights. iii. Punitive damages are particularly appropriate given the defendants' abuse of positions of public trust and authority.

## F. Monitoring and Compliance

1. **Continuing Jurisdiction**: a. The Court should retain jurisdiction over this case until institutional integrity has been restored: i. The Court should require regular reports from all defendants on their compliance with transparency requirements. ii. The Court should hold regular status conferences to assess progress toward institutional reform. iii. The Court should be prepared to impose escalating sanctions for continued non-compliance, including contempt citations and personal liability for responsible officials. iv. The Court should maintain an open docket for Plaintiff to report any continuing violations or retaliation.

2. **Objective Metrics for Institutional Reform**: a. The Court should establish objective metrics for determining when Nebraska's institutional integrity has been sufficiently restored: i. These metrics should include consistent compliance with transparency laws, neutral application of procedural rules, and the absence of retaliation against citizens seeking accountability. ii. The metrics should be publicly available and regularly assessed by the independent monitors appointed by the Court. iii. The metrics should include both quantitative measures (such as response times for public records requests) and qualitative assessments (such as the fairness of procedural rulings). iv. The Court should maintain jurisdiction until these metrics demonstrate sustained improvement over a period of at least two years.

3. **Public Transparency and Reporting**: a. The Court should require regular public reporting on progress toward institutional reform: i. All defendants should be required to submit quarterly reports detailing their handling of public records requests, including response times, fees charged, and the basis for any denials. ii. The independent

monitors should issue semi-annual reports assessing compliance with the Court's orders and identifying areas of continued concern. iii. These reports should be publicly available and subject to comment by interested parties, including Plaintiff and civil society organizations. iv. The Court should hold annual public hearings to assess progress and address ongoing concerns.

# XVIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully implores this Honorable Court:

- Declare that the Defendants have wantonly violated federal racketeering laws, trampled cherished constitutional rights, and willfully flouted state public records statutes. Let this Court's pronouncement ring like a bell of justice, proclaiming that no government official, no matter how powerful, is above the law.

- Permanently enjoin the Defendants and their co-conspirators from perpetrating one more second of their illegal scheme. This enterprise of corruption must be razed to the ground, so that no further harm may grow from its poisoned soil. Compel the agencies in question to hew to the Public Records Act, immediately provide access to all wrongfully withheld documents, and cooperate with a full, independent investigation of their misdeeds. Only through such unsparing sunlight can this state hope to disinfect the wounds of official fraud.

- Award damages in an amount sufficient to punish the Defendants' outrageous conduct and deter other officials from emulating their wanton abuses of power. Treble damages under RICO to reflect the severalfold harms the Defendants have inflicted. Punitive damages to condemn the Defendants' callous disregard for the Plaintiff's rights and the public trust. Damages to compensate the Plaintiff's losses in time, resources, and quality of life from enduring years of the Defendants' persecution. And recovery of all attorney fees and costs incurred in waging this battle for good government. Justice demands no less.

- Retain continuing jurisdiction to supervise the implementation of remedial measures, and impose any further relief necessary to ensure the eradication of this wrongdoing root and branch. No half-steps or superficial fixes will suffice—Nebraska's government must be scoured of the Defendants' corrupt influence. Institutional reforms, monitoring, and robust accountability measures must become the new watchwords. The road to redemption will be long, but this Court's enduring vigilance can set Nebraska on the right path.

# XIX. CONCLUSION: THE MOMENT OF DECISION FOR CONSTITUTIONAL GOVERNANCE

This Court now faces a choice that transcends ordinary judicial review. The evidence presented is not mere allegation but documented proof of a coordinated enterprise spanning multiple institutions, courts, and years – all dedicated to preventing a citizen's right to equal justice, through systematic corruption of every accountability mechanism in Nebraska's government.

Whether the lowest level employee at a private bank, a simple records clerk at a public school district, the FBI or other law enforcement, or an elected/appointed official, one thing that remains constant: in Nebraska, even citizens will participate in the destruction of their own freedoms.

The question before this Court is not merely whether the Plaintiff has been wronged—though he undoubtedly has—but whether our system of government can still function when every institution designed to ensure accountability has been compromised. Do we still live in a republic where the rule of law means something, or have we descended into a system where power alone determines outcomes regardless of law, evidence, or constitutional principle?

How extraordinary it must be for these defendants – attorneys general, judges, law enforcement officials, and respected attorneys – to find their elaborate enterprise of obstruction undone not by a team of high-powered lawyers or federal investigators, but by a self-represented citizen armed only with persistence, public records laws, and a meticulous attention to detail. Their institutional arrogance led them to believe that the rules of evidence, procedure, and logic itself could be casually discarded when inconvenient, leaving behind the very breadcrumbs that now form an unimpeachable record of their coordination.

Most damning of all, Judge Dougherty's logically impossible order dismissing simultaneously for "lack of jurisdiction" and "failure to state a claim" – a legal contradiction so fundamental that it violates principles established centuries ago and explicitly affirmed by the Supreme Court in *Steel Co. v. Citizens for Better Environment*. One imagines first-year law students across the country studying this case in future years, marveling at the audacity of a judge who casually discarded the most basic principles of civil procedure in service of institutional protection.

The defendants have grown so comfortable in their immunity from oversight that they no longer bother to maintain even the pretense of legal coherence. They issue contradictory rulings, falsify procedural history, and coordinate across institutional boundaries with the casual indifference of those who have never faced consequences for their actions.

This case presents a test of whether our constitutional system can still self-correct when faced with systematic corruption. The Founders designed our republic with separated powers precisely because they understood that power corrupts, and that only countervailing power can check that corruption. When every institution designed to provide those checks has been captured, the final responsibility falls to this Court to restore the constitutional order.

At the heart of this case lies something more insidious than ordinary corruption: a system mathematically engineered to make citizen redress impossible by design. The enterprise has constructed not just barriers, but a perfect closed circuit of obstruction with no viable entry point:

1. The Attorney General explicitly positions itself as "adversarial" to citizens while simultaneously claiming to be the authorized arbiter of their disputes
2. When citizens are denied records, they're told to pursue mandamus if dissatisfied with the AG's decision
3. When they file mandamus actions, courts systematically defer to the AG's "expertise" on whether records should be released
4. If a citizen somehow obtains a mandamus, the AG refuses further action because "you already got a mandamus"
5. When citizens try to engage federal law enforcement, they face systematic rejection - as demonstrated when the FBI, after three separate in-person visits by Plaintiff, ultimately placed him on a list of individuals prohibited from speaking directly with agents

This is not disorganization or even conspiracy - it's a deliberately engineered mathematical impossibility. Every path has been systematically closed, creating the appearance of remedy while ensuring none exists. It's accountability theater - a sophisticated performance creating the illusion of democratic institutions while mathematically guaranteeing their failure.

What makes this system particularly ingenious in its corruption is that each component presents a plausible explanation in isolation. Only when viewed as a whole does the mathematical impossibility of the system become clear - like a machine with seemingly functional parts deliberately arranged to ensure it can never actually run.

In a world where "open government" has become a cynical punchline - a sadistic bait-and-switch promising transparency while slamming the door on scrutiny - one man's indefatigable battle against the machine has given Nebraska a once-in-a-generation chance to prove its treasured public records principles still have teeth. Over eight Kafkaesque years and through a gauntlet of hostile courts, Justin Riddle has meticulously documented a tapestry of official misconduct, dishonesty and contempt for basic accountability so brazen it would make Orwell blush. Yet at every turn, he has found himself lost in a hall of mirrors, his unimpeachable evidence bounced endlessly between one torpid institution and the next - all while those charged with upholding the law contort themselves into rhetorical pretzels to shield the connected from consequence.

This isn't just a glitch in our democratic machinery, but a defining feature - a system so rigged to enable the powerful and evade oversight that it has drifted into a kind of twilight zone, unable to course-correct even when confronted with irrefutable proof of its own unraveling. If sunlight and self-rule must perish from this earth, let their last stand at least find us upright - borne skyward by happy few like our self-appointed Patrick Henry here, raging against the dying of the light. For if we lose warriors like Justin Riddle to despair and disillusionment, we'll deserve every ounce of the decline that follows.

Let there be no confusion: ANY judge who attempts to dismiss this case without addressing the OVERWHELMING and UNCONTESTED EVIDENCE presented will be confirming their active role in the RICO enterprise. In such an event, the Plaintiff will immediately file an amended complaint naming them as a co-conspirator, ensuring that their misconduct is preserved in the public record and subjected to the scrutiny they have so desperately tried to avoid. The days of hiding behind procedural games are over—if you choose to obstruct justice, you choose to stand trial for it.

Logically speaking, this will end far outside of the Nebraska corruption machine, if there's no one within that can uphold their judicial duty.

The eyes of history are upon this Court. The decision it renders will answer a question that strikes at the heart of our republic: When every institution designed to ensure accountability has failed, does the rule of law still have meaning? The evidence is before you. The choice is yours.

Respectfully submitted,

Justin Riddle Plaintiff, Pro Se 16422 Patrick Ave Omaha, NE 68116 Justinriddle1@gmail.com Date: March 22, 2025

# CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of March, 2025, a true and correct copy of the foregoing Emergency Motion for Extraordinary Judicial Review of Systemic Due Process Violations and Institutional Corruption was served via First Class Mail and electronic mail upon the following defendants:

[Names and addresses of all defendants]

Justin Riddle Plaintiff, Pro Se d. This exclusion from professional representation further tilts an already uneven playing field, forcing citizens to navigate complex procedural requirements without assistance while institutional defendants enjoy the full resources of government attorneys and private law firms.

4. **The Comprehensive Foreclosure of Public Accountability**: a. The combination of judicial obstruction, administrative collusion, media silence, and denial of representation creates a perfect storm of unaccountability: i. Government misconduct cannot be addressed through administrative channels because the oversight agencies are complicit. ii. It cannot be addressed through the courts because judges manipulate procedural rules to prevent review. iii. It cannot be addressed through public exposure because media either ignores the story or actively participates in suppressing it. iv. Professional representation is unavailable because attorneys fear retaliation for challenging the system. b. The result is a government that has effectively insulated itself from all forms of accountability, transforming democratic institutions into a self-protecting oligarchy immune from citizen oversight. c. This systematic foreclosure of all remedies is

not the result of coincidence or unrelated institutional failures—it represents a coordinated enterprise designed to prevent transparency and accountability at all costs.

5. **The X Corp Case: The Pattern Extends Beyond Nebraska**: a. Plaintiff's recent case against X Corp (formerly Twitter) demonstrates that the pattern of institutional obstruction extends beyond Nebraska: i. Despite maintaining headquarters in Texas, X Corp attempted to exploit California law while enjoying Texas tax benefits—showing the same jurisdictional manipulation seen in Nebraska courts. ii. X Corp acknowledged "impersonation and harassment" in writing yet claimed no responsibility to address it—mirroring the Nebraska AG's acknowledgment of records violations while refusing to enforce the law. iii. X Corp charged for premium services while simultaneously blocking access to those services and preventing cancellation—echoing the catch-22 situations created by Nebraska institutions. iv. The same law firm representing X Corp (Shook, Hardy and Bacon LLP) also represents the Federal Reserve Bank of Kansas City, suggesting coordinated legal strategy across institutions. b. This pattern demonstrates that the blueprint for institutional obstruction established in Nebraska has been adapted and deployed by other entities, creating a broader threat to accountability nationwide. c. Just as Nebraska institutions utilized contradictory legal positions and selective enforcement of rules, X Corp employed logically incompatible arguments—claiming both immunity from responsibility for content and absolute discretion in content moderation. d. The striking parallels between these cases indicate not just isolated instances of misconduct but a replicable playbook for institutional obstruction of justice.

# XIII. THE RICO ENTERPRISE AND ITS PATTERN OF RACKETEERING ACTIVITY

The consistent pattern of obstruction across multiple institutions and years cannot be explained by coincidence or independent actions. It reveals the existence of a coordinated enterprise operating to prevent transparency and accountability. This enterprise meets all statutory requirements for a RICO claim under 18 U.S.C. §§ 1961-1968.

## A. Legal Elements of a RICO Claim

To establish a civil RICO claim, a plaintiff must prove: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing injury to the plaintiff's business or property. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985). Each of these elements is clearly satisfied in this case:

1. **Conduct**: Each defendant has participated in the management or operation of the enterprise through a pattern of racketeering activity. See Reves v. Ernst & Young, 507 U.S. 170, 179 (1993) (establishing the "operation or management" test). a. The defendants' participation extends beyond passive association, including active

coordination, concealment of evidence, falsification of records, obstruction of justice, and witness intimidation. b. The level of participation varies from defendants who directed activities (like Attorney General Mike Hilgers, Judge Duane Dougherty, and OPS Board President Shavonna Holman) to those who executed specific aspects of the scheme (like Records Keeper Anne MacFarland and Assistant Attorneys General). c. All defendants played some part in "operating or managing" the enterprise, as required by Reves, through their respective roles in the coordinated obstruction of transparency and accountability.

2. **Enterprise**: The defendants collectively form an "enterprise" within the meaning of 18 U.S.C. § 1961(4), which defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." a. The Supreme Court has held that a RICO enterprise must have three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. See Boyle v. United States, 556 U.S. 938, 946 (2009). b. Purpose: The enterprise has a clear common purpose—preventing transparency and accountability for government misconduct through coordinated obstruction of public records access and manipulation of procedural mechanisms to prevent judicial review. c. Relationships: The evidence demonstrates extensive relationships among the defendants, including: i. Communications between the Attorney General's Office and OPS attorneys ii. Coordination between OPS officials and law enforcement before filing retaliatory actions iii. Ex parte communications between judges and opposing counsel iv. Synchronized procedural maneuvers across state and federal courts v. Consistent patterns of obstruction across nominally independent agencies d. Longevity: The enterprise has operated continuously since at least 2018 (in the CharterWest matter) and intensified its activities from 2021-2025 (in the OPS records matter), easily satisfying the longevity requirement. e. The enterprise's structure extends beyond the formal boundaries of government agencies and private firms, functioning as an "association-in-fact" that coordinates across institutional boundaries to achieve its shared objective.

3. **Pattern**: The defendants' conduct constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), which requires at least two acts of racketeering activity within a ten-year period. a. The Supreme Court has held that a pattern requires both "relatedness" and "continuity." See H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989). b. Relatedness: The predicate acts are related by similar methods, participants, and objectives, forming a coherent pattern rather than isolated incidents. Each predicate act serves the common purpose of obstructing transparency and preventing accountability. c. Continuity: The predicate acts span more than seven years, from 2018 to 2025, demonstrating "closed-ended continuity." See H.J. Inc., 492 U.S. at 241-42 (describing closed-ended continuity as a series of related predicates extending over a substantial period). d. The pattern also demonstrates "open-ended continuity" as it poses a threat of continued criminal activity. The February 2025 Court of

Appeals dismissal demonstrates that the pattern continues unabated to the present day, with no indication that it will cease without external intervention.

4. **Racketeering Activity**: The defendants have committed numerous predicate acts that constitute "racketeering activity" as defined in 18 U.S.C. § 1961(1), including: a. Mail fraud (18 U.S.C. § 1341) b. Wire fraud (18 U.S.C. § 1343) c. Obstruction of justice (18 U.S.C. § 1503) d. Witness retaliation (18 U.S.C. § 1513) e. These predicate acts are detailed specifically in Section B below.

5. **Injury**: Plaintiff has suffered concrete injury to his business and property as a result of the RICO violations, including: a. Direct financial loss through payment of filing fees for proceedings that were predetermined to be dismissed b. Direct financial loss through payment of approximately $1,600 for heavily redacted documents that were later provided unredacted to others for free c. Direct financial loss through costs associated with transcript preparation and document reproduction d. Loss of valuable time and resources that could have been devoted to productive business activities e. The Supreme Court has held that financial losses constitute injury to "business or property" for RICO purposes. See Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979).

## B. The Enterprise's Structure and Operations

The evidence reveals a sophisticated network of public officials, private attorneys, and institutional leaders working in concert to obstruct transparency and silence whistleblowers:

1. **Executive Branch Participants**: a. The Nebraska Attorney General's Office serves as the legal shield for the enterprise, refusing to enforce transparency laws, issuing fraudulent legal opinions to justify non-compliance, and coordinating strategy with other participants. b. OPS officials serve as the frontline obstruction, withholding records, charging excessive fees, providing false certifications to courts, and retaliating against critics through fraudulent legal proceedings. c. The Nebraska Ombudsman's Office serves as a secondary shield, refusing to investigate complaints about the Attorney General's Office and physically preventing citizens from filing complaints. d. The Department of Banking and Finance provides regulatory protection for financial institutions engaged in fraudulent practices, refusing to investigate documented fraud and coordinating responses with other agencies.

2. **Judicial Branch Participants**: a. State court judges, including Duane Dougherty and Shelly Stratman, manipulate procedural rules to prevent judicial review, issue logically contradictory rulings, make provably false statements about procedural history, and apply different standards to different litigants. b. Federal judges, including John Gerrard, Robert Rossiter, and the Eighth Circuit panel, permit improper forum manipulation, delay remand of cases lacking federal jurisdiction, and issue summary affirmances without addressing documentary evidence. c. Court staff, including clerks and reporters, facilitate

this judicial misconduct by processing improper ex parte communications and selectively applying filing requirements.

3. **Law Enforcement Participants**: a. Omaha Police Department officers, including Lieutenant Charles Ott and Officer Steve Lee, intimidate citizens seeking accountability, coordinate with institutional defendants before retaliatory legal actions, and attempt to frame legitimate political speech as mental health issues. b. Capitol Police officers physically remove citizens from public buildings for attempting to file complaints or request information through established channels.

4. **Private Attorney Participants**: a. Baird Holm attorneys, including Steve Davidson, David Kramer, Jill Ackerman, and Cameron Finke, serve as legal enforcers for the enterprise, drafting fraudulent legal justifications, filing retaliatory lawsuits, engaging in ex parte communications with judges, and making provably false statements in court proceedings. b. Attorneys from the Federal Reserve Bank of Kansas City, including Todd Ruskamp, Jeffrey Nix, Devon Ritter, and D. Welch, provide additional legal cover, coordinating responses across institutional boundaries to ensure consistent obstruction.

5. **Operational Structure and Methods**: a. The enterprise operates through a sophisticated playbook that is applied consistently across different contexts and years: i. Initial Denial: When public records are requested, they are initially denied, excessively redacted, or provided at exorbitant cost. ii. Administrative Obstruction: When administrative review is sought, oversight agencies coordinate to ensure no meaningful investigation occurs. iii. Procedural Manipulation: When judicial review is sought, courts create procedural barriers that prevent substantive examination of the claims. iv. Retaliation: When citizens persist despite these obstacles, they face retaliatory legal actions, law enforcement intimidation, and false security threat designations. v. Coordinated Narrative Control: Throughout this process, participants coordinate their public responses, statements in legal proceedings, and handling of documentary evidence to present a consistent narrative that obscures their coordination. b. This playbook was first deployed in the CharterWest case and refined in the OPS records dispute, demonstrating both continuity and evolution of the enterprise's methods over time. c. The enterprise's operations extend across institutional boundaries, with information and strategies flowing between nominally independent entities in ways that cannot be explained by legitimate governmental functions.

## C. Predicate Acts in Detail

1. **Mail Fraud (18 U.S.C. § 1341)**: a. The Nebraska Attorney General's Office committed mail fraud by sending fraudulent disposition letters claiming that OPS had "faithfully" upheld its NPRL obligations despite documented evidence to the contrary. These letters were sent via U.S. Mail with the specific intent to further the fraudulent scheme of preventing transparency and accountability. b. OPS officials committed mail fraud by

sending Plaintiff invoices for approximately $1,600 for heavily redacted documents they later provided unredacted to others for free. These mailings were made with knowledge of their fraudulent nature and with the specific intent to obstruct legitimate access to public records. c. The Nebraska Department of Unauthorized Practice of Law, through Mark Weber, committed mail fraud by mailing a threat of legal action about a fictitious complaint from a non-existent party. This mailing was made with knowledge of its fraudulent nature and with the specific intent to intimidate Plaintiff into ceasing his legitimate pursuit of accountability. d. Each of these mailings constitutes a separate predicate act under RICO. See Schmuck v. United States, 489 U.S. 705, 710-11 (1989) (holding that each mailing in furtherance of a fraudulent scheme constitutes a separate violation of the mail fraud statute).

2. **Wire Fraud (18 U.S.C. § 1343)**: a. AG Mike Hilgers and his predecessor knowingly published false information about the OPS board meeting incident on the Nebraska Attorney General's website, then refused to correct it when presented with video evidence contradicting their claims. This electronic publication of false information constitutes wire fraud. b. Assistant AGs Laura Nigro, Mitchell Wurm, and Leslie Donley issued fraudulent legal opinions by email and other electronic means to justify suppressing records and refusing to investigate documented violations. These opinions were transmitted electronically, constituting wire fraud. c. OPS officials, including Anne MacFarland, transmitted false certifications to courts by electronic filing systems, claiming all responsive records had been provided when they knew additional responsive documents existed. Each of these electronic filings constitutes a separate predicate act. d. The AG's Office coordinated with OPS and Baird Holm by email to develop a strategy for obstructing public records requests, using interstate electronic communications to further this conspiracy. e. WOWT Digital Media Director Gina Dvorak used electronic means to suppress Plaintiff on WOWT's Facebook platform and make false statements under WOWT's official account, furthering the enterprise's goal of preventing public exposure of misconduct. f. Each of these electronic transmissions constitutes a separate predicate act under RICO. See United States v. Jinian, 725 F.3d 954, 960 (9th Cir. 2013) (holding that each wire transmission in furtherance of a fraudulent scheme constitutes a separate violation of the wire fraud statute).

3. **Obstruction of Justice (18 U.S.C. § 1503)**: a. Judge Duane Dougherty obstructed justice by allowing ex parte communications with defense counsel, relying on nonexistent documents to justify dismissal, and making provably false statements in court opinions. These actions were taken with the specific intent to prevent judicial review of government misconduct. b. Judge Shelly Stratman obstructed justice by permitting flagrant procedural violations by OPS attorneys while holding Plaintiff to impossible standards. Her actions were taken with the specific intent to prevent judicial review of government misconduct. c. The AG's refusal to enforce public records laws despite clear violations represents obstruction of justice, as it prevented the lawful execution of statutory transparency requirements with the specific intent to shield government misconduct from public scrutiny. d. Baird Holm attorney Steve Davidson

obstructed justice by submitting ex parte documents to judges before hearings, corrupting the judicial process through improper influence of court proceedings. e. OPS Records Keeper Anne MacFarland obstructed justice by falsifying and manipulating public records to obstruct access, directly participating in the pattern of fraud that characterized the enterprise's operations. f. Each of these actions constitutes a separate predicate act under RICO. See United States v. Aguilar, 515 U.S. 593, 599 (1995) (defining obstruction of justice as actions taken with the intent to influence, obstruct, or impede the due administration of justice).

4. **Witness Retaliation (18 U.S.C. § 1513)**: a. OPS Board President Shavonna Holman engaged in witness retaliation by filing a fraudulent protection order against Plaintiff based on protected political speech, coordinating with law enforcement before filing. This abuse of the legal process constitutes witness retaliation, as it was specifically designed to punish Plaintiff for his public criticism and testimony. b. Lieutenant Charles Ott contacted Plaintiff before Holman filed her restraining order, proving pre-coordination between OPS and law enforcement in developing a retaliation strategy. This call, which attempted to intimidate Plaintiff into ceasing his advocacy, constitutes witness retaliation. c. Officer Steve Lee from the Mental Health and Wellness Unit similarly contacted Plaintiff in an attempt to frame political speech as a mental health issue, another form of intimidation and retaliation against a witness to government misconduct. d. Attorney Steve Davidson falsely labeled Plaintiff a "security threat" in court records without any evidence, a defamatory act designed to retaliate against Plaintiff for his role as a witness to government misconduct. e. Capitol Police officers physically removed Plaintiff from the state capitol on three separate occasions for properly requesting resolution from the Attorney General's Office, violating his constitutional right to petition for redress of grievances and retaliating against him for his role as a witness to government misconduct. f. Each of these actions constitutes a separate predicate act under RICO. See Deck v. Engineered Laminates, 349 F.3d 1253, 1257 (10th Cir. 2003) (recognizing that witness retaliation claims can constitute RICO predicate acts).

5. **Interstate Commerce and Effect**: a. The enterprise operates across state lines and affects interstate commerce in several ways: i. The use of electronic communications that traverse state boundaries in furtherance of the fraudulent scheme triggers federal wire fraud statutes. ii. The involvement of federal agencies and courts brings this conspiracy within the scope of federal jurisdiction. iii. The enterprise's obstruction affects financial transactions and regulatory oversight that cross state lines, particularly in the banking context. iv. The use of the internet and interstate telecommunications infrastructure to disseminate false information and coordinate obstructive activities satisfies the interstate commerce requirement. b. The Supreme Court has held that RICO should be interpreted broadly to effectuate its remedial purposes. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497-98 (1985) ("RICO is to be read broadly."). c. The minimal connection to interstate commerce required for RICO jurisdiction is easily satisfied in this case through the extensive use of interstate communication methods and

the involvement of federal agencies and courts.

## D. The Pattern Continues Unabated

1. **Continuing Violations Through Present Day**: a. The February 24, 2025 dismissal of Plaintiff's most recent case by the Nebraska Court of Appeals demonstrates that the pattern of obstruction continues unabated to the present day. b. The Court of Appeals dismissed the case based on an alleged verification deficiency, despite Plaintiff's certification under penalty of perjury. c. The court simultaneously denied OPS's motion for summary dismissal as "moot," having already decided to dismiss the case on its own initiative. d. This twin dismissal ensured that, once again, the merits of Plaintiff's public records claims would never be addressed, regardless of the procedural posture. e. The timing of this most recent dismissal is significant, as it demonstrates that the pattern continues despite years of Plaintiff's attempts to navigate the procedural maze created by the courts.

2. **The Attorney General's Explicit Adversarial Position**: a. In 2024 and continuing into 2025, the Nebraska Attorney General's Office has explicitly declared itself "adversarial" to citizens seeking public records while simultaneously claiming statutory authority to adjudicate disputes over those same records. b. This declaration represents the ultimate evolution of the enterprise's strategy—moving from covert obstruction to explicitly acknowledging the structural corruption of the enforcement mechanism. c. This overt adversarial stance proves that the pattern of activity has not only continued but has reached a new level of institutional capture where public officials no longer feel the need to conceal their conflicts of interest. d. The AG's Office has refused to investigate X Corp for consumer protection violations based on Plaintiff's federal case materials, showing that the enterprise's protective shield extends beyond government entities to private companies facing accountability from the same target.

3. **The Consistency Across Years and Contexts**: a. The same tactics used to obstruct accountability for CharterWest Bank's fraud in 2018 were refined and deployed against Plaintiff's public records requests in 2021-2025. b. Many of the same individuals and institutions were involved in both contexts, demonstrating the existence of an ongoing criminal enterprise rather than isolated incidents. c. The pattern has persisted despite Plaintiff's attempts to navigate the procedural maze created by the courts, with new obstacles emerging each time previous ones are overcome. d. This consistency across different substantive contexts (banking fraud and public records access) and time periods (2018 and 2021-2025) demonstrates both the continuity and relatedness required to establish a pattern under RICO.

4. **RICO Pattern Requirements Satisfied**: a. The predicate acts span more than seven years, from 2018 to the present day, easily satisfying the "closed-ended" continuity requirement established in H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229,

241-42 (1989). b. The ongoing nature of the enterprise and its continued operation through the present day also satisfies the "open-ended" continuity requirement, as there is a clear threat of continued criminal activity in the future. c. The predicate acts are related by similar methods, participants, and objectives, forming a coherent pattern rather than isolated incidents. d. The enterprise has shown remarkable resilience and adaptability, evolving its tactics in response to Plaintiff's efforts while maintaining its core objective of preventing transparency and accountability. e. This combination of continuity and relatedness establishes the "pattern" element required for a RICO claim under the Supreme Court's precedents.

# XIV. LEGAL ARGUMENT: WHY EXTRAORDINARY INTERVENTION IS REQUIRED

The systematic foreclosure of all ordinary remedies necessitates extraordinary judicial intervention. This is not simply a case of individual errors or differences in legal interpretation—it is evidence of a comprehensive failure of governmental checks and balances that threatens the foundation of our constitutional system.

## A. The Collapse of Separation of Powers Doctrine

1. **The Fundamental Constitutional Crisis**: a. The Nebraska constitution, like its federal counterpart, relies on the separation of powers to prevent tyranny. The evidence presented demonstrates not merely the failure of individual institutions but the collapse of the separation of powers itself. b. In a functioning constitutional system, when the executive branch (represented here by OPS, the AG's Office, and other agencies) violates the law, the judicial branch provides a check through independent review. c. In a functioning system, when the judiciary fails to provide this check, independent oversight bodies like the Ombudsman's Office ensure accountability. d. In a functioning system, when both administrative and judicial remedies fail, public exposure through media and political pressure creates alternative accountability mechanisms.

2. **The Comprehensive Failure of Checks and Balances**: a. What the evidence in this case reveals is the comprehensive failure of all these checks and balances: i. Executive agencies engage in documented misconduct without fear of consequences. ii. Judicial institutions not only fail to provide checks on executive overreach but actively participate in shielding executive misconduct from review. iii. Oversight bodies like the Ombudsman's Office coordinate with the very entities they are supposed to monitor, creating a closed system impervious to citizen complaints. iv. Media entities either ignore evidence of corruption or actively participate in suppressing it, eliminating the final check of public exposure. b. This situation represents more than the sum of its parts—it constitutes a fundamental breakdown in the constitutional order: i. When each branch of government not only fails to check the others but actively collaborates to prevent citizen

oversight, the entire premise of democratic governance is undermined. ii. The separation of powers doctrine becomes meaningless when the branches unite against citizens seeking transparency and accountability. iii. The system no longer resembles a constitutional republic but a closed oligarchy using the forms of democratic governance to shield itself from accountability.

3. **The Attorney General's Inherent Conflict as Constitutional Crisis**: a. The AG's explicit declaration of being "adversarial" to citizens seeking public records while simultaneously claiming authority to adjudicate those disputes epitomizes this constitutional collapse. b. This arrangement transforms what should be a neutral enforcement mechanism into a structurally corrupted system designed to prevent accountability. c. It demonstrates not a failure of individual officials but a deliberate institutional design that makes accountability impossible by positioning the fox as both a guardian of the henhouse and the judge who determines whether the hens have been properly protected. d. This conflict is not merely a policy disagreement but a fundamental corruption of the constitutional structure that makes meaningful citizen participation in government impossible.

4. **Federal Intervention as Constitutional Necessity**: a. This Court's authority to intervene is not merely statutory but constitutional—it represents the last opportunity to restore the separation of powers when state institutions have demonstrably failed. b. Federal courts have not only the authority but the obligation to intervene when state governmental structures have collapsed to the point where citizens have no meaningful remedies for constitutional violations. c. The Supreme Court has recognized that extraordinary remedies are appropriate when ordinary channels have been systematically foreclosed. See United States v. Nixon, 418 U.S. 683 (1974) (holding that extraordinary judicial intervention is warranted when other constitutional mechanisms have failed). d. In cases of systematic state failure to protect constitutional rights, federal intervention becomes necessary to preserve the constitutional order itself. See Cooper v. Aaron, 358 U.S. 1 (1958) (affirming federal judicial authority to intervene when state institutions systematically fail to protect constitutional rights). e. The evidence presented demonstrates precisely the type of systemic failure that necessitates federal judicial intervention to restore constitutional governance.

5. **The Precedential Support for Intervention**: a. In Ex parte Young, 209 U.S. 123 (1908), the Supreme Court established that federal courts may enjoin state officials from enforcing unconstitutional state laws or policies, even when those officials claim sovereign immunity. b. In Monroe v. Pape, 365 U.S. 167 (1961), the Court recognized that federal remedies are necessary when state remedies are inadequate in practice, regardless of their theoretical availability. c. In Mitchum v. Foster, 407 U.S. 225 (1972), the Court held that federal courts may enjoin state court proceedings that are being used to harass citizens and prevent the exercise of their federal rights, explicitly recognizing that the Anti-Injunction Act does not bar federal intervention when state courts themselves become instruments of constitutional violations. d. In Dombrowski v. Pfister,

380 U.S. 479 (1965), the Court recognized that federal injunctive relief is warranted when state procedures are being used to chill the exercise of constitutional rights through bad faith harassment. e. In Gibson v. Berryhill, 411 U.S. 564 (1973), the Court found federal intervention appropriate when state administrative and judicial proceedings were structurally biased, recognizing that systemic bias justifies extraordinary federal remedies. f. These precedents establish that when state courts systematically fail to provide meaningful remedies, federal intervention is not merely permitted but required to preserve the constitutional order.

## B. The Denial of Fundamental Due Process

1. **The Constitutional Requirements of Due Process**: a. Due process requires not merely procedural formalities but meaningful access to justice. The Supreme Court has consistently held that procedures that operate as arbitrary barriers to justice violate constitutional principles. b. In Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982), the Court held that the state cannot create procedures that arbitrarily deny litigants the opportunity to be heard. c. In Boddie v. Connecticut, 401 U.S. 371 (1971), the Court recognized that procedures that effectively deny access to the courts violate due process, particularly when those procedures are applied selectively. d. In M.L.B. v. S.L.J., 519 U.S. 102 (1996), the Court held that excessive or arbitrary fees that create barriers to justice violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

2. **The Coordinated Obstruction as Due Process Violation**: a. The coordinated obstruction documented here has denied Plaintiff this fundamental right to due process through: i. The creation of impossible procedural hurdles applied only to Plaintiff, such as the ever-shifting "verification" requirements that change each time Plaintiff attempts to comply. ii. The refusal to address the substantive merits of any claim regardless of its presentation, ensuring that no matter how Plaintiff formats his pleadings, they will never receive meaningful review. iii. The systematic altering of procedural rules to prevent meaningful review, including accepting untimely filings from opposing counsel while rejecting timely filings from Plaintiff based on hyper-technical readings of the rules. b. These arbitrary barriers to justice violate the core principle of due process that "within the limits of practicability, a State must afford to all individuals a meaningful opportunity to be heard." Boddie, 401 U.S. at 379. c. The Supreme Court has recognized that seemingly neutral procedures can violate due process when applied in a manner that creates insurmountable barriers to justice. See Little v. Streater, 452 U.S. 1, 16 (1981) (holding that "state procedures for establishing paternity violated the due process guarantee because they effectively denied indigent defendants a meaningful opportunity to be heard").

3. **The Logically Impossible Order as Due Process Violation**: a. Judge Dougherty's December 13, 2024 order, which simultaneously dismisses for "lack of jurisdiction" and

"failure to state a claim," represents a particularly egregious due process violation. b. By creating a logically impossible standard that no litigant could satisfy, Judge Dougherty has violated the fundamental principle that due process requires "notice and an opportunity to be heard appropriate to the nature of the case." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950). c. The Court of Appeals' selective extraction of only the jurisdictional ground while ignoring the contradictory merits dismissal in the same document further compounds this due process violation, creating a situation where even perfect compliance with procedural requirements cannot secure meaningful review. d. The Supreme Court has held that "the Due Process Clause requires that a judicial proceeding adjudicate the merits of an action where the disposition of a party's claim may bind him." Kremer v. Chemical Const. Corp., 456 U.S. 461, 481 n.22 (1982). The deliberate use of contradictory procedural grounds to avoid merits adjudication violates this core requirement.

4. **Due Process Violations Beyond Procedure**: a. The due process violations extend beyond procedure to substance: i. Fundamental fairness requires that courts and administrative agencies apply consistent standards to similar cases. The evidence demonstrates that Plaintiff has been subjected to standards that apply to no other litigant. ii. Due process requires that judges act as neutral arbiters rather than participants in a scheme to obstruct justice. The documented ex parte communications and provably false statements by judges violate this basic principle. iii. The coordinated obstruction across multiple institutions creates a situation where Plaintiff is deprived not just of particular procedures but of any meaningful opportunity to be heard—the essence of the due process guarantee. b. The Supreme Court has recognized that due process has both procedural and substantive components, and that certain government actions may be "so unjustified by any purpose that they run afoul of the Due Process Clause." County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998). c. The pattern of coordinated obstruction demonstrated here shocks the conscience and lacks any legitimate governmental purpose, thereby violating substantive due process.

## C. The Public Records Law Rendered a Dead Letter

1. **The Statutory Framework and Legislative Intent**: a. The Nebraska Public Records Law represents a legislative determination that governmental transparency is essential to democracy: i. The law explicitly states that "citizens of this state shall have the full right to know of and have full access to information on the public finances of ... this state and the public bodies and entities created to serve them." Neb. Rev. Stat. § 84-712.01(1). ii. It further provides that public records shall be "free for examination by any person," with narrow exceptions that must be specifically justified. Neb. Rev. Stat. § 84-712(1). iii. The law establishes specific remedies for citizens denied access, including the right to expedited judicial review and attorney general enforcement. b. The legislative intent behind the Nebraska Public Records Law is clear—to ensure transparency and accountability in government operations by providing citizens with meaningful access to

government information. c. The Nebraska Supreme Court has affirmed this purpose, stating that the Public Records Law "is to be liberally construed whenever any public record is in question." State ex rel. Sileven v. Spire, 243 Neb. 451, 457, 500 N.W.2d 179, 183 (1993).

2. **The Systematic Nullification of Statutory Rights**: a. The evidence demonstrates that every aspect of this statutory scheme has been subverted: i. OPS has# EMERGENCY MOTION FOR EXTRAORDINARY JUDICIAL REVIEW

# AND CIVIL RICO ACTION FOR SYSTEMIC DUE PROCESS VIOLATIONS,

# INSTITUTIONAL CORRUPTION, AND PATTERN OF RACKETEERING ACTIVITY

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA

JUSTIN RIDDLE, ) ) Plaintiff, ) ) v. ) Case No. 8:25-cv-00XXX ) MIKE HILGERS, in his individual ) capacity as Attorney General of ) Nebraska, et al., ) ) Defendants. )

## SELF-REPRESENTED PLEA FOR FAIRNESS

Plaintiff is a self-represented litigant, and as such, the Court is obligated to liberally construe his filings to ensure that technical deficiencies do not obstruct meritorious claims. See *Haines v. Kerner*, 404 U.S. 519, 520 (1972). This is an essential doctrine—one meant to protect those without formal legal training from being disadvantaged by the complexity of judicial proceedings.

However, the application of this principle to the present case creates an interesting paradox.

The Court must, by law, interpret this pleading with generosity due to Plaintiff's lack of legal training. Yet, this same pleading—crafted without any formal legal education—is demonstrably superior to those regularly filed by licensed attorneys. This presents the judiciary with a dilemma: either dismiss the case and admit to obstructing justice, or engage with a filing that surpasses the standard of those who claim legal expertise. In either scenario, the institutional implications of this case will be profound.

It is a fundamental principle of American jurisprudence that courts must interpret the pleadings of self-represented litigants with the utmost leniency and resolve all ambiguities in their favor. This doctrine recognizes that individuals who lack formal legal training should not be penalized for failing to adhere to the rigid technicalities that might entrap a licensed attorney.

As a self-represented litigant, Plaintiff acknowledges the Court's obligation to ensure his filings are read with expansive generosity, affording every possible inference in his favor. Indeed, given that Plaintiff has no formal legal education, it is imperative that this Court read his pleadings broadly, indulgently, and with an open mind to ensure that no meritorious claim is disregarded simply due to procedural imprecision.

This raises an interesting paradox. If the Court were to apply this principle in its ordinary fashion, it would need to engage in an exercise of extraordinary intellectual charity—liberally construing the arguments of a litigant who, by all conventional wisdom, would be assumed to lack the sophistication necessary to articulate them with clarity.

Yet, in this instance, such an assumption would produce a fascinating, if not absurd, outcome. The reality, which is both unfortunate for Defendants and comically painful for the judiciary, is that this brief is constructed with more legal rigor, evidentiary precision, and procedural integrity than most filings they will ever view in their entire careers.

If Plaintiff were truly the "unsophisticated pro se litigant" that the Court is obligated to accommodate, how then does one explain a pleading that matches the quality of work produced by the highest-paid attorneys in the state? How does the Court reconcile the mandatory requirement to interpret pro se filings liberally while simultaneously realizing that this very pleading exposes a level of legal acumen that in some ways, rivals its own clerks, its own bar members, and likely, the judge himself?

Let it be known that:

**I CERTIFY UNDER PENALTY OF PERJURY THAT EVERY SINGLE WORD CONTAINED IN THIS DOCUMENT IS TRUE TO THE BEST OF MY KNOWLEDGE.**

# I. INTRODUCTION: THE SOUND OF INSTITUTIONAL PANIC

Never in human history have the unanimous sounds of fists pounding on tables echoed louder off more brittle walls than in Nebraska's courthouses right now. Having exhausted every procedural sleight of hand, every jurisdictional shell game, and every convenient fiction, the guardians of institutional corruption find themselves confronted with the one thing they cannot defeat: a paper trail of their own creation.

The motion before this Court does not arise from legal complexity requiring sophisticated analysis. Rather, it emerges from a pattern so blatant, so methodical, and so contemptuous of

fundamental legal principles that a first-year law student could identify it. Indeed, the defendants have spent eight years and considerable taxpayer resources desperately attempting to prevent precisely this moment – when their coordinated obstruction would be laid bare before a court not yet compromised by their enterprise.

This Court now faces a constitutional moment that transcends ordinary judicial review. What follows is not mere allegation but documented proof of a coordinated enterprise spanning multiple institutions, courts, and years – all dedicated to a single objective: preventing a citizen's lawful access to public records through the systematic corruption of every accountability mechanism in Nebraska's government.

The defendants have grown so comfortable in their immunity from oversight that they have become sloppy. They now issue rulings that contain within themselves proof of their own illegitimacy – dismissing cases simultaneously for "lack of jurisdiction" and "failure to state a claim," a logical impossibility that violates centuries of established precedent and the Supreme Court's explicit ruling in *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83 (1998), where Justice Scalia declared the requirement for jurisdictional determinations before merits considerations to be "inflexible and without exception."

How extraordinary it must be for these defendants – attorneys general, judges, law enforcement officials, and respected attorneys – to find their elaborate enterprise of obstruction undone not by a team of high-powered lawyers or federal investigators, but by a self-represented citizen whose only weapons were persistence and meticulous documentation. Their institutional arrogance led them to believe that the rules of evidence, procedure, and logic itself could be casually discarded when inconvenient, leaving behind the very breadcrumbs that now form an unimpeachable record of their coordination.

This is not a case about technical violations or good-faith legal disagreements. It is a case about whether our system of constitutional governance can still function when every institution designed to ensure accountability has been compromised. It is about whether the rule of law applies equally to powerful interests and ordinary citizens. And most fundamentally, it is about whether truth still matters when confronted with institutional power determined to suppress it.

This case is not about a single dispute or an isolated grievance. It is not even, fundamentally, about the individual plaintiff who brings it, though his story is a microcosm of the larger crisis that has brought us to this fateful pass.

This case is about the wholesale breakdown of republican self-government in the state of Nebraska - a meltdown of the basic norms of transparency, accountability, and institutional integrity that are the sine qua non of a free society. It is about a pervasive culture of impunity and cronyism that has taken root in the highest corridors of power, turning public service into a sordid racket for personal gain. Most of all, it is about the betrayal of the sacred trust between the government and the governed - the fraying of the social contract that binds citizen to state in a partnership of mutual obligation.

The details would beggar belief were they not so exhaustively documented in the record:

- A bank, CharterWest, that manipulated customer records and leveraged false reporting to shield its malfeasance from scrutiny, while state oversight bodies from the Attorney General to the Banking Department to the Ombudsman turned a blind eye.

- A sprawling educational bureaucracy, Omaha Public Schools (OPS), that violated open records laws with impunity and systematically suppressed whistleblowers who dared to challenge its corruption.

- A judiciary so steeped in the same corrosive culture of casual conspiracy that it has abandoned even the pretense of serving as an independent check on official abuse.

- A State Capitol Police force that physically removed the plaintiff from the capitol building for the "sin" of properly asking the Attorney General's office for resolution.

- The offices of the state Ombudsman and Attorney General, who refused to investigate legitimate complaints and actively abetted the suppression of evidence of misconduct.

- Agencies like the CFPB, the Federal Reserve Bank of Kansas City, the ACLU, the BBB, FHA DEPARTMENT OF EDUCATION and more, staffed with people incapable of reading basic words during the course of standard investigations.

- Even Clerks, Bailiffs, Court Reporters participated in the system of obstruct, abuse, ignore, dismiss.


What materializes to anyone capable of looking at the whole picture is a hidden system that logically can only be staffed with CORRUPTION, WEAKNESS and CRIMINAL INTENT, in that order. We are not talking about unintelligent individuals or short staffed departments, we're talking about people who initially understood my clearly documented situation, but as soon as they connected with an official with something to hide, their interest changed to distancing themselves.

Could major consumer protection agencies, educators, law enforcement, Judges, attorneys and mail clerks all be incapable of understanding what any child (with a dictionary to figure out the big words) can clearly understand? The entire system operates on a wink and a nod while deliberately violating the rights of the citizens.

What emerges is a portrait of a government at war with its own first principles - an insular and unaccountable oligarchy that treats the very notion of public integrity as a punchline. The interlocking abuses chronicled in this complaint, perpetrated by dozens of public employees across every branch of government and level of administration, paint a chilling picture of democracy in decay. They reveal a slow-motion coup against the rule of law itself - a rollback of popular sovereignty so complete as to render the state's constitutional architecture a dead letter.

This case is the story of one citizen's refusal to accept that grim diagnosis as Nebraska's inescapable fate. For nearly a decade, Plaintiff Justin Riddle has waged an indefatigable campaign to uproot the entrenched corruption that has overtaken his government - a lonely crusade for transparency in a wilderness of obfuscation and deceit. Rather than shrink from the powerful interests arrayed against him, Mr. Riddle has compiled a veritable dossier on their collective debasement of the public trust - an omnibus indictment of systemic malfeasance as breathtaking in its breadth as it is meticulous in its evidentiary foundations.

That dossier now serves as the factual backbone of this Complaint - a bill of particulars that names and shames the whole Cornhusker kleptocracy, from the pinnacles of power to the bowels of bureaucracy. By minutely documenting the illicit activities of everyone from the Governor's inner circle to individual records clerks and Assistant AGs, Plaintiff has ripped the veil off an appalling simulacrum of public service. He has delineated, in damning detail after detail, a criminal enterprise so enmeshed in Nebraska's official organs as to render public and private functionally indistinguishable.

The contours of that enterprise are almost too baroque to fathom, but their connective tissue is all too plain: A rootless cynicism that subordinates the general welfare to private whim and sells the state's machinery of enforcement to the highest bidder. Whether abusing the Attorney General's bully pulpit to quash legitimate investigations, or deploying the courts as a retaliatory cudgel against dissident citizens, or turning the Ombudsman's oversight mandate into a farce of legal levitation, the enterprise's disparate parts share a common contempt for the impartial administration of justice. Theirs is a confederation of professional hypocrisies, bound together by a joint commitment to using the letter of the law to shred its spirit.

The result is a staggering tableau of public trust betrayed on an almost incomprehensible scale. To the untrained eye, the offenses documented here might seem too disparate and contradictory to cohere - a random assortment of personal piques and institutional turf battles. But that is precisely the point: The ubiquity of ethical dereliction across so many agencies and individuals, the sheer routinization of impropriety as standard operating procedure, belies any attempt to dismiss it as the work of a few bad apples. What Plaintiff has exposed is a diseased orchard - a culture of corruption so widespread and deeply rooted as to implicate the very possibility of honest self-government.

That is the sobering reality this case confronts - and the monumental stakes that hang in its balance. For the rot in Nebraska's body politic can no longer be written off as a flesh wound. If the dense web of institutional failure limned in this Complaint is any indication, the cancer of unaccountability has reached Stage IV, metastasizing into every organ of republican government. What is at issue is no longer the misdeeds of this or that bureaucrat, but the very survival of bureaucracy as a tool for effectuating the popular will rather than the reverse.

The question is whether that grim prognosis will be Nebraska's epitaph, or its wake-up call. For as much as this case chronicles a staggering record of systemic dereliction, it also serves as a stirring testament to the power of even one free citizen to serve as a watchman on the walls of his republic. In the face of a kleptocratic phalanx marshaled to thwart his every effort at public

scrutiny, Justin Riddle has shown us what a government of the people, by the people, for the people looks like in action. Now it falls to the courts as the last redoubt of constitutional accountability to put those words back into practice - to demonstrate that our founding ideals are more than a parchment promise or a schoolhouse slogan.

Fortunately, this Plaintiff has left them no choice but to try. For in exhaustively documenting the Defendants' interwoven schemes of official treachery, Mr. Riddle has handed this Court both a rare diagnostic opportunity and a profound moral imperative. After years of painstaking investigation and self-sacrificing struggle, he has surfaced a public malignancy so severe that it can no longer be excused or ignored - and in so doing, has forced the question of whether our bedrock republican values can still be made real. By the same token, he has gifted our judiciary a singular chance to cauterize the wounds of misrule and model what strong constitutional medicine looks like.

Make no mistake: What is at stake here is not just the conduct of a few crooked bureaucrats in America's heartland, but the viability of the rule of law in an era of encroaching executive impunity. The Defendants' transgressions are so flagrant, their contempt for basic democratic safeguards so brazen, that to ratify them through inaction would be to deal a body blow to a constitutional order already reeling from a crisis of legitimacy. Conversely, to meet their entrenched lawlessness with the full force of the federal Anti-Corruption Acts would be to take a decisive step toward rehabilitating public trust in our battered instruments of self-government. In an age of cascading institutional faiths, it would provide a desperately needed infusion of civic confidence - a tonic to our long national nightmare of elite unaccountability.

So as the Court ponders the grave allegations contained herein, let it be with a keen awareness that the whole country is watching. For the first and perhaps the last time, the nation's eyes are trained on Nebraska as a microcosm of its larger struggle to salvage popular sovereignty from the jaws of a metastasizing Leviathan. The plaintiff's Complaint is thus not just a parochial grievance but a democratic cri de coeur, a flare lofted from the civic frontlines of a republic under siege. How the judiciary responds - whether with bold reaffirmation or timid abdication - will have consequences far beyond the Cornhusker State.

This is the hour of decision, the moment of truth for a legal system poised on a knife's edge between renewal and decline. A patient bleeds out on the operating table of our national destiny, and the scalpel of reform sits idle in the trembling hands of judges more used to wielding it as a prop than brandishing it in earnest. The question is no longer whether major surgery is needed to restore the vital organs of our democracy, but whether the presiding doctors can still locate their nerve and their professional honor.

Justin Riddle has demonstrated, through Herculean effort, that one citizen with a bellyful of fire can still make the comfortable and connected sweat. He has etched, with cool, devastating precision, a diagnostic map of the Nebraska Establishment's every evasion of public scrutiny. In so doing, he has presented the courts with the ultimate Exhibit A to a generation's bill of impeachment against institutional decadence.

Now this Complaint places the scalpel squarely in their hands. Will they find within themselves the wisdom and fortitude to use it for its highest purpose, or will posterity remember this as the moment the guardians of our laws flinched from the surgeon's oath and let the light of republican self-rule flicker out once and for all?

For over two centuries, this country has served as a shining city on a hill - an imperfect beacon of self-government to a world torn between the Scylla of tyranny and the Charybdis of anarchy. What happens next will determine whether America retains its lonely vigil in the popular imagination, or degenerates into yet another cautionary tale of democratic entropy.

On that score, let no one misapprehend the significance of what unfolds in these pages. The power to write the next chapter in this saga of institutional depravity rests, as it must, with the courts as the last backstop of constitutional faith. But the eyes reading over their shoulder will belong to citizens far beyond the litigants at bar - indeed, to nothing less than the jury pool of history itself.

Like a portent from the past or a postcard from the future, the footnotes to come will bear silent witness to how the United States answers when the roll is called at a hinge moment for self-government. More than any single villain unmasked or victim redressed, the true legacy of this case will be measured in the message it sends about the sinews of our civic creed.

Can a system this sick still heal itself, or has the hard rain of official misconduct washed away the last dams of public trust? Is there still magic enough in the words "ordered liberty" and "popular sovereignty" to defibrillate the Founders' fading heartbeat, or have we passed the event horizon for a government of laws, not of men?

On these and kindred riddles turns more than the passing fate of good government in Nebraska. They will ripple out from this Complaint to shape the tensile strength of our civic immune system for a generation, with implications for experiments in self-rule far beyond our shores. The time has come to administer the sternest possible stress test of our most sacred constitutional promissory notes - and to discover, in the trying, how much structural integrity remains in the hull of our ship of state.

Justin Riddle has spent the better part of a decade ensuring that this moment might arrive while the pumps are still working and self-correction is still possible. He has sacrificed more than any healthy polity should ever require of even its most lion-hearted dissenters to force a long overdue reckoning with the oldest question of our republican identity: Quis custodiet ipsos custodes? Who will guard the guardians themselves when every formal check on their power has been deliberately dismantled or captured from within?

Now it falls to the courts to prove whether Juvenal's ancient conundrum remains a cautionary tale or an epitaph for the American experiment. By the grace of a single citizen's unflagging faith in our creaking institutions, they have been granted one last chance to reaffirm first principles at a watershed moment for self-government itself.

Let us pray they are equal to the awesome responsibility. For the sake of Justin Riddle and of the republic for which he stands - as the last line of defense between the arbitrary rule of venal elites and the just consent of the governed.

# II. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action pursuant to:

1. 28 U.S.C. § 1331 (federal question jurisdiction), as this action arises under the Constitution and laws of the United States, including but not limited to: a. 18 U.S.C. §§ 1961-1968 (Racketeer Influenced and Corrupt Organizations Act) b. 42 U.S.C. § 1983 (Civil Rights Act) c. First Amendment to the United States Constitution (right to petition for redress of grievances) d. Fifth and Fourteenth Amendments to the United States Constitution (due process and equal protection)

2. 28 U.S.C. § 1343(a)(3) and (4), which grant jurisdiction for civil rights violations and to secure equitable relief under federal civil rights laws.

3. The Anti-Injunction Act (28 U.S.C. § 2283) does not bar this action despite its involvement with state court proceedings, as this case falls squarely within the recognized exceptions for: a. Actions expressly authorized by Congress, including RICO enforcement actions (see *Mitchum v. Foster*, 407 U.S. 225 (1972), establishing that federal civil rights actions under 42 U.S.C. § 1983 are expressly authorized exceptions) b. Cases where injunctive relief is necessary to protect or effectuate the judgments of the federal courts c. Circumstances where state courts are being used to harass citizens and prevent the exercise of federal rights (see *Dombrowski v. Pfister*, 380 U.S. 479 (1965))

4. The Rooker-Feldman doctrine does not bar jurisdiction, as this action: a. Does not seek review of final state court judgments but challenges an ongoing pattern of conduct that extends beyond individual cases b. Addresses a coordinated scheme that has corrupted the judicial process itself, not merely the outcomes of specific cases c. Falls within the exception for cases involving extrinsic fraud that prevented full and fair litigation (see *In re Sun Valley Foods Co.*, 801 F.2d 186, 189 (6th Cir. 1986)) d. Challenges conduct that is "separate from and independent of the state court judgment" (see *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 167 (3d Cir. 2010))

5. Abstention doctrines do not apply, as: a. Younger abstention is inapplicable where, as here, there is demonstrated bad faith and harassment in state proceedings (see *Younger v. Harris*, 401 U.S. 37, 53 (1971)) b. Pullman abstention is inappropriate where state court remedies have been systematically foreclosed through procedural manipulation (see *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941)) c. Burford abstention does not apply where, as here, the state regulatory system itself has been corrupted (see *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943)) d. Colorado River abstention is inapplicable given the extraordinary circumstances demonstrating that state

proceedings cannot provide adequate protection of federal rights (see *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976))

6. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367, as these claims form part of the same case or controversy as the federal claims.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to these claims occurred within this judicial district, and at least one of defendants reside or maintain their principal place of business within this district.

Venue is also proper pursuant to 18 U.S.C. § 1965, as the RICO enterprise alleged herein operated in this district.

# III. PARTIES

## A. Plaintiff

Justin Riddle is a citizen of the United States and a resident of Omaha, Nebraska. He has actively sought public records and transparency from Nebraska governmental entities since 2018, using lawful channels established under the Nebraska Public Records Law (Neb. Rev. Stat. §§ 84-712 to 84-712.09). Despite facing systematic obstruction, coordinated retaliation, and the corruption of every accountability mechanism available to citizens, Plaintiff has meticulously documented each instance of misconduct, creating an unimpeachable record of institutional corruption spanning multiple years and agencies.

Mr. Riddle files this suit as a private citizen and as a representative of the people's interest in honest, transparent, and accountable government. He seeks relief both individual and public in nature, including but not limited to damages, injunctive relief, and a judicial declaration that the Defendants' conduct is violative of state and federal law.

## B. Defendants

The defendants in this action represent a coordinated enterprise spanning multiple governmental and private entities, all operating with the shared purpose of preventing transparency and accountability:

1. **Executive Branch Defendants**: a. **Nebraska Attorney General's Office**:

   ○ MIKE HILGERS, in his individual capacity as Attorney General of Nebraska
   ○ DOUG PETERSON, in his individual capacity as former Attorney General of Nebraska
   ○ LAURA NIGRO, in her individual capacity as Assistant Attorney General
   ○ MITCHELL WURM, in his individual capacity as Assistant Attorney General

- ○ LESLIE DONLEY, in her individual capacity as Assistant Attorney General and Legal Advisor
- ○ DAVID BYDALEK, in his individual capacity as Chief Deputy Attorney General

2. b. **Omaha Public Schools**:

- ○ SHAVONNA HOLMAN, in her individual capacity as former President of the OPS Board
- ○ ANNE MACFARLAND, in her individual capacity as Records Keeper for OPS
- ○ CHERYL LOGAN, in her individual capacity as former OPS Superintendent
- ○ MATTHEW RAY, in his individual capacity as OPS Superintendent
- ○ SPENCER HEAD, in his individual capacity as former OPS Board President
- ○ BARRY THOMAS, in his individual capacity as former OPS Director of Equity & Diversity
- ○ UNNAMED OPS BOARD MEMBERS (at least two additional)
- ○ UNNAMED OPS LEGAL COUNSEL

3. c. **Nebraska Department of Banking and Finance**:

- ○ MARK QUANDAHL, in his individual capacity as former Director
- ○ MIKE MCDANNEL, in his individual capacity as Deputy Director

4. **Judicial Branch Defendants**: a. **State Court Judges**:

- ○ DUANE DOUGHERTY, in his individual capacity as District Court Judge
- ○ SHELLY STRATMAN, in her individual capacity as District Court Judge
- ○ VAUGHN, in his individual capacity as State Court Judge

5. b. **Federal Court Judges**:

- ○ JOHN GERRARD, in his individual capacity as Federal District Judge
- ○ ROBERT ROSSITER, in his individual capacity as Federal District Judge
- ○ RICHARD KOPF, in his individual capacity as Federal Judge
- ○ RALPH R. ERICKSON, in his individual capacity as Eighth Circuit Judge
- ○ LAVENSKI R. SMITH, in his individual capacity as Eighth Circuit Judge
- ○ STEVEN M. COLLOTON, in his individual capacity as Eighth Circuit Judge
- ○ HORATIO WHEELOCK

6. **Law Enforcement Defendants**: a. **Omaha Police Department**:

- ○ CHARLES OTT, in his individual capacity as Lieutenant and head of OPS School Resource Officers
- ○ STEVE LEE, in his individual capacity as Officer in the Mental Health and Wellness Unit
- ○ UNNAMED POLICE SUPERVISORS

7. b. **Nebraska State Capitol Police**:

- ○ THREE UNNAMED CAPITOL POLICE OFFICERS who removed Plaintiff from the Capitol building

8. **Private Attorney Defendants**: a. **Baird Holm LLP Attorneys**:

- STEVE DAVIDSON, in his individual capacity
- DAVID KRAMER, in his individual capacity
- JILL ACKERMAN, in her individual capacity
- CAMERON FINKE, in his individual capacity

9. b. **Federal Reserve Bank of Kansas City Attorney**:

- TODD RUSKAMP of SHOOK, HARDY and BACON LLP, in his individual capacity
- NORMA BENNET of SHOOK HARDY and BACON LLP, in her individual capacity
- MICHAELA GIBBS of SHOOK HARDY and BACON LLP, in her individual capacity
- KENNETH M. TRUJILLO-JAMISON, in his individual capacity
- JEFFREY NIX, in his individual capacity
- DEVON RITTER, in his individual capacity
- D. WELCH, in his individual capacity

10. c. **Koley Jessen Attorneys**:

- PATRICK KIMMEL, in his individual capacity as attorney for WOWT

11. **Oversight Agency Defendants**: a. **Nebraska Ombudsman's Office**:

- JULIE ROGERS, in her individual capacity as Public Counsel
- UNNAMED OMBUDSMAN'S OFFICE OFFICIALS

12. b. **Nebraska Department of Unauthorized Practice of Law**:

- MARK WEBER, in his individual capacity

13. **Additional Defendants**: a. **Municipal Officials**:

- JEAN STOTHERT, in her individual capacity as Omaha Mayor

14. b. **Federal Officials**:

- DON BACON, in his individual capacity as U.S. Congressman

15. c. **Financial Institutions**:

- CHARTERWEST BANK EXECUTIVES, including GARY WALTERS

16. d. **Media Representatives**:

- GINA DVORAK, in her individual capacity as WOWT Digital Media Director
- SCOTT VORHEES, in his individual capacity as KFAB reporter

17. e. **Court Staff**:

- UNNAMED COURT REPORTER who facilitated judicial misconduct

18. f. **Doe Defendants**:

- ○ JOHN/JANE DOES 1-50, currently unknown defendants who necessarily participated in, accepted, or ignored clear and flagrant violations of the law

Collectively, the Defendants formed and operated a fraudulent enterprise within the meaning of RICO, 18 U.S.C. § 1961(4), engaging in a pattern of racketeering activity designed to silence Mr. Riddle and prevent public exposure of their misdeeds. They exploited their official positions and manipulated the instruments of government power to erect an impenetrable bulwark around their illicit enterprise, violating the basic rights of the Plaintiff and the public at large to know the truth about their government's functioning and to petition their leaders for the redress of grievances.

Each individual Defendant is sued in his or her individual capacity unless otherwise noted. At all relevant times, each Defendant was illegally acting under color of law pursuant to their authority as government officials or as willful participants in joint action with state and federal agents. The misconduct described herein was undertaken with malice, willfulness, and reckless indifference to the rights of others.

## C. Comprehensive List of Defendants and Allegations

**JUDGES**

1. **Judge Duane Dougherty (Douglas County District Court)**

   - ○ Allowed ex parte communications between Davidson and the court before a hearing
   - ○ Relied on a nonexistent Amended Complaint to justify dismissal
   - ○ Refused to demand a response from OPS attorneys when accused of fraud
   - ○ Took under advisement arguments never made, proving judicial bias
   - ○ Made provably false statements in court opinions, including the claim that the defense scheduled a hearing when court records clearly show Plaintiff scheduled it earlier
   - ○ Allowed procedural fraud to hijack hearings, favoring OPS's fabricated claims over documented evidence
   - ○ Delayed hearings in violation of Nebraska law, preventing timely relief
   - ○ Ignored due process violations in Holman v. Riddle, favoring government at every stage
   - ○ Refused to recuse himself despite clear conflicts of interest
   - ○ Betrayed judicial oath by conspiring from bench to protect enterprise from accountability
   - ○ Issued biased rulings and manipulated procedures to provide veneer of legal legitimacy
   - ○ In 2021, allowed multiple false and prejudicial statements from Baird Holm in OPS case

- ○ Issued protection order based on documented false statements
- ○ Coordinated with co-defendants in administrative actions outside judicial immunity
- ○ Participated in broader RICO enterprise through judicial misconduct
- ○ Predetermined rulings in coordination with co-conspirators
- ○ Used court as "farcical puppet theater" with rigged outcomes
- ○ Created logically impossible rulings by dismissing simultaneously for "lack of jurisdiction" and "failure to state a claim" in violation of Steel Co. v. Citizens for Better Environment

2. **Judge Shelly Stratman (Douglas County District Court)**

- ○ Permitted fraudulent legal tactics in favor of OPS
- ○ Held Plaintiff to impossible procedural standards while excusing OPS's misconduct
- ○ Refused to consider overwhelming evidence of perjury and procedural violations
- ○ Denied due process by refusing to review evidence of OPS misconduct at October 1, 2024 hearing
- ○ Allowed OPS's last-minute motion to dismiss filed less than 24 hours before a hearing
- ○ Created arbitrary "verification" standards not existing in law to obstruct access to records
- ○ Demonstrated bias in favor of OPS, refusing to uphold statutory rights
- ○ Participated in coordinated effort to suppress transparency
- ○ Enabled systematic violations of public trust
- ○ Tried to intimidate the Plaintiff by claiming he was disrespectful for expecting the truth and laws to matter

3. **Judge John M. Gerrard (Federal Court, Nebraska)**

- ○ Dismissed cases based on procedural gamesmanship, avoiding merits of claims
- ○ Blocked legitimate constitutional claims from being heard
- ○ Participated in systematic suppression of evidence
- ○ Coordinated with other federal judges to prevent meaningful review
- ○ Failed to promptly remand case despite obvious lack of jurisdiction

4. **Judge Rossiter (Federal Court, Nebraska)**

- ○ Allowed jurisdictional defects in OPS's removal to federal court
- ○ Prevented meaningful review of the case
- ○ Rubber-stamped OPS's legal obstruction tactics
- ○ Participated in broader pattern of federal judicial misconduct
- ○ Failed to promptly remand case despite obvious lack of jurisdiction

5. **Judge Vaughn (State Court, Nebraska)**

- ○ Recused himself due to unspecified connections to OPS
- ○ Delayed Plaintiff's case unnecessarily, contributing to procedural sabotage

- Initial assignment raised concerns about court's neutrality
- Failed to disclose nature of conflicts with OPS
- Participated in coordinated delay tactics

6. **Judge Richard Kopf (Federal Judge)**

- Upheld unconstitutional rulings that ignored due process
- Showed deference to government agencies over citizen rights
- Refused to acknowledge overwhelming evidence of procedural fraud
- Protected institutional actors from accountability
- Participated in systematic suppression of constitutional claims

7. **Judge Ralph R. Erickson (Eighth Circuit Judge)**

- Part of Eighth Circuit panel issuing baseless summary affirmance in CharterWest case
- Actively ignored clear procedural fraud in Nebraska courts
- Refused to engage with substantive legal arguments in prior appeals
- Demonstrated judiciary's complicity in suppressing Plaintiff's case
- Participated in coordinated effort to prevent meaningful appellate review

8. **Judge Lavenski R. Smith (Eighth Circuit Judge)**

- Allowed systemic discrimination against pro se litigants to continue unchecked
- Failed to issue meaningful ruling addressing constitutional issues
- Helped reinforce pattern of courts protecting institutions over individuals
- Participated in coordinated suppression of evidence
- Enabled broader RICO enterprise through judicial inaction

9. **Judge Steven M. Colloton (Eighth Circuit Judge)**

- Repeatedly dismissed well-pled claims in summary affirmances
- Actively participated in judicial misconduct by refusing to address procedural fraud
- Part of institutional cover-up preventing government entities from facing consequences
- Coordinated with other circuit judges to prevent meaningful review
- Enabled broader pattern of corruption through judicial decisions
- Refused to address Lieutenant Ott's recorded phone call

10. **Judge Horatio Wheelock**

- Additional allegations to be determined during discovery

**ATTORNEYS**

1. **Steve Davidson (Attorney, Baird Holm)**

- Submitted ex parte documents to judge before hearings
- Filed fraudulent documents to justify dismissal

- Labeled Plaintiff as "security threat" in court records, committing defamation
- Refused to deny allegations of misconduct when confronted
- Knowingly made false statements in hearings and filings
- Coordinated with state officials to suppress evidence
- Acted as "megaphone of lies" for OPS
- Fabricated baseless security threats to smear Plaintiff
- Coordinated harassment and intimidation tactics
- Made false statements on record in multiple venues
- Engaged in intentional infliction of emotional distress
- Participated in RICO enterprise through pattern of fraud

2. **David Kramer (Attorney, Baird Holm)**

- Lied to Nebraska Attorney General's Office and courts
- Coordinated with OPS officials to obstruct records requests
- Provided false statements to Nebraska Attorney General's Office
- Actively engaged in legal obfuscation and procedural fraud
- Weaponized legal system to protect OPS and silence whistleblowers
- Leveraged position to participate in records suppression scheme
- Coordinated with conspirators to conceal evidence
- Furthered enterprise's illicit aims through legal tactics
- Participated in broader RICO conspiracy through coordination role

3. **Jill Ackerman & Cameron Finke (Baird Holm Attorneys)**

- Represented Holman in fraudulent restraining order case
- Knowingly used false statements in legal proceedings
- Participated in broader legal strategy to suppress constitutional rights
- Coordinated with other attorneys to enable fraud
- Engaged in pattern of deceptive legal practices including lying on record
- Made highly prejudicial statements of completely unrelated pending litigation claiming Plaintiff was supportive of the "Murderer, Kyle Rittenhouse," who was and remains innocent

4. **Patrick Kimmel - Attorney for Koley Jessen representing WOWT**

- Engaged in same pattern of misconduct and ex parte communications
- Filed 11th Hour Motion to Dismiss
- Worked with Judge Stratman to violate Plaintiff's Due process

5. **Todd Ruskamp (Attorney, Federal Reserve Bank of Kansas City)**

- Enabled CharterWest Bank's records manipulation through legal cover
- Coordinated with Nebraska Banking Department to prevent investigation
- Participated in procedural obstruction blocking access to federal remedies
- Engaged in pattern of legal tactics to prevent accountability
- Leveraged Federal Reserve position to suppress evidence of banking fraud

6. **Jeffrey Nix (Attorney, Federal Reserve Bank of Kansas City)**

   - Participated in coordinated legal obstruction regarding banking complaints
   - Provided false legal justifications for non-investigation of documented fraud
   - Used position to influence regulatory bodies against meaningful review
   - Engaged in pattern of procedural manipulation to prevent legal remedies
   - Coordinated with enterprise participants to ensure systematic protection

7. **Devon Ritter (Attorney, Federal Reserve Bank of Kansas City)**

   - Facilitated regulatory capture through procedural obstruction
   - Participated in coordinated response strategy across banking institutions
   - Engaged in pattern of legal maneuvers to prevent exposure of fraud
   - Used procedural technicalities to dismiss legitimate complaints
   - Provided legal cover for other enterprise participants

8. **D. Welch (Attorney, Federal Reserve Bank of Kansas City)**

   - Participated in systemwide legal obstruction regarding banking oversight
   - Engaged in procedural tactics to prevent investigation of documented fraud
   - Coordinated with state-level participants to ensure regulatory protection
   - Facilitated information-sharing between enterprise participants
   - Used position to influence banking complaints process against transparency

## LAW ENFORCEMENT & GOVERNMENT OFFICIALS

1. **Lt. Charles Ott (Head of OPS School Resource Officers)**

   - Contacted Plaintiff before Holman filed restraining order, proving pre-coordination
   - Acknowledged Plaintiff's speech was lawful but engaged in intimidation
   - Confirmed OPS contacted law enforcement first, exposing coordinated plan
   - Defended OPS's attempt to search student's room without probable cause
   - Was prevented from testifying at restraining order hearing
   - Called Plaintiff before restraining order filed, showing OPS-OPD coordination
   - Refused to testify despite being key law enforcement official
   - Participated in coordinated effort to suppress speech
   - Enabled broader pattern of civil rights violations

2. **Steve Lee (Omaha Police Department, Mental Health and Wellness Unit)**

   - Contacted Plaintiff before Holman's restraining order filing
   - Framed legitimate public concerns as mental health issue
   - Part of preemptive law enforcement effort to silence Plaintiff
   - Called Plaintiff before restraining order, proving pre-coordination
   - Participated in coordinated intimidation campaign
   - Enabled broader pattern of civil rights violations
   - Attempted to frame legitimate political speech as a mental health issue

3. **Mike Hilgers (Nebraska Attorney General)**

   ○ Knowingly published false information about public records case
   ○ Refused to correct documented lies, violating public trust
   ○ Allowed office to label Plaintiff "security threat" without evidence
   ○ Failed to uphold transparency laws and enabled OPS misconduct
   ○ Expanded campaign of records suppression and retaliation
   ○ Key participant in ongoing conspiracy against transparency
   ○ Established policies to obstruct public records access
   ○ Shielded political allies from scrutiny
   ○ Turned blind eye to rampant violations
   ○ Presided over regime of secrecy and cronyism
   ○ Positioned AG office as explicitly "adversarial" to citizens seeking public records while simultaneously claiming authority to adjudicate open meetings and public records disputes
   ○ Created irreconcilable conflict by declaring AG office represents the state against citizens while claiming to enforce transparency laws

4. **Mark Weber (Head of Nebraska Unauthorized Practice of Law Commission)**

   ○ Launched retaliatory investigations against Plaintiff
   ○ Weaponized office to suppress legal claims
   ○ Used false accusations to intimidate Plaintiff
   ○ Initiated unauthorized practice proceedings without notice
   ○ Abused authority as retaliatory measure
   ○ Participated in sham prosecution scheme
   ○ Coordinated with other officials to enable fraud
   ○ Mailed a threat of legal action about a fictitious complaint from a non-existent party
   ○ Used privilege to claim Plaintiff couldn't see the charges, complaint or documents

5. **Laura Nigro (Nebraska Attorney General's Office)**

   ○ Participated in delaying tactics and procedural obstruction
   ○ Refused to investigate OPS's fraudulent filings
   ○ Enabled broader pattern of misconduct
   ○ Coordinated with other officials to suppress evidence
   ○ Maintained cozy relationship with OPS attorneys, demonstrating collusion rather than oversight
   ○ Deliberately delayed informing complainants of disposition decisions
   ○ Coordinated with Kramer to develop strategy for denying legitimate records requests

6. **Mitchell Wurm (Nebraska Attorney General's Office)**

   ○ Issued fraudulent legal opinions to justify suppressing records
   ○ Aided Nebraska's cover-up by misrepresenting laws

- Conspired to concoct spurious legal rationales
- Acted as "loyal foot soldier" for enterprise
- Participated in retaliation campaigns
- Disseminated false legal justifications

7. **Leslie Donley (Attorney General's Legal Advisor)**

  - Weaponized position to provide false legal cover
  - Issued fraudulent opinions to justify denial of records
  - Acted as critical facilitator of scheme
  - Transmitted knowingly false legal interpretations
  - Participated in coordinated effort to obstruct access

8. **Julie Rogers (Nebraska Ombudsman)**

  - Failed to intervene despite evidence of AG misconduct
  - Allowed OPS and AG's Office to manipulate enforcement
  - Blocked legitimate investigations
  - Physically barred Plaintiff from office
  - Refused to act on fraud complaints
  - Abdicated watchdog duty
  - Served as guardian of government corruption
  - Coordinated with AG's office to dismiss valid complaints
  - Enabled enterprise's ongoing violations through inaction
  - Refused to investigate complaints about the Attorney General's Office despite that being explicitly within her statutory jurisdiction

9. **Nebraska State Capitol Police, 3 individuals**

  - Knew the situation because Plaintiff took great care to bring them documentation after being accused of being "disruptive"
  - Removed Plaintiff from the Capitol on 3 separate occasions for the sin of properly asking the AG for resolution
  - Refused to sign a document stating Plaintiff was/was not a "Security Threat" as stated on record and in the motion to dismiss filed by Davidson
  - Physically removed Plaintiff from the state capitol on orders from the Attorney General's office in retaliation for his efforts to expose their corruption

**OMAHA PUBLIC SCHOOLS**

1. **Shavonna Holman (OPS Board President, at the time)**

  - Filed fraudulent protection order against Plaintiff
  - Used authority to suppress records and obstruct claims
  - Coordinated with law enforcement before filing order
  - Worked with OPS attorneys to fabricate legal justifications
  - Participated in broader conspiracy to silence dissent
  - Enabled systematic violations of public trust

2. **Spencer Head (Former OPS Board President)**

   - Personally informed of concerns in 2021 but failed to intervene
   - Allowed retaliation efforts to continue unchallenged
   - Did nothing to correct procedural abuses
   - Knew of violations since 2021 but failed to act
   - Had direct conversations about misconduct without intervention
   - Participated in coordinated suppression strategy

3. **Anne MacFarland (OPS Records Keeper)**

   - Falsified and manipulated public records to obstruct access
   - Knowingly delayed responses and withheld documents
   - Directly participated in records suppression scheme
   - Played integral role in executing enterprise's attacks
   - Coordinated with other officials to conceal evidence

4. **Cheryl Logan (Former OPS Superintendent)**

   - Blocked Plaintiff from official accounts to silence dissent
   - Helped coordinate overall suppression strategy
   - Avoided answering public records requests
   - Abruptly resigned without addressing concerns
   - Ignored records requests
   - Authorized school's involvement in Holman's defense
   - Failed to intervene in systematic suppression
   - Worked with law enforcement to monitor speech
   - Participated in broader conspiracy to prevent transparency

5. **Barry Thomas (Former OPS Director of Equity & Diversity)**

   - Responsible for implementing and hiding curriculum changes
   - Subject of unfulfilled public records requests
   - Blocked access to key public documents
   - Resigned amid controversy without transparency
   - Actively worked to implement controversial curriculum
   - Engaged in retaliatory suppression of speech
   - Coordinated with other officials to prevent disclosure

6. **Matthew Ray (OPS Superintendent)**

   - Continued pattern of records suppression
   - Maintained retaliatory policies against transparency
   - Participated in ongoing conspiracy
   - Enabled systematic violations of public trust

7. **Unnamed OPS Board Members (At Least Two Additional)**

   - Privately discussed suppressing speech & misleading public

- Involved in cutting off microphones & manipulating meetings
- Called Plaintiff "security risk" without evidence
- Voted to indemnify Holman but refused to testify
- Coordinated with attorneys and law enforcement
- Participated in discussions about removing Plaintiff
- Enabled broader retaliation campaign
- Systematically violated open meetings laws

8. **Unnamed OPS Legal Counsel**

   - Advised funding Holman's restraining order
   - Helped draft false legal arguments about OPS involvement
   - Coordinated with law enforcement
   - Participated in systematic suppression strategy

## ADDITIONAL DEFENDANTS

1. **Jean Stothert (Omaha Mayor)**

   - Failed to intervene in systematic violations
   - Enabled broader pattern of corruption
   - Participated in coordinated suppression efforts

2. **CharterWest Bank Executives, including Gary Walters**

   - Fraudulently altered financial documents
   - Falsely claimed past-due child support
   - Destroyed loan ability through false records
   - Conspired with state officials to cover up fraud
   - Initiated broader pattern of retaliation
   - Participated in systematic suppression strategy

3. **Unnamed Court Reporter**

   - Accepted and handled ex parte document
   - Facilitated judicial misconduct
   - Acted as intermediary for improper communications
   - Enabled broader pattern of corruption

4. **Unnamed Police Supervisors**

   - Prevented Lt. Ott from testifying
   - Coordinated with OPS to suppress rights
   - Instructed officers to monitor speech
   - Participated in systematic retaliation
   - Enabled broader conspiracy through coordination

5. **Unnamed Ombudsman's Office Officials**

   - Failed to intervene despite evidence

- ○ Intimidated and retaliated against Plaintiff
- ○ Employed shifting rationales for inaction
- ○ Participated in systematic suppression
- ○ Enabled broader pattern of corruption

6. **Don Bacon (U.S. Congressman)**

   - ○ Knows the issues
   - ○ Claimed they can't help a Citizen that the State is lying about due to "lack of jurisdiction"
   - ○ Refuses to shed light on the situation or get the media involved

7. **Gina Dvorak (WOWT Digital Media Director)**

   - ○ Illegally suppressed Plaintiff on WOWT's Facebook
   - ○ Spread false information and made false statements under WOWT's official account
   - ○ Worked within the same system of obstruction as all other Defendants

8. **Scott Vorhees (KFAB Reporter)**

   - ○ Reached out to Spencer Head and the OPS School Board based on understanding the concerns
   - ○ After presumably speaking with OPS, silently exited the scene, refusing to cover the story

The facts herein paint a disturbing picture of cronyism, corruption, and conspiracy at the highest levels of Nebraska's government and civic institutions.

# IV. THE ATTORNEY GENERAL'S ROLE IN MEDIA SUPPRESSION

For eight years, no media outlet has shown the slightest curiosity about a case involving:

- Public records fraud
- Judicial corruption
- Retaliation against a citizen exposing systemic abuse

That is statistically impossible unless suppression was deliberate.

## A. The Attorney General's Office Has Been Quietly Controlling the Narrative

At some point, at least one reporter had to have asked about this case. Any journalist investigating legal corruption would have encountered the OPS records suppression scandal and the Nebraska Supreme Court case. Instead of covering it, they stayed silent.

The only logical explanation? The Nebraska Attorney General's Office intervened behind the scenes. This is direct evidence of information control. The AG's Office, rather than allowing the press to investigate, likely issued quiet directives to journalists or their editors, discouraging coverage.

## B. Why This Constitutes a RICO Predicate Act

Influencing or manipulating the media to suppress exposure of criminal activity is obstruction of justice under federal law. Coordinating a cover-up through non-public channels (i.e., influencing media silence) is a form of racketeering activity. The AG's Office does not have the legal authority to control press coverage—meaning any effort to do so is an abuse of power designed to protect a criminal enterprise.

Conclusion: The Nebraska Attorney General's Office didn't just refuse to investigate corruption—it actively worked behind the scenes to ensure the media would not report on it.

## C. The AG's Mathematically Impossible Accountability System

The Attorney General's position regarding public records represents not merely a contradiction but a deliberately engineered barrier designed to make accountability mathematically impossible. The Nebraska AG's Office has openly declared itself "adversarial" to citizens seeking public records while simultaneously claiming statutory authority to adjudicate disputes over those same records.

This creates not just a conflict of interest but a perfect circle of obstruction with no entry point for citizens:

1. When citizens seek public records that government entities wish to conceal, agencies deny access
2. The AG's Office, statutorily designated as the enforcer of transparency laws, then positions itself as "adversarial" to citizens because it "represents state agencies"
3. When citizens appeal to the AG, they're told to pursue mandamus actions in court if they disagree with the AG's determination
4. When citizens file mandamus actions, courts defer to the AG's "expertise" on public records matters
5. If by some miracle a citizen obtains a mandamus, the AG then refuses to review the underlying issue because "you already got a mandamus"
6. If citizens try to challenge the AG's decision directly, courts say that's not reviewable either

AG's Office staff have explicitly stated to Plaintiff that they are "adversarial" to citizens raising complaints about state agencies because they represent those agencies. This is not a vague implication but a direct admission from the very office charged with enforcing transparency laws.

This is not merely institutional bias—it is a deliberately designed system of mathematical impossibility. By positioning themselves as both referee and adversary, the AG has created a closed-loop system where accountability is structurally impossible by design. No matter which path a citizen takes, the system ensures they will reach a dead end.

The enterprise hasn't merely captured the enforcement mechanism—they've engineered it to create the appearance of remedy while ensuring none exists. This represents the ultimate evolution of corruption: a system that creates the illusion of accountability while mathematically guaranteeing none can occur.

# V. MEDIA COMPLICITY AND THEIR ROLE IN THE ENTERPRISE

The media is supposed to serve as a check on government corruption. Instead, in Nebraska, they act as protectors of the system.

## A. The Business of Silence

News organizations rely on government relationships for:

- Interviews, scoops, and access to public officials
- Advertising revenue from government agencies and political campaigns

Covering government corruption puts these relationships at risk. Rather than investigate, they chose to protect their financial and political interests.

## B. The Nebraska Media's Unbroken Record of Suppression

- Not one media outlet has covered the Nebraska Supreme Court victory proving public records fraud
- Not one journalist has pursued the AG's refusal to enforce public records laws
- Not one publication has reported on the RICO lawsuit exposing systemic corruption

That isn't oversight. That's complicity.

## C. Why This is a RICO Predicate Act

- The media is actively profiting from suppression. By refusing to report on corruption, they maintain their financial relationships with government officials. This transforms their silence into a commodity exchanged for influence and advertising dollars.
- By suppressing critical public information, the media is aiding and abetting fraud. The public has a legal right to know about judicial and government misconduct. News organizations, by deliberately ignoring clear corruption, are participating in a fraudulent scheme that prevents public accountability.

Conclusion: The Nebraska media is not failing to report. They are choosing not to report. And that makes them active participants in the conspiracy.

# VI. SYSTEMATIC FORECLOSURE OF JUSTICE: THE LEGAL INDUSTRY'S ROLE IN PROTECTING CORRUPTION

This section establishes that no attorney can or will challenge the system, proving that legal recourse is an illusion.

## A. The Myth of Legal Representation

- Government agencies, courts, and law enforcement routinely tell citizens to "get an attorney" to resolve legal disputes.
- In reality, no private attorney will take a case against entrenched corruption for two primary reasons:
    - Career Suicide: Any attorney who challenges Nebraska's legal establishment will face blacklisting, professional retaliation, and financial ruin.
    - Firm Restrictions: Large law firms prohibit their attorneys from taking cases that would put them in direct conflict with the courts, the Attorney General's Office, or other government entities.

## B. The Legal Industry's Silent Complicity

- The Nebraska State Bar and the judicial system create an environment where attorneys fear challenging the status quo.
- Attorneys who represent government entities enjoy guaranteed paychecks funded by taxpayers, while private attorneys who challenge the system risk everything.
- This creates a legal monopoly where only government-approved cases can proceed, ensuring that corruption is never meaningfully challenged.

Conclusion: The legal system is not an avenue for justice—it is a self-regulating monopoly designed to eliminate opposition and ensure power remains concentrated within the government-controlled legal establishment.

# VII. TAXPAYER-FUNDED SUPPRESSION: HOW PUBLIC MONEY IS WEAPONIZED AGAINST WHISTLEBLOWERS

This section establishes that the government is using public funds to fight the very people it is supposed to serve.

## A. Public Resources Are Used to Defend Corruption

- The Nebraska Attorney General's Office, OPS, the judiciary, and law enforcement all use taxpayer money to cover legal fees, investigations, and suppression tactics against private citizens.
- Citizens, on the other hand, must personally finance any attempt to hold these institutions accountable.
- Critically, the Defendants routinely wait the statutory maximum time to respond to requests, ask for irrelevant information to extend out requests, deliberately slow walk cases and often simply ignore public requests.
- This results in a completely one-sided legal battle, where the government has unlimited resources, while the public is financially exhausted before justice can even be pursued.
- This is magnified by the clear fact that in the large majority of situations where the public has enlisted the help of the government, that individual has found themselves in a very time-sensitive and disturbing position.
- By deliberately using the system to frustrate, confuse, avoid, and damage individual citizens who are already disillusioned by the system, the defendants have taken their flaunted positions from clearly morally reprehensible to factually criminally liable.

## B. The Public is Funding a Protection Racket

- Public employees are using tax dollars to pay for attorneys who protect their own misconduct.
- Judges, who are taxpayer-funded, are rubber-stamping dismissals that protect the government from being held accountable.
- Government agencies are paying private law firms (e.g., Baird Holm LLP) to obstruct public records access and silence whistleblowers.
- The media, which relies on government sources and advertising, actively participates in suppressing the truth to maintain financial relationships.

Conclusion: The taxpayers of Nebraska are unknowingly financing a system that is designed to suppress their own rights, protect corrupt officials, and ensure that legal challenges to government misconduct are impossible.

# VIII. CLOSED-LOOP CORRUPTION: THE SELF-SUSTAINING CYCLE OF POWER & SUPPRESSION

## A. The Circular Nature of Government Suppression

- The government funds its own legal defense against corruption allegations.
- The judiciary rubber-stamps dismissals to protect government entities.
- Law enforcement refuses to investigate clear evidence of fraud and abuse.
- The media ensures that the public never hears about these cases.

- Private attorneys cannot challenge this system without professional or financial ruin.

Conclusion: This is not just corruption—it is an organized criminal enterprise where every participant benefits from maintaining the status quo.

# IX. THE SYSTEMATIC DESTRUCTION OF STABILITY THROUGH PROCEDURAL ATTRITION

What is often overlooked in discussions of institutional corruption and procedural manipulation is the profound human cost that extends far beyond financial damages. The defendants' actions represent a documented phenomenon in protracted institutional conflict: the weaponization of time, uncertainty, and procedural complexity as tools for defeating even the most determined opponents without ever having to address substantive claims.

## A. The Human Cost of Institutional Manipulation

The system has been deliberately designed to exploit several leverage points simultaneously:

1. **Financial Depletion**: The structured accumulation of costs—filing fees, transcript fees, document production expenses—creates a financial bleeding effect that eventually renders continued pursuit unsustainable. Beyond direct litigation costs, this extends to impact fundamental life decisions and economic security. Filing fees alone have cost the Plaintiff thousands of dollars for proceedings that were predetermined to be dismissed.

2. **Cognitive Bandwidth Exhaustion**: The constant need to navigate deliberately complex procedural mazes consumes enormous cognitive resources. The human brain has finite capacity for sustained, high-intensity problem-solving, especially when facing intentionally shifting requirements designed to be unsatisfiable. This creates a situation where even the most diligent citizen cannot maintain the mental energy required to combat systematic obstruction.

3. **Relationship Infrastructure Erosion**: The isolation that comes from pursuing a complex legal battle that others can't fully comprehend gradually undermines the social support systems that sustain mental health. This creates a secondary effect where the loss of relationships further reduces resilience against the primary stressors. The Plaintiff has experienced the deterioration of personal relationships due to the all-consuming nature of this battle.

4. **Identity and Purpose Distortion**: What begins as a specific grievance seeking specific remedy gradually transforms into a consuming mission that restructures one's entire identity around the conflict. The legal battle becomes not just something you're doing but defines who you are, creating a psychological dependency that defendants can exploit.

## B. The Absence of Temporal Boundaries as Psychological Warfare

A particularly insidious aspect of this approach is the deliberate removal of any temporal boundaries. When facing a defined challenge with clear parameters—even a difficult one—humans can marshal resources and endurance. But when facing an indefinite challenge with constantly shifting parameters and no clear endpoint, the psychological toll multiplies exponentially.

This is a documented strategy in contexts ranging from interrogation techniques to cult indoctrination: remove all predictability and control over when hardship will end, and even the most resilient individual eventually experiences fundamental psychological distress.

The Defendants have deliberately created an endless procedural maze where each new barrier is followed by another, with no possibility of conclusion. This temporal uncertainty is not incidental but strategic—designed to break the will of those seeking accountability.

## C. Documenting This Dimension for Legal Strategy

This human cost dimension must be explicitly incorporated into the legal strategy for several reasons:

1. **Concrete Damages Quantification**: The emotional toll, relationship disruption, and quality-of-life impairment constitute quantifiable damages that extend beyond direct financial losses. Courts have increasingly recognized these impacts as legitimate damage components, particularly in cases involving institutional misconduct.

2. **Pattern Evidence Reinforcement**: The systematic nature of the procedural obstruction becomes even clearer when viewed through the lens of its human impact. What might otherwise be dismissed as coincidental procedural hurdles appears as the deliberate warfare strategy it truly is when its human consequences are fully documented.

3. **Judicial Empathy Trigger**: Even judges operating within institutional constraints respond to human suffering. Documenting not just the procedural manipulation but its real-world consequences activates ethical and empathic considerations that technical legal arguments alone might not.

4. **Urgency Justification**: The ongoing nature of these harms provides additional justification for emergency intervention. Unlike purely procedural issues that might be remedied later, psychological and relationship damage compounds over time in ways that cannot be fully remediated after the fact.

The human cost inflicted by the Defendants' pattern of institutional abuse represents not just collateral damage but a deliberate strategy of attrition designed to make the price of pursuing justice so high that citizens will abandon their rights rather than face continued torment.

# X. PREEMPTIVELY COUNTERING POTENTIAL DISMISSAL ATTEMPTS

Anticipating the Defendants' defense strategies is critical to ensuring this case receives the substantive review it deserves. What follows are the most likely dismissal arguments they will employ and the countermeasures that preemptively address them.

## A. Jurisdictional Attacks – "This Court Lacks Jurisdiction"

**Their Likely Argument**:

- Sovereign immunity (AG, Judges, Government Officials) → They'll claim the Eleventh Amendment bars your claims against the state actors.
- Rooker-Feldman Doctrine → They'll argue you're improperly challenging a state court decision in federal court.
- Lack of Standing → They'll claim you haven't suffered a direct injury that the court can redress.

**Countermeasures**:

- **42 U.S.C. § 1983 Exception to Sovereign Immunity**:
    - The Supreme Court has ruled that state officials are not immune from suit when sued in their individual capacities for constitutional violations.
    - AG, Judges, and other officials acted outside the scope of their lawful authority → This strips them of immunity under Ex parte Young, 209 U.S. 123 (1908).
    - Requested relief (injunctions and damages) applies to individual conduct, not just the office.
- **Rooker-Feldman is irrelevant because**:
    - This is a new case addressing ongoing fraud and obstruction, not a review of a prior ruling.
    - Independent violations (e.g., Davidson's defamation, AG's false statements) happened outside any state court judgment.
- **Standing is airtight because**:
    - Direct injury is clear → You were unlawfully denied records, falsely labeled a security threat, and retaliated against.
    - Injunctive relief is necessary → Future violations are likely, requiring court intervention.

## B. "Failure to State a Claim" (FRCP 12(b)(6))

**Their Likely Argument**:

- "Plaintiff fails to allege specific conduct that violates a law."
- "There is no pattern of racketeering (RICO)."

- "Public records violations don't create a private cause of action."

**Countermeasures**:

- **RICO Predicate Acts Are Fully Established**:
  - The complaint explicitly identifies mail/wire fraud, obstruction of justice, witness retaliation, and conspiracy.
  - Government fraud cases like Bridge v. Phoenix Bond (2008) confirm public corruption schemes fall under RICO.
- **Civil Rights Violations Are Clear**:
  - Public officials retaliating against a citizen for exposing corruption is a textbook § 1983 violation.
  - Security threat designation without due process = deprivation of liberty interest (Paul v. Davis, 424 U.S. 693).
- **Nebraska Public Records Act Is Actionable**:
  - Denial of access violates state law.
  - Ongoing violations justify injunctive relief.

## C. "Judicial Immunity" (For Judges Named as Defendants)

**Their Likely Argument**:

- Judges have absolute immunity for rulings.
- Dismissing cases is a core judicial function.

**Countermeasures**:

- **Judicial immunity does not apply when**:
  - Acts are administrative, not judicial (e.g., coordination with AG's office to obstruct access to records).
  - Decisions were made in absence of jurisdiction (e.g., misusing procedural dismissals to cover up fraud).
  - Fraud and conspiracy are exceptions (Pierson v. Ray, 386 U.S. 547).
- **Dougherty, Stratman, and other judges engaged in misconduct outside judicial function** → Bias & procedural fraud are actionable.

## D. "No Personal Involvement" (Against Supervisors & Higher Officials)

**Their Likely Argument**:

- The AG (Hilgers) and former AG (Peterson) weren't personally involved.
- They can't be held liable for their employees' actions.

**Countermeasures**:

- **Supervisory Liability Applies When**:

- ○ They knew about violations and failed to act (Ashcroft v. Iqbal, 556 U.S. 662).
- ○ They implemented policies that allowed fraud and retaliation to occur.
- ○ They actively participated in obstruction (e.g., AG's legal opinions and denials).
- **Nebraska AG's Office issued false legal opinions** → Hilgers and Peterson knowingly contributed to the enterprise.

## E. "Statute of Limitations"

**Their Likely Argument**:

- Some of these claims are too old.
- RICO requires recent acts within four years.

**Countermeasures**:

- **The "Continuing Violation Doctrine" applies**:
  - ○ Ongoing suppression of records extends limitations.
  - ○ RICO has no single violation—it's a pattern.
- **Last predicate act occurred recently** → Time clock resets with each new obstructive act.
- **Government concealment tolls the statute** → Fraudulent denial of records prevented timely filing.

## F. "Failure to Exhaust Administrative Remedies"

**Their Likely Argument**:

- Plaintiff should have exhausted Nebraska's administrative review process before suing.
- Ombudsman and AG's Office were still reviewing complaints.

**Countermeasures**:

- **Exhaustion is not required for RICO or § 1983 claims**.
- **The administrative process was corrupted** → Plaintiff exhausted all possible remedies, and the AG/Ombudsman deliberately stalled.
- **The inherent contradiction in the AG's dual role** → The designated administrative arbiter has declared itself "adversarial" to citizens seeking records, making exhaustion futile and a sham process.

## G. "RICO Doesn't Apply to Government Entities"

**Their Likely Argument**:

- RICO is designed for criminal enterprises, not government agencies.

**Countermeasures**:

- **Government officials acting outside their duties form an enterprise**.
- **The enterprise includes private actors** (e.g., Baird Holm attorneys like Kramer, CharterWest Bank executives).
- **Public corruption cases have been prosecuted under RICO before** (e.g., United States v. Salinas, 522 U.S. 52).

These preemptive counters force the Defendants to confront the substantive merits of the case rather than rely on procedural evasions. By addressing these defenses in advance, this complaint ensures that the Court focuses on the profound constitutional issues at stake rather than technical distractions.

# XI. FACTUAL BACKGROUND: THE INTERCONNECTED CONSPIRACIES

## A. The CharterWest Bank Fraud and the Blueprint for Obstruction (2018)

In 2018, Plaintiff applied for a loan from CharterWest Bank, setting in motion a pattern of institutional obstruction that would become the template for subsequent coordinated action across multiple Nebraska agencies:

1. **The Initial Fraud**: CharterWest Bank deliberately falsified Plaintiff's loan application by checking a box indicating he had child support obligations when he had none. This was not a clerical error or oversight but a deliberate document alteration designed to create a pretextual basis for loan denial. a. The document alteration is visually apparent, with the "Yes" box for child support obligations clearly checked after the form was completed. b. Plaintiff had explained that his daughter had lived with him for 8 years, and there was already a special exclusion written in the loan, making this alteration unquestionably fraudulent. c. This initial fraud established the pattern that would be repeated throughout the later public records disputes: when legitimate channels produce unwanted results, documents are altered and records manipulated.

2. **The Regulatory Capture**: When Plaintiff sought accountability for this documented fraud, he encountered a regulatory system designed to protect institutions rather than enforce the law: a. The Nebraska Department of Banking and Finance, under Director Mark Quandahl and Deputy Director Mike McDannel, refused to investigate despite being presented with clear photographic evidence of document alteration. b. Their written responses employed circular reasoning, claiming they found no wrongdoing while simultaneously admitting they conducted no meaningful investigation into the alleged fraud. c. The Federal Reserve Bank of Kansas City similarly acknowledged receipt of the complaint but took no substantive action. Their attorneys, including Todd Ruskamp, Jeffrey Nix, Devon Ritter, and D. Welch, engaged in procedural obstruction that would later be replicated in the public records disputes. d. The Consumer Financial Protection Bureau likewise acknowledged the complaint but failed to enforce regulations specifically

designed to prevent this type of financial fraud.

3. **The Coordinated Non-Response**: These agencies exhibited the same pattern that would later characterize the public records disputes – coordination without accountability: a. Emails and correspondence obtained through subsequent records requests showed these agencies communicating extensively with each other and with CharterWest Bank. b. None of these agencies ever contacted Plaintiff to obtain additional evidence or clarification about his complaint. c. Despite operating under different statutory mandates and jurisdictions, all reached identical conclusions without conducting meaningful investigations, suggesting coordination rather than independent determinations. d. When Plaintiff provided additional evidence contradicting their findings, all agencies refused to reconsider, again suggesting predetermined outcomes rather than good-faith regulation.

4. **The Judicial Obstruction**: When Plaintiff sought judicial review, he encountered the same procedural manipulation that would later characterize his public records cases: a. Courts dismissed his complaints on procedural grounds without addressing the merits, applying hyper-technical readings of pleading requirements selectively against Plaintiff's filings. b. Judges applied impossible standards to Plaintiff's filings while simultaneously allowing opposing counsel substantial procedural leeway, including accepting late filings and overlooking missing elements. c. The Eighth Circuit Court of Appeals, including Judges Ralph R. Erickson, Lavenski R. Smith, and Steven M. Colloton, issued summary affirmances without addressing the substantive legal arguments presented, effectively rubber-stamping lower courts' procedural dismissals. d. At each level, courts focused exclusively on finding procedural defects rather than addressing the documented fraud at the heart of the case.

5. **The Vindication and Media Silence**: Despite this coordinated obstruction, Plaintiff ultimately prevailed in securing the domain name charterwestbank.com – a modest but telling victory that media entities nevertheless refused to cover: a. Local media had ignored his original complaints years earlier, despite clear photographic evidence of document alteration. b. When Plaintiff ultimately succeeded, these same media entities maintained their silence, refusing to acknowledge that his allegations had been vindicated. c. This pattern of media complicity – ignoring both documented misconduct and subsequent vindication – would repeat throughout the public records disputes.

The CharterWest situation established the template that would be refined and deployed in subsequent confrontations: institutional fraud followed by coordinated regulatory inaction, procedural obstruction by courts, and complete media silence despite compelling evidence of wrongdoing.

## B. The Omaha Public Schools Records Suppression Conspiracy (2021-2025)

In 2021, the same patterns established in the CharterWest Bank case reemerged in an even more sophisticated form when Plaintiff sought public records from Omaha Public Schools:

1. **The Board Meeting Incident**: The catalyst for this phase began with a public meeting where Ms. Adamson (Plaintiff's mother) was improperly silenced: a. Video evidence clearly shows Ms. Adamson attempting to speak during the public comment portion of an OPS board meeting when she was removed from the podium for attempting to play an audio recording that contradicted the board's narrative. b. Multiple citizens present at the meeting filed complaints with the Attorney General's Office, documenting that speakers with critical views were routinely silenced while supportive speakers were permitted to exceed time limits and violate the same rules used to silence critics. c. This silencing of public comment violated both Nebraska's Open Meetings Act and the First Amendment's protection of political speech in public forums.

2. **The Retaliatory Protection Order**: In response to legitimate criticism of this viewpoint discrimination, OPS Board President Shavonna Holman coordinated with attorneys and law enforcement to file a fraudulent protection order against Plaintiff: a. Phone records and documented communications prove that this coordination occurred before any allegedly threatening behavior, demonstrating that the protection order was a premeditated strategy to silence criticism rather than a response to legitimate concerns. b. Lieutenant Charles Ott, head of OPS School Resource Officers, contacted Plaintiff in August of 2021 – before the protection order was filed – proving pre-coordination between OPS and law enforcement. This call was legally recorded by Plaintiff, creating irrefutable evidence of the conspiracy. c. Officer Steve Lee from the Omaha Police Department's Mental Health and Wellness Unit similarly contacted Plaintiff, attempting to frame legitimate political speech as a mental health issue – a particularly disturbing abuse of authority that stigmatizes both mental health conditions and political dissent. d. Baird Holm attorneys, including Jill Ackerman and Cameron Finke, representing Holman made provably false statements in court proceedings, including deliberately introducing inflammatory and irrelevant comparisons to Kyle Rittenhouse in an attempt to prejudice the court.

3. **The Protection Order Hearing Manipulation**: When the fraudulent protection order reached Judge Dougherty's courtroom, the pattern of judicial complicity became explicit: a. Judge Dougherty prevented Lieutenant Ott from testifying, despite him being a key witness who could have confirmed the pre-coordination between OPS and law enforcement. b. The judge allowed highly prejudicial and irrelevant statements from Baird Holm attorneys while restricting Plaintiff's ability to present relevant evidence that would have exposed the protection order as retaliatory. c. The protection order was granted based on documented false statements, specifically the claim that Plaintiff had engaged in threatening behavior when the evidence showed only constitutionally protected criticism of public officials. d. The transcript of this hearing reveals Judge Dougherty's active participation in preventing evidence of the conspiracy from entering

the judicial record, rather than serving as a neutral arbiter of fact.

4. **The Public Records Obstruction**: When Plaintiff sought public records regarding these events, the institutional obstruction intensified to unprecedented levels: a. OPS charged Plaintiff approximately $1,600 for heavily redacted documents they later provided to his mother for free – a clear violation of the Nebraska Public Records Law, which prohibits treating different requesters unequally based on their identity or purpose. b. The records provided to Plaintiff contained over 100 pages that were entirely redacted—solid black boxes with no text visible—without any explanation of what was redacted or why, as required by Nebraska law. c. Many of these same documents were later provided to Plaintiff's mother with no redactions whatsoever, proving that the redactions were not legally justified but rather designed to obstruct access to information. d. OPS repeatedly denied the existence of records that they later produced to others. In multiple instances, they certified to courts that all responsive documents had been provided, only to later "discover" additional responsive documents when faced with evidence of their existence. e. When Plaintiff attempted to exercise his statutory right to inspect records in person rather than paying for copies, OPS refused to allow this basic right guaranteed by the Nebraska Public Records Law. This refusal persisted even after they had certified to the court that they had already provided all responsive documents. f. OPS Records Keeper Anne MacFarland played a central role in this obstruction, falsifying and manipulating public records to obstruct access and coordinating with other officials to conceal evidence.

5. **The Oversight Agency Collusion**: When Plaintiff sought assistance from oversight agencies, he encountered the same pattern of coordinated inaction seen in the CharterWest case, but with even more explicit evidence of collusion: a. The Nebraska Attorney General's Office, under AG Mike Hilgers and previously under AG Doug Peterson, communicated extensively with OPS and its attorneys but never once contacted Plaintiff or any of the witnesses to the board meeting incident. b. Records obtained later showed dozens of communications between the AG's office and OPS attorneys, including David Kramer of Baird Holm, while Plaintiff's inquiries were ignored or dismissed without investigation. c. The AG published a demonstrably false opinion containing internal contradictions about the board meeting incident. The opinion simultaneously claimed that "Ms. Adamson was allowed to continue and spoke for approximately one minute" and also that "Ms. Adamson was not removed due to the content of her speech, but because she refused to provide her address." These statements are logically incompatible—she either continued speaking or was removed—making it impossible for both to be true. d. When Plaintiff presented evidence of this falsehood and requested correction, the AG refused to correct the public record. This refusal to correct a known falsehood in an official publication represents a particularly egregious dereliction of duty for the state's chief law enforcement officer. e. The AG's pattern of behavior extended to their handling of public records requests. They denied all of Plaintiff's requests seeking information about their investigation, not portions based on legitimate sensitivity concerns, but everything. Simultaneously, they

selectively published certain denial letters from Plaintiff's case on their website while keeping others unpublished, suggesting deliberate narrative control. f. Assistant Attorneys General, including Laura Nigro, Mitchell Wurm, and Leslie Donley, actively participated in this obstruction, issuing fraudulent legal opinions to justify suppressing records and refusing to investigate OPS's documented violations despite their statutory obligation to enforce the Public Records Law. g. The Nebraska Ombudsman's Office, under Public Counsel Julie Rogers, similarly refused to investigate despite clear evidence of misconduct. Rogers went so far as to physically bar Plaintiff from her office and refused to accept complaints about the Attorney General's Office, despite that being explicitly within her statutory jurisdiction.

6. **The Judicial System Participation**: The court system, rather than providing a check on this misconduct, became an active participant in the obstruction with increasingly blatant procedural manipulations: a. Judge Duane Dougherty allowed ex parte communications between Steve Davidson (Baird Holm attorney) and the court before hearings, a fundamental violation of judicial ethics that undermines the entire concept of adversarial proceedings. b. Judge Dougherty relied on a nonexistent "Amended Complaint" to justify dismissal in one proceeding, then refused to allow Plaintiff to correct this fictitious deficiency. Court records conclusively prove this document never existed, yet it formed the basis for dismissal. c. In multiple hearings, Judge Dougherty claimed to take "under advisement" arguments that were never made, proving judicial bias and pre-determination of outcomes. Transcripts from these proceedings show decisions being announced on issues that were never raised or argued. d. Judge Dougherty made provably false statements in his opinions, including the claim that the defense scheduled a hearing when court records clearly show Plaintiff scheduled it two days earlier and notified the defense. This falsification of the procedural record is particularly disturbing coming from a sitting judge, in particular when he was present when it was scheduled. e. Judge Shelly Stratman similarly permitted fraudulent legal tactics by OPS, holding Plaintiff to impossible procedural standards while excusing OPS's blatant misconduct. At an October 1, 2024 hearing, she refused to consider overwhelming evidence of perjury and procedural violations by OPS representatives. f. Judge Stratman allowed OPS's last-minute motion to dismiss filed less than 24 hours before a hearing, despite court rules requiring reasonable notice. When Plaintiff objected to this violation of procedural rules, Judge Stratman attempted to intimidate him by claiming he was being "disrespectful" for expecting the law to be followed. g. The courts created novel "verification" requirements not found in Nebraska law, then used these manufactured standards to dismiss Plaintiff's cases without addressing the merits. Each time Plaintiff attempted to comply with these shifting requirements, the courts would invent new procedural barriers.

7. **The Federal Court Extension**: The pattern extended to federal courts, creating a comprehensive barrier to justice spanning both state and federal systems: a. When Plaintiff filed his case in state court, OPS improperly removed it to federal court without any legitimate basis for jurisdiction. There was no federal question in the case, which

centered entirely on Nebraska's Public Records Law, and no diversity of citizenship as all parties were Nebraska residents. b. Judge John Gerrard and Judge Robert Rossiter of the federal district court failed to promptly remand the case despite the obvious lack of jurisdiction, allowing OPS to delay the proceedings through clearly improper procedural maneuvering. c. OPS failed to properly serve Plaintiff with notice of removal, violating basic procedural rules. Yet when the case was eventually returned to state court, the state court ignored OPS's procedural violations while strictly enforcing every technical requirement against Plaintiff. d. The Eighth Circuit Court of Appeals, when presented with these issues, issued summary affirmances without addressing the substantive legal arguments, effectively rubber-stamping the lower courts' procedural abuses.

8. **The Logically Impossible Dismissal**: The culmination of this judicial manipulation came in Judge Dougherty's December 13, 2024 order, which contains an explicit logical contradiction that cannot exist in a properly functioning judicial system: a. In this order, Judge Dougherty explicitly ruled: "IT IS THEREFORE ORDERED ADJUDGED AND DECREED that this Court lacks subject matter jurisdiction in this matter and thus the Plaintiff's Complaint and Amended Complaint are hereby dismissed without prejudice." b. Then, in the very next paragraph, he contradicted this ruling: "IT IS FURTHER ORDERED ADJUDGED AND DECREED that in addition to the fact this Court lacks jurisdiction, this matter is hereby dismissed without prejudice for failure to state a claim upon which relief can be granted pursuant to Nebraska Court Rules of Pleadings 6-1112(1) and (6)." c. This creates a logical impossibility that violates the most fundamental principles of civil procedure. As the Supreme Court unequivocally held in Steel Co. v. Citizens for Better Environment, 523 U.S. 83 (1998), if a court lacks subject matter jurisdiction, it has no power whatsoever to render judgment on the merits of a case. d. Justice Scalia specifically described this requirement as "inflexible and without exception," writing: "The requirement that jurisdiction be established as a threshold matter... is 'inflexible and without exception.'" (quoting Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884)). e. A dismissal for failure to state a claim is explicitly a merits determination that requires jurisdiction as a prerequisite. By ruling simultaneously that the court lacks jurisdiction and that the complaint fails to state a claim, Judge Dougherty created a self-negating order that is legally incoherent. f. This contradiction cannot be explained by good-faith error or misunderstanding of law. It represents a deliberate strategy to create multiple dismissal grounds, giving the appellate court options to select whichever would most effectively prevent review.

9. **The Appeals Court Selective Reading**: When Plaintiff appealed to the Nebraska Court of Appeals, the court demonstrated its complicity in the scheme through its selective reading of Judge Dougherty's contradictory order: a. The Court of Appeals dismissed Plaintiff's case claiming lack of jurisdiction because his "amended complaint for mandamus was not properly verified nor supported by affidavits." b. In doing so, the court selectively extracted only the jurisdictional ground from Judge Dougherty's contradictory order while ignoring the logically incompatible merits dismissal in the same document. c. Despite accepting Plaintiff's filing fees and purportedly reviewing his case,

the court failed to identify the fundamental logical contradiction in the district court's ruling – a contradiction so basic that it violates first principles of civil procedure. d. This selective reading cannot be explained by oversight or error. It required the appellate court to actively choose between contradictory grounds in the same order, demonstrating coordination rather than independent judicial action. e. The Court of Appeals further claimed it lacked jurisdiction to review the district court's jurisdictional determination – a position that contradicts the very purpose of appellate review. If appellate courts cannot review jurisdictional determinations, then trial courts could effectively insulate themselves from review by simply declaring "no jurisdiction" in any case they wished to dismiss.

10. **The Eighth Circuit Complicity**: The pattern of obstruction extended to the federal appellate level: a. When Plaintiff petitioned the Eighth Circuit, providing clear evidence of the contradictory orders and procedural manipulation, the court issued a one-sentence summary affirmance that failed to address any of the substantive issues raised. b. The Eighth Circuit deliberately ignored Lieutenant Ott's recorded phone call – direct, uncontested evidence that contradicted the factual basis for their ruling. c. This pattern of summary dismissal without addressing documentary evidence demonstrates that the Eighth Circuit was not functioning as a neutral judicial body but as an active participant in the enterprise of obstruction.

11. **The CharterWest Domain Victory and Its Implications**: Plaintiff's unprecedented success in securing the domain name charterwestbank.com provides compelling corroboration of his claims and demonstrates his credibility: a. Plaintiff successfully obtained and retained ownership of charterwestbank.com, an achievement virtually unheard of in modern domain law, where businesses are almost always able to reclaim their domain names. b. This legal victory effectively validates Plaintiff's assertions about CharterWest's fraudulent conduct. Had there been no merit to Plaintiff's claims, CharterWest Bank would have easily reclaimed their domain through standard domain dispute resolution procedures. c. The fact that Plaintiff maintained ownership of the domain – something that hadn't been successfully done against an existing business in over 20 years – strongly suggests legitimate grievances against the bank and validates his broader pattern of allegations. d. This extraordinary legal outcome should have generated significant media interest but was met with complete silence from Nebraska news outlets, further indicating coordinated suppression. e. The domain victory serves as objective, third-party validation of Plaintiff's claims, demonstrating that independent legal proceedings have found merit in his position when not subject to the coordinated obstruction documented throughout this complaint.

The OPS records suppression conspiracy represents a refinement and escalation of the tactics first deployed in the CharterWest Bank case. What began as institutional protection of a private bank evolved into systematic corruption of every accountability mechanism in Nebraska's

government, all dedicated to preventing a citizen from exercising his statutory right to public information and his constitutional right to petition for redress of grievances.

# XII. THE SYSTEMATIC FORECLOSURE OF ALL REMEDIES

What makes this case extraordinary is not merely the misconduct of individual actors but the systematic foreclosure of every available remedy. The Plaintiff has been trapped in a Kafkaesque nightmare where each institution that should provide a check on the others instead reinforces their obstruction:

## A. Administrative Remedies Foreclosed

1. **The Attorney General's Active Participation in Public Records Violations**: a. Despite having explicit statutory authority to enforce the Public Records Law, the AG has never taken enforcement action against a government entity for violations, regardless of how well-documented or egregious. b. Analysis of the AG's public records opinions over multiple years reveals a pattern of inconsistent reasoning and selective enforcement that consistently favors government entities over requesters. Legal standards shift from opinion to opinion, with the only consistent element being the outcome—government entities prevail. c. The AG published demonstrably false information about the OPS board meeting incident, then refused to correct it when presented with video evidence contradicting their claims. This willful perpetuation of falsehood in official publications represents a fundamental breach of the AG's obligation to uphold the rule of law. d. The AG denied all of Plaintiff's public records requests seeking information about their own investigations, creating a catch-22 where the public cannot obtain information about the AG's failure to enforce transparency laws. This self-protecting secrecy renders the AG's oversight function completely illusory. e. The AG issued a disposition letter claiming that OPS had "faithfully" upheld its NPRL obligations despite the mountain of evidence showing otherwise. This false certification represents not just an error of judgment but active complicity in covering up documented violations. f. When Plaintiff attempted to meet with the AG's office to discuss these issues, Capitol Police physically removed him from the building on three separate occasions, at the direction of AG staff. This use of law enforcement to prevent a citizen from petitioning for redress of grievances represents a particularly alarming abuse of power. g. The AG's Office has explicitly positioned itself as "adversarial" to citizens seeking public records while simultaneously claiming statutory authority to adjudicate disputes over those same records. This inherent contradiction transforms the designated enforcer of transparency laws into an active participant in their violation.

2. **The Ombudsman's Office Abdication of Oversight Responsibility**: a. The Ombudsman is statutorily charged with investigating complaints about any state agency, including the Attorney General's Office. Yet when Plaintiff attempted to file complaints

about the AG's misconduct, the Ombudsman refused to accept them, inventing non-statutory limitations on its own jurisdiction. b. Public Counsel Julie Rogers not only refused to investigate documented violations of law but physically barred Plaintiff from her office, an unprecedented action against a citizen seeking to file legitimate complaints. c. Records obtained later revealed coordination between the Ombudsman's Office and the AG's Office to ensure no meaningful oversight occurred. This collusion between oversight bodies transforms them from checks on power into shields against accountability. d. The Ombudsman created arbitrary standards for accepting complaints that have no basis in law, then applied these standards selectively to reject Plaintiff's complaints while accepting similar complaints from other citizens. e. This pattern of conduct violates the Ombudsman's statutory mandate under Neb. Rev. Stat. § 81-8,240 et seq., which explicitly empowers the office to investigate "administrative acts of administrative agencies," including the Attorney General's Office.

3. **The Structural Paradox in Nebraska's Transparency Enforcement**: a. A fundamental structural defect emerges when examining Nebraska's transparency enforcement mechanism: the AG's Office, which explicitly states it represents state agencies against citizens, is simultaneously designated as the enforcer of public records laws against those same agencies. b. AG's Office staff have openly stated to Plaintiff that they are "adversarial" to citizens because they represent government agencies. This admission demolishes any pretense of neutrality when the AG is called upon to enforce transparency laws against those same agencies. c. This creates an irresolvable conflict of interest that completely subverts the legislative intent behind public records laws. The designated enforcer is structurally incentivized to protect the very violations it is supposed to prevent. d. This is not merely a technical defect but an institutional admission of designed failure. The public records enforcement mechanism was deliberately structured to create the appearance of accountability while ensuring no meaningful enforcement would ever occur.

4. **Other Regulatory and Oversight Bodies' Systemic Failure**: a. The Department of Banking and Finance refused to investigate CharterWest's documented fraud despite clear photographic evidence, establishing the pattern of regulatory capture that would be replicated across other agencies. b. The Federal Reserve Bank of Kansas City and the Consumer Financial Protection Bureau acknowledged complaints but took no meaningful action, demonstrating that the pattern of coordinated inaction extends to federal regulatory bodies. c. The Nebraska Department of Unauthorized Practice of Law, under Mark Weber, launched retaliatory investigations against Plaintiff based on nonexistent complaints from fictional parties, demonstrating that even professional regulatory bodies had been weaponized against citizens seeking accountability. d. The consistent pattern across these diverse agencies with different statutory mandates suggests coordination rather than coincidence, as the likelihood of every single oversight body independently failing in identical ways approaches statistical impossibility.

## B. Judicial Remedies Foreclosed

1. **The Nebraska State Courts' Systematic Prevention of Judicial Review**: a. The "verification" requirement cited in the Nebraska Court of Appeals' dismissal represents the culmination of a pattern of inventing procedural hurdles that cannot be overcome. Despite Plaintiff's efforts to comply with each new requirement, the courts continually shift the standards to ensure no case ever reaches substantive review. b. The courts have applied radically different procedural standards to Plaintiff than to government entities and their attorneys. While Plaintiff's filings are scrutinized for the slightest technical deficiency, opposing counsel routinely violate clear procedural rules without consequence. c. In multiple cases, judges have made provably false statements about the procedural history, claiming events occurred that court records show never happened, or denying the occurrence of events clearly documented in the record. These falsifications of the record cannot be explained by honest error—they represent deliberate manipulation of procedural history to justify predetermined outcomes. d. Judges have allowed opposing counsel to engage in ex parte communications, submit untimely filings, and introduce improper evidence while simultaneously holding Plaintiff to impossible procedural standards. This stark disparity cannot be reconciled with basic principles of due process and equal protection. e. The courts' handling of Plaintiff's cases reflects not just error but manipulation—procedural rules are not being misinterpreted but weaponized to prevent judicial review of government misconduct. f. The most egregious example comes from Judge Dougherty's December 13, 2024 order, which simultaneously dismisses for "lack of jurisdiction" and "failure to state a claim" – a logical impossibility that violates the Supreme Court's explicit holding in Steel Co. v. Citizens for Better Environment that jurisdictional determinations must precede any merits analysis. g. This logical contradiction cannot be explained by incompetence or oversight—it represents a deliberate strategy to create multiple grounds for dismissal, allowing appellate courts to selectively choose whichever ground would most effectively prevent substantive review. h. When Plaintiff directly questioned courts about what would constitute proper verification, judges refused to provide guidance, creating an impossible situation where compliance becomes unattainable by design.

2. **The Federal Courts' Failure to Provide Remedy**: a. When Plaintiff sought relief in federal court, he encountered the same pattern of procedural obstructionism. Cases were dismissed without addressing their merits, often through summary affirmances that provided no substantive analysis. b. The federal courts allowed OPS to engage in forum manipulation through improper removal to federal court, despite the obvious lack of federal jurisdiction. This procedural gamesmanship was permitted for the sole purpose of delay and obstruction. c. Federal judges, including those on the Eighth Circuit Court of Appeals, have repeatedly dismissed well-pled claims through summary affirmances, demonstrating a pattern of federal judicial complicity in preventing meaningful review of local government misconduct. d. The Eighth Circuit refused to address Lieutenant Ott's recorded phone call, which provided direct evidence contradicting the factual basis for their ruling. This deliberate avoidance of dispositive evidence indicates the court was not

functioning as a neutral arbiter but as a participant in the enterprise of obstruction. e. The federal courts' handling of these cases violates their constitutional role as guarantors of federal rights when state courts fail to provide adequate remedies, as established in cases like Monroe v. Pape, 365 U.S. 167 (1961). f. This pattern of federal judicial complicity transforms what might otherwise be a state-level breakdown into a comprehensive failure of the entire judicial system, leaving citizens with no forum in which their claims can receive fair and impartial consideration.

3. **The Cross-Jurisdictional Pattern of Judicial Obstruction**: a. The consistency of obstruction tactics across state and federal courts, and across different judges at different levels of the judicial system, suggests coordination rather than coincidence. The statistical probability of multiple independent judges all employing identical patterns of procedural manipulation approaches zero. b. The specific procedural grounds for dismissal often contradict precedent or create novel requirements never before applied in similar cases. These are not good-faith applications of existing law but ad hoc justifications for predetermined outcomes. c. When Plaintiff successfully navigates one procedural obstacle, a new one immediately appears—creating an endless maze that can never be completed. This pattern of constantly shifting barriers is the hallmark of a system designed not to adjudicate but to obstruct. d. The judicial system's treatment of Plaintiff's cases violates fundamental principles of stare decisis and equal application of law. Other similarly situated litigants receive substantively different treatment, demonstrating that these are not neutral applications of established procedure but targeted obstruction. e. This pattern across both state and federal courts reveals not just individual errors but coordinated obstruction—courts deliberately manipulating procedure to ensure predetermined outcomes rather than applying law to facts. The judiciary has transformed from check on power to its enabler, abandoning its constitutional function in service of institutional protection.

4. **The Logical Impossibility in Judge Dougherty's Order**: a. Judge Dougherty's December 13, 2024 order represents perhaps the most egregious example of judicial manipulation. By dismissing simultaneously for "lack of jurisdiction" and "failure to state a claim," Judge Dougherty created a logical impossibility that cannot exist in a properly functioning judicial system. b. This contradiction directly violates the Supreme Court's holding in Steel Co. v. Citizens for Better Environment, 523 U.S. 83 (1998), where Justice Scalia, writing for the majority, explicitly rejected the practice of "hypothetical jurisdiction" where courts bypass jurisdictional questions to reach merits determinations. c. Justice Scalia described the requirement for jurisdictional determinations before merits considerations as "inflexible and without exception," writing: "The requirement that jurisdiction be established as a threshold matter... is 'inflexible and without exception.'" (quoting Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884)). d. By addressing the merits (failure to state a claim) after declaring lack of jurisdiction, Judge Dougherty violated this fundamental principle, creating a ruling that is not merely incorrect but legally incoherent. e. This contradiction cannot be attributed to oversight or misunderstanding of law—it represents a deliberate strategy to create multiple grounds

for dismissal, giving appellate courts options to select whichever would most effectively prevent review. f. The Court of Appeals' selective extraction of only the jurisdictional ground while ignoring the contradictory merits dismissal in the same document further demonstrates coordination rather than independent judicial action.

## C. Media and Public Exposure Foreclosed

1. **Local Media's Unwillingness to Cover Documented Misconduct**: a. Multiple reporters have initially expressed interest in Plaintiff's story only to suddenly drop it after contacting the very officials they should be investigating, suggesting improper influence or coordination. b. Scott Vorhees of KFAB initially reached out to Spencer Head and the OPS School Board based on his understanding of the concerns. However, after presumably speaking with OPS officials, he silently exited the scene and refused to cover the story, despite its clear public interest value. c. WOWT Digital Media Director Gina Dvorak went even further, illegally suppressing Plaintiff on WOWT's Facebook platform and making false statements under WOWT's official account. When challenged, she provided no explanation for this viewpoint-based censorship. d. No media outlet has reported on Plaintiff's victory regarding the CharterWest Bank website domain, despite this being a significant legal development that vindicated his earlier allegations of fraud. The fact that Plaintiff successfully obtained and maintained ownership of charterwestbank.com—an achievement virtually unheard of in modern domain law—should have generated significant media interest but was met with complete silence. e. This pattern suggests coordination between media entities and the government officials they should be holding accountable. Multiple reporters have initially expressed interest in the story only to suddenly drop it after contacting the very officials they should be investigating. f. This media silence represents a failure of the "fourth estate" function that is supposed to provide an additional check on governmental power when official accountability mechanisms fail.

2. **Political Representatives' Refusal to Intervene**: a. Congressman Don Bacon, when approached about these issues, claimed he couldn't help a citizen being lied about by the state due to "lack of jurisdiction"—an absurd position for a federal representative. He has refused to shed light on the situation or engage with media about these documented abuses. b. State legislators, when presented with evidence of systematic corruption in the implementation of laws they passed, have similarly refused to exercise their oversight authority or propose legislative remedies. c. This political abandonment further reinforces the closed system of unaccountability, where even elected representatives refuse to fulfill their constitutional role as a check on executive and judicial overreach.

3. **Private Attorney Reluctance to Challenge the System**: a. Despite clear evidence of misconduct, attorneys have declined to represent Plaintiff after initially expressing interest in the case. Many have explicitly stated that they fear professional retaliation if they challenge powerful institutions like OPS or the Attorney General's Office. b. This

suggests a legal system where challenging powerful institutions carries professional consequences beyond the normal risks of litigation. Attorneys who rely on maintaining good relationships with courts and government agencies cannot afford to represent citizens challenging systemic corruption. c. The result is a functional monopoly on legal services that prevents meaningful challenges to government misconduct. Citizens are told to "get an attorney" when seeking redress, while simultaneously the system ensures no attorney can afford to take their case. ## VII. MEDIA REGULATORY CAPTURE AND UNJUST ENRICHMENT

4.
5. The final component of Nebraska's accountability collapse involves local media organizations that benefit from special regulatory privileges while systematically failing to fulfill their corresponding public trust obligations. This represents not merely journalistic dereliction but a form of regulatory capture and unjust enrichment that completes the circuit of non-accountability.

6.
7. ### A. Special Regulatory Status and Public Trust Obligations

8.
9. Unlike social media platforms or independent journalists, traditional broadcasters like WOWT operate under Federal Communications Commission licenses that grant them special privileges and access to public airwaves. These privileges include:

10.
11. 1. **Emergency Alert System (EAS) authorization** permitting and requiring them to broadcast emergency notifications
12. 2. **Preferential access to public spectrum** that is fundamentally a limited public resource
13. 3. **"Must-carry" status** on cable and satellite systems within their market
14. 4. **Legal protections and privileged access** to government officials and proceedings
15.
16. These special regulatory privileges are not granted without corresponding obligations. The Communications Act explicitly requires broadcasters to operate in the "public interest, convenience, and necessity." This public interest obligation creates a form of implicit public trust, where broadcasters receive valuable public resources in exchange for serving as trusted information stewards for their communities.

17.
18. ### B. Monetization of Perceived Neutrality and Credibility

19.
20. These media organizations monetize their perceived neutrality, credibility, and public trust status through:

21.
22. 1. **Advertising revenue** based on audience trust and viewership
23. 2. **Digital traffic** generating online advertising revenue
24. 3. **Brand partnerships** leveraging their credibility with the public
25. 4. **Preferential market position** due to regulatory privileges
26.

27. Their economic model fundamentally depends on maintaining the perception that they are neutral, trustworthy sources of information serving the public interest. This perception forms the basis of their value proposition to advertisers and their audience.

28.

29. ### C. Selective Non-Coverage as Unjust Enrichment

30.

31. When these privileged media entities systematically fail to cover documented government corruption or accountability failures, as has occurred throughout this case, they engage in a form of unjust enrichment:

32.

33. 1. They continue to **profit from the perception** of being neutral public interest watchdogs

34. 2. They maintain **preferential regulatory status** and access to public resources

35. 3. They extract **economic value from public trust** while betraying that trust

36. 4. They protect the very **power structures that grant their privileges**

37.

38. This creates a stark economic contradiction: these entities derive financial benefit from the public's perception that they serve as accountability mechanisms, while actively avoiding coverage that would provide actual accountability for governmental misconduct.

39.

40. ### D. Documented Media Suppression in This Case

41.

42. The failings of Nebraska's media institutions are not speculative but documented:

43.

44. 1. Despite receiving detailed evidence of statistical impossibilities in AG opinions, self-contradictory government documents, and on-the-record admissions of procedural manipulation, local media entities including WOWT have provided no substantive coverage.

45.

46. 2. When presented with video evidence contradicting official narratives about the August 2021 OPS meeting, media organizations declined to report on the discrepancies despite their clear newsworthiness.

47.

48. 3. Media entities have failed to investigate or report on the documented disparate treatment in public records responses, where identical records were provided unredacted to one requester while another was charged $1,600 for heavily redacted versions.

49.

50. 4. Local media have demonstrated a pattern of uncritically republishing government press releases and statements while failing to investigate documented contradictions in those same statements.

51.

52. This selective non-coverage cannot be explained by editorial judgment about newsworthiness. Statistical impossibilities in government operations, documented

contradictions in official records, and clear evidence of discriminatory treatment in public access all meet any reasonable standard of newsworthiness. The systematic avoidance of these stories suggests not editorial discretion but participation in the broader accountability-avoidance enterprise.

53.

54. ### E. Completion of the Non-Accountability Circuit

55.

56. This media component completes the circuit of non-accountability:

57.

58. 1. **Government entities** can engage in documented misconduct

59. 2. **Administrative agencies** like the AG's Office can refuse to provide remedies

60. 3. **Courts** can dismiss challenges through procedural manipulation

61. 4. **Media organizations** with special regulatory privileges can suppress public awareness

62. 5. The **public remains uninformed** and unable to exercise democratic accountability

63. 6. All institutional participants in this system **benefit from maintaining it**

64.

65. The media's role is particularly crucial, as it represents the final failsafe in a democratic system of checks and balances. When media entities with special regulatory privileges systematically fail to inform the public about documented government misconduct, they transform from potential accountability mechanisms into active participants in the enterprise of obstruction.

66.

67. ### F. Constitutional and Legal Implications

68.

69. This media regulatory capture raises serious constitutional and legal concerns:

70.

71. 1. **First Amendment considerations**: While media entities have editorial discretion protected by the First Amendment, their operation under special regulatory privileges creates different obligations than those of ordinary private actors.

72.

73. 2. **Public trust doctrine implications**: The public trust doctrine, traditionally applied to natural resources, conceptually extends to the information commons maintained by specially licensed broadcasters utilizing public spectrum.

74.

75. 3. **Unjust enrichment claims**: Media entities derive financial benefit from public perception of their neutrality and watchdog function while failing to perform the function that generates that perception.

76.

77. 4. **Consumer protection issues**: Viewers and advertisers effectively purchase services from these entities based partly on their perceived role as governmental watchdogs, creating potential misrepresentation claims when that role is systematically abandoned.

78.

79. This regulatory capture of media entities represents the final component in Nebraska's comprehensive circuit of non-accountability. When specially privileged media organizations systematically fail to report on documented government misconduct, they transform from potential accountability mechanisms into active participants in the enterprise of obstruction, completing the circuit that renders transparency laws functionally meaningless.

b. The courts' handling of Plaintiff's cases represents a dramatic and unexplained departure from these established precedents, suggesting not good-faith legal interpretation but deliberate obstruction. c. This selective disregard for binding precedent violates the principle of stare decisis, which the Nebraska Supreme Court has described as "the bedrock of our common-law jurisprudence." State v. Hausmann, 277 Neb. 819, 828, 765 N.W.2d 219, 226 (2009).

The Constitutional Implications of Statutory Nullification: a. When a statutory right as fundamental as access to public information can be so comprehensively nullified, it raises profound questions about whether the rule of law still operates in Nebraska: i. Legislative enactments become meaningless if executive agencies can ignore them with impunity and courts refuse to enforce them. ii. The comprehensive subversion of the Public Records Law documented here represents not just violations of particular provisions but the nullification of the entire statutory scheme. iii. This nullification of statutory law by executive and judicial action represents a constitutional crisis that demands extraordinary judicial intervention. b. The Supreme Court has recognized that "the duty of the courts is to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." Boyd v. United States, 116 U.S. 616, 635 (1886). The systematic nullification of the Public Records Law represents precisely such a "stealthy encroachment" on citizens' rights to government transparency.

The Inherent Contradiction in the AG's Dual Role: a. The AG's Office has explicitly positioned itself as "adversarial" to citizens seeking public records while simultaneously claiming statutory authority to adjudicate disputes over those same records. This creates an irreconcilable conflict of interest that fundamentally corrupts the entire enforcement mechanism: i. The designated enforcer of the law has declared itself an adversary to those seeking enforcement. ii. This contradictory position explains the AG's perfect record of ruling in favor of government entities in public records disputes. iii. This arrangement is not a minor administrative quirk but a structural defect that renders the entire enforcement mechanism meaningless. b. The Supreme Court has recognized that due process requires a neutral decision-maker, not one with an "unconstitutional potential for bias." Schweiker v. McClure, 456 U.S. 188, 196 (1982). The AG's explicit adversarial stance creates precisely such an unconstitutional bias. c. This structural defect in Nebraska's public records enforcement system represents not just a state law violation but a constitutional due process violation that requires federal intervention.

D. The Evidence of Deliberate Manipulation Rather Than Good-Faith Error

The "Verification" Requirement as Pretext: a. The most recent dismissal of Plaintiff's case hinges on an alleged failure to properly "verify" his complaint—yet this requirement has been manipulated in ways that expose its pretextual nature: i. The verification standard cited by the Court of Appeals, based on State ex rel. Malone v. Baldonado-Bellamy, is selectively enforced against Plaintiff while similar requirements are waived for institutional litigants. ii. Plaintiff has consistently certified his filings "under penalty of perjury," the standard federal verification language, which should satisfy any reasonable verification requirement. iii. Nebraska law does not prescribe any particular form of verification for mandamus actions. The court has invented increasingly specific requirements that have no basis in statute or consistent precedent. b. The selective enforcement of this procedural requirement demonstrates that it is not about ensuring the integrity of the process but about preventing judicial review of government misconduct: i. In numerous other mandamus cases, Nebraska courts have accepted various forms of verification or waived the requirement entirely. Only in Plaintiff's cases has this requirement been elevated to a jurisdictional barrier that cannot be corrected. ii. Each time Plaintiff attempts to comply with the court's stated verification requirements, the requirements change, creating a moving target that can never be hit. iii. The timing of dismissals consistently prevents any examination of the merits of Plaintiff's claims, regardless of the procedural posture or the form of verification provided.

The Pattern of Selective Procedural Enforcement: a. The courts have applied radically different procedural standards to Plaintiff than to government entities and their attorneys: i. OPS's last-minute motion to dismiss filed less than 24 hours before a hearing was allowed despite court rules requiring reasonable notice, while Plaintiff's timely motions were rejected for minor technical deficiencies. ii. OPS's failure to properly serve Plaintiff with notice of removal to federal court was overlooked, while Plaintiff's alleged service deficiencies were treated as fatal to his case. iii. OPS was permitted to submit untimely filings and engage in ex parte communications without consequences, while Plaintiff was held to an impossible standard of procedural perfection. b. This disparity cannot be reconciled with basic principles of due process and equal protection, which require that procedural rules be applied equally to all litigants. c. The Supreme Court has held that "the Constitution recognizes higher values than speed and efficiency," and that procedural due process requires "the right to be heard before being condemned to suffer grievous loss of any kind." Fuentes v. Shevin, 407 U.S. 67, 90-91 (1972) (internal quotations omitted).

The Logically Impossible Order as Evidence of Deliberate Manipulation: a. Judge Dougherty's December 13, 2024 order, which simultaneously dismisses for "lack of jurisdiction" and "failure to state a claim," represents perhaps the most compelling evidence of deliberate manipulation rather than good-faith error. b. This contradiction cannot be explained by incompetence or oversight—it violates a fundamental principle of civil procedure that first-year law students learn: if a court lacks jurisdiction, it cannot rule on the merits. c. The Supreme Court's decision in Steel Co. v. Citizens for Better Environment, 523 U.S. 83 (1998), explicitly rejected the practice of "hypothetical jurisdiction" where courts bypass jurisdictional questions to reach merits determinations. Justice Scalia described this requirement as "inflexible and without exception." d. By addressing the merits (failure to state a claim) after declaring lack of jurisdiction, Judge Dougherty created a ruling that is not merely incorrect but legally incoherent in a way that cannot be explained by good-faith error. e. The Court of Appeals' selective extraction of only the jurisdictional ground while ignoring the contradictory merits dismissal in the same document further demonstrates coordination rather than independent judicial action.

The Statistical Impossibility of Coincidence: a. The consistency of obstruction tactics across different institutions, different judges, and different time periods creates a statistical impossibility of coincidence: i. Multiple judges independently applying identical patterns of procedural manipulation that consistently prevent substantive review of Plaintiff's claims. ii. Multiple agencies independently reaching identical conclusions without investigation, all protecting the same interests in the same way. iii. Multiple courts independently making the same procedural "errors" that all happen to prevent Plaintiff's claims from receiving substantive review. b. The statistical probability of these patterns occurring independently across so many different institutions and individuals approaches zero, leaving coordination as the only plausible explanation. c. Courts have recognized that pattern evidence can establish intent in discrimination cases. See Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266 (1977) (noting that a "clear pattern, unexplainable on grounds other than [improper motive]" can establish intent). The same principle applies here—the pattern of procedural manipulation is unexplainable on grounds other than deliberate obstruction.

E. The Evidence Compels a Finding of Constitutional Crisis

The Totality of Evidence and Its Implications: a. The totality of evidence presented compels a finding that Nebraska's constitutional system of checks and balances has effectively collapsed: i. Executive agencies violate the law with impunity, secure in the knowledge that no oversight mechanism will hold them accountable. ii. Courts manipulate procedural rules to prevent review

of executive misconduct, transforming themselves from checks on power into its enablers. iii. Independent oversight bodies coordinate with the very entities they are supposed to monitor, creating a closed system impervious to citizen complaints. iv. Media entities either ignore evidence of corruption or actively participate in suppressing it, eliminating the final check of public exposure. b. This systemic failure represents a constitutional crisis requiring extraordinary judicial intervention: i. When normal channels of accountability have been systematically foreclosed, the federal courts represent the last bulwark against the complete collapse of constitutional governance. ii. The evidence presented in this case is not merely of individual errors or misconduct but of the comprehensive failure of an entire system of constitutional governance. iii. This Court has not only the authority but the duty to intervene when state governmental structures have been so thoroughly corrupted that citizens have no meaningful remedies for constitutional violations.

The Implications for Democratic Governance: a. The systematic dismantling of accountability mechanisms strikes at the heart of democratic governance: i. When citizens cannot access public information about their government, they cannot make informed decisions as voters. ii. When courts refuse to enforce statutory rights, the legislative branch is effectively neutered. iii. When executive agencies can violate the law with impunity, the rule of law itself collapses. iv. When all branches of government coordinate to obstruct citizen oversight, government "of the people, by the people, for the people" ceases to exist in any meaningful sense. b. The Supreme Court has recognized that "the very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 163 (1803). The systematic foreclosure of all remedies documented here directly contradicts this foundational principle. c. When citizens have no meaningful recourse against government misconduct, the social contract itself is undermined. See THE FEDERALIST NO. 51 (James Madison) ("If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary.").

The Necessity of Federal Intervention: a. In cases of systematic state failure to protect constitutional rights, federal intervention becomes necessary to preserve the constitutional order itself: i. The Reconstruction Amendments and subsequent civil rights legislation explicitly recognized that federal intervention is sometimes necessary when state institutions systematically fail to protect constitutional rights. ii. In Cooper v. Aaron, 358 U.S. 1 (1958), the Supreme Court affirmed that federal judicial authority must intervene when state institutions systematically fail to protect constitutional rights. iii. In Mitchum v. Foster, 407 U.S. 225 (1972), the Court recognized that federal courts must have the power to enjoin state proceedings when

necessary to protect federal rights from state court abuse. b. This case presents precisely the type of systemic failure that necessitates federal intervention—a complete breakdown of state accountability mechanisms that leaves citizens with no meaningful recourse for vindication of their rights. c. When state courts become active participants in the violation of federal rights rather than their protectors, federal intervention is not merely justified but required by the Supremacy Clause and the constitutional structure.

XVIII. CAUSES OF ACTION

COUNT I - RICO VIOLATIONS (18 U.S.C. § 1962(c))

(Against All Defendants)

The allegations set forth above tell a chilling story of public corruption metastasizing into a criminal enterprise of the first order. By operating this illicit scheme through their various government offices and positions, the Defendants have transformed the very institutions charged with upholding the law into racketeering enterprises violating it.

Each Defendant pursued a pattern of racketeering activity, freely employing the tools of wire fraud, mail fraud, obstruction of justice, and witness retaliation to perpetrate their unlawful ends and conceal the depths of their conspiracy. With each fraudulent email, each incident of coordinated legal deception, each retaliatory proceeding launched on manufactured grounds, the Defendants engaged in predicate criminal acts under RICO.

The Defendants' crimes were not coincidental, parallel misdeeds, but closely coordinated acts in furtherance of a unitary scheme. Each participant played a critical role, from issuing false legal justifications to destroying records, from initiating sham proceedings to obstructing investigations. This interwoven pattern of concerted unlawful activity affecting interstate commerce renders the Defendants liable for operating a racketeering enterprise under 18 U.S.C. § 1962(c).

COUNT II - RICO CONSPIRACY (18 U.S.C. § 1962(d))

(Against All Defendants)

The Defendants were not content to merely perpetrate racketeering activities—they confederated to do so, entering a mutual pact to violate RICO. Each participant willfully joined the cabal, agreeing to pool their collective authority and resources to achieve through teamwork what they could not accomplish alone: the destruction of transparency in Nebraska government.

In service of their corrupt bargain, each conspirator agreed to commit multiple predicate acts. These were not mere tacit understandings, but explicit plans to break the law, laid bare through

numerous communications. With shared purpose, the Defendants lined up to obstruct, to defraud, to cheat the public of their right to an honest government.

The conspiracy's success depended on different players performing different functions—attorneys fabricating legal excuses, commissioners launching retaliatory actions, records custodians denying access. Yet they all moved in concert as part of a cohesive criminal enterprise, and each bears full culpability for their confederates' misdeeds under 18 U.S.C. § 1962(d).

COUNT III - CIVIL RIGHTS VIOLATIONS (42 U.S.C. § 1983)

(Against All Defendants)

The Defendants did not merely violate the letter of the law—they trampled the most sacred constitutional rights of their fellow citizens. With the power of the state weaponized as an instrument of retaliation, Defendants sought to quash the Plaintiff's freedom of speech, freedom to petition, and freedom to seek truth in government. Due process and equal protection were rendered meaningless by agencies that could obstruct and retaliate at will. Access to the courts was a sham, with even the judiciary conscripted into the Defendants' conspiracy.

Though they may have draped themselves in official titles, the Defendants' lawless actions under color of state law served no public end—only the corrupt aims of the enterprise. Retaliating against whistleblowers, manufacturing fraudulent proceedings, hiding public records from the public—these are not legitimate governmental functions, but gross abuses of power. As such, the Defendants are liable under 42 U.S.C. § 1983 for their brazen violations of the Plaintiff's constitutional rights.

COUNT IV - NEBRASKA PUBLIC RECORDS ACT VIOLATIONS

(Against Peterson, Hilgers, Donley, Kramer, MacFarland)

The Nebraska Public Records Act is not a mere box to be checked, but the legal embodiment of the public's right to an open government. In flouting these laws, the Attorney General's Office and its accomplices did not simply neglect a legal duty—they betrayed a solemn promise to the people of Nebraska.

The Defendants' violations were not casual oversights, but deliberate, willful acts to conceal their troubled doings. Records requests were met with false denials and fraudulent justifications. Damaging documents were destroyed or hidden, while the gatekeepers of public information schemed to restrict access. Honest requests for government accountability were reframed as acts of defiance, punishable by retaliatory measures. These practices were not mishaps, but willful violations of the Public Records Act's letter and spirit.

COUNT V - DEFAMATION

(Against Davidson)

Words have power, and in labeling the Plaintiff a "security threat," Defendant Davidson hurled the weight of his malicious lies straight at the Plaintiff's hard-earned reputation. This charge, presented as a statement of official fact, was pure fabrication from start to finish—an invention of Davidson's spiteful imagination, designed to smear the Plaintiff and shield the enterprise's wrongdoing.

Davidson well knew the falsity of his claims when he broadcast them to the world. Truth was immaterial; what mattered was crippling the Plaintiff's credibility and justifying the Defendants' campaign of harassment under a fraudulent banner of "security." The public now views the Plaintiff as a dangerous individual, though the only threat he poses is to the Defendants' corruption. For this malicious defamation, Davidson must be held to account.

COUNT VI - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(Against Davidson)

Defendant Davidson's outrageous conduct in falsely branding the Plaintiff a security threat transcended the bounds of decency and constituted an intentional infliction of emotional distress upon the Plaintiff. Davidson's actions were so extreme and beyond the pale of civil conduct as to be utterly intolerable in a civilized society.

At the time he made the defamatory statements, Davidson knew or should have known that his false claims would inflict severe emotional distress upon the Plaintiff. Davidson's sole motivation was to harass, intimidate, and retaliate against the Plaintiff for exposing the enterprise's misconduct. The resulting anguish, humiliation, and reputational harm were both foreseeable and intentional consequences of Davidson's malicious actions.

As a direct and proximate result of Davidson's extreme and outrageous conduct, the Plaintiff suffered severe emotional distress, anguish, loss of personal and professional reputation, and other significant damages. Davidson is liable for the full measure of compensatory and punitive damages flowing from his unconscionable behavior.

XIX. ANTICIPATORY RESPONSE TO POTENTIAL DISMISSAL ARGUMENTS

A. Jurisdiction and Immunity

The Defendants may seek to cloak themselves in sovereign immunity, but this is no mere dispute over government policy. These officials stepped far outside the legitimate bounds of their authority to perpetrate fraud, and no immunity can shield such ultra vires misconduct. Ex parte Young has long affirmed that state actors may be held to account for unconstitutional abuses, and §1983 codifies the right to bring them to justice. The Plaintiff seeks relief against the Defendants as individuals—as racketeers who only borrowed the state's power to violate the law—not against the state itself. Immunity cannot mean impunity for public corruption.

Nor can the Defendants hide behind the Rooker-Feldman doctrine. This case is not an invite for the Court to sit in appeal of prior judgments, but to address an ongoing criminal enterprise that

continues to inflict fresh injuries. The Plaintiff presents new evidence of new predicate acts—an ever-growing tapestry of fraud that no previous case could have encompassed in its entirety. The Defendants' scheme persists, and with it the grounds for this Court to take action without impinging on past decisions.

The Plaintiff has felt the sting of the Defendants' retaliation too directly to be accused of lacking standing. He was in the cross-hairs of the smear campaign that painted him a security threat on false pretenses. He bore the weight of the sham disciplinary proceedings launched to impede his efforts. And he suffered the loss of access to public records necessary to hold his government accountable. The Plaintiff's injuries are real, they are severe, and they are ongoing—the textbook grounds to seek relief in this Court.

## B. Sufficiency of RICO Claims

The Defendants may bluster that RICO does not reach their actions, but the facts speak for themselves. The participants in this scheme did not act in isolation—they formed a cohesive unit that jointly pursued an agenda of concealment and retaliation, a picture-perfect "enterprise" under RICO. From fraudulent emails to deceptive notices to corrupt court filings, the Defendants engaged in predicate acts with devastating consistency. This pattern of racketeering stretched back years and continues to this day, and has injured the Plaintiff and imperiled the integrity of Nebraska's government. RICO's application could not be more appropriate.

Indeed, the RICO jurisprudence is replete with schemes analogous to this one, in which government officials abused their power for unlawful ends. As the Supreme Court affirmed in Bridge v. Phoenix Bond, public corruption schemes fall squarely within RICO's ambit when officials use their authority to commit fraud. Whether the office abused is an attorney general's chambers or a police precinct or a school administration building, the law does not discriminate. Nor does it matter that the Defendants' aim was to conceal information rather than line their own pockets. RICO recognizes that political machines can warp government functions for myriad improper purposes, all of them corrosive to the public trust. The Defendants' corruption of state agencies as repositories for their illicit activities more than suffices to establish a RICO enterprise.

## C. Judicial Immunity Limitations

For any other defendant, the shield of immunity would have long since shattered under the weight of such brazen misconduct. Defendant Dougherty cannot escape accountability solely because he wore a judicial robe while conspiring to break the law. His participation was not limited to the adjudication of cases, but bled over into administration, policymaking, and improper coordination with other defendants—acts wholly outside the judicial function that immunity is meant to protect. Any judge who wields his office as a weapon to retaliate against litigants and cover up government misdeeds has no claim to the limited immunity afforded to public servants acting in good faith. If Defendant Dougherty wishes to emulate the conduct of his co-conspirators, then he can join them in facing the consequences as well.

The Supreme Court has clearly established that judicial immunity does NOT apply when judges engage in administrative or conspiratorial misconduct. See Forrester v. White, 484 U.S. 219 (1988). This precedent proves that judicial immunity is limited to judicial acts performed within the court's jurisdiction—not to administrative actions, and certainly not to participation in criminal conspiracies.

D. Supervisory Liability

The Defendants at the upper echelons of the Attorney General's Office may seek to evade responsibility for conduct they "merely" enabled, but the law recognizes no such hair-splitting. Defendant Peterson and his successor Defendant Hilgers set policies that directly facilitated the enterprise's misdeeds—not just negligent oversight, but deliberate efforts to shield wrongdoing from public scrutiny. Through their fraudulent legal flunky Defendant Donley and others, they actively participated in deceiving citizens about their rights. And perhaps most damning of all, they did nothing to arrest this runaway corruption despite having the knowledge and power to do so. The Defendants' integral roles in the RICO scheme are undeniable and well-documented, and neither the loftiness nor fungibility of their titles can spare them from liability.

E. Statute of Limitations

The Defendants' racketeering is as alive today as when it first reared its head. Each new fraudulent denial or retaliatory act represents a distinct predicate crime, freshly resetting the limitations clock. And through every deceptive legal memorandum and concealment of public documents, the Defendants actively hid their misdeeds from the Plaintiff until their staggering scope came into focus. Such fraudulent concealment would toll any limitations period until the pattern of racketeering came to light. The Plaintiff has diligently investigated and asserted his claims from the first whiff of impropriety, and the Defendants cannot run out the clock on their own wrongdoing.

F. Administrative Exhaustion

The Plaintiff's claims sound predominantly in RICO and §1983, for which the courthouse doors are open without any administrative preamble. For causes that could implicate agency processes in theory—such as violations of the Public Records Act—pursuing that path would only cast the Plaintiff into a bureaucratic hall of mirrors. The Defendants have already shown their propensity to manipulate internal proceedings to suppress dissent. The administrative realm is the empire of their co-conspirators who remain in power, poised to abuse procedure just as their deposed brethren did. Where the Ombudsman abets the fraud, where the Attorney General openly strategizes to excuse it, what use would exhausting administrative remedies be except to exhaust the Plaintiff's resources and delay his day in court?

Furthermore, the AG's Office has explicitly declared itself "adversarial" to citizens seeking public records while simultaneously claiming to be the arbiter of disputes over those records. This inherent and acknowledged conflict of interest renders administrative remedies not merely inadequate but a sham. The law does not force a plaintiff to submit to a rigged game.

G. RICO Applicability

The Defendants clothed themselves in the garb of officialdom, but wielded the levers of government for personal, partisan, and decidedly non-governmental ends. It simply defies belief to argue, as the Defendants surely will, that conspiring to hide public records and retaliate against whistleblowers is all in a day's work for a public servant. These actions are not just ultra vires, but the antithesis of proper government and the embodiment of the self-serving corruption RICO is meant to uproot. If anything, the Defendants' public positions render their betrayal of the law even more egregious.

The Supreme Court dispatched with any distinction between private and public RICO enterprises in United States v. Salinas, emphasizing that the statute extends to any illicit conduct with a nexus to interstate commerce. And even if the majority of the Defendants were nominally state employees, private parties such as Defendants Kramer and MacFarland willingly joined their criminal scheme as well. Their overriding aim was not to formulate policy, but to protect their shared pecuniary and political interests by breaking the law. Government office provided the Defendants a convenient base for their racketeering, but it did not shape their fundamental purpose. Nor can it shield them from the same liability that any other RICO violator would face.

XX. REMEDIES REQUESTED: EXTRAORDINARY INTERVENTION JUSTIFIED BY EXTRAORDINARY CIRCUMSTANCES

Given the complete breakdown of ordinary checks and balances, this Court must exercise its extraordinary authority to ensure that justice remains accessible. The unprecedented nature of the coordinated institutional obstruction documented here justifies equally unprecedented remedies.

A. Declaratory Relief

Declaration of Constitutional Violations: a. A declaration that the Nebraska courts' application of verification requirements in Plaintiff's cases violates due process and equal protection principles: i. The shifting and selective application of these requirements creates an arbitrary barrier to justice with no basis in consistent legal principles. ii. The requirement as applied functions not as a legitimate procedural safeguard but as a pretext for preventing review of government misconduct. iii. This selective enforcement violates both the procedural and substantive aspects of the Due Process Clause. b. A declaration that Judge Dougherty's December 13, 2024 order, which simultaneously dismisses for "lack of jurisdiction" and "failure to state a claim," is legally void as a violation of fundamental due process principles and the Supreme Court's explicit holding in Steel Co. v. Citizens for Better Environment, 523 U.S. 83 (1998). c. A declaration that the Attorney General's refusal to correct demonstrably false information in published opinions constitutes a violation of statutory and constitutional obligations: i. The AG has a statutory duty to enforce the Public Records Law and provide accurate legal guidance to the public. ii. The willful publication and maintenance of false information in official opinions violates this statutory mandate and undermines the constitutional

principle of transparent governance. iii. This Court should declare that the AG's current practices violate both statutory and constitutional requirements. d. A declaration that OPS's pattern of records manipulation and viewpoint discrimination violates the Nebraska Public Records Law and the First Amendment: i. The evidence demonstrates a clear pattern of treating different requesters differently based on their viewpoint, in violation of both statutory and constitutional principles. ii. OPS's practices of excessive redaction, false certification, and prohibiting in-person inspection violate specific provisions of the Nebraska Public Records Law. iii. This Court should declare that these practices are unlawful and cannot continue. e. A declaration that the Attorney General's inherent conflict of interest in public records enforcement violates due process: i. The AG's explicit positioning as "adversarial" to citizens while claiming to adjudicate their disputes creates a structural bias that violates fundamental due process. ii. This inherent conflict renders the entire public records enforcement mechanism constitutionally defective. iii. The Court should declare that this arrangement violates the Due Process Clause of the Fourteenth Amendment.

Declaration of RICO Enterprise: a. A declaration that the defendants' coordinated pattern of obstruction constitutes a RICO enterprise engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). b. A declaration identifying the specific predicate acts committed by each defendant, including mail fraud, wire fraud, obstruction of justice, and witness retaliation. c. A declaration that the enterprise's activities have caused direct injury to Plaintiff's business and property through enforcement of fraudulent filing fees, excessive document costs, and other quantifiable financial harms. d. A declaration that the enterprise continues to operate through the present day, as evidenced by the February 24, 2025 Court of Appeals dismissal.

B. Injunctive Relief

Public Records Production and Transparency: a. An injunction requiring OPS to produce all requested public records without excessive redaction or cost: i. OPS should be ordered to provide complete, unredacted copies of all records previously requested by Plaintiff, except where specific statutory exemptions apply. ii. Where exemptions are claimed, OPS should be required to provide a detailed, item-by-item justification for each redaction or withholding. iii. OPS should be prohibited from charging excessive fees or treating different requesters differently based on viewpoint. iv. OPS should be required to allow in-person inspection of public records as provided by the Nebraska Public Records Law. b. An injunction requiring the Nebraska Attorney General to enforce the Public Records Law impartially and correct false information in published opinions: i. The AG should be ordered to review and investigate all of

Plaintiff's previously submitted complaints about public records violations. ii. The AG should be required to correct demonstrably false statements in published opinions, particularly regarding the OPS board meeting incident. iii. The AG should be prohibited from selectively publishing certain records denial letters while withholding others. iv. The AG should be required to establish clear, objective standards for public records enforcement that apply equally to all requesters regardless of viewpoint. v. The AG should be required to recuse itself from adjudicating public records disputes as long as it maintains its "adversarial" position toward citizens seeking records.

Judicial System Reforms: a. An injunction prohibiting the Nebraska courts from applying verification requirements in a discriminatory or arbitrary manner: i. The courts should be required to apply consistent standards to all litigants, regardless of their status as individuals or institutions. ii. Any verification requirement must be clearly articulated in advance and consistently applied. iii. Technical deficiencies in verification should be subject to correction rather than treated as jurisdictional barriers. iv. Pro se litigants should be held to the standard established in Haines v. Kerner, 404 U.S. 519 (1972), which requires liberal construction of their pleadings. b. An injunction requiring adequate procedural protections: i. Courts should be required to provide specific, written explanations of any procedural deficiencies, with clear guidance on how to correct them. ii. Courts should be prohibited from creating novel procedural requirements not found in statute or consistent precedent. iii. Courts should be required to apply procedural rules equally to all litigants, with written justification for any disparate application. iv. Ex parte communications between judges and litigants or their counsel should be prohibited, with mandatory disclosure of any inadvertent contact.

RICO Enterprise Dissolution: a. An injunction prohibiting the defendants from continuing to operate the RICO enterprise: i. Defendants should be prohibited from coordinating responses to public records requests or related legal proceedings. ii. Defendants should be prohibited from retaliating against citizens seeking public records or filing complaints. iii. Defendants should be prohibited from using procedural mechanisms to obstruct substantive review of public records disputes. iv. Defendants should be prohibited from communicating with each other regarding strategies for obstruction or retaliation. b. An injunction requiring internal safeguards against future RICO violations: i. Each defendant organization should be required to establish written policies prohibiting the types of coordination documented in this case. ii. Each defendant organization should be required to implement training programs on proper handling of public records requests and related legal proceedings. iii. Each defendant organization should be required to establish internal whistleblower protections for employees who report misconduct. iv. Each defendant organization should be required to document all communications regarding

public records requests and related legal proceedings, with regular reporting to the monitoring committee described below.

C. Appointment of Independent Monitors

Independent Investigation of Coordinated Obstruction: a. This Court should appoint a special master or independent investigator to examine the connections between the various actors and institutions involved in obstructing transparency and accountability. b. This investigation should have subpoena power and the authority to review internal communications between agencies, courts, and private entities like Baird Holm. c. The investigator should have authority to take sworn testimony from all defendants and other relevant witnesses, with appropriate immunity protections for whistleblowers. d. The investigator should issue a public report detailing the extent of coordination and identifying the key participants in the enterprise, with specific findings regarding each predicate act and each defendant's role.

Special Master for Public Records Compliance: a. The appointment of a special master to oversee Nebraska's public records compliance until institutional integrity can be restored: i. The special master should have the authority to review records denials, assess the legitimacy of claimed exemptions, and order production where appropriate. ii. All public records requests to OPS and the Attorney General's Office should be subject to review by the special master to ensure consistent and lawful handling. iii. The special master should have authority to hear complaints about public records violations and issue binding determinations. iv. The special master should issue regular public reports on compliance with transparency laws and the progress toward institutional reform.

Judicial Monitoring Committee: a. The establishment of a monitoring committee to ensure judicial integrity in cases involving government transparency: i. This committee should review dismissals based on procedural grounds to ensure they reflect legitimate application of neutral principles rather than pretextual justifications. ii. The committee should have the authority to refer cases of judicial misconduct to appropriate authorities, including theTo establish a civil RICO claim, a plaintiff must prove: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing injury to the plaintiff's business or property. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985). Each of these elements is clearly satisfied in this case:

Conduct: Each defendant has participated in the management or operation of the enterprise through a pattern of racketeering activity. See Reves v. Ernst & Young, 507 U.S. 170, 179 (1993) (establishing the "operation or management" test). a. The defendants' participation extends beyond passive association, including active coordination, concealment of evidence, falsification of records, obstruction of justice, and witness intimidation. b. The level of participation varies from defendants who directed activities (like Attorney General Mike Hilgers, Judge Duane Dougherty, and OPS Board President Shavonna Holman) to those who executed specific aspects of the scheme (like Records Keeper Anne MacFarland and Assistant Attorneys General). c. All defendants played some part in "operating or managing" the enterprise, as required by Reves, through their respective roles in the coordinated obstruction of transparency and accountability.

Enterprise: The defendants collectively form an "enterprise" within the meaning of 18 U.S.C. § 1961(4), which defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." a. The Supreme Court has held that a RICO enterprise must have three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. See Boyle v. United States, 556 U.S. 938, 946 (2009). b. Purpose: The enterprise has a clear common purpose—preventing transparency and accountability for government misconduct through coordinated obstruction of public records access and manipulation of procedural mechanisms to prevent judicial review. c. Relationships: The evidence demonstrates extensive relationships among the defendants, including: i. Communications between the Attorney General's Office and OPS attorneys ii. Coordination between OPS officials and law enforcement before filing retaliatory actions iii. Ex parte communications between judges and opposing counsel iv. Synchronized procedural maneuvers across state and federal courts v. Consistent patterns of obstruction across nominally independent agencies d. Longevity: The enterprise has operated continuously since at least 2018 (in the CharterWest matter) and intensified its activities from 2021-2025 (in the OPS records matter), easily satisfying the longevity requirement. e. The enterprise's structure extends beyond the formal boundaries of government agencies and private firms, functioning as an "association-in-fact" that coordinates across institutional boundaries to achieve its shared objective.

Pattern: The defendants' conduct constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), which requires at least two acts of racketeering activity within a ten-year period. a. The Supreme Court has held that a pattern requires both "relatedness" and "continuity." See H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989). b. Relatedness: The predicate acts are related by similar methods, participants, and objectives, forming a coherent pattern rather than isolated incidents. Each predicate act serves the common purpose of obstructing transparency and preventing accountability. c. Continuity: The predicate acts span more than seven years, from 2018 to 2025, demonstrating "closed-ended continuity." See H.J. Inc., 492 U.S. at 241-42 (describing closed-ended continuity as a series of related predicates extending over a substantial period). d. The pattern also demonstrates "open-ended continuity" as it poses a threat of continued criminal activity. The February 2025 Court of Appeals dismissal demonstrates that the pattern continues unabated to the present day, with no indication that it will cease without external intervention.

Racketeering Activity: The defendants have committed numerous predicate acts that constitute "racketeering activity" as defined in 18 U.S.C. § 1961(1), including: a. Mail fraud (18 U.S.C. § 1341) b. Wire fraud (18 U.S.C. § 1343) c. Obstruction of justice (18 U.S.C. § 1503) d. Witness retaliation (18 U.S.C. § 1513) e. These predicate acts are detailed specifically in Section C below.

Injury: Plaintiff has suffered concrete injury to his business and property as a result of the RICO violations, including: a. Direct financial loss through payment of filing fees for proceedings that were predetermined to be dismissed b. Direct financial loss through payment of approximately $1,600 for heavily redacted documents that were later provided unredacted to others for free c. Direct financial loss through costs associated with transcript preparation and document reproduction d. Loss of valuable time and resources that could have been devoted to productive business activities e. The Supreme Court has held that financial losses constitute injury to "business or property" for RICO purposes. See Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979).

B. The Enterprise's Structure and Operations

The evidence reveals a sophisticated network of public officials, private attorneys, and institutional leaders working in concert to obstruct transparency and silence whistleblowers:

Executive Branch Participants: a. The Nebraska Attorney General's Office serves as the legal shield for the enterprise, refusing to enforce transparency laws, issuing fraudulent legal opinions to justify non-compliance, and coordinating strategy with other participants. b. OPS officials serve as the frontline obstruction, withholding records, charging excessive fees, providing false certifications to courts, and retaliating against critics through fraudulent legal proceedings. c. The Nebraska Ombudsman's Office serves as a secondary shield, refusing to investigate complaints about the Attorney General's Office and physically preventing citizens from filing complaints. d. The Department of Banking and Finance provides regulatory protection for financial institutions engaged in fraudulent practices, refusing to investigate documented fraud and coordinating responses with other agencies.

Judicial Branch Participants: a. State court judges, including Duane Dougherty and Shelly Stratman, manipulate procedural rules to prevent judicial review, issue logically contradictory rulings, make provably false statements about procedural history, and apply different standards to different litigants. b. Federal judges, including John Gerrard, Robert Rossiter, and the Eighth Circuit panel, permit improper forum manipulation, delay remand of cases lacking federal jurisdiction, and issue summary affirmances without addressing documentary evidence. c. Court staff, including clerks and reporters, facilitate this judicial misconduct by processing improper ex parte communications and selectively applying filing requirements.

Law Enforcement Participants: a. Omaha Police Department officers, including Lieutenant Charles Ott and Officer Steve Lee, intimidate citizens seeking accountability, coordinate with institutional defendants before retaliatory legal actions, and attempt to frame legitimate political speech as mental health issues. b. Capitol Police officers physically remove citizens from public buildings for attempting to file complaints or request information through established channels.

Private Attorney Participants: a. Baird Holm attorneys, including Steve Davidson, David Kramer, Jill Ackerman, and Cameron Finke, serve as legal enforcers for the enterprise, drafting fraudulent legal justifications, filing retaliatory lawsuits, engaging in ex parte communications with judges, and making provably false statements in court proceedings. b. Attorneys from the Federal Reserve Bank of Kansas City, including Todd Ruskamp, Jeffrey Nix, Devon Ritter, and D. Welch, provide additional legal cover, coordinating responses across institutional boundaries to ensure consistent obstruction.

Financial Institution Participants: a. CharterWest Bank executives, including Gary Walters, initiated the pattern of fraud and coordination by falsifying loan documents and then leveraging institutional connections to prevent regulatory accountability. b. These executives maintained coordination with regulatory bodies to ensure that complaints were dismissed without investigation, establishing the template for subsequent obstruction.

Operational Structure and Methods: a. The enterprise operates through a sophisticated playbook that is applied consistently across different contexts and years: i. Initial Denial: When public records are requested, they are initially denied, excessively redacted, or provided at exorbitant cost. ii. Administrative Obstruction: When administrative review is sought, oversight agencies coordinate to ensure no meaningful investigation occurs. iii. Procedural Manipulation: When judicial review is sought, courts create procedural barriers that prevent substantive examination of the claims. iv. Retaliation: When citizens persist despite these obstacles, they face retaliatory legal actions, law enforcement intimidation, and false security threat designations. v. Coordinated Narrative Control: Throughout this process, participants coordinate their public responses, statements in legal proceedings, and handling of documentary evidence to present a consistent narrative that obscures their coordination. b. This playbook was first deployed in the CharterWest case and refined in the OPS records dispute, demonstrating both continuity and evolution of the enterprise's methods over time. c. The enterprise's operations extend across institutional boundaries, with information and strategies flowing between nominally independent entities in ways that cannot be explained by legitimate governmental functions.

C. Predicate Acts in Detail

Mail Fraud (18 U.S.C. § 1341): a. The Nebraska Attorney General's Office committed mail fraud by sending fraudulent disposition letters claiming that OPS had "faithfully" upheld its NPRL obligations despite documented evidence to the contrary. These letters were sent via U.S. Mail with the specific intent to further the fraudulent scheme of preventing transparency and accountability. b. OPS officials committed mail fraud by sending Plaintiff invoices for approximately $1,600 for heavily redacted documents they later provided unredacted to others for free. These mailings were made with knowledge of their fraudulent nature and with the specific intent to obstruct legitimate access to public records. c. The Nebraska Department of Unauthorized Practice of Law, through Mark Weber, committed mail fraud by mailing a threat of

legal action about a fictitious complaint from a non-existent party. This mailing was made with knowledge of its fraudulent nature and with the specific intent to intimidate Plaintiff into ceasing his legitimate pursuit of accountability. d. Each of these mailings constitutes a separate predicate act under RICO. See Schmuck v. United States, 489 U.S. 705, 710-11 (1989) (holding that each mailing in furtherance of a fraudulent scheme constitutes a separate violation of the mail fraud statute).

Wire Fraud (18 U.S.C. § 1343): a. AG Mike Hilgers and his predecessor knowingly published false information about the OPS board meeting incident on the Nebraska Attorney General's website, then refused to correct it when presented with video evidence contradicting their claims. This electronic publication of false information constitutes wire fraud. b. Assistant AGs Laura Nigro, Mitchell Wurm, and Leslie Donley issued fraudulent legal opinions by email and other electronic means to justify suppressing records and refusing to investigate documented violations. These opinions were transmitted electronically, constituting wire fraud. c. OPS officials, including Anne MacFarland, transmitted false certifications to courts by electronic filing systems, claiming all responsive records had been provided when they knew additional responsive documents existed. Each of these electronic filings constitutes a separate predicate act. d. The AG's Office coordinated with OPS and Baird Holm by email to develop a strategy for obstructing public records requests, using interstate electronic communications to further this conspiracy. e. WOWT Digital Media Director Gina Dvorak used electronic means to suppress Plaintiff on WOWT's Facebook platform and make false statements under WOWT's official account, furthering the enterprise's goal of preventing public exposure of misconduct. f. Each of these electronic transmissions constitutes a separate predicate act under RICO. See United States v. Jinian, 725 F.3d 954, 960 (9th Cir. 2013) (holding that each wire transmission in furtherance of a fraudulent scheme constitutes a separate violation of the wire fraud statute).

Obstruction of Justice (18 U.S.C. § 1503): a. Judge Duane Dougherty obstructed justice by allowing ex parte communications with defense counsel, relying on nonexistent documents to justify dismissal, and making provably false statements in court opinions. These actions were taken with the specific intent to prevent judicial review of government misconduct. b. Judge Shelly Stratman obstructed justice by permitting flagrant procedural violations by OPS attorneys while holding Plaintiff to impossible standards. Her actions were taken with the specific intent to prevent judicial review of government misconduct. c. The AG's refusal to enforce public records laws despite clear violations represents obstruction of justice, as it prevented the lawful execution of statutory transparency requirements with the specific intent to shield government misconduct from public scrutiny. d. Baird Holm attorney Steve Davidson obstructed justice by submitting ex parte documents to judges before hearings, corrupting the judicial process

through improper influence of court proceedings. e. OPS Records Keeper Anne MacFarland obstructed justice by falsifying and manipulating public records to obstruct access, directly participating in the pattern of fraud that characterized the enterprise's operations. f. Each of these actions constitutes a separate predicate act under RICO. See United States v. Aguilar, 515 U.S. 593, 599 (1995) (defining obstruction of justice as actions taken with the intent to influence, obstruct, or impede the due administration of justice).

Witness Retaliation (18 U.S.C. § 1513): a. OPS Board President Shavonna Holman engaged in witness retaliation by filing a fraudulent protection order against Plaintiff based on protected political speech, coordinating with law enforcement before filing. This abuse of the legal process constitutes witness retaliation, as it was specifically designed to punish Plaintiff for his public criticism and testimony. b. Lieutenant Charles Ott contacted Plaintiff before Holman filed her restraining order, proving pre-coordination between OPS and law enforcement in developing a retaliation strategy. This call, which attempted to intimidate Plaintiff into ceasing his advocacy, constitutes witness retaliation. c. Officer Steve Lee from the Mental Health and Wellness Unit similarly contacted Plaintiff in an attempt to frame political speech as a mental health issue, another form of intimidation and retaliation against a witness to government misconduct. d. Attorney Steve Davidson falsely labeled Plaintiff a "security threat" in court records without any evidence, a defamatory act designed to retaliate against Plaintiff for his role as a witness to government misconduct. e. Capitol Police officers physically removed Plaintiff from the state capitol on three separate occasions for properly requesting resolution from the Attorney General's Office, violating his constitutional right to petition for redress of grievances and retaliating against him for his role as a witness to government misconduct. f. Each of these actions constitutes a separate predicate act under RICO. See Deck v. Engineered Laminates, 349 F.3d 1253, 1257 (10th Cir. 2003) (recognizing that witness retaliation claims can constitute RICO predicate acts).

Interstate Commerce and Effect: a. The enterprise operates across state lines and affects interstate commerce in several ways: i. The use of electronic communications that traverse state boundaries in furtherance of the fraudulent scheme triggers federal wire fraud statutes. ii. The involvement of federal agencies and courts brings this conspiracy within the scope of federal jurisdiction. iii. The enterprise's obstruction affects financial transactions and regulatory oversight that cross state lines, particularly in the banking context. iv. The use of the internet and interstate telecommunications infrastructure to disseminate false information and coordinate obstructive activities satisfies the interstate commerce requirement. b. The Supreme Court has held that RICO should be interpreted broadly to effectuate its remedial purposes. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497-98 (1985) ("RICO is to be read broadly."). c. The

minimal connection to interstate commerce required for RICO jurisdiction is easily satisfied in this case through the extensive use of interstate communication methods and the involvement of federal agencies and courts.

D. The Pattern Continues Unabated

Continuing Violations Through Present Day: a. The February 24, 2025 dismissal of Plaintiff's most recent case by the Nebraska Court of Appeals demonstrates that the pattern of obstruction continues unabated to the present day. b. The Court of Appeals dismissed the case based on an alleged verification deficiency, despite Plaintiff's certification under penalty of perjury. c. The court simultaneously denied OPS's motion for summary dismissal as "moot," having already decided to dismiss the case on its own initiative. d. This twin dismissal ensured that, once again, the merits of Plaintiff's public records claims would never be addressed, regardless of the procedural posture. e. The timing of this most recent dismissal is significant, as it demonstrates that the pattern continues despite years of Plaintiff's attempts to navigate the procedural maze created by the courts.

The Attorney General's Explicit Adversarial Position: a. In 2024 and continuing into 2025, the Nebraska Attorney General's Office has explicitly declared itself "adversarial" to citizens seeking public records while simultaneously claiming statutory authority to adjudicate disputes over those same records. b. This declaration represents the ultimate evolution of the enterprise's strategy—moving from covert obstruction to explicitly acknowledging the structural corruption of the enforcement mechanism. c. This overt adversarial stance proves that the pattern of activity has not only continued but has reached a new level of institutional capture where public officials no longer feel the need to conceal their conflicts of interest. d. The AG's Office has refused to investigate X Corp for consumer protection violations based on Plaintiff's federal case materials, showing that the enterprise's protective shield extends beyond government entities to private companies facing accountability from the same target.

The Consistency Across Years and Contexts: a. The same tactics used to obstruct accountability for CharterWest Bank's fraud in 2018 were refined and deployed against Plaintiff's public records requests in 2021-2025. b. Many of the same individuals and institutions were involved in both contexts, demonstrating the existence of an ongoing criminal enterprise rather than isolated incidents. c. The pattern has persisted despite Plaintiff's attempts to navigate the

procedural maze created by the courts, with new obstacles emerging each time previous ones are overcome. d. This consistency across different substantive contexts (banking fraud and public records access) and time periods (2018 and 2021-2025) demonstrates both the continuity and relatedness required to establish a pattern under RICO.

RICO Pattern Requirements Satisfied: a. The predicate acts span more than seven years, from 2018 to the present day, easily satisfying the "closed-ended" continuity requirement established in H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 241-42 (1989). b. The ongoing nature of the enterprise and its continued operation through the present day also satisfies the "open-ended" continuity requirement, as there is a clear threat of continued criminal activity in the future. c. The predicate acts are related by similar methods, participants, and objectives, forming a coherent pattern rather than isolated incidents. d. The enterprise has shown remarkable resilience and adaptability, evolving its tactics in response to Plaintiff's efforts while maintaining its core objective of preventing transparency and accountability. e. This combination of continuity and relatedness establishes the "pattern" element required for a RICO claim under the Supreme Court's precedents.

XVII. LEGAL ARGUMENT: WHY EXTRAORDINARY INTERVENTION IS REQUIRED

The systematic foreclosure of all ordinary remedies necessitates extraordinary judicial intervention. This is not simply a case of individual errors or differences in legal interpretation—it is evidence of a comprehensive failure of governmental checks and balances that threatens the foundation of our constitutional system.

A. The Collapse of Separation of Powers Doctrine

The Fundamental Constitutional Crisis: a. The Nebraska constitution, like its federal counterpart, relies on the separation of powers to prevent tyranny. The evidence presented demonstrates not merely the failure of individual institutions but the collapse of the separation of powers itself. b. In a functioning constitutional system, when the executive branch (represented here by OPS, the AG's Office, and other agencies) violates the law, the judicial branch provides a check through independent review. c. In a functioning system, when the judiciary fails to provide this check, independent oversight bodies like the Ombudsman's Office ensure accountability. d. In a functioning system, when both administrative and judicial remedies fail, public exposure through media and political pressure creates alternative accountability mechanisms.

The Comprehensive Failure of Checks and Balances: a. What the evidence in this case reveals is the comprehensive failure of all these checks and balances: i. Executive agencies engage in documented misconduct without fear of consequences. ii. Judicial institutions not only fail to provide checks on executive overreach but actively participate in shielding executive misconduct from review. iii. Oversight bodies like the Ombudsman's Office coordinate with the very entities they are supposed to monitor, creating a closed system impervious to citizen complaints. iv. Media entities either ignore evidence of corruption or actively participate in suppressing it, eliminating the final check of public exposure. b. This situation represents more than the sum of its parts—it constitutes a fundamental breakdown in the constitutional order: i. When each branch of government not only fails to check the others but actively collaborates to prevent citizen oversight, the entire premise of democratic governance is undermined. ii. The separation of powers doctrine becomes meaningless when the branches unite against citizens seeking transparency and accountability. iii. The system no longer resembles a constitutional republic but a closed oligarchy using the forms of democratic governance to shield itself from accountability.

The Attorney General's Inherent Conflict as Constitutional Crisis: a. The AG's explicit declaration of being "adversarial" to citizens seeking public records while simultaneously claiming authority to adjudicate those disputes epitomizes this constitutional collapse. b. This arrangement transforms what should be a neutral enforcement mechanism into a structurally corrupted system designed to prevent accountability. c. It demonstrates not a failure of individual officials but a deliberate institutional design that makes accountability impossible by positioning the fox as both a guardian of the henhouse and the judge who determines whether the hens have been properly protected. d. This conflict is not merely a policy disagreement but a fundamental corruption of the constitutional structure that makes meaningful citizen participation in government impossible.

Federal Intervention as Constitutional Necessity: a. This Court's authority to intervene is not merely statutory but constitutional—it represents the last opportunity to restore the separation of powers when state institutions have demonstrably failed. b. Federal courts have not only the authority but the obligation to intervene when state governmental structures have collapsed to the point where citizens have no meaningful remedies for constitutional violations. c. The Supreme Court has recognized that extraordinary remedies are appropriate when ordinary channels have been systematically foreclosed. See United States v. Nixon, 418 U.S. 683 (1974) (holding that extraordinary judicial intervention is warranted when other constitutional

mechanisms have failed). d. In cases of systematic state failure to protect constitutional rights, federal intervention becomes necessary to preserve the constitutional order itself. See Cooper v. Aaron, 358 U.S. 1 (1958) (affirming federal judicial authority to intervene when state institutions systematically fail to protect constitutional rights). e. The evidence presented demonstrates precisely the type of systemic failure that necessitates federal judicial intervention to restore constitutional governance.

The Precedential Support for Intervention: a. In Ex parte Young, 209 U.S. 123 (1908), the Supreme Court established that federal courts may enjoin state officials from enforcing unconstitutional state laws or policies, even when those officials claim sovereign immunity. b. In Monroe v. Pape, 365 U.S. 167 (1961), the Court recognized that federal remedies are necessary when state remedies are inadequate in practice, regardless of their theoretical availability. c. In Mitchum v. Foster, 407 U.S. 225 (1972), the Court held that federal courts may enjoin state court proceedings that are being used to harass citizens and prevent the exercise of their federal rights, explicitly recognizing that the Anti-Injunction Act does not bar federal intervention when state courts themselves become instruments of constitutional violations. d. In Dombrowski v. Pfister, 380 U.S. 479 (1965), the Court recognized that federal injunctive relief is warranted when state procedures are being used to chill the exercise of constitutional rights through bad faith harassment. e. In Gibson v. Berryhill, 411 U.S. 564 (1973), the Court found federal intervention appropriate when state administrative and judicial proceedings were structurally biased, recognizing that systemic bias justifies extraordinary federal remedies. f. These precedents establish that when state courts systematically fail to provide meaningful remedies, federal intervention is not merely permitted but required to preserve the constitutional order.

B. The Denial of Fundamental Due Process

The Constitutional Requirements of Due Process: a. Due process requires not merely procedural formalities but meaningful access to justice. The Supreme Court has consistently held that procedures that operate as arbitrary barriers to justice violate constitutional principles. b. In Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982), the Court held that the state cannot create procedures that arbitrarily deny litigants the opportunity to be heard. c. In Boddie v. Connecticut, 401 U.S. 371 (1971), the Court recognized that procedures that effectively deny access to the courts violate due process, particularly when those procedures are applied selectively. d. In M.L.B. v. S.L.J., 519 U.S. 102 (1996), the Court held that excessive or arbitrary fees that create barriers to justice violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

The Coordinated Obstruction as Due Process Violation: a. The coordinated obstruction documented here has denied Plaintiff this fundamental right to due process through: i. The creation of impossible procedural hurdles applied only to Plaintiff, such as the ever-shifting "verification" requirements that change each time Plaintiff attempts to comply. ii. The refusal to address the substantive merits of any claim regardless of its presentation, ensuring that no matter how Plaintiff formats his pleadings, they will never receive meaningful review. iii. The systematic altering of procedural rules to prevent meaningful review, including accepting untimely filings from opposing counsel while rejecting timely filings from Plaintiff based on hyper-technical readings of the rules. b. These arbitrary barriers to justice violate the core principle of due process that "within the limits of practicability, a State must afford to all individuals a meaningful opportunity to be heard." Boddie, 401 U.S. at 379. c. The Supreme Court has recognized that seemingly neutral procedures can violate due process when applied in a manner that creates insurmountable barriers to justice. See Little v. Streater, 452 U.S. 1, 16 (1981) (holding that "state procedures for establishing paternity violated the due process guarantee because they effectively denied indigent defendants a meaningful opportunity to be heard").

The Logically Impossible Order as Due Process Violation: a. Judge Dougherty's December 13, 2024 order, which simultaneously dismisses for "lack of jurisdiction" and "failure to state a claim," represents a particularly egregious due process violation. b. By creating a logically impossible standard that no litigant could satisfy, Judge Dougherty has violated the fundamental principle that due process requires "notice and an opportunity to be heard appropriate to the nature of the case." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950). c. The Court of Appeals' selective extraction of only the jurisdictional ground while ignoring the contradictory merits dismissal in the same document further compounds this due process violation, creating a situation where even perfect compliance with procedural requirements cannot secure meaningful review. d. The Supreme Court has held that "the Due Process Clause requires that a judicial proceeding adjudicate the merits of an action where the disposition of a party's claim may bind him." Kremer v. Chemical Const. Corp., 456 U.S. 461, 481 n.22 (1982). The deliberate use of contradictory procedural grounds to avoid merits adjudication violates this core requirement.

Due Process Violations Beyond Procedure: a. The due process violations extend beyond procedure to substance: i. Fundamental fairness requires that courts and administrative

agencies apply consistent standards to similar cases. The evidence demonstrates that Plaintiff has been subjected to standards that apply to no other litigant. ii. Due process requires that judges act as neutral arbiters rather than participants in a scheme to obstruct justice. The documented ex parte communications and provably false statements by judges violate this basic principle. iii. The coordinated obstruction across multiple institutions creates a situation where Plaintiff is deprived not just of particular procedures but of any meaningful opportunity to be heard—the essence of the due process guarantee. b. The Supreme Court has recognized that due process has both procedural and substantive components, and that certain government actions may be "so unjustified by any purpose that they run afoul of the Due Process Clause." County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998). c. The pattern of coordinated obstruction demonstrated here shocks the conscience and lacks any legitimate governmental purpose, thereby violating substantive due process.

## C. The Public Records Law Rendered a Dead Letter

The Statutory Framework and Legislative Intent: a. The Nebraska Public Records Law represents a legislative determination that governmental transparency is essential to democracy: i. The law explicitly states that "citizens of this state shall have the full right to know of and have full access to information on the public finances of ... this state and the public bodies and entities created to serve them." Neb. Rev. Stat. § 84-712.01(1). ii. It further provides that public records shall be "free for examination by any person," with narrow exceptions that must be specifically justified. Neb. Rev. Stat. § 84-712(1). iii. The law establishes specific remedies for citizens denied access, including the right to expedited judicial review and attorney general enforcement. b. The legislative intent behind the Nebraska Public Records Law is clear—to ensure transparency and accountability in government operations by providing citizens with meaningful access to government information. c. The Nebraska Supreme Court has affirmed this purpose, stating that the Public Records Law "is to be liberally construed whenever any public record is in question." State ex rel. Sileven v. Spire, 243 Neb. 451, 457, 500 N.W.2d 179, 183 (1993).

The Systematic Nullification of Statutory Rights: a. The evidence demonstrates that every aspect of this statutory scheme has been subverted: i. OPS has charged excessive fees for heavily redacted documents, provided the same documents to different requesters with different levels of redaction based on viewpoint, and falsely claimed that responsive documents don't exist. ii. The Attorney General has refused to enforce the law despite clear evidence of violations, issued false opinions justifying non-compliance, and denied records requests seeking information about their own enforcement activities. iii. The courts have created procedural

barriers to judicial review that exist nowhere in the statute, ensuring that citizens can never obtain the expedited review promised by the law. b. This systematic obstruction has rendered the Public Records Law a dead letter—a statutory right that exists on paper but cannot be exercised in practice due to coordinated institutional resistance. c. The Nebraska Supreme Court has held that "the purpose of statutory interpretation is to determine the legislative intent and give it effect." ML Manager, LLC v. Jensen, 287 Neb. 171, 176, 842 N.W.2d 566, 571 (2014). The coordinated obstruction documented here directly contravenes this legislative intent.

The Contradiction with Nebraska's Own Precedents: a. The courts' manipulation of mandamus requirements directly contradicts Nebraska's own precedents: i. In State ex rel. BH Media Group v. Frakes, 305 Neb. 780, 943 N.W.2d 231 (2020), the Nebraska Supreme Court allowed a public records mandamus action to proceed despite procedural irregularities, stating that "the focus in a mandamus action is whether a duty exists, not on whether the petition was perfectly pled." ii. In State ex rel. Veskrna v. Steel, 296 Neb. 581, 894 N.W.2d 788 (2017), the court emphasized that the Public Records Act "is to be liberally construed in favor of disclosure" and that exceptions to disclosure "are to be narrowly construed." iii. In State ex rel. Adams Co. Historical Soc. v. Kinyoun, 277 Neb. 749, 765 N.W.2d 212 (2009), the court held that "the burden of showing an exemption from disclosure is on the party claiming the exception." b. The courts' handling of Plaintiff's cases represents a dramatic and unexplained departure from these established precedents, suggesting not good-faith legal interpretation but deliberate obstruction. c. This selective disregard for binding precedent violates the principle of stare decisis, which the Nebraska Supreme Court has described as "the bedrock of our common-law jurispru4. The Judicial Obstruction: When Plaintiff sought judicial review, he encountered the same procedural manipulation that would later characterize his public records cases: a. Courts dismissed his complaints on procedural grounds without addressing the merits, applying hyper-technical readings of pleading requirements selectively against Plaintiff's filings. b. Judges applied impossible standards to Plaintiff's filings while simultaneously allowing opposing counsel substantial procedural leeway, including accepting late filings and overlooking missing elements. c. The Eighth Circuit Court of Appeals, including Judges Ralph R. Erickson, Lavenski R. Smith, and Steven M. Colloton, issued summary affirmances without addressing the substantive legal arguments presented, effectively rubber-stamping lower courts' procedural dismissals. d. At each level, courts focused exclusively on finding procedural defects rather than addressing the documented fraud at the heart of the case.

The Vindication and Media Silence: Despite this coordinated obstruction, Plaintiff ultimately prevailed in securing the domain name charterwestbank.com – a modest but telling victory that

media entities nevertheless refused to cover: a. Local media had ignored his original complaints years earlier, despite clear photographic evidence of document alteration. b. When Plaintiff ultimately succeeded, these same media entities maintained their silence, refusing to acknowledge that his allegations had been vindicated. c. This pattern of media complicity – ignoring both documented misconduct and subsequent vindication – would repeat throughout the public records disputes.

The CharterWest situation established the template that would be refined and deployed in subsequent confrontations: institutional fraud followed by coordinated regulatory inaction, procedural obstruction by courts, and complete media silence despite compelling evidence of wrongdoing.

B. The Omaha Public Schools Records Suppression Conspiracy (2021-2025)

In 2021, the same patterns established in the CharterWest Bank case reemerged in an even more sophisticated form when Plaintiff sought public records from Omaha Public Schools:

The Board Meeting Incident: The catalyst for this phase began with a public meeting where Ms. Adamson (Plaintiff's mother) was improperly silenced: a. Video evidence clearly shows Ms. Adamson attempting to speak during the public comment portion of an OPS board meeting when she was removed from the podium for attempting to play an audio recording that contradicted the board's narrative. b. Multiple citizens present at the meeting filed complaints with the Attorney General's Office, documenting that speakers with critical views were routinely silenced while supportive speakers were permitted to exceed time limits and violate the same rules used to silence critics. c. This silencing of public comment violated both Nebraska's Open Meetings Act and the First Amendment's protection of political speech in public forums.

The Retaliatory Protection Order: In response to legitimate criticism of this viewpoint discrimination, OPS Board President Shavonna Holman coordinated with attorneys and law enforcement to file a fraudulent protection order against Plaintiff: a. Phone records and documented communications prove that this coordination occurred before any allegedly threatening behavior, demonstrating that the protection order was a premeditated strategy to silence criticism rather than a response to legitimate concerns. b. Lieutenant Charles Ott, head of OPS School Resource Officers, contacted Plaintiff in August of 2021 – before the protection order was filed – proving pre-coordination between OPS and law enforcement. This call was legally recorded by Plaintiff, creating irrefutable evidence of the conspiracy. c. Officer Steve Lee from the Omaha Police Department's Mental Health and Wellness Unit similarly contacted Plaintiff, attempting to frame legitimate political speech as a mental health issue – a particularly

disturbing abuse of authority that stigmatizes both mental health conditions and political dissent. d. Baird Holm attorneys, including Jill Ackerman and Cameron Finke, representing Holman made provably false statements in court proceedings, including deliberately introducing inflammatory and irrelevant comparisons to Kyle Rittenhouse in an attempt to prejudice the court.

The Protection Order Hearing Manipulation: When the fraudulent protection order reached Judge Dougherty's courtroom, the pattern of judicial complicity became explicit: a. Judge Dougherty prevented Lieutenant Ott from testifying, despite him being a key witness who could have confirmed the pre-coordination between OPS and law enforcement. b. The judge allowed highly prejudicial and irrelevant statements from Baird Holm attorneys while restricting Plaintiff's ability to present relevant evidence that would have exposed the protection order as retaliatory. c. The protection order was granted based on documented false statements, specifically the claim that Plaintiff had engaged in threatening behavior when the evidence showed only constitutionally protected criticism of public officials. d. The transcript of this hearing reveals Judge Dougherty's active participation in preventing evidence of the conspiracy from entering the judicial record, rather than serving as a neutral arbiter of fact.

The Public Records Obstruction: When Plaintiff sought public records regarding these events, the institutional obstruction intensified to unprecedented levels: a. OPS charged Plaintiff approximately $1,600 for heavily redacted documents they later provided to his mother for free – a clear violation of the Nebraska Public Records Law, which prohibits treating different requesters unequally based on their identity or purpose. b. The records provided to Plaintiff contained over 100 pages that were entirely redacted—solid black boxes with no text visible—without any explanation of what was redacted or why, as required by Nebraska law. c. Many of these same documents were later provided to Plaintiff's mother with no redactions whatsoever, proving that the redactions were not legally justified but rather designed to obstruct access to information. d. OPS repeatedly denied the existence of records that they later produced to others. In multiple instances, they certified to courts that all responsive documents had been provided, only to later "discover" additional responsive documents when faced with evidence of their existence. e. When Plaintiff attempted to exercise his statutory right to inspect records in person rather than paying for copies, OPS refused to allow this basic right guaranteed by the Nebraska Public Records Law. This refusal persisted even after they had certified to the court that they had already provided all responsive documents. f. OPS Records Keeper Anne MacFarland played a central role in this obstruction, falsifying and manipulating public records to obstruct access and coordinating with other officials to conceal evidence.

The Oversight Agency Collusion: When Plaintiff sought assistance from oversight agencies, he encountered the same pattern of coordinated inaction seen in the CharterWest case, but with even more explicit evidence of collusion: a. The Nebraska Attorney General's Office, under AG Mike Hilgers and previously under AG Doug Peterson, communicated extensively with OPS and its attorneys but never once contacted Plaintiff or any of the witnesses to the board meeting incident. b. Records obtained later showed dozens of communications between the AG's office and OPS attorneys, including David Kramer of Baird Holm, while Plaintiff's inquiries were ignored or dismissed without investigation. c. The AG published a demonstrably false opinion containing internal contradictions about the board meeting incident. The opinion simultaneously claimed that "Ms. Adamson was allowed to continue and spoke for approximately one minute" and also that "Ms. Adamson was not removed due to the content of her speech, but because she refused to provide her address." These statements are logically incompatible—she either continued speaking or was removed—making it impossible for both to be true. d. When Plaintiff presented evidence of this falsehood and requested correction, the AG refused to correct the public record. This refusal to correct a known falsehood in an official publication represents a particularly egregious dereliction of duty for the state's chief law enforcement officer. e. The AG's pattern of behavior extended to their handling of public records requests. They denied all of Plaintiff's requests seeking information about their investigation, not portions based on legitimate sensitivity concerns, but everything. Simultaneously, they selectively published certain denial letters from Plaintiff's case on their website while keeping others unpublished, suggesting deliberate narrative control. f. Assistant Attorneys General, including Laura Nigro, Mitchell Wurm, and Leslie Donley, actively participated in this obstruction, issuing fraudulent legal opinions to justify suppressing records and refusing to investigate OPS's documented violations despite their statutory obligation to enforce the Public Records Law. Even more alarming is the information accidentally provided to Plaintiff's mother, that shows a cozy relationship with David Kramer and Laura Nigro. It basically reads: Laura: "Hi David, remember those conversations we had THREE MONTHS AGO? We still haven't notified the victims, and don't plan on it, but we'd like to get this off our desk so that we can harm more citizens!" David: "You got it toots! I'll find a creative way to avoid this when I get back from the BAR association meeting in Vegas!" g. The Nebraska Ombudsman's Office, under Public Counsel Julie Rogers, similarly refused to investigate despite clear evidence of misconduct. Rogers went so far as to physically bar Plaintiff from her office and refused to accept complaints about the Attorney General's Office, despite that being explicitly within her statutory jurisdiction.

The Judicial System Participation: The court system, rather than providing a check on this misconduct, became an active participant in the obstruction with increasingly blatant procedural manipulations: a. Judge Duane Dougherty allowed ex parte communications between Steve

Davidson (Baird Holm attorney) and the court before hearings, a fundamental violation of judicial ethics that undermines the entire concept of adversarial proceedings. b. Judge Dougherty relied on a nonexistent "Amended Complaint" to justify dismissal in one proceeding, then refused to allow Plaintiff to correct this fictitious deficiency. Court records conclusively prove this document never existed, yet it formed the basis for dismissal. c. In multiple hearings, Judge Dougherty claimed to take "under advisement" arguments that were never made, proving judicial bias and pre-determination of outcomes. Transcripts from these proceedings show decisions being announced on issues that were never raised or argued. d. Judge Dougherty made provably false statements in his opinions, including the claim that the defense scheduled a hearing when court records clearly show Plaintiff scheduled it two days earlier and notified the defense. This falsification of the procedural record is particularly disturbing coming from a sitting judge, in particular when he was present when it was scheduled. e. Judge Shelly Stratman similarly permitted fraudulent legal tactics by OPS, holding Plaintiff to impossible procedural standards while excusing OPS's blatant misconduct. At an October 1, 2024 hearing, she refused to consider overwhelming evidence of perjury and procedural violations by OPS representatives. f. Judge Stratman allowed OPS's last-minute motion to dismiss filed less than 24 hours before a hearing, despite court rules requiring reasonable notice. When Plaintiff objected to this violation of procedural rules, Judge Stratman attempted to intimidate him by claiming he was being "disrespectful" for expecting the law to be followed. g. The courts created novel "verification" requirements not found in Nebraska law, then used these manufactured standards to dismiss Plaintiff's cases without addressing the merits. Each time Plaintiff attempted to comply with these shifting requirements, the courts would invent new procedural barriers.

The Federal Court Extension: The pattern extended to federal courts, creating a comprehensive barrier to justice spanning both state and federal systems: a. When Plaintiff filed his case in state court, OPS improperly removed it to federal court without any legitimate basis for jurisdiction. There was no federal question in the case, which centered entirely on Nebraska's Public Records Law, and no diversity of citizenship as all parties were Nebraska residents. b. Judge John Gerrard and Judge Robert Rossiter of the federal district court failed to promptly remand the case despite the obvious lack of jurisdiction, allowing OPS to delay the proceedings through clearly improper procedural maneuvering. c. OPS failed to properly serve Plaintiff with notice of removal, violating basic procedural rules. Yet when the case was eventually returned to state court, the state court ignored OPS's procedural violations while strictly enforcing every technical requirement against Plaintiff. d. The Eighth Circuit Court of Appeals, when presented with these issues, issued summary affirmances without addressing the substantive legal arguments, effectively rubber-stamping the lower courts' procedural abuses.

The Logically Impossible Dismissal: The culmination of this judicial manipulation came in Judge Dougherty's December 13, 2024 order, which contains an explicit logical contradiction that cannot exist in a properly functioning judicial system: a. In this order, Judge Dougherty explicitly ruled: "IT IS THEREFORE ORDERED ADJUDGED AND DECREED that this Court lacks subject matter jurisdiction in this matter and thus the Plaintiff's Complaint and Amended Complaint are hereby dismissed without prejudice." b. Then, in the very next paragraph, he contradicted this ruling: "IT IS FURTHER ORDERED ADJUDGED AND DECREED that in addition to the fact this Court lacks jurisdiction, this matter is hereby dismissed without prejudice for failure to state a claim upon which relief can be granted pursuant to Nebraska Court Rules of Pleadings 6-1112(1) and (6)." c. This creates a logical impossibility that violates the most fundamental principles of civil procedure. As the Supreme Court unequivocally held in Steel Co. v. Citizens for Better Environment, 523 U.S. 83 (1998), if a court lacks subject matter jurisdiction, it has no power whatsoever to render judgment on the merits of a case. d. Justice Scalia specifically described this requirement as "inflexible and without exception," writing: "The requirement that jurisdiction be established as a threshold matter... is 'inflexible and without exception.'" (quoting Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884)). e. A dismissal for failure to state a claim is explicitly a merits determination that requires jurisdiction as a prerequisite. By ruling simultaneously that the court lacks jurisdiction and that the complaint fails to state a claim, Judge Dougherty created a self-negating order that is legally incoherent. f. This contradiction cannot be explained by good-faith error or misunderstanding of law. It represents a deliberate strategy to create multiple dismissal grounds, giving the appellate court options to select whichever would most effectively prevent review.

The Appeals Court Selective Reading: When Plaintiff appealed to the Nebraska Court of Appeals, the court demonstrated its complicity in the scheme through its selective reading of Judge Dougherty's contradictory order: a. The Court of Appeals dismissed Plaintiff's case claiming lack of jurisdiction because his "amended complaint for mandamus was not properly verified nor supported by affidavits." b. In doing so, the court selectively extracted only the jurisdictional ground from Judge Dougherty's contradictory order while ignoring the logically incompatible merits dismissal in the same document. c. Despite accepting Plaintiff's filing fees and purportedly reviewing his case, the court failed to identify the fundamental logical contradiction in the district court's ruling – a contradiction so basic that it violates first principles of civil procedure. d. This selective reading cannot be explained by oversight or error. It required the appellate court to actively choose between contradictory grounds in the same order, demonstrating coordination rather than independent judicial action. e. The Court of Appeals further claimed it lacked jurisdiction to review the district court's jurisdictional determination – a position that contradicts the very purpose of appellate review. If appellate courts cannot review jurisdictional determinations, then trial courts could effectively insulate themselves from review by simply declaring "no jurisdiction" in any case they wished to dismiss.

The Eighth Circuit Complicity: The pattern of obstruction extended to the federal appellate level: a. When Plaintiff petitioned the Eighth Circuit, providing clear evidence of the contradictory orders and procedural manipulation, the court issued a one-sentence summary affirmance that failed to address any of the substantive issues raised. b. The Eighth Circuit deliberately ignored Lieutenant Ott's recorded phone call – direct, uncontested evidence that contradicted the factual basis for their ruling. c. This pattern of summary dismissal without addressing documentary evidence demonstrates that the Eighth Circuit was not functioning as a neutral judicial body but as an active participant in the enterprise of obstruction.

The CharterWest Domain Victory and Its Implications: Plaintiff's unprecedented success in securing the domain name charterwestbank.com provides compelling corroboration of his claims and demonstrates his credibility: a. Plaintiff successfully obtained and retained ownership of charterwestbank.com, an achievement virtually unheard of in modern domain law, where businesses are almost always able to reclaim their domain names. b. This legal victory effectively validates Plaintiff's assertions about CharterWest's fraudulent conduct. Had there been no merit to Plaintiff's claims, CharterWest Bank would have easily reclaimed their domain through standard domain dispute resolution procedures. c. The fact that Plaintiff maintained ownership of the domain – something that hadn't been successfully done against an existing business in over 20 years – strongly suggests legitimate grievances against the bank and validates his broader pattern of allegations. d. This extraordinary legal outcome should have generated significant media interest but was met with complete silence from Nebraska news outlets, further indicating coordinated suppression. e. The domain victory serves as objective, third-party validation of Plaintiff's claims, demonstrating that independent legal proceedings have found merit in his position when not subject to the coordinated obstruction documented throughout this complaint.

The OPS records suppression conspiracy represents a refinement and escalation of the tactics first deployed in the CharterWest Bank case. What began as institutional protection of a private bank evolved into systematic corruption of every accountability mechanism in Nebraska's government, all dedicated to preventing a citizen from exercising his statutory right to public information and his constitutional right to petition for redress of grievances.

XV. THE SYSTEMATIC FORECLOSURE OF ALL REMEDIES

What makes this case extraordinary is not merely the misconduct of individual actors but the systematic foreclosure of every available remedy. The Plaintiff has been trapped in a

Kafkaesque nightmare where each institution that should provide a check on the others instead reinforces their obstruction:

A. Administrative Remedies Foreclosed

Videos of Plaintiff being removed by Capitol Police for asking the published lie to be corrected: https://youtu.be/0H69h9ozCnw https://youtu.be/eVx4HeOJwIY (This one, the Capitol Police actually called Plaintiff and threatened him to stay away) https://youtu.be/AZ0Cxm7x3Rw https://youtu.be/nTpESZkTKLo https://youtu.be/93lq57I2d9M https://youtu.be/Aj_PF5610H0

The Attorney General's Active Participation in Public Records Violations: a. Despite having explicit statutory authority to enforce the Public Records Law, the AG has never taken enforcement action against a government entity for violations, regardless of how well-documented or egregious. b. Analysis of the AG's public records opinions over multiple years reveals a pattern of inconsistent reasoning and selective enforcement that consistently favors government entities over requesters. Legal standards shift from opinion to opinion, with the only consistent element being the outcome—government entities prevail. c. The AG published demonstrably false information about the OPS board meeting incident, then refused to correct it when presented with video evidence contradicting their claims. This willful perpetuation of falsehood in official publications represents a fundamental breach of the AG's obligation to uphold the rule of law. d. The AG denied all of Plaintiff's public records requests seeking information about their own investigations, creating a catch-22 where the public cannot obtain information about the AG's failure to enforce transparency laws. This self-protecting secrecy renders the AG's oversight function completely illusory. e. The AG issued a disposition letter claiming that OPS had "faithfully" upheld its NPRL obligations despite the mountain of evidence showing otherwise. This false certification represents not just an error of judgment but active complicity in covering up documented violations. f. When Plaintiff attempted to meet with the AG's office to discuss these issues, Capitol Police physically removed him from the building on three separate occasions, at the direction of AG staff. This use of law enforcement to prevent a citizen from petitioning for redress of grievances represents a particularly alarming abuse of power. g. The AG's Office has explicitly positioned itself as "adversarial" to citizens seeking public records while simultaneously claiming statutory authority to adjudicate disputes over those same records. This inherent contradiction transforms the designated enforcer of transparency laws into an active participant in their violation.

The Ombudsman's Office Abdication of Oversight Responsibility: Videos below: https://youtu.be/0MDevTbQ3lw https://youtu.be/JBLJ_b2fTi8

 a. The Ombudsman is statutorily charged with investigating complaints about any state agency, including the Attorney General's Office. Yet when Plaintiff attempted to file complaints about the

AG's misconduct, the Ombudsman refused to accept them, inventing non-statutory limitations on its own jurisdiction. b. Public Counsel Julie Rogers not only refused to investigate documented violations of law but physically barred Plaintiff from her office, an unprecedented action against a citizen seeking to file legitimate complaints. c. Records obtained later revealed coordination between the Ombudsman's Office and the AG's Office to ensure no meaningful oversight occurred. This collusion between oversight bodies transforms them from checks on power into shields against accountability. d. The Ombudsman created arbitrary standards for accepting complaints that have no basis in law, then applied these standards selectively to reject Plaintiff's complaints while accepting similar complaints from other citizens. e. This pattern of conduct violates the Ombudsman's statutory mandate under Neb. Rev. Stat. § 81-8,240 et seq., which explicitly empowers the office to investigate "administrative acts of administrative agencies," including the Attorney General's Office.

The Structural Paradox in Nebraska's Transparency Enforcement: a. A fundamental structural defect emerges when examining Nebraska's transparency enforcement mechanism: the AG's Office, which explicitly states it represents state agencies against citizens, is simultaneously designated as the enforcer of public records laws against those same agencies. b. AG's Office staff have openly stated to Plaintiff that they are "adversarial" to citizens because they represent government agencies. This admission demolishes any pretense of neutrality when the AG is called upon to enforce transparency laws against those same agencies. c. This creates an irresolvable conflict of interest that completely subverts the legislative intent behind public records laws. The designated enforcer is structurally incentivized to protect the very violations it is supposed to prevent. d. This is not merely a technical defect but an institutional admission of designed failure. The public records enforcement mechanism was deliberately structured to create the appearance of accountability while ensuring no meaningful enforcement would ever occur.

Other Regulatory and Oversight Bodies' Systemic Failure: a. The Department of Banking and Finance refused to investigate CharterWest's documented fraud despite clear photographic evidence, establishing the pattern of regulatory capture that would be replicated across other agencies. b. The Federal Reserve Bank of Kansas City and the Consumer Financial Protection Bureau acknowledged complaints but took no meaningful action, demonstrating that the pattern of coordinated inaction extends to federal regulatory bodies. c. The Nebraska Department of Unauthorized Practice of Law, under Mark Weber, launched retaliatory investigations against Plaintiff based on nonexistent complaints from fictional parties, demonstrating that even professional regulatory bodies had been weaponized against citizens seeking accountability. d. The consistent pattern across these diverse agencies with different statutory mandates

suggests coordination rather than coincidence, as the likelihood of every single oversight body independently failing in identical ways approaches statistical impossibility.

B. Judicial Remedies Foreclosed

The Nebraska State Courts' Systematic Prevention of Judicial Review: a. The "verification" requirement cited in the Nebraska Court of Appeals' dismissal represents the culmination of a pattern of inventing procedural hurdles that cannot be overcome. Despite Plaintiff's efforts to comply with each new requirement, the courts continually shift the standards to ensure no case ever reaches substantive review. b. The courts have applied radically different procedural standards to Plaintiff than to government entities and their attorneys. While Plaintiff's filings are scrutinized for the slightest technical deficiency, opposing counsel routinely violate clear procedural rules without consequence. c. In multiple cases, judges have made provably false statements about the procedural history, claiming events occurred that court records show never happened, or denying the occurrence of events clearly documented in the record. These falsifications of the record cannot be explained by honest error—they represent deliberate manipulation of procedural history to justify predetermined outcomes. d. Judges have allowed opposing counsel to engage in ex parte communications, submit untimely filings, and introduce improper evidence while simultaneously holding Plaintiff to impossible procedural standards. This stark disparity cannot be reconciled with basic principles of due process and equal protection. e. The courts' handling of Plaintiff's cases reflects not just error but manipulation—procedural rules are not being misinterpreted but weaponized to prevent judicial review of government misconduct. f. The most egregious example comes from Judge Dougherty's December 13, 2024 order, which simultaneously dismisses for "lack of jurisdiction" and "failure to state a claim" – a logical impossibility that violates the Supreme Court's explicit holding in Steel Co. v. Citizens for Better Environment that jurisdictional determinations must precede any merits analysis. g. This logical contradiction cannot be explained by incompetence or oversight—it represents a deliberate strategy to create multiple grounds for dismissal, allowing appellate courts to selectively choose whichever ground would most effectively prevent substantive review. h. When Plaintiff directly questioned courts about what would constitute proper verification, judges refused to provide guidance, creating an impossible situation where compliance becomes unattainable by design.

The Federal Courts' Failure to Provide Remedy: a. When Plaintiff sought relief in federal court, he encountered the same pattern of procedural obstructionism. Cases were dismissed without addressing their merits, often through summary affirmances that provided no substantive analysis. b. The federal courts allowed OPS to engage in forum manipulation through improper

removal to federal court, despite the obvious lack of federal jurisdiction. This procedural gamesmanship was permitted for the sole purpose of delay and obstruction. c. Federal judges, including those on the Eighth Circuit Court of Appeals, have repeatedly dismissed well-pled claims through summary affirmances, demonstrating a pattern of federal judicial complicity in preventing meaningful review of local government misconduct. d. The Eighth Circuit refused to address Lieutenant Ott's recorded phone call, which provided direct evidence contradicting the factual basis for their ruling. This deliberate avoidance of dispositive evidence indicates the court was not functioning as a neutral arbiter but as a participant in the enterprise of obstruction. e. The federal courts' handling of these cases violates their constitutional role as guarantors of federal rights when state courts fail to provide adequate remedies, as established in cases like Monroe v. Pape, 365 U.S. 167 (1961). f. This pattern of federal judicial complicity transforms what might otherwise be a state-level breakdown into a comprehensive failure of the entire judicial system, leaving citizens with no forum in which their claims can receive fair and impartial consideration.

The Cross-Jurisdictional Pattern of Judicial Obstruction: a. The consistency of obstruction tactics across state and federal courts, and across different judges at different levels of the judicial system, suggests coordination rather than coincidence. The statistical probability of multiple independent judges all employing identical patterns of procedural manipulation approaches zero. b. The specific procedural grounds for dismissal often contradict precedent or create novel requirements never before applied in similar cases. These are not good-faith applications of existing law but ad hoc justifications for predetermined outcomes. c. When Plaintiff successfully navigates one procedural obstacle, a new one immediately appears—creating an endless maze that can never be completed. This pattern of constantly shifting barriers is the hallmark of a system designed not to adjudicate but to obstruct. d. The judicial system's treatment of Plaintiff's cases violates fundamental principles of stare decisis and equal application of law. Other similarly situated litigants receive substantively different treatment, demonstrating that these are not neutral applications of established procedure but targeted obstruction. e. This pattern across both state and federal courts reveals not just individual errors but coordinated obstruction—courts deliberately manipulating procedure to ensure predetermined outcomes rather than applying law to facts. The judiciary has transformed from check on power to its enabler, abandoning its constitutional function in service of institutional protection.

The Logical Impossibility in Judge Dougherty's Order: a. Judge Dougherty's December 13, 2024 order represents perhaps the most egregious example of judicial manipulation. By dismissing simultaneously for "lack of jurisdiction" and "failure to state a claim," Judge Dougherty created a

logical impossibility that cannot exist in a properly functioning judicial system. b. This contradiction directly violates the Supreme Court's holding in Steel Co. v. Citizens for Better Environment, 523 U.S. 83 (1998), where Justice Scalia, writing for the majority, explicitly rejected the practice of "hypothetical jurisdiction" where courts bypass jurisdictional questions to reach merits determinations. c. Justice Scalia described the requirement for jurisdictional determinations before merits considerations as "inflexible and without exception," writing: "The requirement that jurisdiction be established as a threshold matter... is 'inflexible and without exception.'" (quoting Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884)). d. By addressing the merits (failure to state a claim) after declaring lack of jurisdiction, Judge Dougherty violated this fundamental principle, creating a ruling that is not merely incorrect but legally incoherent. e. This contradiction cannot be attributed to oversight or misunderstanding of law—it represents a deliberate strategy to create multiple grounds for dismissal, giving appellate courts options to select whichever would most effectively prevent review. f. The Court of Appeals' selective extraction of only the jurisdictional ground while ignoring the contradictory merits dismissal in the same document further demonstrates coordination rather than independent judicial action.

C. Media and Public Exposure Foreclosed

Local Media's Unwillingness to Cover Documented Misconduct: a. Multiple reporters have initially expressed interest in Plaintiff's story only to suddenly drop it after contacting the very officials they should be investigating, suggesting improper influence or coordination. b. Scott Vorhees of KFAB initially reached out to Spencer Head and the OPS School Board based on his understanding of the concerns. However, after presumably speaking with OPS officials, he silently exited the scene and refused to cover the story, despite its clear public interest value. c. WOWT Digital Media Director Gina Dvorak went even further, illegally suppressing Plaintiff on WOWT's Facebook platform and making false statements under WOWT's official account. When challenged, she provided no explanation for this viewpoint-based censorship. d. No media outlet has reported on Plaintiff's victory regarding the CharterWest Bank website domain, despite this being a significant legal development that vindicated his earlier allegations of fraud. The fact that Plaintiff successfully obtained and maintained ownership of charterwestbank.com—an achievement virtually unheard of in modern domain law—should have generated significant media interest but was met with complete silence. e. This pattern suggests coordination between media entities and the government officials they should be holding accountable. Multiple reporters have initially expressed interest in the story only to suddenly drop it after contacting the very officials they should be investigating. f. This media silence represents a failure of the "fourth estate" function that is supposed to provide an additional check on governmental power when official accountability mechanisms fail.

Political Representatives' Refusal to Intervene: a. Congressman Don Bacon, when approached about these issues, claimed he couldn't help a citizen being lied about by the state due to "lack of jurisdiction"—an absurd position for a federal representative. He has refused to shed light on the situation or engage with media about these documented abuses. b. State legislators, when presented with evidence of systematic corruption in the implementation of laws they passed, have similarly refused to exercise their oversight authority or propose legislative remedies. c. This political abandonment further reinforces the closed system of unaccountability, where even elected representatives refuse to fulfill their constitutional role as a check on executive and judicial overreach.

Private Attorney Reluctance to Challenge the System: a. Despite clear evidence of misconduct, attorneys have declined to represent Plaintiff after initially expressing interest in the case. Many have explicitly stated that they fear professional retaliation if they challenge powerful institutions like OPS or the Attorney General's Office. b. This suggests a legal system where challenging powerful institutions carries professional consequences beyond the normal risks of litigation. Attorneys who rely on maintaining good relationships with courts and government agencies cannot afford to represent citizens challenging systemic corruption. c. The result is a functional monopoly on legal services that prevents meaningful challenges to government misconduct. Citizens are told to "get an attorney" when seeking redress, while simultaneously the system ensures no attorney can afford to take their case. d. This exclusion from professional representation further tilts an already uneven playing field, forcing citizens to navigate complex procedural requirements without assistance while institutional defendants enjoy the full resources of government attorneys and private law firms.

The Comprehensive Foreclosure of Public Accountability: a. The combination of judicial obstruction, administrative collusion, media silence, and denial of representation creates a perfect storm of unaccountability: i. Government misconduct cannot be addressed through administrative channels because the oversight agencies are complicit. ii. It cannot be addressed through the courts because judges manipulate procedural rules to prevent review. iii. It cannot be addressed through public exposure because media either ignores the story or actively participates in suppressing it. iv. Professional representation is unavailable because attorneys fear retaliation for challenging the system. b. The result is a government that has effectively insulated itself from all forms of accountability, transforming democratic institutions into a self-protecting oligarchy immune from citizen oversight. c. This systematic foreclosure of all

remedies is not the result of coincidence or unrelated institutional failures—it represents a coordinated enterprise designed to prevent transparency and accountability at all costs.

## XVI. THE RICO ENTERPRISE AND ITS PATTERN OF RACKETEERING ACTIVITY

The consistent pattern of obstruction across multiple institutions and years cannot be explained by coincidence or independent actions. It reveals the existence of a coordinated enterprise operating to prevent transparency and accountability. This enterprise meets all statutory requirements for a RICO claim under 18 U.S.C. §§ 1961-1968.

A. Legal Elements of a RICO Claim

To establish a civil RICO claim, a plaintiff must prove: (1) conduct (2) of an enterprise (3) through a pattern (4)# EMERGENCY MOTION FOR EXTRAORDINARY JUDICIAL REVIEW AND CIVIL RICO ACTION FOR SYSTEMIC DUE PROCESS VIOLATIONS, INSTITUTIONAL CORRUPTION, AND PATTERN OF RACKETEERING ACTIVITY

SELF-REPRESENTED PLEA FOR FAIRNESS

Plaintiff is a self-represented litigant, and as such, the Court is obligated to liberally construe his filings to ensure that technical deficiencies do not obstruct meritorious claims. See Haines v. Kerner, 404 U.S. 519, 520 (1972). This is an essential doctrine—one meant to protect those without formal legal training from being disadvantaged by the complexity of judicial proceedings. However, the application of this principle to the present case creates an interesting paradox.

The Court must, by law, interpret this pleading with generosity due to Plaintiff's lack of legal training. Yet, this same pleading—crafted without any formal legal education—is demonstrably superior to those regularly filed by licensed attorneys. This presents the judiciary with a dilemma: either dismiss the case and admit to obstructing justice, or engage with a filing that surpasses the standard of those who claim legal expertise. In either scenario, the institutional implications of this case will be profound.

It is a fundamental principle of American jurisprudence that courts must interpret the pleadings of self-represented litigants with the utmost leniency and resolve all ambiguities in their favor. This doctrine recognizes that individuals who lack formal legal training should not be penalized for failing to adhere to the rigid technicalities that might entrap a licensed attorney.

As a self-represented litigant, Plaintiff acknowledges the Court's obligation to ensure his filings are read with expansive generosity, affording every possible inference in his favor. Indeed, given that Plaintiff has no formal legal education, it is imperative that this Court read his pleadings broadly, indulgently, and with an open mind to ensure that no meritorious claim is disregarded simply due to procedural imprecision.

This raises an interesting paradox. If the Court were to apply this principle in its ordinary fashion, it would need to engage in an exercise of extraordinary intellectual charity—liberally construing the arguments of a litigant who, by all conventional wisdom, would be assumed to lack the sophistication necessary to articulate them with clarity.

Yet, in this instance, such an assumption would produce a fascinating, if not absurd, outcome. The reality, which is both unfortunate for Defendants and comically painful for the judiciary, is that this brief is constructed with more legal rigor, evidentiary precision, and procedural integrity than most filings they will ever view in their entire careers.

If Plaintiff were truly the "unsophisticated pro se litigant" that the Court is obligated to accommodate, how then does one explain a pleading that matches the quality of work produced by the highest-paid attorneys in the state? How does the Court reconcile the mandatory requirement to interpret pro se filings liberally while simultaneously realizing that this very pleading exposes a level of legal acumen that in some ways, rivals its own clerks, its own bar members, and likely, the judge himself?

Let it be known that:

I CERTIFY UNDER PENALTY OF PERJURY THAT EVERY SINGLE WORD CONTAINED IN THIS DOCUMENT IS TRUE TO THE BEST OF MY KNOWLEDGE.

## I. INTRODUCTION: THE SOUND OF INSTITUTIONAL PANIC

Never in human history have the unanimous sounds of fists pounding on tables echoed louder off more brittle walls than in Nebraska's courthouses right now. Having exhausted every procedural sleight of hand, every jurisdictional shell game, and every convenient fiction, the guardians of institutional corruption find themselves confronted with the one thing they cannot defeat: a paper trail of their own creation.

The motion before this Court does not arise from legal complexity requiring sophisticated analysis. Rather, it emerges from a pattern so blatant, so methodical, and so contemptuous of fundamental legal principles that a first-year law student could identify it. Indeed, the defendants have spent eight years and considerable taxpayer resources desperately attempting to prevent precisely this moment – when their coordinated obstruction would be laid bare before a court not yet compromised by their enterprise.

This Court now faces a constitutional moment that transcends ordinary judicial review. What follows is not mere allegation but documented proof of a coordinated enterprise spanning multiple institutions, courts, and years – all dedicated to a single objective: preventing a citizen's lawful access to public records through the systematic corruption of every accountability mechanism in Nebraska's government.

The defendants have grown so comfortable in their immunity from oversight that they have become sloppy. They now issue rulings that contain within themselves proof of their own illegitimacy – dismissing cases simultaneously for "lack of jurisdiction" and "failure to state a

claim," a logical impossibility that violates centuries of established precedent and the Supreme Court's explicit ruling in Steel Co. v. Citizens for Better Environment, 523 U.S. 83 (1998), where Justice Scalia declared the requirement for jurisdictional determinations before merits considerations to be "inflexible and without exception."

How extraordinary it must be for these defendants – attorneys general, judges, law enforcement officials, and respected attorneys – to find their elaborate enterprise of obstruction undone not by a team of high-powered lawyers or federal investigators, but by a self-represented citizen whose only weapons were persistence and meticulous documentation. Their institutional arrogance led them to believe that the rules of evidence, procedure, and logic itself could be casually discarded when inconvenient, leaving behind the very breadcrumbs that now form an unimpeachable record of their coordination.

This is not a case about technical violations or good-faith legal disagreements. It is a case about whether our system of constitutional governance can still function when every institution designed to ensure accountability has been compromised. It is about whether the rule of law applies equally to powerful interests and ordinary citizens. And most fundamentally, it is about whether truth still matters when confronted with institutional power determined to suppress it.

This case is not about a single dispute or an isolated grievance. It is not even, fundamentally, about the individual plaintiff who brings it, though his story is a microcosm of the larger crisis that has brought us to this fateful pass.

This case is about the wholesale breakdown of republican self-government in the state of Nebraska - a meltdown of the basic norms of transparency, accountability, and institutional integrity that are the sine qua non of a free society. It is about a pervasive culture of impunity and cronyism that has taken root in the highest corridors of power, turning public service into a sordid racket for personal gain. Most of all, it is about the betrayal of the sacred trust between the government and the governed - the fraying of the social contract that binds citizen to state in a partnership of mutual obligation.

The details would beggar belief were they not so exhaustively documented in the record:

A bank, CharterWest, that manipulated customer records and leveraged false reporting to shield its malfeasance from scrutiny, while state oversight bodies from the Attorney General to the Banking Department to the Ombudsman turned a blind eye.

Let's be clear, NO HONEST person could be confused about a bank spoiling a document. Critically, no honest person was confused, there was simply no honest person between ALL of Nebraska's consumer protection agencies, the CFPB, the Fed Reserve of KC or any Court.

A sprawling educational bureaucracy, Omaha Public Schools (OPS), that violated open records laws with impunity and systematically suppressed whistleblowers who dared to challenge its corruption.

Original School Board meeting: https://youtu.be/vSXHOiOlUWw

A judiciary so steeped in the same corrosive culture of casual conspiracy that it has abandoned even the pretense of serving as an independent check on official abuse.

A State Capitol Police force that physically removed the plaintiff from the capitol building for the "sin" of properly asking the Attorney General's office for resolution.

Plaintiff's third time being Kicked out of the Nebraska Attorney General's Office, this time including his mother, the other victim of the Attorney General's Lie (posted below for the world to see how they published two things on the same page that can't both be true). https://youtu.be/4GEKWeUczGA

The offices of the state Ombudsman and Attorney General, who refused to investigate legitimate complaints and actively abetted the suppression of evidence of misconduct. Shown below, one of several letters from the offenders, this one from Attorney General's office telling Plaintiff that he's not allowed to see the same information that Omaha Public Schools was allowed to see.

Agencies like the CFPB, the Federal Reserve Bank of Kansas City, the ACLU, the BBB, FHA DEPARTMENT OF EDUCATION and more, staffed with people incapable of reading basic words during the course of standard investigations.

Embarrassing calls from the Federal Reserve of KC where they lie, stumble and even hang up on Plaintiff for the sin of asking for the facts to reflect. https://youtu.be/nz0ltiNhoco https://youtu.be/nFIIX2Hx3pY https://youtu.be/Jf68qdn9t5E

Even Clerks, Bailiffs, Court Reporters participated in the system of obstruct, abuse, ignore, dismiss.

Conversation with Judge Dougherty's receptionist where she says she can't give me incorrect legal advice that I didn't ask for, while ignoring the question and Judge Dougherty chiming in,

apparently also unaware of basic due process and procedures (one of several): https://youtu.be/gVc8Olf7SQM https://youtu.be/WQUX0Kg6awg

(It would be prudent in general to advise the Judge's staff against claiming that they can't give legal advice while they proceed to give incorrect legal advice. This happens at every visit.)

News outlets such as KFAB, WOWT, KETV, THE DAILY RECORD, FLATWATER FREE PRESS, OANN and more, still remain silent in the face of clear evidence.

Scott Vorhees claiming he reached out to multiple OPS school board members, then suddenly, the same guy who routinely talks about the color of the lights on "Rocket Car Wash" while addressing minor issues in school districts in other states, just couldn't see the problem with OPS sending law enforcement after students for merely showing up, not even speaking at a board meeting)

What materializes to anyone capable of looking at the whole picture is a hidden system that logically can only be staffed with CORRUPTION, WEAKNESS and CRIMINAL INTENT, in that order. We are not talking about unintelligent individuals or short staffed departments, we're talking about people who initially understood my clearly documented situation, but as soon as they connected with an official with something to hide, their interest changed to distancing themselves.

Could major consumer protection agencies, educators, law enforcement, Judges, attorneys and mail clerks all be incapable of understanding what any child (with a dictionary to figure out the big words) can clearly understand? The entire system operates on a wink and a nod while deliberately violating the rights of the citizens.

What emerges is a portrait of a government at war with its own first principles - an insular and unaccountable oligarchy that treats the very notion of public integrity as a punchline. The interlocking abuses chronicled in this complaint, perpetrated by dozens of public employees across every branch of government and level of administration, paint a chilling picture of democracy in decay. They reveal a slow-motion coup against the rule of law itself - a rollback of popular sovereignty so complete as to render the state's constitutional architecture a dead letter.

This case is the story of one citizen's refusal to accept that grim diagnosis as Nebraska's inescapable fate. For nearly a decade, Plaintiff Justin Riddle has waged an indefatigable campaign to uproot the entrenched corruption that has overtaken his government - a lonely crusade for transparency in a wilderness of obfuscation and deceit. Rather than shrink from the powerful interests arrayed against him, Mr. Riddle has compiled a veritable dossier on their collective debasement of the public trust - an omnibus indictment of systemic malfeasance as breathtaking in its breadth as it is meticulous in its evidentiary foundations.

That dossier now serves as the factual backbone of this Complaint - a bill of particulars that names and shames the whole Cornhusker kleptocracy, from the pinnacles of power to the bowels of bureaucracy. By minutely documenting the illicit activities of everyone from the Governor's inner circle to individual records clerks and Assistant AGs, Plaintiff has ripped the

veil off an appalling simulacrum of public service. He has delineated, in damning detail after detail, a criminal enterprise so enmeshed in Nebraska's official organs as to render public and private functionally indistinguishable.

The contours of that enterprise are almost too baroque to fathom, but their connective tissue is all too plain: A rootless cynicism that subordinates the general welfare to private whim and sells the state's machinery of enforcement to the highest bidder. Whether abusing the Attorney General's bully pulpit to quash legitimate investigations, or deploying the courts as a retaliatory cudgel against dissident citizens, or turning the Ombudsman's oversight mandate into a farce of legal levitation, the enterprise's disparate parts share a common contempt for the impartial administration of justice. Theirs is a confederation of professional hypocrisies, bound together by a joint commitment to using the letter of the law to shred its spirit.

The result is a staggering tableau of public trust betrayed on an almost incomprehensible scale. To the untrained eye, the offenses documented here might seem too disparate and contradictory to cohere - a random assortment of personal piques and institutional turf battles. But that is precisely the point: The ubiquity of ethical dereliction across so many agencies and individuals, the sheer routinization of impropriety as standard operating procedure, belies any attempt to dismiss it as the work of a few bad apples. What Plaintiff has exposed is a diseased orchard - a culture of corruption so widespread and deeply rooted as to implicate the very possibility of honest self-government.

That is the sobering reality this case confronts - and the monumental stakes that hang in its balance. For the rot in Nebraska's body politic can no longer be written off as a flesh wound. If the dense web of institutional failure limned in this Complaint is any indication, the cancer of unaccountability has reached Stage IV, metastasizing into every organ of republican government. What is at issue is no longer the misdeeds of this or that bureaucrat, but the very survival of bureaucracy as a tool for effectuating the popular will rather than the reverse.

The question is whether that grim prognosis will be Nebraska's epitaph, or its wake-up call. For as much as this case chronicles a staggering record of systemic dereliction, it also serves as a stirring testament to the power of even one free citizen to serve as a watchman on the walls of his republic. In the face of a kleptocratic phalanx marshaled to thwart his every effort at public scrutiny, Justin Riddle has shown us what a government of the people, by the people, for the people looks like in action. Now it falls to the courts as the last redoubt of constitutional accountability to put those words back into practice - to demonstrate that our founding ideals are more than a parchment promise or a schoolhouse slogan.

Fortunately, this Plaintiff has left them no choice but to try. For in exhaustively documenting the Defendants' interwoven schemes of official treachery, Mr. Riddle has handed this Court both a rare diagnostic opportunity and a profound moral imperative. After years of painstaking investigation and self-sacrificing struggle, he has surfaced a public malignancy so severe that it can no longer be excused or ignored - and in so doing, has forced the question of whether our bedrock republican values can still be made real. By the same token, he has gifted our judiciary

a singular chance to cauterize the wounds of misrule and model what strong constitutional medicine looks like.

Make no mistake: What is at stake here is not just the conduct of a few crooked bureaucrats in America's heartland, but the viability of the rule of law in an era of encroaching executive impunity. The Defendants' transgressions are so flagrant, their contempt for basic democratic safeguards so brazen, that to ratify them through inaction would be to deal a body blow to a constitutional order already reeling from a crisis of legitimacy. Conversely, to meet their entrenched lawlessness with the full force of the federal Anti-Corruption Acts would be to take a decisive step toward rehabilitating public trust in our battered instruments of self-government. In an age of cascading institutional faiths, it would provide a desperately needed infusion of civic confidence - a tonic to our long national nightmare of elite unaccountability.

So as the Court ponders the grave allegations contained herein, let it be with a keen awareness that the whole country is watching. For the first and perhaps the last time, the nation's eyes are trained on Nebraska as a microcosm of its larger struggle to salvage popular sovereignty from the jaws of a metastasizing Leviathan. The plaintiff's Complaint is thus not just a parochial grievance but a democratic cri de coeur, a flare lofted from the civic frontlines of a republic under siege. How the judiciary responds - whether with bold reaffirmation or timid abdication - will have consequences far beyond the Cornhusker State.

This is the hour of decision, the moment of truth for a legal system poised on a knife's edge between renewal and decline. A patient bleeds out on the operating table of our national destiny, and the scalpel of reform sits idle in the trembling hands of judges more used to wielding it as a prop than brandishing it in earnest. The question is no longer whether major surgery is needed to restore the vital organs of our democracy, but whether the presiding doctors can still locate their nerve and their professional honor.

Justin Riddle has demonstrated, through Herculean effort, that one citizen with a bellyful of fire can still make the comfortable and connected sweat. He has etched, with cool, devastating precision, a diagnostic map of the Nebraska Establishment's every evasion of public scrutiny. In so doing, he has presented the courts with the ultimate Exhibit A to a generation's bill of impeachment against institutional decadence.

Now this Complaint places the scalpel squarely in their hands. Will they find within themselves the wisdom and fortitude to use it for its highest purpose, or will posterity remember this as the moment the guardians of our laws flinched from the surgeon's oath and let the light of republican self-rule flicker out once and for all?

For over two centuries, this country has served as a shining city on a hill - an imperfect beacon of self-government to a world torn between the Scylla of tyranny and the Charybdis of anarchy. What happens next will determine whether America retains its lonely vigil in the popular imagination, or degenerates into yet another cautionary tale of democratic entropy.

On that score, let no one misapprehend the significance of what unfolds in these pages. The power to write the next chapter in this saga of institutional depravity rests, as it must, with the courts as the last backstop of constitutional faith. But the eyes reading over their shoulder will belong to citizens far beyond the litigants at bar - indeed, to nothing less than the jury pool of history itself.

Like a portent from the past or a postcard from the future, the footnotes to come will bear silent witness to how the United States answers when the roll is called at a hinge moment for self-government. More than any single villain unmasked or victim redressed, the true legacy of this case will be measured in the message it sends about the sinews of our civic creed.

Can a system this sick still heal itself, or has the hard rain of official misconduct washed away the last dams of public trust? Is there still magic enough in the words "ordered liberty" and "popular sovereignty" to defibrillate the Founders' fading heartbeat, or have we passed the event horizon for a government of laws, not of men?

On these and kindred riddles turns more than the passing fate of good government in Nebraska. They will ripple out from this Complaint to shape the tensile strength of our civic immune system for a generation, with implications for experiments in self-rule far beyond our shores. The time has come to administer the sternest possible stress test of our most sacred constitutional promissory notes - and to discover, in the trying, how much structural integrity remains in the hull of our ship of state.

Justin Riddle has spent the better part of a decade ensuring that this moment might arrive while the pumps are still working and self-correction is still possible. He has sacrificed more than any healthy polity should ever require of even its most lion-hearted dissenters to force a long overdue reckoning with the oldest question of our republican identity: Quis custodiet ipsos custodes? Who will guard the guardians themselves when every formal check on their power has been deliberately dismantled or captured from within?

Now it falls to the courts to prove whether Juvenal's ancient conundrum remains a cautionary tale or an epitaph for the American experiment. By the grace of a single citizen's unflagging faith in our creaking institutions, they have been granted one last chance to reaffirm first principles at a watershed moment for self-government itself.

Let us pray they are equal to the awesome responsibility. For the sake of Justin Riddle and of the republic for which he stands - as the last line of defense between the arbitrary rule of venal elites and the just consent of the governed.

## II. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action pursuant to:

28 U.S.C. § 1331 (federal question jurisdiction), as this action arises under the Constitution and laws of the United States, including but not limited to: a. 18 U.S.C. §§ 1961-1968 (Racketeer Influenced and Corrupt Organizations Act) b. 42 U.S.C. § 1983 (Civil Rights Act) c. First

Amendment to the United States Constitution (right to petition for redress of grievances) d. Fifth and Fourteenth Amendments to the United States Constitution (due process and equal protection)

28 U.S.C. § 1343(a)(3) and (4), which grant jurisdiction for civil rights violations and to secure equitable relief under federal civil rights laws.

The Anti-Injunction Act (28 U.S.C. § 2283) does not bar this action despite its involvement with state court proceedings, as this case falls squarely within the recognized exceptions for: a. Actions expressly authorized by Congress, including RICO enforcement actions (see Mitchum v. Foster, 407 U.S. 225 (1972), establishing that federal civil rights actions under 42 U.S.C. § 1983 are expressly authorized exceptions) b. Cases where injunctive relief is necessary to protect or effectuate the judgments of the federal courts c. Circumstances where state courts are being used to harass citizens and prevent the exercise of federal rights (see Dombrowski v. Pfister, 380 U.S. 479 (1965))

The Rooker-Feldman doctrine does not bar jurisdiction, as this action: a. Does not seek review of final state court judgments but challenges an ongoing pattern of conduct that extends beyond individual cases b. Addresses a coordinated scheme that has corrupted the judicial process itself, not merely the outcomes of specific cases c. Falls within the exception for cases involving extrinsic fraud that prevented full and fair litigation (see In re Sun Valley Foods Co., 801 F.2d 186, 189 (6th Cir. 1986)) d. Challenges conduct that is "separate from and independent of the state court judgment" (see Great Western Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 167 (3d Cir. 2010))

Abstention doctrines do not apply, as: a. Younger abstention is inapplicable where, as here, there is demonstrated bad faith and harassment in state proceedings (see Younger v. Harris, 401 U.S. 37, 53 (1971)) b. Pullman abstention is inappropriate where state court remedies have been systematically foreclosed through procedural manipulation (see Railroad Commission of Texas v. Pullman Co., 312 U.S. 496 (1941)) c. Burford abstention does not apply where, as

here, the state regulatory system itself has been corrupted (see Burford v. Sun Oil Co., 319 U.S. 315 (1943)) d. Colorado River abstention is inapplicable given the extraordinary circumstances demonstrating that state proceedings cannot provide adequate protection of federal rights (see Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976))

This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367, as these claims form part of the same case or controversy as the federal claims.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to these claims occurred within this judicial district, and at least one of defendants reside or maintain their principal place of business within this district.

Venue is also proper pursuant to 18 U.S.C. § 1965, as the RICO enterprise alleged herein operated in this district.

III. PARTIES

A. Plaintiff

Justin Riddle is a citizen of the United States and a resident of Omaha, Nebraska. He has actively sought public records and transparency from Nebraska governmental entities since 2018, using lawful channels established under the Nebraska Public Records Law (Neb. Rev. Stat. §§ 84-712 to 84-712.09). Despite facing systematic obstruction, coordinated retaliation, and the corruption of every accountability mechanism available to citizens, Plaintiff has meticulously documented each instance of misconduct, creating an unimpeachable record of institutional corruption spanning multiple years and agencies.

Mr. Riddle files this suit as a private citizen and as a representative of the people's interest in honest, transparent, and accountable government. He seeks relief both individual and public in nature, including but not limited to damages, injunctive relief, and a judicial declaration that the Defendants' conduct is violative of state and federal law.

B. Defendants

The defendants in this action represent a coordinated enterprise spanning multiple governmental and private entities, all operating with the shared purpose of preventing transparency and accountability:

[Section of names to be added separately as requested]

Collectively, the Defendants formed and operated a fraudulent enterprise within the meaning of RICO, 18 U.S.C. § 1961(4), engaging in a pattern of racketeering activity designed to silence Mr. Riddle and prevent public exposure of their misdeeds. They exploited their official positions and manipulated the instruments of government power to erect an impenetrable bulwark around their illicit enterprise, violating the basic rights of the Plaintiff and the public at large to know the truth about their government's functioning and to petition their leaders for the redress of grievances.

Each individual Defendant is sued in his or her individual capacity unless otherwise noted. At all relevant times, each Defendant was illegally acting under color of law pursuant to their authority as government officials or as willful participants in joint action with state and federal agents. The misconduct described herein was undertaken with malice, willfulness, and reckless indifference to the rights of others.

IV. THE ATTORNEY GENERAL'S ROLE IN MEDIA SUPPRESSION

For eight years, no media outlet has shown the slightest curiosity about a case involving:

Public records fraud

Judicial corruption

Retaliation against a citizen exposing systemic abuse

That is statistically impossible unless suppression was deliberate.

A. The Attorney General's Office Has Been Quietly Controlling the Narrative

At some point, at least one reporter had to have asked about this case. Any journalist investigating legal corruption would have encountered the OPS records suppression scandal and the Nebraska Supreme Court case. Instead of covering it, they stayed silent.

The only logical explanation? The Nebraska Attorney General's Office intervened behind the scenes. This is direct evidence of information control. The AG's Office, rather than allowing the press to investigate, likely issued quiet directives to journalists or their editors, discouraging coverage.

B. Why This Constitutes a RICO Predicate Act

Influencing or manipulating the media to suppress exposure of criminal activity is obstruction of justice under federal law. Coordinating a cover-up through non-public channels (i.e., influencing media silence) is a form of racketeering activity. The AG's Office does not have the legal authority to control press coverage—meaning any effort to do so is an abuse of power designed to protect a criminal enterprise.

Conclusion: The Nebraska Attorney General's Office didn't just refuse to investigate corruption—it actively worked behind the scenes to ensure the media would not report on it.

C. The AG's Mathematically Impossible Accountability System

The Attorney General's position regarding public records represents not merely a contradiction but a deliberately engineered barrier designed to make accountability mathematically impossible. The Nebraska AG's Office has openly declared itself "adversarial" to citizens seeking public records while simultaneously claiming statutory authority to adjudicate disputes over those same records.

This creates not just a conflict of interest but a perfect circle of obstruction with no entry point for citizens:

When citizens seek public records that government entities wish to conceal, agencies deny access

The AG's Office, statutorily designated as the enforcer of transparency laws, then positions itself as "adversarial" to citizens because it "represents state agencies"

When citizens appeal to the AG, they're told to pursue mandamus actions in court if they disagree with the AG's determination

When citizens file mandamus actions, courts defer to the AG's "expertise" on public records matters

If by some miracle a citizen obtains a mandamus, the AG then refuses to review the underlying issue because "you already got a mandamus"

If citizens try to challenge the AG's decision directly, courts say that's not reviewable either

AG's Office staff have explicitly stated to Plaintiff that they are "adversarial" to citizens raising complaints about state agencies because they represent those agencies. This is not a vague implication but a direct admission from the very office charged with enforcing transparency laws.

This is not merely institutional bias—it is a deliberately designed system of mathematical impossibility. By positioning themselves as both referee and adversary, the AG has created a closed-loop system where accountability is structurally impossible by design. No matter which path a citizen takes, the system ensures they will reach a dead end.

The enterprise hasn't merely captured the enforcement mechanism—they've engineered it to create the appearance of remedy while ensuring none exists. This represents the ultimate evolution of corruption: a system that creates the illusion of accountability while mathematically guaranteeing none can occur.

V. MEDIA COMPLICITY AND THEIR ROLE IN THE ENTERPRISE

The media is supposed to serve as a check on government corruption. Instead, in Nebraska, they act as protectors of the system.

A. The Business of Silence

News organizations rely on government relationships for:

Interviews, scoops, and access to public officials

Advertising revenue from government agencies and political campaigns

Covering government corruption puts these relationships at risk. Rather than investigate, they chose to protect their financial and political interests.

B. The Nebraska Media's Unbroken Record of Suppression

Not one media outlet has covered the Nebraska Supreme Court victory proving public records fraud

Not one journalist has pursued the AG's refusal to enforce public records laws

Not one publication has reported on the RICO lawsuit exposing systemic corruption

That isn't oversight. That's complicity.

C. Why This is a RICO Predicate Act

The media is actively profiting from suppression. By refusing to report on corruption, they maintain their financial relationships with government officials. This transforms their silence into a commodity exchanged for influence and advertising dollars.

By suppressing critical public information, the media is aiding and abetting fraud. The public has a legal right to know about judicial and government misconduct. News organizations, by deliberately ignoring clear corruption, are participating in a fraudulent scheme that prevents public accountability.

Conclusion: The Nebraska media is not failing to report. They are choosing not to report. And that makes them active participants in the conspiracy.

VI. SYSTEMATIC FORECLOSURE OF JUSTICE: THE LEGAL INDUSTRY'S ROLE IN PROTECTING CORRUPTION

This section establishes that no attorney can or will challenge the system, proving that legal recourse is an illusion.

A. The Myth of Legal Representation

Government agencies, courts, and law enforcement routinely tell citizens to "get an attorney" to resolve legal disputes.

In reality, no private attorney will take a case against entrenched corruption for two primary reasons:

Career Suicide: Any attorney who challenges Nebraska's legal establishment will face blacklisting, professional retaliation, and financial ruin.

Firm Restrictions: Large law firms prohibit their attorneys from taking cases that would put them in direct conflict with the courts, the Attorney General's Office, or other government entities.

B. The Legal Industry's Silent Complicity

The Nebraska State Bar and the judicial system create an environment where attorneys fear challenging the status quo.

Attorneys who represent government entities enjoy guaranteed paychecks funded by taxpayers, while private attorneys who challenge the system risk everything.

This creates a legal monopoly where only government-approved cases can proceed, ensuring that corruption is never meaningfully challenged.

Conclusion: The legal system is not an avenue for justice—it is a self-regulating monopoly designed to eliminate opposition and ensure power remains concentrated within the government-controlled legal establishment.

VII. TAXPAYER-FUNDED SUPPRESSION: HOW PUBLIC MONEY IS WEAPONIZED AGAINST WHISTLEBLOWERS

This section establishes that the government is using public funds to fight the very people it is supposed to serve.

A. Public Resources Are Used to Defend Corruption

The Nebraska Attorney General's Office, OPS, the judiciary, and law enforcement all use taxpayer money to cover legal fees, investigations, and suppression tactics against private citizens.

Citizens, on the other hand, must personally finance any attempt to hold these institutions accountable.

Critically, the Defendants routinely wait the statutory maximum time to respond to requests, ask for irrelevant information to extend out requests, deliberately slow walk cases and often simply ignore public requests.

This results in a completely one-sided legal battle, where the government has unlimited resources, while the public is financially exhausted before justice can even be pursued.

This is magnified by the clear fact that in the large majority of situations where the public has enlisted the help of the government, that individual has found themselves in a very time-sensitive and disturbing position.

By deliberately using the system to frustrate, confuse, avoid, and damage individual citizens who are already disillusioned by the system, the defendants have taken their flaunted positions from clearly morally reprehensible to factually criminally liable.

B. The Public is Funding a Protection Racket

Public employees are using tax dollars to pay for attorneys who protect their own misconduct.

Judges, who are taxpayer-funded, are rubber-stamping dismissals that protect the government from being held accountable.

Government agencies are paying private law firms (e.g., Baird Holm LLP) to obstruct public records access and silence whistleblowers.

The media, which relies on government sources and advertising, actively participates in suppressing the truth to maintain financial relationships.

Conclusion: The taxpayers of Nebraska are unknowingly financing a system that is designed to suppress their own rights, protect corrupt officials, and ensure that legal challenges to government misconduct are impossible.

VIII. CLOSED-LOOP CORRUPTION: THE SELF-SUSTAINING CYCLE OF POWER & SUPPRESSION

A. The Circular Nature of Government Suppression

The government funds its own legal defense against corruption allegations.

The judiciary rubber-stamps dismissals to protect government entities.

Law enforcement refuses to investigate clear evidence of fraud and abuse.

The media ensures that the public never hears about these cases.

Private attorneys cannot challenge this system without professional or financial ruin.

Conclusion: This is not just corruption—it is an organized criminal enterprise where every participant benefits from maintaining the status quo.

IX. THE SYSTEMATIC DESTRUCTION OF STABILITY THROUGH PROCEDURAL ATTRITION

What is often overlooked in discussions of institutional corruption and procedural manipulation is the profound human cost that extends far beyond financial damages. The defendants' actions represent a documented phenomenon in protracted institutional conflict: the weaponization of time, uncertainty, and procedural complexity as tools for defeating even the most determined opponents without ever having to address substantive claims.

A. The Human Cost of Institutional Manipulation

The system has been deliberately designed to exploit several leverage points simultaneously:

Financial Depletion: The structured accumulation of costs—filing fees, transcript fees, document production expenses—creates a financial bleeding effect that eventually renders continued pursuit unsustainable. Beyond direct litigation costs, this extends to impact fundamental life decisions and economic security. Filing fees alone have cost the Plaintiff thousands of dollars for proceedings that were predetermined to be dismissed.

Cognitive Bandwidth Exhaustion: The constant need to navigate deliberately complex procedural mazes consumes enormous cognitive resources. The human brain has finite capacity for sustained, high-intensity problem-solving, especially when facing intentionally shifting requirements designed to be unsatisfiable. This creates a situation where even the most diligent citizen cannot maintain the mental energy required to combat systematic obstruction.

Relationship Infrastructure Erosion: The isolation that comes from pursuing a complex legal battle that others can't fully comprehend gradually undermines the social support systems that sustain mental health. This creates a secondary effect where the loss of relationships further reduces resilience against the primary stressors. The Plaintiff has experienced the deterioration of personal relationships due to the all-consuming nature of this battle.

Identity and Purpose Distortion: What begins as a specific grievance seeking specific remedy gradually transforms into a consuming mission that restructures one's entire identity around the conflict. The legal battle becomes not just something you're doing but defines who you are, creating a psychological dependency that defendants can exploit.

B. The Absence of Temporal Boundaries as Psychological Warfare

A particularly insidious aspect of this approach is the deliberate removal of any temporal boundaries. When facing a defined challenge with clear parameters—even a difficult one—humans can marshal resources and endurance. But when facing an indefinite challenge with constantly shifting parameters and no clear endpoint, the psychological toll multiplies exponentially.

This is a documented strategy in contexts ranging from interrogation techniques to cult indoctrination: remove all predictability and control over when hardship will end, and even the most resilient individual eventually experiences fundamental psychological distress.

The Defendants have deliberately created an endless procedural maze where each new barrier is followed by another, with no possibility of conclusion. This temporal uncertainty is not incidental but strategic—designed to break the will of those seeking accountability.

C. Documenting This Dimension for Legal Strategy

This human cost dimension must be explicitly incorporated into the legal strategy for several reasons:

Concrete Damages Quantification: The emotional toll, relationship disruption, and quality-of-life impairment constitute quantifiable damages that extend beyond direct financial losses. Courts have increasingly recognized these impacts as legitimate damage components, particularly in cases involving institutional misconduct.

Pattern Evidence Reinforcement: The systematic nature of the procedural obstruction becomes even clearer when viewed through the lens of its human impact. What might otherwise be dismissed as coincidental procedural hurdles appears as the deliberate warfare strategy it truly is when its human consequences are fully documented.

Judicial Empathy Trigger: Even judges operating within institutional constraints respond to human suffering. Documenting not just the procedural manipulation but its real-world consequences activates ethical and empathic considerations that technical legal arguments alone might not.

Urgency Justification: The ongoing nature of these harms provides additional justification for emergency intervention. Unlike purely procedural issues that might be remedied later, psychological and relationship damage compounds over time in ways that cannot be fully remediated after the fact.

The human cost inflicted by the Defendants' pattern of institutional abuse represents not just collateral damage but a deliberate strategy of attrition designed to make the price of pursuing justice so high that citizens will abandon their rights rather than face continued torment.

X. THE WEAPONIZATION OF TIME: TEMPORAL OBSTRUCTION AS STRATEGIC ENTERPRISE CONDUCT

The enterprise's methodology extends beyond procedural and informational obstruction to include a sophisticated temporal strategy that systematically manipulates statutory timelines to create another form of mathematical impossibility. This temporal obstruction represents not isolated delays but a coordinated pattern of timeline manipulation that fundamentally undermines the possibility of meaningful accountability.

A. The Systematic Exploitation of Maximum Statutory Timelines

The Last-Minute Response Pattern: a. Government entities consistently wait until the absolute final moment allowed by law to respond to requests, even when those responses contain no substantive information. b. This pattern is documented repeatedly across multiple agencies: i. OPS Records Keeper Anne MacFarland consistently provides responses at 4:29pm on the final day of statutory response periods, even when those responses merely direct Plaintiff to search public websites. ii. The Attorney General's Office routinely waits until the final day of statutory periods to issue disposition letters on public records complaints. iii. The Ombudsman similarly exhausts maximum response periods before providing non-substantive replies. iv. Courts regularly wait the maximum time permitted for issuing decisions on motions and filings. c. The consistency of this pattern across different agencies with different workloads and priorities can only be explained by coordination rather than coincidence. d. This pattern becomes even more revealing when examining the content of these delayed responses - often containing no substantive information that would require extensive preparation time, demonstrating that the delay itself is the purpose rather than an unavoidable consequence of thorough review.

The Compounding Effect of Sequential Procedures: a. The accountability system requires citizens to complete multiple sequential procedures before obtaining meaningful review: i. Initial records request (statutory maximum: 4 business days) ii. Petition to Attorney General (informal timeline: 4-6 weeks) iii. Mandamus action (no statutory timeline, typically months) iv. Appeal of denied mandamus (statutory maximum: 30 days to file, months for decision) b. Each step in this sequence is individually extended to its maximum statutory limit, creating a cumulative timeline that makes completing the full accountability process practically impossible: i. The total time required to exhaust administrative remedies often exceeds applicable statutes of limitations. ii. The cumulative cost of pursuing each step in sequence becomes prohibitive for individual citizens. iii. The psychological toll of perpetual delay creates strategic attrition designed to exhaust citizens' will to pursue accountability. c. This creates another mathematical impossibility - a system where exhausting administrative remedies as required becomes practically impossible due to the deliberate extension of each component timeline.

B. The Asymmetric Application of Temporal Requirements

The Double Standard in Deadline Enforcement: a. While government entities systematically exploit maximum statutory timelines, citizens are held to strict and often impossible deadline requirements: i. Courts reject citizens' filings for minor timing violations while allowing government entities to file motions less than 24 hours before hearings. ii. Agencies require citizens to respond to inquiries within days while taking weeks or months to address citizen complaints. iii. Missing a single deadline in the sequence creates a procedural trap that can terminate the entire accountability process. b. This asymmetry creates a fundamentally unfair playing field where: i. Citizens must meet exact deadlines with perfect compliance. ii. Government entities treat statutory deadlines as mere suggestions. iii. The system creates artificial bottlenecks knowing citizens have limited time and resources. c. The pattern is particularly evident in how courts treat deadline violations - enforcing them strictly against citizens while routinely granting extensions and exceptions to government entities and their attorneys.

The Email Evidence: A Case Study in Temporal Obstruction: a. A March 19, 2025 email from OPS Records Keeper Anne MacFarland exemplifies this strategy: i. Plaintiff submitted a specific records request on March 13, 2025, seeking "any payments made to Baird Holm including dates, amounts and any accompanying notes." ii. MacFarland waited until 4:29pm on March 19 - the final hour of the statutory response period (4 business days) - to respond. iii. Her response contained no actual records but merely directed Plaintiff to search through general financial documents on the OPS website. iv. The timing of this non-response (4:29pm on the final day) for

what amounted to a simple referral demonstrates deliberate delay rather than legitimate processing time. b. This pattern has been documented repeatedly across dozens of records requests, establishing that these are not isolated incidents but systematic conduct. c. The timing becomes even more revealing when examining responses to follow-up requests, which consistently restart the maximum statutory clock despite addressing the same underlying information.

## C. The Temporal Impossibility

This systematic manipulation of time creates another form of mathematical impossibility within the accountability system:

The Process Completion Paradox: a. Citizens are told they must exhaust administrative remedies before seeking judicial review. b. Each administrative step is deliberately extended to its maximum statutory limit. c. The cumulative time required exceeds practical human endurance and often applicable statutes of limitations. d. This creates a situation where exhausting administrative remedies becomes mathematically impossible within the timeframes required for meaningful relief.

The Accelerated Response to Litigation Threat: a. When Plaintiff indicates potential litigation (as in his March 19 follow-up stating "This is due. I'll add it to my next brief if I don't receive it"), responses suddenly appear at the last possible moment. b. This pattern reveals that agencies are capable of more timely responses but deliberately choose delay as a strategic tool. c. The acceleration in response to litigation threats demonstrates that delays are tactical rather than necessary.

The Cumulative Impact of Temporal Manipulation: a. This weaponization of time creates multiple compounding effects: i. Financial exhaustion through prolonged processes requiring continuous investment of resources ii. Psychological attrition through perpetual uncertainty and delay iii. Procedural traps where citizens miss deadlines due to the overwhelming number of simultaneous processes iv. Legal barriers as statutes of limitations expire during artificially extended administrative processes b. Even when citizens overcome these obstacles, the substantive issues are typically never addressed, and the process begins again with a new round of maximum statutory delays.

This temporal obstruction strategy represents another sophisticated mechanism in the enterprise's arsenal - one that doesn't leave obvious evidence like false statements but effectively prevents accountability through procedural attrition. It's particularly insidious because each individual delay appears legitimate in isolation, but the pattern reveals deliberate coordination to make the overall process impossible to complete.

The weaponization of time complements the information asymmetry and procedural obstruction previously documented, creating a comprehensive system where no matter how determined or resourceful a citizen may be, completing the full accountability process becomes mathematically impossible by design.

XI. THE WEAPONIZATION OF INFORMATION ASYMMETRY

The enterprise's sophistication extends beyond mere procedural obstruction to include a deliberately engineered information asymmetry that fundamentally undermines due process. This asymmetry represents not a series of isolated decisions but a carefully designed mechanism that appears across multiple agencies and contexts, providing further evidence of coordination rather than coincidence.

A. The One-Sided Transparency Shield

The Strategic Invocation of Privacy and Confidentiality: a. Government agencies including the Attorney General's Office, Ombudsman, and regulatory bodies maintain complete transparency with the institutions they're supposedly investigating, while simultaneously invoking "privacy," "confidentiality," and "ongoing investigation" shields against citizen complainants. b. This selective transparency creates a fundamentally unfair process where: i. The accused entity receives the complete complaint and can craft tailored responses ii. The accused entity receives updates and information about the investigation's progress iii. The accused entity effectively gets "multiple bites at the apple" to address concerns iv. Meanwhile, the citizen is kept entirely in the dark, unable to counter false claims or address misrepresentations c. The pattern is too consistent across agencies to be coincidental. Whether dealing with the AG's Office regarding public records violations, the Department of Banking and Finance regarding CharterWest's misconduct, or the Ombudsman regarding accountability failures, the same information asymmetry pattern emerges. d. This one-sided transparency creates a situation where the citizen is functionally prohibited from participating in the very process ostensibly designed to address their complaint.

The Interagency Double Standard: a. Law enforcement agencies maintain comprehensive information sharing with other government entities when investigating external targets, but create an artificial information blackout when the investigation might implicate those same government entities. b. The FBI, for example, doesn't tell the Nebraska Attorney General "we can't update you on investigations" when the AG refers cases for federal investigation. Yet when Plaintiff approached the FBI regarding potential misconduct by the AG's Office and other state officials, he was told they "don't provide updates on whether they're investigating" and was ultimately placed on a list preventing direct agent contact. c. This selective application of information-sharing protocols creates a protective shield around government entities that doesn't exist for ordinary citizens or businesses. d. The pattern repeats across every level, from the CFPB and Federal Reserve addressing banking complaints to the Department of Education addressing OPS issues – robust information sharing with institutional actors, absolute opacity with citizens.

## B. The Catch-22 of Disclosure Timing

The Impossible Standard for Citizen Complaints: a. Agencies create an impossible standard for citizen complaints where: i. If a citizen provides incomplete information initially, the complaint is dismissed based on "insufficient evidence" ii. If a citizen provides comprehensive information initially, agencies cherry-pick what to address and ignore the rest iii. Either way, agencies prevent any meaningful back-and-forth that might lead to actual accountability b. When Plaintiff submitted detailed documentation to the AG's Office regarding OPS's public records violations, the office selectively addressed certain claims while ignoring others, then declared the matter "resolved" without allowing Plaintiff to respond to misrepresentations made by OPS. c. Similarly, when Plaintiff provided comprehensive evidence to the Department of Banking and Finance regarding CharterWest's document alteration, the Department selectively addressed certain claims while ignoring key evidence, then closed the case without allowing Plaintiff to address the bank's misrepresentations. d. This pattern creates a situation where citizens are expected to anticipate and preemptively counter every possible misrepresentation an entity might make – an obviously impossible standard.

The Forever-Closed Investigation: a. Even when citizens manage to provide comprehensive evidence directly contradicting an entity's claims, agencies invoke the "investigation is complete" shield to prevent any reconsideration. b. The AG's Office, for example, refused to reconsider its findings regarding OPS's public records violations even when presented with documentary evidence directly contradicting OPS's statements. c. The Ombudsman similarly refused to reopen investigations despite clear evidence that entities had provided false information during

the initial review. d. This creates a situation where the process is designed to reach a predetermined conclusion regardless of evidence – once an entity's false claims are accepted, no amount of contradictory evidence can reopen the matter.

C. The Perfect Circle of Informational Obstruction

These mechanisms together create yet another perfect circle of obstruction:

Citizens are told to provide complete information upfront

Agencies selectively engage with that information

Accused entities receive full access to complaints and provide tailored responses

Citizens are denied access to those responses and investigation details

When citizens attempt to address false claims made by the accused entity, they're told "the investigation is complete"

If citizens seek judicial review, they're told to exhaust administrative remedies – returning them to the beginning of this circular process

This information asymmetry serves a critical function in the enterprise's operations, ensuring that:

Citizens can never effectively counter false narratives

Investigations always have a predetermined outcome favoring institutional actors

The pretense of process can be maintained while ensuring no actual accountability

Each component of the system can claim it "followed procedure" while actually participating in a rigged process

The consistency of this pattern across different agencies, different time periods, and different substantive contexts provides compelling evidence of coordination rather than coincidence. No legitimate administrative process would systematically deny information to complainants while sharing everything with the entities they're complaining about. This represents not administrative error but deliberate design – a sophisticated mechanism for creating the appearance of investigation while ensuring predetermined outcomes.

Like the mathematical impossibility created by the AG's dual role as both "adversary" and "arbiter," this information asymmetry creates another structural barrier to accountability that

cannot be overcome regardless of evidence or merit. It transforms what should be a truth-seeking process into empty theater with predetermined outcomes, further demonstrating the enterprise's sophisticated methodology for preventing meaningful oversight.

## XII. MEDIA REGULATORY CAPTURE AND UNJUST ENRICHMENT

The final component of Nebraska's accountability collapse involves local media organizations that benefit from special regulatory privileges while systematically failing to fulfill their corresponding public trust obligations. This represents not merely journalistic dereliction but a form of regulatory capture and unjust enrichment that completes the circuit of non-accountability.

### A. Special Regulatory Status and Public Trust Obligations

Unlike social media platforms or independent journalists, traditional broadcasters like WOWT operate under Federal Communications Commission licenses that grant them special privileges and access to public airwaves. These privileges include:

Emergency Alert System (EAS) authorization permitting and requiring them to broadcast emergency notifications

Preferential access to public spectrum that is fundamentally a limited public resource

"Must-carry" status on cable and satellite systems within their market

Legal protections and privileged access to government officials and proceedings

These special regulatory privileges are not granted without corresponding obligations. The Communications Act explicitly requires broadcasters to operate in the "public interest, convenience, and necessity." This public interest obligation creates a form of implicit public trust, where broadcasters receive valuable public resources in exchange for serving as trusted information stewards for their communities.

### B. Monetization of Perceived Neutrality and Credibility

These media organizations monetize their perceived neutrality, credibility, and public trust status through:

Advertising revenue based on audience trust and viewership

Digital traffic generating online advertising revenue

Brand partnerships leveraging their credibility with the public

Preferential market position due to regulatory privileges

Their economic model fundamentally depends on maintaining the perception that they are neutral, trustworthy sources of information serving the public interest. This perception forms the basis of their value proposition to advertisers and their audience.

## C. Selective Non-Coverage as Unjust Enrichment

When these privileged media entities systematically fail to cover documented government corruption or accountability failures, as has occurred throughout this case, they engage in a form of unjust enrichment:

They continue to profit from the perception of being neutral public interest watchdogs

They maintain preferential regulatory status and access to public resources

They extract economic value from public trust while betraying that trust

They protect the very power structures that grant their privileges

This creates a stark economic contradiction: these entities derive financial benefit from the public's perception that they serve as accountability mechanisms, while actively avoiding coverage that would provide actual accountability for governmental misconduct.

## D. Documented Media Suppression in This Case

The failings of Nebraska's media institutions are not speculative but documented:

Despite receiving detailed evidence of statistical impossibilities in AG opinions, self-contradictory government documents, and on-the-record admissions of procedural manipulation, local media entities including WOWT have provided no substantive coverage.

When presented with video evidence contradicting official narratives about the August 2021 OPS meeting, media organizations declined to report on the discrepancies despite their clear newsworthiness.

Media entities have failed to investigate or report on the documented disparate treatment in public records responses, where identical records were provided unredacted to one requester while another was charged $1,600 for heavily redacted versions.

Local media have demonstrated a pattern of uncritically republishing government press releases and statements while failing to investigate documented contradictions in those same statements.

This selective non-coverage cannot be explained by editorial judgment about newsworthiness. Statistical impossibilities in government operations, documented contradictions in official records, and clear evidence of discriminatory treatment in public access all meet any reasonable standard of newsworthiness. The systematic avoidance of these stories suggests not editorial discretion but participation in the broader accountability-avoidance enterprise.

E. Completion of the Non-Accountability Circuit

This media component completes the circuit of non-accountability:

Government entities can engage in documented misconduct

Administrative agencies like the AG's Office can refuse to provide remedies

Courts can dismiss challenges through procedural manipulation

Media organizations with special regulatory privileges can suppress public awareness

The public remains uninformed and unable to exercise democratic accountability

All institutional participants in this system benefit from maintaining it

The media's role is particularly crucial, as it represents the final failsafe in a democratic system of checks and balances. When media entities with special regulatory privileges systematically fail to inform the public about documented government misconduct, they transform from potential accountability mechanisms into active participants in the enterprise of obstruction.

F. Constitutional and Legal Implications

This media regulatory capture raises serious constitutional and legal concerns:

First Amendment considerations: While media entities have editorial discretion protected by the First Amendment, their operation under special regulatory privileges creates different obligations than those of ordinary private actors.

Public trust doctrine implications: The public trust doctrine, traditionally applied to natural resources, conceptually extends to the information commons maintained by specially licensed broadcasters utilizing public spectrum.

Unjust enrichment claims: Media entities derive financial benefit from public perception of their neutrality and watchdog function while failing to perform the function that generates that perception.

Consumer protection issues: Viewers and advertisers effectively purchase services from these entities based partly on their perceived role as governmental watchdogs, creating potential misrepresentation claims when that role is systematically abandoned.

This regulatory capture of media entities represents the final component in Nebraska's comprehensive circuit of non-accountability. When specially privileged media organizations systematically fail to report on documented government misconduct, they transform from potential accountability mechanisms into active participants in the enterprise of obstruction, completing the circuit that renders transparency laws functionally meaningless.

XIII. PREEMPTIVELY COUNTERING POTENTIAL DISMISSAL ATTEMPTS

Anticipating the Defendants' defense strategies is critical to ensuring this case receives the substantive review it deserves. What follows are the most likely dismissal arguments they will employ and the countermeasures that preemptively address them.

A. Jurisdictional Attacks – "This Court Lacks Jurisdiction"

Their Likely Argument:

Sovereign immunity (AG, Judges, Government Officials) → They'll claim the Eleventh Amendment bars your claims against the state actors.

Rooker-Feldman Doctrine → They'll argue you're improperly challenging a state court decision in federal court.

Lack of Standing → They'll claim you haven't suffered a direct injury that the court can redress.

Countermeasures:

42 U.S.C. § 1983 Exception to Sovereign Immunity:

The Supreme Court has ruled that state officials are not immune from suit when sued in their individual capacities for constitutional violations.

AG, Judges, and other officials acted outside the scope of their lawful authority → This strips them of immunity under Ex parte Young, 209 U.S. 123 (1908).

Requested relief (injunctions and damages) applies to individual conduct, not just the office.

Rooker-Feldman is irrelevant because:

This is a new case addressing ongoing fraud and obstruction, not a review of a prior ruling.

Independent violations (e.g., Davidson's defamation, AG's false statements) happened outside any state court judgment.

Standing is airtight because:

Direct injury is clear → You were unlawfully denied records, falsely labeled a security threat, and retaliated against.

Injunctive relief is necessary → Future violations are likely, requiring court intervention.

B. "Failure to State a Claim" (FRCP 12(b)(6))

Their Likely Argument:

"Plaintiff fails to allege specific conduct that violates a law."

"There is no pattern of racketeering (RICO)."

"Public records violations don't create a private cause of action."

Countermeasures:

RICO Predicate Acts Are Fully Established:

The complaint explicitly identifies mail/wire fraud, obstruction of justice, witness retaliation, and conspiracy.

Government fraud cases like Bridge v. Phoenix Bond (2008) confirm public corruption schemes fall under RICO.

Civil Rights Violations Are Clear:

Public officials retaliating against a citizen for exposing corruption is a textbook § 1983 violation.

Security threat designation without due process = deprivation of liberty interest (Paul v. Davis, 424 U.S. 693).

Nebraska Public Records Act Is Actionable:

Denial of access violates state law.

Ongoing violations justify injunctive relief.

C. "Judicial Immunity" (For Judges Named as Defendants)

Their Likely Argument:

Judges have absolute immunity for rulings.

Dismissing cases is a core judicial function.

Countermeasures:

Judicial immunity does not apply when:

Acts are administrative, not judicial (e.g., coordination with AG's office to obstruct access to records).

Decisions were made in absence of jurisdiction (e.g., misusing procedural dismissals to cover up fraud).

Fraud and conspiracy are exceptions (Pierson v. Ray, 386 U.S. 547).

Dougherty, Stratman, and other judges engaged in misconduct outside judicial function → Bias & procedural fraud are actionable.

D. "No Personal Involvement" (Against Supervisors & Higher Officials)

Their Likely Argument:

The AG (Hilgers) and former AG (Peterson) weren't personally involved.

They can't be held liable for their employees' actions.

Countermeasures:

Supervisory Liability Applies When:

They knew about violations and failed to act (Ashcroft v. Iqbal, 556 U.S. 662).

They implemented policies that allowed fraud and retaliation to occur.

They actively participated in obstruction (e.g., AG's legal opinions and denials).

Nebraska AG's Office issued false legal opinions → Hilgers and Peterson knowingly contributed to the enterprise.

E. "Statute of Limitations"

Their Likely Argument:

Some of these claims are too old.

RICO requires recent acts within four years.

Countermeasures:

The "Continuing Violation Doctrine" applies:

Ongoing suppression of records extends limitations.

RICO has no single violation—it's a pattern.

Last predicate act occurred recently → Time clock resets with each new obstructive act.

Government concealment tolls the statute → Fraudulent denial of records prevented timely filing.

F. "Failure to Exhaust Administrative Remedies"

Their Likely Argument:

Plaintiff should have exhausted Nebraska's administrative review process before suing.

Ombudsman and AG's Office were still reviewing complaints.

Countermeasures:

Exhaustion is not required for RICO or § 1983 claims.

The administrative process was corrupted → Plaintiff exhausted all possible remedies, and the AG/Ombudsman deliberately stalled.

The inherent contradiction in the AG's dual role → The designated administrative arbiter has declared itself "adversarial" to citizens seeking records, making exhaustion futile and a sham process.

G. "RICO Doesn't Apply to Government Entities"

Their Likely Argument:

RICO is designed for criminal enterprises, not government agencies.

Countermeasures:

Government officials acting outside their duties form an enterprise.

The enterprise includes private actors (e.g., Baird Holm attorneys like Kramer, CharterWest Bank executives).

Public corruption cases have been prosecuted under RICO before (e.g., United States v. Salinas, 522 U.S. 52).

These preemptive counters force the Defendants to confront the substantive merits of the case rather than rely on procedural evasions. By addressing these defenses in advance, this complaint ensures that the Court focuses on the profound constitutional issues at stake rather than technical distractions.

XIV. FACTUAL BACKGROUND: THE INTERCONNECTED CONSPIRACIES

A. The CharterWest Bank Fraud and the Blueprint for Obstruction (2018)

In 2018, Plaintiff applied for a loan from CharterWest Bank, setting in motion a pattern of institutional obstruction that would become the template for subsequent coordinated action across multiple Nebraska agencies:

The Initial Fraud: CharterWest Bank deliberately falsified Plaintiff's loan application by checking a box indicating he had child support obligations when he had none. This was not a clerical error or oversight but a deliberate document alteration designed to create a pretextual basis for loan denial. a. The document alteration is visually apparent, with the "Yes" box for child support obligations clearly checked after the form was completed. b. Plaintiff had explained that his daughter had lived with him for 8 years, and there was already a special exclusion written in the loan, making this alteration unquestionably fraudulent. c. This initial fraud established the pattern that would be repeated throughout the later public records disputes: when legitimate channels produce unwanted results, documents are altered and records manipulated.

The Regulatory Capture: When Plaintiff sought accountability for this documented fraud, he encountered a regulatory system designed to protect institutions rather than enforce the law: a. The Nebraska Department of Banking and Finance, under Director Mark Quandahl and Deputy Director Mike McDannel, refused to investigate despite being presented with clear photographic

evidence of document alteration. b. Their written responses employed circular reasoning, claiming they found no wrongdoing while simultaneously admitting they conducted no meaningful investigation into the alleged fraud. c. The Federal Reserve Bank of Kansas City similarly acknowledged receipt of the complaint but took no substantive action. Their attorneys, including Todd Ruskamp, Jeffrey Nix, Devon Ritter, and D. Welch, engaged in procedural obstruction that would later be replicated in the public records disputes. d. The Consumer Financial Protection Bureau likewise acknowledged the complaint but failed to enforce regulations specifically designed to prevent this type of financial fraud.

The Coordinated Non-Response: These agencies exhibited the same pattern that would later characterize the public records disputes – coordination without accountability: a. Emails and correspondence obtained through subsequent records requests showed these agencies communicating extensively with each other and with CharterWest Bank. b. None of these agencies ever contacted Plaintiff to obtain additional evidence or clarification about his complaint. c. Despite operating under different statutory mandates and jurisdictions, all reached identical conclusions without conducting meaningful investigations, suggesting coordination rather than independent determinations. d. When Plaintiff provided additional evidence contradicting their findings, all agencies refused to reconsider, again suggesting predetermined outcomes rather than good-faith regulation.

The Judicial Obstruction: When Plaintiff sought judicial review, he encountered the same procedural manipulation that would later characterize his public records cases: a. Courts dismissed his complaints on procedural grounds without addressing the merits, applying hyper-technical readings of pleading requirements selectively against Plaintiff's filings. b. Judges applied impossible standards to Plaintiff's filings while simultaneously allowing opposing counsel substantial procedural leeway, including accepting late filings and overlooking missing elements. c. The Eighth Circuit Court of Appeals, including Judges Ralph R. Erickson, Lavenski R. Smith, and Steven M. Colloton, issued summary affirmances without addressing the substantive legal arguments presented, effectively rubber-stamping lower courts' procedural dismissals. d. At each level, courts