# Judicial Inaction on Emergency Matters: An Analysis of Procedural Rules, Systemic Delays, and Litigant Remedies in Federal Court

## Introduction

The premise of a federal court ignoring a properly filed emergency motion for over 90 days presents a direct challenge to the foundational principles of the American judicial system. While identifying a documented instance of a single, standard "emergency motion" being formally filed and then explicitly "ignored" for such a period is elusive, the core phenomenon this query investigates—significant, documented judicial delay on matters requiring urgent attention—is a tangible and recurring issue. This phenomenon, however, manifests in more complex and systemic ways than the simple neglect of a single filing. It is found not in isolated anomalies but in systemic breakdowns, administrative morass, and protracted litigation aimed at correcting the very delays that deprive litigants of timely justice.

This report reframes the inquiry from a search for a singular, aberrant case to a comprehensive analysis of the conditions under which such profound delays occur. It is framed by the inherent tension between the federal judiciary's procedural promises of expedited review for emergencies and the practical realities of judicial administration, resource constraints, and, in some documented instances, strategic or systemic inaction. An examination of federal court rules reveals an architecture meticulously designed to prevent such delays. Yet, a review of scholarly literature and case law uncovers the systemic pressures and specific contexts where these safeguards falter.

To provide a concrete and exhaustive answer, this report will proceed in five parts. First, it will deconstruct the legal architecture designed to prevent these delays, defining what constitutes an "emergency motion" under federal rules and detailing the mechanisms, such as Temporary Restraining Orders (TROs) and preliminary injunctions, intended to provide swift relief. Second, it will analyze the systemic factors that contribute to judicial delay, from crushing caseloads to sanctioned pauses under emergency declarations. Third, it will present a deep-dive case study of *Cancino Castellar v. Mayorkas*, a landmark class-action lawsuit that serves as a powerful, documented example of systemic delay far exceeding 90 days for a class of individuals whose liberty was at stake, functionally equivalent to a mass denial of emergency relief. Fourth, it will explore how administrative delays within the executive branch, such as the "Controlled Application Review and Resolution Program" (CARRP), spill into the courts, creating another vector for prolonged inaction. Finally, the report will provide a thorough analysis of the ultimate, albeit difficult, remedy for judicial inaction: the writ of mandamus, an extraordinary order compelling a court or agency to perform its duty. Through this multi-faceted analysis, a nuanced picture emerges of a system that, while designed for speed in emergencies, possesses vulnerabilities that can and do lead to the very kind of protracted inaction that undermines faith in the rule of law.

# I. The Architecture of Urgency: Defining the "Emergency Motion" in Federal Practice

The federal judicial system is not designed to be a passive recipient of filings, treating all matters with uniform pace. To the contrary, its procedural rules create a sophisticated triage system intended to identify and accelerate matters of genuine urgency, making a 90-day delay on a true emergency a profound departure from established norms. This architecture of urgency is built upon a foundation of federal rules, local court procedures, and substantive legal standards that collectively define what constitutes an emergency and prescribe a framework for its rapid resolution.

## A. The Foundation: Federal Rules of Civil and Appellate Procedure

At the highest level, the Federal Rules of Civil Procedure (FRCP) and Federal Rules of Appellate Procedure (FRAP) establish a baseline expectation for how federal courts handle motion practice, creating a framework that presumes timely responses and rulings. These rules are the system's primary defense against indefinite delay.
For matters on appeal, Federal Rule of Appellate Procedure 27 dictates a brisk timeline. A response to a motion is typically due within 10 days of the motion's filing, and an optional reply from the movant is due 7 days after the response. Unless the court explicitly orders otherwise, this means a motion is fully briefed and ripe for a judicial decision in approximately 17 days. For a party needing an even faster schedule, the rule allows for a request to shorten this period.
In the district courts, FRCP 6(c) governs the timing of motion papers. The default rule requires a written motion and notice of hearing to be served at least 14 days before the scheduled hearing, with any opposing affidavits due at least 7 days prior. Critically, this rule contains a flexibility provision: for "good cause," a party can apply to the court—even on an *ex parte* basis (without the other party present)—for an order setting a different, shorter timeline. This provision is the gateway through which true emergencies can bypass standard scheduling.
This federal framework is significantly augmented by local rules, which provide the granular detail for how each specific district or circuit court manages its docket. For example, the U.S. Court of Appeals for the Ninth Circuit has a specific rule, Rule 27-3, that defines an emergency motion as one where the moving party requires relief within 21 days to prevent irreparable harm. Similarly, the Local Rules for the U.S. District Court for the Middle District of Florida require any party seeking emergency relief to include "emergency" or "time-sensitive" in the motion's title and provide an introductory paragraph explaining the exigency and stating the date by which a ruling is needed. These local rules are not mere suggestions; they are binding procedures that create a formal track for urgent matters, demonstrating that the system is designed to identify, triage, and prioritize such filings from the moment they arrive at the courthouse.

## B. The Standard of Irreparable Harm: The Gateway to Emergency Status

A litigant cannot simply declare an emergency and expect the court to spring into action. The court's willingness to deviate from its normal processes is directly contingent on the movant meeting a high substantive threshold: a credible showing of imminent and irreparable harm. This standard serves as the judiciary's primary gatekeeping mechanism to prevent abuse of

emergency procedures.

Irreparable harm is an injury for which a later monetary award or other legal remedy would be inadequate. It is a harm that, once suffered, cannot be undone. Classic examples include the imminent deportation of an individual to a country where they face persecution, the impending demolition of a historic landmark, the threatened disclosure of privileged trade secrets, or the immediate loss of constitutional rights. The urgency must be real and the consequences severe. The Ninth Circuit's rules provide a clear illustration of this principle in action. The court specifies that it "generally considers only a substantive request, like a motion for stay or injunction, to be an emergency." In contrast, a "procedural request, like a request for an extension of time, is not considered an emergency, regardless of how quickly the relief is sought". This distinction is crucial. It reveals that the court's focus is on the nature of the underlying injury, not the proximity of a deadline. A party facing a filing deadline tomorrow does not, by that fact alone, have an "emergency" in the eyes of the court if the motion is merely procedural. This gatekeeping function means that a court's failure to act on a motion labeled "emergency" might not be an act of ignoring it, but rather a threshold determination that the motion does not actually qualify for expedited treatment. The M.D. Florida rules underscore this, explicitly warning litigants that the "unwarranted designation of a motion as an emergency can result in a sanction".

## C. The Primary Mechanisms of Emergency Relief

When a litigant successfully demonstrates the threat of irreparable harm, the federal courts have two primary tools at their disposal for providing immediate, pre-trial relief: the Temporary Restraining Order (TRO) and the preliminary injunction. These mechanisms are governed by FRCP 65 and represent the judiciary's most powerful instruments for intervening in a dispute before a full trial on the merits.

### 1. The Temporary Restraining Order (TRO)

A TRO is the most urgent form of judicial relief available. It is a short-term, stop-gap measure designed to freeze the status quo and prevent immediate harm until the court can hold a more comprehensive hearing on a motion for a preliminary injunction.

The extraordinary nature of the TRO is most evident in its potential to be issued *ex parte*—that is, without any written or oral notice to the opposing party. This is the highest level of emergency intervention, reserved for situations where providing notice would itself precipitate the harm the TRO seeks to prevent (e.g., a defendant, upon learning of a lawsuit, might immediately destroy evidence or transfer assets). To obtain an *ex parte* TRO, a movant must present "specific facts in an affidavit or a verified complaint" that "clearly show that immediate and irreparable injury, loss, or damage will result... before the adverse party can be heard in opposition".

Recognizing the due process implications of acting without hearing from both sides, the Federal Rules place strict temporal limits on TROs. Under FRCP 65(b), a TRO issued without notice expires automatically at a time set by the court, "not to exceed 14 days". (This is an update from the previous 10-day limit ). The court can extend this period for one additional "like period" (i.e., another 14 days) if there is "good cause," or for a longer period if the restrained party consents. To prevent these short-term orders from becoming indefinite, un-appealable restraints, federal courts have developed what is known as the "transformation doctrine." Most circuit courts hold that if a TRO is extended beyond the period allowed by FRCP 65(b) without the consent of the restrained party, it is transformed into a preliminary injunction. Because a preliminary injunction requires notice and a hearing—safeguards that were not provided for the TRO—the resulting

order is typically considered improperly issued and becomes immediately appealable. An appellate court will often strike down such an order. This doctrine serves as a powerful judicial backstop, enforcing the durational limits of FRCP 65 and ensuring that emergency relief does not become a permanent state of affairs without proper procedure.

## 2. The Preliminary Injunction

For relief that needs to last longer than a few weeks, a party must seek a preliminary injunction. Unlike a TRO, a preliminary injunction is a longer-term provisional remedy that can remain in effect for many months or even years, preserving the status quo until the litigation is fully resolved.

Given its longer duration and significant impact on the defendant, a preliminary injunction comes with greater procedural safeguards. It *cannot* be issued without providing notice to the adverse party and an opportunity for a hearing. At this hearing, which can function as a "mini-trial," both sides may present evidence and legal arguments.

The legal standard for obtaining a preliminary injunction is exceptionally high. In its landmark decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), the Supreme Court established a demanding four-part balancing test. The plaintiff must demonstrate:

1. A substantial likelihood of success on the merits of the case.
2. A likelihood of suffering irreparable harm in the absence of the injunction.
3. That the balance of equities tips in their favor (i.e., the harm to the plaintiff without the injunction outweighs the harm to the defendant with it).
4. That issuing the injunction is in the public interest.

This stringent test ensures that preliminary injunctions are not granted lightly. The requirement for a hearing and the high evidentiary burden mean that even an expedited process for a preliminary injunction will take more time than a TRO, but it is still expected to be handled with urgency.

## D. The Court's Communication and Case Management

Reinforcing the idea that emergency motions are not meant to fall into a procedural void, many courts have established specific channels for handling them. The Ninth Circuit maintains a dedicated email address (Emergency@ca9.uscourts.gov) and phone number for emergency motions, which are monitored during business hours and periodically after hours and on weekends. The court promises a response the next business day unless a more immediate reply is needed. Similarly, the U.S. District Court for the Eastern District of Pennsylvania notes that when a TRO is filed, the assigned judge will typically set a time to meet with counsel on the very same day.

This combination of federal rules, local procedures, substantive legal standards, and dedicated administrative channels creates a robust system designed to prevent the exact scenario of a 90-day delay on an emergency motion. The existence of these multiple, redundant layers of procedural safeguards suggests that such a delay would not be a normal system failure. It would represent either a fundamental breakdown of judicial administration or, more likely, a situation where the court, at the outset, rejected the motion's "emergency" designation, thereby placing it on a standard, and much slower, track for resolution. The burden is on the litigant to not only file the motion but to persuade the court of its true emergency nature.

## II. The Anatomy of Delay: When the System Falters

Despite an architecture designed for urgency, the federal judicial system is not immune to delay. The phenomenon of cases taking too long to resolve is a persistent and well-documented feature of American jurisprudence. While a court ignoring a properly designated emergency motion for over 90 days would be an extreme outlier, understanding the broader context of judicial delay is essential to comprehending how such a situation could even be possible. The causes are multifaceted, ranging from systemic resource shortages and deliberate party tactics to officially sanctioned pauses and strategic docket management by the courts themselves. A crucial distinction exists between *systemic delay*, which affects the judiciary as a whole, and *case-specific neglect*. The evidence suggests that prolonged inaction is more often a symptom of the former than an instance of the latter.

### A. "Justice Delayed is Justice Denied": Scholarly and Systemic Perspectives

The complaint that justice is too slow is not a modern one. Legal scholars and jurists have lamented the "law's delays" for over a century, with some commentators describing it as a "bane of the American legal system" and an "occupational disease" that lawyers and judges have become accustomed to. As early as 1916, one analysis noted that delay is the criminal's "first line of defense," as the passage of time "softens the zeal of the prosecution, impairs its forces, and strengthens a fictitious defense". This historical perspective reveals that delay is a deeply entrenched problem, not a new crisis.
The modern causes of this delay are varied and complex, creating a baseline condition where timeliness is a constant struggle:
- **Overwhelming Caseloads and Stagnant Resources:** The most frequently cited cause of judicial delay is the simple mismatch between the volume of litigation and the resources available to handle it. Federal courts have seen case filings rise dramatically while the number of authorized judgeships has remained largely stagnant for decades. For example, the U.S. Court of Appeals for Veterans Claims saw its pending caseload grow from under 2,000 to over 5,800 in just a few years, with projections suggesting it could reach 10,000 cases. This immense pressure means that "litigants may have to wait months or even years longer for a resolution to their dispute simply because the case was filed in one court rather than another".
- **Party-Driven Delay:** Not all delay originates with the court. Litigants and their attorneys may have strategic reasons to slow down proceedings. A study on court delay found that plaintiff's counsel might delay a trial date offered by the court to allow more time for settlement negotiations or to prepare evidence. Attorneys may also grant "courtesy consents" to opposing counsel's requests for postponement. Delay can be a calculated move in the interest of a client, not merely a product of negligence.
- **Administrative and Agency Delay:** The executive branch is another significant source of delay that ultimately burdens the judiciary. Federal agencies face enormous backlogs in their own adjudicative functions. For instance, immigration agencies have backlogs totaling nearly 10 million adjudications, and Freedom of Information Act (FOIA) request backlogs have also grown. When individuals or organizations face unreasonable delays from an agency—such as in receiving a decision on a green card application or obtaining public records—their primary recourse is to file a lawsuit in federal court to compel action.

> These cases, born of administrative stasis, add to the federal courts' already crowded dockets.

## B. Sanctioned Delays: The Civil Rules Emergency (FRCP 87)

While systemic pressures can lead to de facto delays, there are also situations where delay is officially sanctioned by the rules themselves. Federal Rule of Civil Procedure 87, "Declaring a Civil Rules Emergency," provides a formal mechanism for pausing court operations for a period that directly aligns with the 90-day timeframe in the user's query.
Under FRCP 87, the Judicial Conference of the United States can declare a "Civil Rules emergency" for a specific court or courts for a stated period of "no more than 90 days". This can be done when "extraordinary circumstances"—such as hurricanes, floods, pandemics, civil unrest, or major disruptions to electronic communications—"substantially impair the court's ability to perform its functions in compliance with these rules".
During a declared emergency, a court may be authorized to extend certain deadlines that are normally considered rigid and non-extendable, such as the time to file post-judgment motions under Rules 50, 52, and 59. The rule is pragmatic and functional, designed as a release valve for the entire system when faced with a crisis. Importantly, the Judicial Conference may issue "additional declarations," meaning these 90-day periods of sanctioned delay could be renewed, extending the pause on normal court operations even further. This rule provides a documented, legally permissible reason why all matters before a court, including those designated as emergencies, might be held in abeyance for 90 days or more.

## C. The "Shadow Docket" and Strategic Judicial Management

Beyond systemic backlogs and declared emergencies, a more nuanced form of delay can arise from the judiciary's active management of its own docket, particularly in politically sensitive or high-stakes cases. This is not "delay" in the sense of passive neglect, but rather a form of strategic pacing.
The Supreme Court's "emergency docket," often referred to by critics as the "shadow docket," provides a prominent example. These are cases decided on an expedited basis, often without full briefing or oral argument, typically to grant or deny emergency relief like a stay of a lower court's order. While these actions can be swift, their effect is often to introduce delay at a different stage. By staying a lower court's nationwide injunction, for example, the Supreme Court can halt a legal challenge to a government policy, effectively delaying a final resolution on the merits for months or years while the case proceeds through the normal appellate process. Some legal scholars argue that courts can use such procedural tools to "buy time" and avoid rendering decisions on deeply divisive issues that they would prefer to see resolved through the political process. The Supreme Court's recent ruling in *Trump v. CASA*, which curtailed the power of lower courts to issue nationwide injunctions, is viewed by some analysts as a mechanism that will inevitably create delay. By requiring plaintiffs in different parts of the country to bring separate lawsuits rather than benefiting from a single, nationwide order, the decision is likely to lead to an "increase in litigation time" and create a "procedural bog". This form of delay is not a bug in the system, but an intentional feature designed to manage the flow and impact of certain types of litigation. When investigating a long delay, therefore, one must consider whether it is the result of a court being overwhelmed or a court actively shaping the pace of justice.

# III. Case Study: Systemic Delay and the Fight for a First Hearing in *Cancino Castellar v. Mayorkas*

While finding a singular emergency motion from a typical civil case that was ignored for over 90 days is difficult, a far more powerful and documented answer to the user's query emerges from the realm of class-action litigation. The case of *Cancino Castellar v. Mayorkas* (Case No. 3:17-cv-00491, S.D. Cal.) provides a stark and compelling example of systemic, unconstitutional delay on a matter of utmost urgency: the deprivation of liberty without prompt judicial review. This case demonstrates that for an entire class of people, the wait for what is functionally emergency relief—a first court appearance—stretched not just beyond 90 days, but for months, and required seven years of hard-fought litigation to remedy. The lawsuit itself can be viewed as a massive, class-wide emergency motion to compel government action, and its protracted journey through the federal court system is the ultimate documentation of delay.

## A. Factual Background: The Core Allegation of Unconstitutional Delay

On March 9, 2017, the ACLU of San Diego & Imperial Counties and its partners filed a class-action lawsuit against the Department of Homeland Security (DHS) and the Department of Justice. The central allegation was that immigration authorities in San Diego and Imperial Counties had a systemic policy and practice of detaining noncitizens for extended periods—routinely "one to three months" and sometimes longer—without ever bringing them before an immigration judge for a first appearance.
This practice, the plaintiffs argued, was a flagrant violation of fundamental constitutional rights. The complaint alleged that the failure to provide a prompt hearing violated the Fifth Amendment's Due Process Clause, which protects against the deprivation of liberty without due process of law, and the Fourth Amendment's requirement of a prompt judicial determination of probable cause to justify ongoing detention. For the detained individuals, this delay was not a mere inconvenience. They were held in "deplorable" and "harsh" detention facilities, separated from their families, and unable to pursue their jobs or education, all without having been found guilty of any crime.
The named plaintiff, Jose Orlando Cancino Castellar, was an 18-year-old high school senior eligible for DACA who was taken into custody on February 17, 2017. By the time the complaint was filed over three weeks later on March 9, he had still not seen a judge. He was ultimately detained for over a month before he finally had his first court hearing, at which the judge ordered his release. His experience was representative of a class of thousands who would "languish for months" in a legal limbo, a situation that is the functional equivalent of having an emergency request for a hearing on one's freedom ignored indefinitely.

## B. Procedural History: A Seven-Year Legal Battle

The fight to remedy this systemic delay was not swift. The case docket reveals a seven-year odyssey through the federal court, marked by extensive motion practice, jurisdictional challenges, and settlement negotiations. This timeline provides a clear, data-driven illustration of judicial delay on a matter of fundamental rights.
- **Jurisdictional and Pleading Fights (2017–2019):** After the complaint was filed in March 2017, the government responded not by remedying the delay, but by moving to dismiss

- the case entirely, arguing that the district court lacked jurisdiction under the Immigration and Nationality Act. In February 2018, nearly a year after the case began, the court granted the government's motion. The plaintiffs were forced to file a motion for reconsideration. In September 2018, the court reversed its prior decision in part, reinstating the crucial Fifth Amendment due process claims but leaving the Fourth Amendment claims dismissed. This initial phase of litigation, just to establish that the court could hear the case, consumed over a year and a half.
- **Class Certification (2020–2022):** Having survived dismissal, the plaintiffs filed a renewed motion for class certification in October 2020 to have the case apply to all similarly situated detainees. It took nearly another year for the court to rule on this motion, granting it in part in September 2021. Even then, disputes over the precise definition of the class continued for almost another full year, with the parties not reaching a final stipulated definition until August 2022. The process of formally defining the group of people harmed by the delay took nearly two years.
- **Settlement (2023–2024):** From late 2022 through 2023, the parties engaged in numerous settlement conferences. A joint motion for preliminary approval of a settlement was filed in January 2024, and the court granted final approval on March 14, 2024—a full seven years and five days after the lawsuit was initiated.

The settlement agreement finally secured the relief sought seven years prior. It requires immigration agencies to provide detainees with written notice of their right to a prompt first appearance and ensures that those who want to see a judge will have that hearing within 11 days of entering ICE custody.

## Table 1: Key Docket Events and Timeline in *Cancino Castellar v. Mayorkas* (3:17-cv-00491, S.D. Cal.)

The following table provides a stark, data-driven summary of the protracted nature of this litigation. It documents a timeline where the resolution of an urgent constitutional issue was delayed not for 90 days, but for years.

| Date | ECF Docket # | Event | Time Elapsed |
|---|---|---|---|
| Mar 9, 2017 | 1 | Complaint Filed | - |
| Feb 8, 2018 | 49 | Order Granting Government's Motion to Dismiss | ~11 months |
| Mar 8, 2018 | 50 | Plaintiffs' Motion for Reconsideration Filed | 28 days |
| Sep 5, 2018 | 56 | Order Granting Reconsideration in Part (Reinstating 5th Am. Claims) | ~6 months |
| Oct 16, 2020 | 125 | Plaintiffs' Renewed Motion for Class Certification Filed | ~2 years, 1 month |
| Sep 8, 2021 | 179 | Order Granting Class Certification in Part | ~11 months |
| Jan 18, 2024 | 242 | Joint Motion for Preliminary Approval of | ~2 years, 4 months |

| Date | ECF Docket # | Event | Time Elapsed |
|---|---|---|---|
|  |  | Settlement Filed |  |
| Mar 14, 2024 | - | Final Approval of Settlement Granted | ~2 months |
| **Total Time** |  | **From Complaint to Final Settlement Approval** | **~7 years** |

## C. The Functional Equivalent of an Ignored Emergency Motion

The *Cancino Castellar* lawsuit is the most direct answer to the user's query because the entire case functioned as a massive, class-wide emergency motion. Each individual detainee held for weeks or months without a hearing was, in effect, having their unfiled but constitutionally mandated "emergency motion for a hearing" ignored by the government. The irreparable harm was the ongoing, unlawful deprivation of physical liberty—the very definition of a legal emergency.

The lawsuit sought to compel the government to perform its non-discretionary constitutional duty to provide prompt due process, which is precisely the function of emergency injunctive relief or a writ of mandamus. The fact that it took seven years of federal court litigation to secure a settlement that merely guarantees a hearing within 11 days is the ultimate documentation of a system failing to respond to an emergency. The delay was not an anomaly affecting a single motion; it was a systemic feature of the immigration detention apparatus that required an extraordinary and prolonged legal effort to correct. This case illustrates that the most egregious delays are often not clerical errors but systemic policies affecting disfavored groups, and the "delay" to be measured is not just the time a motion is pending, but the entire lifecycle of the litigation required to force a just resolution.

# IV. Related Manifestations: Administrative Stasis and the CARRP Program

The phenomenon of extreme, multi-month delays on urgent matters is not confined to the actions or inactions of the judiciary alone. Often, the federal courts become the battleground for resolving delays that originate within the executive branch. A prime example of this is the litigation surrounding the "Controlled Application Review and Resolution Program" (CARRP), a secretive government policy that institutionalized delay and denial for certain immigration applicants. This situation demonstrates how administrative stasis can create emergencies that then spill into the courts, compounding the harm to affected individuals.

## A. "Delay and Deny": The Controlled Application Review and Resolution Program (CARRP)

Since 2008, U.S. Citizenship and Immigration Services (USCIS), an agency within DHS, has operated the CARRP program. This policy was designed to subject certain applications for immigration benefits, such as green cards and citizenship, to a process of "extreme vetting" if the applicant was flagged as a potential "national security concern". However, the criteria for being flagged are extraordinarily broad, vague, and not based on any illegal activity. An applicant could be designated a national security concern based on their country of origin, their

associations, their religious activities, or even having "technical skills" like knowledge of chemistry or a foreign language.

Once an application is placed into the CARRP system, it is effectively removed from the normal processing queue and put on indefinite hold. The program's internal logic instructs immigration officers to first search for any reason—no matter how trivial, such as a simple paperwork error—to deny the application. This process is designed to "create delays and facilitate denials". The resulting delays are staggering. A 2024 ACLU report, titled "Delay and Deny," analyzed government data and found that between 2012 and 2019, the average processing time for a CARRP-flagged application was over 20 months, compared to just 8 months for a standard application. The report and related litigation have documented cases where applicants have waited for years, with one individual's citizenship process taking 11 years to resolve, and only after a judge intervened. The program has a demonstrably discriminatory impact, with applicants from Muslim-majority countries being placed into CARRP at vastly higher rates than others. All the while, the applicants are kept in the dark, never told why their case is delayed or given a meaningful opportunity to respond to the government's secret concerns.

## B. From Administrative Delay to Federal Lawsuit: *Wagafe v. USCIS*

Faced with these extreme and unexplained administrative delays, which can devastate careers and keep families separated, applicants have no effective remedy within the agency itself. Their only recourse is to sue the government in federal court. In January 2017, the ACLU and its partners filed a major class-action lawsuit, *Wagafe v. USCIS*, in the U.S. District Court for the Western District of Washington, challenging the CARRP program as a violation of the Administrative Procedure Act (APA) and the constitutional right to due process.

These lawsuits typically seek an order compelling USCIS to adjudicate the long-pending application. This form of relief is functionally analogous to a litigant asking a court to rule on a delayed motion. The lawsuit becomes the vehicle for addressing the underlying administrative inaction. In January 2025, the district court in *Wagafe* ruled that the CARRP program was unlawful under the APA because the government failed to provide any evidence justifying its creation and did not consider its capacity to decide the cases within a reasonable time.

This entire dynamic illustrates a critical point about delay in the federal system. The court itself may not be the initial source of the problem. Here, the executive branch created a program that systematically and intentionally delayed adjudications for months and years. The federal court then becomes the arena where this pre-existing delay is litigated. Any subsequent delay by the *court* in ruling on motions within the *Wagafe* case becomes a second-order delay, compounding the original harm caused by the administrative agency. This reveals a deeply interconnected system where inaction in one branch of government can trigger a crisis that the judicial branch is then called upon to resolve, often through a slow and arduous process of its own.

# V. The Extraordinary Remedy: Compelling a Decision via Writ of Mandamus

When a litigant is confronted with profound and unreasonable delay—whether from a government agency or a lower court itself—the legal system provides a final, powerful, albeit rarely granted, tool: the writ of mandamus. The very existence of this remedy is the strongest evidence that the American legal system anticipates the possibility of extreme inaction and has created a mechanism to correct it. A writ of mandamus is an order from a higher court to a lower

court, government official, or agency, commanding the performance of a specific, legally required duty. For a litigant facing a motion that has languished for months without a ruling, it is the ultimate recourse.

## A. Legal Basis and Purpose

The authority for federal courts to issue a writ of mandamus stems primarily from two statutes. The All Writs Act, 28 U.S.C. § 1651, grants all federal courts, including the Supreme Court and the courts of appeals, the power to issue writs "in aid of their respective jurisdictions". Additionally, 28 U.S.C. § 1361 gives federal district courts original jurisdiction over any "action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff".
In the context of judicial delay, its purpose is precise and limited. A party can petition a court of appeals for a writ of mandamus to compel a district court judge to rule on a long-pending motion. It is a tool to force a decision and break a procedural logjam. Critically, however, the writ cannot be used to control judicial discretion; it can order the lower court *to rule*, but it cannot dictate *how* that court should rule. The goal is to compel the performance of a ministerial act—the duty to adjudicate matters properly before the court—not to second-guess the substance of the eventual decision.

## B. The High Standard for a Writ: An "Extraordinary Remedy"

Courts consistently emphasize that mandamus is not a substitute for a standard appeal and must be reserved for the most "exceptional circumstances of peculiar emergency or public importance". The bar for obtaining the writ is intentionally set high to prevent litigants from using it to circumvent the normal appellate process and to respect the autonomy of lower courts in managing their own dockets.
To succeed, a petitioner must typically satisfy a demanding three-part test, demonstrating:
1. **A Clear and Indisputable Right to Relief:** The petitioner must show that they are unequivocally entitled to the action they seek. In the case of a delayed motion, this means having a right to a timely decision.
2. **A Clear Legal Duty on the Part of the Respondent:** The lower court or agency must have a clear, non-discretionary duty to perform the act in question. While docket management involves discretion, a judge has an underlying, non-discretionary duty to adjudicate the cases before them and rule on pending motions within a reasonable time.
3. **The Lack of Any Other Plain and Adequate Remedy:** This is often the most difficult prong to satisfy. The petitioner must show that no other legal avenue, such as a direct appeal after a final judgment, can adequately redress the harm. Because an eventual appeal is ordinarily considered an adequate remedy for most trial court errors, petitions for mandamus based on delay are frequently denied on this basis. The delay must be so egregious that waiting for a final judgment would cause an "irreparable injury" or a "special loss beyond the burden of litigation" that cannot be fixed on appeal.

This high standard creates a "zone of unreviewable delay"—a frustrating gray area where a delay is clearly unreasonable and far exceeds the timelines contemplated by the rules, but may not yet be so "extraordinary" or "irreparable" as to convince an appellate court to take the drastic step of intervening in a district court's affairs.

### C. Procedural Aspects (FRAP 21)

The process for seeking a writ of mandamus against a district court judge is governed by Federal Rule of Appellate Procedure 21. The petitioner files the petition with the clerk of the court of appeals. To avoid placing the district judge in a direct adversarial posture with a litigant, the petition is titled "In re [name of petitioner]" and does not formally name the judge as a respondent. A copy is provided to the judge, but they are not required to respond and may only do so if invited or ordered by the appellate court. The court of appeals has the discretion to deny the petition summarily without even requesting an answer from the opposing party. If the court is inclined to consider the petition, it will order the adverse party from the underlying case to file a response.

### D. Mandamus as a Practical Tool for Delay

Despite the high bar, the writ of mandamus remains a recognized and viable tool for combating extreme delay. Its most effective use is often seen in the context of administrative inaction. In the immigration field, for example, mandamus lawsuits are frequently filed to compel USCIS to adjudicate applications that have been pending for an unreasonable amount of time. In a majority of these cases, the government chooses to adjudicate the delayed application within a few months of the lawsuit being filed rather than engage in costly and protracted litigation. The mere filing of the mandamus action is often enough to force the agency to perform its duty. This demonstrates its practical power as a remedy of last resort, capable of breaking through even the most entrenched bureaucratic inertia.

## VI. Conclusion and Recommendations

The investigation into documented situations of a federal court ignoring an emergency motion for over 90 days reveals a nuanced reality. The query is most accurately answered not by identifying a single, anomalous case of judicial neglect, but by understanding the systemic contexts in which such extreme delays on urgent matters occur. The federal rules of procedure are meticulously designed to prevent such delays through a robust architecture of urgency. However, this system can be overwhelmed by systemic pressures, such as staggering caseloads, or intentionally superseded by specific policies, such as FRCP 87 emergency declarations or administrative programs like CARRP that institutionalize delay.
The most powerful documented evidence of this phenomenon comes from large-scale, class-action litigation. The seven-year legal battle in *Cancino Castellar v. Mayorkas* stands as a testament to the fact that, for certain disfavored groups like immigration detainees, delays far exceeding 90 days for what amounts to emergency relief—a hearing on the deprivation of one's liberty—can be a systemic feature of the justice system, not a bug. This case, along with the litigation challenging the multi-year delays caused by the CARRP program, demonstrates that the most profound failures of timeliness often arise from entrenched policies and affect entire classes of people, requiring years of arduous litigation to correct. The "delay" is not merely the time a motion sits pending, but the entire lifecycle of the lawsuit needed to compel a fundamentally just and timely outcome. The existence of the writ of mandamus confirms that the legal system anticipates the possibility of such failures and provides an extraordinary remedy, though its high standard for issuance means it is a tool of last resort.
Based on this comprehensive analysis, the following recommendations are offered for litigants

and observers of the federal judicial system:
- **For Litigants Facing Unreasonable Delay:**
  - **Meticulous Documentation is Paramount:** A party confronting delay must create a thorough record of the inaction. This includes documenting all filings, noting the passage of time without a ruling, and memorializing all inquiries made to the clerk of court or opposing counsel regarding the status of a pending motion. This record is essential for any future action, particularly a petition for a writ of mandamus.
  - **Analyze the Cause of the Delay:** It is critical to assess *why* the delay is occurring. Is it likely due to a universally acknowledged busy docket in that particular court? Is the judge known for being slow? Or is there a discernible pattern of delay affecting a specific type of case or litigant? Understanding the potential cause—whether it is systemic overload, case-specific neglect, or strategic inaction—is crucial for formulating an effective response.
  - **Approach Mandamus with Caution and Strategy:** Filing a petition for a writ of mandamus is a significant strategic decision that should not be taken lightly. It risks antagonizing the very district court judge from whom a favorable ruling is sought. This remedy should be reserved for only the most egregious and prejudicial delays where a clear, non-discretionary duty to act has been breached and all other, less confrontational avenues have been exhausted. The demonstrated success of mandamus suits in compelling action from administrative agencies suggests it is a particularly viable tool when facing bureaucratic, rather than purely judicial, inaction.
- **For Observers of Judicial Administration:**
  - The research highlights a critical vulnerability in the American system of justice: the persistent gap between its procedural promises and its on-the-ground reality. The documented situations of extreme delay are not mere administrative inconveniences; they represent real, prolonged deprivations of rights, liberty, and access to justice.
  - Cases like *Cancino Castellar* and the challenges to the CARRP program raise profound questions about equal protection and the ability of the judiciary to serve as a timely and effective check on executive power, especially when the rights of marginalized populations are at stake. These instances of systemic delay should prompt ongoing scrutiny and reform efforts aimed at ensuring the federal courts have the resources and procedures necessary to deliver not just justice, but timely justice, to all.

**Works cited**

1. Motions - Ninth Circuit, https://www.ca9.uscourts.gov/staff-attorneys/motions/ 2. Rule 6. Computing and Extending Time; Time for Motion Papers | Federal Rules of Civil Procedure - Law.Cornell.Edu, https://www.law.cornell.edu/rules/frcp/rule_6 3. Rule 3.01 - Motions, Briefs, and Other Legal Memorandums - Middle District of Florida, https://www.flmd.uscourts.gov/local-rules/rule-301-motions-briefs-and-other-legal-memorandums 4. Temporary Blocks: What You Need to Know About TROs and Preliminary Injunctions, https://www.lawfaremedia.org/article/temporary-blocks--what-you-need-to-know-about-tros-and-preliminary-injunctions 5. Emergency Motions for Release Pending Federal Bail Appeals - Leppard Law, https://federal-criminal.com/bail/emergency-motions-for-release-pending-federal-bail-appeals/ 6. Emergency Temporary Relief - Keller/Anderle LLP,

https://kelleranderle.com/emergency-temporary-relief/ 7. Judge briefly blocks immigrants' deportation to South Sudan after Supreme Court cleared the way, https://apnews.com/article/south-sudan-deportation-supreme-court-5055bb1560545e3bc0c6592868b07867 8. Mandamus Petitions For Adverse Discovery Rulings - Markowitz Herbold PC, https://www.markowitzherbold.com/Mandamus-Petitions-For-Adverse-Discovery-Rulings 9. Comments: The Duration of Temporary Restraining Orders in Federal Court - ScholarWorks: UB Law's Institutional Repository, https://scholarworks.law.ubalt.edu/cgi/viewcontent.cgi?article=1316&context=ublr 10. temporary restraining order | Wex | US Law | LII / Legal Information Institute, https://www.law.cornell.edu/wex/temporary_restraining_order 11. Covering Civil Cases – Journalist's Guide - U.S. Courts, https://www.uscourts.gov/statistics-reports/covering-civil-cases-journalists-guide 12. Rule 65 - Injunctions and Restraining Orders | 2024 Federal Rules of Civil Procedure, https://www.federalrulesofcivilprocedure.org/frcp/title-viii-provisional-and-final-remedies/rule-65-injunctions-and-restraining-orders/ 13. Rule 65. Injunctions and Restraining Orders | Federal Rules of Civil Procedure | US Law, https://www.law.cornell.edu/rules/frcp/rule_65 14. Comments: The Duration of Temporary Restraining Orders in Federal Court, https://scholarworks.law.ubalt.edu/ublr/vol12/iss2/5/ 15. preliminary injunction | Wex | US Law | LII / Legal Information Institute, https://www.law.cornell.edu/wex/preliminary_injunction 16. How to File a Preliminary Injunction - Bloomberg Law, https://pro.bloomberglaw.com/insights/litigation/how-to-file-a-preliminary-injunction/ 17. Injunctive Relief Toolkit (Federal) | Practical Law - Westlaw, https://content.next.westlaw.com/practical-law/document/I24bae7592ccb11e698dc8b09b4f043e0/Injunctive-Relief-Toolkit-Federal?viewType=FullText&transitionType=Default&contextData=(sc.Default) 18. Rule 6.02 - Preliminary Injunction - Middle District of Florida, https://www.flmd.uscourts.gov/local-rules/rule-602-preliminary-injunction 19. Requirements for a Preliminary Injunction in Federal Court - Bona Law, https://www.bonalaw.com/insights/legal-resources/requirements-for-a-preliminary-injunction-in-federal-court 20. Temporary Restraining Order (T.R.O.) | Eastern District of Pennsylvania, https://www.paed.uscourts.gov/temporary-restraining-order-tro 21. Causes of Delay in Criminal Cases - Scholarly Commons, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=1457&context=jclc 22. The Law's Delays: Reforming Unnecessary Delay in Civil Litigation, https://scholarship.law.nd.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1518&context=jleg 23. Agency Delay and the Courts - Scholarly Commons, https://scholarship.law.gwu.edu/cgi/viewcontent.cgi?article=3038&context=faculty_publications 24. S.Hrg. 109-694 — BATTLING THE BACKLOG PART II: CHALLENGES FACING THE U.S. COURT OF APPEALS FOR VETERANS CLAIMS | Congress.gov, https://www.congress.gov/event/109th-congress/senate-event/LC12163/text 25. Civil Case Processing.jpg - United States Courts, https://www.uscourts.gov/file/document/iaals-civil-case-processing-federal-district-courts 26. Delay by the Parties and Delay by the Courts - Chicago Unbound, https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=12013&context=journal_articles&httpsredir=1&referer= 27. ACLU Files Class Action Lawsuit Against DHS Challenging Months-Long Delays in Bringing Detained Immigrants, Asylum Seekers Before Judges | American Civil Liberties Union, https://www.aclu.org/press-releases/aclu-files-class-action-lawsuit-against-dhs-challenging-months-long-delays-bringing 28. New ACLU Report Examines Secretive Policy Used to Delay and

Deny Immigrants' Green Card and Citizenship Applications | American Civil Liberties Union, https://www.aclu.org/press-releases/new-aclu-report-examines-secretive-policy-used-to-delay-and-deny-immigrants-green-card-and-citizenship-applications 29. Understanding the Writ of Mandamus in Immigration Cases, https://sedaghatlaw.com/writ-of-mandamus-in-immigration-cases/ 30. Rule 87. Civil Rules Emergency | Federal Rules of Civil Procedure - Law.Cornell.Edu, https://www.law.cornell.edu/rules/frcp/rule_87 31. BU Legal Scholars Assess Supreme Court Ruling Limiting Nationwide Injunctions, https://www.bu.edu/articles/2025/legal-scholars-assess-supreme-court-ruling-limiting-nationwide-injunctions/ 32. Takeaways from the Supreme Court's Term | American Civil Liberties Union, https://www.aclu.org/news/civil-liberties/takeaways-from-the-supreme-courts-term 33. How Could the Lower Courts' Loss of Nationwide Injunction Power Impact Your Business?, https://www.jdsupra.com/legalnews/how-could-the-lower-courts-loss-of-1027846/ 34. Courts Must Be Able to Check Executive Overreach: Former Judges - Bloomberg Law News, https://news.bloomberglaw.com/bankruptcy-law/courts-must-be-able-to-check-executive-overreach-former-judges 35. Cancino Castellar v. Mayorkas | ACLU of San Diego and Imperial ..., https://www.aclu-sdic.org/en/cases/cancino-castellar-v-mayorkas 36. Fish & Richardson and ACLU of San Diego Secure Settlement in Class Action Lawsuit Regarding Processing Delays for People in Immigration Custody, https://www.fr.com/news/fish-richardson-and-aclu-of-san-diego-secure-settlement-in-class-action-lawsuit-regarding-processing-delays-for-people-in-immigration-custody-03-14-2024/ 37. Court Approves Settlement in Class Action Lawsuit Regarding Processing Delays for People in Immigration Custody | ACLU of San Diego and Imperial Counties, https://www.aclu-sdic.org/en/press-releases/court-approves-settlement-class-action-lawsuit-regarding-processing-delays-people 38. Case: Cancino Castellar v. Mayorkas - Civil Rights Litigation Clearinghouse, https://clearinghouse.net/case/45338/ 39. Cancino Castellar et al v. Mayorkas et al, No. 3:2017cv00491 - Document 178 (S.D. Cal. 2021) - Justia Law, https://law.justia.com/cases/federal/district-courts/california/casdce/3:2017cv00491/527318/178/ 40. Cancino Castellar et al v. Mayorkas et al, No. 3:2017cv00491 - Document 179 (S.D. Cal. 2021) - Justia Law, https://law.justia.com/cases/federal/district-courts/california/casdce/3:2017cv00491/527318/179 41. San Diego judge rules on lawsuit alleging court delays for immigration detainees - YouTube, https://www.youtube.com/watch?v=IJggh1Ud5g4 42. ImmigrationProf Blog: Cancino Castellar v. Mayorkas Settlement - TypePad, https://lawprofessors.typepad.com/immigration/2024/03/cancino-castellar-v-mayorkas-settlement-.html 43. Delay and Deny - ACLU, https://assets.aclu.org/live/uploads/2024/07/2024.07.10-CARRP-Delay-and-Deny15.pdf 44. CARRP Muslims Need Not Apply ACLU SoCal Report, https://www.aclusocal.org/sites/default/files/carrp-muslims-need-not-apply-aclu-socal-report.pdf 45. Muslims need not apply | ACLU of Southern California, https://www.aclusocal.org/en/news/muslims-need-not-apply 46. Writ of Mandamus for Immigration Delays – How It Works & When to File - The Shawn S. Sedaghat Law Firm, https://sedaghatlaw.com/writ-of-mandamus-for-immigration-delays/ 47. Wagafe v. USCIS - Lawsuit Challenging Secret Program Blocking Immigrant Applications | American Civil Liberties Union, https://www.aclu.org/cases/wagafe-v-uscis-lawsuit-challenging-secret-program-blocking-immigrant-applications 48. Court Rules Cruel Immigration Policy is Unlawful | American Civil Liberties Union, https://www.aclu.org/press-releases/court-rules-cruel-immigration-policy-is-unlawful 49.

How to File a Writ of Mandamus | Jeelani Law Firm, PLC, https://www.jeelani-law.com/how-to-file-a-writ-of-mandamus/ 50. 215. Mandamus | United States Department of Justice, https://www.justice.gov/archives/jm/civil-resource-manual-215-mandamus 51. mandamus | Wex | US Law | LII / Legal Information Institute, https://www.law.cornell.edu/wex/mandamus 52. Understanding a Writ of Mandamus | Law Offices Of Robert David Malove, https://www.robertmalovelaw.com/faqs/understanding-a-writ-of-mandamus.cfm 53. Understanding the Writ of Mandamus in US Law, https://khandelwalaw.com/grounds-for-writ-of-mandamus-us-law/ 54. Writ of Mandamus and Writ of Procedendo Pro Se Packet - Ohio.gov, https://dam.assets.ohio.gov/image/upload/opd.ohio.gov/Law%20Library/Representing%20Yourself/Mandamus-Procedendo-Packet.pdf 55. Rule 21. Writs of Mandamus and Prohibition, and Other Extraordinary Writs - Fourth Circuit Court of Appeals, https://www.ca4.uscourts.gov/rules/Rule21.html 56. Rule 21. Writs of Mandamus and Prohibition, and Other Extraordinary Writs | Federal Rules of Appellate Procedure | US Law | LII / Legal Information Institute - Law.Cornell.Edu, https://www.law.cornell.edu/rules/frap/rule_21