# Justice Undone: Procedural Violations and the Denial of Due Process for Pro Se Litigants in Federal Courts

## Introduction

### The Constitutional Promise vs. The Procedural Reality

The Fifth Amendment to the United States Constitution guarantees that no person shall be "deprived of life, liberty, or property, without due process of law." At its core, this clause promises a meaningful opportunity for all to be heard in a court of law, a principle that forms the bedrock of American jurisprudence. Yet, for a vast and growing population of litigants who navigate the federal court system without legal representation, this promise often remains illusory. These individuals, proceeding *pro se*—a Latin phrase meaning "for oneself"—enter a procedural labyrinth designed by lawyers, for lawyers. While the right to represent oneself is statutorily protected, the practical ability to do so effectively is fraught with peril. More than a quarter of all civil cases in federal district courts are filed by *pro se* litigants, with the number soaring to over 90 percent for civil suits filed by prisoners. These are often the most vulnerable members of society: the indigent, the incarcerated, and the unsophisticated, for whom hiring an attorney is not a choice but an impossibility.
The procedural errors detailed in this report are not mere technicalities or harmless missteps. They are fundamental violations that slam the courthouse door shut on potentially meritorious claims, often at the earliest stages of litigation. When a federal judge dismisses a case because an unrepresented plaintiff failed to use precise legal terminology, or grants summary judgment because an incarcerated individual did not understand the arcane requirements for submitting evidence, the system is not dispensing justice; it is enforcing a barrier to it. The cases examined herein, overturned on appeal for the most basic of procedural failures by the trial court, reveal a disturbing pattern. They demonstrate that the very system designed to provide a neutral forum for resolving disputes can become an instrument of injustice for those who lack the specialized knowledge to navigate its complexities.

### Thesis Statement

This report posits that a pattern of appellate reversals reveals a systemic failure within federal district courts to consistently apply established procedural safeguards for *pro se* litigants, particularly at the critical stages of dismissal and summary judgment. This failure stems not only from individual judicial error but from a combination of ambiguous legal standards, implicit institutional biases against the unrepresented, and a procedural framework ill-suited for their participation. The judiciary's own appellate rulings, which repeatedly correct lower courts on fundamental principles of fairness, serve as the primary evidence that the promise of due process is being systematically undone for those who must advocate for themselves.

**Roadmap**

To substantiate this thesis, this report will proceed in five parts. Section 1 will establish the legal bedrock, outlining the foundational principles and judicial duties owed to *pro se* litigants, with a focus on the cornerstone doctrine of "liberal construction." Section 2 will analyze "The Dismissal Trap," examining how courts improperly terminate *pro se* cases at the pleading stage through the misapplication of procedural rules. Section 3, "Trial by Paper," will investigate the due process minefield of summary judgment, where the failure to provide adequate notice and to properly evaluate *pro se* evidence frequently leads to reversible error. Section 4 will then move from effect to cause, unpacking the systemic deficits—including cognitive biases, the impact of the Prison Litigation Reform Act, and the structural imbalances of the adversary system—that precipitate these procedural injustices. Finally, Section 5 will offer a comprehensive blueprint for reform, proposing concrete pathways toward a more equitable system for all litigants, regardless of their representational status.

# Section 1: The Judicial Duty of Lenity: Foundational Principles for Pro Se Litigation

To comprehend the significance of the procedural violations detailed in this report, one must first understand the legal duties federal courts owe to individuals who represent themselves. The American legal system operates on an adversarial model that presumes a rough parity between opposing sides, a presumption that collapses when one party is a trained attorney and the other is a layperson. In recognition of this inherent imbalance, the judiciary has developed a set of principles designed to ensure that *pro se* litigants receive a fair opportunity to have their cases heard. However, these principles are often articulated in broad strokes, creating a persistent tension between the mandate for leniency and the requirement that all parties adhere to the rules. This ambiguity, in turn, has fostered an inconsistent and unpredictable legal landscape for the unrepresented.

## 1.1 The Constitutional and Statutory Right to Self-Representation

The right of an individual to appear in federal court "for oneself" is not a modern accommodation but one of the oldest features of the American legal system. It was enshrined in the Judiciary Act of 1789 and is now codified in federal law at 28 U.S.C. § 1654, which states: "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel". This statutory right establishes that proceeding *pro se* is a legitimate and protected form of participation in the federal judiciary.
It is crucial, however, to distinguish the nature of this right in civil versus criminal proceedings. In the criminal context, the Supreme Court has recognized a constitutional right to waive counsel and represent oneself, as established in *Faretta v. California*. This choice, however, comes with the expectation that the defendant will adhere strictly to courtroom rules. In the civil context, the dynamic is fundamentally different. The Supreme Court has held that there is no absolute due process right to appointed counsel in civil cases, particularly where a litigant's physical liberty is not at stake. The practical consequence of this distinction is profound. While a criminal defendant's decision to proceed *pro se* may be a strategic choice, for the overwhelming majority of civil *pro se* litigants, self-representation is a necessity born of indigence. They appear without a lawyer not because they want to, but because they cannot afford one. This economic reality

underscores the critical importance of the procedural accommodations developed by the courts; without them, the statutory right to self-representation would be a hollow promise, and access to the courts would become a privilege reserved for the wealthy.

## 1.2 The Haines v. Kerner Standard: Holding Pro Se Pleadings to a "Less Stringent" Standard

The single most important legal doctrine governing the treatment of *pro se* litigants is the principle of "liberal construction," established by the Supreme Court in the landmark case of *Haines v. Kerner*, 404 U.S. 519 (1972). The case involved a complaint filed by a prisoner in Illinois, Francis Haines, who alleged that placing him in solitary confinement aggravated his physical ailments and violated his due process rights. The district court dismissed his complaint for failure to state a claim, and the Seventh Circuit affirmed, emphasizing the "wide discretion" of prison officials.
The Supreme Court, in a short but powerful *per curiam* opinion, unanimously reversed. The Court's mandate was unequivocal: a *pro se* complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers". The Court further held that such a complaint should not be dismissed for failure to state a claim unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief". The core purpose of the *Haines* doctrine is to prevent the premature dismissal of potentially meritorious claims simply because the litigant, lacking legal expertise, failed to use the correct legal terminology or follow the precise formatting of a formal pleading. It recognizes that the courthouse door must be open to all, not just to those who possess the key of legal training. *Haines* stands for the fundamental proposition that substance should triumph over form when a person's rights are at stake and they lack the means to hire a professional advocate.

## 1.3 The Limits of Liberality: The Enduring Obligation to Follow Procedural Rules

While the *Haines* doctrine provides a crucial shield for the unrepresented, it is not an impenetrable one. Courts consistently balance the duty of liberal construction with the practical necessity of maintaining an orderly and efficient judicial process. As a result, it is a well-established principle that *pro se* status does not grant a litigant a license to ignore the fundamental rules of procedure. Handbooks and guides provided by the federal courts themselves explicitly warn *pro se* litigants that they are "expected to follow/abide by the rules that govern the practice of law in the Federal Courts," including the Federal Rules of Civil Procedure (FRCP) and the specific local rules of the district court in which they are filing.
This creates an inherent and challenging tension for judges. On one hand, they are commanded by the Supreme Court to be lenient with "inartfully pleaded" documents. On the other, they are tasked with enforcing a complex set of rules designed to ensure fairness to all parties and to manage a crowded docket. This tension is evident in modern appellate decisions. For instance, in *Heidary v. Amazon.com, Inc.*, the Federal Circuit affirmed the dismissal of a *pro se* litigant's patent infringement claim, stating that "a liberal construction of pleadings by pro se litigants does not mean ignoring the pleading requirements under the FRCP". Such rulings underscore the fine line that judges must walk. The critical question, which is often answered inconsistently, is where "inartful pleading" ends and a fatal procedural deficiency begins. This ambiguity is a

significant source of the disparate outcomes and procedural violations that plague *pro se* litigation.

## 1.4 A System Adrift: The Lack of Uniformity and the Patchwork of Local Rules

The single greatest structural cause of inconsistency in the treatment of *pro se* litigants is the profound lack of clear, uniform, national guidance. The Federal Rules of Civil Procedure, the comprehensive rulebook governing all civil actions in federal court, are shockingly silent on the matter, referring to *pro se* litigants only once. Furthermore, the Supreme Court has not revisited or provided significant clarification on the practical application of the *Haines* standard in over a decade. This top-level silence has created a vacuum.

This vacuum has been filled not by a coherent national policy, but by what one legal scholar has termed the "piecemeal and largely unnoticed local rulemaking" that has taken place within each of the 94 federal district courts. An analysis of these local rules reveals a bewildering array of nearly 500 pro se-specific rules and practices across the country. The result is a patchwork system where the procedural rights and accommodations afforded to an unrepresented litigant can change dramatically simply by crossing a state line. Some districts may have robust self-help centers and mandatory notice requirements for summary judgment, while others may offer little more than a basic handbook.

This systemic inconsistency is not an accident; it is the direct and foreseeable consequence of a failure in top-down rulemaking. The Supreme Court in *Haines* issued a broad, principled command to "be lenient," but it failed to define the specific procedural mechanics of that leniency. The drafters of the FRCP, in turn, failed to fill this gap, leaving district courts to improvise. This improvisation, while often well-intentioned, has created a system that is fundamentally unpredictable for its most vulnerable users. This lack of uniformity raises profound constitutional questions. The principles of Due Process and Equal Protection demand a predictable and even-handed application of the law. When the procedural rights a litigant receives depend on the happenstance of geographic location, the very ideal of equal justice under federal law is undermined. This transforms the problem from one of isolated judicial mistakes into one of systemic constitutional deficiency.

# Section 2: The Dismissal Trap: Foreclosing Meritorious Claims at the Courthouse Gates

For many *pro se* litigants, the legal journey ends almost as soon as it begins. The motion to dismiss, governed by Federal Rule of Civil Procedure 12(b)(6), is the first major procedural hurdle they face, and it is a point at which a disproportionate number of their cases are terminated. This stage of litigation starkly exposes the tension between modern, heightened pleading standards and the long-standing duty to construe *pro se* filings liberally. When district courts misapply these standards or, more egregiously, deny a *pro se* litigant the opportunity to correct pleading deficiencies, they are not merely enforcing rules; they are often violating the core command of *Haines v. Kerner* and foreclosing access to justice.

## 2.1 Misapplication of Pleading Standards: The Iqbal/Twombly

## "Plausibility" Standard vs. Haines's Lenity

The legal landscape for all plaintiffs, represented and unrepresented alike, was fundamentally altered by the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal*. These cases jettisoned the half-century-old liberal "no set of facts" pleading standard from *Conley v. Gibson* and replaced it with a stricter "plausibility" standard. Under *Iqbal* and *Twombly*, a complaint must now contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." This requires more than just alleging a legal wrong; it demands that the plaintiff plead enough facts to allow the court to draw a reasonable inference that the defendant is liable for the misconduct alleged.

This shift has created a procedural pincer movement that squeezes *pro se* litigants with particular force. The leniency standard of *Haines* has remained static since 1972, but the baseline pleading requirement it modifies has become significantly more demanding. *Haines* was decided against the backdrop of the *Conley* standard, where a complaint was difficult to dismiss. Liberally construing a complaint under that regime was a relatively low bar. Today, judges are asked to liberally construe a complaint while simultaneously applying the much higher "plausibility" threshold of *Iqbal*. This creates a profound conflict. *Pro se* litigants, especially those who are incarcerated, often lack the legal knowledge and, more importantly, the pre-discovery access to the specific facts needed to meet this heightened standard. They may know they have been wronged but lack the ability to articulate the "who, what, when, where, and why" with the level of detail *Iqbal* seems to demand.

This conflict is institutionalized and amplified by the Prison Litigation Reform Act (PLRA). The PLRA mandates that district courts screen all complaints filed by prisoners and dismiss *sua sponte* (on their own initiative) any case that is frivolous, malicious, or "fails to state a claim upon which relief can be granted". This forces judges to apply the difficult *Iqbal*/*Haines* balancing act to cases filed by the largest and most procedurally disadvantaged group of *pro se* litigants, often without the benefit of any argument from the plaintiff. The result is a high risk of erroneous dismissal, where a judge, seeing a factually sparse complaint, deems it "implausible" without giving the unsophisticated litigant a chance to develop their case.

## 2.2 The Fundamental Error of Finality: Dismissal "With Prejudice" and the Denial of Leave to Amend

When a court dismisses a case, the specific language it uses carries immense consequences. A dismissal "without prejudice" is a temporary setback; it signals that the complaint is deficient but allows the litigant to fix the errors and file an amended complaint. In contrast, a dismissal "with prejudice" is a final, fatal blow. It is a final judgment on the merits that permanently ends the lawsuit and prevents the litigant from ever bringing the same claim again.

For a *pro se* litigant, a dismissal with prejudice based on the initial complaint is often a profound procedural injustice. It effectively punishes the individual for their lack of legal skill—the very circumstance the *Haines* doctrine was designed to accommodate. Federal Rule of Civil Procedure 15(a) embodies a liberal policy towards amendment, stating that courts should "freely give leave [to amend] when justice so requires". Withholding this leave from a *pro se* plaintiff, particularly on the first-filed complaint, is often an abuse of discretion and a common basis for appellate reversal.

Such an action represents a *de facto* nullification of the *Haines* doctrine. The entire purpose of liberal construction is to look past the "inartful" pleading to see if a viable claim might exist

underneath. By treating the initial, flawed document as the litigant's final and only chance, the court is effectively holding the *pro se* party to the same exacting standard as a seasoned attorney, which is precisely what *Haines* and its progeny forbid. The act of denying leave to amend becomes the procedural mechanism by which a court can circumvent its duty to provide leniency. It transforms a correctable mistake into a case-ending catastrophe.

## 2.3 Case Study in Reversal—Lopez v. Smith, 203 F.3d 1122 (9th Cir. 2000)

The Ninth Circuit's *en banc* decision in *Lopez v. Smith* stands as a seminal and forceful rejection of the practice of dismissing *pro se* complaints without affording an opportunity to amend. The case involved John Lopez, a *pro se* prisoner who filed a civil rights complaint. The district court dismissed some of his claims for failure to state a claim, without granting leave to amend. The court's rationale was that the recently enacted PLRA, with its command that a court "shall dismiss" a deficient complaint, had stripped it of its traditional discretion to allow amendments. The Ninth Circuit, reviewing the case with the full court, emphatically reversed this interpretation. The court's detailed reasoning provides a powerful defense of *pro se* rights at the pleading stage. First, the court held that the PLRA's "shall dismiss" language does not contain the words "without leave to amend." To read such a limitation into the statute would be an improper judicial invention. The court reasoned that this language simply codified the court's power to dismiss deficient complaints under Rule 12(b)(6), a power that has always coexisted with the liberal amendment policy of Rule 15(a).
Second, the court highlighted the severe and unjust consequences of a no-amendment rule. It would cause indigent prisoners to accumulate "strikes" under the PLRA's three-strikes provision (28 U.S.C. § 1915(g)) for simple, curable pleading errors, effectively penalizing them for being "unskilled in the law" rather than for filing truly meritless claims. This, the court found, was contrary to the stated intent of the PLRA's sponsors, who did not wish to prevent inmates from raising "legitimate claims." Furthermore, it would be inefficient, forcing litigants to file entirely new lawsuits instead of simply amending existing ones.
Ultimately, the Ninth Circuit in *Lopez* established a clear and binding rule for the circuit: a district court must grant leave to amend a *pro se* complaint unless "it is absolutely clear that the deficiencies of the complaint could not be cured by amendment". *Lopez* is more than just a case about the PLRA; it is a fundamental reaffirmation of the principle that *pro se* status itself warrants a second chance at pleading. It stands as a powerful appellate rebuke to lower courts that would use procedural rules as a sword to cut down the claims of the unrepresented before they can be fairly heard.

# Section 3: Trial by Paper: How Summary Judgment Becomes a Due Process Minefield

If a *pro se* litigant successfully navigates the dismissal trap, they face an even more formidable obstacle: the motion for summary judgment. Governed by Federal Rule of Civil Procedure 56, summary judgment is a "trial by paper" where a judge decides the case based on written submissions without a live trial. The procedural complexity of this stage escalates dramatically, requiring the non-moving party to marshal and present admissible evidence to demonstrate a "genuine dispute as to any material fact". For unrepresented individuals, who often lack legal

training and resources, this process is a procedural minefield. The failure of district courts to provide adequate guidance and to properly evaluate *pro se* evidence at this stage is a frequent source of due process violations and a leading cause of appellate reversals.

## 3.1 The Summary Judgment Standard and its Perils for the Unrepresented

Rule 56 allows a party to move for summary judgment by asserting that the undisputed facts show they are entitled to "judgment as a matter of law". Once the moving party (typically the defendant with counsel) makes this showing, the burden shifts to the non-moving party (often the *pro se* plaintiff) to come forward with specific evidence to demonstrate that a genuine factual dispute exists that requires a trial. This burden cannot be met by simply resting on the allegations in the complaint. The *pro se* litigant must produce admissible evidence, such as their own sworn affidavit or declaration, deposition testimony, or documents, that contradicts the moving party's version of the facts.
This burden-shifting framework is profoundly counter-intuitive for non-lawyers. Many *pro se* litigants mistakenly believe that the story they told in their complaint is enough to get them to trial. They do not understand the critical distinction between an unsworn allegation and admissible evidence, nor the technical requirements for an affidavit (it must be based on personal knowledge and set out facts that would be admissible in evidence). As a result, they may fail to respond to a summary judgment motion, or respond inadequately, leading the court to deem the defendant's facts as undisputed and grant the motion by default. This transforms a procedural misunderstanding into a final loss on the merits, a result that is fundamentally at odds with the principles of due process.

## 3.2 A Critical Procedural Safeguard: The Notice Requirement

Recognizing the inherent unfairness of this procedural trap, several federal appellate courts have created a crucial procedural safeguard: the requirement that *pro se* litigants receive a special, plain-language notice explaining the nature of summary judgment and the specific requirements for opposing it. The very existence of such court-created notice requirements is an implicit admission by the judiciary that the standard Rule 56 procedure is inadequate and procedurally unfair for unrepresented parties. These special rules are a "patch" on a system that is known to be broken.
The seminal case establishing this principle is *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975). In *Roseboro*, the Fourth Circuit Court of Appeals reversed a summary judgment entered against a *pro se* prisoner because he had not been properly informed of his obligations. The court held that a *pro se* litigant must be "advised of his right to file counter-affidavits or other responsive material and alerted to the fact that his failure to so respond might result in the entry of summary judgment against him". The court stressed the need for a "notice sufficiently understandable to one in appellant's circumstances".
The *Roseboro* doctrine has since been adopted in various forms across the country and implemented through local court rules. For example, Local Civil Rule 56.2 in the Southern District of New York requires a represented party moving for summary judgment against a *pro se* litigant to serve a specific, detailed notice explaining what summary judgment is, that the complaint's allegations are not enough, and that the case may be dismissed without a trial if a proper response with sworn evidence is not filed. Similarly, Local Rule 7(K) in the Eastern

District of Virginia has historically required counsel to include a "Roseboro warning" in the motion itself. The continued need for appellate courts to reverse cases for failure to follow these remedial rules demonstrates a deep and persistent failure of implementation at the trial court level, indicating a resistance to adopting the very safeguards the system created to protect due process.

## 3.3 Case Studies in Reversal—Egregious Summary Judgment Errors

Recent appellate decisions provide stark examples of how district courts continue to err at the summary judgment stage, often in ways that seem to disregard the fundamental principles of fairness owed to *pro se* litigants.

***McDaniel v. Syed*, No. 20-2946 (7th Cir. 2024):** In this case, a Wisconsin prisoner, Carl McDaniel, alleged that prison officials violated the Americans with Disabilities Act (ADA) by refusing to assign him to a no-stairs housing unit, which caused him to miss approximately 600 meals because of the pain involved in navigating stairs. The district court granted summary judgment to the defendants, explicitly refusing to treat McDaniel's sworn statements, signed under penalty of perjury, as evidence creating a genuine factual dispute. The Seventh Circuit reversed, calling the district court's refusal an "error". The appellate court clarified that a litigant's own verified submissions are evidence and that the district court had improperly discounted facts that a reasonable jury could believe. This case highlights a critical failure: a judge improperly weighing the credibility of evidence at the summary judgment stage, rather than simply identifying whether a factual dispute exists.

***Kowalchuck v. MTA* (2nd Cir. 2024):** This case illustrates how judicial attempts at efficiency can trample due process rights. The district court, following its local practice, had the parties submit pre-motion letters outlining their positions on an anticipated summary judgment motion. Two years later, just four days before trial was set to begin and without any formal motion ever being filed, the court *sua sponte* granted summary judgment to the defendant based on those letters. The Second Circuit reversed, finding multiple procedural errors. The court held that granting a dispositive motion based on pre-motion letters without giving the opposing party formal notice and a "full and fair" opportunity to submit their evidence is a violation of their right to be heard. This decision serves as a powerful reminder that procedural shortcuts cannot come at the expense of fundamental fairness.

***Luna v. Davis*, No. 21-50578 (5th Cir. 2023):** Richard Luna, an inmate proceeding *pro se*, filed an Eighth Amendment failure-to-protect claim. The district court granted summary judgment to the defendant, a prison official, concluding that Luna's own sworn declaration was "unsubstantiated" and insufficient to create a factual dispute about whether the official was aware of the risk to Luna. The Fifth Circuit reversed. The appellate court held that while "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient," a "self-serving" declaration is not automatically disqualified. If the declaration is made on personal knowledge, sets out specific facts, and is given by a competent witness, it *is* sufficient to create a genuine dispute of material fact. The reversal in *Luna* directly confronts the judicial tendency to dismiss evidence simply because it comes from the *pro se* party themselves, reaffirming that their testimony, when properly presented, must be given due weight.

## 3.4 The Supreme Court's Intervention on Procedural Technicalities

Even the nation's highest court has found it necessary to intervene to correct lower court rulings

that penalize *pro se* litigants for hyper-technical, non-prejudicial procedural missteps. In *Parrish v. United States* (2025), an inmate, Donte Parrish, sought to appeal the dismissal of his lawsuit. Due to a prison transfer and mail delays, he missed the original 60-day deadline to file his notice of appeal. He sent a letter to the court asking to reopen the time to appeal. Crucially, he filed his formal notice of appeal *before* the district court officially granted his motion to reopen the time. The Fourth Circuit dismissed his appeal, ruling that his notice was premature and that he was required to file a *second*, identical notice of appeal after the court's order.

The Supreme Court reversed in an 8-1 decision. Justice Sotomayor, writing for the majority, found that the Federal Rules of Appellate Procedure do not require such a duplicative filing. She noted that it was "perfectly clear after Parrish's first notice that he intended to appeal his case's dismissal" and that requiring another notice would amount to nothing more than "empty paper shuffling". This decision represents a significant, top-level rejection of the "gotcha" mentality that can pervade procedural law. It signals that federal courts should focus on the substance of a litigant's intent rather than enforcing rigid procedural timelines that serve no practical purpose and only act as a trap for the unwary, particularly for incarcerated individuals facing the unique obstacle of prison mail systems.

**Table 1: Key Appellate Reversals in Federal Pro Se Litigation**

| Case Name & Citation | Lower Court/Circuit | Reversing Appellate Court | Core Procedural Issue(s) | Key Holding / Reason for Reversal |
|---|---|---|---|---|
| *Haines v. Kerner*, 404 U.S. 519 (1972) | 7th Circuit | U.S. Supreme Court | Improper Dismissal (Rule 12(b)(6)) | Established that *pro se* complaints are held to "less stringent standards" and should not be dismissed unless it is beyond doubt that no relief could be granted. |
| *Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000) | District Court (9th Cir.) | 9th Circuit (en banc) | Dismissal without Leave to Amend; Improper Summary Judgment | Held that the PLRA does not strip courts of discretion to grant leave to amend; found genuine issues of material fact precluded summary judgment. |
| *McDaniel v. Syed*, No. 20-2946 (7th Cir. 2024) | District Court (7th Cir.) | 7th Circuit | Improper Summary Judgment | Ruled the district court erred by failing to treat the *pro se* prisoner's sworn statements |

| Case Name & Citation | Lower Court/Circuit | Reversing Appellate Court | Core Procedural Issue(s) | Key Holding / Reason for Reversal |
|---|---|---|---|---|
| | | | | as evidence and improperly discounted facts creating a genuine dispute. |
| *Kowalchuck v. MTA* (2nd Cir. 2024) | District Court (2nd Cir.) | 2nd Circuit | Improper Summary Judgment | Found procedural error where the court granted summary judgment based on pre-motion letters without giving the litigant notice and a full opportunity to be heard. |
| *Luna v. Davis*, No. 21-50578 (5th Cir. 2023) | District Court (5th Cir.) | 5th Circuit | Improper Summary Judgment | Reversed summary judgment, finding the *pro se* prisoner's sworn declaration was sufficient to create a genuine dispute of material fact regarding an official's awareness of risk. |
| *Parrish v. United States* (U.S. 2025) | 4th Circuit | U.S. Supreme Court | Untimely Notice of Appeal | Held that a *pro se* litigant who files a notice of appeal before the appeal period is formally reopened does not need to file a second, duplicative notice. |
| *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975) | District Court (4th Cir.) | 4th Circuit | Improper Summary Judgment | Established the requirement that *pro se* litigants must be given fair and understandable notice of the |

| Case Name & Citation | Lower Court/Circuit | Reversing Appellate Court | Core Procedural Issue(s) | Key Holding / Reason for Reversal |
|---|---|---|---|---|
| | | | | requirements and consequences of a summary judgment motion. |

# Section 4: The Systemic Deficit: Unpacking the Causes of Procedural Injustice

The recurring procedural errors documented in appellate reversals are not merely a collection of isolated mistakes by individual judges. They are symptoms of a deeper, systemic dysfunction in how the federal justice system perceives and processes *pro se* litigation. The injustices faced by unrepresented litigants are the predictable result of a confluence of factors: the cognitive biases of legal actors, legislative schemes that institutionalize suspicion, and a structural adherence to an adversarial model that is fundamentally ill-suited for unequal participants. These forces are not independent; they are mutually reinforcing, creating a climate where procedural fairness for the unrepresented is the exception rather than the rule.

## 4.1 The "Signaling Effect": Implicit Bias and the Perception of the Pro Se Litigant

One of the most powerful, yet often invisible, forces working against unrepresented litigants is what legal scholars have termed the "signaling effect" of *pro se* status. Research in this area reveals that a litigant's status as unrepresented, in and of itself, sends a negative signal to legally trained individuals, including judges and opposing counsel. This signal triggers a cascade of implicit biases and negative stereotypes that can profoundly and unfairly impact case outcomes.

Experimental studies have shown that when presented with identical case facts, law-trained individuals perceive a *pro se* claimant as significantly less competent than a represented claimant. This perception of incompetence—encompassing beliefs about the person's abilities and work ethic—directly influences decision-making. In one study, practicing lawyers and law students awarded substantially lower settlement values to a *pro se* claimant compared to a represented claimant, even though the merits of the underlying claim were held constant. This demonstrates that the bias is not just about the quality of the legal filings, but about the status of the filer. Legal officials often describe *pro se* litigants in negative terms, viewing them as irrational, burdensome, or as people who bring frivolous claims.

This cognitive bias provides a compelling psychological explanation for the procedural errors seen in the case law. A judge who subconsciously views a *pro se* litigant as incompetent or their claim as likely frivolous may be more inclined to apply pleading standards rigidly, to deny leave to amend a "woefully incomplete" complaint, or to discount the credibility of a "self-serving" affidavit at the summary judgment stage. The "signaling effect" is the cognitive engine that can drive a judge from a position of neutral arbiter to one of skeptical gatekeeper, predisposing them to find procedural fault and terminate the case.

## 4.2 The Impact of the Prison Litigation Reform Act (PLRA):

**Heightened Barriers for Incarcerated Litigants**

While implicit bias affects all *pro se* litigants, Congress has created a legislative framework that institutionalizes and amplifies suspicion against one group in particular: incarcerated individuals. The Prison Litigation Reform Act (PLRA) of 1995 was passed with the express purpose of curbing what was perceived as a flood of frivolous lawsuits by prisoners. In doing so, it established a separate and significantly more difficult procedural track for the single largest group of *pro se* litigants in the federal system.

Several key provisions of the PLRA create formidable barriers. First, the Act mandates *sua sponte* screening of all prisoner complaints under 28 U.S.C. § 1915A. This requires judges to proactively search for deficiencies and dismiss any claim that is "frivolous, malicious, or fails to state a claim upon which relief may be granted" before the complaint is even served on the defendant. This front-loads the judicial gatekeeping function and puts the judge in an adversarial posture from the outset. Second, the PLRA's infamous "three strikes" rule, 28 U.S.C. § 1915(g), bars a prisoner from proceeding *in forma pauperis* (without paying fees) if they have had three or more prior cases dismissed on the grounds that they were frivolous, malicious, or failed to state a claim. This provision raises the stakes of any procedural error, as a dismissal for a curable pleading defect can count as a "strike," eventually barring the courthouse door entirely.

The PLRA, therefore, acts as a legislative engine that reinforces the negative "signaling effect." It provides a statutory justification for the judicial skepticism that might otherwise be an unstated bias. A judge reviewing a prisoner's complaint is legislatively mandated to be suspicious, making it far more likely that an "inartfully pleaded" complaint will be interpreted as a "frivolous" one, leading to the types of improper dismissals seen in cases like *Lopez v. Smith*. The American Civil Liberties Union (ACLU) has been a persistent critic of the PLRA, arguing that it has denied countless prisoners access to the courts to redress serious constitutional violations.

## 4.3 The Adversary System's Imbalance: The Role of Opposing Counsel and Judicial Passivity

The final systemic cause of injustice is the structure of the adversary system itself. The system is predicated on a "battle of equals," where zealous advocates on both sides present their best case to a neutral umpire. In *pro se* litigation, this foundational premise is a fiction. The "battle" is between a trained, experienced attorney and an unsophisticated layperson, a gross mismatch that the system's standard operating procedures are not designed to correct.

The role of opposing counsel is to zealously represent their client, not to ensure a fair process for the unrepresented party. While ethical rules, such as ABA Model Rule 4.3, prohibit lawyers from stating or implying that they are disinterested and require them to correct any misunderstanding about their role, their fundamental duty is adversarial. They are expected to use their superior knowledge of procedure to their client's advantage, which can include filing dispositive motions that exploit the *pro se* litigant's procedural ignorance.

This imbalance is compounded by a traditional model of judicial passivity, in which the judge's role is merely to call balls and strikes based on the arguments presented by the parties. In a *pro se* case, this veneer of "even-handedness" can become a form of profound unfairness. A judge who passively watches a represented party win on a technicality that the *pro se* litigant did not understand is not being neutral; they are allowing the structural inequalities of the system to determine the outcome. This model of judicial passivity allows the cognitive and legislative engines of bias and suspicion to run unchecked. A judge armed with the PLRA's mandate for

skepticism and influenced by the negative signal of *pro se* status is unlikely to take the affirmative, managerial steps—such as clearly explaining what is needed in an amended complaint or what evidence is required to oppose summary judgment—that are necessary to level the playing field. The result is a procedural failure that is the legal manifestation of these combined systemic forces. This suggests that the adversarial model itself, when applied to a contest between such unequal parties, may fail to provide the meaningful opportunity to be heard that due process requires. A more inquisitorial or actively managerial model of judging may be constitutionally necessary to ensure genuine justice for the unrepresented.

## Section 5: Pathways to Substantive Justice: A Blueprint for Reform

Diagnosing the systemic failures that lead to procedural injustice against *pro se* litigants is a critical first step, but it is insufficient. A durable solution requires moving from diagnosis to prescription. The pattern of appellate reversals demonstrates that isolated fixes and reliance on the discretion of individual judges have failed to create a consistently fair system. What is needed is a coordinated, multi-faceted approach that addresses the root causes of these failures through judicial training, legislative and rules reform, and a significant expansion of the ecosystem of support available to unrepresented individuals. The ultimate goal of this blueprint is to engineer a paradigm shift within the federal judiciary: moving from a system focused on *gatekeeping* and efficient dismissal to one dedicated to *facilitating* a just and fair decision on the merits for all.

### 5.1 Judicial Reform: From Passive Umpires to Active Case Managers

The judiciary itself is the most critical lever for change. While appellate courts can correct egregious errors after the fact, true reform must begin with the trial judges who interact with *pro se* litigants daily. This requires a fundamental shift in the judicial role from that of a passive umpire to an active case manager.

First, **mandatory and recurring training** for federal judges and their law clerks is essential. This training must go beyond a cursory review of the case law and delve into the specific, practical challenges of *pro se* litigation. It should include modules on the proper application of the *Haines* and *Roseboro* doctrines, with a focus on real-world examples of both proper and improper handling of *pro se* filings. Critically, this training must also address the cognitive science of implicit bias, incorporating the research on the "signaling effect" to make judges aware of the subconscious stereotypes that can influence their decision-making.

Second, to translate training into practice, courts should adopt **mandatory procedural checklists** for dispositive motions in *pro se* cases. Before a judge can dismiss a *pro se* case under Rule 12(b)(6) or grant summary judgment under Rule 56, the checklist would require the judge to make explicit findings on the record: Was the litigant given a clear opportunity to amend the complaint? Was the complaint's deficiency truly incurable? Was the litigant provided with a plain-language *Roseboro*-style notice? Was all of the litigant's sworn evidence considered in the light most favorable to them? Such a checklist would create a "cognitive speed bump," forcing a deliberative process that counteracts the pull of implicit bias and ensures that essential procedural safeguards are not overlooked.

Finally, these reforms should be part of a broader embrace of **active judicial management** in *pro se* cases. This model requires judges to take a more hands-on role in explaining

procedures, setting clear and realistic deadlines, and ensuring that the litigant understands what is required of them at each stage of the litigation. This is not advocacy; it is the management necessary to ensure the integrity of the process when one party is unequipped for the adversarial contest.

## 5.2 Legislative and Rules Reform: Creating a Uniform and Fair Framework

Judicial reform alone is insufficient if the underlying rules remain ambiguous or actively hostile to *pro se* litigants. Meaningful change requires action from Congress and the Judicial Conference of the United States to create a uniform and fair procedural framework.
The most immediate target for legislative reform is the **Prison Litigation Reform Act (PLRA)**. Congress should amend the PLRA to clarify that its dismissal standards are fully subject to the liberal amendment policies of Federal Rule of Civil Procedure 15. An amendment could explicitly state that a dismissal for failure to state a claim under the PLRA should be without prejudice, at least for the first instance, to prevent prisoners from losing their "three strikes" on curable technicalities. This would align the PLRA with the principles articulated in *Lopez v. Smith* and reduce the number of unjust dismissals.
More broadly and perhaps more importantly, the Judicial Conference should heed the call from legal scholars and **create a dedicated set of Federal Rules of *Pro Se* Procedure**. The current system, where the FRCP barely acknowledge the existence of *pro se* litigants, is untenable. A new, uniform set of rules would eliminate the confusing and inequitable "patchwork" of nearly 500 different local rules and practices. These rules could codify best practices from across the country, creating a national standard for plain-language notices, simplifying pleading requirements, establishing clear procedures for summary judgment, and defining the scope of the court's duty to provide assistance. Such a reform would provide the clarity and predictability that both *pro se* litigants and judges desperately need, making judicial training more effective and the application of justice more consistent.

## 5.3 Expanding the Ecosystem of Support: Beyond the Courthouse

While court-centric reforms are vital, the "pro se crisis" is fundamentally an access-to-justice crisis that cannot be solved by the judiciary alone. A robust ecosystem of support outside the courthouse is necessary to provide litigants with the assistance they need to meaningfully present their cases.
This includes bolstering and expanding the work of **law school clinics and pro bono programs**. These institutions provide an invaluable service, offering free legal advice, limited-scope assistance, and sometimes full representation to those who could not otherwise afford it. Organizations like the Legal Services Corporation (LSC) and the American Bar Association (ABA) play a crucial role in supporting and coordinating these efforts, advocating for rules that facilitate pro bono work, such as allowing limited-scope representation or "unbundling" of legal services.
Beyond direct services, a high-impact strategy involves leveraging limited resources for systemic change through the concept of **"distributive precedent"**. This innovative approach, identified through empirical research, recognizes that *pro se* litigants often succeed by citing favorable precedents established in cases handled by experienced lawyers. The reform strategy, therefore, is for philanthropic foundations, civil rights organizations like the ACLU, and

large law firms to strategically fund and litigate high-quality "impact" cases in areas of law with high volumes of *pro se* activity, such as prisoner rights, social security appeals, and employment discrimination. The goal is not just to win for the individual client, but to create a body of clear, favorable, and easy-to-cite case law that can be used as a tool by countless future unrepresented litigants. This approach acts as a force multiplier, allowing the expertise of a few skilled attorneys to be "distributed" throughout the system, making it easier for judges to recognize meritorious claims and for *pro se* litigants to articulate them.

These reforms are interconnected. Uniform national rules would make judicial training more effective. Better-trained judges applying clearer rules would create a more predictable environment for pro bono attorneys. And a robust body of "distributive precedent" would make the task of every actor in the system—litigant, lawyer, and judge—more manageable and more focused on the substantive justice of the case.

## Conclusion

### Synthesis of Findings

This report has charted a course through the complex and often treacherous landscape of *pro se* litigation in federal court. The analysis began by establishing the clear judicial duty of lenity, a principle rooted in the statutory right to self-representation and cemented in the Supreme Court's half-century-old mandate in *Haines v. Kerner*. This duty requires courts to hold the "inartfully pleaded" filings of unrepresented litigants to a "less stringent" standard than those drafted by lawyers. Despite this clear command, the evidence drawn from the judiciary's own appellate rulings reveals a persistent and troubling pattern of non-compliance. At the critical gateway stages of dismissal and summary judgment, district courts frequently commit fundamental procedural errors—improperly applying heightened pleading standards, denying leave to amend curable complaints, failing to provide adequate notice of summary judgment requirements, and improperly discounting the sworn evidence of *pro se* parties. These are not minor technicalities; they are due process violations that prematurely and unjustly terminate potentially meritorious claims.

The root causes of this systemic failure are as deep as they are interconnected. They include the cognitive "signaling effect," an implicit bias that predisposes legal professionals to view *pro se* litigants and their claims with skepticism; the legislative institutionalization of this suspicion through the harsh procedural regime of the Prison Litigation Reform Act; and the structural inadequacy of a passive, adversarial system that is predicated on a battle of equals—a premise that is demonstrably false in the *pro se* context.

### Reiteration of Thesis

These findings confirm this report's central thesis: the procedural violations committed against *pro se* litigants are not random, isolated mistakes but the predictable outcomes of a system failing its most vulnerable users. The steady stream of appellate reversals is the judiciary's own canary in the coal mine, signaling a toxic procedural environment where the constitutional promise of a meaningful opportunity to be heard is systematically undermined. The failure is not merely one of implementation by individual judges, but one of design, stemming from ambiguous national standards and a framework that is structurally ill-equipped to provide justice

to those without counsel.

## Final Call to Action

The path forward requires more than incremental adjustments. It demands a renewed, system-wide commitment to the foundational promise of *Haines v. Kerner*. This commitment must manifest in a paradigm shift: from a culture of judicial gatekeeping focused on docket management and efficient dismissal, to a culture of judicial responsibility focused on facilitating a fair and just resolution on the merits. This requires active judicial management, uniform and fair national rules of procedure, and a robust ecosystem of legal support. Ensuring justice for the unrepresented is not a matter of judicial charity or administrative convenience. It is a constitutional and institutional imperative. The legitimacy of the federal courts, and the public's faith in their ability to dispense equal justice under law, depends on their capacity to provide a genuinely accessible forum for all, not just for those who can afford to hire a guide.

## Works cited

1. Representing Yourself in Federal District Court:, https://www.ded.uscourts.gov/sites/ded/files/Pro%20Se%20Handbook.pdf 2. Procedural Due Process Rights of Pro Se Civil Litigants - Chicago Unbound, https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=4573&context=uclrev 3. The Pitfalls and Perils of Pro Se Representation - Levene Gouldin & Thompson, LLP, https://www.lgtlegal.com/news/208/The-Pitfalls-and-Perils-of-Pro-Se-Representation/ 4. "The Federal Rules of Pro Se Procedure" by Andrew Hammond, https://ir.lawnet.fordham.edu/flr/vol90/iss6/12/ 5. A Guide for Attorneys Litigating Against Self-Represented Individuals | Caplin & Drysdale, https://www.caplindrysdale.com/media/publication/150811_A_Guide_for_Attorneys_Litigating_Against_Self-Represented_Individuals.pdf 6. The Misunderstood Pro Se Litigant: More Than a Pawn in the Game - Digital Commons @ American University Washington College of Law, https://digitalcommons.wcl.american.edu/cgi/viewcontent.cgi?article=2750&context=facsch_lawrev 7. Self-Represented Litigants and the Pro Se Crisis – Cornell Journal of Law and Public Policy, https://publications.lawschool.cornell.edu/jlpp/2023/11/04/self-represented-litigants-and-the-pro-se-crisis/ 8. Pro Se May Be a Solution, But it's Also a Symptom: A Response to The Atlantic's "The DIY Divorce", https://www.americanbar.org/groups/center-pro-bono/publications/pro-bono-exchange/2019/pro-se-may-be-a-solution--but-its-also-a-symptom--a-response-to-/ 9. (Un)Changing Rates of Pro Se Litigation in Federal Court | Law & Social Inquiry, https://www.cambridge.org/core/journals/law-and-social-inquiry/article/unchanging-rates-of-pro-se-litigation-in-federal-court/21434F32D9DB2AC89C42433F926CBFAC 10. Pro se legal representation in the United States - Wikipedia, https://en.wikipedia.org/wiki/Pro_se_legal_representation_in_the_United_States 11. Representing Yourself in Federal Court - Northern District of New York, https://www.nynd.uscourts.gov/representing-yourself-federal-court 12. Illiberal Construction of Pro Se Pleadings - Penn Carey Law: Legal ..., https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1089&context=penn_law_review 13. Haines v. Kerner, 404 U.S. 519 (1972). - Loc, https://tile.loc.gov/storage-services/service/ll/usrep/usrep404/usrep404519/usrep404519.pdf 14.

Haines v. Kerner | Oyez, https://www.oyez.org/cases/1971/70-5025 15. Haines v. Kerner Case Brief - Lexplug, https://www.lexplug.com/casebrief/haines_v_kerner_659def4c4890e63827c93ca9 16. HAINES v. KERNER, 404 U.S. 519 (1972) - FindLaw Caselaw, https://caselaw.findlaw.com/court/us-supreme-court/404/519.html 17. Haines v. Kerner | 404 U.S. 519 (1972) - Justia U.S. Supreme Court Center, https://supreme.justia.com/cases/federal/us/404/519/ 18. PRO SE PACKAGE A SIMPLE GUIDE TO FILING A CIVIL ACTION - Eastern District of California, https://www.caed.uscourts.gov/caednew/assets/File/Combined%20Pro%20Se%20Packet(2).pdf 19. Your Responsibilities as a Self-Represented Litigant - eFiling, https://ehelp.kycourts.net/your-responsibilities-as-a-self-represented-litigant/ 20. Pro Se - Filing Fee - Tenth Circuit Court of Appeals, https://www.ca10.uscourts.gov/book/export/html/2431 21. Liberal construction for pro se litigants does not mean ignoring the pleading requirements under the FRCP - WHDA, LLP, https://www.whda.com/cafc-alert-blog/liberal-construction-for-pro-se-litigants-does-not-mean-ignoring-the-pleading-requirements-under-the-frcp/ 22. Liberal construction for pro se litigants does not mean ignoring the pleading requirements under the FRCP - CAFC Alert, https://cafc.whda.com/liberal-construction-for-pro-se-litigants-does-not-mean-ignoring-the-pleading-requirements-under-the-frcp/ 23. FINDING THE LIMITS OF EQUITABLE LIBERALITY: RECONSIDERING THE LIBERAL CONSTRUCTION OF PRO SE APPELLATE BRIEFS - Vermont Law Review, https://lawreview.vermontlaw.edu/wp-content/uploads/2012/02/11-Correll_Vol.35-Book04.pdf 24. ARTICLES THE FEDERAL RULES OF PRO SE PROCEDURE - Fordham Law Review, https://fordhamlawreview.org/wp-content/uploads/2022/05/Hammond_May.pdf 25. Local Civil Rule 56.2. Notice to Pro Se Litigants Opposing Summary Judgment, https://www.nysd.uscourts.gov/sites/default/files/2018-06/Local%20Civil%20Rule%2056.2%20%26%20Notice.pdf 26. Plausibly Illiberal: Sua Sponte Dismissals of Pro Se Complaints Under the Prison Litigation Reform Act - Fordham Law Review, https://fordhamlawreview.org/issues/plausibly-illiberal-sua-sponte-dismissals-of-pro-se-complaints-under-the-prison-litigation-reform-act/ 27. Motions to Dismiss for Failure to State a Claim After Iqbal: Report to the Judicial Conference Advisory Committee on Civil Rules, https://www.uscourts.gov/file/document/motions-dismiss-after-iqbal-march-2011 28. Plausibly Illiberal: Sua Sponte Dismissals of Pro Se Complaints Under the Prison Litigation Reform Act - FLASH: The Fordham Law Archive of Scholarship and History, https://ir.lawnet.fordham.edu/cgi/viewcontent.cgi?article=6125&context=flr 29. What Does 'Dismissed Without Prejudice' Mean? | Helfend Law Group, https://www.robertmhelfend.com/criminal-defense/dismissed-without-prejudice-mean/ 30. Representing Yourself in Federal Court: A Handbook for Pro Se Litigants - Northern District of California, https://www.cand.uscourts.gov/wp-content/uploads/2023/03/Pro_Se_Handbook_9-2024_MBB.pdf 31. Dismissal of an Action for Failure to State Facts Sufficient to Constitute a Cause of Action - Does That Automatically Result in the Right to Amend - Maynard Nexsen, https://www.maynardnexsen.com/publication-dismissal-of-action-for-failure-to-state-facts-sufficient-to-constitute-coa 32. Lopez v. Smith, 203 F.3d 1122 (9th Cir. 2000) :: Justia, https://law.justia.com/cases/federal/appellate-courts/F3/203/1122/474805/ 33. Rule 15. Amended and Supplemental Pleadings | Federal Rules of Civil Procedure, https://www.law.cornell.edu/rules/frcp/rule_15 34. NOTICE TO PRO SE LITIGANT REGARDING RULE 56 MOTIONS ...,

https://www.nywd.uscourts.gov/sites/nywd/files/Pro%20Se%20Rule%2056%20Notice%2020250101.pdf 35. What is a Summary Judgment Motion? Notice for Parties Who Do Not Have a Lawyer - Kitsap County, https://www.kitsap.gov/sc/Documents/KCLCR%2056%20-%20Summary%20Judgment,%20Notice.pdf 36. Rule 56. Summary Judgment | Federal Rules of Civil Procedure - Law.Cornell.Edu, https://www.law.cornell.edu/rules/frcp/rule_56 37. Guide: How to File a Motion for Summary Judgment - Federal Pro Se Clinic, https://publiccounsel.org/wp-content/uploads/2024/01/Guide-How-to-File-a-Motion-for-Summary-Judgment-2023.pdf 38. What is a Summary Judgment Motion? Notice for Parties Who Do Not Have a Lawyer - Spokane County, https://www.spokanecounty.gov/DocumentCenter/View/26815/What-is-a-Summary-Judgment-Motion-Notice-for-Parties-Who-Do-Not-Have-a-Lawyer 39. ROSEBORO v. GARRISON | 528 F.2d 309 | 4th Cir. | Judgment | Law - CaseMine, https://www.casemine.com/judgement/us/591495a8add7b049345d2da0 40. Fair Notice to Pro Se Litigants: Eastern District of Virginia Set to Modify Roseboro Warnings, https://www.sandsanderson.com/insights/thought/fair-notice-to-pro-se-litigants-eastern-district-of-virginia-set-to-modify-roseboro-warnings 41. McDaniel v. Syed, No. 20-2946 (7th Cir. 2024) :: Justia, https://law.justia.com/cases/federal/appellate-courts/ca7/20-2946/20-2946-2024-09-16.html 42. Second Circuit Finds Procedural Error in Judgement Based on Pre ..., https://rpjlaw.com/second-circuit-finds-procedural-error-in-judgement-based-on-pre-motion-proceedings/ 43. Luna v. Davis, No. 21-50578 (5th Cir. 2023) :: Justia, https://law.justia.com/cases/federal/appellate-courts/ca5/21-50578/21-50578-2023-02-06.html 44. Justices rule for inmate whose lawsuit was dismissed on procedural grounds - SCOTUSblog, https://www.scotusblog.com/2025/06/justices-rule-for-inmate-whose-lawsuit-was-dismissed-on-procedural-grounds/ 45. The Signaling Effect of Pro se Status - Maurer School of Law, https://law.indiana.edu/publications/faculty/2020/vdq-signaling-effect.pdf 46. Just the Facts: Trends in Pro Se Civil Litigation from 2000 to 2019 - United States Courts, https://www.uscourts.gov/data-news/judiciary-news/2021/02/11/just-facts-trends-pro-se-civil-litigation-2000-2019 47. Self-Representation, Access to Justice, and the Quality of Counsel: A Comment on Rabeea Assyâ - Scholarship @ GEORGETOWN LAW, https://scholarship.law.georgetown.edu/cgi/viewcontent.cgi?article=3038&context=facpub 48. Don't Play the Fool: Litigation with a Pro Se Party - Attorney Protective, https://attorneyprotective.com/ethics/dont-play-the-fool-litigation-with-a-pro-se-party 49. The Perils of Dealing with Pro Se Litigants - American Bar Association, https://www.americanbar.org/groups/litigation/resources/litigation-news/2023/fall/the-perils-dealing-pro-se-litigants/ 50. Distributive Precedent and the Pro Se Crisis - Iowa Law Review, https://ilr.law.uiowa.edu/sites/ilr.law.uiowa.edu/files/2023-01/A5_Tahk.pdf 51. Pro Se Legal Clinics - Justice Power, https://justicepower.org/pro-se-legal-clinics/ 52. Federal Pro Se Legal Assistance Clinic (UDM) - US District Court for the Eastern District of Michigan, https://www.mied.uscourts.gov/index.cfm?pagefunction=federalprose 53. New Clinic Set to Launch - BC Law Magazine - Boston College, https://lawmagazine.bc.edu/2025/06/new-clinic-set-to-launch/ 54. Report of the Pro Bono Task Force | LSC - Legal Services Corporation, https://www.lsc.gov/our-impact/publications/other-publications-and-reports/report-pro-bono-task-force 55. Self-Represented Litigants - American Bar Association, https://www.americanbar.org/groups/legal_aid_indigent_defense/resource_center_for_access_t

o_justice/resources---information-on-key-atj-issues/litigant_resources/ 56. Unbundling Resources by State - American Bar Association, https://www.americanbar.org/groups/delivery_legal_services/resources/pro_se_unbundling_resource_center/pro_se_resources_by_state/ 57. Love v. State | American Civil Liberties Union, https://www.aclu.org/cases/love-v-state 58. Types of Cases we Litigate - ACLU of DC, https://www.acludc.org/types-cases-we-litigate/