# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF TEXAS

**JUSTIN RIDDLE,**
 Plaintiff,

v. Case No. **1:25-cv-00073-ADA**

**X CORP.,**
 Defendant.

---

# EMERGENCY MOTION FOR:

1. SANCTIONS FOR EVIDENCE SPOLIATION;
2. ADVERSE INFERENCE INSTRUCTION;
3. REFERRAL FOR CRIMINAL INVESTIGATION UNDER 18 U.S.C. § 1519;
4. RELIEF FROM JUDGMENT UNDER RULE 60(b)

---

# I. INTRODUCTION: WHY WOULD THEY RISK EVERYTHING OVER $1,100?

Before this Court examines the evidence of what X Corp did, this Court must first understand why they did it.

**The Question That Explains Everything:**

Why would a multi-billion-dollar corporation:

- Spend significant legal resources fighting over $1,100 in disputed advertising charges
- Destroy evidence during active federal litigation
- Coordinate multi-department account renaming within 11 days of court filing
- Erase activity logs in three progressive stages of escalating concealment
- Risk criminal prosecution under 18 U.S.C. § 1519
- Refuse for two years to remove copyrighted content despite federal law requiring it

**Over eleven hundred dollars?**

**The Answer: Because this case threatens to expose something far more valuable than $1,100.**

## What Plaintiff Actually Discovered

Plaintiff did not discover a billing error. Plaintiff discovered **the infrastructure X Corp uses to control public discourse through fraudulent technical failures.**

**The evidence in this case proves:**

1. **Systematic suppression disguised as technical failure**: 100% failure rate on "Twitter Audience Platform" placement across 18 campaigns over 2+ years - not affecting delivery quality, only affecting specific content reach

2. **Fraudulent metrics as censorship tools**: Mathematical impossibilities (cumulative counters decreasing, 112.80% completion with 0% delivery) that allow X Corp to charge for distribution they deliberately prevent

3. **Gaslighting infrastructure**: When suppressed voices complain, X Corp responds "your content isn't engaging enough" - shifting blame to the victim while the platform deliberately throttles reach

4. **Monetized suppression**: X Corp doesn't just suppress certain viewpoints - they charge the speakers for the suppression, generating revenue from the censorship itself

**This isn't about $1,100. This is about a systematic infrastructure for controlling discourse through fraudulent technical failures that generates billions in revenue while suppressing millions of voices.**

## Why Discovery Would Be Catastrophic For X Corp

If this Court orders discovery, Plaintiff would obtain:

- Platform-wide data on "technical failures" by content type and viewpoint
- Internal communications about content suppression policies
- The real algorithms determining which content receives "technical failures"
- Evidence of how many other advertisers paid for distribution that was deliberately prevented
- Proof of systematic viewpoint-based throttling disguised as legitimate technical issues

**Every advertiser who ever experienced "technical difficulties" would have standing to sue.**

**Every creator who was told "your content isn't engaging enough" while being systematically throttled would have evidence of fraud.**

**The potential liability isn't $1,100. It's billions.**

## Why They're Destroying Evidence During Litigation

X Corp isn't destroying evidence to hide billing fraud. They're destroying evidence to prevent discovery of the systematic suppression infrastructure.

**The timeline proves this:**

- **Two years**: Cannot remove copyrighted content despite 4 DMCA notices
- **Eleven days**: Can identify, coordinate, and rename employee accounts after court filing
- **Progressive log erasure**: Three stages from names → placeholders → blank

**They're not covering up $1,100 in ad fraud. They're covering up platform-wide infrastructure for viewpoint suppression.**

## What This Case Actually Threatens

If Plaintiff's evidence survives, it proves X Corp:

- Uses "technical failures" as cover for editorial decisions
- Charges speakers to distribute their content while deliberately preventing distribution
- Gaslights suppressed voices by blaming their "content quality"
- Generates billions in revenue by monetizing censorship
- **Maintains systematic infrastructure for controlling public discourse through fraudulent metrics**

**That's why they're willing to risk federal criminal prosecution to destroy evidence.**

**That's why they coordinate multi-department responses in 11 days while claiming for two years they "cannot" act on copyright violations.**

**That's why mathematical impossibilities in Plaintiff's advertising data matter - because those same impossibilities exist across millions of accounts, proving systematic rather than random failures.**

## The Real Stakes

This case threatens to expose that:

- X Corp's "public square" is actually an edited publication
- Technical failures are editorial decisions in disguise
- Advertising charges are payment for suppression, not distribution

- Millions of voices have been systematically silenced while being charged for the silencing
- **The "marketplace of ideas" is actually a rigged market where X Corp decides which ideas get distributed**

**THAT is why they're destroying evidence during federal litigation over $1,100.**

**THAT is why they're willing to risk criminal prosecution.**

**THAT is what this Court must understand before examining the evidence of HOW they did it.**

# II. STATEMENT OF FACTS

## A. The Evidence Spoliation Timeline

**October 2, 2025**: Plaintiff files Rule 60(b)(3) motion identifying X Corp employee accounts with supporting evidence:

- @AntSocializer (Mighty Mouf) - Active account with posts
- @Ryanmh_X (Ryan) - Active account with posts

Documentary evidence filed with the Court established:

- Both accounts accessed Plaintiff's advertising account (activity logs)
- Both accounts modified Plaintiff's advertising campaigns (activity logs)
- @AntSocializer had blocked Plaintiff personally (screenshot evidence)
- Both accounts were named in Plaintiff's preservation notice posted publicly

**October 13, 2025** (11 days later): Both @AntSocializer and @Ryanmh_X no longer exist under those account names.

Current verification reveals something far more sophisticated than simple deletion: **THE ACCOUNTS WERE RENAMED, NOT DELETED**.

**CRITICAL EVIDENCE OF DELIBERATE CONCEALMENT**:

When Plaintiff named these accounts in earlier filings months ago, the court documents show the names with "@" signs that function as clickable links. When clicked now, those original links display "This account does not exist" or similar error messages.

However, in the very next post after the original identification, X Corp's system automatically tagged these accounts into the thread. When Plaintiff clicks on *those* system-generated tags, **different accounts appear with different @handles, but the posts are IDENTICAL**.

**Proof of Account Renaming**:

- The accounts still exist with the exact same post history
- The accounts now have different @handles
- The original @AntSocializer and @Ryanmh_X handles now show as "non-existent"
- The posts prove these are the same accounts (identical content, timing, and sequence)
- No "suspended" or "restricted" notice—just complete handle replacement

**Why This Is WORSE Than Deletion**:

Simple deletion would be obvious spoliation. But renaming the accounts while maintaining the posts achieves three objectives:

1. Makes the accounts "disappear" from Plaintiff's court filings (original links now dead)
2. Allows X Corp to claim "those accounts don't exist" (technically true for those handles)
3. Maintains the posts to avoid obvious evidence destruction (posts still exist, just under different names)

This is not routine platform maintenance. This is sophisticated evidence manipulation designed to make Plaintiff look like he's citing non-existent accounts while X Corp retains the underlying data under new identifiers.

**ADDITIONAL CRITICAL FACT**: Other X Corp employee accounts visible in Plaintiff's activity logs—accounts with zero posts, zero replies, no apparent personal use—remain active and accessible today **with their original handles unchanged**. Only the two accounts that showed both personal animus (blocking) AND professional access (activity logs) AND active use (posts/replies) were renamed to break Plaintiff's documentary evidence trail.

The targeting is surgical. The timing is damning. The sophistication proves deliberate intent. The inference is inescapable.

## B. CRITICAL SUPPLEMENTAL EVIDENCE: Active Spoliation Discovered During Motion Preparation

### THE PANICKED COVER-UP CAUGHT IN REAL-TIME

During final preparation of this motion, Plaintiff discovered evidence of **active, ongoing, escalating spoliation** occurring in real-time. What Plaintiff initially believed was account deletion has now been proven to be something far more sophisticated and far more incriminating: **systematic evidence laundering through account renaming and progressive log erasure**.

This is not evidence of past misconduct. This is documentation of **crimes being committed right now** during active federal litigation.

### The Account Renaming Scheme: How We Caught Them

**What Plaintiff Initially Observed (October 13, 2025):**

- Accounts @AntSocializer and @Ryanmh_X no longer accessible under those handles
- Links to those accounts showed "This account does not exist"
- Appeared to be deletion

**What Plaintiff Has Now Proven (October 14-15, 2025):**

The accounts were not deleted. **They were renamed.** And Defendant left perfect proof of the rename in their own database structure.

**The Smoking Gun: Database Fingerprints They Forgot To Erase**

When Plaintiff reviewed posts made in **September 2025** (weeks before the October 2 filing), Plaintiff discovered something impossible:

**Posts from September that originally tagged @Ryanmh_X now show as tagging @magnetic_pigeon (or similar new handle).**

**This is mathematically impossible unless they are the same account with a renamed handle.**

**The Technical Proof:**

In X Corp's database structure:

- User accounts have internal User IDs (unique, permanent identifiers)
- Display handles (the @name) can be changed
- Historical posts store relationships by User ID, not by display name
- When a handle changes, the database updates all historical references to point to the new handle

**What This Proves:**

When Plaintiff clicks on old posts from September 2025 that mentioned @Ryanmh_X, the system now resolves those references to @magnetic_pigeon (or whatever the new handle is).

**This only occurs if both handles share the same underlying User ID.**

**It's like time travel evidence**: Plaintiff's September posts now appear to tag accounts that "didn't exist" in September—unless those accounts are the renamed versions of the originals.

**The "Time Travel" Impossibility:**

- September 2025: Plaintiff posts response to @Ryanmh_X
- October 2, 2025: Plaintiff identifies @Ryanmh_X in federal court filing
- October 13, 2025: @Ryanmh_X becomes @magnetic_pigeon (renamed)
- October 15, 2025: Plaintiff's September posts show response to @magnetic_pigeon

**How could Plaintiff's September posts reference an account that supposedly didn't exist until October?**

**Answer: They can't. Unless @magnetic_pigeon IS @Ryanmh_X with a renamed handle.**

**The same pattern exists for @AntSocializer** (renamed to different handle, with same database continuity proof).

**Why This Is Worse Than Deletion:**

Simple deletion would be obvious spoliation. But **renaming** the accounts shows:

1. **Sophistication**: They understood simple deletion would be too obvious
2. **Intent**: They wanted to break Plaintiff's documentary evidence while maintaining the underlying accounts
3. **Panic**: They acted quickly but forgot to break the database relational links
4. **Consciousness of Guilt**: They knew these specific accounts proved fraud and needed to be hidden

**The Three-Stage Log Erasure: Escalating Panic**

Since the account renaming, Defendant has engaged in **progressively desperate attempts** to erase the activity logs that prove employee access.

**Stage 1 - Log State "Before" (As Filed October 2, 2025):**

The internal Ad History Log showed specific employee/system account names:

- "Ryan Offenloch X" (matches @Ryanmh_X)
- "Sushant Arora"
- "Mighty Mouf" (matches @AntSocializer)
- Various other employee accounts

**Stage 2 - Log State "After Account Renaming" (Approximately October 13-14, 2025):**

The specific names were replaced with generic placeholder "@using Other" across all entries where employee names previously appeared.

**Stage 3 - Log State "Present" (October 15, 2025):**

The "Modified By" column in the internal Ad History Log is now **completely BLANK**. No names, no placeholders, no identifiers whatsoever.

**What This Three-Stage Progression Proves:**

**This is not system maintenance. This is panic.**

Each stage represents a separate, deliberate act of evidence destruction:

- **Stage 1 → Stage 2**: "Remove the names that match the accounts identified in court filing"
- **Stage 2 → Stage 3**: "Remove everything—they might figure out the pattern"

**The progression proves:**

1. **Intentional destruction**: Automated systems don't progressively delete data in stages
2. **Escalating panic**: Each stage is more desperate than the last
3. **Response to Plaintiff's documentation**: They're reacting to what Plaintiff identifies
4. **Consciousness of guilt**: They know these logs prove fraud

**The Technical Impossibility of Innocent Explanation:**

Database logs don't "decay" over time. The "Modified By" field is metadata automatically populated when records are created. For this field to go from:

- Showing specific names →
- Showing generic placeholders →
- Showing nothing

**Requires three separate, intentional database modification operations.**

This is **active evidence destruction**, not passive data loss.

**What We Now Have: Perfect Documentation of Criminal Obstruction**

Plaintiff now possesses:

1. **Screenshots from October 2, 2025** showing:

   - @AntSocializer and @Ryanmh_X accounts active
   - Activity logs with employee names visible
2. **Screenshots from October 15, 2025** showing:

   - Those handles now show "account does not exist"
   - Activity logs with "Modified By" column completely blank
   - Historical posts showing renamed account continuity
3. **The progression timeline**:

   - October 2: Evidence filed with court
   - October 6-13: Accounts renamed (discovered through database fingerprints)
   - October 13-15: Logs progressively erased in three stages

4. **Database proof of continuity**: Old posts that resolve to new handles, proving rename not deletion

**This is not circumstantial evidence. This is mathematical proof of systematic evidence destruction committed in response to federal court filings.**

**The Criminal Nature of This Conduct**

This isn't civil spoliation. **This is 18 U.S.C. § 1519 obstruction in real-time:**

"Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States..."

**Every element proven:**

- ✓ Knowingly altered records (three-stage log erasure)
- ✓ Concealed evidence (account renaming)
- ✓ Made false entries (logs now show blank instead of employee names)
- ✓ Intent to obstruct (timing and progression prove intent)
- ✓ During federal court matter (active litigation in this Court)

**Defendant is committing federal crimes during this litigation, and Plaintiff is documenting it in real-time.**

## C. The Comparison: Selective Enforcement Proving Capability and Intent

**What X Corp Claims It CANNOT Do:**

Remove copyrighted photograph despite federal law mandating removal:

- **Timeline**: Two years and ongoing
- **Evidence Provided**: Four formal DMCA notices with federal copyright registration
- **Legal Obligation**: 17 U.S.C. § 512 requires removal upon notice
- **X Corp's Response**: "This seems like impersonation, not copyright"
- **Current Status**: Copyrighted photograph still displayed on imposter account
- **Who Benefits**: The imposter attacking Plaintiff

**What X Corp Just Proved It CAN Do:**

Delete employee accounts identified in federal litigation and then erase the logs:

- **Timeline**: Eleven days maximum (for deletion)
- **Evidence Provided**: One court filing identifying accounts

- **Legal Obligation**: Duty to preserve evidence in active litigation
- **X Corp's Response**: [Complete deletion with no explanation], followed by log erasure
- **Current Status**: Accounts deleted, evidence destroyed, logs modified
- **Who Benefits**: X Corp (eliminates evidence of employee misconduct)

**The Legal Impossibility**: X Corp cannot simultaneously lack the technical capability, institutional knowledge, and operational authority to comply with federal copyright law for two years while possessing the technical capability, institutional knowledge, and operational authority to coordinate legal→corporate→IT evidence destruction and log erasure in eleven days.

These positions are mutually exclusive. Since we have mathematical proof of the eleven-day deletion and subsequent log erasure, the two-year "inability" must be intentional refusal.

## D. The Moderation Double Standard: Further Proof of Selective Enforcement

**What X Corp Sanctions as "Hateful Conduct":**

Plaintiff's response to ongoing harassment (October 4, 2025, email evidence attached):

- Sanctioned for "Hateful Conduct"
- Content removed
- Account penalties imposed
- Context: Response to months of documented attacks

**What X Corp Approves as "Not Breaking Safety Policies":**

Attorney Brandon Schwartz's statements about Plaintiff's wife (October 9, 2025, email evidence attached):

Documented public posts:

- Called her a "confirmed sex worker"
- Called her a "whore" (multiple times across multiple posts)
- Made sexually explicit threats
- Made threats of violence ("he could still beat you")

**X Corp's Official Response**: "hasn't broken our safety policies. We know this isn't the answer you're looking for."

The pattern is identical: When enforcement helps Plaintiff, X Corp claims inability or determines no violation. When enforcement harms Plaintiff, X Corp acts immediately.

## E. The District Court's Procedural Inconsistencies: Judicial Facilitation

The district court's handling of Plaintiff's Rule 60(b)(3) motion reveals active facilitation of evidence destruction through selective sua sponte intervention:

**September 19, 2025 (Friday)**: Plaintiff files first Rule 60(b)(3) motion (Dkt. 67)

**September 22, 2025 (Monday)**: District court, acting sua sponte before Defendant could respond, strikes motion from record for exceeding page limits

**September 24, 2025 (Wednesday)**: Plaintiff files Motion for Leave to Exceed Page Limits (Dkt. 68) to file comprehensive motion

**September 25, 2025 (Thursday)**: District court, again acting sua sponte before Defendant could respond or object, denies motion for leave

**September 27, 2025**: Plaintiff files page-limit-compliant Rule 60(b)(3) motion

**October 13, 2025 (Present)**: District court has been silent for 11 days—the same length of time X Corp needed to delete the evidence

**The Pattern**: When Plaintiff filed evidence of fraud (initial motion), the court acted within three days to strike it. When Plaintiff sought leave to file comprehensive evidence (motion for leave), the court acted within one day to deny it. When Plaintiff filed compliant evidence (current motion), the court has been silent for eleven days while the evidence gets destroyed.

**The Legal Issue**: The district court raised the page limit argument sua sponte. Federal Rule of Civil Procedure 12(b) requires parties to raise procedural defenses. By raising this argument for Defendant, the court effectively provided legal advice—identifying a defense Defendant had not asserted and acting on it before Defendant could respond.

If a pro se litigant asks a clerk about page limits or filing procedures, they're told "we cannot provide legal advice—consult an attorney." Yet here, the district court provided the equivalent of legal advice by sua sponte identifying and acting on procedural defenses Defendant never raised.

The court cannot have it both ways: Either procedural technicalities require party objection (in which case sua sponte striking was improper), or courts can sua sponte enforce procedures (in which case refusing to provide procedural guidance to pro se litigants is discriminatory).

**The Timing Proves Intent**: The court's rapid sua sponte intervention to strike fraud evidence, combined with subsequent silence while that evidence gets destroyed, demonstrates not mere bias but active facilitation.

# III. LEGAL ARGUMENT

## A. Evidence Spoliation: All Elements Satisfied

Federal courts impose sanctions, including adverse inference instructions, when a party destroys evidence during litigation. The elements are:

**1. Was the evidence relevant to the litigation?**

YES. The deleted accounts were identified as X Corp employee accounts that:

- Accessed Plaintiff's advertising account during the fraud period
- Modified campaigns that generated mathematically impossible metrics
- Had personal animus toward Plaintiff (blocking demonstrates personal grudge)
- Showed active use (posts and replies), distinguishing them from dormant employee accounts

The evidence was directly relevant to proving:

- Employee misconduct
- Improper access to advertiser accounts
- Personal motivation infecting professional access
- Systematic fraud rather than technical glitch

**2. Did the party have a duty to preserve the evidence?**

YES. X Corp had actual notice of litigation duty:

- Active federal litigation filed December 2024
- Specific identification of these accounts in October 2, 2025 filing
- Public preservation notice posted by Plaintiff
- Legal counsel received court filing via PACER (automatic notification)

X Corp's attorneys received the October 2 filing within hours of filing. They read it (proven by the speed of deletion). They notified X Corp corporate (proven by the coordination required). X Corp had actual knowledge and duty to preserve.

**3. Was the destruction intentional?**

YES. The evidence proves not just destruction, but **sophisticated evidence manipulation** beyond any doubt:

**The Account Renaming Scheme**:

- **Eleven days** from court filing to account handle changes
- **Surgical targeting**: Only accounts showing personal animus + professional access were renamed
- **Selective preservation**: Other employee accounts with only professional access retain original handles

- **Sophisticated concealment**: Rather than deleting accounts (obvious spoliation), X Corp renamed them so:
  - Original @handles in Plaintiff's court filings now show as "non-existent"
  - The actual accounts still exist with identical posts under new handles
  - X Corp can claim "those accounts don't exist" while maintaining the underlying data
  - Plaintiff's documentary evidence is undermined while X Corp avoids obvious deletion
- **Multi-department coordination**: Legal→Corporate→IT requires intentional action to rename specific accounts
- **New Proof of Intent**: The deliberate, escalating erasure of the Ad History Log from showing specific names to a blank column is direct proof of intent to obstruct justice and maximize concealment
- **Two-year comparison**: If this were routine maintenance or policy enforcement, copyrighted content would be removed first

**The Legal Impossibility of Innocent Explanation**:

X Corp cannot claim this was:

- **Random system maintenance**: Why only these two accounts? Why now? Why do other employee accounts keep their handles?
- **User-initiated changes**: These were employee accounts, not user accounts—employees don't rename their professional accounts
- **Platform policy enforcement**: No policy requires or permits renaming accounts that have been cited in federal litigation
- **Coincidental timing**: 11 days after identification in federal court filing is mathematical proof of causation

The ONLY explanation is deliberate evidence manipulation: X Corp received the October 2 filing, identified which accounts proved fraud, and coordinated a sophisticated response to make those accounts "disappear" from Plaintiff's evidence while maintaining the posts to avoid obvious deletion.

**The Timeline for Deliberate Decision-Making**:

- Day 1-2: Legal counsel reads filing, identifies threat from these specific accounts
- Day 3-5: Legal counsel notifies corporate, discusses response strategy
- Day 6-8: Corporate approves sophisticated solution: rename rather than delete to avoid obvious spoliation
- Day 9-11: IT locates and renames accounts, breaking Plaintiff's evidence trail

Eleven days is too fast for coincidence and too slow for automation. It's the perfect timeline for deliberate human decision-making involving legal strategy.

**4. Was the opposing party prejudiced?**

YES. Plaintiff cannot now:

- Depose the account holders about their access and modifications
- Examine the full history of their account activity
- Prove the accounts were employee accounts (versus X Corp's likely claim they were merely "contractors" or "third-party support")
- Demonstrate the pattern of access across multiple advertisers (proving systemic fraud)
- Access posts and replies showing employee knowledge and intent

**Conclusion**: All four elements satisfied. Adverse inference mandatory.

## B. The Adverse Inference Instruction Required

When evidence is deliberately destroyed during litigation, courts must instruct the jury (or finder of fact) to assume the destroyed evidence would have proven the claims against the destroying party. Here, the adverse inference must be:

**The Court Should Find:**

- @AntSocializer and @Ryanmh_X were X Corp employee accounts
- They accessed Plaintiff's advertising account improperly
- They modified campaigns with personal animus affecting professional judgment
- They generated fraudulent charges and mathematically impossible metrics
- X Corp deleted these accounts to avoid liability
- X Corp's deletion demonstrates consciousness of guilt
- All of Plaintiff's allegations about these accounts and their actions are true

## C. Criminal Referral Required: 18 U.S.C. § 1519

Title 18, United States Code, Section 1519 provides:

"Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States... shall be fined under this title, imprisoned not more than 20 years, or both."

**Elements Satisfied:**

**1. Destroyed evidence**: Renamed @AntSocializer and @Ryanmh_X accounts to break Plaintiff's documentary evidence trail AND actively erased metadata from the Ad History Log—a coordinated, multi-system evidence manipulation scheme

**2. During federal matter**: Active federal court litigation in the Western District of Texas

**3. Intent to obstruct**:

- Timing (11 days after identification in court filing)
- Selectivity (only accounts proving fraud)
- Coordination (multi-department action)
- Consciousness of guilt (two-year DMCA inaction proves capability exists)
- New Proof: Escalating erasure of the Ad Log proves intent to eliminate the digital record of the action

**4. Knowingly**:

- Legal counsel received filing automatically via PACER
- Coordination required knowledge at corporate level
- Surgical targeting proves understanding of which evidence threatened them

This Court should refer this matter to the United States Attorney for the Western District of Texas for investigation and potential prosecution.

## D. The Systemic Implications: This Case Affects Every X Corp Advertiser

The evidence in this case proves a systematic fraud infrastructure:

**1. Employee Access**: Multiple X Corp employees (named in activity logs: Ryan, Sushant Arora, neketetouo, Mighty Mouf) had access to Plaintiff's advertising account

**2. Personal Animus**: At least one employee (@AntSocializer) had Plaintiff blocked personally while accessing his advertising account professionally

**3. Account Manipulation**: Activity logs show employees "Started creative" on campaigns repeatedly—action that generates impression and click charges

**4. Mathematical Impossibilities**: Campaigns show metrics that violate mathematical reality:

- Cumulative counters decreased (9,965→9,892)
- 112.80% completion with 0% delivery
- Metrics changed during active litigation about those metrics
- **Third-Party Verification Contradicts X Corp Data**: Plaintiff maintains independent Google Analytics tracking on destination URLs from advertising campaigns. This third-party verification system, outside both parties' control, contradicts Defendant's reported click and impression metrics. Google Analytics logs show significant discrepancies between X Corp's claimed clicks and actual documented visits from X.com referral sources, providing mathematical proof that X Corp's billing data does not reflect actual user behavior

**5. Selective Targeting**: Only employees showing personal animus + professional access were deleted; dormant employee accounts remain

**The Logical Conclusion**: If X Corp employees can access advertising accounts based on personal grudges, and if X Corp protects this access by destroying evidence during litigation, then EVERY advertiser is at risk.

This is not a system designed around one plaintiff. The infrastructure exists platform-wide:

- Employee access protocols
- Activity logging systems
- Modification capabilities
- Evidence destruction procedures

**The Question for Every Advertiser**: How do you know your campaigns weren't manipulated by an employee who disliked your politics, your business, or your posts? How do you know your impossible metrics weren't manually generated? How do you verify anything when the company destroys evidence in eleven days?

X Corp has proven they will:

- Refuse to act on copyright infringement for two years
- Delete evidence of employee misconduct in eleven days
- Sanction victims while approving harassment of victims
- Coordinate corporate-wide evidence destruction during federal litigation

If they'll do this in a federal case with judicial oversight, what are they doing to advertisers without lawyers, without documentation, without the ability to fight back?

## E. The Court Cannot Grant Relief from Judgment While Defendant Destroys Evidence

The district court dismissed based on:

- Tone (that developed only after months of judicial inaction on emergency evidence)
- Page limits (raised sua sponte and applied inconsistently)
- Purported implausibility (while mathematical impossibilities remain unaddressed)

But the district court never addressed:

- Why cumulative counters can decrease (9,965→9,892)
- Why completion rates exceed 100% with zero delivery
- Why employees with personal animus access advertising accounts
- Why copyright infringement continues for two years while evidence destruction takes eleven days

**The Legal Impossibility**: A court cannot dismiss for insufficient evidence when the defendant is actively destroying the evidence during litigation.

The proper sequence is:

1. Stop the evidence destruction
2. Impose sanctions for destruction
3. Apply adverse inference
4. THEN determine if claims are plausible

The district court inverted this: dismissed first, allowed evidence destruction during post-judgment proceedings. This sequence denies due process.

## F. The Judicial Inconsistency Requires Relief from Judgment

The district court's sua sponte interventions reveal a pattern:

**When Helping Defendant:**

- Raised page limit argument Defendant never raised (September 22, 2025)
- Acted within three days to strike motion (September 22, 2025)
- Denied leave to exceed within one day (September 25, 2025)
- Dismissed for tone without addressing mathematical evidence

**When Addressing Plaintiff's Evidence:**

- Eleven days of silence on compliant motion (September 27-October 13)
- Months of silence on emergency preliminary injunction
- Never addressed mathematical impossibilities
- Never addressed why 9,965 > 9,892 remains unresolved

**The Legal Principle**: A judge cannot selectively raise arguments for one party while remaining silent on the other party's evidence. This violates the fundamental requirement of neutrality.

If the court can sua sponte raise page limits for Defendant, why can't it sua sponte recognize that cumulative counters cannot decrease? If the court can sua sponte strike motions for procedural defects, why can't it sua sponte recognize evidence spoliation?

**The Answer**: Because one helps Defendant and one helps Plaintiff.

## G. The "Legal Advice" Double Standard

The court system maintains strict prohibition on providing legal advice to pro se litigants:

**What Court Staff Say**: "We cannot tell you about page limits, filing procedures, or requirements—that would be legal advice. Consult an attorney."

**What the District Court Did**: Sua sponte identified page limit defect Defendant had not raised, acted on it before Defendant could respond, and eliminated Plaintiff's fraud evidence based on this court-initiated procedural defense.

**The Equivalency**: If telling a pro se litigant "your motion exceeds page limits" is legal advice they cannot provide, then sua sponte striking a motion for exceeding page limits IS legal advice provided to the opponent.

The court effectively told Defendant: "Here's a defense you didn't raise. I'll enforce it for you before you even have to respond."

**The Constitutional Problem**: Pro se litigants are denied information about procedures (claimed to be "legal advice"), while courts sua sponte provide procedural defenses to represented parties. This creates a structural advantage for represented parties that violates equal protection and due process.

Either:

1. Courts can sua sponte enforce procedures (in which case pro se litigants deserve procedural guidance), OR
2. Courts cannot sua sponte enforce procedures (in which case the district court's actions were improper)

The court cannot maintain both positions simultaneously.

# IV. THE IMPOSSIBLE DEFENSES: X CORP'S MUTUALLY EXCLUSIVE POSITIONS

X Corp faces an insurmountable logical trap. Every potential defense to the spoliation allegation requires admitting fraud, incompetence, or perjury.

## The Account Identity Trap

**If X Corp Claims: "These weren't employee accounts"**

THEN X Corp must explain:

- How non-employee accounts appear in internal activity logs with "Modified By" entries
- How non-employees accessed Plaintiff's advertising account backend systems
- Why X Corp's security is so weak that random users who dislike an advertiser can access and modify their campaigns
- How this isn't a massive security breach affecting every advertiser on the platform
- Why they renamed these specific "non-employee" accounts 11 days after federal court identification

- Why they didn't report this "security breach" to Plaintiff or authorities

**Result**: Admitting catastrophic platform-wide security failure that makes every advertiser a victim of potential manipulation by any user with a grudge. This creates liability to millions of advertisers and potential SEC violations for misrepresenting platform security.

**If X Corp Claims: "These were employee accounts"**

THEN X Corp must explain:

- Why employees with personal animus (blocking Plaintiff) had access to his advertising account
- Why employee modifications generated mathematically impossible metrics
- Why they renamed employee accounts to hide them from federal litigation
- Why they erased employee names from activity logs
- Why employees charged Plaintiff for fraudulent impressions and clicks

**Result**: Admits the systematic fraud Plaintiff alleged and the deliberate spoliation to conceal it.

**If X Corp Claims: "These were contractor or third-party support accounts"**

THEN X Corp must explain:

- Why contractors/third-parties are granted access to advertiser accounts without advertiser consent
- Why these "contractors" had Plaintiff personally blocked on social media while professionally accessing his account
- Why X Corp renames contractor accounts during federal litigation
- Why X Corp's Answer claimed lack of knowledge about platform operations if they control contractor access
- How this doesn't constitute fraud (billing for "X Corp services" while using unauthorized third parties)

**Result**: Admits unauthorized access, fraudulent billing, and spoliation.

## The "No Defense" Position

**X Corp's Current Position: Silence**

By saying nothing, X Corp:

- Allows the spoliation to speak for itself (consciousness of guilt)
- Cannot defend against adverse inference
- Proves they have no innocent explanation
- Demonstrates the renaming was intentional evidence destruction

**Result**: Default judgment on all spoliation findings.

## The Mathematical Certainty

Here's what we know with mathematical certainty:

1. **Fact**: These accounts appear in Plaintiff's internal activity logs
2. **Fact**: Activity logs are internal X Corp systems, not public-facing
3. **Fact**: These accounts show "Modified By" entries for Plaintiff's campaigns
4. **Fact**: These accounts were renamed exactly 11 days after federal court identification
5. **Fact**: Activity logs showing their names were subsequently erased
6. **Fact**: Other employee accounts visible in same activity logs were NOT renamed
7. **Fact**: Only accounts showing personal animus + professional access were renamed

**Conclusion**: These were employee accounts, they had improper access, they generated fraudulent charges, X Corp renamed them during litigation to destroy evidence, and X Corp simultaneously erased the logs to maximize concealment.

## The Software Development Reality That Destroys All "Glitch" Defenses

X Corp cannot claim these mathematical impossibilities are "technical glitches" or "bugs" because such claims are incompatible with basic software development practices at enterprise scale.

**The Production Code Reality:**

At X Corp's scale—billions in revenue, millions of advertisers, years of mature platform operation—code reaching production has passed through:

1. **Automated Testing**: Unit tests verify that cumulative counters only increment, never decrement. If code allowed 9,965 to become 9,892, automated tests would fail before deployment.

2. **Code Review**: Multiple senior engineers review every change to billing systems. No engineer approves code that makes arithmetic impossible.

3. **Staging Environment**: All code runs in staging environments identical to production. Billing anomalies get caught before reaching live systems.

4. **Real-Time Monitoring**: Production systems have automated monitoring that alerts engineers immediately when metrics behave impossibly. If counters decreased, alarms would trigger within seconds.

5. **Immediate Rollback**: When bugs reach production, they get rolled back within hours—especially billing bugs that affect revenue and legal liability.

## The Programmer's Obsession:

Programmers are obsessively focused on eliminating bugs, particularly in billing systems where:

- Legal liability attaches to billing errors
- Revenue depends on accurate metrics
- Advertiser trust requires reliable data
- SEC scrutiny examines revenue reporting (for public companies)

**The fundamental principle**: If a feature has unfixable bugs, you disable the feature and work on it in development until it works correctly. You don't leave broken billing code in production for years while continuing to charge customers.

## The Impossibility of "Accidental" Arithmetic Failures:

For a cumulative counter to decrease (9,965 → 9,892), the code would need to execute a decrement operation:

impressions -= 73 // Decrease by 73

This cannot happen "accidentally" because:

- Increment operators (+=) don't randomly become decrement operators (-=)
- If such a bug existed, it would affect ALL campaigns, not just Plaintiff's
- Selective occurrence proves intentional manipulation, not systematic bug

For completion rate to show 112.80% with 0% delivery requires:

completion = (delivered / total) * 100
// To get 112.80%: delivered > total
// To get 0% delivery: delivered = 0
// These cannot coexist unless fields are manipulated independently

This isn't a bug—it's evidence that completion percentage and delivery metrics are stored separately and were manipulated independently to generate billing charges while showing zero actual delivery.

## X Corp's Impossible Position:

Defendant cannot simultaneously claim:

1. "Our platform is sophisticated enough to justify billion-dollar valuation and handle millions of advertisers"
2. "Our platform has bugs that make basic arithmetic impossible and we can't fix them for years"

**These positions are mutually exclusive.**

**The Legal Impossibility of the "Glitch" Defense:**

If X Corp claims these are "technical glitches," they must admit:

- Their testing environment doesn't test billing functions (fraud)
- Their monitoring doesn't catch billing errors (negligence)
- Their code review doesn't catch impossible arithmetic (incompetence)
- They deploy billing changes without testing (recklessness)
- They leave billing bugs unfixed for years while knowing about them (fraud)
- **Their metrics contradict third-party verification systems**: Plaintiff's Google Analytics tracking shows actual traffic volumes that directly contradict X Corp's billing claims, proving the discrepancies are not "glitches" but systematic fraud

**Every admission creates massive liability to every advertiser who ever used their platform.**

**The Binary Choice:**

**If intentional manipulation**: Fraud, criminal liability, punitive damages

**If "glitches"**:

- Refund every advertiser for unreliable billing
- SEC violations for material misrepresentation of systems
- Negligence for failing to fix known billing errors
- Breach of contract for charging based on impossible metrics

**If ignorance**:

- Then how did legal counsel know to rename the specific accounts in 11 days?
- Then why do activity logs show specific employee names?
- Then why the surgical deletion of only accounts proving fraud?
- Ignorance of billing systems contradicts sophisticated evidence destruction

**The Timeline Proves Knowledge:**

X Corp cannot claim:

- "We don't understand our billing systems" (claimed ignorance in Answer)

While simultaneously demonstrating:

- Read federal court filing within days
- Identified specific threatening accounts
- Coordinated Legal→Corporate→IT response
- Renamed accounts to break documentary evidence
- Erased activity logs to maximize concealment
- Executed all actions in 11 days

**This level of coordination proves detailed knowledge of exactly which evidence proved fraud and why it threatened them.**

## The "Unauthorized Access" Defense Creates Worse Liability

**If X Corp Claims These Weren't Employee Accounts:**

Then X Corp must explain a series of impossibilities that create even greater liability than admitting employee fraud.

**The "Hacker" Scenario X Corp Cannot Defend**

**If these were "unauthorized users" or "hackers" accessing Plaintiff's account, then:**

**Impossibility 1: X Corp Allowed Hackers to Continue Operating**

After discovering "unauthorized access" (when Plaintiff filed the October 2 motion identifying these accounts), X Corp's response was to:

- **NOT** report the security breach to Plaintiff
- **NOT** notify law enforcement
- **NOT** file incident reports
- **NOT** alert other advertisers of platform vulnerability
- **INSTEAD**: Rename the "hacker" accounts to let them continue operating

**This makes no sense.** If you discover hackers in your system, you don't help them hide by renaming their accounts.

**Impossibility 2: The World's Most Boring Hacker**

X Corp must explain why a "hacker" who gained unauthorized access to advertising accounts would:

- Generate fake impressions and clicks **that look legitimate**
- Carefully manipulate metrics to appear as if campaigns were running properly
- Create mathematical impossibilities (9,965 → 9,892) that require sophisticated understanding of the billing system

- Make completion rates show 112.80% while actual delivery shows 0%
- **Ensure the surface appearance suggested campaigns were working as intended**

**What would a real hacker do?**

- Steal credit card information
- Drain advertising budgets completely
- Create obviously fraudulent campaigns
- Access as many accounts as possible for maximum theft
- Leave traces that get them caught
- **NOT** carefully emulate legitimate campaign performance

**The Absurdity:** X Corp asks this Court to believe a hacker gained access to advertising systems and used that access to... make campaigns LOOK like they were working properly while subtly manipulating underlying metrics in ways victims wouldn't notice without obsessive documentation.

**That's not hacking. That's employee fraud designed to avoid detection.**

**Impossibility 3: The Selective Metric Manipulation**

X Corp's own data shows:

- Impressions: Manipulated (backwards traveling counters)
- Clicks: Manipulated (impossible completion rates)
- Retweets: **NOT manipulated** (can't hide retweets because they're publicly visible)
- Likes: Potentially manipulated (not publicly viewable in bulk)

**Why would a "hacker" care about which metrics are publicly auditable?**

**They wouldn't. But an employee committing fraud would** - because they know:

- Retweets can be verified (leave them alone or keep them proportional)
- Likes can't be easily verified (manipulate as needed)
- Impressions can't be verified by users (manipulate freely)
- Clicks can't be verified by users (manipulate freely)

**This selective manipulation proves insider knowledge of what can and cannot be hidden from users.**

**Impossibility 4: The Activity Log Appearance**

"Hackers" don't appear in internal activity logs with employee naming conventions like:

- "Ryan Offenloch X"
- "Sushant Arora"
- "Mighty Mouf"

They appear as:

- Suspicious IP addresses
- Unknown user agents
- System anomalies
- Security alerts

**The fact these accounts appeared in activity logs WITH EMPLOYEE-STYLE NAMES proves they had legitimate system access, not unauthorized hacking.**

**Impossibility 5: X Corp's Response Proves They Knew These Were Employees**

When Plaintiff identified these accounts on October 2, X Corp:

- Read the filing within days (proven by response speed)
- Identified which specific accounts were threatened
- Coordinated Legal → Corporate → IT response
- Renamed accounts to break documentary evidence
- Erased logs in three progressive stages

**If these were "hackers," X Corp would:**

- Lock the accounts immediately
- Preserve evidence for law enforcement
- Notify Plaintiff of the breach
- File reports with relevant authorities
- Potentially notify SEC (material security breach)

**Instead, X Corp destroyed evidence and hid the "hackers."**

**Why?** Because they weren't hackers. They were employees, and X Corp knew it.

**The Legal Trap: Every Defense Creates Massive Liability**

**Defense 1: "These were employee accounts"** → Admits employee fraud, personal animus, improper access → Admits spoliation to hide employee misconduct → Proves Plaintiff's entire case

**Defense 2: "These were unauthorized hackers"** → Admits catastrophic security failure → Admits X Corp helped hackers hide by renaming accounts → Creates liability to every advertiser (platform is insecure) → Creates SEC liability (material misrepresentation of security) → Creates criminal liability (failing to report security breach) → Proves systematic billing fraud (sophisticated metric manipulation)

**Defense 3: "These were contractors or third-party support"** → Admits unauthorized access to advertiser accounts → Admits fraudulent billing (charging for X Corp services while using

third parties) → Creates liability for contractor misconduct → Doesn't explain personal animus (blocking)

**Defense 4: "We don't know who they were"** → Then why rename them in 11 days? → Then why erase logs in three stages? → Then why target ONLY these accounts? → Ignorance contradicts sophisticated evidence destruction

**There is no Defense 5 where X Corp's conduct makes sense.**

**The Question That Destroys All Defenses**

**Your Honor, please ask X Corp:**

"If you discovered on October 2, 2025 that unauthorized users were accessing advertiser accounts and manipulating billing metrics, why did you rename those accounts to hide them rather than report the security breach and preserve evidence?"

**Any honest answer proves:**

- They weren't unauthorized users
- They were employees
- X Corp destroyed evidence to hide employee fraud
- X Corp's renaming proves consciousness of guilt

**No answer at all proves:** Consciousness of guilt through silence

**The "Least Sophisticated Development Team" Argument**

For these to be "glitches" or "system errors" as X Corp might claim, X Corp must admit:

Their development team is so incompetent that:

- Cumulative counters decrease (violates basic programming)
- Completion rates exceed 100% with zero delivery (violates mathematics)
- Retweet percentages differ from impression sources (violates internal consistency)
- Activity logs show employee names for "unauthorized access" (violates security protocols)
- These bugs persist for years in production (violates all quality control)

**Yet simultaneously, their team is so sophisticated that:**

- They carefully manipulate only non-verifiable metrics
- They maintain surface appearance of proper campaign performance
- They create mathematical impossibilities that require deep system knowledge
- They can rename accounts and erase logs in coordinated three-stage operations

**These positions are mutually exclusive.**

**You can't be both "too incompetent to fix basic bugs" and "sophisticated enough to execute coordinated evidence destruction."**

**Conclusion: The Defense That Doesn't Exist**

X Corp has no defense that doesn't create equal or greater liability:

**Employee fraud** → Proves Plaintiff's case **Unauthorized access** → Catastrophic security failure affecting millions **System glitches** → Incompetence contradicted by sophisticated cover-up **Ignorance** → Contradicted by 11-day evidence destruction

**The only consistent explanation:** Employees with personal animus accessed and manipulated Plaintiff's advertising account, X Corp discovered this when Plaintiff filed proof on October 2, and X Corp destroyed evidence to avoid liability.

**Everything else is impossible.**

If X Corp argues these weren't employee accounts, they must admit their platform allows:

- Random users to access other users' advertising accounts
- Random users to modify campaigns they don't own
- Random users to generate charges against advertisers
- Random users to appear in internal activity logs with modification privileges

**This admission creates liability to every advertiser who asks**: "How do I know random users didn't manipulate MY campaigns? How do I know MY metrics are real? Why should I ever advertise on a platform where anyone can access and modify my account?"

**This admission also creates securities fraud liability**: X Corp is publicly traded (was, before going private). If their platform has this security flaw, they misrepresented platform integrity to investors and advertisers.

## The Timing Destroys All Defenses

No matter which defense X Corp attempts, they cannot escape the timing detailed in Section II.C above: two years of claimed inability to remove copyrighted content versus eleven days to coordinate multi-department evidence destruction. This comparison alone proves capability, selective enforcement, sophisticated monitoring, and deliberate choice.

## The Questions That Have No Answers

**Question**: "If your platform is so secure that only employees can access internal advertising account modification systems, why did you rename employee accounts during federal litigation?" **Answer**: [Must admit spoliation]

**Question**: "If your platform is so insecure that non-employees can access advertising accounts, why hasn't this been disclosed to advertisers and why weren't these 'security breaches' reported?" **Answer**: [Must admit fraud or massive negligence]

**Question**: "If you don't know whether these were employees or not, why did you rename them exactly 11 days after they were identified in federal court?" **Answer**: [Admits they knew exactly who they were and what they proved]

**Question**: "If this was routine maintenance or policy enforcement, why do other employee accounts from the same activity logs still have their original handles?" **Answer**: [Admits selective targeting proves intent]

## The Evidence Standard This Case Now Meets

After spoliation, this case has stronger evidence than most cases AFTER full discovery. The mathematical impossibilities, activity logs, screenshots, timeline documentation, and proof of coordinated concealment detailed throughout this motion represent evidence quality that most cases never achieve even after years of discovery.

**Most importantly, the spoliation itself is better evidence than most smoking guns** because it proves X Corp: (1) knew these accounts were significant, (2) knew they proved fraud, (3) coordinated sophisticated concealment, (4) did this during active litigation, and (5) did this in response to federal court filing.

## Why This Court Cannot Ignore This

Judges dismiss cases for "implausibility" when plaintiffs make allegations without proof. But this case has mathematical proof, documentary proof, timeline proof, comparative proof, and spoliation proof all detailed above. **If this case is "implausible," then no case is plausible.**

The district court dismissed based on "tone" and "page limits" while ignoring mathematical impossibilities, active evidence destruction, and comparative timelines proving selective enforcement. **This isn't judicial discretion. This is judicial facilitation of fraud.**

Every day this Court allows the dismissal to stand while X Corp continues destroying evidence tells corporations: "Destroy evidence quickly enough and we'll help you get away with it."

## EXHIBIT: THE PLACEMENT DATA THAT PROVES SYSTEMATIC SUPPRESSION

**During preparation of this motion, Plaintiff exported campaign data directly from X Corp's advertising platform using X Corp's own export function. The resulting file is attached as Exhibit [X].**

**What This File Proves Beyond Any Dispute:**

This is not Plaintiff's analysis. This is not Plaintiff's interpretation. **This is X Corp's own data, exported from X Corp's own systems, using X Corp's own file naming conventions and structure.**

**The Data Shows:**

- 18 campaigns spanning June 12, 2023 to October 14, 2025
- Every single campaign has TWO placement rows: "Twitter" and "Twitter Audience Platform"
- **Twitter Audience Platform: ZERO impressions across all 18 campaigns**
- **Twitter Audience Platform: ZERO spend across all 18 campaigns**
- **Twitter Audience Platform: ZERO results across all 18 campaigns**

**The Mathematical Impossibility:**

100% failure rate across 18 campaigns over 2+ years is not a "glitch" - it is **systematic suppression**.

**Why X Corp Cannot Claim This Data Is Compromised:**

1. **File Origin**: Exported directly from X Corp's advertising dashboard using their official export function
2. **File Structure**: Uses X Corp's proprietary naming conventions and data structure
3. **File Integrity**: Contains X Corp's internal campaign IDs, ad group IDs, and system metadata
4. **Perfect Consistency**: Shows detailed metrics for "Twitter" placement while showing exactly ZERO for "Twitter Audience Platform" placement across every single campaign

**The Pattern That Cannot Be Explained Away:**

If Plaintiff examines individual campaigns in isolation, some metrics appear normal. But when viewed systematically across all campaigns:

- Different ad types ("player," "Untitled ad," "summary_large_image") show inconsistent patterns
- Campaigns with identical objectives show vastly different delivery rates
- The categorizations don't align with themselves
- **The only perfect consistency is Twitter Audience Platform delivering exactly ZERO across all campaigns**

**What This Proves About Intent:**

X Corp's platform can identify and deliver impressions on "Twitter" placement. The same campaigns, running simultaneously, show ZERO delivery on "Twitter Audience Platform" placement.

**This is not technical failure. This is targeted suppression.**

**The Operational Reality This Exposes:**

The pattern suggests multiple actors without central coordination:

- Different handlers/operators working different aspects of suppression
- No single sophisticated architect ensuring consistency
- Multiple people making decisions without understanding Plaintiff would document everything
- A system that works through informal coordination rather than formal policy

**This decentralized suppression is MORE damning than centralized policy because it proves:**

1. The suppression is so normalized it doesn't require formal authorization
2. Multiple X Corp personnel understood Plaintiff was a target
3. No single person checked whether the suppression would leave obvious traces
4. The assumption was Plaintiff would never export and analyze placement-level data

**X Corp's Impossible Position:**

**If they claim the file is inaccurate**: Then their own export function produces fraudulent data, creating liability to every advertiser who relies on exported data for business decisions.

**If they claim this is "normal"**: Then every advertiser should demand refunds for Twitter Audience Platform placement that delivered zero impressions.

**If they claim this is specific to Plaintiff**: Then they admit targeted suppression - which proves Plaintiff's entire case about systematic fraud against him specifically.

**If they claim "technical issues"**: Then why does it affect ONLY Audience Platform placement and ONLY for Plaintiff, with 100% consistency across 2+ years?

**The Data Cannot Lie:**

- Twitter Placement Total: 618,050 impressions, $1,109.57 spend, 3,052 results
- Audience Platform Total: 0 impressions, $0.00 spend, 0 results

**Across 18 campaigns. Over 2+ years. 100% failure rate on one placement type.**

**This is not a bug. This is proof of systematic, intentional suppression of Plaintiff's content.**

**Why This Matters For Spoliation:**

When X Corp discovered on October 2 that Plaintiff had identified employee accounts with access to his advertising systems, they knew Plaintiff had the sophistication to analyze their data at this level.

**The 11-day evidence destruction wasn't panic about one filing. It was panic about what Plaintiff might discover next.**

**And they were right to panic. Because Plaintiff did discover it. And exported it. And now it's in the permanent federal court record.**

**Question 1**: "Who authorized the renaming of @AntSocializer and @Ryanmh_X eleven days after they were identified in federal court filings?"

**If they answer**: Admits renaming was deliberate (sophisticated spoliation) **If they claim users changed their own handles**: Admits these were user accounts, not employee accounts (contradicts their Answer) **If they claim automated system**: Must explain why only these two accounts, why this timing, why no other employee accounts were renamed **If they refuse**: Consciousness of guilt

**Question 2**: "If these were random user accounts that users themselves renamed, why do you have the authority and technical ability to track and link them to their new handles, yet you maintained for two years that you couldn't track or remove copyrighted content?"

**Any answer creates impossibility**:

- If they can track renamed accounts → they have technical capability they denied having
- If they can't track renamed accounts → they can't explain how Plaintiff found the identical posts under new handles
- If these were employee accounts → admits the fraud Plaintiff alleged

**Question 3**: "Why did you rename the two accounts that showed personal animus (blocking) plus professional access, while leaving other employee accounts with their original handles unchanged?"

**Any answer proves**: Targeted evidence manipulation to break the documentary trail showing improper motive

**Question 4**: "The posts under the new account handles are identical to the posts under @AntSocializer and @Ryanmh_X. If these are different accounts, how do they have identical post histories? If they're the same accounts, why did you rename them eleven days after federal court identification?"

**Cannot answer without admitting**: Either same accounts were renamed (deliberate spoliation) or X Corp's platform duplicates posts across accounts (systemic fraud)

**Question 5**: "How is calling Plaintiff's wife a 'confirmed sex worker' not hateful conduct, while Plaintiff's response to harassment is?"

**Any answer proves**: Selective enforcement to silence Plaintiff while protecting attackers

**Question 6**: "If the activity logs showing these employees were wrong or mistaken, why didn't you correct them during the two years of litigation before renaming the accounts?"

**Cannot answer without admitting**: Either the logs were accurate (proving fraud) or X Corp maintained false records for two years (separate violation)

**Question 7**: "Why was the Ad History Log altered from showing specific employee names to generic placeholders, and then to completely blank entries, coinciding exactly with the timeframe when you renamed the accounts identified in Plaintiff's court filing?"

**Any answer proves**: Coordinated, multi-system evidence manipulation across account handles AND internal logging systems

**Question 8**: "When Plaintiff clicks on the system-generated account tags from posts made *after* the renaming, why do different account handles appear with identical post histories to the original @AntSocializer and @Ryanmh_X accounts?"

**Cannot answer without admitting**: The accounts were renamed to break Plaintiff's documentary evidence while maintaining posts to avoid obvious deletion

# IX. REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court:

**1. Order Adverse Inference Instruction**

Direct that any subsequent finder of fact must be instructed to assume:

- @AntSocializer and @Ryanmh_X were X Corp employee accounts
- They improperly accessed Plaintiff's advertising account
- They manipulated campaigns with personal animus
- They generated fraudulent charges
- Their deletion proves X Corp's consciousness of guilt
- All of Plaintiff's allegations about these accounts are true

**2. Impose Monetary Sanctions**

Order X Corp to pay:

- Plaintiff's costs for this motion
- Plaintiff's costs for discovery now impossible due to spoliation

- Punitive sanctions sufficient to deter future evidence destruction
- Amount to be determined by this Court

**3. Refer for Criminal Investigation**

Refer this matter to the United States Attorney for the Western District of Texas for investigation of potential violations of 18 U.S.C. § 1519 (destruction of evidence in federal matter)

**4. Grant Relief from Judgment Under Rule 60(b)**

Set aside the dismissal because:

- Defendant is actively destroying evidence of the fraud alleged
- District court's sua sponte procedural interventions denied due process
- Mathematical impossibilities remain unaddressed
- Dismissal for tone ignores judicial creation of that tone through inaction
- New evidence of escalating spoliation (log erasure) constitutes fraud, misrepresentation, or misconduct under Rule 60(b)(3)

**5. Order Immediate Preservation**

Direct X Corp to immediately preserve all:

- Employee access logs for Plaintiff's advertising account
- Internal communications about this litigation
- Policies regarding employee access to advertiser accounts
- Records of account deletions in October 2025
- All versions of Ad History Logs showing modifications
- Moderation decisions regarding Brandon Schwartz's posts
- All evidence relevant to this litigation

**6. Set Case for Further Proceedings**

Schedule appropriate proceedings to address:

- X Corp's demonstrated capabilities (eleven-day deletion) that destroy their claimed defenses (two-year inability)
- Application of adverse inference to all destroyed evidence
- Mathematical impossibilities requiring explanation
- Proper standards for sua sponte procedural interventions

# X. CONCLUSION

This Court confronts evidence destruction committed during active federal litigation with mathematical precision: **Eleven days** from court filing to account deletion, **two years** unable to

remove copyrighted content, **surgical targeting** of only accounts showing personal animus plus professional access, and **escalating concealment** through systematic erasure of internal activity logs.

The inference is inescapable: X Corp destroyed evidence proving employee misconduct through coordinated action by legal counsel who received and read Plaintiff's court filing.

A defendant cannot destroy evidence, claim the plaintiff has insufficient evidence, and win dismissal based on that insufficiency. Due process requires courts stop evidence destruction first, then adjudicate claims. The district court did the opposite: dismissed while evidence destruction occurred.

This Court must grant relief from judgment, impose sanctions, and ensure that evidence destruction during federal litigation has consequences.

Respectfully submitted,

_____

Justin Riddle Plaintiff, Pro Se

402.813.2156

Dated: October 17, 2025